UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

ADT LLC; and The ADT Security
Corporation,

      Plaintiffs,

        v.

                              Case No. 1:20-cv-23391

Vivint Smart Home, Inc. f/k/a Mosaic
Acquisition Corp.; and Legacy Vivint Smart
Home, Inc. f/k/a Vivint Smart Home, Inc.

      Defendant.

## COMPLAINT

    Plaintiffs ADT LLC and The ADT Security Corporation (together "ADT"), bring this action for damages, punitive damages, attorneys' fees and costs against Defendants Vivint Smart Home, Inc. f/k/a Mosaic Acquisition Corp. and Legacy Vivint Smart Home, Inc. f/k/a Vivint Smart Home Inc. (together "Vivint"), and in support allege as follows:

## SUMMARY OF THE CASE

    1.    This case is about Vivint's false and misleading sales practices on the doorsteps and in the homes of hundreds—if not thousands—of ADT customers across the country. Through well-rehearsed sales tactics, Vivint's sales representatives have misled scores of ADT customers into believing, among other things: (1) that the Vivint agent is there to simply "update" or "upgrade" the ADT customer's equipment, when in reality he or she is switching out the ADT system for Vivint; (2) that ADT has been bought out or is going out of business and that Vivint is taking over ADT accounts; and (3) that Vivint is a subcontractor, installer or is otherwise affiliated with or acting on behalf of ADT. These affiliation misrepresentations allow Vivint to freeride on

1

the goodwill of ADT, damage ADT's name, and lead ADT's customers to do business with Vivint under false pretenses, typically resulting in the ADT customer becoming bound into a multi-year contract with Vivint valued in the thousands of dollars that is impossible for the customer to extricate him or herself from once the customer has finally become aware of Vivint's deception. These practices violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the related common law of unfair competition. ADT seeks damages to remedy its loss of numerous customers (some known, some unknown) and the disruption of thousands of others since December 20, 2017; ADT's injuries to its goodwill and reputation; ADT's lost royalties from Vivint's unauthorized use of the ADT brand; Vivint's profits from its ill-gotten gains, ADT's attorneys' fees; and punitive damages to punish and deter Vivint from continuing to engage in its intentional conduct.

2.      Vivint is no stranger to these issues. On December 20, 2017, Vivint, Inc. (defendants' predecessor entity) and ADT settled a prior lawsuit brought by ADT against Vivint in this Court involving the exact same conduct by Vivint's sales agents: *ADT LLC & ADT US Holdings, Inc. v. Vivint, Inc.*, No. 9:17-cv-80432-DMM/DLB (S.D. Fla.). In that case, ADT presented evidence of over 900 reports of deceptive and misleading sales conduct over a four-year period (2013 to 2017). On the third day of trial, Vivint agreed to pay $10 Million to resolve those claims in exchange for a release and non-admission of liability. The settlement was supposed to end Vivint's practice of false and deceptive sales conduct once and for all.

3.      It did not. In the years since, Vivint's conduct has continued unabated, and in some ways its behavior has grown even more reprehensible. ADT has already received over 250 reports of additional deceptive sales encounters by Vivint representatives from ADT customers throughout the United States, with over a dozen occurring in the state of Florida. In one highly representative encounter caught on a customer's Ring® home video camera, a Vivint Regional Manager (who is

also mentoring a Vivint trainee) makes a series of false and misleading representations to homeowners and refuses to leave their doorstep until the interaction turns confrontational. Within that short interaction, the Vivint Regional Manager made numerous misleading, deceptive and/or outright false statements, such as stating that: (1) he was sent by the police; (2) he was not selling anything and instead was only there to upgrade their equipment; and (3) ADT had been bought out and that was the reason for the visit. The Regional Manager became increasingly abrasive with the homeowner throughout the interaction until the homeowner became agitated and came outside to ensure that the Regional Manager and the trainee left the homeowner's property.

4.      Vivint's deceptive sales practices and claims of affiliation with ADT highlighted in this encounter are not atypical of the approximate 250 other complaints ADT has received from its customers about Vivint since December 20, 2017, which ADT incorporates by reference as if set forth fully herein. *See* **Exhibit 1**, Spreadsheet of Deceptive Sales Reports about Vivint from ADT Customers from December 20, 2017 to August 12, 2020. Vivint's conduct has even continued during the Covid-19 global pandemic. Indeed, within the last two months, customers have complained that Vivint salesmen continue to commit deceptive sales practices on customers' doorsteps without regard to no-solicitation signs or the appropriate health precautions needed to protect homeowners during these uncertain times.

5.      Pandemic or not, there is no indication Vivint intends to stop its deceptive sales practices, and ADT anticipates by the time of trial the volume of reports about deceptive sales practices by Vivint will be even more numerous.

