**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:20-cv-23391-GOODMAN
[CONSENT CASE]

ADT LLC, *et al*.,

      Plaintiffs,

v.

VIVINT SMART HOME, INC., *et al*.,

      Defendants.

_____/

## **DEFENDANTS' MOTION IN *LIMINE***

Defendants/Counterclaimants Vivint Smart Home, Inc. and Legacy Vivint Smart Home, Inc. ("Vivint") respectfully move the Court to exclude evidence, reference, or argument at trial by ADT of: (1) customer complaints other than testimony from customers subject to cross-examination ("**Customer Complaints**"); (2) external proceedings, settlements, and complaints against Vivint by nonparties, and a 2017 proceeding brought by ADT against Vivint ("**External Matters Against Vivint**"); (3) lawsuits Vivint has brought against non-ADT competitors ("**Competitor Lawsuits**"); and (4) damage computations based on the foregoing and other inadmissible evidence ("**Inadmissible Damages**").[1]

## MEMORANDUM OF LAW

ADT's claims, and Vivint's counterclaims, allege that the other company's door-to-door salespeople committed deceptive sales practices against its customers, misleading some customers into "switching" their alarm service provider based on verbal misrepresentations that the two companies are affiliated or taking the other over. Because each in-person sales interaction is a unique and variable event, Vivint intends to prove its claims through sworn deposition and trial testimony of its customers, and its actual damages are based on the proof supplied by those customers subject to the Federal Rules of Evidence (the "Rules" or "Rule").

This Motion addresses ADT's disclosed intent to artificially "multiply" any actual damages it has sustained from its testifying customers, through the summary introduction of **unadjudicated allegations** from out-of-court complaints and lawsuits. ADT will ask the jury to treat this inadmissible hearsay as proof of the scope of Vivint's alleged conduct, even though ADT has only

---

[1] Vivint is contemporaneously filing an unopposed motion to seal Exhibits B, D, E, F, G, H, I, J, K, L, Q, and R, which ADT has designated "confidential" or "highly confidential—attorneys' eyes only" under the Protective Order (D.E. 31). At the Court's direction, Vivint will file the exhibits under seal and/or provide courtesy copies of the Motion and all exhibits to chambers.

identified a handful of customers that can attest to any alleged wrongdoing under oath. In turn, ADT's damage computations hinge entirely on the presumed "truth" of inadmissible hearsay. This Court and other courts have repeatedly explained that such evidence is inadmissible under the Rules, and any probative value is dwarfed by its unfair prejudice, confusion of the issues, and waste of trial time and resources. ADT's disclosures in this regard are voluminous, but can be distilled down to four evidentiary categories, as follows:

**ISSUE NO. 1: OUT-OF-COURT CUSTOMER COMPLAINTS.**

The Court should exclude evidence of ADT customer complaints other than testimony from customers subject to cross examination (the "**Customer Complaints**").[2] These "complaints" consist of recordings of phone calls between customers and ADT, Vivint, or both, as well as any written notes, reports, or spreadsheet summary purporting to document the customers' recollection of their alleged interactions with Vivint on those recordings.

The Customer Complaints are inadmissible hearsay. ADT has the burden of proving to a jury that individual Vivint sales representatives engaged in unlawful sales practices with its customers. Yet ADT intends to seek liability for customers who do not testify at all; in other words, by asking the jury for damages based on the number of alleged "consumers who complained" in out-of-court statements. The Customer Complaints consist of multiple layers of hearsay, are extraordinarily untrustworthy, and cannot replace Vivint's right of cross-examination—the "greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149,

---

[2] (**Ex. A**, ADT R. 26(a)(1) Discl. at pp. 3-4, "Appendix containing descriptions of ADT customers impacted by Vivint's deceptive sales practices," "[a]udio recordings of intake customer calls for ADT's customers identified in the Appendix," "ADT deceptive sales reports for customers identified in the Appendix," and "Vivint documents received from ADT customers identified in the Appendix".) The "Appendix" is a spreadsheet (ADT00032494) prepared by ADT. (**Ex. B**.)

158 (1970). All of this is why this Court has precluded ADT from introducing this same type of

evidence in at least three other cases.[3]

## I.       The Customer Complaints Contain Multiple Layers of Hearsay.

The Court is familiar with the hearsay prohibition. *See* Fed. R. Evid. 801(c), 802. In every

Customer Complaint an ADT customer purports to tell an ADT or Vivint customer service

representative about something a Vivint salesperson allegedly said. The Vivint salesperson is not

involved in the complaint; rather, the salesperson's statements are alleged by the customer (the

second out-of-court declarant), then attributed to the salesperson (the alleged first out-of-court

declarant). Thus, every Customer Complaint (at a minimum[4]) contains double hearsay under Rule

805 and is only admissible if each layer of hearsay satisfies an exception. *Ocean Bio–Chem, Inc.

v. Turner Network Television, Inc.,* 741 F. Supp. 1546, 1559 (S.D. Fla. 1990) (affidavit contained

"inadmissible double hearsay, in that an out-of-court declarant attests to the out-of-court statements

of others"). As this Court held on three prior occasions, the Customer Complaints do not satisfy

any exceptions to hearsay.

## II.      The Business Records Exception (Rule 803(6)) Does Not Apply.

The business records exception only applies where "the record was kept in the course of a

---

[3] *ADT LLC v. Alarm Prot. LLC*, 2017 WL 1881957, *1–2 n.2 (S.D. Fla. May 9, 2017) (excluding phone calls of customer complaints to prove truth of asserted deceptive sales practices against defendant) (citing *ADT, LLC v. Sec. Networks, LLC*, No. 12-CIV-81120 (S.D. Fla. Dec. 9, 2016) (same)); *ADT LLC v. Vivint, Inc.*, 2017 WL 11632866, *1-4 (S.D. Fla. Dec. 8, 2017) (same).

