## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 1:20-cv-23391- GOODMAN
[CONSENT CASE]

ADT LLC, *et al.*,

    Plaintiffs,

v.

VIVINT SMART HOME, INC., *et al.*,

    Defendants.

_____/

### DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DR. RUSSELL S. WINER

Defendants Vivint Smart Home, Inc. f/k/a Mosaic Acquisition Corp. and Legacy Vivint Smart Home, Inc. f/k/a Vivint Smart Home, Inc. (collectively "Vivint") seek to exclude the testimony of ADT LLC and The ADT Security Corporation (collectively, "ADT") proposed expert witness Dr. Russell Winer ("Winer"), a marketing professor who proposes a door-to-door remedial advertising campaign to remedy purported "confusion" created by the alleged misconduct of Vivint representatives in promoting the sale of their home security alarm systems. Winer's opinions should be excluded under Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny because his expert testimony is neither relevant nor reliable.[1]

### INTRODUCTION

In addition to opining on the ultimate jury question of whether there is "sufficient evidence" to conclude that Vivint is liable for the alleged misconduct in this case, Winer opines

---

[1] Vivint is contemporaneously filing an unopposed motion to seal Exhibits A, B and D, which ADT has designated "confidential" or "highly confidential - attorneys' eyes only" under the Protective Order (D.E. 31). At the Court's direction, Vivint will file the exhibits under seal and/or provide courtesy copies of the Motion and all exhibits to chambers.

1

that ADT's alleged reputational harm from this misconduct must be rectified by a $27 million "remedial information campaign." Yet there is a complete disconnect between the scope of the alleged misconduct found by Winer the fact finder and his proposed damages measure.

His remedial information campaign involves ADT hiring staff to conduct a door-to-door campaign visiting 750,000 of ADT's customers to correct purported deceptive misstatements made by Vivint representatives about ADT. Winer insists that 750,000 ADT customers must be visited regardless of the number of customers that were confused by Vivint's alleged misconduct. In fact, Winer insists that 750,000 ADT customers must be visited regardless of whether these customers were ever visited by any Vivint representative.

Indeed, Winer proposes an entirely novel "inoculation theory" as part of his remedial information campaign. Under this "theory," ADT customers that have never been visited by a Vivint representative must still be educated by ADT during its door-to-door campaign to "watch out for" Vivint's future deceptive sales practices that might never take place. His "inoculation theory" is, thus, an impermissible attempt to obtain highly speculative damages to prevent potential harm from unknown future interactions with Vivint that might never occur and might not be deceptive or misleading. The law of damages, however, is not intended to "inoculate"—it is meant to compensate.

Winer's proposed sweeping remedial information campaign is further suspect because it is not tailored to rectify the ADT customer confusion caused by Vivint's alleged false or misleading statements. Instead, Winer casts such a wide net to remedy harm that it does not matter to him if ADT's customers believed Vivint's purported statements or were confused or deceived by Vivint's alleged conduct. Instead, Winer contends that if a Vivint representative visits an ADT customer and that ADT customer has any "negative feelings" about ADT or Vivint after the interaction, that

2

ADT customer is subject to his $27 million remedial information campaign. The law, however, was never intended to remedy negative feelings—it is meant to correct customer confusion about perceived affiliation as between the parties' goods and services. Accordingly, Winer's sweeping remedial information campaign travels far outside the boundaries of the law and is neither relevant nor helpful in addressing the facts and evidence in this case.

Not only is Winer's remedial information campaign contrary to law, but his methodology is entirely suspect and unreliable. Winer admits he was not able to quantify the damages because he does not know the number of people exposed to the alleged deception by Vivint sales representatives. Instead, Winer relied on a "random sampling" given to him by a litigation consulting firm and ADT's counsel that included no more than six or seven audio files, six deposition excerpts, a few social media posts, and purported "evidence" that Vivint committed bad acts in the past. Winer took no steps to ensure that the "random sampling" was representative, did not know what methodology was used to select the random sample, and did nothing to verify the accuracy of the social media posts.

It is based on this highly selective random sampling that Winer—under the guise of scientific methodology—concluded that 750,000 ADT customers should receive door-to-door visits by ADT representatives to correct the alleged nebulous harm to ADT's goodwill and reputation. Winer's use of this novel, untested, and not generally accepted methodology for his $27 million "remedial information campaign" is nothing but inadmissible guesswork, unrelated to the facts of this case.

