# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 17-cv-80432-MIDDLEBROOKS

ADT LLC, and ADT US HOLDINGS, INC.,

    Plaintiffs,

v.

VIVINT, INC.,

    Defendant.

_____/

## ORDER GRANTING IN PART DEFENDANT'S MOTION TO EXCLUDE

THIS CAUSE comes before the Court upon Defendant Vivint, Inc.'s ("Vivint") Motion to Exclude Expert Report and Testimony of Russell W. Mangum III, filed October 10, 2017. (DE 125). Plaintiffs ADT LLC, and ADT US Holdings, Inc. (collectively "ADT") filed a response on October 17, 2017 (DE 141), to which Vivint replied on October 23, 2017 (DE 147). For reasons stated below, Vivint's Motion is granted in part and denied in part.

### I. LEGAL STANDARD

"The admission of expert evidence is governed by Federal Rule of Evidence 702, as explained by *Daubert* and its progeny." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). "Under Rule 702 and *Daubert*, district courts must act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant." *Id.* (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)). "District courts are charged with this gatekeeping function 'to ensure that speculative, unreliable expert testimony does not reach the jury' under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Id.* (quoting *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002)). Although "[u]nder Rule 702, a district court acts as a gatekeeper to keep out irrelevant or unreliable expert testimony . . . , [t]his gatekeeping role, [] is not intended to supplant the adversary system or the role of the jury: vigorous

cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *United States v. Alabama Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013) (citations omitted).

"To fulfill their obligation under *Daubert*, district courts must engage in a rigorous inquiry to determine whether: '(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.'" *Rink*, 400 F.3d at 1291-92 (*quoting City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir.1998)). "The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." *Id.* at 1292 (*citing Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999)).

"In ascertaining reliability under the second *Daubert* prong, we have identified several factors which can be considered: (1) whether the expert's methodology can be tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method has a known rate of error; (4) whether the technique is generally accepted by the scientific community." *Rink*, 400 F.3d at 1292 (*citing Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). "This list of factors, however, 'do[es] not exhaust the universe of considerations that may bear on . . . reliability.'" *Id.* (*citing Quiet Tech.*, 326 F.3d at 1341; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999); *Daubert*, 509 U.S. at 594). "District courts 'have substantial discretion in deciding how to test an expert's reliability . . . .'" *Id.* (*quoting United States v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999)).

Even if proposed expert testimony is admissible under Rule 702, that evidence may be excluded if it is irrelevant or if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. Because "expert

2

testimony may be assigned talismanic significance in the eyes of lay jurors," a district court "must take care to weigh the value of such evidence against its potential to mislead or confuse." *United States v. Frazier*, 387 F.3d 1224, 1263 (11th Cir. 2004)

## II. Discussion

In its Sixth Amended Rule 26(a)(1) Initial Disclosures, ADT states that it "will present evidence at trial that Vivint's agents' claims of affiliation with ADT amount in effect to a forced license of the right to claim an affiliation with ADT, and that ADT is entitled to a forced royalty payment for their claims of affiliation with ADT." (DE 125-4 at 12). ADT's counsel engaged Russel Mangum III ("Mangum") to "analyze and opine on the appropriateness and quantification of royalty damages relating to ADT's claims." (125-2 at 3). Vivint seeks to exclude Mangum's report and testimony. (DE 125).

In his report, Mangum concludes that ADT's damages can be modeled in the form of a royalty and that the appropriate royalty amount is "22 percent of revenues earned from home monitoring, security and automation products/services for accounts generated during the timeframe contemplated in the Complaint (*i.e.*, 2013–2016)." (DE 125-2 at 6). Vivint argues that Mangum's report should be excluded because his methodology is flawed and his conclusion is "wildly inappropriate." (DE 125 at 12). Specifically, Vivint argues that: (1) Mangum considers irrelevant information and fails to consider relevant information; and (2) Mangum applies the 22% royalty rate to all Vivint revenues, not just revenues derived from customers who switched from ADT to Vivint based on Vivint's alleged misrepresentations.

Vivint argues that Mangum considers irrelevant information in reaching his conclusion. Specifically, Vivint argues that Mangum should not consider ADT's agreements with third-party dealers in which ADT licenses the right to use the ADT trademark as those agreements do not call for royalty payments. (DE 125 at 5). Mangum opines that these agreements are relevant because:

3

> [T]he dealer revenue sharing agreement ADT has in place for hundreds of dealers is an established market transaction model that indicates what contract revenue sharing portion ADT is willing to accept and what revenue sharing portion dealers are willing to pay for the dealers to be able to use ADT's intangible assets and sell security and monitoring contracts with an affiliation with ADT.

