# EXHIBIT
# E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 17-cv-80432-MIDDLEBROOKS

ADT LLC, and ADT US HOLDINGS, INC.,

   Plaintiffs,

v.

VIVINT, INC.,

   Defendant.
_____/

## ORDER ON DEFENDANT'S MOTION TO EXCLUDE TESTIMONY AND REPORT OF JOHN GOODMAN AND DAVID STEWART

THIS CAUSE comes before the Court upon Defendant Vivint, Inc.'s ("Vivint") Motion to Exclude Expert Reports and Testimony of John Goodman and David Stewart, filed October 10, 2017. (DE 126). Plaintiffs ADT LLC, and ADT US Holdings, Inc. (collectively "ADT") filed a response on October 16, 2017 (DE 136), to which Vivint replied on October 23, 2017 (DE 149).

### I. LEGAL STANDARD

"The admission of expert evidence is governed by Federal Rule of Evidence 702, as explained by *Daubert* and its progeny." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). "Under Rule 702 and *Daubert*, district courts must act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant." *Id.* (*citing Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)). "District courts are charged with this gatekeeping function 'to ensure that speculative, unreliable expert testimony does not reach the jury' under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Id.* (*quoting McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002)).

Although "[u]nder Rule 702, a district court acts as a gatekeeper to keep out irrelevant or unreliable expert testimony . . . , [t]his gatekeeping role, [] is not intended to supplant the adversary system or the role of the jury: vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *United States v. Alabama Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013) (citations omitted).

"To fulfill their obligation under *Daubert*, district courts must engage in a rigorous inquiry to determine whether: '(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.'" *Rink*, 400 F.3d at 1291-92 (*quoting City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir.1998)). "The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." *Id.* at 1292 (*citing Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999)).

"In ascertaining reliability under the second *Daubert* prong, we have identified several factors which can be considered: (1) whether the expert's methodology can be tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method has a known rate of error; (4) whether the technique is generally accepted by the scientific community." *Rink*, 400 F.3d at 1292 (*citing Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). "This list of factors, however, 'do[es] not exhaust the universe of considerations that may bear on . . . reliability.'" *Id.* (*citing Quiet*

*Tech.*, 326 F.3d at 1341; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999); *Daubert*, 509 U.S. at 594). "District courts 'have substantial discretion in deciding how to test an expert's reliability . . . .'" *Id.* (quoting *United States v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999)).

Even if proposed expert testimony is admissible under Rule 702, that evidence may be excluded if it is irrelevant or if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. Because "expert testimony may be assigned talismanic significance in the eyes of lay jurors," a district court "must take care to weigh the value of such evidence against its potential to mislead or confuse." *United States v. Frazier*, 387 F.3d 1224, 1263 (11th Cir. 2004).

## II. Discussion

### a. Multiplier

Vivint moves to exclude ADT's experts, John Goodman and David Stewart "from testifying as to the percentage of ADT customers who received false sales pitches from Vivint sales agents, who likely reported the incident to ADT." (DE 136 at 1). ADT responds that both experts will testify to "well-known and unremarkable proposition that customers who complain are vastly outnumbered by customers who do not complain." (DE 136) (*citing ADT LLC v. Alarm Protection LLC,* No. 9:15-cv-80073, 2017 WL 2212541, *7 (S.D. Fla. 2017) (Rosenberg, J.)). Further, ADT intends to call Stewart to "explain why Vivint's defenses relating to its post-sale disclosures do not protect consumers from the confusion caused in the earlier stages of a sale." (DE 136 at 1).

