UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:20-cv-23391- GOODMAN
[CONSENT CASE]

ADT LLC, *et al.*,

    Plaintiffs,

v.

VIVINT SMART HOME, INC., *et al.*,

    Defendants.

_____/

## DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DR. ERIC MATOLO

Defendants Vivint Smart Home, Inc. and Legacy Vivint Smart Home, Inc. (collectively, "Vivint") respectfully move the Court for an Order excluding the testimony of ADT LLC and The ADT Security Corporation (collectively, "ADT") proposed expert witness Dr. Eric Matolo ("Matolo"), under Fed. R. Evid. 702 and on *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137 (1999) and their progeny. In support thereof, Vivint states as follows:[1]

## INTRODUCTION

In his report, Matolo applies two untested, unreliable "models" developed by other persons for other purposes. Matolo's adopted models are not peer reviewed, tested, published, or adopted by persons other than: (a) the plaintiffs in this case; and (b) Matolo's professional colleague, Dr. Russell Mangum ("Mangum"). Mangum's testimony based on one of the models, coined "the Representative Industry Model," was excluded in a similar case prosecuted by the same counsel

---

[1] Vivint is contemporaneously filing an unopposed motion to seal **Exhibits A** and **B**, which ADT has designated "confidential" or "highly confidential - attorneys' eyes only" under the Protective Order (D.E. 31). At the Court's direction, Vivint will file the exhibits under seal and/or provide courtesy copies of the Motion and all exhibits to chambers.

against the same defendants. Mangum's royalty base calculation was excluded by this Court in a prior case brought by the same plaintiffs (and the same counsel) against the same defendants on the same claims. The authors of the other model, known simply as "the ADT Model," were not disclosed as experts. Nor does ADT claim they are experts. Matolo adopts and attempts to apply this lay model without understanding how it was created or its inputs.

Without verifying the underlying data or methodologies used to produce the two models, Matolo purports to apply them yet makes no changes to the models to fit the facts of this case. Other than rounding a few numbers differently and adding a summary column to the ADT Model, Matolo makes **no changes whatsoever** to either the ADT Model or the Representative Industry Model. In fact, Matolo admits at his deposition that he made no substantive changes to the Representative Industry Model. Instead, Matolo reaches exactly the same royalty rate conclusion his colleague, Mangum, reached in the CPI Case based on exactly same calculations using exactly the same inputs.

As further detailed below, this Court can exclude Matolo's testimony either: because the "models" he adopts from others are unreliable; **or** for the independent reason that he has not reliably applied either methodology to the facts of this case. Either ground is alone a sufficient basis for his exclusion.

## GOVERNING STANDARDS

Federal Rule of Evidence 702 allows qualified experts to testify only if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Eleventh Circuit has "distilled" the admissibility inquiry into three factors:

(1) the expert is qualified to testify competently regarding the matters he intends to address;

(2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and

(3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*MidAmerica C2L Inc. v. Siemens Energy Inc.*, 25 F.4th 1312, 1326 (11th Cir. 2022).

The rule "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co.*, 526 U.S. at 147 (*quoting Daubert*, 509 U.S. at 589); *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005) (a district court should "screen out" expert testimony that is not sufficiently reliable or trustworthy); *United States v. Hinestroza-Newbboolll*, No. 20-13891, 2022 U.S. App. LEXIS 19072, at *6 (11th Cir. July 12, 2022) (as a gatekeeper for expert testimony, the district court must ensure that the expert is qualified and the testimony sufficiently reliable and relevant in order to be considered by the jury).

ADT has the burden to demonstrate that Matolo is qualified to testify, his opinions are based on sound methodology, and his testimony will be helpful to the trier of fact. *Placida Prof'l Ctr., LLC v. FDIC*, 512 F. App'x 938, 954 (11th Cir. 2013); *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion . . . ."). For the reasons that follow, ADT cannot meet this burden.

## ARGUMENT

### I. Matolo's Tesimony is not Reliable nor Helpful to the Jury.

Expert testimony is only admissible if it is shown to be both "based on sufficient facts or data" and "the product of reliable principles and methods." Fed. R. Evid. 702(b), (c). The expert must also have "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(d). ADT cannot meet this burden because: (A) Matolo's wholesale adoption of the ADT Model is unreliable; (B) Matolo's wholesale adoption of Mangum's Representative Industry Model is unreliable; and (C) Matolo has not "reliably applied" either model "to the facts of [this] case."