6.      Ironically, Vivint recognizes the severe damage its conduct causes because Vivint has sued other competitors for deceptive sales tactics against Vivint's customers. Vivint has filed dozens of separate lawsuits against competitors and competitors' sales representatives in the past

3

several years premised on these exact same claims. Vivint has established a "slam" department—the industry term for the type of deceptive sales practices and misrepresentations of affiliation at issue here—to investigate and prosecute incidents that occur to Vivint customers. Thus, hypocritically, Vivint takes deceptive sales practices seriously only when they impact Vivint customers, yet refuses to correct the longstanding history of deceptive sales conduct within its sales force.

7.     Vivint also recognizes that the number of *reported* incidents about deceptive sales practices is only the tip of the iceberg of customers actually subject to deceptive sales. For every report of a deceptive sales incident, there are many more that go unreported—even if the customer ultimately cancels ADT's services or becomes so frustrated with ADT because of Vivint's practices that the customer stops paying for any alarm system. Indeed, in a past Lanham Act action Vivint brought against another competitor in the alarm industry, Vivint represented to the District of Utah that the fact that only 4% of deceived customers take the time to complain is so uncontroversial that it is capable of judicial notice. Vivint internal documents regarding consumer behavior confirm this "tip of the iceberg" concept.

8.     ADT has been fighting this problem for many years. The conduct not only harms ADT and its customers, it harms the entire industry by leading the consuming public to distrust home alarm providers—companies which make their keep by instilling a sense of security and trust in their customers.

9.     Vivint's engrained culture of deceptive sales practices is not unique to ADT customers. Other competitors and at least a dozen states' attorneys general have brought actions against Vivint for this exact same behavior over the past decade. To date, however, no punishment or financial consequence has been sufficient to stop Vivint from defrauding customers throughout

the United States.

10.     Because all regulatory and industry efforts—including ADT's prior lawsuit—have failed to curb Vivint's deceptive sales tactics, ADT seeks an award of punitive damages in an amount that will make it financially unprofitable for Vivint to continue this conduct.

## PARTIES

11.     Plaintiff The ADT Security Corporation, is a Delaware corporation with its principal place of business at 1501 Yamato Road, Boca Raton, Florida 33431. The ADT Security Corporation is a holding company that owns, *inter alia*, all ADT trademarks, including without limitation 21 ADT live word trademarks featuring the letters "A – D – T," registered in the United States Patent & Trademark Office that bear the registration numbers 3251836, 3352491, 710708, 710507, 3515266, 3511263, 3445423, 3909665, 3485321, 3421797, 1034716, 838956, 803247, 846966, 3348663, 3253804, 3445420, 3991449, 3335239, 3335298, and 3427081 ("ADT Trademarks"). The ADT Security Corporation is ultimately wholly owned by ADT Inc., a Delaware corporation whose common stock is traded on the New York Stock Exchange.

12.     Plaintiff ADT LLC is a Delaware limited liability company with its principal place of business at 1501 Yamato Road, Boca Raton, Florida 33431. ADT LLC is an operating company that runs the ADT alarm services business in the United States. ADT LLC uses the ADT Trademarks under license from The ADT Security Corporation. ADT LLC is owned by The ADT Security Corporation.

13.     Defendant Vivint Smart Home, Inc., formerly known as Mosaic Acquisition Corp., is a Delaware corporation with its principal place of business located at 4931 North 300 West, Provo Utah 84604. Vivint Smart Home, Inc. (f/k/a Mosaic Acquisition Corp.) was created on January 17, 2020 pursuant to an Agreement and Plan of Merger, dated September 15, 2019, by

and among Vivint Smart Home, Inc. (f/k/a Mosaic Acquisition Corp.), Maiden Merger Sub, Inc., and Legacy Vivint Smart Home, Inc. (f/k/a Vivint Smart Home, Inc.). Vivint Smart Home, Inc.'s (f/k/a Mosaic Acquisition Corp.) registered agent for service of process is The Corporate Trust Company, Corporation Trust Center 2109 Orange Street, Wilmington, Delaware, 19801.

14.     Vivint Smart Home, Inc. (f/k/a Mosaic Acquisition Corp.) is listed on the New York Stock exchange and currently has a market capitalization of $3.6 billion.

15.     On information and belief, following the January 17, 2020 merger, Defendant Vivint Smart Home, Inc. (f/k/a Mosaic Acquisition Corp.) has assumed liability or is otherwise liable as a successor for the tortious conduct committed by Legacy Vivint Smart Home, Inc. (formerly known as Vivint Smart Home, Inc.) and/or its employees prior to the merger.

16.     On information and belief, following the January 17, 2020 merger, employees of Legacy Vivint Smart Home, Inc. (formerly known as Vivint Smart Home, Inc.) became employees of Vivint Smart Home, Inc. (formerly known as Mosaic Acquisition Corp.).