[4] Some Customer Complaints have additional layers of hearsay. (**Ex. C**, ADT 30(b)(6) Dep. (B. Ver Planck) at 104:24-25, 105:1-6, "Q. [T]here are also situations where the person who . . . makes the DSP complaint is not actually the person who spoke with or interacted with the sales rep for the initial pitch, right? . . . A. Yes."); *see also* (**Ex. D**, ADT 941 Call Tr. at 4:8-19, customer relaying what her husband told her a salesperson said while she was out of town; **Ex. E**, ADT 184 Call Tr. at 2:17-20, 19:17-21, 20:12-16, caller admitting she "do[es] not know" what salesperson said to her mother because she was not there.)

regularly conducted activity of a business" and "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6). "The touchstone of admissibility under the business records exception to the hearsay rule is reliability[.]" *United States v. Bueno-Sierra*, 99 F.3d 375, 378 (11th Cir. 1996) (internal citations omitted). This exception does not apply here:

First, the customers did not make the Customer Complaints in the regular course of their own business. ADT seeks to admit the Customer Complaints for the truth of the ADT customer's statement that a Vivint salesperson did, in fact, make deceptive statements. The business records exception does not apply to information supplied by "outsiders" of ADT's or Vivint's business. *See T. Harris Young & Assoc., Inc. v. Marquette Elec., Inc*., 931 F.2d 816, 828 (11th Cir. 1991) (citing Rule 803, 1972 Advisory Committee Notes). As explained by the Advisory Committee:

> If, however, the supplier of the information does not act in the regular course, an essential link is broken; the assurance of accuracy does not extend to the information itself, and the fact that it may be recorded with scrupulous accuracy is of no avail. An illustration is the police report incorporating information obtained from a bystander: the officer qualifies as acting in the regular course but the informant does not.

*See* Rule 803 advisory committee's note. Here, ADT **customers** "suppl[y] the information" regarding the allegations, but they are not agents of ADT or Vivint acting under a duty of accuracy in the regular course of business. *See T. Harris Young*, 931 F.2d at 826 (out-of-court allegations as to what defendant's employees allegedly said were not business records, as "[the proponent] was not trying to prove the truth of the matter asserted [by the defendant employees]; instead, [the proponent] was trying to prove that [the defendant] employees made the comments").

This Court has excluded ADT's customer recordings as business records in at least three prior cases. *ADT, LLC*, 2017 WL 1881957 at * 2 ("[T]he customer complaining to [ADT] is not acting in the normal course of business—the customer is not an employee. The customer, as an

unattached agent, is not afforded the same presumption of trustworthiness an employee is afforded under the Federal Rules"). "Thus, just as [ADT has] been informed in another case before this Court, the Court concludes that [ADT's] recorded telephone conversations of customer complaints do not qualify for the hearsay exception in Rule 803(6)." *Id.* (citing *ADT, LLC v. Security Networks*, ***"with [ADT] conceding on the record that a customer complaining to ADT does not qualify as the 'regular course of business' and the court granting a motion in *limine* to exclude recorded telephone calls from ADT customers"); *ADT, LLC v. Vivint*, 2017 WL 11632866 at *2 (customer complaint recordings inadmissible hearsay where the ADT customers were not acting in the regular course of business). ADT customers must testify in a trial deposition or in court—the Customer Complaints do not qualify as business records. *U.S. v. Pazsint*, 703 F.2d 420, 424-25 (9th Cir. 1983) (calls to police were not business records because witnesses who gave the information were under no business duty to report the event; "[t]herefore, while the direct testimony of the witnesses was admissible at trial, the tapes were not").[5]

Second, both the source and preparation of the Customer Complaints indicate a lack of trustworthiness, as shown by the following representative examples:

A.  <u>ADT coaches its customers to believe that a deceptive sales practice was committed</u>.

**<u>Ms. Guerra</u>**. Ms. Guerra told ADT she switched to Vivint because it "[was] offering more stuff and less money." (**Ex. G**, ADT 328 Call Tr. at 4:3-7.) The ADT rep tells her:

> Unfortunately, they [Vivint] do it a lot unethically as well. They lie to a lot of our customers. That's how they get a lot of their business. I know that they—they maybe gave you some misinformation about the ADT merger, based off of—the customer service rep that you talked to says that, you know, maybe they gave you

---

[5] Vivint does not concede admissibility of the statements attributed to the salespersons because, *inter alia*, the Customer Complaints lack foundation that the "salesperson" is a Vivint agent. (*See, e.g.,* **Ex. F**, ADT 576 Call Tr. at 3:14-21, customer Mr. Lamb stating he "just can't remember" the salesperson's company, suggesting it was "Dynamo".) When he recalls the salesperson had orange on his hat, ADT immediately declares: "Oh, that's Vivint." (**Ex. F**, ADT 577 Call Tr. at 8:15-18.)

> some misinformation. I just want to make you aware that Vivint has actually been
> sued by [ADT's predecessor] Protection 1, actually within the last—probably the
> last six months, and they are in the process of paying Protection 1 $10 million for
> their unlawful practices . . . You know, so they lie a lot, unfortunately.

(*Id*. at 8:21-25; 9:1-11.) Ms. Guerra then adopts ADT's narrative: "It's true. I thought it was you

guys," despite stating that she knew Vivint was a separate company because the salesperson never

said they were Protection 1, (*id*. at 12:1-2) and had told her that Vivint was a "different company"

and "[Vivint] is not the same" as her existing provider. (*Id*. at 11:8-10.)

**Ms. Eckenrode**. ADT coached Ms. Eckenrode to agree that Vivint told her ADT was

"going out of business," despite Ms. Eckenrode explaining that she does not remember any

misrepresentation. ADT tells her: "My [ADT] coworker was telling me I guess we had a competitor

come out to you and switched your service to them and told you that we had—Protection 1 had

gone out of business; is that correct?" Ms. Eckenrode responds: "I'm not sure they said you were

going out of business, but anyway, they switched me." (**Ex. H**, ADT 239 Call Tr. at 4:12-19.)

Undeterred, ADT purports to put Ms. Eckenrode on hold to process her cancellation but instead

falsely tells another ADT rep: "Vivint went to her door to door, told her we were going out of

business, and so she switched . . . so I don't know if you can do anything with it. If not, kick it

back to me and I'll take the hit on it. But I—like I said, at least see if maybe you can take a swing

at her." (*Id*. at 7:1-8.) The second ADT rep repeats to Ms. Eckenrode the unsubstantiated claim

that Vivint "had given you some information that we had gone out of business." Ms. Eckenrode

again responds: "I really don't remember." (**Ex. H**, ADT 240 Call Tr. at 3:23-25; 4:1-7.)