Winer further intends to usurp the role of the jury and offer an "opinion" that (1) Vivint is practicing deceptive sales tactics; (2) the allegations in the ADT Complaint regarding Vivint's deceptive sales tactics are true; and (3) Vivint's misleading and aggressive tactics have been

3

widespread, harmful, and need to be remedied. Clearly, whether Vivint engaged in deceptive sales tactics, how widespread such alleged tactics were, and the resulting harm, if any, are all issues that must be decided by the jury based on the evidence presented at trial. Winer, of course, cannot tell the jury what result to reach or testify as to legal conclusions. Yet, that is exactly what he intends to do if he is allowed to testify.

Winer's testimony is a perfect illustration of why the district court is the "gatekeeper" of expert testimony. Allowing Winer to testify will (1) infect the jury with a highly suspect $27 million proposed remedial information campaign that is contrary to law and outside the bounds of any generally accepted methodology; and (2) usurp the jury's role as a factfinder on issues of liability. For these reasons, more fully discussed below, Winer's testimony should be excluded under Rule 702 and *Daubert*.

## ARGUMENT

**I.    THIS COURT, IN ITS ROLE AS "GATEKEEPER," SHOULD EXCLUDE WINER'S EXPERT TESTIMONY.**

The district court, in its role as a "gatekeeper" of expert testimony, "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *U.S. v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 589 (1993)); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (under the *Daubert* framework, district courts act as gatekeepers overseeing the admission of scientific and non-scientific expert testimony). In the Eleventh Circuit, consistent with *Daubert*, the inquiry into the admissibility of an expert's testimony is based on the following three factors:

> (1) the expert is qualified to testify competently regarding the matters he intends to address;[2]
>
> (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and
>
> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*MidAmerica C2L Inc. v. Siemens Energy Inc.*, 25 F.4th 1312, 1326 (11th Cir. 2022) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). While there is some overlap in these requirements (qualification, reliability, and helpfulness), they are distinct concepts and the Court should not conflate them. *Id.*

"The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) (citing *Daubert*, 509 U.S. at 592 n. 10). Here, ADT has failed to meet its burden, and this Court, acting as the "gatekeeper," should exclude Winer's testimony.

### A. Prospective Corrective Advertising Damages Are An Extraordinary Remedy Under The Lanham Act.

Section 1117(a) of the Lanham Act provides that a successful plaintiff shall be entitled, subject to the principles of equity, to recover (1) the defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. 15 U.S.C.A. § 1117(a).

---

[2] Rule 702 requires the district court to initially determine whether the purported expert witness is qualified to give the proffered testimony. To be qualified as an expert, a witness must possess specialized "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. If the purported expert is qualified, the district court must then determine that the expert's testimony is both relevant and reliable. Vivint is not challenging Winer's qualifications in this Motion.

"Damages sustained by the plaintiff" may include "the costs of corrective advertising" to repair injury to its business reputation. *PODS Enters., LLC v. U-Haul Int'l, Inc.*, 126 F. Supp. 3d 1263, 1282 (M.D. Fla. 2015); *see also, Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1241 (11th Cir. 2008) (affirming jury verdict awarding $25,000 in damages for corrective advertising in trademark infringement case). "In a typical case, a plaintiff acts quickly to dispel the defendant's harmful statements by conducting its own corrective advertising campaign well before trial." *First Act Inc. Brook Mays Music Co., Inc.*, 429 F. Supp. 2d 429, 437 (D. Mass. 2006). Such retrospective advertising damages are "eas[y] to quantify because the plaintiff can represent out-of-pocket corrective advertising costs already incurred." *Id.*

Courts have also awarded "prospective corrective advertising damages" to be conducted in the future, but with reservation. *See, e.g. First Act*, 429 F. Supp. 2d at 438 (calling it a "somewhat novel theory of damages that has been limited in its application"); *PBM Prods., Inc. v. Mead Johnson & Co.*, 174 F. Supp. 2d 417, 420 (E.D. Va. 2001) (noting that "there have only been a few false advertising case[s] where a federal court granted prospective corrective advertising expenditures"). Courts hesitate to award "prospective damages" because of the "substantial potential for inaccuracy" and difficulty quantifying the "reputational harm" sustained by the plaintiff. *Monahan Prods. LLC v. Sam's East, Inc.*, 463 F. Supp. 3d 128, 146 (D. Mass. 2020). Indeed, some courts have gone so far as to describe "prospective corrective advertising damages" as an "extraordinary remedy," and commentators have criticized it as "arbitrary and inefficient."[3]