(DE 125-2 at 14–15). Mangum states that this revenue sharing model is a "market measure" that is useful to determine the economic value of ADT's intangible assets. (*Id.* at 14). Vivint argues that the "ADT-dealer agreement does not set forth any royalty rate" and therefore is an inappropriate reference point in determining the proper royalty amount. (DE 125 at 7). Whether or not the ADT-dealer model is a proper reference point is a question for the jury and does not affect the evidence's admissibility. *See ADT & ADT US Holdings, Inc. v. Alarm Protection LLC*, Case No. 9:15-CV-80073, 2017 WL 2212541 (S.D. Fla. 2017) (rejecting defendant's argument that plaintiffs "cannot seek royalty damages as a matter of law because they do not label their income stream as 'a royalty'" where evidence suggests that plaintiffs' agreement with dealers amounts to "the economic functional equivalent of a royalty").

Vivint then argues that Mangum fails to consider relevant information. Specifically, Vivint argues that Mangum "ignores an actual royalty rate established for the use of the ADT brand—that set forth in the Trademark Licensing Agreement between ADT US Holdings, Inc., and ADT, LLC." (DE 125 at 5). ADT responds that the "intra-company rate" that ADT, LLC pays ADT US Holdings, Inc. ("Holdings") "bears no relationship to what ADT charges third-parties to use the trademarks in the market." (DE 141 at 6). ADT notes that the royalty payment is part of a larger intra-company agreement whereby ADT, LLC pays Holdings a 1.65% royalty payment to use the ADT brand. In addition to the royalty payment, ADT, LLC also has spent between $140 million and $160 million on advertising and marketing in each of the past three years to enhance the value of the brand. (DE 141 at 7). Whether Mangum should have considered this royalty rate is an issue more appropriately explored on cross examination and does not affect the admissibility of his testimony and report. *See*

4

*Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir. 1988) ("[W]eakness in the underpinnings of the expert's opinion go to its weight rather than its admissibility.") (citations omitted).

Finally, Vivint argues that Mangum's report and testimony should be excluded because his "opinion regarding the revenue to which [the] purported 22% royalty should be applied (*i.e.*, the royalty base) is wildly inappropriate." (DE 125 at 12). Mangum's report concludes that "[ADT's] damages in the form of a royalty amount to approximately 22 percent of revenues earned from home monitoring, security and automation products/services for accounts generated during the timeframe contemplated in the Complaint (*i.e.*, 2013–2016)." (DE 125-2 at 6). Vivint argues that it is inappropriate to apply a royalty to "every account generated by Vivint during the pertinent time period, whether or not the result of any confusion by the customer as to an affiliation between ADT and Vivint." (DE 125 at 12). This Court has previously instructed ADT that it "must 'separate out the claimed damages that were *actually attributable to*' Vivint's conduct." (DE 70 at 4) (*citing Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1252 (11th Cir. 2007) (affirming judgment as a matter of law in favor of defendant where plaintiff's expert failed to "separate out the claimed damages that were actually attributable to" defendant's trademark violations such that there was insufficient evidence that defendant's misconduct proximately caused plaintiff's injury)). Under Mangum's sweeping damages calculation, Vivint would have to pay a 22% royalty on revenues earned from monitoring customers who were never affiliated with ADT. ADT cannot possibly claim that such revenues reflect damages actually attributable to Vivint's misconduct.

ADT does not dispute that Mangum opines that Vivint should be required to pay a royalty on revenues not actually attributable to Vivint's misconduct. Instead, ADT responds only that it "limited the base to which the 22 percent royalty would apply" to an amount that "reflect[s] that proportion of U.S. households with ADT alarm systems." (DE 141 at 17). Regardless of the amount of damages ADT ultimately decides to pursue, Mangum's report and testimony is excluded to the

5

extent Mangum opines that the 22% royalty should be applied to all of Vivint's "revenues earned from home monitoring, security and automation products/services for accounts generated during the timeframe contemplated in the Complaint (*i.e.*, 2013–2016)" as ADT has failed to identify evidence suggesting that this sweeping damages calculation reflects damages actually attributable to Vivint's alleged misconduct. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Defendant's Motion (DE 125) is **GRANTED IN PART and DENIED IN PART.** Mangum may testify as to an appropriate royalty rate applicable to ADT's claim for a forced royalty but may not testify that the royalty rate should be applied to Vivint's revenues that are not actually attributable to Vivint's alleged misconduct.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this 14 day of November, 2017.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to: Counsel of Record

6