Goodman opines that the 900 ADT customers who allegedly contacted ADT only represent between 5%–10% of the "actual" number of ADT customers who experienced

3

"similar" conduct.[1] (DE 126 at 2). In reaching their opinions, Goodman and Stewart relied upon a spreadsheet provided them by ADT which purports to identify approximately 900 ADT customers coupled with ADT's characterization of what a customer said a purported Vivint salesperson told the customer. (DE 126 at 4). Goodman's conclusion assumes that this data is accurate without interviewing any of the customers. (*Id.*). Goodman reviews entries for only 310 of the 900 customers and testified that he "performed no subsequent analysis" to determine whether the 310 customers were representative of the population from which they were drawn. (DE 126-2 at 84). Upon review of the entries for those 310 customers, Goodman testified that he "made a best guess as to whether [Vivint's] scam was successful or not."[2] (DE 126-2 at 59). Based on these "best guess[es]" Goodman concluded that 37% of the customers were successfully solicited. (DE 126 at 4).

Vivint argues that Goodman's[3] methodology, and the application of that methodology to the data are unreliable. Citing its own expert report, Vivint argues that to determine the ratio of all ADT customers who experienced a deceptive sales practice by a Vivint salesperson, an independent researcher would follow a four-step process: "(1) survey a statistically representative sample of all ADT customers; (2) determine how many of these customers were visited by a Vivint salesperson; (3) determine how many from this group experienced a deceptive sales practice; and (4) out of this subset, determine how many reported the conduct to ADT." (DE 126 at 6). Further, Goodman has published a book in which he explained that "the best approach to quantifying the multiplier for key problems is to execute a one-time survey of a

---

[1] Stewart opines that these 900 customers represent only between 4% and 9% of customers affected.
[2] A successful scam is one in which the customer signs a contract with Vivint.
[3] Vivint states that "[b]ecause all of the defects in Goodman's data and methodology apply equally to Stewart's opinions, this Motion will address Goodman's deficiencies in detail and Stewart's in more concise terms." (DE 126 at 3).

4

random sample of your entire customer base. Use this to determine the ratio of problems customers encounter to those reported to each company touch point or social media tool." (DE 126 at 7). Goodman recommended this approach to ADT; however, ADT chose to not conduct a survey and instead provided Goodman with the spreadsheet it created.

ADT argues that it was appropriate for the experts to rely on ADT's spreadsheet because "[a]ccording to Dr. Stewart, it would have been *impossible* to design and implement a meaningful survey to inform any expert's opinion on the likely number of nonreporting ADT customers who were slammed by Vivint sales agents." (DE 136 at 9). The Supreme Court has stated:

> [A] key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested. Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry.

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993) (internal quotations omitted). The fact that the experts were unable to "design and implement a meaningful survey" does not give them license to rely on less reliable data. Instead, it suggests that the question of how many customers who were affected by Vivint's alleged deceptive practices may not be amenable to reliable testing using a "scientific methodology."

Another factor considered in whether expert testimony is reliable is "[w]hether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting," Fed. R. Evid. 702 cmt. *See also Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (noting that the court must ensure that "an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"). Here, Goodman has opined as to the best way for a business to calculate a multiplier and

5

recommended that method to ADT. ADT chose not to follow Goodman's expert advice and instead required Goodman to rely on a spreadsheet that purports to summarize what an ADT customer told the ADT representative. Further, ADT has conceded in numerous filings and at Calendar Call that the Parties have discovered that the spreadsheet upon which both Goodman and Stewart relied inaccurately characterizes what certain customers told ADT representatives. This is problematic considering that Goodman testified at his deposition that if ADT's characterization of a customer complaint was incorrect, his corresponding extrapolation estimate would also be incorrect. (DE 126-2). Based on the foregoing, Vivint's Motion to exclude the expert report and testimony of Goodman is granted and Vivint's Motion to exclude Stewart's report and testimony relating to his opinion of the percentage of ADT customers who received false sales pitches from Vivint sales agents, who likely reported the incident to ADT is granted.

### b. Stewart's Theory Regarding Initial Confusion

ADT also plans to introduce Stewart's opinion as to a second topic, "[t]he ineffectuality of Vivint's *post-sale* efforts to dispel the *pre-sale* customer confusion that its agents cause with their false claims of ADT affiliation." (DE 136 at 14). Prior to installing an alarm system in a customer's home, Vivint requires the customer to complete a "pre-install survey" in which the customer affirms that she understands that Vivint is not affiliated with any other company.[4] (DE 136 at 14). In his report, Stewart opines that the pre-install surveys are insufficient to dispel customer confusion because by that time, "[t]he consumer's emotional and motivational commitment to the transaction is complete. If the late disclosure gives the consumer pause, the consumer will likely rationalize it away as an oversight that she should have recognized earlier in the transaction." (DE 126-15 at 12).