### A. Matolo's Use of the "ADT Model" is not Reliable.

ADT cannot meet its burden of showing that Matolo's methodology based on the ADT Model is reliable. In determining reliability, the court may consider several factors, including "whether the theory or technique at issue can be and has been tested, whether it has been subjected to peer review and publication, its known or potential rate of error, and whether it is generally accepted in the field." *Hinestroza-Newbbooll*, 2022 U.S. App. LEXIS 19072, at *6; *Chapman v. P&G Distrib., LLC*, 766 F.3d 1296, 1305 (11th Cir. 2014) (citing *United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013)). As further discussed below, none of these traditional indicia of reliability are present here. Further, Matolo "provided no reliable link between his data and the facts at issue in this case." *Phillips v. Am. Honda Motor Co.*, 238 F. App'x 537, 540, 542 (11th Cir. 2007) (excluding as unreliable expert testimony based on tests performed "on a plastic dummy without providing a reliable link to the facts of [the] case"). Instead, he improperly parrots the ADT Model without verifying its validity.

4

Matolo's first basis for his "Royalty Calculation" is an "ADT Dealer Revenue Sharing Model," which he later refers to as just "the ADT Model." **Exhibit A** (hereinafter "Matolo Report") ¶¶ 32, 33. Matolo claims in his report that the ADT Model is based on ADT's agreements with "hundreds of [third-party] dealers" ADT contracts with "to obtain new customers," Matolo Report ¶ 27; however, on deposition, he admits that he did not review any of the underlying dealer agreements before reaching his conclusions. **Exhibit B** (hereinafter "Matolo Dep.") at 127:17-128:5. According to Matolo, the ADT Model was developed to help ADT understand how to adjust the revenue sharing arrangement with its dealer when going from an upfront and ongoing revenue share to only an ongoing revenue share. Matolo Dep. at 151:1-10. Matolo believes that the ADT Model can be used to identify a running royalty payment structure, and in doing so he concludes that a 22% royalty is appropriate for this case. Matolo Report ¶¶ 33, 39.

1. *The ADT Model Has None of the Traditional Indicia of Reliability.*

The ADT Model has none of the traditional indicia of reliability including being tested, being capable of testing, having an error rate, being peer reviewed, being published, being generally accepted in the scientific community. *See Dishman v. Wise*, Civil Action No. 7:08-cv-45 (HL), 2009 U.S. Dist. LEXIS 57888, at *8 (M.D. Ga. July 7, 2009) (opinion was not reliable when it was not testable, did offer a rate of error, was not peer reviewed or based upon a peer reviewed source, and was not generally accepted); *Affiliati Network, Inc. v. Wanamaker*, No. 1:16-cv-24097-UU, 2017 U.S. Dist. LEXIS 217403, at *17-*18 (S.D. Fla. Aug. 14, 2017) (finding that expert testimony based on "common practice" with no indication that the methodology was subject to peer review or publication, no description of rate of error, and no explanation whether the methodology was generally accepted in the industry is "nowhere near" enough to show the calculations were reliable under *Daubert*).

There is no outside reference one can read to understand the calculations used to generate the ADT Model because it is simply not available outside of ADT. Matolo Dep. 205:12-206:15. In fact, the ADT Model is "confidential" and may not be shared with individuals outside of the present litigation. Matolo Dep. at 202:12-203:3. Matolo does not know for certain who created the ADT Model, nor the qualifications of those who created the ADT Model. Matolo Dep. at 200:10-201:23. Matolo's only knowledge regarding the creation of the model is that Susan Gates – who is described as "someone that's been internal at ADT" in "finance related positions" – was involved in the ADT Model's creation. Matolo Dep. at 200:1-201:23. Matolo is also not aware of anyone else, aside from himself and his colleague, Mangum, that has applied the ADT Model in any litigation. Matolo Dep. at 206:16-207:5. Nor has the ADT Model been applied by Matolo in any other matters –aside from litigation brought by ADT– that he has been involved in. Matolo Dep. at 207:6-10. Matolo's report does not disclose any error rate for the ADT Model. As further discussed in the following section, Matolo has made no attempt to test or verify the ADT Model. Because the ADT Model is not available outside of ADT, it is not available for peer review or testing by others. As it is wholly unknown to the scientific community outside of Matolo and Mangum, there can be no argument that it is generally accepted within that community. For each of these reasons, Matolo's analysis based on the unknown and tested ADT Model should be excluded. *See Benkwith v. Matrixx Initiatives, Inc.*, 467 F. Supp. 2d 1316, 1330 (M.D. Ala. 2006) (excluding opinion when the cited studies only supported the opinion by unacceptable analogy, the opinion had not been tested, there was no evidence of the known or potential rate of error of the theory, and the opinion did not enjoy general acceptance in the relevant scientific community).