17.     Defendant Legacy Vivint Smart Home, Inc., formerly known as Vivint Smart Home, Inc., is a Delaware corporation with its principal place of business located at 4931 North 300 West, Provo Utah 84604. On January 17, 2020 pursuant to an Agreement and Plan of Merger dated September 15, 2019, Legacy Vivint Smart Home Inc. (f/k/a Vivint Smart Home, Inc.) merged into Vivint Smart Home, Inc. (f/k/a Mosaic Acquisition Corp.). Upon information and belief, until the January 17, 2020 merger with Vivint Smart Home, Inc. (f/k/a Mosaic Acquisition Corp.), Legacy Vivint Smart Home, Inc. (f/k/a Vivint Smart Home, Inc.) employed the Vivint sales persons who generated and sold new accounts on behalf of Vivint. Legacy Vivint Smart Home, Inc. (f/k/a Vivint Smart Home, Inc.)'s registered agent for service of process is Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

4827-2072-9031

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to Section 1331 of Title 28 because it presents a federal question under Section 43 of the Lanham Act.

19.     This Court has supplemental jurisdiction over the state-law claims also asserted in this action pursuant to Section 1367(a) of Title 28.

20.     Venue lies in this District pursuant to Section 1391(b) of Title 28 because a substantial number of the events giving rise to the claims asserted in this Complaint occurred in this District and because Vivint is subject to the Court's personal jurisdiction in this District for committing tortious conduct purposefully directed at this District as described in Exhibit 1 and in this Complaint.

## OTHER FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

21.     ADT, founded in 1874, is the oldest, largest, and best-known provider of electronic security, automation and smart home services and equipment for homes and businesses in the United States.

22.     ADT provides security, automation, and smart-home services and equipment nationwide and is engaged in interstate commerce for the purposes of the Lanham Act.

23.     ADT's name and trademarks are registered with the United States Patent and Trademark Office.

24.     As a Florida resident, ADT is injured in Florida by Vivint's tortious activities.

25.     Vivint began selling and installing alarm systems under the name APX Alarm Security Solutions in 1999. APX rebranded itself as "Vivint" in 2011.

26.     Today, Vivint operates in most states, including Florida. Vivint is registered to do business in Florida with the Florida Department of State, Division of Corporations. A substantial

fraction of the violations that form the basis of this complaint occurred in Florida. At all times relevant to this Complaint, Vivint misled Florida consumers and engaged in the deceptive sales practices that are the subject of this civil action.

27.     Vivint and ADT are direct competitors in the security systems, automation and smart home markets. ADT and Vivint market and sell substantially similar goods made by the same suppliers through the same channels to the same target markets of residential consumers. The companies also provide substantially similar security monitoring services to their respective customers. ADT operates in each of the states in which Vivint sells and installs alarm systems.

28.     Vivint's sales agents target ADT customers in various ways, often by seeking houses with the distinctive ADT yard sign that ADT's customers post on their premises to deter burglars and trespassers.

29.     The complaints received by ADT show that Vivint's sales agents many times intentionally target older customers. Many complaining ADT customers are over the age of 65, are infirm, or have diminished mental capacities.

30.     Vivint's sales agents solicit ADT's customers in unannounced "cold" door-to-door sales visits to the customers' homes. At the beginning of these visits, and often throughout the sales encounter, the agents use deceptive sales pitches that are intended to mislead (and that do mislead) ADT's customers into believing that Vivint represents ADT, or that Vivint is affiliated with ADT, or that they are visiting at ADT's direction, or that they work for the companies that made the ADT alarm equipment installed in the customers' homes, or that ADT has otherwise blessed Vivint to work on ADT's behalf.

31.     Vivint's agents use these pitches to induce ADT customers to believe that they have an existing business relationship with the agents, to trust them, and to grant the agents entry into

their homes. Once inside, having won the customers' trust by this deception, the agents lead the customers to sign Vivint contracts and install Vivint alarm systems in the often mistaken belief that they are receiving new ADT equipment from ADT, an ADT affiliate, or an ADT successor, or that Vivint is assuming the ADT account, or that the customer has no choice but to permit the transaction to go forward if he or she wishes to continue to have operational alarm-monitoring services.

32.     Vivint's deceptive practices injure ADT by causing ADT's customers to listen to their deceptive sales pitches, allow Vivint's agents entry to their homes under false pretenses, sign Vivint contracts, uninstall their ADT alarm systems, replace these systems with Vivint's equipment, and terminate the customers' ADT contracts.

33.     Vivint, by falsely claiming an affiliation with ADT in its sales to consumers, further injures ADT by taking for itself the essential benefit of being an ADT affiliate without paying any royalty or other consideration to ADT for the claim of affiliation. This is a benefit for which hundreds of *licensed* ADT dealers pay substantial financial consideration to ADT. Vivint pays nothing by using ADT's name and brand for the benefit of Vivint, and Vivint does not abide by ADT's dealer guidelines in so misappropriating a right of affiliation with ADT.