**Mr. Trawick**. Mr. Trawick calls ADT to "complain" that Vivint merely solicited him:

> He [Vivint salesperson] said he's been instructed to come to everybody that's got a
> Protection 1 sign and get them to switch over, I guess . . . He was kind of, like,
> downgrading y'all's service and everything . . . And then that was kind of it. And
> then he was like—after he realized I wasn't switching—he finally got in his car and
> left. But I didn't feel that that was really right for another company to come up and

then—because I had y'all's service . . . they're, like, talking down about it and—you know. Whether I want to switch or not, it's—it's my choice, not for someone to come to my door.

(**Ex. I**, ADT 1069 Call Tr. at 2:20-25; 3:1-18.) Despite a "report" of nothing more than lawful competition, the ADT rep tells Mr. Trawick that Vivint "is not supposed to be doing that," and ADT has been "reporting all the ones we hear about to the Better Business Bureau[.]" (*Id*. at 4:1-4.) ADT coaches Mr. Trawick:

> Yeah. No, they -- a lot of them, they'll even say they're with Protection 1 and they're fixing your system for Protection 1 and have you, like, sign a contract and everything, and you don't realize till you read it that it says Vivint at the top. They've done that to several people. (*Id*. at 4:19-24.)

Based on its speculation, ADT tells Mr. Trawick to report Vivint to the police: "Just call the cops and tell them that, you know, he's, you know, **unlawfully soliciting** you and you've already told him no . . . and they just keep coming back. Yeah, I've had to have some people call the cops on them because they get a little too persistent. (*Id*. at 6:19-25; 7:1-2.) (Emphasis added.)

**<u>Ms. Martinez</u>**. Ms. Martinez told ADT: "I just wanted to report to you [ADT] that someone had come to my door saying they wanted to sell me one of those doorbell things that has the camera." (**Ex. J**, ADT 675 Call Tr. at 2:5-9.) The salesperson left promptly. Ms. Martinez "reported" the solicitation because she had been primed by an ADT "newsletter" purportedly alerting customers to "people doing stuff like that." (*Id*. at 2:21-25; 3:1-3.) Ms. Martinez does not allege any deceptive conduct, yet the ADT rep responds: "I'm just taking notes . . . I'm actually filling out a report, a local report . . . of **the deceptive sale**." (*Id*. at 4:1-6.) (Emphasis added.) The ADT rep also confirms that ADT sends out its "newsletters" to pre-coach its customers based on mere reports that competitors are in the area:

> I know we sent a letter out, so I know—especially if it came to your area . . . **those letters go out to areas where we know either we have competing competition out there trying to snatch our customers or we have reports that there is funny**

**business going on**. So it's already on our radar just for us sending you the letter out. (*Id.* at 8:4-16.) (Emphasis added.)

B. <u>ADT customers express faulty memories or fail to attribute statements to Vivint.</u>

**<u>Mr. Lamb</u>**. Assuming Mr. Lamb was approached by a **Vivint** salesperson (fn. 4 above), he does not attribute any misrepresentation to the salesperson. His only "complaint," like Mr. Trawick, is annoyance at having been solicited, and says the first thing the salesperson said was that he was ADT's "main competitor." After Mr. Lamb told him, "I'm not changing a thing," the salesperson promptly left. (**Ex. F**, ADT 576 Call Tr. at 3:19-25; 4:1.)

**<u>Ms. Cox</u>**. Ms. Cox's daughter called to complain on her behalf and says she did not know what Vivint allegedly said to her mother. She admits not even her mother could recall: "And if you ask [her mother] today, I don't know if she could say it was AT&T, DirecTV, or this Vivint—or whatever it is—system. I think she initially thought it was an upgrade on ADT." (**Ex. E**, at 20:18-22.) In addition, as recounted above, Ms. Eckenrode and Ms. Guerra also either expressed faulty memories or no recollection of any misrepresentation by Vivint.

**<u>Ms. Gruetzmacher</u>**. Ms. Gruetzmacher called ADT because she missed a call from an unknown number and suspected the call was from Vivint. ADT calls the number, and states on a separate line to another ADT rep: "[The customer] called the number back and Googled the number, and it was a number in Russian or some words in Russian. But when she called it, it says Vivine [sic]. **When I called it, it was just an insurance company, but hey.** [The customer] basically said, when **the [ADT] technician came out, he told her** that that company [Vivint] was basically a fraudulent company." (**Ex. K**, ADT 323 Call Tr. at 10:17-25; 11:1-8.) (Emphasis added.) Ms. Gruetzmacher cannot say if "Vivint" ever attempted to contact her. It was only after an onsite ADT technician told her that Vivint was "fraudulent," that she called ADT to complain that Vivint must have attempted to disrupt her service visit. Even the ADT rep on the call says that

her suspicions sound like a "coincidence." (*Id*. at 8:6-8.)

To be clear, ADT has disclosed each of the above customers as alleged victims of deceptive practices by Vivint in this case. In-person sales interactions are conversations, not static advertisements. They are highly variable and readily susceptible to misinterpretation. ADT agrees. (**Ex**. **C**, ADT 30(b)(6) Dep. (B. Ver Planck) at 62:18-22, agreeing that "whether an interaction is or is not a deceptive sales practice, really depends on what exactly was said by the sales rep"; (*id*. at 104:1-6), agreeing that it's "possible that the customer misinterpreted what the sales rep said"; (*id*. at 106:21-25; 107:1), agreeing that "sometimes the customer is just simply wrong . . . that they say something that [ADT's] got documentation that show it's not the case"; (*id*. at 105:21-24), agreeing that the customer and salesperson may be "in conflict" as to what was said.) ADT further agrees that whether a deceptive sale occurred is not an "easy determination" to make "just by talking to one of the parties" (*id*. at 106:15-19)—yet intends to show the one-sided Customer Complaints to the jury to make exactly this inference or finding.