---

[3] In the Tenth Circuit, and other circuits, prospective corrective advertising damages are only allowed if the plaintiff lacked the financial ability to conduct adequate corrective advertising before trial. *See, e.g., Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F. 2d 1365, 1375 (10th Cir. 1977). The Eleventh Circuit has not expressly adopted or rejected this limitation. *Aronowitz v. Health-Chem*, 513 F.3d 1229 (11th Cir. 2008). If such a limitation was applied, ADT would have to demonstrate that it did not have the financial ability to conduct adequate corrective advertising prior to trial.

*See, e.g.*, *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.*, 628 F. Supp. 2d 312, 326 (E.D.N.Y. 2009); Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition 30:84* (4th ed. 2006).

Here, ADT does not seek the more easily quantifiable retrospective advertising damages, presumably since it has undertaken little or no such effort and incurred little or no such costs, despite alleging grievous reputational harm spanning five years. Instead, ADT seeks "prospective damages" to fund a future remedial information campaign for the alleged harm caused by Vivint's purported deceptive sales practices. According to Winer, this remedy is not "corrective advertising," though it is based on "the same principal [*sic*]." **Exhibit A** (hereinafter "Winer Dep.") at 206:20-25). Instead, Winer's remedial information campaign is designed to "re-educate the consumers" about deceptive practices and "how to defend against them." (Winer Dep. at 207:16-208:2). Winer's "remedial information campaign" is, thus, even more novel and suspect than an award for prospective corrective advertising, and thus this Court, after carefully exercising its gatekeeping function, should conclude that Winer's opinions are inadmissible under *Daubert* and must be excluded in their entirety.

      **B.**      **Winer's "Inoculation" Theory Is Contrary To Law.**

An expert's damage theory must be excluded if it is contrary to law. *See, e.g., Coquina Invs. v. Rothstein*, No. 10–60786–Civ, 2011 WL 4949191, at *7 (S.D. Fla. Oct. 18, 2011) (expert opinion that does not comport with a recognized measure of damages is unreliable); *Steele v. Sears Roebuck & Co.*, 684 F. App'x 876, 877 (11th Cir. 2017) (no abuse of discretion in excluding expert testimony when it was irrelevant because it concerned damages that were not available under the relevant statute). That is the precise circumstance here.

Corrective advertising awards, like all § 1117(a) awards under the Lanham Act, are compensatory—not punitive.[4] A plaintiff must, therefore, establish a loss before being entitled to a damage award to "make the plaintiff whole." *Illinois Tool Works, Inc. v. Rust-Oleum Corp.*, 955 F.3d 512, 516 (5th Cir. 2020) (vacating corrective advertising award); *Big O Tire Dealers, Inc.*, 561 F.2d at 1374. Stated differently, "damages are available only to the extent that injury is shown already to have been suffered." *Macia v. Microsoft Corp.*, 335 F. Supp. 2d 507, 521 (D. Vt. 2004), *aff'd*, 164 F. App'x 17 (2d Cir. 2006) (internal quotations marks and citation omitted).

For Winer's opinion on damages to be admissible, it must be tailored to rectify the harm, if proven, that ADT has already suffered. Winer's opinion fails to meet this test. Instead, Winer's $27 million remedial information campaign seeks to rectify speculative future harm to ADT's reputation if Vivint's alleged deceptive sales practices are not abated. His creative theory—which he refers to as "inoculation"—travels far outside the law's boundaries. According to Winer, even if an ADT customer was **never** visited by Vivint, that customer must nonetheless be subject to his remedial information campaign. (Winer Dep. at 133:8-21). Winer describes his "inoculation" theory as follows:

> [I]t may well be the case there are actually more people who haven't been contacted by Vivint yet.
>
> So, the idea is kind of inoculation, all right? And try to get them to watch out for this kind of behavior, watch out for the deceptive tactics that Vivint salespeople use. And, so, definitely, even if they have not been contacted by Vivint yet, they should be part of the population that receives this campaign.