---

[4] ADT argues that Vivint only requires some, not all, customers to complete the pre-install survey. (DE 136 at 14).

6

Vivint moves to exclude this testimony on the basis that Stewart's theory "that initial confusion cannot be rectified and is an independent basis for a legal remedy fails under law." (DE 126 at 20). Vivint argues that "Stewart opined that any occasion of 'initial confusion' is an independent basis for damages, and that any correction of such confusion cannot remedy the initial confusion." Vivint cites this Court's opinion in *Vital Pharms., Inc. v. Am. Body Bldg. Prod. LLC*, 511 F. Supp. 2d 1303 (S.D. Fla. 2007). There, the plaintiff attempted to show that the trade dress of Defendant's sports drink caused actual confusion among customers as to whether it was produced by the plaintiff. *Id.* The plaintiff attempted to prove actual confusion through the testimony of two individuals, Mr. Bukovic and Mr. Hanson. Mr. Bukovic testifies that he "selected a bottle of [Defendant's sports drink] with the initial impression that it was [Plaintiff's] product" but realized that the drink was Defendant's product before purchasing it. *Id.* Mr. Hanson testifies that he saw people drinking Defendant's sports drink "and due to the shape of the bottle, he believed it to be" produced by Plaintiff. *Id.* He then testified that "upon looking at the bottle more closely, he determined that it was in fact not" produced by Plaintiff.

I noted that the Eleventh Circuit has not embraced the principle that initial interest confusion is sufficient to find a likelihood of confusion and that I find the theory unpersuasive. I noted that "[w]hen the bottom line is sales of a particular product, initial confusion prior to and concluding before the point of purchase does not seem dispositive in a likelihood of confusion analysis." *Id.*

Stewart's theory appears to be distinguishable from the initial confusion doctrine discussed in *Vital Pharms*. There, the customers were confused upon first seeing Defendant's product; however, that confusion was dispelled upon closer review and before purchasing the product. Here, Stewart opines that the statements of Vivint agents "in the initial stages of their

7

approaches to ADT's customers created a likelihood of consumer confusion" and that "later efforts to clarify the agent's affiliation cannot undo the damage caused by the initial confusion that enabled the rest of the Vivint agent's pitch to be heard and succeed." ADT states that this testimony is "critical to refute Vivint's defense that the 'pre-install survey' . . . cures any earlier customer confusion."[5] (DE 136 at 15). Therefore, it appears that ADT will use Stewart's opinion to prove that the customers remained confused at the time of the purchase, unlike *Vital Pharms.* where the customers testified that they were no longer confused by the time of purchase. Therefore, Vivint's argument that Mr. Stewart's theory fails under the law is unpersuasive. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Vivint's Motion to Exclude (DE 126) is **GRANTED IN PART and DENIED IN PART**. Mr. Goodman's report and testimony is excluded. Mr. Stewart's report and testimony is excluded to the extent he opines as to the percentage of ADT customers who received false sales pitches from Vivint sales agents, who likely reported the incident to ADT. Mr. Stewart's report and testimony relating to the effectiveness of post-sale efforts to cure pre-sale confusion is not excluded.

**DONE AND ORDERED** in Chambers in West Palm Beach, Florida, this __7__ day of December, 2017.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to: Counsel of Record

---

[5] ADT notes that it "has not asked the Court to impose liability on Vivint based on the initial interest confusion doctrine" but proceeds to argue that "if the Court finds it relevant, it should recognize the doctrine in this case." (DE 136 at 17). Plaintiff's Response to a Motion to Exclude is not the proper vehicle by which to assert a new theory of liability, and thus the Court will not address this argument here.