    2. *Matolo Improperly Adopts ADT's Analysis Without Verifying It.*

The ADT Model was provided to Matolo in its entirety by ADT, and Matolo undertook no substantive analysis of ADT's data on his own, nor does he understand the bases and inputs ADT used in creating the model. This type of "parroting" opinion is expressly forbidden under Rule 702. At minimum, expert testimony should include a description of the methodology and an expert's assurance that the methodology and supporting data is reliable will not suffice. *Bowers v. Norfolk S. Corp.*, 537 F. Supp. 2d 1343, 1372 (M.D. Ga. 2007). Indeed, if an expert does not have an explanation or empirical support for his opinions, all he offers is an inadmissible "bare conclusion." *Id*. at 1373. While Rule 703 permits an expert to base his opinion on facts or data that an expert in the field would "reasonably rely on," it is well-settled that Rule 703 does not permit an expert to adopt the findings of another without assessing the validity of the opinion. *Mamani v. BerzaÍn*, No. 07-22459-CIV-COHN/SELTZER, 2018 U.S. Dist. LEXIS 32375, at *24, *25-26 (S.D. Fla. Feb. 28, 2018) ("blind reliance . . . cannot be squared with the basic precepts governing admissibility of expert testimony."); *Sofillas v. Carnival Corp.*, Civil Action No. 14-23920-Civ-Scola, 2016 U.S. Dist. LEXIS 139429, *10-*11, *15 (S.D. Fla. July 7, 2016) (an expert cannot blindly ratify the opinion of another and even though there was some evidence showing that the expert may have considered other facts or data in forming her opinion, the record was unclear, and the opinion was properly excluded); *MasForce Europe v. Mastry Marine & Indus. Design, Inc.*, No. 8:11-CV-1814-T-24AEP, 2013 U.S. Dist. LEXIS 121916, at *12-*13 (M.D. Fla. Aug. 27, 2013) (an expert may not adopt the findings of another without conducting an independent investigation).

The substance of Matolo's ADT model is identical to the model created by ADT, aside from differences as to rounding and the addition of one column, which is merely an average of the

other columns created by ADT. Matolo Dep. at 152:1-153:17, 154:9-21; 179:1-9 (all numbers aside from the numbers in the average column are numbers that originated from ADT). Yet Matolo is unfamiliar with how the model works. Quite the opposite, Matolo admits that he is "relying on the conclusion" of the ADT Model with only a "general" understanding of the analysis that led to the conclusion.

> Q. So you are relying on ADT's conclusion, not their analysis?
> MR. HOBBS: Object to form.
> THE WITNESS: Their conclusion of their analysis.
> Q. Okay. To -- have you -- do you understand how they reached their conclusion?
> A. I understand it generally.

Matolo Dep. at 192:13-21. Matolo is also unfamiliar with the inputs to the ADT Model. For example, as to the "Pulse take rate" included in the ADT Model, Matolo does not know whether the number includes information for subscribers that were not added through ADT dealers, whether that number has been adjusted, how ADT came up with the number, and he did not look at underlying data that led to the number. Matolo Dep. at 156:2-2, 160:25-162:9. Moreover, he does not know the date range that ADT used to determine the Pulse take rate or if ADT performed a calculation to come up with this number. Matolo Dep. 180:7-12, 181:12-25. Similarly, Matolo he does not know:

- how ADT computed the number for "bad debt" and did not ask how it was calculated (Matolo Dep. at 172:22-174:6);
- does not know how the "gross multiple" was calculated (Matolo Dep. 188:9-189:21);
- does not know the period of time used to determine the "automation" number or the calculation used to determine that number (Matolo Dep. 193:3-194:18);
- does not know the data set or date range used to determine the "billed RPU/MRR" or whether a calculation was used to reach this number (Matolo Dep. 194:19-196:17); and

- does not know the formula used to determine the net present value row and all of the inputs used to calculate the net present value (Matolo Dep. 197:10-199:24).

Matolo made no attempt to understand how the ADT Model was built or operates. He simply accepted the conclusion as-is from ADT and did not undertake any verification or analysis of his own.