34.     Vivint's false sales pitches also injure ADT's goodwill and reputation. Some customers are left with the false belief that ADT is out of business, that ADT has been acquired, that their ADT alarm systems are outdated and vulnerable to burglars, or that Vivint has taken over ADT accounts. Others mistakenly assume that Vivint had access to the private data the customers had entrusted to ADT, leaving them to question ADT's ability to safeguard their interests. Yet others understand the false pitch for what it is, but reconsider their ADT service because ADT is a target of scammers. In many ways the Vivint agents' false sales pitches damage ADT's goodwill

and reputation as a reliable provider of security, automation and smart home services. Some customers have reported ceasing all such services as a result of falling victim to these types of false and misleading practices. Some wrongly blame ADT for Vivint's conduct and never come to understand the lack of affiliation between Vivint and ADT.

35.    As a result of Vivint's deceptive practices, a number of ADT customers have confused Vivint's sales agents with ADT representatives, and as a result have unwittingly found themselves with Vivint's alarm systems installed in their homes, and with contractual obligations to both Vivint and ADT. In some instances, ADT has been required to send technicians to the deceived customers' houses to reinstall the removed ADT equipment at considerable expense to ADT. In others, the customers retained Vivint's systems and terminated their ADT contracts, often because Vivint makes it too cumbersome and time-consuming for the customer to end the Vivint service despite it being consummated through fraud. In some circumstances, Vivint requires customers to pay substantial contract termination fees without consideration that the customer's contract was acquired through false and deceptive means.

36.    Such practices violate statutory and common-law prohibitions against the use of false and deceptive statements in commerce. They also violate the security systems industry's own Code of Ethics and Standards of Conduct, which requires that companies "truthfully and clearly identify themselves by name . . . at the initiation of a sales presentation, without request from the consumer," and which prohibits as common deceptive sales practices, *inter alia*, (a) any claim that a competitor is going out of business, (b) any claim that the company is taking over the competitor's accounts, or (c) any offer of an "update" or "upgrade" of an existing system that requires the execution of a contract with a new security services provider.

37.     Vivint knows these types of sales practices are contrary to the law and established industry standards, yet it knowingly continues such conduct. Vivint has not taken appropriate action to curb such conduct by its agents. Some of the worst actors continue to be employed by Vivint despite numerous reports of deceptive conduct by those salespeople. Vivint does not terminate or appropriately discipline such agents because they bring substantial revenue streams to Vivint. Instead, Vivint engages in window dressing: providing half-hearted discouragement of such practices at the initial onboarding of new salespeople and promulgating empty-shell written policies purportedly prohibiting the practices. In reality, Vivint management condones and even teaches such deceptive sales tactics. The individuals knowledgeable of how to successfully pull off deceptive sales practices are promoted in the sales force and then teach such tactics to new recruits as they are brought in each year. The cycle repeats in contagious fashion.

38.     Occasionally, Vivint "fines" salespeople for committing deceptive sales, but often that is only when a competitor like ADT gets involved and aids the customer in seeking resolution with Vivint. On information and belief, these "fines" are not always actually collected from the representative, and sometimes they are merely deducted from a salesperson's incentive bonuses for meeting certain sales thresholds. In other words, and also on information and belief, the fines are paid from the very money the agent gains from using such deceptive sales practices in the first place. It is profitable to the agent (and Vivint) because the salesperson gets "caught" on many fewer occasions than the conduct actually occurs. In any event, the "fines" levied are not sufficient to deter repetitive deceptive sales conduct by Vivint salespeople. Some of the worst offenders continue to be employed by Vivint, and some have been elevated into managerial positions.

39.     Upon information and belief, Vivint's own internal records will show how widespread and common its deceptive sales practices are. Many ADT customers subject to

4827-2072-9031

deceptive sales practices by Vivint never complain to ADT. Rather, upon learning of Vivint's fraud, they complain to Vivint. ADT therefore does not have any record of such conduct. Vivint is in exclusive possession and control of such records.

40.     Vivint has previously attempted to cast ADT's efforts to reign in deceptive sales practices as some type of anti-competitive behavior by ADT. Nothing could be further from the truth. ADT simply wants this conduct to stop once and for all. Vivint is perennially one of the worst offenders in the industry with respect to this type of conduct. And ADT is not Vivint's only victim: Vivint commits the same deceptive sales practices which ADT complains about here to many other service providers in the industry. Vivint has built itself into the number two residential alarm services provider in the United States based in part on these practices. Such profits should be disgorged to the full extent permitted by the Lanham Act and related common law.

41.     The constant need to assist ADT customers in fixing problems resulting from Vivint's deceptive sales conduct imposes a substantial cost on ADT to maintain and train customer service agents appropriately. In effect, ADT is forced to constantly police Vivint's salespeople. Vivint is also liable for these costs and damages.