C.  <u>ADT customers have motives to misrepresent interactions</u>.

ADT uses its deceptive sales "training" to as a tool to offer customers incentives to switch back to ADT. (**Ex**. **C**, ADT 30(b)(6) Dep. (B. Ver Planck) at 55:19-25; 56:1-2, ADT's "training" on deceptive sales includes attempts to gain back ADT customers; (*id*. at 101:3-8), acknowledging that ADT "might make the effort to keep the customer, give them a discount, a lower monthly rate or something like that[]".) Thus, there is an inherent motivation for customers to misrepresent, or be susceptible to coaching to misrepresent, these interactions. *FTC v. E.M.A. Nationwide, Inc.*, 2013 WL 4545143, at \*2 (N.D. Ohio Aug. 27, 2013) (excluding consumer complaints for truth of the complaint and noting that "consumers often made the complaints with hopes of receiving some type of refund or other financial benefit"). ADT acknowledges this motivation. (**Ex. C** at 101:14-

22, agreeing that "the customer might have an incentive to not be totally 100 percent forthcoming about the interaction because they have a financial incentive to get a discount from their prior provider"; (*id*. at 107:3-12), agreeing there are cases where a customer might allege a deceptive sale because "they just have buyer's remorse about making the decision, and now, they want to change their mind"[.]) The Customer Complaints ". . . by [their] very nature, [are] **dripping with motivations to misrepresent**[]" and are thus inherently unreliable. *Hoffman v. Palmer*, 129 F.2d 976, 991 (2d. Cir. 1942) (emphasis added). For each of these reasons, Rule 803(6) does not support admission of the Customer Complaints.

## III.    The Residual Exception (Rule 807) Does Not Apply.

As demonstrated above, the content and structure of the Customer Complaints is wildly inconsistent. The customers' allegations cannot be forced into any other enumerated exception to hearsay, including the residual exception. *In re Terazosin Hydrochloride Antitrust Litigation*, 2005 WL 5955699, at *5 (S.D. Fla. Feb. 2, 2005) ("This exception . . . is to be utilized only rarely, and is not to be taken as a 'broad license for trial judges to admit hearsay statements that do not fit within one of the other exceptions . . .") (internal citation and quotation omitted). Rule 807 permits hearsay only if the statement is (1) "supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement"; and (2) "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." *See id*.

First, as demonstrated above, the Customer Complaints do not have sufficient guarantees of trustworthiness. *FTC v. Washington Data Resources*, 2011 WL 2669661, at *5 (M.D. Fla. July 7, 2011) (residual exception did not apply to un-cross-examined declarations offering "substantive evidence of the defendants' alleged deceptive statements and marketing material"). Vivint

welcomes ADT to put its customers under oath so it can examine the inconsistencies, biases, and foundation for these "complaints," but the Customer Complaints summarily deprive Vivint of this right. *See ADT v. AP*, 2017 WL 1881957 (S.D. Fla. May 9, 2017) (rejecting residual exception to admit ADT customer recordings, in part, because recordings were not under oath subject to cross examination). Cross-examination is critical to address the "substantial risks of insincerity and faulty narration, memory and perception," (*T. Harris Young & Assoc.*, 931 F.2d at 826), or to be present during ADT's eliciting of information to discourage improper coaching. *ADT v. AP*, 2017 WL 1881957 at *2 ("there is evidence to suggest that the customers in the instant case were guided, to an extent, to report negative information about Defendants' agents," and that "[ADT's] unilateral ability to guide its receipt of consumer complaints, or otherwise participate in the eliciting of information from the customer, is particularly concerning in light of the fact that Defendants were not afforded the opportunity to be present, as [ADT was], at the time the recording was made").

Second, the Customer Complaints are not more probative than any other evidence ADT could obtain through reasonable efforts. ADT can and has located customers to provide trial deposition testimony and who will testify at trial. *W. Insulation, LP v. Moore*, 242 F. App'x 112, 122 (4th Cir. 2007) (customer statements inadmissible under Rule 807, in part, where "clearly it would have been more probative to produce the testimony of the customers themselves rather than secondhand accounts of the information the customers provided"); *Versatile v. Johnson*, 2011 WL 1167440, at *4 (E.D. Va. Mar. 28, 2011) (Rule 807 did not apply to affidavit that was less probative than declarant's testimony subject to cross-examination).

## IV.   The Customer Complaints are Inadmissible in Summary Form.

ADT cannot offer any summary of the Customer Complaints because the only reason ADT will offer a summary (or reference to the total "number" of "complaints") is to argue or imply the

validity of those complaints to support the fact and purported scope of Vivint's liability. A summary under Fed. R. Evid. 1006 requires ADT to "establish that the underlying documents would have been admissible if the proponent had sought their admission." *In re International Mgmt. Associates, LLC*, 781 F.3d 1262, 1266 (11th Cir. 2015). This Court rejected a prior attempt by ADT to circumvent the hearsay rule. *See ADT, LLC v. Vivint, Inc*., 2017 WL 11632866, at *4 (excluding "any documents that purport to summarize any customer phone calls are inadmissible hearsay . . . This includes the spreadsheet and corresponding summary . . . [which] purports to summarize the recordings described above"). Such summaries here include, but are not limited to, ADT00032494 (**Ex. B**, ADT's "Appendix"). The summaries are also self-serving, excluding facts that do not support the finding of a deceptive practice and including inaccurate recollections. (*See, e.g.,* **Ex. L**, ADT 30(b)(6) Dep. (M. Gold) at 139:1-23, excluding fact that the customer was not home at the time the Vivint representative knocked at the door; (*id*. at 167:11-169:15; 170:16-173:18), excluding fact that the customer stated a different company name and including incorrect information that the customer stated the representative was wearing "ball cap that said Vivint"; (*id*. at 205:16-207:8, 210:13-211:19), excluding fact that the customer was satisfied with Vivint and unhappy with Protection 1; (*id*. at 227:7-229:11), including information that the customer was told ADT was going out of business, when the customer actually did not remember; (*id*. at 231:1-23), excluding fact that the customer indicated she wanted to stay with Vivint.)

In sum, Vivint respectfully requests the Court exclude the Out-of-Court Customer Complaints at trial, in any format, for any customers who have or will not testify.

<u>**ISSUE NO. 2**</u>: **EXTERNAL MATTERS AGAINST VIVINT.**

The Court should exclude: (1) evidence regarding "consumer" complaints about Vivint to the Better Business Bureau ("BBB"), state attorneys general or other regulatory agencies ("**Agency**

**Complaints**");[6] and (2) evidence, including documents and depositions, related to external proceedings brought against Vivint by third parties, and a 2017 proceeding brought by ADT ("**Other Proceedings**"). ADT intends to introduce these **unadjudicated** matters to argue Vivint's liability beyond any testifying customers or other proof in this case.