---

[4] Because there is no law on remedial information campaigns as a remedy for unfair competition, and Winer concedes his remedy is based on the same principle, the decisions on corrective advertising are instructive. (Winer Dep. at 24:24-25:5). If the remedy is not based on corrective advertising, it is a completely novel theory and contrary to law.

(Winer Dep. at 134:9-18). He further explains that he uses the term "inoculation" because: "[I]t's kind of like inoculation against a virus. It's kind of like giving them information in advance so that they don't get deceived when they get called on." (Winer Dep. at 135:3-6). Thus, Winer's remedial information campaign is not limited to alleged harm suffered by ADT but, instead, is meant to prevent potential future harm. (Winer Dep. at 135:15-19). Winer admits this, in the following exchange:

> Q. So, part of your -- the purpose of your information campaign is to prevent not only past harm that has already occurred, but future harm that has not yet occurred, but could occur if Vivint rep- -- sales representatives do visit customers?
>
> A. That's correct.

(Winer Dep. at 135:20-25). Such damages for theoretical future harm are impermissible under the law, and Winer' "inoculation" theory is wholly improper.

Importantly, Winer fails to opine on an informational campaign to solely **remedy** purported past harms sustained by ADT. Yet, that is exactly what corrective advertising—a form of compensatory damages—is meant to do. *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 506 (7th Cir. 1992) (internal citations omitted) (corrective advertising is a method of repair). Instead, Winer's sum of $27 million is reached by impermissibly lumping damages for alleged past **and** potential future harm together.

Not only is the amount of this award legally flawed but it is also factually specious. Corrective advertising awards must bear a relation to the value of the trademark that was harmed. *See, e.g., Zazu Designs*, 979 F.2d at 506. Here, Winer has presented no evidence that any ADT trademarks were harmed in this case. Winer's $27 million figure is astonishing given ADT's Vice President and Deputy General Counsel for Intellectual Property's testimony that in the last four years, ADT has (1) not included or considered including any statements in its publicly filed 10-Ks

9

regarding any material impact to its brand; and (2) the publicly filed 10-Ks have included "the same or very similar" statement regarding the strength of ADT's brand. **Exhibit B** (hereinafter "Cona Dep.") at 133:17-135:25). Indeed, ADT has failed to even attempt to measure or quantify any alleged damage to its brand, goodwill or reputation by any traditional means, such as via a consumer perception survey, as is common in Lanham Act cases.

Simply stated, Winer's opinion seeking future damages is impermissible, and he has not provided a basis for $27 million award to compensate for the unsubstantiated harm to ADT's brand. His failure to substantiate and separate out damages that are directly attributable to the alleged harm suffered by ADT due to Vivint's conduct leaves this Court with no choice but to exclude his expert testimony on damages in its entirety. *See, e.g., Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1252 (11th Cir. 2007) (expert report failed to "separate out" damages that were actually attributable to defendant's actions); *ADT LLC v. Vivint, Inc.*, Case No. 17-cv-80432-Middlebrooks (S.D. Fla. Nov. 14, 2017), attached as **Exhibit C**, at 5 (ADT should "separate out the claimed damages that were **actually attributable** to Vivint's conduct").

### C. Winer's Proposed Remedial Information Campaign Is Not Tailored to Rectify The Alleged Harm to ADT Resulting From Vivint's Purported Deceptive Sales Practices.

The requirement that the expert's testimony "assist[s] the trier of fact to understand the evidence or to determine a fact in issue . . . . goes primarily to relevance." *Daubert*, 509 U.S. at 591. Thus, "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* District courts should, therefore, exclude expert testimony if it lacks relevance to, or does not "fit," the issues to be decided in the case. *Id.*

Here, the jury must decide is whether ADT was harmed by Vivint's alleged unfair competition, resulting in damage. To prove the required harm, ADT must establish that Vivint

engaged in unfair competition by using false or misleading facts or representations of fact that **were likely to cause confusion or to deceive as to affiliation, connection, or association with ADT**. 15 U.S.C. Section 1125(a)(1). If such harm is established, a prospective corrective advertising award may be proper to "compensate[] the injured party for **identifiable** harm to its reputation." *Monahan Prods., LLC*, 463 F. Supp. 3d at 146-148 (emphasis added) (granting summary judgment for the defendant on the plaintiff's claim for prospective corrective advertising damages where the expert's proposed remedy failed to distinguish between actionable misconduct and sales activity that does not violate the Lanham Act); *see also Zazu Designs*, 979 F.2d at 506-07 (rejecting corrective advertising award that was unrelated to plaintiff's injury). The award must, therefore, be tailored to the injury suffered; it is meant only to repair proven damage to the plaintiff's goodwill, not to provide a free advertising campaign. *Monahan Prods.*, 463 F. Supp. 3d at 148 (citing *Zazu Designs*, 979 F.2d at 506) (stating that "[w]ithout such a showing, [the plaintiff's] proposal is simply a free advertising campaign 'unrelated to [its] injury," and therefore it is "an unacceptable way to estimate damages.'").