Even more troublesome, the ADT Model adopted by Matolo was not even the work of an expert. Rather, as Matolo admits, the only person he knows who was involved in the creation of the ADT Model was one in a "finance related position[]" at ADT, who is not qualified as an expert. Matolo Dep. at 200:1-201:23. Further, ADT's corporate representative designated to testify about the model admits that the authors are not qualified to be experts. **Exhibit C** (Stanley Scott Dep.) at 130:7-133:2 (not aware of anyone who contributed to the ADT Model being an expert in the field of Lanham Act damages, in calculating forced royalty payments, in calculating damages stemming from deceptive sales practices, or in calculating damages based on false affiliation claims). Such wholesale adoption of the opinions and conclusions of a non-expert, without any independent analysis of his own, renders Matolo's opinion unreliable, and as such, should not be submitted to the jury. *See Transcon. Gas Pipe Line Co. v. 1.84 Acres*, No. 1:16-cv-02991-ELR, 2020 U.S. Dist. LEXIS 254808, at *15-*16 (N.D. Ga. May 22, 2020) (methodology was not reliable when the sources of the testimony were information from others sought out for the purpose of testifying in the action, and not his own independent expert analysis using his knowledge, skill, experience, training, or education); *In re Deepwater Horizon Belo Cases*, No. 3:19cv963, 2020 U.S. Dist. LEXIS 213309, at *38 (N.D. Fla. Nov. 4, 2020) (an expert opinion, even if supported by case studies and treatises, is not reliable without an explanation of the logical steps supporting it); *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009) (opinion based on

the work of another expert is not based on any specialized, technical, or scientific knowledge or methodology).

### B. Matolo's Use of the Representative Industry Model is not Reliable.

ADT also cannot meet its burden of establishing that Matolo's use of the Representative Industry Model as set forth in his Report in Exhibits 3, 3.1, 3.2, 3.2a, 3.3, 3.3a, and Table 3 is reliable because the novel methodology has not been applied by other experts aside from Matolo and his colleague, Mangum. As with the ADT Model, the Representative Industry Model has not been tested, not subject to peer review, and not generally accepted in the scientific community. Moreover, the use of the Representative Industry Model is improper "parroting" because the model has been consistently applied by Matolo and Mangum in the exact same way in several different cases, with no adjustments made. In at least three separate cases, Mangum and Matolo apply the same exact calculations, using the same exact inputs, to reach precisely the same royalty rate conclusion. Matolo Dep. at 116:5-118:1, 231:9-232:9.

The Representative Industry Model was created in the summer of 2021 by Matolo and three of his colleagues, one of which was Mangum. Matolo Dep. at 108:24-110:5. Prior to the Summer of 2021, the Representative Industry Model had not been used. Matolo Dep. at 110:6-13. Indeed, aside from the reports created by Mangum and Matolo, there are no other reports that describe a Representative Industry Model similar to the one applied in this case or use a similar analysis. Matolo Dep. at 119:18-120:4. And while Matolo asserts that "numerous" other experts use "sort of a representative model," he cannot name a specific expert that has used a Representative Industry Model to opine as to royalty damages. Matolo Dep. at 111:11-112:1. Thus, the use of the novel Representative Industry Model is unreliable as it has not been tested, subject to peer review, published, and is not generally accepted in the scientific community. *See D. H. Pace Co. v. Aaron*

*Overhead Door Atlanta Llc*, 526 F. Supp. 3d 1360, 1372 (N.D. Ga. 2021) (self-serving conclusions not based on an appropriate methodology are nothing more than *ipse dixit*); *Wanamaker*, 2017 U.S. Dist. LEXIS 217403, at *17-*18; *Taylor v. Geico Indem. Co.*, No. 8:12-cv-2448-AEP, 2015 U.S. Dist. LEXIS 25558, at *4 (M.D. Fla. Mar. 3, 2015*)* (excluding expert testimony that "lacks a reliable and sound foundation and appears contrived to reach a particular result.").