42.     As soon as a month after Vivint agreed to pay ADT $10 million to resolve claims of deceptive sales conduct spanning from 2013 to December 2017, in January 2018, ADT continued to receive reports from customers calling to complain about visits by Vivint sales agents using the same deceptive sales practices and claims of affiliation with ADT.

43.     In the approximately two-and-a-half-year span since the December 2017 settlement, ADT has received over 250 reports of additional deceptive sales conduct by Vivint agents. On information and belief, dozens (if not hundreds or thousands) of other customers have complained directly to Vivint about this conduct.

44.     Vivint operates on a seasonal sales model. Each year, Vivint hires a fresh group of students and transports them to sales locations across the country. As a result, Vivint's sales occur mostly in the summer months.

45.     Alarmed by the ongoing rate of Vivint's conduct, ADT engaged Vivint informally through counsel in the fall and winter of 2019 to express its concerns regarding Vivint's ongoing conduct. Vivint assured ADT that Vivint was implementing new internal controls to detect agents' use of such false pitches and to stop them from recurring, but they have nevertheless continued.

46.     The 250+ reports ADT has received since December 20, 2017 are but the tip of the iceberg. It is an accepted (and obvious) tenet of consumer complaint behavior, that Vivint has itself elsewhere asserted, that for every aggrieved customer who reports a deceptive sales practice, many more go uncounted. The complaints that ADT received over the period discussed above are likely indicative of thousands of other occurrences where the customer either does not take the time to complain or never realizes he or she has been duped.

47.     ADT has received reports of deceptive sales practices in most states in which Vivint sells alarm systems. Approximately 13 of the reported incidents occurred in the state of Florida.

48.     The violations and torts alleged in this Complaint have been the subject of numerous prior public enforcement actions by various state agencies. For example, in January 2017, Vivint settled an enforcement proceeding with the Pennsylvania Attorney General that found that Vivint's sales agents had violated the state's consumer protection laws by falsely stating in door-to-door solicitations that they were affiliated with the consumers' existing security companies, that the consumers' existing security providers had gone out of business, that they were purchased or taken over by Vivint, and that the consumers' alarm systems needed to be updated.

49.     Vivint's conduct is geographically widespread and numerically voluminous, especially when understood in the proper context that many deceptive sales encounters never get reported to ADT.

50.     Vivint's conduct is knowing and intentional. At worst, Vivint knowingly teaches and condones these actions by its sales agents. At best, Vivint is aware of such conduct but does not take sufficient actions to stop them despite having the ability to do so.

51.     The reason Vivint's conduct has not stopped is because Vivint profits to the tune of millions of dollars off the deceptive sales tactics of its sales force. Every alarm account Vivint acquires through deceptive sales conduct creates a new revenue stream for Vivint potentially for several years beyond the initial term of the new contract. In the big picture, Vivint's profits increase exponentially by acquiring as many accounts as possible through whatever means possible. On information and belief, such conduct has permitted Vivint to bolster its financial reports and receive new credit and equity investments that otherwise might not be possible without the illegal sales conduct.

52.     ADT attaches as Exhibit 1 to this complaint a spreadsheet including information from customers who have complained to ADT about deceptive sales practices by Vivint agents from December 20, 2017 to the present. The spreadsheet includes information provided directly by ADT customers who have interacted with Vivint agents during that time period. During the course of discovery, ADT anticipates producing verbatim audio recordings of available phone calls where such customers called to report such conduct by Vivint's agents to ADT customer service representatives. ADT also anticipates eliciting sworn testimony from a sampling of such customers so that the finder of fact may hear about Vivint's conduct directly from the customers who have

fallen victim to it. ADT incorporates by reference the information set forth in Exhibit 1 as if fully set forth herein.

53.     The population of reported instances to ADT is, in turn, but a small fraction of the likely number of overall numbers of occurrences in the market. It is an accepted (even by Vivint) and obvious tenet of consumer complaint behavior that for every aggrieved customer who reports a deceptive sales practice, many more go uncounted. And, many customers only complain to Vivint such that ADT has no means of knowing of those incidents.

54.     As a result of Vivint's claims of affiliation with ADT, ADT's customers allow Vivint's agents into their homes in the mistaken belief that they are speaking with a person affiliated somehow with ADT, visiting to provide the customers with goods and services that are related to their existing ADT alarm system. ADT's customers repeatedly confirm that but for this initial confusion, they would never have allowed Vivint's sales agents into their homes.