## I.    Agency Complaints are Inadmissible Hearsay under Rule 802.

The Agency Complaints are hearsay for the same reasons the Customer Complaints are hearsay, yet more untrustworthy because they consist of third parties communicating with third parties, which constrains Vivint's ability to address accuracy and reliability concerns. These are not trivial concerns. ADT encourages customers to file dubious Agency Complaints against Vivint. For example, despite Ms. Eckenrode saying she cannot remember what Vivint said to her (**Ex. H**, ADT 240 Call Tr. at 4:1-7), ADT badgers her to file a complaint with the Attorney General's office because she "may have issues down the road with false information" and there might be unknown customers "in a worse spot than you are." (*Id*. at 6:13-25; 7:1-16.) Mr. Trawick's "complaint" was the fact that Vivint solicited him, yet ADT tells him to file a police report for "unlawful solicitation." (**Ex. I**, ADT 1069 Call Tr. at 6:19-22.) The ADT rep says he will send the information "through to our reporting agency with your account information on our side so that they know that there is someone in your area as well so they can report them." (*Id*. at 7:23-25; 8:1-2.)

ADT also uses the Agency Complaints as a customer retention tool. After Ms. Eckenrode said she wished to stay with Vivint, two ADT representatives privately discuss taking a "hit on it" (presumably the lost account), "but . . . at least see if maybe [the second ADT rep] can take a swing

---

[6] (**Ex. A**, ADT R. 26(a)(1) Discl. at pp. 2, 4; **Ex. M**, ADT Trial Witness List at p. 6, disclosing BBB of Utah 30(b)(6) deposition regarding BBB complaints in a prior lawsuit between Vivint and ADT; **Ex. N**, ADT 2nd Suppl. Discl. at p. 2, intent to seek "compensatory damages" based on "customer records relating to the respective account".)

at her." (**Ex. H**, ADT 239 Call Tr. at 7:6-8.) The ADT rep admits to telling "all [ADT] customers" that are "feeling a certain way" and "past the point where you can cancel [the competitor] without a penalty" to make an attorney general report. (*Id.*, ADT 240 Call Tr. at 6:13-21.)

ADT also advises customers that they can "get out" of Vivint agreements by making Agency Complaints. When Ms. Simmons called to relay her husband's recollection of a sales pitch while she was out of town, the ADT rep responds: "I'm going to give you the phone number to the attorney general in your state. That way, you can call them, and **that will help with getting you out of your contract with them**. **We definitely don't want you stuck in an agreement because, I mean, you have a really good system with Protection One[.]**" (**Ex. D**, ADT 941 Call Tr. at 6:25-7:1-6.) (Emphasis added.) Neither Ms. Simmons, much less ADT, had personal knowledge to lodge a complaint based on a double hearsay allegation. The nuances of these out-of-court interactions demand questioning of any Agency Complaint, whether they are lodged at the behest of ADT or by consumers for any litany of motives. *ADT Sec. Servs. v. Sec. One Int'l.*, 2013 WL 4766401, at *1 n.1 (N.D. Cal. Sept. 5, 2013) (in response to the defendants' motion in *limine*, ADT indicated it would not introduce BBB complaints).

## II.     Agency Complaints are Unfairly Prejudicial under Rule 403.

Any probative value of the Agency Complaints is outweighed by their prejudicial effect. As discussed above, the multiple-hearsay statements may be motivated by ADT or the hope of getting out of a contract. Thus, the probative value of any individual complaint is limited. Here, ADT seeks to present a volume of Agency Complaints to suggest Vivint is guilty of "widespread" misconduct that justifies awarding damages beyond the specific examples ADT can establish through the testimony of customers subject to cross examination.

The volume of this evidence (relative to the minimal amount of admissible customer evidence) increases the risk that the jury will misuse the evidence. *See* Wright & Miller, Confusion of Issues—Application, 22A Fed. Prac. & Proc. Evid. § 5216.1 (2d ed.) (urging courts to "consider the bulk of the proffered evidence" under Rule 403 because "the more evidence the proponent offers, the more potential interference it will provide the jury to wander along"). This risk is amplified where ADT will argue that the known instances of misconduct are merely the "tip of the iceberg" and will ask the jury to award damages for unknown instances of conduct.

To combat this prejudice, Vivint would be forced to conduct a mini-trial on the validity of each Agency Complaint, an impossible task where there will be no testimony to cross-examine, and under the time constraints of trial. *Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292, 305 (4th Cir. 1984) (affirming exclusion of "consumer complaints" under Rule 403 because if admitted "the trial would have been unduly prolonged while [the defendant] challenged the substance of each complaint and sought to identify the precise type of [product] that each complainant used").

## III.    Other Proceedings are Inadmissible under Rules 402, 404(b), 802, and 403.

The Court should exclude evidence of and from proceedings brought **against** Vivint by third parties including a pending lawsuit by CPI Security Systems, Inc.,[7] "any [unspecified] criminal, legal, or administrative proceedings" against Vivint, and regulatory agency proceedings against Vivint.[8] The Court should also exclude evidence from a settled 2017 lawsuit between ADT and Vivint (the "2017 Lawsuit").[9]

---

[7] (**Ex. N**, ADT 2nd Suppl. Discl. at p. 1; **Ex. O**, ADT 1st Suppl. Discl. at pp. 2-3.)

[8] (**Ex. A**, ADT R. 26(a)(1) Discl. at pp. 2-3.)

[9] (**Ex. A**, ADT R. 26(a)(1) Discl. at p. 5, documents from *ADT LLC & ADT US Holdings, Inc. v. Vivint, Inc.*, No. 9:17-cv-80432-DMM/DLB (S.D. Fla.); **Ex. M**, ADT Trial Witness List at p. 3,

Irrelevant (Rule 402). The Other Proceedings involving third parties are irrelevant to ADT's claims because the evidence has no tendency to make ADT's allegations in any given customer interaction more or less probable. *See* Rule 401. Separate lawsuits, involving different parties, legal standards, and circumstances, is not relevant here. *Affiliati Network, Inc. v. Wanamaker*, 2017 WL 8784853, at *5 (S.D. Fla. Aug. 23, 2017) (granting motion in *limine* to exclude evidence of prior litigation); *Ward v. Estaleiro Itajai S/A*, 2008 WL 1749475, at *2 (S.D. Fla. Apr. 10, 2008) (same); *Bunch v. Pac. Cycle, Inc*., 2015 WL 11622952, at *7–8 (N.D. Ga. Apr. 27, 2015) (granting motion in *limine* to preclude evidence or argument about "other, unrelated lawsuits, as this evidence is irrelevant").