Accordingly, for Winer's sweeping remedial information campaign damage theory to "fit" the facts of this case, it must be "tailored" to rectify the harm caused by the confusion or deception of Vivint's alleged false or misleading statements to ADT's customers. It does not. Instead, Winer casts a wide net and seeks to remedy potential harm that is wholly disconnected from any purported harm to ADT's reputation resulting from the purported confusion or deception caused by Vivint's alleged deceptive sales practices. In fact, it does not matter to Winer if ADT's customers were confused or deceived by Vivint's alleged conduct at all. According to Winer, his remedial information campaign applies to ADT customers who:

- Were provided false information about ADT by a Vivint representative **even if the customer does not believe the information** because there still might be a "negative impact" to ADT. (Winer Dep. at 100:1-101:21);

- Were provided with false information regarding an association between Vivint and ADT and, as a result, **had "lingering negative feelings" about the interaction but was not confused about the affiliation between Vivint and ADT**. (Winer Dep. at 105:16-106:24);

- Were provided with false information regarding an association between Vivint and ADT **but was neither confused nor believed the negative information** because there still may be "lingering negative residual feelings towards ADT." (Winer Dep. at 106:2-107:6);

- Were provided with false information, subsequently left ADT for Vivint but switched back to ADT because "**the customer at some point had a negative impression of ADT**." (Winer Dep. at 114:5-21);

- Were provided false information **but did not leave ADT after the interaction with the Vivint sales representative because the fact that the customer did not leave "doesn't mean [] there is some seed of doubt planted in their mind that there is something going on with the security company**." (Winer Dep. at 115:1-11);

- Were lied to by a Vivint representative who stated that Vivint would cancel the existing ADT contract when they switched over to Vivint, because such **lies by Vivint—though unrelated to ADT—might still make the ADT customer think that there is "some problem" with ADT**. (Winer Dep. at 131:3-132:15);

- **Formed negative impressions about Vivint after visiting an ADT customer's home**. (Winer Dep. at 142:7-23); and

- **Were not told anything negative or deceptive about ADT but the Vivint sales representative failed to leave the premises when requested**. (Winer Dep. at 186:3-11).

Therefore, according to Winer, even if there is no customer confusion or deception regarding the alleged representation made by Vivint about ADT, he nonetheless contends that the harm—which is no more than possible "negative impressions" or "negative residual feelings" about ADT—must be remedied by his $27 million remedial information campaign. (Winer Dep. at 106:16-107:6). But the Lanham Act was never intended to remedy negative feelings—it was meant to correct customer confusion about the affiliation of the plaintiff's goods and services.

12

Just how far Winer has strayed beyond the boundaries of the law is illustrated by his prior testimony on prospective corrective advertising in *PODS*. In *PODS*, PODS filed a trademark infringement action against U-Haul contending that U-Haul's use of the of the words "pod" and "pods" on its website to market U-Haul's products infringed on and diluted PODS' federally registered trademark. *Pods Enters., LLC*, 126 F. Supp. 3d at 1271. Winer was engaged as an expert by PODS and proposed a corrective web-based advertising campaign that was meant to remedy the dilution of the distinctiveness of the PODS' brand, i.e., it was intended to remedy U-Haul's infringement of PODS' trademark. *Id*. at 1283.

Here, Winer's proposed remedial information campaign is not meant to remedy the "confusion" or "deception" caused by Vivint's alleged sales tactics. In fact, he repeatedly admits that it does not matter if the customer was "confused" or "deceived" by Vivint's representations about its affiliation with ADT. Instead, his remedial information campaign is meant to remedy the possibility that an ADT customer might have some negative feelings about ADT after its interaction with Vivint. In fact, his proposed campaign would include ADT customers who were never even visited by Vivint. That is wholly disconnected from ADT's claims in this case, does not constitute actual damages, and is entirely speculative. If this Court admits Winer's opinions, it will permit a prospective corrective advertising damage award—which has already been characterized as "novel," "extraordinary," and "arbitrary" by courts and commentators—to be expanded to such an extent that the award would no longer be compensatory but would be "punitive," speculative, and in direct contravention of the law.