Moreover, Matolo's colleague, Mangum, was previously excluded from testifying based on the Representative Industry Model in the CPI case. *CPI Security Systems, Inc. v. Vivint Smart Home*, *Inc.*, 3:20-CV-0504-FDW-DSC (W.D.N.C. Jan. 14, 2022), attached as **Exhibit D**; *see also* Matolo Dep. at 102:1-104:10. In that case, Mangum applied the Representative Industry Model – the same model applied here by Matolo. Matolo Dep. at 104:12-23. Indeed, the exhibits used in Mangum's excluded report and Matolo's current report are identical, and Matolo reached the same conclusion in this case that Mangum reached in the CPI case using the Representative Industry Model. Matolo Dep. at 105:7-108:23, 117:11-118:1, 230:15-25. What's more, Matolo did not make any adjustments to the Representative Industry Model from the CPI case to this action. Matolo Dep. at 231:15-21. The arithmetic, inputs, and conclusions were the same in Matolo's analysis here as they were in his CPI analysis. Matolo Dep. at 229:11-230:25. In fact, in all three cases where Matolo and/or Mangum was involved in applying the Representative Industry Model, the same result was reached, and no adjustments to the model were made. Matolo Dep. at 116:5-118:1, 231:9-232:9.

As detailed above, this type of "parroting" opinion is wholly improper. Matolo cannot simply adopt the conclusions of Mangum without any independent analysis of his own. *See Sofillas*, 2016 U.S. Dist. LEXIS 139429, at *10 (expert cannot repeat or adopt the findings of another expert without assessing the validity of the opinions relied on); *Schoen v. State Farm Fire*

*& Cas. Co.*, No. 21-00264-JB-N, 2022 U.S. Dist. LEXIS 198453, at *19-*20 (S.D. Ala. Nov. 1, 2022) (an expert may not simply repeat or adopt the findings of another expert without assessing the validity of the opinions relied on, and an expert must give his own opinion rather than being a conduit for the opinion of an unproduced expert); *Rebotix Repair, LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-2274-VMC-TGW, 2022 U.S. Dist. LEXIS 142875, at *12 (M.D. Fla. Aug. 10, 2022) (expert may not present testimony that parrots the opinions of others without independent evaluation of the evidence).

Further, Matolo bases this methodology on "industry-wide metrics" taken from various hearsay publications of third parties, rather than admissible evidence particular to this case. Matolo Dep. 215:7-216:15 (metrics from alarmprogramadvisor.com); 218:22-220:1 (metrics from Barnes Associates); *see also* Matolo Report at Exhibit 3 n.1 ("Average of the industry-wide figures is used"); Exhibit 3 n.4 ("Industry publication indicates . . ."), n.6 ("Based on average of WACC for selected alarm companies."), n.8, 9, 10. It is axiomatic that a reasonable royalty must be tied to the relevant facts and circumstances of the case at issue. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317-18 (Fed. Cir. 2011). Yet, the general industry data used by Matolo is not linked to the facts and circumstances at hand, thus making it an unreliable basis for Matolo's analysis. *See Multimedia Patent Tr. v. Apple Inc.*, No. 10-CV-2618-H (KSC), 2012 U.S. Dist. LEXIS 165928, at *34 (S.D. Cal. Nov. 20, 2012) (generic industry data is not tethered to the facts and circumstances and therefore any damages testimony based on the industry data should be excluded); *Joyce v. Armstrong Teasdale, LLP*, 4:08-CV-1390-CEJ, 2012 U.S. Dist. LEXIS 1148472012 WL 3541825, at *8-9 (E.D. Mo. Aug. 15, 2012) (royalty rates used by expert were "so fundamentally unsupported that [they] offer no assistance to the jury" where they were "based solely [on] several published sources that estimated the industry average for the entire computer

software industry" and expert did not "link certain licenses to the patent at issue"); *IP Innovation L.L.C. v. Red Hat, Inc.*, 705 F. Supp. 2d 687, 691 (E.D. Tex. 2010) ("[L]icenses are far more relevant than the general market studies on which [expert] primarily relied in his expert report.").

Additionally, this industry data is largely provided by Michael Barnes and Barnes Associates, and Brandon Hess. Matolo Report ¶ 9; Matolo Dep. at 213:15-24 (Matolo learned of a website relied upon, alarmprogramadvisor.com, through Mr. Hess); Matolo Report at Exhibit 3 (citing data from Barnes Associates and alarmprogramadvisor.com). But these individuals have not been disclosed as testifying experts or included on ADT's witness list. Thus, they have not been subject to cross examination. And while an expert may rely on hearsay evidence, it must be the type of evidence "reasonably relied on by experts in the particular field in forming opinions or inferences upon the subject." *See* Fed. R. Evid. 703; *United States v. Cox*, 696 F.2d 1294, 1297 (11th Cir. 1983).