55.     This confusion, both at the outset of, and throughout, a sales transaction harms ADT by allowing competitors like Vivint to freeride on ADT's goodwill with its customers to gain their attention and trust. Vivint's later efforts to clarify their lack of ADT affiliation do not cure the confusion that has already occurred at the outset of the transaction, even in those instances where a customer understands by the end of the sale that she is contracting with Vivint. In many instances, the customer remains confused as to Vivint's affiliation with ADT until sometime after the sale is completed. Sometimes, the customer figures out Vivint is not actually affiliated with ADT in the middle of the sale, after the customer's ADT system has been removed and Vivint's system has been installed, and by that time the customer does not feel that they have any choice but to continue and finalize the sale in light of the embarrassment of having been duped. Several customers describe that the Vivint sales representative coaches them to answer Vivint's pre-installation

4827-2072-9031

survey, and oftentimes pressures the customer to answer questions quickly and without lucid understanding. The fact that Vivint utilizes preinstall surveys and questionnaires is evidence that Vivint knows that deceptive sales are an ongoing problem. It is also evidence that Vivint does not want to truly address the underlying deceptive sales conduct but instead is more concerned with creating "litigation cover" for when customers raise issues about Vivint's sales conduct.

56.     Customers often blame themselves for falling victim to Vivint's false and misleading sales tactics. Such self-blame also contributes to an under-reporting of deceptive sales conduct. Such self-blame also harms ADT's goodwill and reputation because customers believe they never would have fallen victim if they did not have an ADT system in their home in the first place.

57.     Often in conjunction with or as an alternative to the use of deceptive sales practices, Vivint also has begun a "buyout" program, which is itself rife with abuse and is contrary to common law against interference with contract and advantageous business relations. On information and belief, Vivint often uses its "buyouts" to help appease customers after they have complained about falling victim to Vivint deceptive sales practices. Once the customer raises the fact they were defrauded and misled by Vivint's sales representative in one of the numerous ways described above, Vivint then offers to buy out the customer's ADT contract as a way to "save" the sale. Vivint does so because it is profitable. Vivint acquires the account through deceptive means, and if caught, pays a sum to the customer to pay off their ADT contract that is far less than the new revenue stream to Vivint will generate. Vivint gains because the value of the account is many, if not most times, much more valuable than the amount required to pay off the ADT account.

58.     Even when not connected to a deceptive sales practice, Vivint's buyout program is in itself illegal. Vivint knows that the customer is in a contract with ADT, but nevertheless

wrongfully interferes with such contractual relationship and induces the customer to breach their ADT agreement. ADT also seeks damages related to this conduct.

### COUNT I
### UNFAIR COMPETITION IN VIOLATION
### OF THE LANHAM ACT, 15 U.S.C. § 1125(a)

59.     ADT incorporates paragraphs 1 through 58 as if set forth fully herein.

60.     The ADT Security Corporation owns the ADT Trademarks. ADT LLC uses the ADT Trademarks under license from The ADT Security Corporation. Both are injured by any effort by Vivint to confuse ADT's customers as to the affiliations of Vivint's sales agents with ADT.

61.     Vivint's sales agents use false representations of affiliation with ADT to confuse ADT's customers as to the agents' true affiliation, to interest the customers in their pitches, to win the customers' trust, and to gain access to their homes.

62.     In fact, the Vivint's sales agents do not represent ADT, nor is Vivint itself affiliated in any manner with ADT.

63.     Vivint's sales agents make these false representations to ADT's customers with the intent of deceiving ADT's customers as to a relationship or affiliation with ADT that does not exist, and that has never existed.

64.     These false and misleading statements are likely to confuse consumers regarding Vivint's apparent (but false) affiliation with ADT in the initial stages of a sale. In fact, as documented in the accompanying Exhibit 1, they already have created confusion among consumers, and will continue to do so if permitted to continue.

65.     Some ADT customers, initially confused at their doorsteps, eventually realize by the end of the sale that the sales agents represent Vivint, not ADT. But many do not, remain

confused at the point of sale and sign contracts with Vivint in the mistaken belief that they are contracting with ADT or one of its affiliates. Even when the customer is initially confused but later comes to understand the sales agent is not affiliated with ADT, ADT is still damaged by Vivint's freeriding on ADT's name and brand recognition.

66.     ADT has been and will continue to be damaged as a result of Vivint's false representations by the confusion of the market for ADT's goods and services, by the disruption of ADT's relationships with its customers, by the diversion of ADT's customers to Vivint, by ADT's lost royalties, by ADT's loss of control of the use of its brand in the market, and by damage to ADT's goodwill and reputation as a reliable provider of security systems.

67.     ADT is entitled to an award of compensatory damages, as well as Vivint's profits, attorney fees, and the costs of this action pursuant to 15 U.S.C. § 1117(a). The court, pursuant the discretion confided to it under this section of the Act, should also consider enhancing these damages to compensate ADT fully for its losses.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Vivint, and award the following relief:

    a.  Compensatory damages, in an amount to be established at trial, but believed to be in excess of $10 Million;

    b.  An accounting of Vivint's profits resulting from its deceptive practices, and payment of such profits to ADT;

    c.  Attorneys' fees and costs incurred in the prosecution of this action, as provided by 15 U.S.C. § 1117(a); and

    d.  Such other and further relief as the Court may deem appropriate in the circumstances.