ADT intends to argue that unsubstantiated allegations against Vivint in external circumstances are indicative of Vivint's liability here. (**Ex. N**, ADT 2nd Suppl. Discl. at p. 10, "ADT anticipates asking the jury to consider the amount of past settlements paid by Vivint only to continue such [deceptive sales] conduct, including . . . Vivint's numerous settlements with various public entities and state attorneys general.") To conclude that Vivint has "continued" unlawful practices presupposes the accuracy of ***unproven*** allegations in Other Proceedings, requiring an impracticable "mini-trial" as to the validity of allegations in external proceedings that, again, have no bearing on whether alleged statements were made to any ADT customer in this lawsuit. *Goussen v. Mendez Fuel Holdings LLC*, 2018 WL 5831084, at *2–3 (S.D. Fla. Nov. 7, 2018) (excluding all references at trial to any previous FLSA lawsuits filed against defendants where raising prior lawsuits "would effectively create a 'mini-trial' about the merits of the previous cases and other 'collateral issues' that may not relate to the present case") (quoting *Bui v. Minority*

---

intent to "call by deposition designation video" witnesses in the 2017 Lawsuit, including but not limited to 22 ADT customer depositions.)

*Mobile Sys., Inc.*, 2016 WL 6518804, at *1 (S.D. Fla. Jan. 28, 2016) (excluding any reference to previous lawsuits) (quoting *Anderson v. WBMG-42*, 253 F.3d 561, 567 (11th Cir. 2001)). Settlements with third parties are no more probative. *See id.* (excluding FLSA settlement agreements "for the same reasons" the Court granted the motion to exclude prior lawsuits).[10]

Evidence from the 2017 Lawsuit, including the parties' prior settlement, is likewise not relevant. ADT intends to introduce, *inter alia*, 22 ADT customer depositions taken in that case to argue that Vivint's conduct **in this case** is "widespread." (**Ex. O**, ADT's 1st Suppl. Discl. at p. 2.) Testimony provided by ADT customers in a prior lawsuit do not make it more or less probable that an entirely different customer, years later, has the same experience. Moreover, there was never any finding, adjudication, or admission of liability against Vivint relating to any of 22 customers, such that admitting their testimony would result in the same "mini-trial" problems that plague the Agency Complaints and the Other Proceedings.

Ultimately the 2017 Lawsuit is of no consequence in determining this action because ADT has contractually released any claims regarding the 2017 ADT customers. This sweeping release included ADT's agreement to not seek **any** form of future relief—including but not limited to "monetary damages"—arising from any of its former claims. (**Ex. P**, § (B)(1), (6).) The release included claims even "touching upon or concerning" the 2017 Lawsuit, "including but not limited to ADT's claims of deceptive sales practices." (*Id.*) Any reference to the 2017 Lawsuit to argue that Vivint's alleged unlawful conduct is "widespread" is barred and thus irrelevant. ADT's intent to introduce the 2017 settlement as a baseline amount for its damages is likewise inadmissible.

---

[10] *See also Wajcman v. Inv. Corp. of Palm Beach*, 2009 WL 465071, at *1–2 (S.D. Fla. Feb. 23, 2009) (settlements in similar cases inadmissible where offered to "suggest" that defendant violated the law in the present case) (citing *Sears v. PHP of Alabama, Inc*., 2006 WL 1223302, at *2 (M.D. Ala. May 5, 2006) (excluded settlement in other cases where Plaintiff sought to make improper implications about liability)).

ADT intends to demand a "sum sufficiently higher" in this case "given that the prior settlement failed to curtail Vivint's misconduct." (**Ex. N**, ADT 2nd Suppl. Discl. at p. 10.) The settlement denied any admission of wrongdoing or liability by Vivint (**Ex. P**, § I) such that there is no basis to argue or imply unlawful conduct has "continued." As explained above, courts exclude settlements where offered to even "suggest" a defendant was guilty of prior alleged wrongdoing. ADT intends to present the settlement dollar amount as a starting point for jury deliberations.

Inadmissible hearsay (Rule 802). Evidence of the out-of-court Other Proceedings is inadmissible hearsay. *Salinero v. Johnson and Johnson*, 2019 WL 7753445, at *3 (S.D. Fla. Sept. 25, 2019) ("[I]f Plaintiffs were to use the existence of other claims or complaints as proof that other women suffered complications…such evidence would be inadmissible hearsay").

Inadmissible prior-acts (Rule 404(b)). "Prior lawsuits are encompassed by [Rule 404(b)'s] restriction on prior acts." *Guarantee Ins. Co. v. Brand Management Service, Inc.*, 2013 WL 6728177, at *1 (S.D. Fla. Dec. 20, 2013) (excluding references to a former lawsuit dealing with an unrelated litigant because those claims were "wholly immaterial to those asserted before this Court" and are "ultimately much more prejudicial than probative"); *Lanham v. Whitfield*, 805 F.2d 970, 972 (11th Cir. 1986) (upholding exclusion of evidence relating to other litigation under Rule 404(b) because the danger of confusing the issues, misleading the jury, and substantial prejudice outweighed probative value).

Unfair prejudice (Rule 403). Vivint would be unfairly prejudiced by ADT portraying it as a "bad" company based on the mere receipt of unsubstantiated complaints, and/or its participation in litigation. This evidence would confuse and mislead the jury as to substantive evidence of admissible customer evidence in this case versus ADT's innuendo and speculation. *A.T.O. Golden Construction Corp. v. Allied World Insurance Company*, 2018 WL 5886663, at *8-9 (S.D. Fla.

Nov. 9, 2018) (excluding prior lawsuits because "even if Plaintiff could demonstrate some probative value from allegations in other lawsuits, presenting evidence of these other cases would lead to a series of mini-trials that would likely confuse and mislead the jury from the task at hand of evaluating plaintiff's claims in this case and result in a waste of time and judicial resources"); *Bui v. Minority Mobile sys., Inc.*, 2016 WL 6518804, at \*1 (S.D. Fla. Jan. 28, 2016) ("[T]he probative value of [prior litigation] evidence is substantially outweighed by the danger of unfair jury bias against the chronic litigant under Rule 403.").