    **D.**  **Winer's Scientific Methodology Is Untethered to The Alleged Conduct At Issue and Is Unreliable.**

Winer's opinions should also be excluded because his methodology in calculating damages is not linked to the facts in this case and is, therefore, wholly unreliable. *See Phillips v. Am. Honda*

13

*Motor Co., Inc.*, 238 F. App'x 537, 540 (11th Cir. 2007) (no reliable link between the data and facts in the case). As a result, his testimony should be excluded under *Daubert*. The *PODS* case is, again, instructive. In *PODS*, the wrongful use of the words "pod" or "pods" was made on U-Haul's webpages. *Pods Enters., LLC*, 126 F. Supp. 3d at 1275. Therefore, based on the number of web searches conducted, PODS was able to establish that there were approximately 113.6 million misimpressions. *Id*. at 1283. Based on this number, Winer determined that it took 28 cents to create an impression and that it would take three impressions to correct a misimpression. *Id*. That number was then multiplied by the 113.6 million misimpressions producing a corrective advertising program that would cost approximately $95.4 million. *Id.*

Here, no such quantification was done. (Winer Dep. at 208:3-21) (admitting that in the *PODS* case, he was able to quantify the number of misimpressions because he could determine the number of people who visited the pages). In fact, Winer admitted that he does not know the number of people exposed to the alleged deception by Vivint sales representatives—a fact he states would have been helpful to his analysis. (Winer Dep. at 218:19-220:13). Therefore, Winer could not, and did not, quantify the number of visits that Vivint made to homes of ADT customers where alleged confusion occurred. Instead, Winer relied on (1) six or seven audio files provided to him by GBX, a litigation consulting firm retained by ADT; (2) six deposition excerpts from ADT customers, which he "skimmed"; (3) a few social media posts, whose accuracy he did not confirm; and (4) historical records of Vivint's past practices, some which involved legal actions pre-dating the claims in this lawsuit that did not involve ADT. (Winer Dep. at 24:1-25:5; 55:15-25; 159:14-162:15; 182:3-184:14; 216:1-12; 217:4-11).

The six or seven audio files selected by GBX were chosen from GBX's random sampling of 357 audio files out of a total of 1300 (which represented 250 ADT customers). (Winer Dep. at

14

62:1-25). According to Winer, GBX selected the six or seven because they "would help support my claims…that some kind of remedial information campaign was needed." (Winer Dep. at 29:19-20). Winer admitted that GBX advised him that "there was nothing negative about ADT" in the remaining random sampling. (Winer Dep. at 67:13-25). As for the remaining approximately 950 audio files, those were never reviewed by GBX or Winer, and their contents are unknown to Winer. (Winer Dep. at 79:23-24; 85:17-25) (Winer acknowledged that "we don't know what's in them" because "we did not analyze them."). Accordingly, Winer does not know if the audio files not reviewed by him may or may not have (1) supported his opinion (Winer Dep. at 24:3-16); (2) referenced Vivint (Winer Dep. at 78:20-22); or (3) involved ADT customer interactions with Vivint (Winer Dep. at 27:17-19; 28:17-29:24; 82:2-5).

In addition, Winer did not take any steps to ensure the GBX sample was representative, did not know what methodology was used to select the random sample, and did nothing to verify the accuracy of the social media posts. (Winer Dep. at 40:2-42:11; 64:3-16; 75:20-25, 87:-88). Instead, he merely "assumed that [GBX] did it in an appropriate manner." (Winer Dep. at 41:16-20; 64, 87:11-88:12; 168:14-169:2).

Based on this highly selective random sampling, Winer—under the guise of scientific methodology—concludes that 750,000 ADT customers should receive door-to-door visits by ADT representatives to correct the alleged nebulous harm to ADT's goodwill and reputation from Vivint's purported deceptive sales practices at a cost of $27 million. (Winer Dep. at 125:4-7). Winer's conclusion that "750,000 customers need to be visited door-to-door in this case" would not change even if "no customers left ADT to go to Vivint as a result of any alleged deceptive sales practices by Vivint." (Winer Dep. 124:25-126:10; *see also* Winer Dep. at 125:13-16) (testifying that the 750,000 visits would be required even if the evidence established that ADT did

not lose a single customer resulting from Vivint's purported deceptive sales practices). Thus, his analysis is completely orthogonal to any measure or quantification of the alleged misconduct or resulting confusion in this case.