Aside from himself and Mangum, Matolo is not aware of any other expert that has relied on materials from Barnes Associates or alarmprogramadvisor.com. Matolo Dep. at 221:11-222:3. Nor did Matolo review the underlying data or calculations provided by alarmprogramadvisor.com or Barnes Associates. *Id*. at 216:19-217:18, 220:2-221:6. Accordingly, Matolo's opinion should not be presented to the jury. *WhereverTV, Inc. v. Comcast Cable Communs., LLC*, No. 2:18-cv-529-JLB-NPM, 2022 U.S. Dist. LEXIS 159537, at *6 (M.D. Fla. Sep. 4, 2022) ("as a matter of law, an expert cannot introduce a damages theory to the jury without establishing the reliability of that theory").

### C. Matolo's Methodology was not Applied in a Reliable Way.

Even if Matolo employed a reliable methodology – which he does not – his opinion should still be excluded because he has not "reliably applied the principles and methods to the facts of the

13

case." Fed. R. Evid. 702(d). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591. District courts should, therefore, exclude expert testimony if it lacks relevance to, or does not "fit," the issues to be decided in the case. *Id.* More particularly in Lanham Act cases, royalty-based damages must be related to the scope the defendant's alleged infringement. *See Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 920 (Fed. Cir. 1984) ("any royalty-based measure of damages must exhibit a strictly rational correlation between the rights appropriated and the measure of damages applied."); *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1252 (11th Cir. 2007) (Lanham Act plaintiff failed to establish actual damages where the plaintiff's expert "failed to 'separate out' the claimed damages that were actually attributable to" the defendant's alleged misconduct). Yet, Matolo's calculations do not differentiate or quantify the Vivint subscribers that originated from ADT, switched to ADT, or were subject to alleged misconduct. Accordingly, Matolo does not reliably apply his methodology because his damage calculation is entirely divorced from the misconduct ADT alleges in this case.

As discussed above, Matolo's royalty rate conclusions based on the ADT Model and the Representative Industry Model are completely divorced from the facts of this case. Matolo and his colleague Mangum have applied the exact same calculations, using the exact same inputs, in multiple cases to reach the same royalty rate conclusion. Those conclusions are complete independent of the type or quantity of Vivint's misconduct in this case. For example, in reaching his royalty rate conclusion, Matolo does not all the trademarks at issue in this case or all the ways Vivint allegedly infringed those marks. Matolo Dep. At 255:3-256:5.

As for his royalty base, Matolo attempts to quantify Vivint's new subscribers and apply such input into his royalty base calculation. Matolo Report at Table 6. However, this number

includes all Vivint's new subscribers for a three-year period – not just those who switched from ADT to Vivint – meaning, Matolo's royalty base includes Vivint subscribers who were never ADT customers. Matolo Dep. at 243:23-244:10. Additionally, in determining the percentage of direct-to-home subscribers, for at least two of the years applied, Matolo uses the percentage of direct to home total subscribers, as opposed to new direct to home subscribers. Matolo Dep. at 243:11-245:7. In essence, this calculation assumes without any factual support that every new subscriber Vivint generated from direct-to-home sales from 2018-2020 was generated from Vivint's alleged misconduct.

Nor does Matolo adjust his analysis to reflect the number of new subscribers that were actually subjected to Vivint's purported misconduct. This is because Matolo admits that he does not know this number. Matolo Dep. at 249:22-250:14; 252:11-21 ("we don't know for sure what are all of the customers that have been subject to the alleged wrongdoing"); 254:5-8 ("we won't know total amount of customers subject to any specific alleged wrongdoing"). Nor does Matolo's analysis distinguish between new subscribers that experienced affiliation misrepresentations as opposed to another form of misconduct. Matolo Dep. at 253:25-254:14; 254:15-22 (Matolo was not able to distinguish in his analysis between customers that were subject to affiliation misrepresentations as opposed to other misconduct).

Finally, without explanation, Matolo multiplies the number of Vivint's new subscribers by an ADT market share figure for a single year obtained from a third-party industry source. Matolo Report at Exhibit 6, n.7; Matolo Dep. 247:25-248:15. Instead of relying on information from ADT, Matolo again relies on inadmissible hearsay without establishing the validity of this data or that other experts similarly rely on it. Matolo Dep. 248:16-249:9. Matolo also fails to explain how

using ADT's market share results in a royalty base that correlated to the scope of Vivint's alleged misconduct in this case. Matolo Dep. 249:10-252:21; *see Bandag, Inc.*, 750 F.2d at 920.