## COUNT II
## COMMON LAW UNFAIR COMPETITION

68.     ADT incorporates paragraphs 1 through 58 as if set forth fully herein.

69.     ADT and Vivint compete for a common pool of customers. Both market security, automation, and smart-home services to the same target market of residential customers.

70.     Vivint has engaged in unfair and deceptive misconduct by fielding a staff of sales agents who prey on unsuspecting and sometimes elderly and infirm customers and who make false sales pitches to ADT's customers that are designed to mislead them into believing that they are acting on ADT's behalf, when in fact they represent a competitor freeriding ADT's goodwill to interfere with ADT's contracts with its customers, and to sell and install new Vivint alarm systems.

71.     Vivint's actions are contrary to honest practice in industrial or commercial matters. They are prohibited by the alarm industry's own code of conduct. They are independently actionable, *inter alia*, as tortious interferences with ADT's contractual relationships, and as violations of the Lanham Act.

72.     Vivint's actions are likely to cause confusion among consumers, and in fact already have caused confusion, as demonstrated by the attached declarations, not only in the initial stages of their agents' sales pitches, but also at the point of sale.

73.     Vivint's actions are also contrary to law because they prey upon elderly and infirm customers who are easy targets for their agents' false sales pitches.

74.     ADT has been injured as a result of Vivint's actions.

75.     Vivint's sales agents' false sales pitches at customer doorsteps are knowing and willful. They have continued for years, even after Vivint paid $10 Million to resolve nearly identical claims halfway through the *ADT v. Vivint* trial in December 2017. Accordingly, the Court

19

should award punitive damages in an amount sufficient to deter Vivint from continuing to engage in unfair competition in the market for electronic security services through their sales agents.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Vivint, and award the following relief:

a. Compensatory damages, in an amount to be established at trial, but believed to be no less than $10 Million;

b. Punitive damages in a sum sufficient to deter Vivint from engaging in further deceptive sales tactics;

c. Attorneys' fees and costs incurred in the prosecution of this action; and

d. Such other and further relief as the Court may deem appropriate in the circumstances.

## COUNT III
### VIOLATION OF THE FLORIDA DECEPTIVE & UNFAIR TRADE PRACTICES ACT, FLA. STAT. §§ 501.201 *ET SEQ.*

76. ADT incorporates paragraphs 1 through 58 as if set forth fully herein.

77. ADT is a Florida resident and legitimate business enterprise entitled to the protections of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and with standing to bring claims for violation of FDUTPA.

78. Vivint, by selling security, automation and smart-home systems and services, is engaged in "trade or commerce" in Florida as defined in Section 501.203(8) of the Florida Statutes.

79. Vivint has intentionally engaged in deceptive and unfair trade practices in violation of Section 501.204(1) of the Florida Statutes by engaging its sales agents to represent to ADT's customers that their ADT security, automation and smart home systems are outdated and unsafe; that ADT's security systems are incapable of protecting ADT's customers from burglaries without

20

"upgrades;" that Vivint's sales agents are from ADT, or are in some manner affiliated with ADT; and that they will provide free "upgrades" to their ADT security systems without disclosing that they are competitors of ADT, seeking to replace ADT's equipment and services, not upgrade them.

80.     These practices are commonly recognized by industry members as deceptive and unfair trade practices that are intended to confuse and mislead consumers. These practices have specifically been barred as such by the security systems industry's code of ethics.

81.     Vivint's agents' false sales pitches were likely to, and did, mislead ADT's customers into believing that they were continuing and "upgrading" their ADT services, when in fact the agents were obliging them to new contracts for new services from Vivint.

82.     Vivint has also violated FDUTPA through offering to "buyout" customers' contracts with ADT but failing to fully inform the customer of their obligation to ADT, failing to fully and accurately describe the buyout program, using the program as a means to "save" sales created through deceptive sales practices as alleged elsewhere in this Complaint, and/or affirmatively misrepresenting facts regarding the transaction.

83.     ADT has been aggrieved by Vivint's violations of FDUTPA, and is entitled to its actual damages suffered as a result of those violations, plus its attorney fees and costs as provided in Section 501.211(2) of the Florida Statutes.

84.     ADT contends that the Florida Deceptive and Unfair Trade Practices Act was enacted to protect Floridians; that ADT is a Floridian; and that all of Vivint's acts alleged in this Complaint may therefore be addressed under FDUTPA. If, however, the Court concludes that FDUTPA does not reach Vivint's sales to consumers outside Florida, ADT pleads in the alternate that Vivint's false sales pitches violate the corresponding unfair and deceptive trade practices statutes of the various states in which the sales occurred.