ADT has disclosed 27 depositions from the 2017 Lawsuit (including customers released by ADT), and third-party CPI customer depositions, upon which ADT seeks to piggy-back to contribute to its alleged damages. Vivint would have to defend third-party and released claims to the same extent as the claims in this lawsuit, essentially subsuming this trial entirely. *See Bunch; Boneta v. American Medical systems, Inc.*, 2021 WL 6776245, at \*3 (S.D. Fla. Oct. 6, 2021) ("[e]vidence of other lawsuits and the factual allegations therein is inadmissible under Rule 403").

## **ISSUE NO. 3: COMPETITOR LAWSUITS.**

The Court should exclude evidence of external lawsuits in which Vivint sued non-ADT competitors ("**Competitor Lawsuits**").[11] For the same reasons explained above as to External Matters against Vivint, these outside matters are not probative to the discrete ADT customer interactions supporting ADT's claims under Rule 402, and are inadmissible under Rule 404(b), Rule 802, and Rule 403. (*See discussion, supra.*)

---

[11] (**Ex. N**, ADT 2nd Suppl. Discl. at p. 4, pleadings in 2012 Utah case against Elite Security Services, Inc.; *id.* at p. 5, pleadings and deposition testimony in 2011 Utah case against NorthStar Alarm Services, LLC; Vivint's "positions taken in cases it has prosecuted against other competitors in the industry.")

These matters did not involve any ADT customer, and concerned alleged unlawful conduct by non-Vivint salespersons. ADT intends to use this evidence to attribute prior ***legal*** positions to Vivint, which is specifically disallowed under Rules 402 and 404(b), as ADT improperly intends to paint Vivint as a litigious character that lacks validity in its current defenses. *See Energy Smart Industry, LLC v. Morning View Hotels-Beverly Hills, LLC*, 2015 WL 11233085, at *1 (S.D. Fla. June 3, 2015) (excluding plaintiff's other lawsuits, as the fact that the plaintiff brought breach of contract claims against other parties "does nothing to show that Plaintiff breached its contract with Defendant"); *Hydentra HLP Int. Limited v. Luchian*, 2016 WL 5942525, at *2 (S.D. Fla. May 31, 2016) (excluding testimony and argument from prior lawsuits because "[t]he charge of litigiousness is a serious one, likely to result in undue prejudice against the party charged, unless the previous claims made by the party are shown to have been fraudulent"). Under Rule 403, this evidence would further require the jury to analyze the allegations and non-binding legal arguments from two cases over a decade old, and neither resolved at trial or summary judgment. "The reason evidence of prior lawsuits is generally not allowed is because evidence of other cases can at times 'lead to a series of mini-trials,' and pose a danger of confusing and misleading the jury 'from the task at hand of evaluating plaintiff's claims,' including a 'waste of time and judicial resources.'" *Gutierrez v. Galiano Enterprises of Miami Corp.*, 2019 WL 3302325, at *3 (S.D. Fla. July 23, 2019) (internal citation and quotation omitted).

<u>**ISSUE NO. 4**</u>**: INADMISSIBLE DAMAGES.**

The Court should exclude any reference to any category or computation of damages based on (or extrapolated from) inadmissible evidence. For example, in reaching his conclusions regarding ADT's damages, ADT's expert Dr. Winer relies on Customer Complaints, External

Matters Against Vivint, Agency Complaints, and Other Proceedings.[12] ADT's other expert Dr. Matolo relies on "industrywide metrics" taken from various hearsay publications to inform "the Representative Industry Model."[13] ADT's disclosures indicate that ADT will attempt to establish other categories of damages using such inadmissible evidence as well as Competitor Lawsuits.[14] As discussed above, each of these categories of documents are inadmissible.

ADT has the burden to prove its damages to a reasonable degree of certainty through the introduction of admissible evidence. *See, e.g.*, *Hassan v. United States Postal Serv.*, 842 F.2d 260, 267 n.11 (11th Cir. 1988); *Iron Bridge Tools, Inc. v. Meridian Int'l Co.*, 2016 WL 8716673, at *7 (S.D. Fla. Feb. 2, 2016) (damages must be proven with "a sufficient quantum of evidence" and "with reasonable certainty"); *Smith v. Austin Dev. Co.*, 538 So. 2d 128, 129 (Fla. 2d DCA 1989) ("[I]t is incumbent upon the party seeking damages to present evidence to justify an award of damages in a definite amount").

While an expert may rely on inadmissible evidence "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject," Rule 703; ADT has not established that predicate. Dr. Matolo claims "numerous" other experts use "kind of, industry type of models," but fails to name a single specific expert that uses "the Representative Industry Model" described in his report. (**Ex. R**, Matolo Dep. at 111:11-112:1.)

---

[12] (**Ex. Q**, Winer Dep. at 171:11-25, listing "customer complaints," "social media posts," "Previous ADT Case Against Vivint," and "State Government and FTC Actions" in response to "what is the main evidence that you're using as a basis for your opinions in this case?")

[13] (**Ex. R**, Matolo Dep. at 215:7-216:15, metrics from alarmprogramadvisor.com; (*id*. at 218:22-220:1), metrics from Barnes Associates.)

[14] (**Ex. N**, ADT 2nd Suppl. Discl. at p. 2, relying on Customer Complaints and summaries thereof to state damages for "lost and disrupted customers"; (*id*. at pp. 7-8), relying "on the totality of the evidence presented" to state damages for "disgorgement of Vivint's profits".)

Moreover, "a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Mamani v. Berzaín*, 2018 WL 1010582, at *3 n. 6 (S.D. Fla. Feb. 22, 2018); *see also In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 684183, at *2-3 (N.D. Fla. Feb. 11, 2021) (allowing an expert to opine about circumstances throughout the entire Army based on limited personal accounts and information relayed by an unspecified number of third parties would "sanction their use as a vehicle for introducing hearsay testimony").