Moreover, Winer references multiple surveys that are wholly unrelated to this case or even to the alarm services industry to opine that customer complaints about dissatisfaction with a company's services are significantly underreported. **Exhibit D** (hereinafter "Winer Report") at ¶¶ 85-87). These surveys state different underreporting percentages for customer complaints; but, without explanation, Winer arbitrarily concludes that only 5% of ADT customers who were dissatisfied because of Vivint's conduct voiced their discontent to ADT. (*Id*. at ¶ 87). Winer, however, never explained how he applied the data to the facts in this case. Furthermore, he failed to obtain or conduct a research survey that would be relevant to this case. In a previous case between the parties on similar allegations, this Court found this failure fatal under *Daubert*. (*See ADT LLC v. Vivint, Inc.*, Case No. 17-cv-80432-Middlebrooks (S.D. Fla. Dec. 7, 2017), attached as **Exhibit E**) (excluding expert testimony on underreporting factor). To the extent Winer applies the facts of this case at all, he makes only vague assertions that the reporting would be less in this case. (Winer Report at ¶ 86). The information Winer relies on for these vague assertions is itself inadmissible. *See* Defendants' Motion in Limine, Issue No. 4, contemporaneously filed with this Motion (setting forth that the data is speculative and inadmissible and should not be relied on by the experts). For each of these reasons, Winer's conclusion that customer complaints in this case were underreported is not reliable under *Daubert* and must be excluded.

In the end, what Winer has done is create a "novel," untested, and not generally accepted methodology for a "remedial information campaign" that does not relate to the facts of this case. *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, No. 09-61490-Civ, 2011 U.S. Dist. LEXIS

62969, at *13-14 (S.D. Fla. June 7, 2011) (expert's testimony "would not provide any calculation of concrete, specific forms of corrective advertising necessary to correct alleged customer confusion," and "[a]s such, [expert's] methodology will not assist the trier of fact"); *U.S. v. Hinestroza-Newbboll*, No. 20-13891, 2022 WL 2678773, at *2 (11th Cir. July 12, 2022) (as a gatekeeper for expert testimony, the district court must ensure expert testimony is "sufficiently reliable and relevant" in order to be considered by the jury); *WhereverTV, Inc. v. Comcast Cable Commc'ns, LLC*, No. 2:18-cv-529-JLB-NPM, 2022 WL 2751752, at *2 (M.D. Fla. July 14, 2022) (where the scientific principles and expert opinion lack "'evidentiary relevance and reliability,' the expert opinion will be found inadmissible"). Accordingly, Winer's testimony should also be excluded on this basis.

## II. WINER'S OPINIONS ON LIABILITY ARE IMPERMISSIBLE LEGAL CONCLUSIONS THAT USURP THE ROLE OF THE JURY AND MUST BE EXCLUDED.

An expert may testify on an issue of ultimate fact, but may not (1) tell the jury what result to reach; or (2) testify as to a legal conclusion. *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (the legal conclusion of the expert "should not have been permitted"). Telling the jury what result to reach is "unhelpful and inappropriate," and any such statements are impermissible under *Daubert. O'Malley v. Royal Caribbean Cruises, Ltd.*, No. 17-21225-Civ-SCOLA/TORRES, 2018 WL 2970728, at *3-4 (S.D. Fla. June 13, 2018). Yet, that is exactly what Winer intends to do here.

ADT seeks to admit Winer's opinion that Vivint is liable under the Lanham Act because, among other things, (1) Vivint allegedly engaged in deceptive sales tactics by suggesting that ADT is an "inadequate, non-functioning, or fading corporate entity"; and (2) as a result, created customer confusion resulting in harm to ADT's brand. **(** Winer Report at ¶¶ 12-17, 92-95). Such

17

statements are pure legal conclusions wholly outside of the purview of permissible expert testimony.