Matolo's colleague, Mangum's, testimony was previously limited in this Court in a case involving these same parties for this same reason. *See ADT LLC v. Vivint, Inc.*, Case No. 17-cv-80432-Middlebrooks (S.D. Fla. Nov. 14, 2017), attached as **Exhibit E**. In that case, the court noted that ADT should "separate out the claimed damages that were *actually attributable* to Vivint's conduct." *Id*. at 5 (emphasis in original). The court also reasoned that under the "sweeping" damages calculation proposed by the expert, Vivint would pay a royalty on revenues earned from customers who were never affiliated with ADT, and ADT "cannot possibly claim that such revenues reflect damages actually attributable to Vivint's misconduct." *Id*. As a result, the court excluded the testimony to the extent the expert opinion did not reflect damages "actually attributable to Vivint's alleged misconduct." *Id*. at 6.

Likewise, Matolo's does not "separate out" damages attributable to Vivint's alleged misconduct. *Id*. 5, 6. As such, Matolo's application of his (faulty) methodology is not reliable and should not be presented to the jury. *See Phillips*, 238 F. App'x at 540 (excluding expert opinion with no reliable link between the data and facts); *WhereverTV, Inc.*, 2022 U.S. Dist. LEXIS 125079, at *4 (where the scientific principles and expert opinion lack evidentiary relevance and reliability, the opinion will be found inadmissible); *Wind Logistics Prof'l, LLC v. Universal Truckload, Inc.*, No. 1:16-cv-00068, 2020 U.S. Dist. LEXIS 108160, at *11-*12 (N.D. Ga. June 22, 2020) ("to allow an expert to present testimony that ignores the difference between actionable conduct and nonactionable conduct would be to ignore the requirement that expert testimony must assist the trier of fact in deciding some relevant issue.").

## **CONCLUSION**

Matolo's testimony should be excluded under Rule 702 for at least two reasons. First, Matolo's methodology is not reliable. Rather than performing his own analysis, Matolo adopts the models of both ADT and Dr. Russell Mangum. Matolo accepts these models at face value, with no independent analysis or verification. In fact, he admits he only generally understands the ADT Model. What's more, these models are not based on the facts and issues at hand, nor have they changed from any previous applications of the models to fit the facts of this case. Additionally, these models are not published, subject to peer review, tested, or generally accepted.

Second, Matolo does not apply his methodology in a reliable way (or really at all) to the facts of this case. Specifically, his royalty damages are not related to the scope of the alleged trademark infringement, as required by the Lanham Act. Indeed, Matolo entirely ignores the scope of the alleged infringement and assumes that **every** new Vivint subscriber from direct to home sales was the result of Vivint's alleged misconduct. Further, substantially similar testimony from Matolo's colleague has already been excluded by this Court and other district courts. For these reasons, Matolo's testimony should be excluded in its entirety.

In the alternative, at the very least, the Court should prohibit Matolo from testifying about his calculation of the royalty base, which is completely divorced from the alleged misconduct in this case.

Respectfully submitted,

/s/Joshua R. Brown
Michael N. Kreitzer
Florida Bar No. 705561
kreitzerm@gtlaw.com
GREENBERG TRAURIG, P.A.
333 S.E. 2nd Ave., Suite 4400
Miami, Florida 33131
Telephone: 305.579.0500

       -and-

       Gregory W. Herbert
       Florida Bar No. 0111510
       herbertg@gtlaw.com
       Joshua R. Brown
       Florida Bar No. 826391
       brownjr@gtlaw.com
       GREENBERG TRAURIG, P.A.
       450 S. Orange Ave., Suite 650
       Orlando, Florida 32801
       Telephone: 407.420.1100

       -and-

       Matthew A. Steward (*pro hac vice*)
       mas@clydesnow.com
       Shannon K. Zollinger (*pro hac vice*)
       skz@clydesnow.com
       CLYDE SNOW & SESSIONS
       201 S. Main Street, Suite 1300
       Salt Lake City, Utah 84111
       Telephone: 801.322.2516

       *Counsel for Defendants Vivint Smart Home, Inc. and Legacy Vivint Smart Home, Inc.*

## **CERTIFICATE OF SERVICE**

I certify that on December 15, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of filing to all counsel of record.

       /s/Joshua R. Brown