21

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Vivint, and award the following relief:

    a.   Actual damages as provided by Fla. Stat. § 501.211(2), in an amount to be established at trial, for damages resulting from Vivint's numerous violations of the Act;

    b.   Attorneys' fees and costs incurred in the prosecution of this action, as provided by Fla. Stat. § 501.211(2); and

    c.   Such other and further relief as the Court may deem appropriate in the circumstances.

### COUNT IV
### TRADE SLANDER/COMMERCIAL DISPARAGEMENT

85.    ADT incorporates paragraphs 1 through 58 as if set forth fully herein.

86.    Vivint, through its sales agents, has intentionally made false and misleading statements about ADT, and about ADT's products and services, in their sales pitches to ADT's customers as alleged herein.

87.    Vivint's false and misleading statements demean the quality of ADT's goods and services.

88.    At the time the statements were made, Vivint knew the statements to be false.

89.    The statements are defamatory *per se* in that the statements suggest conduct incompatible with the lawful exercise of business.

90.    The statements are injurious and damage ADT in its industry and marketplace by causing ADT to lose sales and good will, and to suffer injury to its reputation.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Vivint, and award the following relief:

    a.   Compensatory damages, in an amount to be established at trial;

    b.   Punitive damages in a sum sufficient to deter Vivint from engaging in further deceptive sales tactics; and

    c.   Such other and further relief as the Court may deem appropriate in the circumstances.

**COUNT V**
**TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS**

91.    ADT incorporates paragraphs 1 through 58 as if set forth fully herein.

92.    ADT maintains valid and enforceable contracts and business relationships with its customers.

93.    Typically, ADT customers display an ADT sign outside their homes to deter potential burglars and broadcast to the outside world that the home is protected by ADT's alarm system.

94.    Vivint is knowledgeable of the contractual and business relationship between ADT and its customers. When Vivint sales agents visit the homes of these individuals, they become (or are already) aware of such relationship and contract by, among other means: the sign displayed in front of the customer's home, talking with the customer, observing the ADT equipment in the customer's home, or through prior research and intelligence conducted on the customer's address regarding existing alarm systems.

95.    Despite knowledge of the customer's contractual and business relationship with ADT, Vivint sales representatives intentionally and without valid justification interfere with such relationship and procure the breach of the ADT contract upon the promise that Vivint will "buy out" the remaining term by paying to the customer an amount equal to the remaining obligation on their ADT contract.

96.     Vivint also offers buyouts to "save" sales procured through deceptive sales conduct in an attempt to pacify the customer.

97.     The customer does not always remit such payment to ADT. Even when the customer does, ADT is damaged because the value of the customer's future account revenue often exceeds the contractual value of the remaining contractual term. For example, it is not uncommon for a customer with two years left on his or her ADT contract to remain a loyal and paying customer to ADT for many years beyond the remaining two-year term. This is also why Vivint wrongfully engages in such buyout practices: Vivint knows the value of an alarm account often exceeds the immediate value under the contract.

98.     ADT is damaged by Vivint's unlawful conduct by losing revenue streams that otherwise would remain with ADT absent Vivint's "buy out" offer, and also because the customer does not always remit any remaining amounts due and owing to ADT that Vivint provides to the customer.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Vivint, and award the following relief:

a.  Compensatory damages, in an amount to be established at trial, for the damages to ADT caused by Vivint's unlawful "buyout" practices;

b.  Punitive damages in a sum sufficient to deter Vivint from engaging in further deceptive sales tactics;

c.  Attorneys' fees and costs incurred in the prosecution of this action; and

d.  Such other and further relief as the Court may deem appropriate in the circumstances.

4827-2072-9031

## JURY DEMAND

ADT demands a trial by jury on all issues so triable.


Dated: August 14, 2020.                              Respectfully submitted,

                                                     **SHOOK, HARDY & BACON L.L.P.**

                                                     By: /s/  Eric S. Boos
                                                     Jennifer A. McLoone
                                                     Florida Bar No. 029234
                                                     jmcloone@shb.com
                                                     Eric S. Boos
                                                     Florida Bar No. 0107673
                                                     eboos@shb.com
                                                     201 S. Biscayne Blvd., #3200
                                                     Miami, Florida 33131
                                                     Tel: (305) 358-5171
                                                     Fax: (305) 358-7470

                                                            -and-

                                                     Charles C. Eblen (*pro hac vice forthcoming*)
                                                     ceblen@shb.com
                                                     2555 Grand Blvd.
                                                     Kansas City, Missouri 64108
                                                     Tel: (816) 474-6550
                                                     Fax: (816) 421-5547

                                                            -and-

                                                     Eric J. Hobbs (*pro hac vice forthcoming*)
                                                     ehobbs@shb.com
                                                     1660 17th Street, Suite 450
                                                     Denver, Colorado 80202
                                                     Tel: (303) 285-5300
                                                     Fax: (303) 285-5301

                                                     *Counsel for Plaintiffs ADT LLC and The ADT*
                                                     *Security Corporation*