When a party attempts to extrapolate damages based on a sampling of actual evidence not only must the method of extrapolation be appropriate,[15] but the underlying evidence must be admissible and be a reliable representation. *See 200 Leslie Condo. Ass'n v. QBE Ins. Corp.*, 965 F. Supp. 2d 1386, 1394 (S.D. Fla. 2013) (because hurricane damage was not uniform across a building, extrapolating a 30% damage finding to the over 80% of units is speculative); *316, Inc. v. Md. Cas. Co.*, 625 F. Supp. 2d 1179, 1184 (N.D. Fla. 2008) (defendant's alleged conduct toward plaintiff is not enough to extrapolate defendant's general business practice as the allegations about the defendant's business practices were "untethered to supporting factual allegations" and "impermissibly speculative"); *Commodity Futures Trading Comm'n v. Wilshire Inv. Mgmt. Corp.*, 407 F. Supp. 2d 1304, 1315 (S.D. Fla. 2005), *vacated on other grounds*, *Commodity Futures Trading Com'n v. Wilshire Inv. Management Corp.*, 531 F.3d 1339 (11th Cir. 2008) (concluding that evidence of fraud committed in nine customer solicitations did not allow inference that other customers were also victims where there was "little indication" that the fraud was "necessarily a part of each . . . solicitation").

---

[15]   ADT's unreliable methods of extrapolation are further documented in Vivint's contemporaneously filed *Daubert* Motions.

Here, based on Customer Complaints, ADT and its experts intend to extrapolate damages for lost customers, disgorgement of profits, and corrective advertising. (*See* fn. 12 & 14, above.) Such extrapolation is inappropriate because the underlying evidence is inadmissible for the reasons discussed above. ADT's attempted extrapolations also fail because the Customer Complaints are not a reliable representation of Vivint's sales practices. The examples set forth in Issue No. 1 above, show that what ADT calls a complaint of a "deceptive sales practice" can mean many different things. Determining whether a deceptive sales practice actually occurred and harmed ADT requires customer testimony and cross-examination. ADT glosses over the high variability, and instead pretends the evidence shows a predicable, uniform pattern of interactions between Vivint representatives and ADT customers. ADT then attempts to extrapolate from this faulty, inadmissible data. The result is speculative and baseless claims for damages.

ADT's attempts to extrapolate damages are further flawed because they fail to distinguish actionable misconduct from legal sales activity. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1252 (11th Cir. 2007) (expert report failed to "separate out" damages that were actually attributable to defendant's alleged misconduct); *Monahan Prods. LLC v. Sam's East, Inc.*, 463 F. Supp. 3d 128, 146-148 (D. Mass. 2020) (granting summary judgement for the defendant on the plaintiff's claim for prospective corrective advertising damages where the plaintiff's marketing expert's proposed remedy failed to distinguish between actionable misconduct and sales activity that does not violate the Lanham Act); *ADT LLC v. Vivint, Inc.*, Case No. 17-cv-80432-Middlebrooks (S.D. Fla. Nov. 15, 2017), attached as **Ex. S**, at pp. 5-6 (excluding Dr. Mangum from testifying "that the royalty rate should be applied to Vivint's revenues that are not actually attributable to Vivint's alleged misconduct").

Finally, ADT's attempts to extrapolate damages based on Customer Complaints should not be permitted for the additional reason that ADT's formula for such damages was not timely disclosed. *See* Fed. R. Civ. P. 37(c)(1) (providing that information required to be disclosed by Rule 26(a), if not disclosed timely, may not be used at trial "unless the failure was substantially justified or is harmless"); *see also City of Rome v. Hotels.com, L.P.*, 549 F. App'x 896, 905 (11th Cir. 2013) (affirming district court's exclusion of damages evidence when the plaintiff failed to submit a proper Rule 26 disclosure); *K3 Enterprises, Inc. v. Sasowski*, 2022 WL 3306725, at *5-6 (S.D. Fla. Aug. 11, 2022) (plaintiff failed to provide a computation of each category of damages, so the court excluded damages for which "rudimentary estimates" and "some supporting documentation" could have been offered); *Nymbus, Inc. v. Chrome Fed. Credit Union*, 2021 WL 2433630, at *1-2 (S.D. Fla. June 3, 2021) (barring the party from introducing evidence of its damages at trial when failure to disclose the damages sought was not substantially justified and was not harmless). Here, ADT's counsel emailed a "demonstrative exhibit" to Vivint's counsel on November 18, 2022, in the middle of the ADT Rule 30(b)(6) deposition, including a previously undisclosed "formula" for "Lost Account Damages," which formula included previously undisclosed factors titled "Multiple" and "Underreporting Factor."[16] ADT offered no justification for this late disclosure, which prejudiced Vivint's ability to prepare for and conduct discovery including the ongoing depositions of ADT.

For each of these reasons, the Court should exclude ADT's damages theories based on inadmissible evidence.

---

[16] A copy of ADT's proposed demonstrative exhibit is attached as **Ex. T**.

**REQUEST FOR HEARING**

Pursuant to local Rule 7.1(b), Vivint respectfully requests a hearing on its Motion in *Limine*. A hearing would be beneficial given the volume and complexity of issues raised in the Motion. Moreover, Vivint previously requested additional pages for its Motion, which was denied [D.E. 106, 110]. A hearing would allow Vivint to fully and adequately present the issues raised in the Motion. Vivint estimates that the time required for argument would be approximately 60 minutes.

**CERTIFICATE OF GOOD FAITH CONFERENCE**

Pursuant to Local Rule 7.1(a)(3), undersigned counsel certifies that on Friday, December 2, 2022, he conferred in good faith by video-conference with counsel for ADT regarding this Motion, who stated that ADT will oppose the Motion.

Respectfully submitted,

/s/Joshua R. Brown
Michael N. Kreitzer
Florida Bar No. 705561
kreitzerm@gtlaw.com
GREENBERG TRAURIG, P.A.
333 S.E. 2nd Ave., Suite 4400
Miami, Florida 33131
Telephone: 305.579.0500

-and-

Gregory W. Herbert
Florida Bar No. 0111510
herbertg@gtlaw.com
Joshua R. Brown
Florida Bar No. 826391
brownjr@gtlaw.com
GREENBERG TRAURIG, P.A.
450 S. Orange Ave., Suite 650
Orlando, Florida 32801
Telephone: 407.420.1100

-and-

Matthew A. Steward (*pro hac vice*)
mas@clydesnow.com
Shannon K. Zollinger (*pro hac vice*)
skz@clydesnow.com
CLYDE SNOW & SESSIONS
201 S. Main Street, Suite 1300
Salt Lake City, Utah 84111
Telephone: 801.322.2516

*Counsel for Defendants Vivint Smart Home,*
*Inc. and Legacy Vivint Smart Home, Inc.*

## CERTIFICATE OF SERVICE

I certify that on December 15, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of filing to all counsel of record.

/s/Joshua R. Brown