In fact, Winer's deposition testimony makes clear that he reached, and intends to offer, an opinion that Vivint committed deceptive sales tactics. When asked what conclusion he intends to offer to the jury, Winer stated as follows:

> I will say that I have discovered enough evidence from [] four sources of information,[5] and other sources that I've read, that lend credibility to the fact that Vivint is practicing deceptive sales practices.

(Winer Dep. at 176:10-14). In addition, he testified that based on the "evidence," he concluded that the allegations in the Complaint are true, stating "the weight of the evidence from everything put together, seems to support the position that ADT has taken in this case." (Winer Dep. at 165:23-25). Further exchanges during Winer's deposition elucidate his opinion:

> Q. So, your position that – part of your opinion in this case is that Vivint did, in fact, commit the misconduct that ADT alleges they committed?
>
> A. My – my conclusion is that there was enough evidence to support the fact – to support my conclusion that, yes, in fact, Vivint is culpable of deceptive behavior at that point of purchase with consumers in their homes.
>
> Q. And if you're allowed to testify at trial, would part of your testimony be to tell the jury that there is sufficient evidence for you to determine that Vivint was culpable of that behavior?
>
> ***
>
> A. I would say that – I would say that there is sufficient evidence supporting that. That, in fact, Vivint did, in fact, use deceptive sales practices on customers and that some kind of remedy needs to be implemented.

---

[5] The "evidence" Winer relies on consists only of the (1) six or seven audio files provided to him by GBX; (2) six deposition excerpts; (3) a few social media posts, and (4) historical records of Vivint's past practices. *See supra* Argument I(d). Most of this "evidence" is subject to a separate motion in limine that is being filed contemporaneously with this motion challenging the admission of the evidence as hearsay and as otherwise inadmissible. Although an expert can rely on inadmissible evidence, such testimony cannot be used as a vehicle to admit it.

(Winer Dep. at 148:13-25; 149:2-6). Winer further concludes based on the "evidence" that Vivint's "misleading and aggressive intrusion of ADT customers has been widespread, harmful, and needs to be remedied." ( Winer Report ¶ 14).

Clearly, whether Vivint engaged in deceptive sales tactics, how widespread such alleged tactics were, and the resulting harm, if any, are all issues that must be decided by the jury based on the evidence presented at trial. Not only would a contrary ruling improperly usurp the factfinding role of the jury, but admitting such expert testimony would be highly prejudicial and inflammatory because of the likelihood that it would taint the jury's views based on Winer's selective, flawed, and misguided liability analysis. *See, e.g., Katzoff v. NCL Bah., Ltd*, No. 19-22754-CIV-COOKE/GOODMAN, 2021 WL 1525517, at *8 (S.D. Fla. Apr. 19, 2021) (expert's opinion that placement of monitor was risky unreasonably usurped the factfinder's role).

## CONCLUSION

In sum, Winer admits that his conclusions regarding Vivint's deceptive sales practices have no bearing on the amount of damages he opines to in this case. (Winer Dep. at 197:6-198:2). Thus, not only is Winer's $27 million damages award completely disconnected from the alleged misconduct in this case. His liability conclusions, even if permissible, are of no value to the jury in reaching a damages award.

For each of reasons outlined here, Winer's testimony should be excluded in its entirety under Rule 702 and *Daubert*.

Respectfully submitted,

/s/Joshua R. Brown
Michael N. Kreitzer
Florida Bar No. 705561
kreitzerm@gtlaw.com
GREENBERG TRAURIG, P.A.
333 S.E. 2nd Ave., Suite 4400

Miami, Florida 33131
Telephone: 305.579.0500

-and-

Gregory W. Herbert
Florida Bar No. 0111510
herbertg@gtlaw.com
Joshua R. Brown
Florida Bar No. 826391
brownjr@gtlaw.com
GREENBERG TRAURIG, P.A.
450 S. Orange Ave., Suite 650
Orlando, Florida 32801
Telephone: 407.420.1100

-and-

Matthew A. Steward (*pro hac vice*)
mas@clydesnow.com
Shannon K. Zollinger (*pro hac vice*)
skz@clydesnow.com
CLYDE SNOW & SESSIONS
201 S. Main Street, Suite 1300
Salt Lake City, Utah 84111
Telephone: 801.322.2516

*Counsel for Defendants Vivint Smart Home, Inc. and Legacy Vivint Smart Home, Inc.*

## CERTIFICATE OF SERVICE

I certify that on December 15, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of filing to all counsel of record.

/s/Joshua R. Brown