CONFIDENTIAL

Page 1

1           UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA
2                  MIAMI DIVISION
3                        CASE NO.: 1:20-cv-23391-MGC
4      ADT; et al,
5          Plaintiff,
6      v.                       (CONFIDENTIAL)
7      VIVINT SMART HOME, INC., f/k/a
       MOSIAC AQUISITION CORP.; et al.,
8
           Defendants.
9      _____/
10
       *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
11
12         VIDEOTAPED DEPOSITION OF DR. RUSSELL S. WINER
13     DATE TAKEN:        AUGUST 30, 2022
14     TIME:             11:27 A.M. UNTIL 7:59 P.M. EASTERN
15     TAKEN BY:         DEFENDANTS/COUNTERCLAIMANTS
16     LOCATION:         VIA VIDEOCONFERENCE
17     REPORTED BY:      DIANE C. ROBERTS
                         STENOGRAPHIC SHORTHAND REPORTER,
18                       NOTARY PUBLIC, STATE OF FLORIDA
                         AT LARGE
19
20
21
22
23
24
25     Job No. CS5384054

CONFIDENTIAL

Page 2

```
 1              A P P E A R A N C E S
 2    (Via Videoconference)
      ERIC J. HOBBS, ESQUIRE
 3    OF:  Shook, Hardy & Bacon, LLP
              1660 17th St., Suite 450
 4            Denver, CO  80202
              ehobbs@shb.com
 5
                  Attorney for the Plaintiff
 6
 7    (Via Videoconference)
      JOSHUA R. BROWN  ESQUIRE
 8    and MICHAEL N. KREITZER, ESQUIRE
      OF:  Greenberg, Traurig, P.A.
 9            450 S. Orange Avenue, Suite 650
              Orlando, FL  32801
10            brownjr@gtlaw.com
11               Attorneys for Defendants/Counterclaimants
12
      ALSO PRESENT:  BRIAN BUSS
13                   Defense Expert
14                   TIMOTHY LENZ
                     Videographer
15
16
17
18
19
20
21
22
23
24
25
```

CONFIDENTIAL

Page 3

1                         I N D E X

                                                    PAGE
2    VIDEOCONFERENCE VIDEOTAPED TESTIMONY OF:
       DR. RUSSELL S. WINER
3      Direct Examination by Mr. Brown....................6
       Cross Examination by Mr. Hobbs..................279
4
     CERTIFICATE OF OATH..............................284
5
     CERTIFICATE OF DEPOSITION TRANSCRIPT.............285
6
     ERRATA SHEET.....................................286
7
     NOTIFICATION LETTER..............................287
8
9                       E X H I B I T S

                                                    PAGE
10   DEFENDANTS' EXHIBIT:
11   EXHIBIT NO. 1  Expert Report.....................11
12
13                  S T I P U L A T I O N S
14        It is hereby stipulated and agreed by and
15   between the counsel for the respective parties and the
16   deponent that the reading and signing of the deposition
17   transcript be reserved.
18
19
20
21
22
23
24
25

CONFIDENTIAL

Page 4

```
 1                    P R O C E E D I N G S

 2                      *       *       *

 3            MR. VIDEOGRAPHER:  Good morning.  We're now

 4       going on the video record and the time is

 5       11:27 a.m., Eastern.

 6            Today is Tuesday, August 30th, 2022.  Please

 7       note that this deposition is being conducted

 8       remotely, using virtual technology.  The quality of

 9       the recording depends on the quality of the cameras

10       used and Internet connection of all participants.

11       What is seen from the witness and heard on the

12       screen is what will be recorded.

13            Audio and video recording will continue to take

14       place until all of the parties agree to go off the

15       record.

16            This is Media Number 1 of the video-recorded

17       deposition of Dr. Russell S. Winer, taken by

18       Counsel for Defense in the matter of ADT, et al.,

19       vs. Vivint Smart Home, Incorporated, et al.

20            It's been filed in the U.S. District Court,

21       Southern District of Florida, Miami Division, and

22       has a Case Number of 1:20-cv-23391.

23            My name is Timothy Lenz and I represent

24       Veritext Legal Solutions.  The court reporter is

25       Diane Roberts, also representing Veritext Legal
```

CONFIDENTIAL

Page 5

1    Solutions.

2        If there are any objections to this proceeding,

3    please state them at the time of your appearance.

4    Counsel and all present, including remotely, will

5    now state their appearance and affiliations, for the

6    record, beginning with the noticing attorney.

7        MR. BROWN:  Good morning.  This is

8    Joshua Brown, with Greenberg Traurig.  I'm here

9    representing the Vivint Defendants.  With me here

10   today is Michael Kreitzer, also with Greenberg

11   Traurig, representing the Vivint Defendants.  And

12   then, also, we have on the line Brian Buss, who is

13   an expert witness that the Vivint Defendants have

14   retained in this matter.

15       MR. HOBBS:  And good morning.  This is

16   Eric Hobbs, with the law firm of Shook, Hardy &

17   Bacon, on behalf of ADT.

18       VIDEOGRAPHER:  Thank you.  If the court

19   reporter will please swear in the witness, then

20   counsel may proceed.

21       COURT REPORTER:  Raise your right hand to be

22   sworn.  Do you solemnly swear the testimony you're

23   about to give will be the truth, the whole truth,

24   and nothing but the truth, so help you God?

25       THE WITNESS:  I do.

CONFIDENTIAL

Page 6

1          COURT REPORTER:  Thank you.

2     THEREUPON:

3                    DR. RUSSELL S. WINER,

4     having been produced and first duly sworn as a witness,

5     was examined and testified upon his oath as follows:

6                     DIRECT EXAMINATION

7     BY MR. BROWN:

8          Q.   Good morning, Dr. Winer.  How are you doing

9     today?

10         A.   Good morning, Mr. Brown.

11         Q.   So, can you -- just for the record, can you

12    state your full name?

13         A.   My name is Russell S. -- middle initial --

14    Winer, W-I-N-E-R.

15         Q.   Thank you, Dr. Winer.  And I'll just go

16    through -- I know that you've been deposed before, but

17    I'll just put some reminders on the record.  First of

18    all, you understand that you're under oath?

19         A.   Yes, I do.

20         Q.   You understand there are penalties for perjury?

21         A.   Yes, I do.

22         Q.   Do you know that, if you are to give testimony

23    at trial in this case, that your deposition testimony

24    here today will have equal weight to whatever testimony

25    you might give at trial?

CONFIDENTIAL

Page 7

1        A.    Yes, I do.

2        Q.    Because we are doing our deposition today -- we

3    have a court reporter that's taking down what you say.

4    So, because of that, it's really important that we do

5    not talk over each other.  So, I will do my best to

6    allow you to complete your answer before I start my next

7    question.  But, I'll ask that you please wait for me to

8    finish my question before you begin your answer.

9        A.    Sounds good.

10        Q.    If at any time you do not understand the

11    question that I'm trying to ask, please let me know.

12        A.    Okay.

13        Q.    And if you don't tell me you didn't understand

14    the question, I'm going to assume that you understood

15    the question.  Is that fair?

16        A.    Yes.

17        Q.    Okay.  The other thing is, because we're doing

18    the deposition today, it's important that your response

19    is an out-loud verbal response.  You can't -- so,

20    shaking your head or nodding your head doesn't come --

21    or, doesn't -- doesn't show up on the record well.

22    Neither do things, you know, like "uh-huh" and "uh-uh,"

23    things like that.  So, please try to use an out-loud

24    verbal response to the questions.

25        A.    Okay.

CONFIDENTIAL

Page 8

1      Q.   So, there are multiple ADT entities that are

2   Plaintiffs in this case.  Do you understand that?

3      A.   No, I don't.

4      Q.   Okay.  Who do you understand is the Plaintiff

5   in this case?

6      A.   I only understand that it is the corporate

7   entity ADT.  I don't know anything about multiple

8   entities.

9      Q.   Do you know the name of the -- do you know the

10  name of the entity that -- that is the Plaintiff?  What

11  is the exact name of the entity that is the Plaintiff?

12     A.   Well, I'm reading it off my report.  ADT, LLC,

13  and the ADT Security Corporation.

14     Q.   Okay.  And for the purpose of your analysis, is

15  there any distinction between ADT, LLC, and the ADT

16  Security Corporation?

17     A.   No.

18     Q.   So, if -- and for the purposes of our

19  deposition, when I'm referring to the Plaintiffs, I'll

20  collectively refer to them as ADT.  Does that make

21  sense?

22     A.   Yes, it does.

23     Q.   Okay.  If at any time it's important for your

24  analysis that there's some distinction between which ADT

25  entity we're talking about, please let me know.

CONFIDENTIAL

Page 9

1          A.    Okay.

2          Q.    Do you understand that there are multiple

3    Defendants in the case?

4          A.    Again, I only considered one entity, Vivint.

5          Q.    Okay.   And -- and do you know the precise

6    Vivint entity that you're referring to, when you say

7    Vivint?

8          A.    I believe it is Vivint Smart Home,

9    Incorporated.

10         Q.    Okay.   Well, if we look again at your report,

11   it lists Vivint Smart Home, Incorporated, formerly known

12   as Mosaic Acquisition Corp., and Legacy Vivint Smart

13   Home, Inc., formerly known as Vivint Smart Home, Inc.

14   Did I read that right?

15         A.    Yes, you did.

16         Q.    Okay.   And do you understand those are both --

17   both of those entities are Defendants in this case?

18         A.    I only considered one Defendant in this case,

19   Vivint.

20         Q.    Okay.   And when you say Vivint, who do you

21   mean?

22         A.    I assume it is Vivint Smart Home.   I didn't

23   draw any distinction between the different entities

24   here.

25         Q.    Would it change your analysis in this case if

CONFIDENTIAL

Page 10

1    the Defendant in the case were Legacy Vivint Smart Home,

2    Inc., instead of Vivint Smart Home, Inc.?

3        A.   As I said before, I only considered one entity,

4    Vivint.  That's -- I made no distinction between the

5    other entities here.

6        Q.   Okay.  And when you say you only considered one

7    entity, Vivint, what precisely is that entity that you

8    considered?

9        A.   Whatever you want to call it.  It's the company

10   that made the alleged deceptive sales calls on ADT

11   customers.

12       Q.   Okay.  Well, we'll get into that as we go.

13   But, for the purposes of the deposition, I'll refer to

14   the Defendants collectively as Vivint.  But, if it is

15   important to your analysis to draw some distinction

16   between the various Vivint entities, please let me know.

17       A.   Okay.

18       Q.   Okay.  So, let's go ahead and -- let me go

19   ahead and share my screen.  I'm going to share the copy

20   of the deposition -- excuse me, of your expert report.

21            Prior to the deposition this morning, I

22   e-mailed a copy of -- of the report to your counsel.

23   Did you receive an e-mail from your counsel with a copy

24   of your expert report?

25       A.   Yes, I did.

CONFIDENTIAL

Page 11

1      Q.   Okay.  And the report that you received in that

2   e-mail, was that a true and correct copy of your expert

3   report?

4      A.   Yes, it was.

5          MR. BROWN:  So, I will represent to you that

6          I'm sharing with you the same -- a copy of that same

7          report which I have marked for identification

8          purposes with a "1" in the file name.

9          So, this is, for Identification purposes,

10         Exhibit 1 to your deposition.

11         (Received and attached to the transcript as

12         Defendants' Exhibit No. 1.)

13   BY MR. BROWN:

14     Q.   And I'm starting -- I have the first page.  Do

15   you recognize this as the cover page of your expert

16   report?

17     A.   Yes, I do.

18     Q.   Let me go down and find the signature page,

19   just so we can make sure that we have the signature.

20   Okay.  Let me see.  I think it's about in the --

21     A.   You have to go a little further above my

22   resume.

23     Q.   Yeah, I'm trying to get to it faster.  Okay.

24   I'm now on Page 50 of the PDF -- on Page 50 of

25   Exhibit 1, which is your expert report.  And do you

CONFIDENTIAL

Page 12

1    recognize the signature on this page as your signature?

2        A.   Yes, I do.

3        Q.   Do you recall signing this expert report?

4        A.   About a year ago, yes.

5        Q.   Did you review the expert report more recently

6    in preparation for your deposition?

7        A.   Yes, I did.

8        Q.   Do you stand by everything in your report?

9        A.   Yes, I do.

10       Q.   Are you aware of any errors?  When you reviewed

11   the report, did you find any errors?

12       A.   No.

13       Q.   Is there anything you've relied on for your

14   opinions in this case other than the things that you've

15   cited in your expert report?

16       A.   Well, over my 45-year career as a marketing

17   professor, I've read a lot of papers and books,

18   et cetera.  So, that's all part of my accumulated

19   knowledge.  So, if you want to be specific, I only

20   relied on those things that are on my reference list for

21   the report.  But, in general, of course, I rely on

22   everything that's gone into my expertise over the years.

23       Q.   Okay.  Well, specifically related to this

24   case, let's go ahead and go to that appendix.  I think

25   it's Appendix B that you're referring to.  Is what the

CONFIDENTIAL

Page 13

1    you're referring to as the list of things that you

2    relied on for your report?

3        A.    As soon as you get to it, I'll let you know.

4        Q.    Okay.  So, I'm at Page 67 of Exhibit 1.  It's

5    titled, Appendix B:  Materials Considered.  Is this the

6    list that you mentioned before of the things that you

7    relied on for your expert report?

8        A.    Yes, it is.

9        Q.    Okay.  And is this list complete?

10       A.    As far as I know, it is.

11       Q.    Okay.  Can you think of anything else that

12   you've relied on for your opinions in this report other

13   than those things that are listed on this Appendix B of

14   your expert report?

15       A.    Not specifically for the report.

16       Q.    Have you reviewed any customer files for any

17   customers that ADT alleges that were subject to

18   deceptive sales practice -- practices?

19       A.    Could you --

20             MR. HOBBS:  Object to form.

21             THE WITNESS:  Could you repeat that question?

22             MR. BROWN:  Yeah.  I'll rephrase it.  I

23       apologize.

24   BY MR. BROWN:

25       Q.    So, in your report you referred to audio files.

CONFIDENTIAL

Page 14

1    I think you referred to 1,300 audio files.  Let's go

2    ahead and find that.

3            Okay.  I'm not finding it right off, but we'll

4    get there?  Do you recall reviewing audio files in

5    relation to your reaching your opinion in this case?

6        A.   I reviewed a few of them, yes.

7        Q.   Okay.  How many audio files did you review?

8        A.   I don't recall exactly.  Maybe six or seven.

9    The ones that I included in the report.

10       Q.   And when you say the ones included in your

11   report, which -- what are you referring to?

12       A.   Well, in my report, I have a section called

13   Customer Complaints and that has some snippets of the

14   audio files that I reviewed.

15       Q.   Okay.  Let's go to that portion of your report.

16   Can you give me a page number?

17       A.   Page 19 in my report.  The paragraph starts

18   with Paragraph 48.

19       Q.   Okay.  So, I'm on Paragraph 48.  And it says,

20   "One set of evidence of Vivint's actions I found very

21   useful were audio recordings of ADT customer complaint

22   calls."

23            Did I read that right?

24       A.   Yes, you did.

25       Q.   And then you go on to say, "I understand that

CONFIDENTIAL

Page 15

1    there are approximately 1,300 of these recorded calls of

2    which my team and I reviewed several hundred drawn from

3    the full set."

4            Did I read that right?

5        A.   Yes.

6        Q.   Okay.  And then, you just testified that you

7    reviewed just six or seven audio files.  Is that right?

8        A.   Yes.  I did not review all of the ones that we

9    randomly selected from those 1,300.

10       Q.   Well, let's -- let's start with, which -- well,

11   let's start with the 1,300.  So, it says there's

12   approximately 1,300 audio -- is it 1,300 audio files?

13       A.   Yes, 1,300 audio files.

14       Q.   Do you know what format the audio files were

15   in?

16       A.   WAV files.

17       Q.   Okay.  And so the files were actual audio

18   files, not transcripts of -- of audio.  Is that right?

19       A.   The WAV files are the actual audio, correct.

20       Q.   Did you also review any call transcripts?

21       A.   Yes, I did.

22       Q.   Okay.  I'll come back to that.

23            So, in terms of the 1,300 or so audio WAV

24   files, how did you obtain those files?

25       A.   They were obtained from ADT.

CONFIDENTIAL

Page 16

1          Q.   Who -- who sent them to you?

2          A.   Don't remember exactly who obtained them

3     through the Discovery portion of the litigation.

4          Q.   Do you mean that those files were -- came from

5     Vivint?

6          A.   No.  As I just said, they came from ADT.

7          Q.   Okay.  And how did you receive them?

8          A.   I don't recall.

9          Q.   Were they e-mailed to you?

10         A.   I don't recall.

11         Q.   Okay.  Did you personally receive them?

12         A.   I did not personally receive them.

13         Q.   So, who actually received the 1,300 or so audio

14    WAV files?

15         A.   The team of consultants that I work with at the

16    company called GBX.

17         Q.   Who is GBX?

18         A.   It's the litigation consulting firm that I

19    worked with on this case.

20         Q.   And have you worked with GBX before?

21         A.   Yes, I have.

22         Q.   How many times?

23         A.   Maybe eight to ten times.

24         Q.   Have you worked with GBX for cases that did not

25    involve Vivint as a Defendant?

CONFIDENTIAL

Page 17

1      A.   Yes.

2      Q.   Okay.  Have you worked with GBX on cases that

3   did not involve Shook, Hardy & Bacon as counsel?

4      A.   Yes.

5      Q.   Okay.  Do you work with GBX on all of your

6   litigation cases?

7      A.   Most of them.  But, not all of them.

8      Q.   How did you first become acquainted with GBX?

9      A.   I worked with two of the principals of GBX on

10  a case maybe 10 -- 10 years ago.  They were working for

11  another firm at the time and then they split off and

12  formed their own company called GBX.

13     Q.   Okay.  And what was that case where you first

14  worked with these principals of GBX?

15     A.   You know, I remember the product involved.  It

16  was football helmets.  I remember one of the litigants

17  was a company called Schutt, S-C-H-U-T-T.  I don't

18  remember the other litigant's name.

19     Q.   What was the -- can you spell that name once

20  again of the party you remember?

21     A.   S-C-H-U-T-T.  Again, it had to do with football

22  helmets.

23     Q.   And were you representing Schutt or were you

24  representing a different party?

25     A.   I don't recall.

CONFIDENTIAL

1    Q.  Do you recall who the attorneys were for --

2  that you working with in that case?

3    A.  No, I don't.

4    Q.  But, you recall that you were working with the

5  principals of GBX -- the principals that later formed

6  GBX?

7    A.  That is correct.

8    Q.  Who were those -- what were those principals?

9    A.  One is Mark Pelofsky, P-E-L-O-F-S-K-Y.

10    Q.  Can you spell that again for me?  I'm sorry.

11    A.  P --

12    Q.  Last name.

13    A.  P-E-L-O-F-S-K-Y.  And the other is Brenda

14  Arnott, A-R-N-O-T-T, dash, Wesson, W-E-S-S-O-N.

15    Q.  Okay.  So, you worked with Mark Pelofsky and

16  Brenda Arnott-Wesson in this case related to football

17  helmets?

18    A.  Yes.  As I said, it was a number of years ago.

19    Q.  Do you recall what your analysis -- did you

20  issue a report in that case?

21    A.  Yes, I did.

22    Q.  Do you recall what your opinions were in that

23  case?

24    A.  No, I don't.

25    Q.  Do you know what the outcome of that case was?

CONFIDENTIAL

Page 19

1      A.   No, I don't recall.  I do recall the other

2  company, now, involved is a major football helmet

3  manufacturer called Riddell.

4      Q.   But, do you recall whether you represented

5  Riddell or Schutt?

6      A.   No, I don't.

7      Q.   Do you remember what the case was about?

8      A.   It had to do with some kind of -- some aspect

9  of liability of the -- of injuries from football

10  helmets.  But, that's all I recall.

11      Q.   Okay.  Were you -- were you testifying -- were

12  you -- were your opinions related to damages in that

13  case?

14      A.   I believe it had to do with a rebuttal to a

15  study that was done.  But, again, I don't remember all

16  the details.

17      Q.   Do you remember what kind of study it was that

18  you were rebutting?

19      A.   No, I don't.

20      Q.   Was it a marketing study?

21      A.   I don't recall, Counselor.

22      Q.   Okay.  So, when did -- when did Mark Pelofsky

23  and Brenda Arnott-Wesson form GBX?

24      A.   I don't remember the exact year.

25      Q.   Okay.  Can you give me a ballpark?

CONFIDENTIAL

Page 20

1      A.   Maybe six to eight years ago.  Somewhere around

2   that.

3      Q.   Did you work with Mark Pelofsky or Brenda

4   Arnott-Wesson on any other cases outside of their

5   involvement with -- with GBX?

6      A.   I don't recall if they immediately founded GBX

7   after the football helmet case or there was another case

8   we worked on.  I just don't recall.

9      Q.   Okay.  How many employees does GBX have?

10      A.   I have no idea.

11      Q.   Is it a large company?

12      A.   Well, other companies I've worked with, like

13   Cornerstone Research, have more employees than GBX.  I

14   know that.

15      Q.   How do you know that?

16      A.   Because I know Cornerstone is a huge company

17   and I know GBX is not a huge company.

18      Q.   Okay.  Other than saying GBX is not a huge

19   company, can you give me any indication of how many

20   employees GBX has?

21      A.   As I said, they have a lot fewer than

22   Cornerstone or Charles River, those -- those big

23   companies, Analysis Group.  They have a lot fewer than

24   them.

25      Q.   Okay.  Can give me an idea of how many they

CONFIDENTIAL

Page 21

1    have?

2         A.    No, I can't.

3         Q.    So, over the period of eight to ten cases that

4    you worked on with GBX, how many different individuals

5    have you worked with at GBX?

6         A.    I primarily worked with Mark Pelofsky.  He has

7    other staff people that he brings into doing analyses.

8    But, I don't know many.

9         Q.    Do you know how many people GBX had working on

10   this case?

11        A.    No, I don't.

12        Q.    Do you know how many people you've worked --

13   you've interacted with at GBX, on this case?

14        A.    Maybe two, other than Mark.

15        Q.    Who are they?

16        A.    I don't remember their names.

17        Q.    Are you aware -- so, let's go back to these

18   1,300 audio files.  Someone at GBX -- you believe

19   someone at GBX received the 13- -- approximately 1,300

20   audio files.  Do you know who at GBX received those

21   files?

22        A.    No, I don't.

23        Q.    Have you ever had the 13- -- approximately

24   1,300 audio files in your possession?

25        A.    No, I have not.

CONFIDENTIAL

Page 22

1          Q.    So, how did you receive any of the audio -- you

2     said you reviewed six or seven audio files.  How did you

3     receive those files?

4          A.    I received them from GBX.

5          Q.    And how did you receive them from GBX?

6          A.    Oh, I don't remember.  Maybe by e-mail.  Or

7     they were just posted on a site, maybe.  I don't know.

8     I don't remember.

9          Q.    Is it -- do -- do you know for sure -- do you

10    still have copies of the audio files you received from

11    GBX?

12         A.    I have access to them, yes.  I don't have

13    copies on any of my own hard drives or Cloud-based

14    files.

15         Q.    How do you have access to them?

16         A.    I have access to them through a list of all of

17    the sources that are referenced in this report.

18         Q.    What do you mean by a list?

19         A.    We have a list or binder, electronic binder,

20    that has all of these references and citations in the

21    report.  And, so, I can access them that way.

22         Q.    Okay.  And what form is the electronic binder

23    in?

24         A.    I'm sorry, I did not -- I didn't hear the first

25    part.

CONFIDENTIAL

Page 23

1      Q.   I said, what format is the electronic binder

2    in?

3      A.   I -- I don't know what format it is.  It's

4    just, I can access it.  I can click on a reference and

5    I can get access to whatever the file is.

6      Q.   Okay.  And do you -- do you know what program

7    that -- what software program you were using when you

8    click on those references?

9      A.   No.

10     Q.   Do you know where the actual files are stored?

11     A.   No, I don't.

12     Q.   Okay.  When you received these six or seven

13   audio files, did you receive those separately from this

14   list of sources that you're talking about, the

15   electronic binder?

16     A.   No, they were all part of that.

17     Q.   Okay.  So, how -- how did you -- how did you

18   determine to look at the six or seven, out of the

19   1,300 -- well, let me ask you this.

20          Through that electronic binder, do you have --

21   can you access all 13- -- approximately 1,300 audio WAV

22   files?

23     A.   I actually don't recall.

24     Q.   So, you don't know whether you have access to

25   all of the approximately 1,300 audio files that you

CONFIDENTIAL

1    referenced here in Paragraph 48 of your report?

2        A.   No.

3        Q.   Okay.  How did you come to look at the six or

4    seven audio files that you -- that you listened to?  Let

5    me rephrase.

6            How did you come to listen to the six or seven

7    audio files that you listened to out of the

8    approximately 1,300?

9        A.   The GBX personnel went through the files and

10   selected a number that we thought would provide

11   supporting evidence to my opinions in the case.

12       Q.   Did GBX ever indicate any of the approximately

13   1,300 files that did not support your hypotheses that

14   you were considering in the case?

15       A.   I know that there were some, based on

16   Mr. Buss's report.  But, I did not hear any of them.

17       Q.   If you listened to those files, might it change

18   your opinion in the case?  Any of your opinions in this

19   case?

20       A.   No, it would not.

21       Q.   Why not?

22       A.   Well, first of all, you would have to listen

23   to the entire file to see what the text was of the

24   full -- full conversation.  But, secondly, I felt that,

25   when I wrote the report, that I had enough evidence in

CONFIDENTIAL

Page 25

1    the report from the audio files I looked at, the

2    depositions of some of the customers, from the social

3    media posts, and also given a historical record of

4    deceptive practices, to be convinced that some kind of

5    remedial information campaign needed to be implemented.

6         Q.   So, who -- do you know if anyone reviewed all

7    1,300 -- approximately 1,300 audio files?

8         A.   I was informed that GBX personnel reviewed all

9    1,300 audio files.

10        Q.   Who at GBX reviewed the audio files?

11        A.   I don't know.

12        Q.   Do you know how many people were involved in

13   that effort?

14        A.   No.

15        Q.   Do you know if it were 10 people?

16        A.   I have no idea how many people were involved.

17        Q.   Could it have been 20 people?

18        A.   I don't know.

19        Q.   Do you know how long it took GBX to review the

20   approximately 1,300 audio files?

21        A.   No, I don't.

22        Q.   Did you do anything to verify that GBX actually

23   reviewed all 13- -- approximately 1,300 audio files?

24        A.   No.

25        Q.   Who at GBX selected the six or seven audio

CONFIDENTIAL

Page 26

1    files that you reviewed?

2         A.    I don't know.

3         Q.    Do you know that GBX made that determination?

4         A.    To the best of my information, yes.

5         Q.    Is it -- is it possible that someone at ADT

6    selected those six or seven audio files for you to

7    review?

8         A.    To the best of my knowledge, that's not

9    correct.

10        Q.    Okay.  And what is that based on?

11        A.    My knowledge that it was GBX that reviewed the

12   audio files, not ADT.

13        Q.    Okay.  Did someone at ADT review the audio

14   files?  The 1,300 or approximately 1,300 audio files?

15             MR. HOBBS:  Object to form.

16             THE WITNESS:  It's possible that they did.  I

17        mean, they were their files.  They have internal

18        customer service, you know, processes.  And probably

19        just in the normal course of business outside of

20        this litigation, they would review the files.  So,

21        I wouldn't be surprised if someone, or a group of

22        people, reviewed the files within ADT.

23   BY MR. BROWN:

24        Q.    Do you know if anyone at Shook, Hardy & Bacon

25   reviewed the approximately 1,300 audio files?

CONFIDENTIAL

Page 27

1        A.    No, I do not.

2        Q.    Okay.  So, who -- I may have asked this, again,

3    but bear with me.  Excuse me.  Let me get a drink of

4    water.  I apologize.

5             Who at GBX directed you to these six or seven

6    audio files that you listened to?

7        A.    I don't recall.  There was a group of us -- of

8    them, I'm sorry -- that supported me in this report.

9    So, I don't know if it was an individual or a group of

10   people that found the relevant audio files.

11       Q.    So, the six or seven audio files you reviewed,

12   you believe those were the relevant audio files?

13            MR. HOBBS:  Object to form.

14            THE WITNESS:  Yes.  They were selected from the

15       1,300 that were supplied to me.

16   BY MR. BROWN:

17       Q.    Does that mean the rest of the approximately

18   1,300 audio files were not relevant?

19       A.    No, it doesn't.

20            MR. HOBBS:  Object to form.

21            THE WITNESS:  I'm sorry.  There may have been

22       many more that had similar information.  There were,

23       you know, perhaps some that were contrary, as I

24       indicated earlier.  So, I really don't know what the

25       content is of the other ones.

CONFIDENTIAL

Page 28

1    BY MR. BROWN:

2        Q.   Did anyone tell you what criteria they used --

3    well, first, you said that you were working with a group

4    of people at GBX.  Who -- who is in that group of people

5    you were working with at GBX on this case?

6        A.   Well, as I told you earlier, my main point of

7    contact was Mark Pelofsky.  I don't know who within his

8    company, on his team specifically, reviewed the audio

9    files.

10       Q.   Okay.  And you don't know if it was one person

11   or 20 people that reviewed the audio files?

12       A.   No, I don't.

13       Q.   Do you remember any of the -- any other names

14   of the people on that group at GBX that may have been

15   involved in reviewing the audio files?

16       A.   No, not sitting here today.

17       Q.   Do you know what criteria GBX used to determine

18   which audio files that you should review related to this

19   case?

20       A.   As I indicated earlier, we were looking for

21   evidence of Vivint practices, or malpractices, when

22   they made sales calls on ADT customers.  So, that was

23   certainly one of the criteria.

24       Q.   So, they -- you believe -- directing you to

25   these six or seven audio files, GBX selected audio files

CONFIDENTIAL

Page 29

1    that showed some of the deceptive sales practices that

2    are alleged by ADT in this case?

3        A.   Yes.  But, as I said before, they may not be

4    the only ones.  They're a representative.

5        Q.   What did you do to determine that these six or

6    seven audio files were representative of the approximate

7    1,300 audio files that you had access to?  Or, excuse

8    me, that GBX had access to?

9        A.   I didn't do anything else.  I just accepted

10   these six or seven.

11       Q.   Did GBX tell you anything about the six or

12   seven audio files that they suggested you review?

13       A.   I'm sorry, I don't know what -- did they tell

14   me -- what specifically do you have in mind?

15       Q.   Did -- when GBX -- well, first of all, how

16   did -- how did GBX tell you which audio files to review?

17       A.   Well, as I've answered previously, they found a

18   small sample of -- of customer interactions with Vivint

19   that would help to support my claims in this report that

20   some kind of remedial information campaign was needed.

21       Q.   Okay.  And did they attempt to identify any

22   audio files that did not support the opinions that you

23   were rendering in this case?

24       A.   Not to my knowledge.

25       Q.   Did -- when GBX directed you to these six or

CONFIDENTIAL

Page 30

1   seven audio files, how did they direct you?  Did they --

2   did they send you copies of the files?

3       A.   Well, as I said, we have -- we have the files.

4   And not only do we have the original WAV files, but we

5   have transcripts of the files.

6       Q.   Okay.  How -- where did you receive transcripts

7   of the files?

8       A.   As I said, they're part of this information

9   binder that we have that represents all of the -- all of

10  the footnotes in my report.

11      Q.   Do you have transcripts of -- to your

12  knowledge, are there transcripts of all of the

13  approximately 1,300 audio files?

14      A.   I don't know if they exist.  My understanding

15  is that they were done by an outside company.

16      Q.   Okay.  Who --

17           COURT REPORTER:  "I don't know if" -- could you

18      please repeat the answer?

19           THE WITNESS:  My understanding is that the

20      transcripts for the ones that I used for my report

21      were created by an outside company.  I don't know if

22      they did -- or created transcripts for all of the

23      other remaining from the 1,300.

24  BY MR. BROWN:

25      Q.   What was the name of the company that created

CONFIDENTIAL

Page 31

1   the transcripts?

2       A.   I don't know.

3       Q.   Did you direct the company that created the

4   transcripts?

5       A.   No, I did not.

6       Q.   Did you do anything to verify the accuracy of

7   the transcripts?

8       A.   No.

9       Q.   And of the approximately 1,300 audio files, how

10  many transcripts of those files are you aware of?

11      A.   I only looked at the ones that I used in my

12  report.  I don't know how many others might exist.

13      Q.   So, you're only aware of transcripts of the six

14  or seven audio files that you reviewed?

15      A.   Correct.

16      Q.   Okay.

17           MR. BROWN:  I'm just going to note, for the

18      record, that we have not received -- I don't believe

19      we've received copies of any transcripts.  So, I

20      will go ahead and request that at this time.

21           MR. HOBBS:  Okay.  Josh, I guess I'm confused

22      by your -- by your request.  But, we can talk about

23      that later.

24           MR. BROWN:  Okay.  We can talk about it after

25      the depo.

CONFIDENTIAL

Page 32

1    BY MR. BROWN:

2        Q.    Okay.  So, Mr. -- excuse me, Dr. Winer, when

3    you say you reviewed six or seven audio files, did you

4    actually listen to the audio files or did you read

5    transcripts of the audio files?

6        A.    Both.

7        Q.    Okay.  Why -- why both?

8        A.    I want to get a sense of what the -- what the

9    customer was saying.  So, that's why I listened to the

10   audio file.  And I don't think I listened necessarily to

11   the whole -- whole audio file.  The transcript allowed

12   me to be more efficient in analyzing what was said

13   during the conversation.

14       Q.    So, do you not listen -- of the six or seven

15   audio files that you listened to, you did not listen to

16   the complete copies of the six or seven audio files?

17       A.    I don't recall today whether I did or I didn't.

18   This was a while ago.  It was over a year ago when I

19   wrote this report.  I can't recall all my exact actions

20   that I took preparing the report.

21       Q.    Well, of the six or seven audio files, can you

22   tell me how long they were, the six or seven audio files

23   you did review?

24       A.    Well, some of them -- of the 1,300, some of

25   them were multiple files from the same call.  So, there

CONFIDENTIAL

Page 33

1    were fewer unique calls, but I don't remember how long

2    each one was.

3        Q.   So, let me make -- let me see if I understand

4    that.  You're saying, of the 13- -- of the approximately

5    1,300 audio files, some were recordings of the same

6    call?

7        A.   (Unintelligible.)

8        Q.   Are you -- are you -- go ahead.

9        A.   Do you want me to answer?

10       Q.   Yeah.  Sorry.

11       A.   From what I understand, a particular call might

12   have been broken up into multiple WAV files.  So, there

13   were fewer unique -- unique calls.

14       Q.   To your knowledge, of the 1,300 audio files --

15   approximately 1,300 audio files, were -- were any of

16   them duplicative?

17       A.   I don't know.  I don't know about being

18   duplicative, no.

19       Q.   I mean -- I mean, the exact same recording.

20   Recording the exact same information.

21       A.   I know what duplicative means.  I don't know if

22   any were duplicative.

23       Q.   Did you ask that question of GBX?

24       A.   No, I did not.

25       Q.   Of the approximately 1,300 audio files, do you

CONFIDENTIAL

Page 34

1    know how many separate calls were represented in those

2    approximately 1,300 files?

3          A.   I believe it represented 250 different

4    customers.

5          Q.   Okay.  And that wasn't my question, but let's

6    go there first.  So, you believe that 250 unique

7    customers are included in the 1,300 -- approximately

8    1,300 files?

9          A.   Yes.

10         Q.   Did you do anything to verify that?

11         A.   No.

12         Q.   Who -- who told you that?

13         A.   I don't remember.

14         Q.   Was it someone at ADT?

15         A.   As I just said, I don't remember.

16         Q.   Is it someone at -- with Shook, Hardy & Bacon?

17         A.   I don't remember.

18         Q.   Okay.  So, going back to my original question,

19    of the approximately 1,300 audio files, you testified

20    earlier that you believe that some of those were -- were

21    audio files that had been broken up.  So, that they --

22    each audio file represented a portion of a phone call.

23    Is that right?

24         A.   Yes.  As I said, the 1,300 calls were based on

25    250 different customer complaints.  So, obviously there

CONFIDENTIAL

Page 35

1    were multiple files from, you know, some of the

2    customers.

3         Q.   Okay.  That's not my question I'm trying to ask

4    you.  I'm trying -- you testified earlier that some of

5    the calls were broken up into multiple files.  Did I

6    understand you correctly?

7         A.   Yes.  And I think that's what I just said.

8         Q.   And you -- what you were just talking about was

9    unique customers.  I'm trying to get a feel for unique

10   calls.  Are you aware that some customers called

11   multiple times?  Is that true?  Or maybe it's not true.

12        A.   I don't know if it's a customer that called

13   multiple times or whether the call was so long that they

14   had to break up the WAV file.  I don't know.  I don't

15   know that.

16        Q.   Who would know that?

17        A.   Probably the people at GBX who listened to all

18   the calls.

19        Q.   Did they tell you that?  They didn't tell you

20   whether there were multiple calls from these customers?

21        A.   I was told that --

22        Q.   Go ahead.

23        A.   I'm sorry.

24             THE WITNESS:  Eric, did you say something?

25             MR. HOBBS:  No, I did not.

CONFIDENTIAL

Page 36

1          THE WITNESS:  Okay.

2          MR. HOBBS:  Go ahead.

3          THE WITNESS:  I heard a noise.

4          Could you repeat the question, please?

5   BY MR. BROWN:

6      Q.   Did someone at GBX tell you whether or not the

7   approximately 1,300 audio files represented individual

8   calls from 250 customers or whether there were multiple

9   calls from the 250 customers?

10     A.   No.  I don't know the -- I didn't -- no, I -- I

11  don't know the distinction.

12     Q.   Did -- did anyone at GBX -- from GBX tell you

13  whether any of the 250 customers that were represented

14  in the approximately 1,300 files, whether any of those

15  customers called multiple times?

16     A.   I don't know the answer to that.

17     Q.   The -- of the six or seven audio files that you

18  reviewed, are any of those multiple calls from the same

19  customer?

20     A.   I don't recall.

21     Q.   Of the six or seven audio files that you

22  reviewed, are any of those multiple files relating to

23  the same call?  In other words, different portions of

24  the same call?

25     A.   I don't recall.

CONFIDENTIAL

Page 37

1          MR. HOBBS:  Object to form.

2     BY MR. BROWN:

3          Q.   Of the -- you understood -- someone told you --

4     you don't remember who, but someone told you there were

5     250 unique customers represented in the approximately

6     1,300 audio files.  Do you know who -- who they were

7     customers of?

8          A.   They were ADT customers.

9          Q.   Okay.  And who told you they were ADT

10    customers?

11         A.   I don't recall.

12         Q.   Was it someone at Shook, Hardy & Bacon?

13         A.   I don't recall.

14         Q.   Did you do anything to verify that the 250

15    customers were all customers of ADT?

16         A.   As far as I know, they were all customer

17    complaints from ADT customers that called in to ADT

18    customer service.  We did not receive any information

19    from Vivint, so they had to be ADT customers.

20         Q.   Okay.  Well, you don't -- you didn't receive

21    any information from anyone.  GBX received the

22    information, correct?

23         MR. HOBBS:  Object to form.

24         THE WITNESS:  Well, they -- they received the

25         information and passed it along to me.

CONFIDENTIAL

Page 38

1    BY MR. BROWN:

2        Q.    Okay.   They passed along six or seven audio

3    files?

4        A.    No, that's --

5            MR. HOBBS:   Mischaracterizes testimony.

6            COURT REPORTER:   Okay.   Go ahead.

7            THE WITNESS:   No.   They said that they were ADT

8        customer calls.

9    BY MR. BROWN:

10       Q.    Who said they were ADT customer calls?

11       A.    The GBX people.

12       Q.    You previously said you didn't recall who told

13   you they were ADT customers?

14       A.    I know they're ADT customers because we used

15   that 250 later in my report.   So, somebody told me they

16   were ADT customers.

17       Q.    Who told you they were ADT customers?

18       A.    I don't know.   I can't recall.

19       Q.    Did you do anything to verify that they were

20   ADT customers?

21       A.    No.

22       Q.    And you believe the 250 -- you believe that the

23   approximately 1,300 audio files were all calls that were

24   made to ADT customer support.   Is that correct?

25       A.    I know that they were ADT customers.   I can't

CONFIDENTIAL

Page 39

1   say that they were all made to ADT customer support.

2       Q.   Okay.  Who else were they made to besides ADT

3   customer support?

4       A.   I don't know.

5       Q.   Who would know?

6       A.   Probably ADT personnel.

7       Q.   Did you do anything to obtain that information?

8       A.   No.

9       Q.   When GBX somehow directed you -- well, let

10  me -- so, the -- let me start over, sorry.

11          When GBX somehow directed you to these six or

12  seven audio files, did they tell you anything about the

13  files?

14      A.   When I looked at the files, I could see that

15  they represented the -- deceptive behavior on the part

16  of Vivint.  And I used them in my report, as I've said.

17      Q.   Okay.

18      A.   I don't think they told me anything about them

19  other than that these would be supportive calls.

20      Q.   Okay.  At any time did GBX tell you anything

21  else about the six or seven audio files you reviewed?

22      A.   No.

23      Q.   Did GBX tell you anything about the remainder

24  of the approximately 1,300 audio files that you did not

25  review?

CONFIDENTIAL

Page 40

1      A.   No.

2      Q.   Did anyone in the case tell you anything about

3  the remainder of the 1,300 audio files that you did not

4  review?

5      A.   No.

6           MR. HOBBS:  Object to form.

7           THE WITNESS:  No.

8  BY MR. BROWN:

9      Q.   So, GBX did not tell you anything about the

10 approximately 1,300 audio files that you did not review

11 in this case?

12     A.   Not that I recall.

13     Q.   And you don't recall anyone else telling you

14 anything about those approximately 1,300 audio files

15 that you did not review in this case?

16     A.   No.

17     Q.   Did you direct GBX regarding what files -- what

18 audio files they should send you to review?

19     A.   No.  We took -- initially, GBX took a random

20 sample of the 1,300 files and then found these files

21 that, as I said, are supportive of our position in the

22 case.

23     Q.   Tell me about the random sample that GBX took

24 of the approximately 1,300 audio files.  How many audio

25 files were in the random sample?

CONFIDENTIAL

Page 41

1      A.   I don't know.

2      Q.   Who told you about the random sample?

3      A.   A GBX personnel told me that they took a random

4   sample of the 1,300 files.

5      Q.   What did they tell you about that random

6   sample?

7      A.   Nothing.

8      Q.   What -- how many -- other than the six or seven

9   audio files that you reviewed, how many other files were

10  in the random sample?

11     A.   I don't know the size of the sample.

12     Q.   Did you do anything to verify that the random

13  sample was an appropriate random sample?

14     A.   No, I did not.  I delegated this analysis to

15  them.

16     Q.   And do you know how they determined that they

17  were doing an appropriate random sample?

18     A.   Well, they have statisticians on their staff

19  who know how to do these kinds of things, so I just

20  assumed they did it in an appropriate manner.

21     Q.   What statisticians do they have on their staff?

22     A.   I don't -- I don't know their names.

23     Q.   Do you know that the statisticians were

24  involved in creating the random sample?

25     A.   No, I do not.

CONFIDENTIAL

Page 42

1     Q.   Do you know how many statisticians GBX has on

2   its staff?

3     A.   No, I do not.

4     Q.   Did you -- did you do anything to verify that

5   the random sample was selected appropriately in this

6   case?

7     A.   No, I did not.

8     Q.   Do you know anything about the method that was

9   used to select the random sample of the approximately

10   1,300 audio files?

11     A.   No.

12     Q.   So, the -- you talked earlier about, you

13   reviewed transcripts in addition to the audio files.

14   How many transcripts did you review?

15     A.   Just the ones that I used in my report.

16     Q.   Which transcripts did you use in your report?

17     A.   Well, you can see them.  They're in this

18   section of the report.  If you look through this

19   section, Section A, there are a number of specific

20   examples.  Loretta ████████ Paragraph 50; Catherine ████████

21   Paragraph 51; another one, Paragraph 52; et cetera.

22     Q.   Okay.  And let's go through these.  So, in

23   Paragraph 50, you're referencing Exhibit 1 to the

24   deposition which is your expert report.  And we're at

25   Section A, beginning on Page 19 of your expert report,

CONFIDENTIAL

Page 43

1    correct?

2        A.   Yes.

3        Q.   And now you're directing me to Paragraph 50,

4    which talks about a woman named Loretta ███████ correct?

5             MR. HOBBS:  Object to form.

6             And Josh, I think he was starting on

7        Paragraph 48.  He referred to Section A.

8    BY MR. BROWN:

9        Q.   Okay.  I think the question is fine.  Go ahead.

10       A.   Please restate the question.

11       Q.   Okay.  I'm now directing your attention to

12   Paragraph 50, which you mentioned before mentions a

13   Loretta ██████ correct?

14       A.   That's correct.

15       Q.   Okay.  And in Footnote 54, it says, "The

16   customers' names have not been verified as to spelling."

17            Did I read that right?

18       A.   Yes, you did.

19       Q.   So, you don't know if you have spelled

20   Loretta ██████ name correctly?

21       A.   Yes, that's correct.

22       Q.   Okay.  And do -- do you know if you are the one

23   who chose that spelling or did that come from a

24   transcript?

25       A.   I did not choose the spelling.

CONFIDENTIAL

Page 44

1          Q.   Who chose the spelling?

2          A.   GBX.

3          Q.   All right.  Is GBX who actually typed out this

4     paragraph of your report?

5          A.   Are you going to let me answer?

6          Q.   I'm sorry.  Go ahead.

7          A.   I wrote the report myself.  They gave me the

8     information from the particular customer in this case

9     and I wrote the paragraph.

10         Q.   So, you actually typed out Loretta ██████ as it

11    appears here?

12         A.   Yes.

13         Q.   So, did you choose that spelling or did someone

14    else choose that spelling?

15         A.   The spelling was provided to me.

16         Q.   By whom?

17         A.   The -- whoever did the analysis at GBX.

18         Q.   Okay.  Do you know who at GBX?

19         A.   I'm sorry.  Repeat that, please.

20         Q.   Do you know who at GBX provided the spelling?

21         A.   No, I do not.

22         Q.   So, here, when you're talking about

23    Loretta ██████ later on in the paragraph you have

24    references to a WAV file?

25         A.   Correct.  Yes.

CONFIDENTIAL

1      Q.   Go ahead.

2      A.   (No response.)

3      Q.   Hold on.  I'll finish my question.

4      A.   Yeah.

5      Q.   So, this WAV file, ADT00000191.wav, is that a

6   audio file or a transcript?

7      A.   That's an audio file.

8      Q.   Okay.  So, it's an audio file of a -- of what?

9      A.   Of this call from the customer.

10     Q.   Okay.  And did you listen to that audio file?

11     A.   I listened to at least some of it.  Enough to

12  be able to write the paragraph.

13     Q.   How much of the audio file did you not listen

14  to?

15     A.   As I said earlier, it was over -- over a year

16  ago.  I don't remember exactly how much I listened to.

17     Q.   Okay.  Could you say you listened to a quarter

18  of the audio file?

19     A.   Of the small number that I used in the report,

20  I believe I listened to the whole audio files from the

21  customers.

22     Q.   Okay.  So, now you're changing your testimony

23  and you're saying that you listened to this entire audio

24  file, ADT00000191.wav?

25     A.   You asked me if I --

CONFIDENTIAL

Page 46

```
 1              MR. HOBBS:  Object to the form.
 2              THE WITNESS:  You asked me if I -- how much I
 3         listened to, a quarter or whatever.  I said I
 4         listened to at least most of it.  As I said, I don't
 5         remember exactly what I did more than 12 months ago.
 6    BY MR. BROWN:
 7         Q.   Okay.  Do you -- do you know whether you
 8    listened to this entire audio file that you referenced
 9    here at Paragraph 50, Footnote 55 and 56, of your
10    report?
11         A.   As I said, I don't remember exactly how much I
12    listened to of the audio file.
13         Q.   Okay.  Do you know -- I don't see a transcript
14    that related to Loretta ███████  Am I missing something?
15         A.   No, you're not missing anything.
16         Q.   Okay.  Did you review a transcript related to
17    any audio files -- any audio calls from Mr. -- from
18    Mrs. ███████
19         A.   I don't remember.  I might have taken it just
20    from the WAV file.
21         Q.   Okay.  Are the transcripts that you referred to
22    listed in Appendix B to your report?
23         A.   I don't know.  I'd have to look at the
24    appendix.
25         Q.   Well, let's go ahead and do that.  We'll keep
```

CONFIDENTIAL

1    our place here at Paragraph 50 -- we'll remember where

2    we are -- and we'll go down to the Appendix B.

3              So, once again for the record, we are in

4    Exhibit 1 for the deposition, which is your expert

5    report, and we're going now to Appendix B of that

6    document.  Okay.  So, I'm now at Page 67 of Exhibit 1,

7    your expert report.

8         A.    Um-hum.

9         Q.    Is this the Appendix B that you're referring

10   to?

11        A.    Yes.

12        Q.    Okay.  And do you see any transcripts of audio

13   files that are listed anywhere on Appendix B?

14        A.    Could you go slow?  More slowly?

15        Q.    Sure.  I'll start at the top.  Let me know --

16   you're welcome to refer -- I believe you have a paper

17   copy with you.  You're welcome to refer to that if it's

18   easier.

19        A.    Why don't you do it?

20        Q.    Okay.  So, this section, the first section

21   says, Articles.

22        A.    Um-hum.

23        Q.    Is it -- are any transcripts listed there?

24        A.    (No response.)

25        Q.    Are any transcripts listed in the section

CONFIDENTIAL

Page 48

1    titled, Articles?

2         A.    No.

3         Q.    Okay.  The next section is called, Produced

4    Documents.  Are there any transcripts listed there?

5         A.    I don't recall what those ADT files are, the

6    four at the top.

7         Q.    So, it's possible that these are transcripts

8    that you reviewed?

9         A.    I -- I don't know.

10        Q.    Okay.  Well, there are only six or -- you

11   mentioned six or seven audio files and there's only four

12   files here.  So, were there transcripts of all six or

13   seven audio files that you reviewed?

14        A.    I don't recall.

15        Q.    Were there transcripts of all six or seven

16   audio files that you received?

17        A.    I don't recall.

18        Q.    How did you receive the transcripts?

19        A.    I don't recall.

20        Q.    Do you -- do you still have access to these

21   transcripts?

22        A.    I may.

23        Q.    Okay.  How -- how would you figure that out?

24        A.    I'd have to go back to the -- to the binder and

25   other information that I have.

CONFIDENTIAL

Page 49

1      Q.   Okay.  I'm going to ask that you do that on a

2   break and let me know if you have access to those.

3   Because, if you do, I'd like copies of them.

4            The transcripts -- you -- you don't recall

5   who -- let me ask you.  Do you have copies of the

6   transcripts saved locally anywhere?  On a computer hard

7   drive or a flash drive or something like that?

8      A.   I don't know.  I didn't --

9      Q.   I'm sorry.  Go ahead.

10      A.   I can't recall.

11      Q.   Do you have copies of the transcripts in an

12   e-mail?

13      A.   I can't recall right now.

14      Q.   All right.  Here, there's a bullet point under,

15   Produced Documents, that says, "ADT audio files or

16   customer calls, see index."  What is that referring to?

17      A.   There's another file there, another appendix or

18   exhibit, that has all -- all the files listed.

19      Q.   Okay.  We'll go there in a moment.  I'm sorry.

20   Did I miss something?

21      A.   No.  Keep going.

22      Q.   Okay.  We'll go there in a minute.  But, before

23   we do, other than these four ADT Bates numbered files,

24   do you see any other places where transcripts of audio

25   files are listed in the Produced Documents section of

CONFIDENTIAL

1   your Appendix B?

2       A.   If you could go down and see the whole

3   appendix, please?

4       Q.   I will.  But, right now, I'm just asking you

5   about this Produced Documents section.

6       A.   As I said, I don't recall what those ADT files

7   are referring to.

8       Q.   Okay.  Before we do this, there's also three --

9   there's also an entry here, "Ring Video From Complaint."

10  What is that referencing?

11      A.   Well, in my report, there is a video that one

12  of the customers took of the interaction that he had

13  with a Vivint salesperson.  And I think it came

14  through -- let me take a look for it.  Paragraph 61,

15  "Video produced by ADT in this matter from a customer's

16  Ring Video Doorbell."

17      Q.   So, that -- that video here is discussed in

18  Paragraph 61 of your report?

19      A.   Yes, it is.

20      Q.   Okay.  And here in Appendix B, I see three

21  separate videos.  What are the other two videos

22  referring to?

23      A.   Well, it must be the case that the whole

24  incident took three videos or three components -- three

25  parts.

CONFIDENTIAL

Page 51

1      Q.   So, you believe these are three separate videos

2   that represent different portions of the same

3   interaction?

4      A.   Yes, the one in Paragraph 61 that I just

5   referred to.

6      Q.   And how did you obtain these videos?

7      A.   From the same source where we got the WAV

8   files.  From the customer complaints.

9      Q.   I'm sorry.  I mean, who sent you these videos?

10      A.   We got them from ADT.

11      Q.   Okay.  When you say, "We got them," who

12   actually received them?

13      A.   GBX analyzed them.  But, they're part of all

14   the information that I received.

15      Q.   Okay.  Did you ever receive copies of these

16   videos?

17      A.   Yes.

18      Q.   Okay.  Who sent them to you?

19      A.   They're part of the information that we

20   received from ADT.

21      Q.   Okay.  I'm -- when you say, "we," who are you

22   referring to?

23      A.   Myself and my team at GBX.

24      Q.   Okay.  I'm asking you, you personally received

25   copies of these video files?  Yes or no?

CONFIDENTIAL

1      A.   Yes.

2      Q.   Who did you receive them from?

3      A.   I think they were initially sent to GBX and

4    then I received them from GBX.

5      Q.   How did you receive them from GBX?

6      A.   I don't recall.

7      Q.   Who at GBX sent them to you?

8      A.   I don't recall.

9      Q.   When GBX sent them to you, did they say

10   anything about the content?

11     A.   They just said that it was a video of a

12   customer interaction with a Vivint salesperson.  The

13   others are all audio, this one is a video of the

14   interaction.

15     Q.   Okay.  Do you know if GBX received any other

16   videos of any other interactions?

17     A.   No, I don't.

18     Q.   Did GBX tell you whether or not -- tell you

19   anything about any other videos they received?

20          MR. HOBBS:  Object to form.

21          THE WITNESS:  I don't recall.

22   BY MR. BROWN:

23     Q.   Did you watch all three of these videos that

24   are listed here in your report on Page 68, Appendix B?

25     A.   I did at one time.

CONFIDENTIAL

Page 53

1      Q.   Did you watch the entirety of each of the three

2   videos?

3      A.   I don't recall what percent of the videos I

4   watched.

5      Q.   Did you receive a transcript of the videos?

6      A.   I don't recall.

7      Q.   Okay.  Let's keep going through this

8   Appendix B.  The next section of Appendix B on Page 68

9   of Exhibit 1 is titled, Books.  Do you see any

10   transcripts listed there under the section, Books?

11      A.   No.

12      Q.   Okay.  Scrolling down, beginning at the bottom

13   of Page 68, continuing on to Page 69 and the top of

14   Page 70, there's a section of this Appendix B called,

15   Court Documents.  I'll scroll through it slowly.  Let me

16   know if you see any transcripts listed there.

17      A.   No.

18      Q.   I see a number of depositions listed.  Are

19   those deposition transcripts that you reviewed?

20      A.   Yes.

21      Q.   Okay.  And did you -- did you receive copies of

22   these transcripts?

23      A.   Yes.

24      Q.   Okay.  Do you have copies of them stored

25   locally anywhere on your computer?

CONFIDENTIAL

1      A.   Yes, I do.

2      Q.   When you reviewed the transcripts, how did you

3  review them?  When you reviewed the deposition

4  transcripts.

5      A.   I'm sorry, what do you mean by that?  Other

6  than reading them?

7      Q.   Well, you may recall that I took your

8  deposition in another case where Vivint was a Defendant.

9  And in that case, you testified that, when you reviewed

10  certain deposition transcripts, you reviewed them

11  through screen -- through a screen share, like we're

12  doing now.

13          So, I'm wondering, in this case, did you review

14  the depositions that are listed here, any of these

15  depositions, via screen share?

16      A.   No, I looked at the -- the transcript.

17      Q.   How did you look at them?

18      A.   I don't understand your question.  I had them.

19  They were sent to me and I looked through them for

20  relevant points.

21      Q.   Did you receive them on paper?  Did you receive

22  them in electronic form?

23      A.   They were not on paper.  They were in

24  electronic form.

25      Q.   Okay.  And how did you receive the electronic

CONFIDENTIAL

Page 55

1   form of these deposition transcripts?

2       A.   Well, again, we have a -- I'll call it a

3   binder.  We have a repository for all of the sources

4   that are used in my report.

5       Q.   Okay.  Did you access each one of these

6   deposition transcripts that are listed on your

7   Appendix B through that electronic binder?

8       A.   Yes.

9       Q.   Okay.  And when you accessed it, did that

10  download a copy of that entire transcript to your

11  computer?

12      A.   No, I did not download a copy to my computer.

13      Q.   So, you reviewed them on the electronic binder?

14      A.   Correct.

15      Q.   Did you review the entire transcript of each of

16  these depositions?

17      A.   Well, I skimmed through them, yes.  And I was

18  looking for, you know, again, relevant points.

19      Q.   Okay.  I'll ask you again.  Did you read the

20  entire transcripts of each of these depositions?

21      A.   Yes.

22      Q.   You read every word in each of these

23  transcripts?

24      A.   I can't say I read every word.  As I just told

25  you, I skimmed them.  As you know, there's a lot of

CONFIDENTIAL

Page 56

1   irrelevant material in a transcript of a deposition.

2   So, I focused in those areas that are relevant or were

3   relevant to my opinions.

4       Q.   Did anyone suggest to you any portions of any

5   deposition transcripts that were relevant to this case?

6       A.   No.

7       Q.   Did anyone at GBX tell you which portions -- or

8   direct to you, in any manner, to any particular portions

9   of any deposition transcripts?

10      A.   No, I did it myself.

11      Q.   What do you mean by, you did it yourself?

12      A.   I just told you two minutes ago that I looked

13  through them myself.

14      Q.   Are you aware -- do you know if there were

15  other deposition transcripts that are not listed here

16  that you reviewed in relation to this case?

17      A.   They're all listed here.

18      Q.   Are you aware -- were there depositions taken

19  in this case that you did not review?

20          MR. HOBBS:  Object to form.

21          And, Josh, if you could just, I guess, specify

22      the time period you're referencing, I think that

23      would be --

24          MR. BROWN:  I think --

25          THE WITNESS:  I don't recall.

CONFIDENTIAL

Page 57

1          MR. BROWN:  Let me just ask the videographer.

2     Videographer, are we close to where we're going to

3     need to take a break?

4          VIDEOGRAPHER:  Yes.  Yes, sir, we are.

5          MR. BROWN:  How many minutes do we have?

6          THE WITNESS:  Right now, we've been on since

7     11:27 and it's now 12:51.

8          MR. BROWN:  Okay.  Let me ask one more

9     question, and then we can take a break, just to

10    clarify this.

11  BY MR. BROWN:

12    Q.   Dr. Winer, are you aware of any depositions

13  that were taken in this case that you did not review?

14    A.   I don't recall.

15         MR. BROWN:  Okay.  Let's take a break there.

16         VIDEOGRAPHER:  All right.  Please stand by.

17    This is the end of Media Number 1 in the testimony

18    of Dr. Russell Winer.  We are now going off the

19    video record and the time is 12:52 p.m., Eastern.

20         Please wait until the recorder is off.

21         THE WITNESS:  Counselor, how long do you want

22    to take a break?

23         MR. BROWN:  Why don't we do 10 minutes, if that

24    works for everyone.  Let's try to come back about

25    three minutes after the hour.

CONFIDENTIAL

1          MR. HOBBS:  Let's say 15 minutes, if that

2      works.

3          MR. BROWN:  Fifteen minutes total from here?

4          MR. HOBBS:  Maybe 10 minutes after the hour.

5          MR. BROWN:  Let's say 10 minutes after the

6      hour.  1:10 p.m., Eastern.

7      (Whereupon, a recess was held at 12:52 p.m., and the

8      deposition resumed at 1:13 p.m.)

9          VIDEOGRAPHER:  And this is the beginning of

10     Media Number 2 in the testimony of Dr. Russell

11     Winer.  We are now back on the record -- the video

12     record, and the time is 1:13 p.m., Eastern.

13 BY MR. BROWN:

14     Q.   Thank you.  Dr. Winer, I'm going to once again

15 share my screen.  Once again, I'm going to share

16 exhibit -- what's been identified as Exhibit 1 to

17 today's deposition, which is your expert report.

18 Correct?

19     A.   Yes.

20     Q.   And we're now on Page 70 of your expert report.

21 We're going through the Appendix B of your expert

22 report, correct?

23     A.   Yes.

24     Q.   Okay.  And we've gone through the previous

25 sections, now we're up to Section 5, which is titled,

CONFIDENTIAL

1    Additional Documents Referenced or Cited in the Body of

2    the Expert Report.

3            Do you see in this section any mention of

4    transcripts of audio files?

5        A.    No.

6        Q.    Okay.  The next section beginning on Page 70 of

7    your expert report and continuing to Page 72, this is

8    the last section of your report.  Correct?

9        A.    Yes.

10       Q.    And it's titled, Websites?

11       A.    Yes.

12       Q.    Are there any transcripts of audio files that

13   are mentioned in this portion of your expert report?

14       A.    No.

15       Q.    Are you aware of anywhere else in your expert

16   report where you mentioned transcripts of audio files?

17       A.    No.

18       Q.    You testified earlier that GBX conducted a

19   random sample of the 1,300 -- approximately 1,300 audio

20   files.  Is that random sample mentioned anywhere in your

21   expert report?

22       A.    Well, it says, in Paragraph 48, "I understand

23   that there are approximately 1,300 of these recorded

24   calls of which my team and I reviewed several hundred

25   drawn from the full set."

CONFIDENTIAL

Page 60

1      Q.   Okay.  And were these --

2      A.   So, in fact, I was reminded by Mr. Pelofsky

3    that you've been sent a spreadsheet that indicates

4    exactly how many were drawn from the 1,300 and which

5    ones those were.

6      Q.   When were you reminded by Mr. Pelofsky?

7      A.   During the break.

8      Q.   Did you call Mr. Pelofsky during the break,

9    or --

10     A.   I spoke with him.

11     Q.   Did he call you or did you call him?

12     A.   I called him.

13     Q.   Okay.  And why did you call him?

14     A.   Because I wanted to substantiate more my memory

15   of what happened.

16          As I told you before, we've had a lot of --

17   there's been a lot of time that's elapsed from when this

18   work was done to this deposition today.  And he reminded

19   me that you have been sent a spreadsheet that has

20   exactly the information that you need in terms of how

21   big the random sample was and which -- exactly which WAV

22   files were drawn.

23     Q.   When you say, you, who are you referring to?

24     A.   You.

25     Q.   Me, personally?  Joshua Brown?

CONFIDENTIAL

Page 61

1      A.    Yes.

2      Q.    Mr. Pelofsky told you that I personally have

3   received a spreadsheet?

4      A.    He told me that it was made available to the

5   opposing counsel.

6      Q.    Okay.  Can you give me a Bates Number for this

7   spreadsheet?

8      A.    I don't have it.

9      Q.    Okay.  What else did Mr. Pelofsky say about --

10  what else did Mr. Pelofsky tell you while we were on a

11  break from the deposition?

12     A.    That's all.  He just reminded me of the

13  spreadsheet.

14     Q.    When you called Dr. Pelofsky -- or

15  Mr. Pelofsky, what did you ask him?

16     A.    I ask him about the random sample and the size

17  of the sample, since I don't have that specifically in

18  my report in Paragraph 48.

19     Q.    Okay.  Did you ask him anything else?

20     A.    No.

21     Q.    Did you say anything else to him?

22     A.    No.

23     Q.    Did you tell him anything about what was going

24  on during your deposition?

25     A.    No.

CONFIDENTIAL

Page 62

1      Q.   So, the only thing you asked him was about how

2   that random sample was done?

3      A.   Yes.

4      Q.   Did he tell you what statistician at GBX did

5   the random sample?

6      A.   I did not ask him that.

7      Q.   Did he tell you that?

8      A.   No.

9      Q.   Okay.  What -- what did he tell you?

10     A.   As I just said, he reminded me of the

11  spreadsheet that has, for each WAV file, an indicator

12  of whether or not it was chosen in the random sample.

13  And then, specifically, which of the WAV files were

14  chosen to -- that we used in the report.

15     Q.   Okay.  Do you know -- did he tell you how that

16  random sample was generated?

17     A.   No.

18     Q.   Did he tell you how many audio files were in

19  the random sample?

20     A.   Yes.  He reminded me there were 357.

21     Q.   Okay.  Is that number anywhere in your report?

22     A.   No.  As I said before, we did not include the

23  exact number of the files that were in the random

24  sample.  But, the spreadsheet has been made available to

25  you.

CONFIDENTIAL

Page 63

1    Q.   What spreadsheet are you referring to?

2    A.   I just told you, Counselor.  The one that lists

3    all the WAV files and the ones that were chosen in the

4    random sample.

5    Q.   Okay.  Can you identify that -- can you give me

6    the file name for that file?

7    A.   We can make it available to you after this

8    deposition if you don't have it.  If you don't remember

9    getting it.

10    Q.   Okay.

11         MR. HOBBS:  Josh, I'm happy to resend this to

12    you.

13         MR. BROWN:  Okay.  Sure.

14         MR. HOBBS:  All right.

15    BY MR. BROWN:

16    Q.   In terms -- did you find out anything else,

17    Dr. Winer, about how that random sample was done?

18    A.   No.  I did not ask him those questions.

19    Q.   Okay.  In terms of the 357 documents that were

20    included in the random sample, were those 357 audio

21    files treated differently than the remainder of the

22    approximately 1,300 files?

23    A.   You mean the remainder of the other thousand,

24    approximately, files?

25    Q.   Sure.  So, we have approximately 1,300 files in

CONFIDENTIAL

Page 64

1    the total set of audio files, correct?

2        A.   Yes.

3        Q.   And 357 of them were selected for this random

4    sample, correct?

5        A.   Correct.

6        Q.   You don't know how they were selected, but you

7    know about 357 were selected from the random sample.

8    Correct?

9        A.   Correct.

10       Q.   So, how were the files in the random sample

11   treated differently, if at all, from the remainder of

12   the audio files, the approximately 1,300 audio files?

13       A.   Well, if 357 were taken, then that left about

14   950 of the 1,300.  And once you draw the random sample,

15   it's -- the ones in the random sample are the ones that

16   we analyzed, and the others we did not look at.

17       Q.   So, when you say, the ones in the random sample

18   are the ones that we analyzed, who is "we" in that

19   sentence?

20       A.   GBX.

21       Q.   Who at GBX analyzed the 357 files in the random

22   sample?

23       A.   I don't know who exactly did that.

24       Q.   What did they do to review those 357 files that

25   were included in the random sample?

CONFIDENTIAL

Page 65

1      A.   Well, they listened to the -- to the audio.

2   And, ultimately, we chose seven of them that made points

3   that I wanted to make in my report.

4      Q.   You found seven of them that supported the

5   opinions that you reached in your report, correct?

6      A.   Correct.  But, that does not imply that the

7   other 350 were not useful.  We couldn't put all of them

8   in the report, so they chose seven of the 357 that made

9   the points that we wanted to make.

10      Q.   And when you say they made the points you

11   wanted to make, they were supportive of the conclusions

12   that you reached in your report, correct?

13      A.   Yes.  Part of the -- part of the evidence.  Not

14   the whole evidence, but part of the evidence I used to

15   make the case for the -- for the campaign.

16      Q.   Okay.  And I'm going to stop sharing this,

17   because I'm not asking questions about Exhibit 1 right

18   now.

19           So, of those 357, did you direct GBX in terms

20   of how they should review those 357 audio files in the

21   random sample?

22      A.   Yes.  I directed them to look for, you know,

23   cases of obvious bad practice on the part of Vivint in

24   their interactions in sales calls with people in their

25   households.

CONFIDENTIAL

Page 66

1      Q.   So, you directed GBX to identify evidence that
2   supported the conclusions that you ultimately reached in
3   your report, correct?
4      A.   Yes, that ultimately supported.  We looked for
5   evidence in those sales calls of bad practices on the
6   part of Vivint that I used as part of the evidence to
7   develop a rationale for the information -- remedial
8   information campaign.
9      Q.   When you say "we," you mean GBX looked for that
10  evidence?
11     A.   Yes.
12     Q.   You did not review the 357 audio files in the
13  sample?
14     A.   I reviewed the seven that they chose.
15     Q.   And when you say "they," you mean GBX?
16     A.   Yes.
17     Q.   You reviewed the seven files that GBX chose,
18  correct?
19     A.   Yes.  And as I said, there may have been others
20  that also provided information.  But, there's only so
21  many that we could put in the report, so we limited it.
22     Q.   Who made the determination that you should
23  limit it to six or seven?
24     A.   I did.
25     Q.   Did you tell GBX, just send me six or seven?

CONFIDENTIAL

Page 67

1      A.   I said, you know, look for maybe half-a-dozen

2    or so that we can highlight in the report.

3      Q.   Okay.  And when you told them that you wanted

4    six or -- half-a-dozen, you meant that you wanted

5    half-a-dozen examples that supported your conclusions?

6      A.   Well, I hadn't drawn any conclusions yet.  You

7    know, I was looking for information that would be more

8    evidence of what Vivint was doing in these interactions

9    with the households.  You know, I didn't write the end

10   of the report and then go back and fill it in with

11   things that I want.  I looked for information that would

12   lead me to the conclusion.

13     Q.   Okay.  Did you ask GBX to tell you about -- did

14   GBX tell you anything about the remainder of the random

15   sample?  In other words, the 350 or 51 files that you

16   did not receive?

17     A.   They did not give me specific information about

18   those -- the other files.

19     Q.   Did they give you any information about them?

20     A.   They said that there was nothing negative about

21   ADT in those files.  But, not all of the files

22   necessarily had, you know, significant negative

23   interactions with Vivint.

24     Q.   Who told you that?

25     A.   GBX.

CONFIDENTIAL

1  Q. Who at GBX?

2  A. I don't recall.

3  Q. How did they communicate that to you?

4  A. In a -- you know, we communicated via phone

5 call.  Um --

6  Q. Did they ever send you -- I'm sorry.  Go ahead.

7  A. No.  With attorneys present, yes.

8  Q. Who -- who were the attorneys present?

9  A. Mr. Hobbs, generally.

10  Q. Anyone else?

11  A. Don't recall.

12  Q. Do you have any -- did you have any

13 interactions with GBX where there were no attorneys

14 present?

15  A. No.  Never.

16  Q. Are -- was it Mr. Hobbs or GBX that told you

17 about the contents of the 350 or so files that were

18 selected for the random sample but you did not discuss

19 in your report?

20  A. It was GBX, not Mr. Hobbs.

21  Q. Who at GBX?

22  A. I don't recall.

23  Q. Did GBX ever send you any summary or any type

24 of description, at all, of the 357 files included in

25 their random sample?

CONFIDENTIAL

Page 69

1      A.   No, they did not.

2      Q.   Of -- they just directed you to these six or

3  seven audio files that we've been discussing?

4      A.   I'm sorry.  Could you repeat the question?

5      Q.   They just directed you to the six or seven

6  audio files that we've been discussing?

7           MR. HOBBS:  Object to form.

8           THE WITNESS:  Yes.  With the spreadsheet, you

9      can see seven -- which seven we decided to use,

10     correct.

11 BY MR. BROWN:

12     Q.   When you say we decided to use, you mean GBX

13  decided to use?

14     A.   GBX recommended these as good examples of

15  Vivint's bad practices.

16     Q.   Did you direct GBX to send you any examples of

17  audio files that did not exhibit bad practices on the

18  part of Vivint?

19     A.   No, I did not.

20          MR. HOBBS:  Object to form.

21          THE WITNESS:  No, I did not.

22 BY MR. BROWN:

23     Q.   Of the six or seven audio files that were

24  selected, you did not, in fact, review the entirety of

25  all of the six or seven files.  Correct?

CONFIDENTIAL

Page 70

1          MR. HOBBS:  Object to form.  Misstates

2     testimony.

3          THE WITNESS:  That's not correct.  I did listen

4     to those audio files.

5  BY MR. BROWN:

6     Q.   In their entirety?

7     A.   As I said earlier, I don't recall how much of

8  the audio files I listened to.

9     Q.   So, you -- as you sit here today, you don't

10  know for sure whether you listened to the entirety of

11  the six or seven audio files that GBX directed you to?

12     A.   I listened to enough of them to be able to pick

13  out the material that I needed for my report.

14     Q.   Well, how do you know what material existed in

15  the remainder of the files that you didn't listen to?

16  GBX didn't tell you anything about the files, you

17  already testified.  So, how do you know what was in the

18  part you didn't listen to?

19     A.   I don't.  As I said before, I'm not going to

20  put 350 examples of Vivint's behavior in the report.  I

21  wanted to limit it to, you know, a certain amount of

22  evidence that would lead to my conclusions.

23     Q.   Is it possible that there are portions of those

24  six or seven audio files that you did not listen to that

25  would impact your opinions in this case?

CONFIDENTIAL

1          MR. HOBBS:  Object to form.

2          THE WITNESS:  No.

3    BY MR. BROWN:

4        Q.   That's not possible?

5        A.   No.

6        Q.   How can you say that with such certainty?

7        A.   Because we have enough weight of evidence,

8    between the audio files, the depositions, the social

9    media posts, and just Vivint's record, track record, to

10   lead me in the direction that I went.

11       Q.   Is it possible that there are other audio files

12   in the random sample of 357 audio files that GBX

13   selected that would impact your opinion in this case?

14       A.   I think, if there was something that was so

15   contrarian, they would have told me.

16       Q.   Did you ask them to tell you about contrary

17   evidence?

18       A.   No.

19       Q.   All right.  I want to go to appendix --

20   Exhibit 2.  I'm going to share my screen again.

21          I'm sharing, once again, Exhibit 1 to the

22   deposition which is your expert report, correct?

23       A.   Yes.

24       Q.   And I'm going to scroll down.  I'm going to go

25   to Exhibit 2 of your expert report.

CONFIDENTIAL

Page 72

1        Okay.  I am now at, for the record, Page 76 of

2   Exhibit 1 to the deposition.  And it's titled, Audio

3   Recordings Produced by ADT for Disclosed Customers.

4        Did I read that correctly, sir?

5        A.   Yes.

6        Q.   Okay.  And to your knowledge, what is

7   Exhibit 2?

8        A.   This is a list of all 1,300 WAV files that ADT

9   provided to us.

10       Q.   And when you say "us," you mean GBX?

11       A.   Well, and me.

12       Q.   Well, did you review -- did you receive these

13  1,300 audio files?

14       A.   Well, they were produced -- the list was

15  produced to me, as well as GBX.

16       Q.   Did you receive all 1,300 of the audio files?

17       A.   No, I did not.

18       Q.   During the break, did you test, to see if you

19  had access to all 1,300 of the audio files?

20       A.   No, I did not.

21       Q.   Did you ever consider asking for additional

22  audio files other than the six or seven that you

23  reviewed?

24       A.   You're misrepresenting what we did, all right?

25  We took a random sample of 357 from the 1,300 and

CONFIDENTIAL

Page 73

1    analyzed those.

2         Q.   Dr. Winer, GBX is not the expert in the case,

3    you are.  I'm asking what you did.  So, did you

4    receive -- or, did you ask for any other -- did you ever

5    ask anyone or attempt to obtain additional audio files

6    other than the six or seven audio files that you

7    reviewed?

8              MR. HOBBS:  Object to form.  Misstates

9         testimony.

10             He's already said that he has this entire set

11        available to him, Josh.  You can't --

12             MR. BROWN:  Eric, stop talking now.  Because,

13        it's a speaking objection and inappropriate.  You

14        may say, object to form, that's enough.  Do not go

15        beyond that.  It is entirely inappropriate and I'm

16        not going to allow it.

17             MR. HOBBS:  Well, you keep on characterizing

18        what he's testifying.

19             MR. BROWN:  You're welcome to state that you

20        think I'm mischaracterizing his testimony.  You

21        really don't need to, to preserve your objections.

22        You just say, object to form, and that preserves

23        all of your objections.  If you continue to make

24        speaking objections, I will shut down the

25        deposition.

CONFIDENTIAL

Page 74

1          THE WITNESS:  Can you restate the question,

2     please?

3          MR. BROWN:  I'm going to have to ask the court

4     reporter to read it back.

5          COURT REPORTER:  Okay.

6          "Dr. Winer, GBX is not the expert in the case,

7     you are.  I'm asking what you did.  So, did you

8     receive -- or, did you ask for any other -- did you

9     ever ask anyone or attempt to obtain additional

10     audio files other than the six or seven audio files

11     that you reviewed?"

12          THE WITNESS:  No, I did not.

13          MR. HOBBS:  Same objection.

14          THE WITNESS:  No, I did not.

15     BY MR. BROWN:

16     Q.   All right.  So, going back to the screen share.

17     Once again, we're on Exhibit 1 to the deposition and

18     we're at Exhibit 2, starting at Page 76.  And can you

19     tell me what Exhibit 2 is?

20     A.   Can you first please enlarge it?  It's kind

21     of --

22     Q.   Sure.

23     A.   -- micro-sized.

24     Q.   Does that work?

25     A.   Yeah.  Thank you.

CONFIDENTIAL

Page 75

1          Could you page down?  Scroll down.

2     Q.   Um-hum.

3     A.   Could you go down to the bottom?  Do a quick

4     scroll?

5     Q.   Um-hum.  I should say, yes.  I apologize for

6     saying, "um-hum," earlier.  I meant, yes.

7          Okay.  I think I've scrolled through the

8     entirety of Exhibit 2.

9     A.   So, this is the original set of WAV files that

10    were produced by ADT of customer calls.

11    Q.   Okay.  And -- and to your knowledge, is this

12    all of the audio files of customer calls that ADT has in

13    its possession?

14         MR. HOBBS:  Object to form.

15         THE WITNESS:  I'm sure they have a lot more

16         than these.  I mean, it's a big company.  They've

17         got six million customers and I think that roughly

18         1,300 is not all of the calls that they have.

19    BY MR. BROWN:

20    Q.   Okay.  Do you know how ADT selected these

21    1,300 -- and it appears to be 1,342, is that right?

22    There are 1,342 files that are listed in this Exhibit 2?

23    A.   Yes.  As I note in my report, Paragraph 48, I

24    say approximately 1,300.  So, yes.

25         I don't know how ADT selected them.

CONFIDENTIAL

Page 76

1        Q.   Okay.  Do you know if all of these audio files

2    are -- I think you stated earlier you did not know --

3    well, strike that.

4             Do you know if ADT included audio files -- all

5    of the audio recordings they had in terms of

6    interactions with the 250 unique customers that are

7    represented in the 1,342 audio files?

8        A.   I assume so.  But, I don't know for certain.

9        Q.   Did anyone ever tell you that?

10       A.   No.

11       Q.   Okay.  I'm going to start back at the beginning

12   of Exhibit 2.  And let's just start looking through it,

13   see if we can figure anything out.

14            So, I'm now at Page 77 of Exhibit 1.  The first

15   two audio files listed relate to, or have in their file

16   name, Donald ████████   Do you know who Donald ████████ is?

17       A.   No.

18       Q.   Okay.  Do you know if that's an ADT customer?

19       A.   My assumption, for this report and the

20   analysis, is that they're all ADT customers that called

21   ADT customer service.

22       Q.   What is that assumption based on?

23       A.   Why would any other customer call ADT customer

24   service?

25       Q.   Okay.  I'm not going to answer your question,

CONFIDENTIAL

Page 77

1    sir.  I'm trying to find out the basis for your

2    opinions.  What is your assumption based on?

3         A.   My experience with --

4              MR. HOBBS:  Form.

5              THE WITNESS:  Sorry.  My experience in the

6         customer service area, customer relationship

7         management, and knowledge of how these -- how these

8         systems work.  They are ADT customers.

9    BY MR. BROWN:

10        Q.   Did anyone tell you that Donald ███████ is an

11   ADT customer?

12        A.   No.

13        Q.   Did anyone tell you -- did you ever speak to

14   Donald ██████?

15        A.   No.

16        Q.   Do you have a copy of Donald ██████ contract

17   with ADT?

18        A.   No.

19        Q.   Did you review any other files in relation to

20   Donald ██████?

21             MR. HOBBS:  Object to form.

22             THE WITNESS:  I did not review his files unless

23        he was one of the 357 that were chosen through the

24        random sample.  I'd have to go look at that

25        spreadsheet to see if his was in there.

CONFIDENTIAL

1    BY MR. BROWN:

2         Q.   Well, of the 357 that were chosen as the random

3    sample, you don't -- you personally did not review any

4    of those files either other than the six or seven that

5    GBX selected for your review.  Correct?

6         A.   Correct.

7         Q.   Okay.  So, the first and second files are

8    labeled, Audio Intake 1 and Audio Intake 2.  Do you know

9    what audio intake refers to?

10        A.   I assume that the call that was recorded was

11   broken up into two parts and that's the way they're

12   labeling it.

13        Q.   How -- what is your assumption based on?

14        A.   Well, intake means to receive it and that is

15   basically what it is.  It's the receiving of an audio

16   complaint from Mr. █████

17        Q.   Okay.  And what -- do you know that this was a

18   complaint?

19        A.   It was a contact.  Let me restate that.

20        Q.   Do you know if anything in this WAV file says

21   anything about Vivint?

22        A.   No, I don't know.

23        Q.   Do you know if -- in terms of the two audio

24   files that are referenced in here relating to

25   Donald █████ do you know if anything is said in these

CONFIDENTIAL

Page 79

1    WAV files about Vivint?

2        A.   No.

3        Q.   Do you know if anything in these WAV files --

4    is it possible that there is anything in these WAV files

5    that would support your opinions in this case?

6            MR. HOBBS:  Object to form.

7            THE WITNESS:  Yes, it's possible.  If the files

8        were not chosen through the random sample, the other

9        950 or so might have had some information in them

10       that would have been useful to me.

11   BY MR. BROWN:

12       Q.   If the -- if the -- if these files were in the

13   random sample, but they were not selected as part of the

14   six or seven, does that mean they don't have information

15   that would have been useful to you?

16       A.   No, I didn't say that.  You asked me, if his

17   was not chosen in the random sample, would that mean

18   that there was no information that was useful to me.

19   And I said, no.

20       Q.   Okay.  Is it possible that there is information

21   in this -- in these two WAV files that would contradict

22   the opinions that you reached in this case?

23       A.   It's possible.  I -- since I haven't listened

24   to them, nor did GBX, we don't know what's in them.

25       Q.   Okay.  Who made the decision to not listen to

CONFIDENTIAL

1   all 1,300 of the -- of these audio recordings?

2       A.   Well, I think it was a -- it was a team

3   decision.  I talked about it with GBX.  As you know,

4   there's always a time constraint in terms of having to

5   file these reports.  And, so, we made the decision to

6   sample roughly a quarter of the -- of the total number

7   of audio recordings.

8       Q.   And when you say we made that decision, who

9   made that decision?

10      A.   We -- I did, in conjunction with the

11  discussions with GBX.

12      Q.   Did anyone at ADT -- at ADT -- did anyone at

13  ADT have any input in that decision?

14      A.   No.  Certainly not.

15      Q.   Did anyone at Shook, Hardy & Bacon have any

16  input in that decision?

17      A.   Definitely not.

18      Q.   Do you know if ADT has recordings of other

19  contacts with Mr. Donald ███████

20      A.   No, I do not.

21          MR. HOBBS:  Objection to form.

22          THE WITNESS:  No, I do not.

23  BY MR. BROWN:

24      Q.   Do you know for sure that -- are you sure that

25  these two WAV files are not separate contacts with

CONFIDENTIAL

Page 81

1    Donald �ču

2              MR. HOBBS:  Object to form.

3              THE WITNESS:  No.  As we said earlier in the

4        deposition, they could be one contact broken up into

5        multiple files or it could be multiple contacts.

6    BY MR. BROWN:

7        Q.   Okay.  I'm going to scroll down.  Now I'm at

8    Page 78, Exhibit 2 to Exhibit 1 of the deposition, your

9    expert report.  And I'm looking at Rows 56, 57, and 58

10   and I see three different WAV files here with the name,

11   Jackie ▅▅▅▅     Was -- did you personally review any

12   information relating to Jackie ▅▅▅▅  in relation to

13   reaching your opinions in this case?

14       A.   No.

15       Q.   Okay.  Do you know if these WAV files that are

16   represented here at Rows 56, 57, and 58 of Exhibit 2 of

17   Exhibit 1, do you know if these represent three separate

18   contacts between Ms. ▅▅▅▅ and ADT?

19             MR. HOBBS:  Form.

20   BY MR. BROWN:

21       Q.   Were they separate portions of the same call or

22   contact?

23       A.   I don't know.

24       Q.   Do you know if ADT has audio -- other audio

25   recordings of interactions with Ms. ▅▅▅▅

CONFIDENTIAL

Page 82

1         A.    No, I don't know.

2         Q.    Did you review these interactions -- did you

3    review these audio files that are shown at 56, 57, and

4    58 of Exhibit 2 of Exhibit 1?

5         A.    No, I did not.

6         Q.    If you did review them, is there any chance

7    that they would change your opinions in this case?

8         A.    No.

9         Q.    Do you know -- if there are other recordings of

10   ADT's interactions with Ms. ██████ would that change

11   your opinions in this case?

12        A.    No.

13             MR. HOBBS:  Object to the form.

14   BY MR. BROWN:

15        Q.    Did you review any other files in relation to

16   Jackie ██████

17        A.    No.

18        Q.    Did you ever speak to Ms. ██████

19        A.    No, I did not.

20        Q.    Do you know who she is?

21        A.    No.

22        Q.    Do you know where she lives?

23        A.    No.

24        Q.    Do you know if she ever had any interactions

25   with Vivint, at all?

CONFIDENTIAL

Page 83

1      A.   I don't know.

2      Q.   All right.  I'm going to go back to

3  Paragraph 48 of your expert report.  I'm sorry, I'm just

4  scrolling through.

5           Now we're at Paragraph 48 on Page 19 of

6  Exhibit 1 to the deposition, which is your expert

7  report, correct?

8      A.   Yes.

9      Q.   Do you know -- the 357 files that were in the

10  random selected set, what did GBX do in relation to

11  those 357 files?

12      A.   They listened to them.

13      Q.   In their entirety?

14      A.   I don't know.

15      Q.   The 900-odd files -- okay, the approximately

16  900 files that were not in the selected -- randomly

17  selected set, what did ADT -- excuse me, what did GBX do

18  in relation to those files?

19      A.   Nothing.

20      Q.   Did they review them, at all?

21      A.   They only reviewed the ones in the random

22  sample.

23      Q.   In Paragraph 49, you state, "The calls I

24  listened to support those allegations."  Correct?

25      A.   Yes.

CONFIDENTIAL

Page 84

1      Q.   And when you say those allegations, you're

2   referring to ADT's allegations against Vivint in this

3   case?

4      A.   Yes.

5      Q.   Did the calls -- do you know if the

6   approximately 1,300 calls that you did not listen to

7   support those allegations?

8          MR. HOBBS:   Object to form.

9          THE WITNESS:   Well, we did not -- they, GBX,

10         did not listen to roughly 950 of them, they did

11         listen to 357.

12         As I said earlier, if there was a lot of

13         information in there contrary to what we were trying

14         to -- what our objective was in the report, they

15         would have told me.

16   BY MR. BROWN:

17     Q.   How do you know they would have told you?

18     A.   Because, they are an honest legitimate

19   consulting firm.  We've worked together a lot, as I've

20   said before.  And I have to stand by any report that I

21   write.  And if there's not information in there that is

22   correct or supportive, I want to know that.

23     Q.   Did you tell that to GBX?  Did you tell them,

24   if there's anything in these 357 files that doesn't

25   support my opinions, I want to know about it?

CONFIDENTIAL

Page 85

1      A.   I told them that if there was a consistent

2   pattern of contrary information, that they should tell

3   me.

4      Q.   Who did you tell that to?

5      A.   Probably, Mark.

6      Q.   Anyone else?

7      A.   No.

8      Q.   Who reviewed the 357 files?

9      A.   I don't know.

10     Q.   Was it Mark?

11     A.   I don't know.

12     Q.   Do you know if Mark reviewed any of them?

13     A.   I don't know.

14     Q.   When you say Mark, you mean Mark Pelofsky, the

15  principal of GBX?

16     A.   Yes.  One of the principals, correct.

17     Q.   So, of the 950 files -- approximately 950 files

18  that GBX did not review, do any of those calls

19  represented in those files not support your -- the

20  allegations that ADT makes against Vivint in this case?

21          MR. HOBBS:  Object to form.

22          THE WITNESS:  We don't know what's in them.  We

23      did not analyze them.

24  BY MR. BROWN:

25     Q.   Is it possible that there's information in

CONFIDENTIAL

1    there that does not support ADT's allegations in this

2    case?

3        A.   There could be some.  I have no way of knowing

4    how much.

5        Q.   Okay.  If there were some, would that affect

6    your opinions in this case?

7            MR. HOBBS:  Object to form.

8            THE WITNESS:  I don't know.  I'd have to -- I'd

9        have to listen to the recording and -- and ascertain

10        exactly what's being said.

11   BY MR. BROWN:

12       Q.   I think you alluded earlier that it's been over

13   a year since you wrote this report.  Is that right?

14       A.   That is true.

15       Q.   It's dated, August 9th of 2021.  Correct?

16       A.   That's correct.

17       Q.   Okay.  In that year, did you ever take any

18   action to review any of those 950 files that you know

19   nothing about?

20       A.   No.  There was no need to.

21       Q.   They would not change your opinions in this

22   case even if you did review them?

23       A.   We took a random -- the purpose of random

24   sampling is to do exactly that.  We got a random sample

25   of all 1,340, or whatever the exact number is, reports.

CONFIDENTIAL

Page 87

1    The purpose of random sampling is that it gives you an

2    estimate of what we call the population, which was, in

3    this case, 1,340.  So, there's no reason to believe that

4    there's any information in those other 950 that would be

5    any different than what was in the 357.

6        Q.   And that's true if the sample that you took is

7    representative of the entire set, correct?

8        A.   We used -- GBX used random sampling, which has

9    well-known properties and very clear directions on how

10   to proceed.

11       Q.   All right.  Did you give GBX any direction on

12   how to conduct that random sampling?

13       A.   No.  I assumed that they know how to do it.

14       Q.   Did they tell you how they did the random

15   sample?

16       A.   No.  I didn't ask.  Because, as I said, they

17   have some statisticians on their staff that can do it

18   very well.

19       Q.   Do you know that those statisticians were the

20   ones that actually did the random sample in this case?

21       A.   I don't know.  I didn't ask who did the random

22   sampling.

23       Q.   Did you take any steps to ensure that the

24   sample was representative?

25       A.   I did not verify that the sampling was random.

CONFIDENTIAL

1  I trusted GBX to do that appropriately.

2      Q.   Did you do anything to ensure that the sample

3  was representative of the entire population?

4          MR. HOBBS:  Object to form.

5          THE WITNESS:  As I said before, if you take a

6      random sample the way you're supposed to do it, it

7      is representative of a population, period.

8  BY MR. BROWN:

9      Q.   And how do you know it was done "the way you're

10 supposed to do it," quote, unquote?

11     A.   Because I trust GBX and its staff to do it

12 correctly.

13     Q.   Any other reason?

14     A.   That's enough for me.

15     Q.   Should that be enough for the jury in this

16 case?

17         MR. HOBBS:  Object to form.

18         THE WITNESS:  If you'd like, you're free to

19     call the statistician who did the random sampling

20     and he or she can talk about what they did.

21         MR. BROWN:  Okay.  Tell me their name.

22         THE WITNESS:  I think you've asked me this

23     half-a-dozen times.  I don't know who did it.

24 BY MR. BROWN:

25     Q.   Okay.  Let's go to Paragraph 50.  Paragraph 50

CONFIDENTIAL

Page 89

1    is -- talks about a woman named Loretta ███████  And I

2    believe you testified earlier that you reviewed audio

3    files related to interactions between ADT and

4    Loretta ███████ correct?

5         A.   That's correct.

6         Q.   How many audio files did you review related to

7    Loretta ███████

8         A.   Well, we'd have to go back to the exhibit you

9    showed before indicating how many files there were for

10   her.  I did see her name on the list.  There were

11   multiple, but I don't remember how many there were.

12        Q.   Well, you testified earlier that you only

13   reviewed six or seven audio files.  Did you review all

14   of the files for Loretta ███████

15        A.   What I meant was, I reviewed six or seven sets

16   of audio files.  I'm sorry.  There are six or seven

17   reports in my report based on the audio files.  I

18   reviewed those.  I did not mean to imply that I only

19   read -- listened to maybe one audio file from any one

20   individual.

21        Q.   Well, that's what I'm trying to figure out.

22   How many audio files did you listen to, total?  I

23   thought you said it was six or seven.

24        A.   As I said, I misinterpreted the question.

25   Those represent the number of people from whom we have

CONFIDENTIAL

Page 90

1    information from the audio files.  I don't recall

2    exactly how many total audio files I reviewed.  But, if

3    there were multiple files for an individual, I listened

4    to multiple files.

5         Q.   Okay.  So, you believe you listened to every --

6    all of the audio files related to Ms. ████

7         A.   Yes, I do.

8         Q.   Okay.  Let's -- let's go to -- let's just go to

9    Exhibit 2 and see what they are.

10        A.   Okay.

11        Q.   All right.  I just did a search.  I'm at

12   Page 82 of your expert report, Exhibit 1 of the

13   deposition.  And there are two audio files listed here

14   related -- with the title, Loretta ████   Does that

15   refresh your recollection that you reviewed two audio

16   files relating to Loretta ████

17        A.   Yes, I did.

18        Q.   Did you review audio -- these audio files for

19   Sandra ████

20        A.   I don't know who she is.

21        Q.   Do you know if she has any relationship to

22   Loretta ████

23        A.   No, I don't.

24        Q.   So, you believe you reviewed both of these

25   audio files for Loretta ████   Are there other files

CONFIDENTIAL

Page 91

1    for -- audio files in ADT's possession related to

2    Loretta ███████

3            MR. HOBBS:  Object to form.

4            THE WITNESS:  I wouldn't know that.

5    BY MR. BROWN:

6        Q.   Did you ask that?

7        A.   No.

8        Q.   Did you -- did you speak to Ms. ██████

9        A.   No, I did not.

10       Q.   Did you review an ADT contract for Ms. ██████

11       A.   No.

12       Q.   Did you review any other documents related to

13   Ms. ██████

14       A.   No.

15       Q.   Okay.  But, here we have two audio files.  One

16   is ADT00000191, and then we have ADT00000192.  Correct?

17       A.   Yes.

18       Q.   Okay.  Let's go back to Paragraph 50 of your --

19   of Exhibit 1.

20       A.   50, yes.

21       Q.   I see, in Paragraph 50, there are footnotes

22   referring to ADT00000191, but I don't see any references

23   to the ADT 192 WAV file.  What did the -- what occurred

24   in the ADT 192 WAV file?

25       A.   I don't recall.  But, apparently it did not

CONFIDENTIAL

Page 92

1    have any relevant information.

2         Q.   Are you sure that you reviewed it?

3              COURT REPORTER:  Are you sure that you what?

4              MR. BROWN:  Reviewed it.

5              THE WITNESS:  To the best of my recollection, I

6         reviewed both of the audio files.

7    BY MR. BROWN:

8         Q.   Relating to Ms. ███████

9         A.   Correct.

10        Q.   In their entirety?

11        A.   I don't remember exactly how much of them I

12   recall -- I reviewed.

13        Q.   Well, let's see what you did say about them.

14             So, you say, for example, "One call involved an

15   ADT customer, Loretta ███████ who was confused after

16   receiving a visit from a Vivint sales representative."

17             Did I read that right?

18        A.   Yes.

19        Q.   Okay.  When did Ms. ███████ receive a visit from

20   a Vivint sales representative?

21        A.   I'm sorry.  What's your question?

22        Q.   When did Ms. ███████ receive a visit from a

23   Vivint sales representative?

24        A.   You mean, what's the date of the call?

25        Q.   No.  The call is describing the interaction

CONFIDENTIAL

Page 93

1   that Ms. ███ --

2      A.   I meant, sales call.

3      Q.   Yeah.  What -- sure, we can use your

4   terminology.

5           What was the date that Loretta ███ received a

6   sales call from a Vivint representative?

7      A.   I don't know.

8      Q.   Do you know if it was before the year 2017?

9      A.   I don't know.

10     Q.   Would that change the conclusions that you

11  reached in this case?

12     A.   I -- I don't know why it would.  I mean, the

13  substance of the sales call has a negative impact on

14  her, which negatively impacts the ADT brand, which is

15  the main point of my report.  So, I don't see why it

16  would change my opinion.

17     Q.   How do you know that the person who visited

18  Ms. ███ was actually a Vivint sales representative?

19     A.   Well, I'm relying on what is -- what she is

20  saying in the call.

21     Q.   Okay.  Any other basis for that?

22     A.   Well, she's pretty specific.  She stated that

23  a person from Vivint had come to her home and told her

24  that Vivint had merged with ADT and that he was there to

25  upgrade her security system.  I don't think ADT would

CONFIDENTIAL

Page 94

1   say that and I don't think any of the competitors would

2   say that.  So, I'm reasonably confident that it was a

3   salesperson from Vivint.

4       Q.    Other than what Ms. ███ had allegedly said in

5   these interactions between Ms. ███ and ADT, do you

6   have any other basis for your belief that Ms. ███ was

7   actually visited by a sales representative from Vivint?

8       A.    Well, there might have been more on the call,

9   but I did not put it here in the text.  So, I have to

10  rely on what I have here in Paragraph 50.

11      Q.    So, other than what you have here in

12  Paragraph 50, do you have any other basis for your

13  belief that Ms. ███ was actually visited by someone

14  who was a Vivint sales representative?

15      A.    No.

16      Q.    So, according to what you say here, a

17  person -- Ms. ███ called ADT and stated that a person

18  from Vivint had come to her home and told her that

19  Vivint had merged with ADT and that he was there to

20  upgrade her system.  Right?

21      A.    Yes.

22      Q.    Okay.  And then, next, it says, "In her call to

23  ADT, Ms. ███ stated she had been duped and that she

24  thought it was ADT but then later found out it was a

25  totally different company."

CONFIDENTIAL

Page 95

1              Did I read that right?

2        A.    Yes.  A total different company, not totally.

3    But, yes.

4        Q.    Okay.  Sorry.  Thank you for the correction.

5              Do you know -- when did Ms. ████ figure out

6    that she had been duped?

7        A.    Well, if you look at the timeline, it's clear

8    that it happened after Vivint upgraded her security

9    system.

10       Q.    Why do you say that?

11       A.    Well, if you just look at the -- just look at

12   the information that I took from the call, you can see

13   that, first, a person -- a Vivint person came and that

14   he was there to upgrade her security system.  Then, she

15   called ADT.

16             She would have only been duped after the

17   security system had been upgraded incorrectly, and she

18   would only find out it was a different company after the

19   security system had been upgraded inappropriately.

20       Q.    Well, it says that she said that the alleged

21   Vivint representative was there to upgrade her security

22   system.  Do you know for sure that her Vivint -- that

23   her security system was upgraded?

24       A.    Well, I'm inferring that.  Otherwise, why would

25   she say she had been duped?

CONFIDENTIAL

Page 96

1      Q.   What is the basis of your inference?

2      A.   Well, if someone is duped, by the

3   interpretation of the word, they have been tricked.  So,

4   clearly she was tricked by the Vivint salesperson.

5      Q.   Is it possible that she was -- she meant that

6   she was duped, in that she let the person in the door,

7   but then she later figured out that they weren't

8   actually related to ADT and did not actually sign any

9   contracts with Vivint?

10     A.   To my mind, it really doesn't matter, you know,

11   fully.  If the person from Vivint had come to her home

12   and told her Vivint had merged with ADT, that's enough

13   in my mind that Vivint is misrepresenting the facts.

14         You know, if in fact the system even hadn't

15   been switched out, there's still a negative and a lie

16   being told in the interaction.  So, all it has to be, to

17   in fact support my -- my report, is that it was a person

18   from Vivint and that -- I guess it's a he, told her that

19   Vivint had merged with ADT.  End of story.

20     Q.   Does it matter if Ms. ▮▮▮▮ or -- does it

21   matter, for your analysis, whether Ms. ▮▮▮▮ believed

22   the misinformation that was allegedly given by the

23   Vivint sales representative?

24         MR. HOBBS:  Object to form.

25         THE WITNESS:  Well, she must have believed it,

CONFIDENTIAL

Page 97

1          with the follow-up about having been duped.  I think

2          that sort of solidifies the fact that she believed

3          that it was a Vivint salesperson and that in fact

4          Vivint was merging with ADT.

5     BY MR. BROWN:

6          Q.   Okay.  But, that wasn't my question.  My

7     question is, is that important to your analysis?  You

8     said before that it was enough that a Vivint salesperson

9     said that Vivint and ADT were merging.  Is it also

10    important to your analysis whether or not the customer

11    believed the allegedly incorrect information?

12         A.   Yes.  She has to have believed it, of course.

13         Q.   If she did not believe the allegedly incorrect

14    information, is there still a damage to ADT that needs

15    to be remedied?

16         A.   If she did not believe that Vivint was merging

17    with ADT, and that he was there to upgrade her security

18    system, she wouldn't have said that she had been duped.

19    She clearly believed it.

20         Q.   Okay.  Well, I'm asking you, is that important

21    to your analysis?  Had she not believed it, is there

22    still harm to ADT that needs to be remedied?

23         A.   Yes.

24         Q.   Okay.  Why?

25         A.   Because, it's possible that -- that the

CONFIDENTIAL

Page 98

1    customer is still being exposed to misinformation from

2    Vivint.  So, even if you call on this Ms. ███████  and she

3    doesn't believe it, it doesn't mean that she can't tell

4    neighbors or believe that maybe there's some --

5    something wrong with ADT, that maybe they're scamming

6    customers.  So, there's definitely negative information

7    still in this call, even if she doesn't -- I mean, sales

8    call -- even if she doesn't believe that ADT is merging

9    with Vivint.

10        Q.   So, if someone from Vivint makes a sales call

11   and says something negative about ADT, does it matter

12   whether -- it does not matter whether the person

13   believed that?  It's enough that a Vivint representative

14   said something negative about ADT?

15            MR. HOBBS:  Object to form.

16            THE WITNESS:  Okay.  Let's be very careful

17        here, okay?  You say something negative about ADT,

18        all right?  Now, companies say negative things about

19        competitors all the time.  So, let's distinguish

20        between something negative about ADT, all right,

21        which, you know, might have to do with, you know, a

22        report that the salesperson shows her about, say,

23        ADT customer service.  I don't know what it could

24        be.  That's negative information, but that is

25        legitimate information to give to a customer.

CONFIDENTIAL

Page 99

1          We're not talking about negative information

2      here, we're talking about a lie.  And that's very

3      different.

4   BY MR. BROWN:

5      Q.   So, sometimes it's okay for a company to say

6   negative things about its competitor?

7      A.   It happens all the time.  It's very common in

8   business.

9      Q.   Okay.  So -- so, the important thing is that

10  the negative thing that was said was not true.  Is that

11  correct?

12     A.   Yes.

13          MR. HOBBS:  Object to form.

14  BY MR. BROWN:

15     Q.   So, what if an ADT -- a Vivint representative

16  said something to Ms. ████ that was negative about ADT,

17  but Ms. ████ did not believe it?

18     A.   Well, you're just saying negative, again.

19     Q.   Hold on.  I'm not done with my question.

20  Please wait until the end of my question.

21     A.   Okay.  You stopped.  So, I interpreted it that

22  you were done.

23     Q.   No.  It was a comma, Dr. Winer, not a question

24  mark.

25     A.   Got it.

CONFIDENTIAL

Page 100

1      Q.   Okay.  What if a Vivint representative came to

2  Ms. ███ and said something to her that was negative

3  about ADT, but she did not believe it.  Is that

4  important to -- would that affect your analysis in this

5  case?

6          MR. HOBBS:  Object to form.  Improper

7      hypothetical, vague and ambiguous.

8          THE WITNESS:  That's not an example of

9      misbehavior on the part of Vivint.

10  BY MR. BROWN:

11      Q.   So, that would not be something that you would

12  need to remedy in this case?

13      A.   Correct.

14      Q.   Okay.  If Ms. ███ was subjected to false

15  information about ADT by the Vivint representative, but

16  she did not believe it, then that is not something that

17  you need to remedy in this case?

18          MR. HOBBS:  Object to form.  Misstates

19      testimony.

20          THE WITNESS:  That's not true.  As I said

21      before, let's assume that a Vivint representative

22      states some lie, okay?  Ms. ███ doesn't believe

23      it, okay?  That still doesn't mean that there's not

24      a negative impact on ADT, all right?  Because,

25      Ms. ███ could say, well, you know, some company

CONFIDENTIAL

Page 101

1     is getting into ADT.  Maybe I should start to be

2     suspicious of ADT, what they're doing.  You know,

3     maybe she's going to talk to her neighbor who's also

4     an ADT customer, saying, there's this person saying

5     negative -- you know, lies about ADT, all right?

6     Maybe it's ADT's fault, all right?  Maybe it's a

7     problem with -- with ADT's association with this

8     company.

9          So, no, I'm not going to agree with that.

10  BY MR. BROWN:

11     Q.   Okay.  I -- I'm not sure I have a problem.

12  What I'm trying to determine is, if an ADT (sic)

13  representative says something false and negative about

14  ADT, but the customer they say it to does not believe

15  it, is that something that your opinion in this case,

16  the advertising campaign that you opine to in this case,

17  is meant to remedy?

18          MR. HOBBS:  Object to form.

19          THE WITNESS:  Well, I believe I've answered

20     that already.  I would say that, yes, we still need

21     the remedial information campaign.

22  BY MR. BROWN:

23     Q.   Okay.  So, in this example, Ms. ███ -- well,

24  first of all, are you -- here in this case, do you plan

25  to testify as to the state of mind of Ms. ███

CONFIDENTIAL

Page 102

1    A.   No.

2    Q.   Are you able to -- as you sit here today, or

3    later if this case goes trial, are you going to be able

4    to testify what was in Ms. █████ head?

5    A.   I would assume that maybe Ms. █████ would be

6    brought as a witness and she could say for herself.

7    But, I could not say.

8    Q.   Okay.  If Ms. █████ comes as a witness, then

9    she'll be able to say for herself what she meant by

10   being duped, correct?

11   A.   She could, yeah.  I would assume that you would

12   follow up with her on the stand.

13   Q.   And if Ms. █████ does not testify in this case,

14   how do you -- how would you know what was actually in

15   her mind in terms of whether she was duped or not?

16   A.   Well, I have to rely on her own words -- which

17   are in quotes -- that she had been tricked.  Which, to

18   me, says a lot.  But, I cannot -- I'm not a mind reader,

19   nor can I go back in time and figure out what was said

20   back when this recording was made.  So, I -- I can't say

21   what was in her mind.

22   Q.   Okay.  And the only information that you have

23   related to what was in her mind was these audio

24   recordings that you reviewed in relation to her,

25   correct?

CONFIDENTIAL

Page 103

1          A.    That's correct.

2          Q.    Now, you go on, here.  And it says, "So she

3    says that she had been duped and that she thought it was

4    ADT, but then later found out it was a total different

5    company."  Correct?

6          A.    Yes.

7          Q.    So, at some point, Ms. ███ found out that the

8    information that was given to her by the Vivint sales

9    representative was incorrect?

10         A.    Yes.

11         Q.    And then, "The ADT call representative told

12   Ms. ███ about the deceptive sales practices that

13   Vivint practices and noted that ADT's employees are

14   trained to be on the lookout for these occurrences."

15               Did I read that right?

16         A.    Yes, you did.

17         Q.    So, at some point, Ms. ███ found out that the

18   incorrect information that was given to her by Vivint

19   about ADT was incorrect, right?

20         A.    Correct.

21         Q.    And then, the ADT representative, during this

22   phone call, confirmed that the information that she had

23   been given by this alleged ADT representative was

24   incorrect, right?

25         A.    Right.

CONFIDENTIAL

Page 104

1      Q.   So, at the end of this phone call between ADT

2   and Ms. ████ is Ms. ████ confused regarding a

3   relationship between ADT and Vivint?

4      A.   It's hard to tell.  You know, we don't -- I

5   don't put in there and I don't remember everything that

6   the ADT call representative said.  It could have been

7   just a boilerplate response.  It's -- it's hard to tell

8   from the text.

9      Q.   Okay.  Where would you go to find out if

10   Ms. ████ is still confused about a relationship between

11   Vivint and ADT?

12      A.   There's nowhere for me to go.  There would have

13   had to have been a follow-up from the ADT call

14   representative just verifying that Ms. ████ is not

15   confused anymore.  And that did not happen.

16      Q.   How do you know it didn't happen?

17      A.   Well, I don't remember the exact phone call,

18   but -- I don't know it didn't happen.

19      Q.   Okay.  Is it possible it happened in a separate

20   phone call?

21      A.   It's possible.  I don't know.  I don't -- I

22   don't recall the second phone call.  I don't know what

23   was said in that phone call.

24      Q.   Okay.  Did ADT actually -- well, we know there

25   were two audio files, right?  We saw that on your

CONFIDENTIAL

Page 105

1    Exhibit 2, correct?

2         A.   Right.

3         Q.   So, it's possible it happened in the second

4    phone call?

5         A.   I -- I don't know.

6         Q.   Is it important to your analysis whether or not

7    Ms. ████ was confused or remained -- remains confused

8    about an association between Vivint and ADT?

9         A.   Well, not really.  I mean, even if she's not

10   confused anymore, as I said several times earlier, she

11   can still have some suspicions that there's an issue

12   with ADT.  Some company or some companies are -- have

13   gotten involved by taking over some of ADT's messaging

14   and she may still have a negative perception of ADT.

15   It's possible.

16        Q.   Okay.  So, is it -- and your analysis seeks

17   to -- so, let's say -- let's say Ms. ████ is not

18   confused, but she still has some lingering negative

19   feeling about this interaction.  And does -- in your --

20   does your expert opinion, the campaign that you've come

21   to in your expert opinion, does it seek to remedy those

22   negative feelings even if there's no confusion?

23        A.   Yes.

24             MR. HOBBS:  Object to form.

25             THE WITNESS:  Yes, it does.

CONFIDENTIAL

Page 106

```
 1    BY MR. BROWN:
 2        Q.    If Ms. ███ is not confused about a
 3    relationship between ADT and Vivint, and also no longer
 4    believes the negative information that was allegedly
 5    given to her by the Vivint sales representative, is it
 6    still necessary that she be contacted in order to remedy
 7    the harm that you're testifying to in this case?
 8            THE WITNESS:  Could you read back the question
 9        to me, please?
10            COURT REPORTER:  Remedy the what, that you're
11        testifying to in this case?  Let me get that word,
12        first.
13            MR. BROWN:  The harm.
14            COURT REPORTER:  Oh, harm.  The harm.  Okay.
15            Hold on.  Okay.
16            "If Ms. ███ is not confused about a
17        relationship between ADT and Vivint, and also no
18        longer believes the negative information that was
19        allegedly given to her by the Vivint sales
20        representative, is it still -- is it still" --
21        sorry -- "is it still necessary that she be
22        contacted in order to remedy the harm that you're
23        testifying to in this case?"
24            THE WITNESS:  Yes.
25    BY MR. BROWN:
```

CONFIDENTIAL

Page 107

1      Q.   Why is that?

2      A.   Because, she still may have -- you know, as

3   you've said in the premises of the question, she still

4   may have some lingering negative residual feelings

5   towards ADT.  And, so, it needs to be clarified and --

6   and remedied.

7      Q.   Okay.

8           MR. BROWN:  Let's go ahead and take a break.

9      I think we're getting to the end of the media.

10          THE WITNESS:  We've been going about 80

11     minutes.

12          VIDEOGRAPHER:  All right.  Please stand by.

13     This is the end of Media Number 2, in the testimony

14     of Dr. Russell Winer.  We're now going off the

15     record and the time being 2:28 p.m., Eastern.

16          Please wait until the recorders are off.

17          THE WITNESS:  Can we take 15?

18          MR. BROWN:  That's fine with me.

19     (Whereupon, a recess was held at 2:28 p.m., and the

20     deposition resumed at 3:02 p.m.)

21          VIDEOGRAPHER:  This is the beginning of Media

22     Number 3 in the testimony of Dr. Russell Winer.

23     We're now going back on the video record and the

24     time is 3:02 p.m., Eastern.

25   BY MR. BROWN:

CONFIDENTIAL

Page 108

1      Q.   Okay.  I'm going to go back to your report,

2   your expert report, Dr. Winer.  I'm sharing again what

3   has been marked as Exhibit 1 to the deposition, which is

4   your expert report.  Correct?

5      A.   Yes, it is.

6      Q.   So, I want to turn your attention now to

7   Paragraph 51 of your expert report.  We're now on

8   Page 20 of Exhibit 1 to the deposition.  Paragraph 51

9   discusses an ADT customer named Catherine ██████ correct?

10     A.   Yes.

11     Q.   And did you review audio files with alleged

12  interactions between Ms. █████ and ADT?

13     A.   Yes, I did.

14          MR. HOBBS:  Object to form.

15  BY MR. BROWN:

16     Q.   How many audio files did you review related to

17  Ms. ██████

18     A.   Well, can you go back to my -- to my exhibit,

19  then you can see how many files there are.

20     Q.   Sure.

21     A.   Obviously, I'm not going to remember how many

22  files I listened to.

23     Q.   Okay.  So, I -- do you have a copy in front of

24  you?  Or, I can go here.  I'll just go here.

25     A.   Actually, I didn't print it out.  It's just

CONFIDENTIAL

1 like 10 pages of just stuff, so I didn't print it out.

2   Q. All right.  So, we're going back down to

3 Exhibit 2 --

4   A. Right.

5   Q. -- of your expert report, which is Exhibit 1 to

6 the deposition, and we're looking for Ms. █████

7   A. Right there.

8   Q. Okay.  So, does that refresh your recollection

9 as to how many audio files you reviewed in relation to

10 Ms. █████

11   A. It looks like I did two.

12   Q. Okay.  And do you know if those files were

13 separate portions, distinct portions of the same

14 interaction with ADT?  The same phone call with ADT?

15   A. I don't -- I don't remember.

16   Q. You don't remember if they were separate phone

17 calls between Ms. █████ and ADT?

18   A. No, I don't remember.

19   Q. Do you -- do you remember if they were calls

20 between Ms. █████ and ADT?

21   A. I'm sorry.  Could you repeat that question?

22   Q. Were both of these audio recordings, recordings

23 of calls between Ms. █████ and ADT?

24   A. Yes, they were.

25   Q. Okay.  But, you don't remember if they are two

CONFIDENTIAL

Page 110

```
 1   different portions of the same call or whether they're

 2   separate calls?

 3        A.   That's correct.

 4        Q.   Okay.  And did you review the entirety of each

 5   of these audio files?

 6        A.   Again, I don't remember.

 7        Q.   Did you review any other -- did you speak to

 8   Ms. ████

 9        A.   No, I did not.

10        Q.   Did you review any other information regarding

11   Ms. ████

12        A.   No, I did not.

13        Q.   Did you ask whether or not she had signed a

14   contract with Vivint?

15        A.   Why don't we take a look at Paragraph 51 and

16   find out what she did.

17        Q.   Well, I'm asking you a question.  You're

18   welcome to look at your expert report if you want, but

19   I'm asking you, did you ask to see whether Ms. ████

20   signed a contract with Vivint?

21        A.   It appears that she did.

22        Q.   She did sign a contract with Vivint?

23        A.   That's what it says in Paragraph 51.

24        Q.   Okay.  Did you request a copy of that contract?

25        A.   No.
```

CONFIDENTIAL

Page 111

1     Q.   Why not?

2     A.   These can be produced when she gets called to

3  trial.  I didn't see any need to do it.

4     Q.   Okay.  Does -- would it affect -- did -- did --

5  does the content of any contract that Ms. ███ signed

6  with Vivint affect your analysis in this case?

7     A.   No.  It's the conditions under which she signed

8  the contract, not the contract itself.

9     Q.   Okay.  And are you going to testify today as to

10  her state of mind?

11     A.   No.  I think she'll be able to tell you that,

12  herself.

13     Q.   Okay.  Well, let's look at what we do know from

14  Paragraph 51.  Did you request any other information in

15  relation to Ms. ███

16     A.   No, I did not.  All I did was to listen to the

17  audio recording and try to faithfully reproduce what

18  happened in the encounter.

19     Q.   Well, it goes into a portion of the audio

20  recording, right?

21     A.   As I said, I don't remember how much I listened

22  to.

23     Q.   Did you request from ADT any information --

24  other than the six or seven audio recordings that you

25  reviewed or the audio recordings relating to six or

CONFIDENTIAL

Page 112

1    seven customers, did you request from ADT any other

2    information related to those six or seven customers?

3             MR. HOBBS:  Object to form.

4             THE WITNESS:  No, I did not.

5    BY MR. BROWN:

6        Q.   Did you ask ADT or anyone on the ADT team -- by

7    which, I mean GBX, or Shook, Hardy & Bacon, or any other

8    attorneys related to ADT -- for copies of any contracts

9    between ADT and any of these six or seven customers?

10       A.   No.  I didn't feel that I needed any contracts.

11   I know you've been asking me that question.  The

12   witnesses can produce them, themselves.  And what I'm

13   trying to do here is just lay the foundation for the

14   misconduct that Vivint is perpetrating on the customers

15   in the field.  And that's basically the kind of

16   information I was looking for in these -- in these

17   calls.

18       Q.   Did you request copies -- does it affect your

19   analysis whether or not -- what the terms of the six or

20   seven customers, or any customers' contracts with ADT

21   are or were?

22       A.   No.  Again, it's the -- it's the information

23   that the Vivint salesperson was communicating to the

24   customer, the kind of information, whether it fairly

25   represented or did not fairly represent the truth.  And

CONFIDENTIAL

Page 113

1    then, you know, how it affected the customer, at least

2    in terms of their behavior.

3        Q.   Okay.  Did you request from ADT, or anyone

4    else associated with this case, copies of any Vivint

5    contracts between any of these -- any ADT customer and

6    Vivint?

7        A.   No.  I didn't think the contracts, as I said,

8    were relevant to my -- to my report.

9        Q.   Is it relevant whether or not the customer

10   entered into a contract with Vivint?

11       A.   No.

12       Q.   That doesn't affect your analysis?

13       A.   No.  I think it makes it worse for the customer

14   if in fact they've been tricked into doing it.  But, as

15   I said earlier, the fact that there's misinformation

16   in the marketplace that it's affecting a customer's

17   attitude towards ADT, is really a determining factor in

18   my report, which then lead to the requirement of a

19   remedial information campaign.

20       Q.   Does it -- so, it does not affect your analysis

21   whether or not -- well, let me ask.

22            Does it affect your analysis whether or not the

23   customer stopped being a customer for -- of ADT at any

24   point in time?

25       A.   Well, I don't know what you mean, by any point

CONFIDENTIAL

Page 114

1    in time.  I mean, you know, obviously, it could be -- it

2    could be in the future.  You're talking about this

3    particular time frame that's represented here in the

4    case?

5        Q.   Well, let's say that the customer -- I'm trying

6    to distinguish from a position -- a period of, you know,

7    perhaps there are some customers that left ADT, went to

8    Vivint, and then went back to ADT.

9             If you -- if you knew that a customer left ADT,

10   but -- and went to Vivint, but later went back to ADT,

11   does that affect your analysis in any way?

12       A.   Well, I think it still is the fact that the

13   customer at some point had a negative impression of ADT.

14   And, so, even if they went back to, you know,

15   subscribing to ADT's services, there's still this issue

16   lingering out there of, what's going on here in the

17   marketplace?  What's the truth?  You know, can I trust

18   ADT even if I re-enter into a contract going forward?

19            So, I think it's just this whole misinformation

20   environment that needed to be corrected and that's why I

21   recommended the approach that I did.

22       Q.   And that's true regardless of whether -- well,

23   whether the customer later rejoined ADT and became a

24   customer -- a customer again of ADT?

25       A.   Yes, I believe that to be true.

CONFIDENTIAL

Page 115

1          Q.   What if the customer never left ADT at all?

2     What if the -- regardless of what the interaction was,

3     or the alleged interaction was with the Vivint sales

4     representative, what if the customer never left ADT.

5     Does that affect your analysis, at all?

6          A.   No.  Because -- that's already come up.  We've

7     already talked about this a few minutes ago with the

8     first customer.  You know, just because they didn't

9     leave ADT, it doesn't mean, again, that there is some

10    seed of doubt planted in their mind that there is

11    something going on with the security company.

12          And I make a point in my report that, you know,

13    you can't get worse than having any suspicions or

14    problems with your security company, right?  Because,

15    that's what you're paying for, security.  And if you

16    feel insecure about your security company, that's like

17    the worst of everything.  So, I don't think that the

18    customer -- the customer does not have to switch to a

19    Vivint product, or somebody else's product, to make my

20    analysis relevant.

21          Q.   So, if a customer has any amount of doubt about

22    ADT after their alleged interactions with Vivint, then

23    that customer needs to be a subject of your remedial

24    information -- of your advertising campaign?

25          A.   Well, I wouldn't call it an advertising

CONFIDENTIAL

Page 116

1    campaign; but, yes.  The answer is, yes.

2        Q.   Okay.  I did get that's what you called it

3    later in your report, an advertising campaign.

4        A.   I don't think I ever called it an advertising

5    campaign.

6        Q.   Well, we'll get there.  What would you call it?

7    It's not an advertising campaign?

8        A.   Well, there -- it's two parts.  There's the

9    personal selling part.  That's personal visits to

10   people's homes, which is an information campaign being

11   delivered face-to-face.  And then there's an

12   informational campaign being delivered, you know, using,

13   you know, other media.

14            So, it's not advertising.  It's not selling

15   information.  It's trying to assuage their -- you know,

16   their doubts and concerns they have about ADT.

17       Q.   So, if they have any remaining doubts, after

18   the alleged interaction with Vivint, then they need to

19   be a subject of this information campaign?

20       A.   Well, not just the people that are -- that we

21   analyzed here.  But, as you know from the report, there

22   are many others, as well, who could have well been

23   affected by Vivint's deceptive practices.  Alleged

24   deceptive practices.

25       Q.   Okay.  But, my question is, if the person

CONFIDENTIAL

Page 117

1    has -- that has been subjected to this Vivint's alleged

2    deceptive practices, has any doubt related to ADT left

3    in their mind, then that person needs to be the subject

4    of your information campaign, correct?

5          A.    Correct.

6          Q.    Okay.  Does it matter if that doubt is related

7    to confusion relating to an affiliation between Vivint

8    and that -- and ADT?

9          A.    Well, I mean, there are different sources of

10   that doubt, right?  I mean -- I mean, a lot of it

11   relates to consumers being confused about their -- the

12   salesperson's information, right?  Whether -- (witness

13   coughs) -- excuse me.

14         Q.    Well, that's my question.  Does it matter --

15         A.    Excuse me.  Let me take -- let me take a drink

16   for a second, okay?

17               Okay.  Go ahead.

18         Q.    Does it matter what that doubt is about?

19         A.    Well, the doubt has to be related to a

20   deceptive practice, okay?  As we discussed earlier, just

21   saying negative information about a competitor is part

22   of normal business practice.  If the doubt is a Vivint

23   salesperson saying that they are taking over ADT's

24   customers, or they're servicing ADT's customers, that's

25   a very different category of doubt.

CONFIDENTIAL

Page 118

1     Q.   Dr. Winer, did you have any phone calls during

2   the break we just took?

3     A.   We got on the line with the attorney and Mark,

4   yes.

5     Q.   Okay.  And what did you discuss?

6     A.   We didn't discuss anything.  He asked how I was

7   doing, we talked about time left.  Nothing -- nothing in

8   particular.

9     Q.   Okay.  You did not talk about your -- the

10   deposition today?

11     A.   No.  Eric needed to get his lunch, so we didn't

12   spend too much time on it.

13     Q.   How long was the phone call?

14     A.   Maybe 10 minutes.

15     Q.   Okay.  Did you talk about how the deposition

16   was going?

17     A.   No.

18     Q.   Did you talk about the questions that you might

19   encounter in the deposition?

20     A.   You'll have to repeat that.  Somebody was

21   coughing in the background.

22     Q.   Did you talk about the questions that you might

23   encounter in the deposition?

24     A.   No.  We've done that the last couple days.  We

25   didn't do that today.

CONFIDENTIAL

Page 119

1    Q.   Did anyone suggest to you how you should answer

2    any particular questions that I might ask?

3    A.   No.  Definitely not.

4    Q.   Okay.  So, let's look at -- back at

5    Paragraph 51.  So, Ms. ███ was -- according to what you

6    write here, Ms. ███ was contacted by ADT after

7    reporting a deceptive sales call and asked in a

8    follow-up discussion to describe what happened.

9         So, did ADT -- did Ms. ███ call ADT or did ADT

10   call Ms. ███

11   A.   It looks like both.  Ms. ███ was contacted,

12   after reporting a deceptive sales call, and was asked

13   in a follow-up discussion to describe what happened.

14        So, perhaps the first recording was her -- I

15   don't recall -- contacting ADT and then the second

16   recording was ADT calling her.

17   Q.   Did you review the first call?

18   A.   I reviewed both calls.

19   Q.   Okay.  In their entirety?

20   A.   I don't remember that, Counselor.

21   Q.   Okay.  So, ADT followed up with Ms. ███ and

22   asked her to describe what happened.  Is that right?

23   A.   Correct.

24   Q.   To your knowledge, does ADT have a practice of

25   following up with customers that cancel their services

CONFIDENTIAL

Page 120

1    with ADT?

2         A.   Oh, it's very common.  You know, they try to

3    win back the accounts.  Vivint does it.  Everybody does

4    it.  Any service company does it.

5         Q.   My question is, does ADT do it?

6         A.   Well, I don't know for a fact.  But, I would be

7    shocked if they didn't.

8         Q.   So, you believe -- you believe that ADT has a

9    practice of, when someone leaves their service, they try

10   to win that customer back?

11        A.   Yes.

12        Q.   And do you know if they reach out to those

13   customers in phone calls in order to try to win them

14   back?

15        A.   I don't know exactly how they do it.  But,

16   certainly, a lot of the customer service operations I've

17   seen that do this win-back operation, do it by phone.

18        Q.   Okay.  Do you know if ADT tries to determine,

19   if a customer is leaving, if they're going to a

20   competitor?

21        A.   As opposed to just not having any service at

22   all?

23        Q.   Sure.

24        A.   I mean, where else would they go if they didn't

25   go to a competitor?

CONFIDENTIAL

Page 121

1      Q.   My question is, do you know if ADT attempts to

2   determine, when a customer leaves ADT, if they are going

3   to a competitor?

4      A.   I -- of all the customer service operations

5   I've seen, they definitely want to know that.  I mean,

6   they want to know who -- if they're -- you know, who

7   they might be losing customers to, why it's happening.

8   Often, they do exit interviews with the customer, to try

9   to figure out, you know, what were they happy with, what

10   were they unhappy with.  Very common.

11      Q.   And -- and you believe that ADT does that, as

12   well?

13      A.   I do.

14      Q.   ADT tries to determine why someone is -- if

15   someone's leaving ADT, ADT tries to determine why

16   they're leaving.  Correct?

17      A.   Yes.

18      Q.   And if a customer is leaving ADT, ADT tries to

19   determine what competitor that customer is going to.

20   Correct?

21      A.   Yes.

22      Q.   And if a customer is leaving ADT, ADT tries to

23   determine whether that customer was subject to a

24   deceptive sales practice.  Correct?

25      A.   That, I don't know for sure.  I wouldn't know

CONFIDENTIAL

Page 122

1    that.  It seemed like it happened here.

2        Q.   ADT -- ADT tries to determine why a customer

3    leaves, but they don't care whether it was a deceptive

4    sales practice or not?

5        A.   I don't know that.  They may.  They may ask

6    that question.  I don't know that they would go into

7    this kind of a discussion on a win-back call, assuming

8    it was deceptive.  I would think they would have to

9    depend on the customer to tell them there was some

10   deception going on.

11       Q.   Do you believe that ADT seeks that

12   information -- information from customers that are

13   leaving?

14       A.   I don't know the answer to that.

15       Q.   They did in this instance?

16       A.   They did in this instance.  And maybe it is

17   because of the issues they've had with Vivint and maybe

18   other -- other competitors.  Maybe it's a standard part

19   of their -- of their follow-up phone call.

20       Q.   Did you ask anyone related -- excuse me.

21            Did you ask anyone involved in this case

22   whether ADT has a practice of following up on -- with

23   customers to see if they were subjected to deceptive

24   sales practices?

25       A.   No, I did not.

CONFIDENTIAL

Page 123

1      Q.   Did you ask anyone whether ADT has a practice

2   of tracking whether customers were subject to deceptive

3   sales practices?

4      A.   By asking anyone, do you mean someone in ADT?

5      Q.   Someone with ADT, someone with Vivint, one of

6   the attorneys, someone at GBX.  Anyone related to this

7   case.

8      A.   No, I did not.

9      Q.   Did you ask anyone related to this case whether

10   ADT tracks where -- where customers that are leaving ADT

11   are going in terms of what competitor they're going to?

12      A.   I don't need to ask that.  I know they do.

13      Q.   So, does ADT track when its customers are

14   leaving ADT to go to Vivint?

15      A.   I'm sure they do.

16      Q.   Okay.  Was that information made available to

17   you?

18      A.   I didn't ask for it.

19      Q.   Why not?

20      A.   I didn't feel I needed it for the purposes of

21   my report.

22      Q.   Would it impact your analysis in this case to

23   know how many customers left ADT to go to Vivint?

24      A.   Well, it would have been nice to get that kind

25   of information from Vivint, too.  We didn't get any

CONFIDENTIAL

Page 124

1    information from Vivint indicating the customers that

2    left ADT to go to Vivint.  We do have some information

3    from these calls, of customers that left ADT for Vivint,

4    from ADT.  But, we don't -- we don't have any big

5    picture idea of how much that happened, because we

6    didn't get anything from Vivint.

7        Q.   Okay.  Your answer is largely unresponsive, so

8    I'll ask my question again.

9             Did you ask --

10            MR. BROWN:  Well, I'm just going to -- I

11        apologize, but I'm going to have the court reporter

12        read back my question.

13            COURT REPORTER:  "Would it impact your analysis

14        in this case to know how many customers left ADT to

15        go to Vivint?"

16            THE WITNESS:  No.  My analysis was based on --

17            MR. HOBBS:  Objection, asked and answered.

18            THE WITNESS:  No.  My analysis -- in fact, I

19        explicitly state, early in my report, that I'm not

20        doing a lost customer analysis, I'm doing a grand

21        harm analysis here and trying to calculate the

22        damages to the brand.  So, I wasn't interested in

23        tracking numbers of lost customers.

24    BY MR. BROWN:

25        Q.   Your ultimate conclusion is that door-to-door

CONFIDENTIAL

Page 125

1   visits are required of about 750,000 customers in this

2   case, correct?

3       A.   Correct.

4       Q.   It's necessary for ADT to send sales

5   representatives to visit the 750,000 of its customers in

6   this case, correct?

7       A.   Right.  About 12 percent of its customer base.

8       Q.   If you knew that only 100 customers left ADT to

9   go to Vivint, would that affect your conclusion that

10  750,000 customers need to be visited door-to-door in

11  this case?

12      A.   No.

13      Q.   If it were one customer that left ADT to go to

14  Vivint, would that affect your analysis of the

15  information campaign that is required in this case?

16      A.   No.

17           MR. HOBBS:  Object to the form.

18  BY MR. BROWN:

19      Q.   What if no customers left ADT to go to Vivint

20  as a result of any alleged deceptive sales practices by

21  Vivint.  Would that affect your analysis as to the scope

22  of the information campaign that is required in this

23  case?

24           MR. HOBBS:  Object to form, improper

25      hypothetical.

CONFIDENTIAL

Page 126

1      THE WITNESS:  Could you read back the question,

2   please?

3      COURT REPORTER:  "What if no customers left ADT

4   to go to Vivint as a result of any alleged deceptive

5   sales practices by Vivint.  Would that affect your

6   analysis as to the scope of the information campaign

7   that is required in this case?"

8      THE WITNESS:  No, it would not.

9      MR. HOBBS:  Same objection.

10      THE WITNESS:  No, it would not.

11   BY MR. BROWN:

12   Q.   So, is it fair to say that the facts -- well,

13   strike that.  Let's go back to Paragraph 53.

14      So, Ms. ▇▇▇ -- sorry, let me find my spot,

15   here.  Ms. ▇▇▇ reported that someone came to her --

16   "That a Vivint employee came to her door in the evening

17   and told her Vivint was going around the neighborhood to

18   switch out old equipment."

19      Did I read that right?

20   A.   Yes.

21   Q.   What did you do -- or, did you do anything to

22   verify that Ms. ▇▇▇ was actually visited by a Vivint

23   employee?

24   A.   I didn't do anything.  I think that you're

25   going to have to talk to Ms. ▇▇▇ about what happened

CONFIDENTIAL

                                                    Page 127

1    that evening.

2         Q.   Did you talk to Ms. ██████

3         A.   No.

4         Q.   Other than the audio recordings that you

5    reviewed, do you have any other basis for your belief

6    that a Vivint employee visited Ms. █████

7         A.   No.  I relied on the audio.

8         Q.   Do you know when that visit occurred?

9         A.   I don't know the date.

10        Q.   Does it affect your analysis if it occurred

11   before 2017?

12        A.   No.

13        Q.   Okay.  You then say, "The Vivint employee told

14   her that Vivint is taking over the company you're with.

15   A statement which gave Ms. █████ the impression that he

16   was with ADT."

17             Did I read that right?

18        A.   Yes.

19        Q.   Do you know precisely what the alleged Vivint

20   employee said to Ms. █████

21        A.   Well, I have it in quotes, so I must have taken

22   it directly from the recording.

23        Q.   Well, that was a recording of Ms. █████ talking

24   to ADT, correct?

25        A.   Yes.

CONFIDENTIAL

Page 128

1      Q.   Okay.  So, do you know what -- the exact words

2   that the Vivint representative said to Ms. ███████

3      A.   Well, I wasn't a fly on the wall, so I don't

4   know if this is not exactly what she said.  But, I have

5   to take it -- I'm taking it as truth.

6      Q.   Okay.  And what about for -- what about for the

7   prior customer that we talked about in Paragraph 50,

8   Ms. ██████   Do you know exactly what the alleged Vivint

9   representative said to Ms. ██████

10     A.   She reported that Vivint -- that the person

11   from Vivint came to her home, told her that Vivint had

12   merged with ADT, and that he was there to upgrade her

13   security system.

14        Now, a merger is not something sort of normal

15   people talk about, in -- in everyday conversation,

16   unless she happens to be an investment banker or some

17   other related profession.  So, it sounds pretty accurate

18   to me.

19     Q.   My question was, do you know the exact words

20   that the alleged Vivint representative said to Ms. --

21     A.   No.

22     Q.   -- I'm sorry, finishing the question --

23   Ms. ██████

24     A.   I'm sorry, I didn't hear the beginning.

25     Q.   I was just trying to finish the question,

CONFIDENTIAL

Page 129

1    because you had interrupted me.

2            Do you know what the alleged Vivint

3    representative said, the exact words that the alleged

4    Vivint representative said to Ms. ████

5            MR. HOBBS:  Objection, asked and answered.

6            THE WITNESS:  No.

7    BY MR. BROWN:

8        Q.   Okay.  So, going back to Paragraph 51, "The

9    Vivint representative told Ms. ████ that it would help

10   to -- help her cancel her contract with ADT."

11           Did I read that right?

12       A.   Yes.

13       Q.   And -- and also that the Vivint representative

14   indicated they would cover any expenses stemming from

15   the cancellation.

16       A.   That's right.

17       Q.   Let's -- let me ask this.

18           What if the doubt or confusion or deception,

19   that the customer has left in their mind after an

20   interaction with Vivint relates to a promise or

21   representation regarding who would pay for cancellation

22   expenses -- who would pay certain expenses.  Is that

23   something that your information campaign needs to remedy

24   in this case?

25           MR. HOBBS:  Object to the form.

CONFIDENTIAL

Page 130

1           THE WITNESS:  Well, I mean, in this particular

2      interaction, the -- the misrepresentations are

3      that Vivint is taking over ADT.  He gave her the

4      impression that he was with ADT.  The parts that

5      you're referring to in this question, cancel her

6      contract, cover any expenses, are not the same kinds

7      of misrepresentations.  They're just promises that

8      the Vivint representative is making if she switches

9      to Vivint.

10  BY MR. BROWN:

11  Q.   So, if the only deception interaction -- the

12  only deception or alleged misrepresentation that

13  occurred in an interaction between an alleged Vivint

14  representative and an ADT customer relates to whether or

15  not Vivint would pay certain expenses in switching that

16  customer from ADT to Vivint, is that something that

17  needs to be remedied in this case?

18           MR. HOBBS:  Object to form.  Misstates

19      testimony.

20           THE WITNESS:  It does, if, to get to that

21      point, there have been deceptive statements to the

22      customer.  If the Vivint representative makes a

23      sales call, and it's an honest approach to try to

24      get a customer to switch and he says that he will

25      cancel their contract with ADT and cover any

CONFIDENTIAL

Page 131

1          expenses, that is a fair business practice.

2     BY MR. BROWN:

3          Q.   Okay.  What -- what if -- what if the Vivint

4     representative says that he will cancel the ADT contract

5     and cover the expenses for switching over, but that's a

6     lie, that's a deception.  Is that a deception that your

7     information campaign needs to remedy?

8          A.   Yes.

9          Q.   Why?  Why does that need to be remedied?

10         A.   Because it's all part of the -- it's -- it

11    leaves the customer with still a bad taste about ADT as

12    a company.  I mean, it's not just Vivint, right, that is

13    doing the deception, but it's ADT that is the one that

14    is being switched from.  And, so, the customer still has

15    this feeling or some thought in her head, in this case,

16    that there is some problem with ADT.  And that needs to

17    be remedied.

18         Q.   Well, what -- but, what I just described is a

19    deception related to Vivint.  A deception that Vivint

20    would pay some expenses or take some action.  That's not

21    a deception related to ADT.  I'm talking -- correct?

22    That's a deception related to Vivint?

23              MR. HOBBS:  Object to form.

24              THE WITNESS:  Right.  But, it's -- it's

25         getting -- it could be effective.  It might be

CONFIDENTIAL

Page 132

1          getting ADT customers to switch and to switch under

2          false pretenses.  So, ADT customers need to be

3          informed that there is this kind of behavior going

4          on in the marketplace and to be forewarned about it.

5          And that's part of my remedial information campaign.

6     BY MR. BROWN:

7          Q.   I think I'm following you.  I just want to

8     confirm that.  So, if the Vivint -- if the deceptive

9     sales practice by the Vivint representative relates only

10    to Vivint, and it's not a deception about ADT, but a

11    deception only related to Vivint, and that deception is

12    successful in getting the customer to switch from ADT to

13    Vivint, then that is something that needs to be remedied

14    and the subject of your information campaign?

15         A.   Yes, it does.

16         MR. HOBBS:  Object to form, asked and answered.

17    BY MR. BROWN:

18         Q.   Now, what if the Vivint representative says --

19    makes a deceptive statement related to Vivint, not ADT,

20    and the ADT customer does not switch from ADT to Vivint.

21    Is that still something that needs to be remedied by

22    your information campaign?

23         A.   Could you repeat the question?  The scenario?

24         Q.   The scenario is, a Vivint representative comes

25    to an ADT customer and makes a deceptive sales -- excuse

CONFIDENTIAL

Page 133

1    me, makes a deceptive statement related to Vivint,

2    such as, Vivint will cover the cost of switching your

3    account.  Is that a deceptive sales practice that needs

4    to be -- does -- does that deception need to be remedied

5    by your information campaign?

6              MR. HOBBS:  Object to form, asked and answered.

7              THE WITNESS:  I mean, yes.  The -- my remedial

8         information campaign not only talks about, you

9         know -- well, it talks about the kind of deceptive

10        practice that Vivint has, tries to warn consumers

11        that this is going on in the marketplace.  So, any

12        form of deceptive practice would fall under the --

13        under the aegis of my remedial information campaign.

14   BY MR. BROWN:

15        Q.   So, let's say that -- it's a different

16   question, now.  Let's say that an ADT customer was never

17   visited by Vivint.  And we know for sure that this ADT

18   customer has never been visited by Vivint.  Is it

19   necessary to -- for that customer to be a subject of

20   your information campaign?

21        A.   Definitely.

22             MR. HOBBS:  Object to form, improper

23        hypothetical, foundation.

24             THE WITNESS:  Definitely.

25   BY MR. BROWN:

CONFIDENTIAL

Page 134

1      Q.    Why is that?

2      A.    Because --

3            MR. HOBBS:  Same objection.

4            THE WITNESS:  Because, Vivint has a large sales

5      force, calls on many customers, even if they haven't

6      been called on yet.  You know, part of this remedial

7      information campaign is to try to contact and talk

8      about things or situations where maybe a customer

9      has been contacted by Vivint.  But, it may well be

10     the case there are actually more people who haven't

11     been contacted by Vivint yet.

12           So, the idea is kind of inoculation, all right?

13     And try to get them to watch out for this kind of

14     behavior, watch out for the deceptive tactics that

15     Vivint salespeople use.  And, so, definitely, even

16     if they have not been contacted by Vivint yet, they

17     should be part of the population that receives this

18     campaign.

19   BY MR. BROWN:

20     Q.    Can you say more what you mean by inoculation?

21   I'm not sure I'm following you.

22     A.    Yeah.  Even if a customer has not been called

23   on by Vivint, that customer needs to be informed that

24   this kind of behavior is going on in the marketplace and

25   to warn them that they could be called on by somebody in

CONFIDENTIAL

Page 135

1    the future who claims that Vivint is taking over ADT,

2    et cetera.

3              So, I use the word inoculation, because it's

4    kind of like inoculation against a virus.  It's kind of

5    like giving them information in advance so that they

6    don't get deceived when they're called on.

7        Q.   So, even if -- to go back to your virus

8    analogy, even if someone has not been exposed to the

9    virus -- which, in this case, would be analogous to

10   deceptive sales practices by Vivint -- part of your

11   information campaign is to inoculate that person to

12   prevent any future harm that would be caused by a future

13   visit by Vivint?

14       A.   Yes.  That's the point.

15       Q.   Okay.  I think I'm following you.  So, part of

16   your -- part of your -- the purpose of your information

17   campaign is to inoculate ADT customers from future

18   conduct by Vivint?

19       A.   That's part of it, yes.

20       Q.   So, part of your -- the purpose of your

21   information campaign is to prevent not only past harm

22   that has already occurred, but future harm that has not

23   yet occurred, but could occur if Vivint rep- -- sales

24   representatives do visit those customers?

25       A.   That's correct.

CONFIDENTIAL

Page 136

1            MR. HOBBS:  Object to form.

2            THE WITNESS:  That's correct.

3     BY MR. BROWN:

4        Q.   Is it possible to -- I'll just -- I'll leave

5     it there.  Okay.  Let's go back to Paragraph 51.

6            Okay.  In -- in the conclusion of this

7     interaction between ADT and Ms. ███  Ms. ███ calls ADT

8     and -- and tells them that she was deceived.  Correct?

9        A.   Yes.

10       Q.   So, at some point, Ms. ███ realizes that she

11    was deceived by the Vivint sales representative?

12       A.   Yes.

13       Q.   And then she calls ADT and she tells ADT that

14    she was deceived by a Vivint sales representative?

15       A.   Yes.

16       Q.   So, at the time of that second sales call,

17    she's no longer deceived.  She realizes she was

18    deceived, so she's never -- no longer deceived by what

19    the Vivint sales representative had told her.  Correct?

20           MR. HOBBS:  Object to form.

21           THE WITNESS:  Give me a minute to re-read this.

22           Well, okay.  Ask the question again, please.

23       Can you read it -- read it back?

24    BY MR. BROWN:

25       Q.   So, at some point, Ms. ███ realizes that she

CONFIDENTIAL

Page 137

1    was deceived by the Vivint sales representative,

2    correct?

3         A.   Yes.

4         Q.   And then she calls ADT and reports that she had

5    been deceived by the Vivint sales representative?

6         A.   Yes.

7         Q.   So, we know, at the time she makes the call to

8    ADT, that she's no longer deceived about the alleged

9    misrepresentation by the Vivint sales representative?

10             MR. HOBBS:  Object to form.

11             THE WITNESS:  Yes.  But, she has already

12        switched out all of her ADT equipment.  It says here

13        in the paragraph.

14   BY MR. BROWN:

15        Q.   Okay.  But, you said the fact that she switched

16   is not relevant to your analysis?

17        A.   I did not -- I did not track all the switches,

18   that's correct.  The issue was whether or not it is

19   still a -- whether it hurts the ADT brand, all right,

20   which is the focus of my analysis.  And I would argue

21   that it -- it still does.  I mean, because now she

22   doesn't have ADT equipment.  She's not going to be able

23   to be reminded every day that she feels secure with ADT

24   equipment.  And, so, at least in this person, the brand

25   equity is going to be -- for ADT is going to be

CONFIDENTIAL

Page 138

1    diminished.

2         Q.   So, it is relevant that she switched from ADT

3    to Vivint?

4         A.   I -- I never said switches are irrelevant.

5    What I said was that I'm not measuring -- the intent of

6    this report is not to estimate how many switches there

7    were due to Vivint's sales behavior.

8         Q.   Okay.  And maybe I'm being imprecise.  What I

9    mean by relevant is, does it impact your conclusion?

10   Does it impact your opinions in this case whether or not

11   she switched from ADT to Vivint?

12        A.   Yes.  It's not the number of switches that

13   matters, it's the fact she doesn't have ADT equipment

14   anymore.  So, as I said, the value of the brand within

15   Ms. ███ is diminished.

16        Q.   Okay.  So, if that is relevant to your

17   analysis -- how many people switched from ADT to

18   Vivint -- did you attempt to obtain that information

19   from anyone related to this case?

20        A.   I'll repeat that my intent was not to try to

21   measure how many switches there were, all right?  The

22   fact that there were switches, all right, is all I

23   needed to know.  The fact that there were switches based

24   upon deceptive behavior laid the foundation for my

25   remedial communications campaign.  So that, the people

CONFIDENTIAL

Page 139

1    that -- even if they had switched, all right, might feel

2    more favorable towards ADT in the future and therefore

3    maybe switch back at some point.

4         Q.   Well, you previously testified that it -- it

5    wouldn't matter how many people switched.  I asked you,

6    does it matter if one person switched?  You said, no.  I

7    asked you, does it matter if no one switched?  And you

8    said, no.  You said it wouldn't affect your analysis.

9    So, I'm confused.

10        Does it affect your analysis, the number of

11   people who switched from ADT to Vivint?

12        A.   No.  I've said this several times.  I did

13   not -- I was not interested in the exact number -- in

14   the number or an estimate of the number for how many

15   people switched.  It's just the general idea that there

16   were switches due to deceptive behavior, right, that

17   supports my position that the campaign is needed.

18        Q.   So -- but, I asked you, does it matter if no

19   one switched?  And you said, no, it doesn't matter.

20             MR. HOBBS:  Object to form.

21             THE WITNESS:  It doesn't matter if no one --

22        it -- it all -- it -- I'm sorry.  It does not matter

23        if no one switched, I agree with that.

24   BY MR. BROWN:

25        Q.   Okay.  But, now I want to direct your attention

CONFIDENTIAL

Page 140

1    to the bottom of Paragraph 51, because I think I'm

2    understanding what matters to you.

3            In the last phrase of the last sentence, it

4    says, "Which left her feeling really stupid and upset."

5    Right?

6        A.   That's what it says.

7        Q.   And that's what matters to you, that she felt

8    stupid and upset.  Right?

9            MR. HOBBS:  Object to form.

10           THE WITNESS:  It's not just -- yeah, it's not

11       just -- it's not the fact that she actually

12       switched.  Even if she didn't switch, it still hurts

13       ADT.  So, that's the -- again, the foundation of

14       my -- of my thesis in this report.

15   BY MR. BROWN:

16       Q.   Right.  And it doesn't matter if she's still

17   deceived or not.  What matters is that she felt stupid

18   and upset.  Right?

19           MR. HOBBS:  Object to form, asked and answered.

20           THE WITNESS:  Yes.  Which then carries over to

21       her feelings about ADT.

22   BY MR. BROWN:

23       Q.   Okay.  And, so, the information campaign --

24   regardless of whether she remains deceived or not by

25   the practices of Vivint, the information campaign that

CONFIDENTIAL

Page 141

1    you're opining to is necessary to remedy any lingering

2    negative feelings that she has about ADT?

3              MR. HOBBS:  Object to form.

4              THE WITNESS:  That certainly is part of it,

5       yes.

6    BY MR. BROWN:

7       Q.   What if she has negative feelings lingering,

8    but they're directed to Vivint, not ADT?

9       A.   Well, there's still --

10             MR. HOBBS:  Object to form.

11             THE WITNESS:  I mean -- I mean, there's still

12      all this complicated interaction that happened

13      between her and Vivint.  She may well feel negative

14      about Vivint, but that's not our problem in this

15      litigation.  You know, our problem is that she may

16      well feel negative towards ADT, as well, and might

17      even switch to a third one, you know, because she's

18      just unhappy with the situation.

19   BY MR. BROWN:

20      Q.   Well -- so, here she says she feels really

21   stupid and upset.  How do you know whether she's feeling

22   stupid and upset with ADT or feeling stupid and upset

23   with Vivint?  How does your analysis discern who she's

24   upset with?

25             MR. HOBBS:  Object to the form.

CONFIDENTIAL

Page 142

1          THE WITNESS:  Well, it says, if you look at

2      the clause before that, she was told she had been

3      deceived, probably by the ADT person.  That left her

4      feeling really stupid and upset.  So, clearly, it's

5      due to Vivint's actions.

6  BY MR. BROWN:

7      Q.   Okay.  So, if she's upset with Vivint, is that

8  something that your information campaign needs to

9  remedy?

10          MR. HOBBS:  Object to form.

11          THE WITNESS:  My information campaign is

12      intended to remedy any negative feelings that people

13      may have towards ADT, but also, as I said, inoculate

14      them against any future sales calls from Vivint.

15          So, yes.  I mean, if they feel negative towards

16      Vivint, then that's part of the communications

17      campaign.  We have to warn people about what's

18      happening in these sales calls.

19  BY MR. BROWN:

20      Q.   Well, if the customer already feels negatively

21  towards Vivint and doesn't have any remaining negative

22  feelings about ADT, why is it necessary to contact that

23  customer?

24          MR. HOBBS:  Object to form, improper

25      hypothetical, misstates testimony.

CONFIDENTIAL

Page 143

1           THE WITNESS:  Well, as I said before, the --

2       the remedial campaign is intended to be a broad

3       campaign to educate all ADT customers about what

4       Vivint was doing in the marketplace and try to --

5       try to build back the ADT brand, which was harmed or

6       has been harmed by Vivint's actions.

7   BY MR. BROWN:

8       Q.   And it's necessary to -- for that campaign to

9   reach all of the ADT customers, including customers that

10  were never exposed to any Vivint representatives?

11      A.   Yes.

12          MR. HOBBS:  Object to form.

13          THE WITNESS:  As I said before, it -- that's

14      important, as well.

15  BY MR. BROWN:

16      Q.   All right.  Let me have you turn to

17  Paragraph 61 of your report.  I'm going to bring us

18  there, to Exhibit 1 to the deposition.  We are now at

19  Paragraph 61, which appears at 25 -- Page 25 of

20  Exhibit 1 to the deposition.

21          So, here -- I think we focused on this earlier.

22  Here, this is -- the Ring Video that we found on your

23  Exhibit B is discussed here, correct?

24      A.   Yes.

25      Q.   Is there any other place in your report where

CONFIDENTIAL

Page 144

1  you talk about the Ring Video -- either of the three

2  Ring Videos that are referenced on your Exhibit B?

3      A.   No.

4      Q.   And the -- this -- this video is a video of an

5  interaction between an alleged Vivint representative and

6  an ADT customer at the customer's home, correct?

7      A.   Yes.

8      Q.   And it's called a Ring Video, because this was

9  a video that was captured by a Ring Doorbell?

10     A.   Correct.

11     Q.   Okay.  How did you obtain the video?

12     A.   That was part of the -- of the information that

13 ADT sent GBX and me, including the calls, the WAV files.

14     Q.   Did you personally receive a copy of the three

15 videos that are referenced on your Exhibit B?

16     A.   I don't remember how I received them, but I

17 have seen them.  I don't remember -- I don't remember

18 how I received them.

19     Q.   But, you know you did receive them?

20     A.   And I viewed them.

21     Q.   Is it possible that you only viewed them over a

22 screen share, similar to what we're doing today?

23     A.   No, it's not possible.  I looked at the

24 originals.

25     Q.   You looked at the original videos, yourself?

CONFIDENTIAL

Page 145

1      A.   Correct.

2      Q.   Did you watch the entirety of all three videos?

3      A.   I don't remember.

4      Q.   So, you can't say today whether you did or did

5   not?

6      A.   I can't say today whether I watched 100 percent

7   of all three videos.

8      Q.   Did -- regardless, you've described the videos.

9   And you said, "In the video, the Vivint representative

10  is shown trying to gain access to the ADT customer's

11  home."

12          How did you know that the person trying to gain

13  access to the ADT customer's home was associated with

14  Vivint?

15     A.   Well, the -- the customer, as you can see in

16  Footnote 68 and 69, also submitted an Affidavit, which I

17  read where he reported that.

18     Q.   Okay.  So, your basis for the fact that the

19  person in the video that was trying to gain access to

20  the home was a Vivint representative is this Affidavit

21  from the customer?

22     A.   Well, I think the two are mutually supportive.

23  I don't know -- it's possible.  I don't remember if the

24  video showed actually the representative with a Vivint

25  badge.  I don't remember that kind of detail.  But, that

Page 146

1    could have been in it.  It could have been, in this

2    case, the customer or the potential customer who

3    reported that.

4        Q.   So, you don't recall whether there was some

5    indication in the video that the person who was trying

6    to gain access was somehow associated with Vivint?

7        A.   I don't recall the basis for the conclusion

8    that it was a Vivint salesperson.

9        Q.   Okay.  Other than the video and the Affidavit,

10   is there any other basis that you have for your

11   conclusion that it was a Vivint representative?

12       A.   Well, it's not clear why the person would say

13   it's a Vivint representative if it wasn't.  Because,

14   there are other competitors in the marketplace who could

15   have also made a sales call to him to try to get him to

16   switch.  So, why did he say Vivint?

17       Q.   Well, if he wanted the customer to think he was

18   associated with ADT, then the most explicit thing that

19   he can do is say that he's with ADT.  Right?

20       A.   Yes.  Well, that even reinforces my point.  If

21   the most obvious case would be it was someone from ADT,

22   for him to say it was somebody from Vivint, it must have

23   been produced by some relatively vivid information that

24   made an impact on him.

25       Q.   That it made an impact on who?

CONFIDENTIAL

Page 147

1          A.    The customer.

2          Q.    Okay.  But, I'm not asking about what the

3     customer thought.  I'm asking what was the basis for

4     your conclusion that the person shown on the video is

5     actually a Vivint representative.

6          A.    I'm using the testimony from this customer.

7          Q.    Okay.  Anything else besides the testimony from

8     the customer?

9          A.    No.

10         Q.    Did you assume -- were you asked, in this

11    case -- scratch that.

12               Were you directed in this case to assume that

13    the allegations that ADT made in its Complaint were

14    true?

15         A.    No.

16         Q.    Okay.  Were you asked to assume in this case

17    that Vivint is going to be found liable for one or more

18    of the claims that ADT is bringing against Vivint in

19    this case?

20         A.    Of course not.  That's not my job as an expert.

21         Q.    Maybe you misunderstood my question.  I asked

22    you, were you directed to assume that Vivint would be

23    found liable on some of the claims that ADT is bringing

24    in this case?

25         A.    No.

CONFIDENTIAL

Page 148

1     Q.   You did not make that assumption?

2     A.   No.  There's a trial and the jury decides that.

3  I don't decide that.

4     Q.   But, for the purposes of your analysis, were

5  you asked to make that assumption?

6     A.   No.  I -- in fact, the reason that we're going

7  through these calls in excruciating detail, as well as

8  the depositions and other information, it forms the

9  foundation for my conclusion that, in fact, Vivint is,

10  in fact, culpable of deceptive behavior to its

11  consumers.  I didn't -- I was not asked to assume that

12  from the beginning.

13     Q.   So, your position that -- part of your opinion

14  in this case is that Vivint did, in fact, commit the

15  misconduct that ADT alleges they committed?

16     A.   My -- my conclusion is that there was enough

17  evidence to support the fact -- to support my conclusion

18  that, yes, in fact, Vivint is culpable of deceptive

19  behavior at the point of purchase with consumers in

20  their homes.

21     Q.   And if you're allowed to testify at trial,

22  would part of your testimony be to tell the jury that

23  there is sufficient evidence for you to determine that

24  Vivint was culpable of that behavior?

25     A.   Yes.  I would say that --

CONFIDENTIAL

Page 149

1           MR. HOBBS:  Object to form.

2           THE WITNESS:  I would say that -- I would say

3       that there is sufficient evidence supporting that.

4       That, in fact, Vivint did, in fact, use deceptive

5       sales practices on customers and that some kind of

6       remedy needs to be implemented.

7    BY MR. BROWN:

8       Q.  So, you plan -- if you testify in this case,

9    part of the testimony that you would make to the jury

10   in this case is to tell them that there is sufficient

11   evidence, in your view, to find that Vivint had

12   committed these alleged deceptive sales practices?

13          MR. HOBBS:  Object to form.

14          THE WITNESS:  I think -- actually, I think,

15      most of the evidence that's going to be put in front

16      of the jury will be not my -- not be my report.  You

17      know, there will be the customers, ADT managers.

18      Other people are going to provide the foundation for

19      that.

20          My analysis of seven recordings and a few

21      depositions, et cetera, was more for me to be

22      comfortable concluding that.  But, in a jury trial,

23      I assume that our counsel is going to bring forth

24      many more people to testify to -- to Vivint's

25      actions.  It's not going to be my job to do that.

CONFIDENTIAL

Page 150

1    BY MR. BROWN:

2        Q.   Okay.  I didn't -- I didn't ask if it was your

3    job.  I asked if you plan to testify to the jury as to

4    your view of the evidence that you discussed in your

5    report and your conclusion that it's sufficient to

6    determine that Vivint did, in fact, commit the alleged

7    misconduct that ADT has put in the Complaint.

8        A.   I think that's a --

9             MR. HOBBS:  Object to form.

10            THE WITNESS:  I think that's a decision that

11       will have to be made by the ADT attorneys, not me.

12   BY MR. BROWN:

13       Q.   Okay.  So, if you're asked to testify to the

14   jury whether the evidence that you reviewed establishes

15   that Vivint was, in fact, culpable, what would your

16   answer be?

17       A.   My answer would be, yes, based upon the

18   evidence that I've seen.

19       Q.   Okay.  And in this -- going back to

20   Paragraph 61, this customer -- you're -- you're -- I

21   think you're describing the videos.  You say, "The

22   customers are very skeptical and repeatedly tell the

23   rep- -- the Vivint representatives to leave, which they

24   eventually do."

25            Did I read that right?

CONFIDENTIAL

Page 151

1       A.   Yes.

2       Q.   And is that you describing what you saw in the

3    Ring Doorbell Video?

4       A.   Yes.

5       Q.   Okay.  So, on the Ring Doorbell Video, you're

6    seeing what you believe are customers being skeptical of

7    what the Vivint representative is telling them?

8       A.   Yes.

9       Q.   Okay.  And they tell -- and because they're

10   skeptical, they repeatedly tell the Vivint

11   representative to leave their home?

12      A.   Yes.

13      Q.   Okay.  Now -- and when I say -- this is a video

14   of an interaction that occurred on the front doorstep.

15   Is that correct?

16      A.   Yes.

17      Q.   Okay.  And, so -- so, the Vivint

18   representatives didn't -- in this instance, the Vivint

19   representatives did not actually gain access to the

20   home.  Correct?

21      A.   Correct.

22      Q.   The Vivint representatives attempted to gain

23   access to the home, but the ADT customer repeatedly told

24   them to leave.  Correct?

25      A.   Yes.

CONFIDENTIAL

Page 152

1          Q.   Okay.  And the Vivint representatives do, in
2     fact, leave?
3          A.   Yes.
4          Q.   So, in this instance, the -- the ADT customer
5     did not switch to Vivint?
6          A.   That's correct.
7          Q.   They -- they did not buy what the Vivint
8     representative was trying to sell?
9          A.   That's correct.
10         Q.   Okay.  And, in fact, they told -- repeatedly
11    told the Vivint representative to leave?
12         A.   Correct.
13         Q.   Okay.  Is it necessary -- for this ADT customer
14    that's the subject of Paragraph 61 and the subject of
15    the Ring Video that you reviewed, is it necessary, as
16    part of your information campaign, for this customer to
17    be visited door-to-door?
18         A.   I think the purpose of including this is just
19    to continue to document the deceptive behavior on the
20    part of the Vivint salespeople.  This particular
21    customer seems to be pretty competent, I guess, in his
22    ability or her ability to reaffirm that ADT is their
23    security company.  So, this particular customer may not
24    need as much assurance, maybe, as most of the others.
25         Q.   Okay.  So, how do we distinguish customers like

CONFIDENTIAL

Page 153

1   this, that don't need much assurance, from those that do

2   need more assurance?

3       A.   Well, again, I think that still part of this is

4   inoculation, just warning them of other practices.  In

5   this case, the Vivint representative stated that ADT

6   sold their company.  What if another Vivint

7   representative tries to call on this particular ADT

8   customer and says that they have an arrangement with

9   ADT, in terms of -- in terms of swapping out equipment

10  or something like that.

11          So, I think all customers need to be exposed to

12  the remedial information campaign, even a customer like

13  this one.

14      Q.   So -- so, from this customer, one possible

15  representation -- misrepresentation did not work on

16  this ADT customer.  But, it's possible that a future

17  Vivint representative could come with a different

18  misrepresentation that would be effective?

19      A.   Yes.  And the --

20          MR. HOBBS:  Object to form.

21          THE WITNESS:  And the remedial information

22      campaign would detail all of the approaches that

23      Vivint has attempted on customers.

24          MR. BROWN:  Okay.

25          VIDEOGRAPHER:  Mr. Brown, this might be an

CONFIDENTIAL

Page 154

1         opportune time for a media break.

2              MR. BROWN:  Yeah, that works for me.

3              VIDEOGRAPHER:  Okay.  Stand by, please.

4              This is the end of Media Number 3 in the

5         testimony of Dr. Russell Winer.  We're now going off

6         the video record and the time is 4:11 p.m., Eastern.

7              Please stand by.

8              MR. BROWN:  Let's take five minutes.

9              MR. HOBBS:  Okay.

10             MR. BROWN:  See everybody when you get back.

11        (Whereupon, a recess was held at 4:11 p.m., and the

12        deposition resumed at 4:20 p.m.)

13             VIDEOGRAPHER:  And this is the beginning of

14        Media Number 4 in the testimony of Dr. Russell

15        Winer.  We are back on the record, the time being

16        4:20 p.m., Eastern.

17   BY MR. BROWN:

18        Q.   Okay.  I'm going to continue to share the

19   Exhibit 1 to the deposition, which is your expert

20   report, Dr. Winer.  I've now moved to Page 26 of the

21   report, which starts a section called, Customer

22   Depositions.  And you've stated at the beginning that

23   you have reviewed six customer depositions in relation

24   to this case.  Is that correct?

25             MR. HOBBS:  Object to form.

CONFIDENTIAL

Page 155

```
 1              THE WITNESS:  Yes.
 2      BY MR. BROWN:
 3          Q.   I'll rephrase.
 4              Dr. Winer, have you read six customer
 5      depositions -- have you reviewed six customer
 6      depositions in relation to this case?
 7              MR. HOBBS:  Same objection.
 8              THE WITNESS:  Yes.
 9      BY MR. BROWN:
10          Q.   Have you reviewed more than six?
11          A.   I just -- I reviewed just this -- these six.
12          Q.   Okay.  And when say these six, do you mean the
13      six that are found in Footnote 70 of -- on Page 26 of
14      Exhibit 1?
15          A.   They are the six that are in this section of
16      the report.
17          Q.   The six that are described in this section of
18      your report?
19          A.   Correct.
20          Q.   Other than these six customer depositions, have
21      you reviewed any other depositions that were -- that
22      have been taken in this case?
23              MR. HOBBS:  And I'm just going to object,
24          again, with respect to the form of the question.
25          Again, you know, the report was rendered in 2021.
```

CONFIDENTIAL

Page 156

1          COURT REPORTER:  I can't -- you're -- I can't

2     understand what you're saying, Mr. Hobbs.

3          MR. HOBBS:  I'm sorry.  I'm objecting to the

4     form of the question with respect to his lack of, I

5     guess, specifying a time frame.  The report was

6     rendered in '21.

7          MR. BROWN:  Okay.  I'm intending to ask about

8     any deposition that he's reviewed in this case,

9     regardless of if he reviewed them before or after

10     this opinion was rendered.

11     BY MR. BROWN:

12     Q.   Does that change your answer, Dr. Winer?

13     A.   Oh.  I mean, there are other depositions that I

14     reviewed that we saw on my list of sources.  If you're

15     just referring to customer depositions, these are the

16     only six I reviewed.

17     Q.   Okay.  Yeah, I'm -- I'm actually interested in

18     both answers.  So, let's confirm that.  I'm talking now

19     specifically about customer depositions that have been

20     taken in this case.  Have you reviewed any other

21     customer depositions that have been taken in this case

22     other than those that are listed in Footnote 70 of

23     Exhibit 1?

24          MR. HOBBS:  Same objection.  I just want to be

25     clear.  I'm happy to elaborate more, Josh.  I don't

CONFIDENTIAL

Page 157

1    want to be improper, here.  But --

2         MR. BROWN:  I -- I'm not a fan of speaking

3    objections.  Maybe we can go off the record.  It

4    seems like something is bothering you, Eric.

5         MR. HOBBS:  Well, I -- I'm happy to elaborate

6    more on my objection.  I'm not trying to make an

7    improper objection.  I just think the question is

8    unclear.

9         MR. BROWN:  Unclear as to when he reviewed the

10   depositions?

11        MR. HOBBS:  Well, he rendered the depo- -- the

12   report in August of '21, before a number of other

13   depositions were taken.  So, I -- my objection is

14   just, are you asking him about if he reviewed

15   additional depositions that were taken after the

16   date of the report or are you just asking him about

17   what he's cited in this section of the report?

18        MR. BROWN:  Yeah.  I mean -- I mean to ask him

19   what he's reviewed, regardless of whether he

20   reviewed it before or after this report.

21        MR. HOBBS:  Okay.  Okay.

22        MR. BROWN:  So, let me try it again.

23   BY MR. BROWN:

24        Q.   Dr. Winer, other than the six customer

25   depositions that are listed in Footnote 70 of Exhibit 1

CONFIDENTIAL

Page 158

1    to the deposition, have you reviewed any other

2    depositions that were taken in this case, regardless of

3    whether those depositions were taken before or after the

4    date of your report?

5         A.   I have not reviewed any other customer

6    depositions and I do not believe I've reviewed any other

7    type of deposition.

8         Q.   That was taken in this case?

9         A.   Correct.

10        Q.   Okay.  How did you obtain copies of the

11   depositions that you did review?

12        A.   I believe they were provided by Counsel.

13        Q.   When you say Counsel, do you mean Shook,

14   Hardy & Bacon?

15        A.   Yes.

16        Q.   What format were they provided to you in?

17        A.   Some kind of -- I believe, PDF, or maybe Word.

18   I don't remember which type format.

19        Q.   Okay.

20        A.   Not physical.  Electronic -- e-copies.

21        Q.   They provided you electronic copies of these

22   six depositions?

23        A.   Yes.

24        Q.   And how did you receive the depositions that

25   they provided to you?

CONFIDENTIAL

Page 159

1          A.    I don't recall.

2          Q.    Do you know if you received them by e-mail?

3          A.    I don't think they put them in e-mails.  It's

4    not typically the way they work.  So, they must have

5    been just available in that binder that we talked about

6    this morning.

7          Q.    The electronic binder?

8          A.    Yeah.  Yes.

9          Q.    Were there other customer depositions -- well,

10   are there other customer depositions that are available

11   through that electronic binder that you have not decided

12   to review?

13         A.    Not that I'm aware of.

14         Q.    How did you determine that these were the six

15   customer depositions that you wanted to review?

16         A.    As I said, I was provided these by Counsel.

17   They had taken the depositions of a number of customers.

18   And, again, I'm just using these as providing a

19   foundation for my perceptions of Vivint's selling

20   practices.

21         Q.    But, are you -- is it your practice here,

22   similar to what we talked about earlier, that you intend

23   these six depositions to operate as a representative

24   sample?

25         A.    Well, unlike -- unlike the -- the WAV files

CONFIDENTIAL

Page 160

1   that were -- where there was a sample taken from a

2   larger population, in this case, these were the only

3   ones that were made available -- that I -- that were

4   available to me.

5       Q.   Okay.  And do know whether there were other

6   depositions that ADT had taken of customers at the time

7   you wrote your report?

8       A.   I don't know.

9       Q.   Do you know if ADT selected these customer

10  depositions from a larger set of customer depositions

11  that had been taken in this case?

12      A.   No, I don't know.

13      Q.   Did you ask ADT how it selected the depositions

14  it was providing to you in this case?

15      A.   No, I did not.

16      Q.   Did you -- did you direct ADT or its counsel as

17  to which depositions you wanted to review?

18      A.   No, they just gave me these that they had taken

19  recently.

20      Q.   And did they say anything about the depositions

21  at the time they gave them to you to review?

22      A.   No.

23      Q.   Did they tell you anything about any other

24  customer depositions that had occurred in the case?

25      A.   No.  I don't -- I don't know if other customer

CONFIDENTIAL

Page 161

1     depositions were taken.  All I know is that ADT counsel

2     plans to call some of these people as witnesses, if it

3     goes to a trial, and I was asked to take a look at them

4     and see how they informed my opinions.

5          Q.   Okay.  And did -- if -- are you aware that

6     Vivint also took customer depositions in this case?

7          A.   No, I'm not.

8          Q.   Are you aware that Vivint has a counterclaim in

9     this case?

10         A.   I was told the other day that Vivint has a

11    counterclaim, but I don't know any details about it.

12         Q.   Who told you that?

13         A.   Mr. Hobbs.

14         Q.   Okay.  Do you know anything about the Vivint

15    depositions that were taken -- let me rephrase.

16              Do you know anything about the depositions that

17    Vivint took of customers in this case?

18         A.   No, I don't.

19         Q.   Do you know anything about any of the other --

20    besides these six customer depositions, do you have any

21    information about any other depositions that were taken

22    by customers in this case?

23         A.   No, I don't.

24              MR. HOBBS:  Object to the form.

25    BY MR. BROWN:

CONFIDENTIAL

Page 162

1      Q.   Besides these six customer depositions that are

2    listed in Footnote 70 of Exhibit 1, do you have any

3    information about any other depositions that have been

4    taken in this case at any time?

5           MR. HOBBS:  Object to form.

6           THE WITNESS:  Now, again, my question is, are

7       you referring to customer depositions or are you

8       referring to any depositions?

9    BY MR. BROWN:

10     Q.   At that time, it was any depositions.

11     A.   I'm sorry.  Say that again.

12     Q.   At that -- that last question, I said, any

13   depositions.

14     A.   I -- I have not read any other depositions

15   other than those that are in my sources list.

16          COURT REPORTER:  My what list?

17          THE WITNESS:  Sources.

18          COURT REPORTER:  Oh.  Thank you.

19   BY MR. BROWN:

20     Q.   And when you say sources list, you're referring

21   to Exhibit B of Exhibit 1?

22     A.   Yes.

23     Q.   Or -- I'm sorry, I think it's Appendix B of

24   Exhibit 1.

25     A.   Well, yeah.  Yes.

CONFIDENTIAL

Page 163

1        Q.    Correct?

2        A.    Correct.

3        Q.    Okay.  What -- what -- how did what you

4    reviewed in the six customer depositions impact the

5    conclusions you reached in this case?

6        A.    Well, again, I used the -- the audios, the

7    depositions, and the social media -- the social media

8    comments and Vivint's history with the FTC and -- and

9    other government agencies, to just support my position

10   that some kind of a remedial communication campaign is

11   needed.  It's not a scientific sample.  It's just enough

12   to -- for me to be convinced that there is something

13   going on here that requires a remedy.

14       Q.    Okay.  And, so, part of what your -- well,

15   let's go to -- actually, there's a place in your -- at

16   the beginning of the report, where you summarize your

17   conclusions.  Is that right?

18       A.    I do summarize them at the beginning, yes.

19       Q.    Let's go to that section, briefly.  All right.

20   I'm going to go to Paragraph 12 of Exhibit 1.

21       A.    Okay.  I'm here.

22       Q.    Okay.  Just before Paragraph 12, on Page 6 of

23   Exhibit 1, it says, Summary of Opinions, correct?

24       A.    Yes.

25       Q.    And Paragraph 12 says, "ADT has alleged that

CONFIDENTIAL

Page 164

```
 1    Vivint's door-to-door salespeople have damaged this
 2    company and brand in a variety of ways.  In my expert
 3    opinion, the alleged Vivint actions suggests a threat
 4    to ADT's business, particularly with regard to its
 5    reputation among its consumers and its brand equity, the
 6    value of the brand of the company."
 7            Did I read that right?
 8        A.   Yes.
 9        Q.   Okay.  And skipping down to Paragraph 14,
10    which begins at the top -- at the bottom of Page 6 of
11    Exhibit 1, you say, "I've reviewed several sources of
12    evidence that corroborate the allegations made in the
13    Complaint.  These sources include recordings of calls
14    from ADT customers, deposition transcripts of ADT
15    customers, ADT's internal deceptive sales reports,
16    social media posts, and postings on Vivint's own
17    website.  Additionally, Vivint's actions appear to be
18    far more extensive and have had more impact than what
19    ADT has been able to document.  The academic literature
20    explains that consumers usually do not report problems
21    they experience.  In short, Vivint's misleading and
22    aggressive intrusion of ADT customers have been -- has
23    been widespread and harmful and needs to be remedied."
24            And then, going into para- -- did I read that
25    right?
```

CONFIDENTIAL

Page 165

1        A.   Yes.

2        Q.   Okay.  Okay.  And then, in Paragraph 15, it

3    says, "It is clear to me that Vivint's actions in this

4    case are consistent with the pattern of behavior that

5    Vivint has engaged in, as identified by government

6    agencies and other companies competing in the industry,

7    and even by ADT in a previous lawsuit.  This pattern

8    strongly suggests that Vivint's behaviors at issue in

9    this case are not incidental to Vivint's business, but

10   have instead -- excuse me, but instead are fundamental

11   to the way that it operates, generally.  In addition,

12   the pattern of past behavior is consistent with the

13   alleged in this case -- with that alleged in this case,

14   as additional weight to the evidence I've reviewed."

15            Did I read that right?

16       A.   Yes.

17       Q.   So, is part of the conclusion that you

18   reached -- having reviewed all of the evidence that

19   you've described here, is part of the conclusions that

20   you reached that ADT's allegations in this case are

21   true?

22            MR. HOBBS:  Object to form.

23            THE WITNESS:  Yes.  The weight of the evidence,

24       from everything put together, seems to support the

25       position that ADT has taken in this case.

CONFIDENTIAL

Page 166

1    BY MR. BROWN:

2        Q.    And if asked to testify on that in trial, would

3    you testify as to the weight of the evidence as you've

4    just described it?

5            MR. HOBBS:  Same objection.

6            THE WITNESS:  If asked at trial to opine on

7        that, I would.

8    BY MR. BROWN:

9        Q.    Okay.  And in Paragraph 14, you describe a

10   number of different sources that you're referring to.

11           Now, did you review each of those sources or

12   was some of that review done by GBX?

13       A.    Well, we've gone through pretty much all of

14   these -- the recordings of the calls, deposition

15   transcripts, the calls on the deceptive sales reports,

16   social media posts.  Yeah, I've looked at those.

17       Q.    Okay.  So, you reviewed all of the social media

18   posts that you're relying on in this case?

19       A.    I reviewed the ones that I put in the report.

20   I can't claim to have reviewed all social media posts,

21   which would be a large number.  A very large number.

22       Q.    Okay.  Well, let's go back to the section we

23   were starting to talk about, social media posts, and get

24   more detailed on that.

25       A.    So, Page 28?

CONFIDENTIAL

Page 167

1    Q.   Yeah.  Back to Page 28, Paragraph 72.

2    A.   Okay.

3    Q.   Okay.  So, who directed your attention -- how

4  did you -- how did you find these social media posts?

5    A.   Well, GBX has a social media analysis group in

6  their organization.  And they were directed -- I asked

7  them to see if there were any of these kinds of posts

8  that have been made mentioning Vivint by name.  And, so,

9  we found some.

10   Q.   When you say we found some, you mean GBX found

11 some?

12   A.   Yes, they found some.

13   Q.   Okay.  And did they find more than just the

14 ones -- well, first of all, you reference several in

15 your report.  Are there more that you reviewed other

16 than just the ones you referenced in your report?

17   A.   No.  Essentially, they found this sample of

18 social media posts -- I guess there are nine of them --

19 and I used them in the report.

20   Q.   Okay.  Did -- did they find more than nine, do

21 you know?

22   A.   I don't know.

23   Q.   Did you review more than nine?

24   A.   No, I just reviewed these.

25   Q.   And when you directed them to use their social

CONFIDENTIAL

Page 168

1    media group to find social media posts, did you tell

2    them to find social media posts that would support your

3    analysis in this case?

4         A.   What I asked them to do was to find social --

5    find if there were any social media posts that referred

6    to Vivint's deceptive practices.  It would be possible

7    that there wouldn't be any.  But, there were some.

8         Q.   Did you ask them to search for social media

9    posts that referred to ADT's deceptive sales practices?

10        A.   No, I did not.

11        Q.   Did you ask them to find social media posts

12   that said positive things about Vivint?

13        A.   No, I didn't.

14        Q.   Did you do anything to verify the accuracy of

15   the information in these social media posts?

16        A.   Well, that's very difficult to do.  I mean,

17   when somebody posts something on Facebook, or -- or

18   Tweets something, it's essentially impossible to verify

19   the truth.

20        Q.   People post inaccurate things all the time?

21        A.   That has been known to happen.

22        Q.   Okay.  So, did you do anything to verify the

23   accuracy of these posts?

24        A.   Well, as I say here in Paragraph 72, I'm not

25   using these as a main source of evidence in my -- in my

CONFIDENTIAL

Page 169

1    report, all right?  They're kind of supplementary.

2           The answer is, no.  It's -- as I said, it's

3    almost impossible to verify.  The only thing you can

4    look at is the level of detail in the post.  Does it

5    seem like someone actually did have that experience with

6    the company.  And the more detail there is, the more

7    confidence you have that it's a truthful post.

8        Q.   And what is that based on, your belief that the

9    more detailed the post is, the more likely it is to be

10   true?

11       A.   It's based on academic research, actually.  You

12   know, often, like in Travelocity, there are misleading

13   posts.  Some of them are -- are fake.  And some academic

14   papers have found that the way to determine or

15   distinguish between the fake and the real is how much

16   detail there is in the post.  So, the ones that are sort

17   of general don't seem to indicate somebody actually

18   stayed in the hotel.  They're much more likely to be

19   fake than the people who gave very detailed responses.

20       Q.   Okay.  Do you cite those papers in your report?

21       A.   No.

22       Q.   Are they part of the basis for your conclusions

23   in this case?

24       A.   No.

25       Q.   Can you -- can you give me specific citations

CONFIDENTIAL

Page 170

1    to those articles now?

2         A.   No.  I'm happy to do it after the deposition,

3    though.

4         Q.   Okay.

5         A.   You can ask Eric to ask me.

6         Q.   Just making a note of that.

7              Okay.  So, in addition to looking at the level

8    of specificity -- excuse me, let me try that again.

9              In addition to looking at the level of

10   specificity of the social media posts, could you not

11   have also tried to identify the authors of the posts?

12        A.   That would be a ridiculous exercise.

13        Q.   Why?

14        A.   Where am I going to find Sean Davenport?

15        Q.   Well, I believe this is a post on Twitter.

16   And, to my knowledge, if you go to the account for

17   Sean Twitter (sic) -- for Sean Davenport, you can find

18   information about him, and you may be able to track him

19   down based on that information.

20        A.   There are a lot of Sean Davenports.

21        Q.   Okay.  So, did you do anything to try to

22   identify the authors of these posts?

23        A.   I did not.

24        Q.   Did you do -- did you do anything to attempt to

25   talk to or otherwise communicate with the authors of

CONFIDENTIAL

Page 171

1    these posts?

2         A.   No.  As -- as I said before, I'm not using this

3    as my main evidence.  I'm using this as sort of a

4    complementary evidence to what else we found.

5         Q.   Okay.  Regardless of whether or not it's your

6    main evidence, are these posts part of the basis for

7    your opinions in this case?

8         A.   Yes.

9              MR. HOBBS:  Object to the form.

10   BY MR. BROWN:

11        Q.   What are -- what are -- what is the main

12   evidence that you're using as a basis for your opinions

13   in this case?

14        A.   Well, it's really a combination of the sources

15   of information that I have in this section of the -- of

16   the report.

17             If you go back and take a look at -- let's

18   see -- Evidence of Vivint's Actions Harming the ADT

19   Brand -- that's Section 8, from Paragraph 47 -- I've got

20   customer complaints, which we talked about.  We've got

21   customer depositions, which we talked about a little

22   bit.  I've got the social media posts, which we're

23   talking about.  And we've got Section D, which is

24   labeled, Previous ADT Case Against Vivint, State

25   Government and FTC Actions.

CONFIDENTIAL

Page 172

1          So, again, the purpose of this is to just

2    satisfy my -- satisfy me that there's enough information

3    here in all of this, taken together, that Vivint has,

4    in fact, committed deceptive practices.  And then, it

5    requires the further analysis later in the report, which

6    is how much it is to remedy, in terms of information.

7          Q.   Okay.  So -- so, there's kind of two parts

8    here, as you've just described it.  Step 1 is, were

9    there actually deceptive sales practices.  And then,

10   Step 2 is, what do we need to do to remedy that in an

11   information campaign.  Correct?

12         A.   Yes.

13         Q.   Okay.  And, so, all of the information that we

14   just talked about -- the customer depositions, the

15   audio recordings, the social media posts, the things

16   we're about to talk about in terms of the Government

17   agency actions -- all of that goes into your conclusion

18   of Step 1, that deceptive sales practices actually

19   occurred.  Correct?

20         A.   Correct.

21         Q.   So, you reviewed -- and the basis of your

22   conclusion that deceptive sales practices actually

23   occurred is your review of the information we've been

24   talking about, the depositions, the audio recordings,

25   the social media posts, and what we're about to talk

CONFIDENTIAL

Page 173

1    about after this section, the Government Investigations

2    and Actions.  Correct?

3        A.   Correct.  And that's exactly what is in

4    Paragraph 8, which is my assignment.  Two things.

5        Q.   Go ahead.

6        A.   I have been asked to review and analyze how

7    Vivint has approached and marketed itself to ADT

8    customers and whether, and to what extent, its tactics

9    might have caused harm to the ADT brand.

10           Point 1, you just mentioned.  Point 2, I've

11   also been asked to identify and outline potential

12   remedies to reduce any harm done to the ADT brand

13   arising from Vivint's use of deceptive sales tactics,

14   including misrepresentation, as discussed in further

15   detail below.

16           So, essentially, there are two things.  Two

17   major points made in this report.

18       Q.   The first point is, Vivint committed deceptive

19   sales practices.  And the second point is, here's what

20   you need to do to create an information campaign to

21   remedy harm to ADT's brand.  Correct?

22       A.   That was my --

23           MR. HOBBS:  Object to form.  Misstates

24       testimony.

25           THE WITNESS:  That was my assignment.

CONFIDENTIAL

Page 174

1    BY MR. BROWN:

2         Q.    Okay.  So, I stated that accurately?

3         A.    Yes.

4         Q.    Okay.  So, in terms of Step 1, my understanding

5    is that the basis for your reaching the conclusion

6    that's Step 1 -- that Vivint did commit deceptive sales

7    practices -- was a review of the deposition transcripts,

8    the audio recordings, the social media posts, and the

9    Government actions we're about to talk about.  And then,

10   also, the prior case by ADT against Vivint, as well?

11   Was that a part of your basis?

12        A.    Yes.

13        Q.    Okay.  And how -- so, all of the -- I'm sorry?

14        A.    There are other sources that I list in

15   Appendix B -- you know, other depositions from managers

16   and other things -- but, I don't cite them specifically

17   in this report.

18        Q.    Okay.  Well, you previously -- and I was trying

19   to understand this.  You made a distinction between the

20   main evidence, and, I guess, things that were not main

21   evidence, but that supported that conclusion under

22   Number 1.  So, what is -- what is the main evidence and

23   what is the not main evidence that supports your

24   conclusion under the first step, that Vivint committed

25   deceptive sales practices?

CONFIDENTIAL

Page 175

1    A.   It's all four of the sources.

2         MR. HOBBS:  Object to form.

3         COURT REPORTER:  Are you -- I'm sorry.  I'm not

4    hearing if that was an objection.  Please wait a

5    couple of seconds, Mr. Winer.  Was that an

6    objection?

7         MR. HOBBS:  Yes.  Object to form.

8         COURT REPORTER:  Thank you.  And the answer

9    was, "It's all four of the" -- continue.

10        THE WITNESS:  Yes.  All four of the sources

11   that you just mentioned.

12   BY MR. BROWN:

13   Q.   And what are the four?

14   A.   The audios, the depositions, the social media

15   posts, and prior litigation.

16   Q.   Which includes Government litigation and ADT's

17   prior litigations against Vivint?

18   A.   Correct.

19   Q.   Okay.  So, part of what you will testify to,

20   if you come to trial, is that, reviewing those four

21   categories of evidence, you've determined that Vivint

22   committed deceptive sales practices.  Correct?

23        MR. HOBBS:  Object to form.

24        THE WITNESS:  Maybe.  Maybe not.  I may not be

25   asked to testify on those areas.  They may -- they

CONFIDENTIAL

Page 176

1      will call, as I said before, the individuals to whom

2      I reference in this report.  But, maybe not.  They

3      may make my analysis here less important.  I don't

4      know what I will be asked to do.

5  BY MR. BROWN:

6      Q.   Okay.  If you are asked to give a conclusion on

7  Step 1 of your assignment, what will you say?

8      A.   I will say that --

9           MR. HOBBS:  Object to form.

10          THE WITNESS:  Sorry.  I will say that I have

11     discovered enough evidence from these four sources

12     of information, and other sources that I've read,

13     that lend credibility to the fact that Vivint is

14     practicing deceptive sales practices.

15 BY MR. BROWN:

16     Q.   Okay.  And then, the second part of your

17 analysis was then to determine -- well, why don't you

18 describe it.  What's the second part of your analysis?

19     A.   I mean, that's the damages part, the remedy.

20 How much it would cost to develop a communications

21 campaign to remedy the damage to the brand.

22     Q.   Okay.  And when you say the brand, what in

23 specific are you referring to?

24     A.   To the ADT brand.

25     Q.   Okay.  So, there's a -- there's a portion of

CONFIDENTIAL

Page 177

1   your report where you describe -- well, I'll -- let me

2   set that aside, for a second.  I don't want to get off

3   track.

4           In terms of the -- how -- does the evidence

5   that we've talked about, these four main categories of

6   evidence that contributed to your conclusion under the

7   first step of your analysis, how did those four

8   categories of information impact your conclusion in the

9   second part of your analysis?

10          MR. HOBBS:  Object to form.

11          THE WITNESS:  Well, it just led me to believe

12      that some kind of remedy was necessary.  The next

13      step, Step 2, was to figure out what that remedy

14      might be and how much it would cost to implement the

15      remedy.

16  BY MR. BROWN:

17      Q.   And you came to the conclusion that it would

18  cost more than $27 million?

19      A.   About $27 million, yes.

20      Q.   Okay.  So, the four categories of information

21  that we talked about in relationship to the first part

22  of the assignment, how did those -- how did you use

23  those four categories of information to quantify that

24  $27 million conclusion?

25          MR. HOBBS:  Object to form.  Misstates

CONFIDENTIAL

Page 178

1        testimony.

2                THE WITNESS:  I didn't use them at all.

3    BY MR. BROWN:

4        Q.   So, they are not the basis of your conclusion

5    as to the quantity of damages that are required for this

6    information campaign?

7        A.   Well, let me -- let me restate that.  I

8    didn't -- there was no direct link between the four

9    sources of information and the number, okay?  There is a

10   direct link between the four sources of information,

11   which led me to believe that there was damage done to

12   the ADT brand, right, which led me to the approach that

13   we took in coming up with the number.  But, it's not a

14   direct link of the four sections to the $27 million, if

15   that's what you're asking.

16       Q.   Did -- the four categories of information that

17   we've been discussing, did you use those to determine

18   the extent of the -- or, let me rephrase.

19               Did you use that to quantify the extent of

20   damage that was done to the ADT brand?

21               MR. HOBBS:  Object to form.

22               THE WITNESS:  What I did was, I used that

23           information to establish that there was damage done

24           to the ADT brand.  I then came up with a model of an

25           approach to figure out how much that damage is that

CONFIDENTIAL

Page 179

```
 1        would have to be spent in order to rectify or repair
 2        that damage.
 3    BY MR. BROWN:
 4        Q.   Okay.  I'm going to go to Page 29 of Exhibit 1.
 5    Going to the next page, here.  First of all, did --
 6        A.   29 doesn't have an Exhibit 1.
 7        Q.   I'm talking about Exhibit 1 to your deposition.
 8    I'm on Page 29 of Exhibit 1 to your deposition.
 9        A.   Oh, oh.  I'm sorry.
10        Q.   Looking at actually both Page 28 and 29, 30,
11    and 31, of Exhibit 1, did you review other social media
12    posts from the same authors?
13        A.   No, I did not.
14        Q.   So, if we're now at the top of Page 30, there's
15    two separate Tweets by this author named Teri Overturf.
16    Do you see that?
17        A.   I do.
18        Q.   So, here, you reviewed both of these Tweets?
19        A.   Yes.  They're both from the same day.
20        Q.   Okay.  And -- and both of these are from the
21    same author?
22        A.   Yes.
23        Q.   Did you review any other Tweets from this
24    author, Teri Overturf?
25        A.   No, I did not.
```

CONFIDENTIAL

Page 180

1      Q.    Other than the social media posts shown on

2   these pages -- Pages 28, 29, 30 and 31, of Exhibit 1 --

3   did you review any other social media posts in relation

4   to this case?

5      A.    No.  These are the ones that GBX's social media

6   analysis group found for me.

7      Q.    Okay.  I'm going to direct your attention to

8   the bottom of Page 29.  There's a social media post that

9   starts, "@VivintHome."  Do you see that?

10     A.    Yes.

11     Q.    It's from an author, "Nunyabiz714."

12     A.    I see it.

13     Q.    Okay.  And right after "@VivintHome," there's a

14   Number 1 and a slash character.  Do you see that?

15     A.    Yes, I do.

16     Q.    Do you know what -- and this -- this is a

17   Tweet, correct?

18     A.    Yes.

19     Q.    This is a post on Twitter, correct?

20     A.    Yes, it is.

21     Q.    Do you know what that numeric character

22   followed by a slash -- do you know what that means, in

23   the context of a Tweet?

24     A.    No, I don't.

25     Q.    I'll represent to you that that's an indication

CONFIDENTIAL

Page 181

1    that this is going to be a stream of Tweets on a subject

2    and this is the first one.  Have you seen that before?

3        A.   I am not a big Twitter person.  So, the answer

4    is no.

5        Q.   Okay.  I'll ask you -- I think I already asked

6    you, but I'll ask it again.  Now that we've seen this

7    "1" slash, here, are you aware if there was any -- if

8    there were any other Tweets by this author, following up

9    on this Tweet you had here at the bottom of Page 29 of

10   Exhibit 1?

11       A.   No, I'm not.

12       Q.   Okay.  Did -- did GBX provide you with any

13   other Tweets from this author?

14       A.   No, they did not.

15       Q.   Did you ask them for them?

16       A.   No.

17       Q.   I'm going to now direct your attention to

18   Page 31 of Exhibit 1, your expert report.  And in this

19   section, I believe you testified earlier that you

20   discussed various litigation related to Vivint.

21   Correct?

22       A.   Yes.  As you can see, it's labeled, Previous

23   ADT Case Against Vivint, State Government and FTC

24   Actions.

25       Q.   Are ADT's prior lawsuit and allegations against

CONFIDENTIAL

Page 182

1    Vivint part of the basis for your opinions in this case?

2        A.   Yes.

3        Q.   I'm going to now move to Paragraph 75.  In

4    Paragraph 75, you refer to numerous actions by state

5    attorneys general offices related to the same types of

6    deceptive sales taxes -- tactics at issue in this case.

7        A.   I see that.

8        Q.   Okay.  Are these numerous state attorney

9    general actions part of the basis for your opinions in

10   this case?

11       A.   Yes.  Vivint has a well-worn trail of

12   litigation.  And I used that as part of my opinions in

13   this case, yes.

14       Q.   Of these state attorney general actions, isn't

15   it true that some of them do not relate to ADT

16   customers?

17       A.   My understanding is that some of them relate to

18   other companies other than ADT.

19       Q.   So, nevertheless, even though these -- some of

20   these state attorneys general actions do not relate to

21   ADT, are conduct that Vivint took against ADT that are

22   nevertheless relevant to your analysis in this case?

23       A.   That's correct.

24       Q.   Isn't it true that some of the conduct that is

25   the basis for these state attorney general actions

CONFIDENTIAL

Page 183

1   occurred in the years -- in the years prior to the year

2   2017?

3       A.   Yes, that's true.

4       Q.   In fact, if we look at Footnote 93, it relates

5   to an article that's dated September 2nd of 2015?

6       A.   Yes.

7       Q.   And you're aware that -- did you do anything to

8   parse out what conduct is described in these attorney

9   generals' actions that related to ADT from conduct that

10  related to other alarm services companies?

11      A.   Well, we definitely have, in Paragraph 74,

12  specifically a lawsuit where Vivint settled the lawsuit

13  for $10 million.  I did not parse, as you put it, the

14  other cases, or all the other cases, to determine which

15  were ADT, if any.

16      Q.   Okay.  Did you do anything to distinguish in

17  your analysis those state attorneys general actions that

18  related to conduct prior to the year 2017?  I'll say --

19  I'll say prior to the year 2018, from conduct occurring

20  after December of 2017?

21      A.   No.  I just looked at the overall pattern.

22  There's about six or seven paragraphs with evidence of

23  bad behavior, whether it's ADT or some other company.

24  And if you take a look at it in terms of the gestalt,

25  it's pretty clear that Vivint has been sought after in

CONFIDENTIAL

Page 184

1   this business of selling security systems.

2        Q.   All right.  Now, I want to move to the top of

3   Page 33.  In the top of Page 33, there's a sentence that

4   says that, "In 2012 and 2013, the attorneys general in

5   at least five states reached voluntary settlement

6   agreements against Vivint for sales practices that

7   violated state rules or state law, in some cases also

8   requiring Vivint to make restitution to customers, pay

9   investigative court costs and fines."

10            Did I read that right?

11       A.   Yes.

12       Q.   Did all five of those settlements relate to

13   conduct that occurred before the year 2014?

14       A.   Yes.

15       Q.   Moving on to Paragraph 76, this paragraph

16   details sales practices that the attorney generals were

17   reprimanding Vivint for, correct?

18       A.   Yes.

19       Q.   And it gives -- there's a few different

20   examples it's giving here, or that you give here on

21   Page 33, in Paragraph 76.  One is, "Failing to leave the

22   premises when asked by a consumer to leave."

23            Did I read that right?

24       A.   Yes.

25       Q.   Is -- failing to leave the premises when asked

CONFIDENTIAL

Page 185

1    by a consumer to leave, is that a deceptive sales

2    practice?

3        A.   No.  But, it's a poor sales practice and also

4    offensive to the -- to the consumer.

5        Q.   Is that part of ADT's allegations in this case?

6    That Vivint is culpable because it failed to leave

7    premises when asked by a consumer to leave?

8            MR. HOBBS:  Object to form.

9            THE WITNESS:  I don't recall all of the -- all

10           of the aspects of the Complaint.  So, I don't know.

11           I don't recall.

12   BY MR. BROWN:

13       Q.   Okay.  If Vivint has failed to leave premises

14   when asked by a consumer to leave, is that something

15   that needs to be corrected by your information campaign

16   that you've opined to?

17           MR. HOBBS:  Same objection.

18           THE WITNESS:  Well, yes.  It would cover that.

19           It would be part of what I call the inoculation

20           campaign or aspect of the campaign for consumers

21           that may not have had a sales call from -- from

22           Vivint.  Failing to leave the premises is -- scares

23           consumers.  I mean, you know, these days, you don't

24           know what a person would do when he or she refuses

25           to leave.  And I think consumers need to be warned

CONFIDENTIAL

Page 186

1      about that.

2    BY MR. BROWN:

3      Q.   So, if a -- if a Vivint sales representative

4    did not say anything deceptive to a consumer, nor did --

5    and the Vivint representative also did not say anything

6    that gave the consumer a misimpression that there was an

7    affiliation between Vivint and ADT, but they failed to

8    leave the premises when the consumer asked them to

9    leave, is that something that needs to be corrected by

10   your information campaign?

11     A.   Yes.

12         MR. HOBBS:  Object to form.  Improper

13     hypothetical.

14         THE WITNESS:  Yes.

15   BY MR. BROWN:

16     Q.   Okay.  The next quote you have, here -- well,

17   I'm going to skip the -- well, I'm going to the next

18   one.  The next one is, "Making false or misleading

19   statements to homeowners in an attempt to induce

20   purchases."

21         Did I read that right?

22     A.   Yes, you did.

23     Q.   That's another example of a conduct that was

24   alleged in these state attorney general actions,

25   correct?

CONFIDENTIAL

Page 187

1      A.    Correct.

2      Q.    Okay.  It doesn't indicate what the false or

3   misleading statements were about.  Does it matter to

4   your analysis whether a Vivint representative made false

5   or misleading statements about ADT or about another

6   subject that has no relationship to ADT?

7      A.    Well, if they're making these false and

8   misleading statements, trying to get people to buy a

9   Vivint system, then it's very similar to the previous

10  discussion about failing to leave the premises.  People

11  have to be forewarned about Vivint's misleading sales

12  practices.  It doesn't necessarily mean that they have

13  to say that, well, we're taking over ADT, or we have

14  some kind of joint venture with ADT.  But, the component

15  of the information campaign that warns ADT customers

16  about the possibility of these kinds of statements is

17  definitely part of the information campaign.

18     Q.    The next quotation is, "Refusal to honor

19  notices of cancellation."  That was one of the examples

20  of accusations in the Ohio attorney general

21  investigation, correct?

22     A.    Yes.

23     Q.    And, again, is this the type of conduct, if it

24  occurred in this case, that would require a -- a visit

25  or a -- or a customer needing to receive information

CONFIDENTIAL

Page 188

1    within your information campaign that you opined to?

2        A.   Yes.

3             MR. HOBBS:   Object to form.

4    BY MR. BROWN:

5        Q.   Moving on to -- the next example is from a

6    Kansas investigation.  And it says, "Salesmen did not

7    disclose all costs associated with switching alarm

8    service -- alarm system providers."  Did I read that?

9        A.   Yes.

10       Q.   And, again, this doesn't necessarily indicate

11   that there was a deception as to ADT's business,

12   correct?

13       A.   Correct.

14       Q.   But, nevertheless, this is the type of -- this

15   statement would also be the type of statement that

16   your information campaign would be directed towards

17   alleviating?

18       A.   Yes, it would.

19       Q.   I want to go now to Paragraph 27 (sic).  In

20   Paragraph 27, you're referring to a warning that the

21   City of Palm Coast, Florida, gave to its residents.

22   Correct?

23       A.   I think you mean, Paragraph 77.

24       Q.   I'm sorry, what did I say?

25       A.   Twenty-seven.

CONFIDENTIAL

Page 189

1          Q.   Oh, yeah.  I mean, 77.  Thank you.  I'll start

2     again.

3               I'm now moving to Paragraph 77 of Exhibit 1.

4     In this paragraph, you're referencing a warning that

5     the City of Palm Coast, Florida, gave to its residents.

6     Correct?

7          A.   Yes.

8          Q.   And Palm Coast, Florida, was warning its

9     residents about deceptive and high-pressure sales

10    tactics that occurred in August of 2013.  Correct?

11         A.   That's true.

12         Q.   Okay.  And those -- that conduct related to an

13    alarm company called Alarm Pro, correct?

14         A.   Yes.

15         Q.   Are you aware of any -- that ADT was involved

16    in any of the conduct that's discussed in Paragraph 77?

17         A.   No.

18         Q.   Nevertheless, the information in Paragraph 77

19    is part of your basis for your opinions in this case?

20         A.   Yes.  It represents part of a pattern of

21    deceptive marketing practices.

22         Q.   I'm going to now direct your attention to

23    Paragraph 80.  Now, we're on Page 35 of Exhibit 1 and

24    you're referring to an FTC settlement that resulted in

25    a $50 million fine for Vivint.  Correct?

Page 190

1       A.    Correct.

2       Q.    In the last sentence of that paragraph, you

3    state, "The FTC also mandated that Vivint verify all

4    credit accounts before turning them over to third-party

5    collection agencies and have an independent outside

6    review of Vivint's compliance with the Fair Credit

7    Reporting Act every other year."

8          Did I read that right?

9       A.    Yes.

10      Q.    What does -- Vivint's alleged violations of the

11   Fair Credit Reporting Act, how does that relate to ADT

12   in any way?

13      A.    Well, I -- it might.  I don't know -- none of

14   the examples demonstrate this.  But, there may be some

15   customers, some ADT customers, who might have suffered

16   because of -- of the former ADT customers due to issues

17   with their credit or not making payments.  I don't know

18   what exactly this -- these -- I don't know what exactly

19   what the problem is, but there could have been some ADT

20   customers that also suffered from this.

21      Q.    Okay.  Do you know that to be true or not true?

22      A.    I said there could have been.

23      Q.    Okay.  Well, is the information discussed in

24   Paragraph 80 a basis for your opinion in this case?

25      A.    Again, it's part of a pattern of misbehavior on

CONFIDENTIAL

Page 191

1    the part of Vivint's salespeople and the company.

2        Q.   How does the information that you provided in

3    Paragraph 80 impact your opinions in this case?

4        A.   As I just said, it's part of a -- part of a

5    pattern of Vivint executing deceptive marketing

6    campaigns.  And, as it says here, practicing -- you

7    know, having fraudulent practices.  So, again, it's just

8    part of the overall picture that I drew in terms of

9    Vivint's behavior.

10       Q.   Okay.  So, I'm going to broaden my question now

11   to include this entire section of the prior litigation,

12   including the Vivint litigation and the attorney general

13   investigations and the FTC settlement.

14            How do all of these -- how does -- well, first,

15   let me ask you.  Did -- does this evidence impact the

16   opinions that you've reached in this case?

17       A.   Yes, it does.  If it didn't, I wouldn't have

18   put the section in the report.

19       Q.   Okay.  And we've talked about your having two

20   stages of opinions here.  As we've discussed it, does

21   this evidence impact your opinion as to the first step

22   of your analysis or the second step of your analysis?

23            MR. HOBBS:  Object to form.

24            THE WITNESS:  Well, it's certainly an important

25       component of the first step, which is the

Page 192

1          establishment of Vivint's pattern of misbehavior

2          that -- particularly, towards ADT.  But, it also

3          affects the second step, as we've talked about

4          already.  That, it implies that some kind of

5          remedial communication program needs to be

6          implemented.  But, it's more the first step.  It's

7          part of an overall pattern of misbehavior on the

8          part of Vivint.

9    BY MR. BROWN:

10         Q.   So, talking first about the first step.  How

11   does prior conduct that does not relate to ADT impact

12   your opinion that Vivint conducted deceptive sales

13   practices against ADT?

14         A.   Well, first of all --

15              MR. HOBBS:  Object to form.  Misstates

16         testimony.

17              THE WITNESS:  First of all, some of --

18              MR. BROWN:  I'll rephrase.  I'll rephrase, in

19         response to the objection.

20   BY MR. BROWN:

21         Q.   How -- going -- in terms of the first step of

22   your analysis, how does the fact that Vivint committed

23   alleged misconduct against customers other than ADT

24   customers during time periods prior to 2017, how does

25   that impact your analysis and conclusion that Vivint

CONFIDENTIAL

Page 193

1     conducted deceptive sales practices against ADT

2     customers after the year 2017?

3             MR. HOBBS:  Same objection.

4             THE WITNESS:  First of all, there is some

5         evidence that Vivint practiced deceptive marketing

6         practices against ADT, because of the -- that

7         settlement.  Secondly, it's just part of an overall

8         pattern.  As I've said before, the company has

9         consistently been accused and settled lawsuits.  And

10        it just lends credence to the -- to the -- to my

11        opinion that they're continuing to be -- to exhibit

12        bad practices and deceptive practices in selling

13        their systems.

14    BY MR. BROWN:

15        Q.   So, they behaved that way in the past.

16    Therefore, we can infer that they also behaved badly in

17    this case?

18        A.   Well, there's also a case that I did not

19    mention, and is not mentioned here, that's also being

20    litigated, the CPI case.  And, so, there is plenty of

21    evidence of -- of Vivint's continued bad practices.

22    Now, that is not against ADT, but still it's relatively

23    recent and more evidence that they've continued the

24    practices.

25        Q.   So, in that -- so, you're referring -- and CPI

CONFIDENTIAL

Page 194

1   is a separate alarm services company.  Correct?

2       A.   Correct.

3       Q.   They're not a party to this case?

4       A.   No, they're not.

5       Q.   But, if I -- but, my understanding is that

6   you're inferring that because Vivint allegedly committed

7   deceptive practices against CPI, another alarm services

8   company, that we can infer that they likely committed

9   deceptive sales practices against ADT in this case.

10  Correct?

11      A.   What I'm saying --

12      Q.   Go ahead.

13      A.   What I'm saying is that you're trying to paint

14  the practices of -- Vivint's practices all sort of in

15  the past.  And as you've said before, well, is the past

16  kind of a predictor of the future?  Well, the CPI case

17  is pretty recent, and so it shows that they've continued

18  these bad practices, even in the last few years.  So, I

19  see no reason not to continue to believe that Vivint's

20  practices in this case against ADT are deceptive and

21  continue to be.

22      Q.   Okay.  Well, I'm -- I'm actually -- actually

23  interested in both of those inferences.  It seems to me

24  you're making -- when you're drawing from this evidence,

25  you're making two inferences.  One, that Vivint's past

CONFIDENTIAL

Page 195

1    behavior predicts its current and more recent past

2    behavior.  And two, that Vivint's behavior against one

3    company predicts its behavior against another company.

4    Am I wrong?  Are you not making those inferences?

5        A.   I'm -- what I'm saying is, if you look at the

6    gestalt of all of their behaviors, past and relatively

7    recent, there's no reason to believe that they're not

8    continuing to practice deceptive behavior in the sales

9    calls.  That's my conclusion.

10       Q.   So, you're inferring from Vivint's past

11   behavior that it is continuing to act in those ways?

12       A.   Well, in some recent past.  Not just 2012 and

13   '13, right?  The much more recent past.  So, yes.

14       Q.   Both the -- both the far past and the recent

15   past are a basis for your opinion, correct?

16       A.   Yes, in this portion of the analysis of Step 1.

17       Q.   Okay.  Now, let's talk about Step 2.  For

18   Step 2, how does the information that we've been

19   discussing so far in this case -- how does that impact

20   your conclusion as to Step 2, that the appropriate

21   amount of damages in this case is over $27 million?

22            THE WITNESS:  I'd ask --

23            MR. HOBBS:  Object to the form.

24            THE WITNESS:  I'd ask that we take a short

25        break -- I need to use the bathroom -- since you're

CONFIDENTIAL

Page 196

1          switching -- switching topics, anyway.

2               MR. BROWN:  Yeah, we can.  But, I'd ask that

3          you answer the question that I just posed.  It --

4          it's generally not considered fair to take a break

5          in the middle of a question.  So, I would appreciate

6          it if you would answer my last question and then we

7          can take a break.

8               THE WITNESS:  Okay.  Can you repeat the

9          question?

10              MR. BROWN:  I'm going to ask the court reporter

11         to read it back.  Sorry.

12              COURT REPORTER:  That's okay.

13              "Okay.  Now, let's talk about Step 2.  For

14         Step 2, how does the information that we've been

15         discussing so far in this case -- how does that

16         impact your conclusion as to Step 2, that the

17         appropriate amount of damages in this case is over

18         $27 million?"

19              MR. HOBBS:  Same objection.

20              THE WITNESS:  All right.  Step 1 establishes

21         the foundation that some kind of remedial action has

22         to take place, right?  I'm -- I am convinced that

23         there's been damage to the ADT brand from Vivint's

24         deceptive practices at the point of purchase.

25         All right.  Having established that, then I have to

CONFIDENTIAL

Page 197

```
 1            think about, well, how do I measure the damage
 2            that's been done to the ADT brand?  And that leads
 3            me to Step 2 and the approach that we took in
 4            developing that model and the $27 million.
 5      BY MR. BROWN:
 6            Q.   Okay.  So, does the information we've been
 7       discussing so far impact that conclusion of the
 8       $27 million quantification?
 9                 MR. HOBBS:  Object to form.
10                 THE WITNESS:  Actually, what it did was, it
11            just established, again, a foundation that some
12            remedial action had to take place.  As I said
13            earlier, there's not like a direct correspondence
14            between the information we've already covered,
15            all right, and the $27 million.  We had to develop
16            an approach that would measure the damage to the ADT
17            brand that then resulted in the $27 million total.
18      BY MR. BROWN:
19            Q.   Okay.  So, the information we've discussed thus
20       far does not impact your conclusion as to the quantity
21       of the $27 million?
22                 MR. HOBBS:  Object to form.
23                 THE WITNESS:  What it does is, it gives us a
24            direction to look at in terms of how to develop a
25            model for trying to quantify the remedy.  So, it
```

CONFIDENTIAL

Page 198

1          points in the direction of what has to be done, but

2          it doesn't produce a number.

3               MR. BROWN:  Okay.  With that, we can take a

4          break.  Thank you for your patience.

5               VIDEOGRAPHER:  All right.  And this is the end

6          of Unit Number 4 in the testimony of Dr. Russell

7          Winer.  We're now going off the video record.  The

8          time is 5:29 p.m., Eastern.

9               MR. HOBBS:  Ten minutes okay?

10              MR. BROWN:  Yeah, 10 minutes works for me.

11              THE WITNESS:  Okay.

12         (Whereupon, a recess was held at 5:29 p.m., and the

13         deposition resumed at 5:39 p.m.)

14              VIDEOGRAPHER:  And this is the beginning of

15         Media Number 5 in the testimony of Dr. Russell

16         Winer.  We are now back on the record and the time

17         is 5:39 p.m., Eastern.

18    BY MR. BROWN:

19         Q.   Okay.  I'm going to return to Exhibit 1 to the

20    deposition and now I'm going to go to Page 36.  In this

21    section of your report, Dr. Winer, you describe various

22    mitigation efforts that ADT has already undertook in

23    this case.  Is that right?

24         A.   Yes.  They have undertaken them, yes.

25         Q.   And these are efforts that ADT undertook to

CONFIDENTIAL

Page 199

1    mitigate the alleged misconduct of Vivint in this case?

2        A.    Correct.

3        Q.    Okay.  Do you know what amount of money or

4    expenses ADT has incurred in taking these mitigation

5    efforts that you describe in this section of your

6    report?

7        A.    No, I don't know how much money they have spent

8    on -- on these.

9        Q.    Is that something that you asked of anyone in

10   relation to this case?

11       A.    No.  I think it's just an indicator that they

12   have attempted to try to offset Vivint's actions with --

13   as you can see, a social media campaign, YouTube,

14   e-mails.  Those kinds of things.

15       Q.    Would the amount of money that ADT has expended

16   thus far in these mitigation efforts impact your

17   analysis in this case either as to Step 1 or Step 2, as

18   we've been discussing it?

19       A.    Well, it's not -- it's not a Step 1, it's in

20   response to Step 1.  You know, it's -- it's one -- one

21   thing that you would expect them to do is to try to

22   alert their customers that there are some of these

23   practices that are going on.  You know, the campaign

24   that they have here, the social media campaign, is

25   something that -- again, it's what we naturally try to

CONFIDENTIAL

Page 200

1    do.  But, they only had -- as you can see, there are

2    only two posts on Facebook, three posts on Twitter, two

3    on Instagram.  It's not a large sustained program.

4         Q.   Well, there are also videos on YouTube?

5         A.   Yes, videos on YouTube.

6         Q.   And they also -- in June of 2019, they provided

7    warnings of deceptive sales messaging inserted into

8    paper invoices mailed to customers.  Correct?

9         A.   Yes.

10        Q.   Okay.  Did you get any information on what it

11   cost ADT to do that mailing?

12        A.   No.  As you know, I did get some estimates on

13   costs for our -- our program.  But, I did not get

14   estimates of costs on this.

15        Q.   So, your -- your information campaign includes

16   a mailing, as well?

17        A.   It does.

18        Q.   And part of the costs that you have indicated

19   as part of the damages in your $27 million number, you

20   included postage that would be required to send those

21   mailings.  Correct?

22        A.   Yes.  The -- that part of the campaign is a

23   relatively small part.  The large part is the personal

24   visits to homes.

25        Q.   But, that -- but, that part of the campaign

CONFIDENTIAL

Page 201

1   seems in some ways similar to what ADT did in June of

2   2019, is it not?

3        A.   I don't know what the text was of these -- of

4   these programs.

5        Q.   Okay.  Well, it says that ADT provided -- what

6   you say in Paragraph 82 is, "ADT provided warnings of

7   deceptive sales messaging, inserted in paper -- inserted

8   in paper invoices mailed to customers."

9            Did I read that right?

10       A.   That's correct.

11       Q.   Do you know how many customers they sent these

12  inserts to?

13       A.   No.  But, more importantly, we don't know how

14  many customers actually looked at them.

15       Q.   Okay.  Do you know how much it costs them to

16  send these inserts?

17       A.   No.  I didn't ask the chief marketing officer

18  how much she spent on this campaign.

19       Q.   Did you ask anyone?

20       A.   No.

21       Q.   Do you know if ADT was able to include these

22  inserts without paying additional postage?

23       A.   I'm sorry, what -- could ask you that again?

24  I'm not sure what you mean.

25       Q.   Well, it said they inserted this messaging in

CONFIDENTIAL

Page 202

1    paper invoices that it was mailing to customers.  So, my

2    question is, by inserting this additional information,

3    did it increase -- did they incur any increased postage

4    costs?

5        A.   I don't know if the cost of the postage of

6    the -- of the invoices went up with that insert.  Maybe

7    it did, maybe it didn't.

8        Q.   But, part of your calculation of the

9    $27 million of damages is a postage charge for mailing

10   information to customers, correct?

11       A.   Yes.

12       Q.   Is it possible that the postage may not be

13   necessary if ADT is able to insert whatever message you

14   find -- you believe is appropriate into the invoices

15   that it already sends to its customers?

16       A.   I wouldn't recommend that.  I think that, you

17   know, the evidence from direct marketing and campaigns

18   that I've seen are that, when you put these inserts in,

19   the readership level is often quite low.  I think

20   what's needed is a stand-alone piece that just focuses

21   on the remedial information that's required.

22       Q.   Well, ADT hasn't done a stand-alone piece.  Why

23   didn't ADT -- if what's needed is a stand-alone piece,

24   why didn't ADT do a stand-alone piece?

25       A.   I don't know.  Maybe they had a budget -- a

CONFIDENTIAL

Page 203

1    budget problem.  I have no idea.

2         Q.   Do you know -- did anyone at ADT -- at ADT tell

3    you that they didn't do a stand-alone piece because they

4    didn't have the funds to do that?

5         A.   I didn't ask them about this -- or these

6    campaigns.  So, it's irrelevant.

7         Q.   It's not relevant to your analysis?

8         A.   No, your question is irrelevant.  Because, as I

9    said before, I didn't ask them about the campaign.  So,

10   there's no way I would know the answer to your question.

11        Q.   Okay.  Would -- do you know how many people

12   were reached by -- well, do you know how many of these

13   inserts that ADT mailed to customers?

14        A.   No, I don't.

15        Q.   Do you know if they sent them to all of their

16   customers?

17        A.   No, I don't.

18        Q.   Okay.  In May of 2018 and April 21st -- April

19   of 2021, ADT sent out newsletters, educating residents

20   on identifying and recording deceptive sales attempts.

21   And so, it appears here this was a stand-alone message.

22   Is that right?

23        A.   It looks like it, yes.

24        Q.   Then, do you know how much it cost ADT to

25   deliver this message to its customers?

CONFIDENTIAL

Page 204

1      A.   No, I don't.

2      Q.   Do you know how many customers were reached by

3   this message?

4      A.   No.

5      Q.   Do you know how many customers they sent it to?

6      A.   That's redundant.

7      Q.   Do you know how many customers they sent it to?

8      A.   It's the same as how many would be reached.

9   So, the answer is no.

10     Q.   Do you know -- did you do anything to determine

11  the effectiveness of ADT's mitigation efforts thus far?

12     A.   Are you referring to the remedial -- the

13  mitigation effort?  Communications measures?

14     Q.   Yeah, I'm -- so, I'm talking about the efforts

15  that were described in this section, so ADT's mitigation

16  efforts.  You have a section of your report titled,

17  ADT's Mitigation Efforts, that starts at Page 36 of

18  Exhibit 1.

19        My question is, did you do anything to

20  determine the effectiveness of these mitigation efforts

21  that were made by ADT?

22     A.   No, I didn't.

23     Q.   Is it possible that ADT's mitigation efforts

24  have already alleviated some of the harm that you

25  believe occurred to ADT's brand?

CONFIDENTIAL

Page 205

1      A.    It's possible.  But, since Vivint continues to

2   employ deceptive practices, there's always the need to

3   develop a new program to try to mitigate that --

4   those -- those problems.  So, you know, these were

5   programs -- these were efforts in 2018, 2019, Spring of

6   2021.  But, the damage continues to be -- to exist.

7      Q.    Okay.  I'm going to ask you again.  Is it

8   possible that any of the mitigation efforts that ADT has

9   already took, as described in your report, have already

10  undone some of the damage to ADT's brand?

11     A.    It's possible that some of it, all right?  But,

12  anything done through mail is not going to be nearly as

13  effective as is going to be done face-to-face.  Which is

14  what we argued for, for at least some of their

15  customers.

16     Q.    Okay.  So, I -- I'm confused by that.  You say

17  that -- well, first of all, what is your -- what is

18  your basis for the conclusion that the sales -- that a

19  face-to-face delivery is required for your information

20  campaign?

21     A.    The -- in the early 1980s, the FTC, in a number

22  of academic papers, opined that, to offset a deceptive

23  campaign like the one that -- deceptive activities like

24  what Vivint is using, you need to hit the same target

25  audience and you need to hit them in the same -- using

CONFIDENTIAL

Page 206

1    the same medium in which the message was delivered.

2          That suggests that ADT's customers, in their

3    homes, is the place where you have to communicate the

4    repair or the information about repairing the damage.

5    You can't communicate the nuances of the problems in a

6    letter very easily, which may or may not be read in the

7    mail.  But, you can communicate it in a face-to-face

8    encounter.  And that's why we recommend at least part of

9    it be face-to-face.

10         Q.   What was the FTC- -- I believe you referred to

11   an FTC --

12         A.   Um-hum.

13         Q.   -- article?

14         A.   Yes.  I read some papers, back when I was -- in

15   looking at deceptive advertising.  In particular, that

16   deceptive advertising was a major topic the FTC

17   investigated in the early '80s, late '70s.  And these

18   were some of the rulings of the FTC in terms of how to

19   correct your advertising.

20         Now, I'm not doing corrective advertising, but

21   it's the same principal.  It's remedial information to

22   try to adjust for misinformation.

23         Q.   Oh.  So, you would not call your analysis

24   corrective advertising?

25         A.   No.  I never did.  I didn't say -- I didn't

CONFIDENTIAL

Page 207

1    call it that in the report.

2        Q.   Okay.  So, you're not basing your analysis on

3    the methodology that other people have referred to as

4    corrective advertising?

5            MR. HOBBS:  Object to form, vague.

6            COURT REPORTER:  I didn't hear the -- after,

7        "object to form."

8            MR. HOBBS:  Vague.

9            COURT REPORTER:  Thank you.

10           THE WITNESS:  No, I'm not calling it corrective

11       advertising.

12   BY MR. BROWN:

13       Q.   Okay.  Why are you not -- is there something

14   that you're aware of that is called corrective

15   advertising?

16       A.   Well, corrective advertising could be where

17   Vivint, you know, puts out its own information about

18   some of its practices, and, you know, says, we're sorry

19   for some of these things.  And that would correct, you

20   know, some of the misimpressions that people might have

21   from some of their activities.  Corrective advertising

22   also has other implications, but that's not what we're

23   doing.  We're taking misinformation and deceptive

24   practices and trying to re-educate the consumers about

25   the -- these practices and how to defend against them.

CONFIDENTIAL

Page 208

1    So, it's more of an educational program, it's not

2    corrective advertising.

3         Q.   Have you -- in any of your past litigation

4    work, have you ever rendered an opinion as to corrective

5    advertising?

6         A.   Well, in the Pods vs. --

7              MR. HOBBS:  Objection.

8              THE WITNESS:  In the Pods vs. U-Haul case, we

9         developed a -- also, a damages -- a damages estimate

10        based upon U-Haul's misimpressions by putting a lot

11        of lowercase pods on its website.

12   BY MR. BROWN:

13        Q.   Okay.  And would -- was -- that analysis that

14   you did in that case, was that a corrective advertising

15   analysis?

16        A.   Well, not really.  I mean, all it did -- all we

17   did was take a look at, what's the value of the -- what

18   we call misimpressions on the U-Haul website and

19   calculate what's the value of those misimpressions, and

20   that became part of the damages for company pods in that

21   instance.

22             I've never done an explicit corrective

23   advertising case.  That's not what I do.

24        Q.   So, when you say -- when you use the term,

25   "corrective advertising," what do you mean?

CONFIDENTIAL

1   A.   Well, the classic case is, when -- if you go

2   back -- I don't know if it was in the '70s, or maybe

3   before, Campbell Soup put marbles in the bottom of its

4   soup to prop up the vegetables and make it look like

5   there were so many vegetables that they were swimming in

6   the soup.  In fact, they were investigated -- I don't

7   know which agency -- and had to put out a campaign,

8   saying that our soup actually doesn't look like that,

9   and, so, therefore, correcting misimpressions people

10  might have had about the soup.

11  Q.   Okay.  And how is that analysis different than

12  the analysis that you conducted in the Pods vs. U-Haul

13  case that you've described?

14  A.   Well, what we did was, we valued the -- tried

15  to put a value on the eyeballs that saw all the lower

16  case pods on U-Haul's site and also demanded that U-Haul

17  take down all the pods from its website.  It did not

18  have to do any kind of campaign or put a post on its

19  website that, our product is confusing with the pods

20  product or any kind of corrections like that.

21  Q.   So -- and -- and I'm trying to understand what

22  you mean when you say, corrective advertising.  In your

23  view, is part of what corrective adverting mean --

24  means, is that the party that committed the

25  misrepresentation or the deceptive statement takes

CONFIDENTIAL

Page 210

1   action to put out a -- a -- a corrective statement that

2   the party themselves that committed the misconduct has

3   to be the one to correct it?

4       A.   I don't know if it has to be.  But, certainly,

5   that's -- a lot of the earlier cases on corrective

6   advertising, that's what was done, yes.

7       Q.   Okay.  But, that's not what happened in the

8   Pods case.  In the Pods case, the damage analysis that

9   you created was based on, number one, U-Haul needed to

10  take down the references to pods on its web pages,

11  correct?

12      A.   Correct.

13      Q.   And then, it also needed to -- it also

14  needed -- you also valued how much it would cost to

15  correct the misimpressions that had occurred due to the

16  existence of those web pages, correct?

17      A.   That's right.  That was -- right, that was the

18  monetary damages from that.  There were other monetary

19  damages, but that was from our analysis.

20      Q.   Okay.  And, so, if I recall, your analysis was

21  that you were able to determine where the deceptive

22  statements occurred, because they were on web pages.

23  Correct?

24      A.   And that's exactly what we're doing here.

25      Q.   Okay.  Well, I'm -- I'm curious of that.

CONFIDENTIAL

Page 211

1    Because, in the Pods case, the statements were all on

2    web pages, so you knew exactly what was said by U-Haul,

3    correct?  Because, you had --

4         A.   What pages?

5         Q.   You had the text of the web pages, correct?

6         A.   And that's consistent with what I said before.

7    About, you know, you target the same consumers and you

8    put the campaign or the communication campaign in the

9    same medium in which the deceptive messages were

10   distributed.  And that -- so, in that case, we used the

11   web, right?  In other cases, you know, we've used --

12   valued it based upon advertising that was done in terms

13   of -- in that case, which was Rise -- Rise Brewing vs.

14   Pepsi, Pepsi spent --

15        Q.   Doctor, I don't want to get -- I don't want

16   to -- I'm going to interrupt you.  I asked about the

17   Pods case, you're now talking about another case.  I'd

18   like to go back to the Pods case.  I -- I have a limited

19   amount of time, here.  So, my question wasn't about this

20   other case you're talking about now.  I'm talking about

21   the U-Haul vs. Pods case.

22        A.   I apologize.

23        Q.   Okay.  So -- and I apologize for interrupting

24   you.  But, going back to the U-Haul case, you were

25   talking about how it's similar to this case.  And I

CONFIDENTIAL

Page 212

1    got -- and my question is, in the U-Haul case, you knew

2    exactly what deceptive statements each consumer was

3    subjected to, because you had the text of the web pages,

4    so you knew exactly what the deceptive statements were

5    that the consumers were exposed to.  Correct?

6              MR. HOBBS:  Object to form, foundation.

7              THE WITNESS:  Well, that's not entirely true.

8         I mean, you know, consumers could go to different

9         parts of the U-Haul website and maybe be exposed to

10        other information.  So, it's not the case that every

11        single consumer that went to the U-Haul website

12        would be exposed to the same information.

13   BY MR. BROWN:

14        Q.   Well, when you quantified the amount of

15   misimpressions in the U-Haul case, isn't it true that

16   you were able to determine the number of people who had

17   visited the web pages that had the deceptive statements

18   on them?

19        A.   Yes, that's true.  We had an expert -- an

20   expert come in, estimate the number of page views.  And

21   then, we used company -- Pods company data to estimate

22   the value of those page views, how much they spent

23   for -- for eyeballs and we got a number that way.

24        Q.   Right.  So, you were able to quantify the

25   extent of the misconduct because you had an expert who

CONFIDENTIAL

Page 213

1   could tell you the number of people who had viewed the

2   pages that contained the -- the deceptive statements,

3   correct?

4       A.   Yes.  That's how we did it in that case.

5       Q.   Okay.

6       A.   But, again --

7       Q.   So, in this case --

8       A.   -- what we've done is, we've used the same

9   principle.  Just different places where the

10  communications were occurring.

11      Q.   So, in this case, tell me how you quantified

12  the number of people that have been exposed to

13  particular deceptive statements?

14      A.   Well, what we did was, we assumed that the

15  locust of the misinformation was in the household,

16  instead of on a website, where the misinformation or

17  deception is occurring is in individuals' homes.  Now,

18  obviously, the particular message could be different for

19  different -- for different households.  One message --

20  one deceptive message might be, we're acquiring ADT, and

21  another one could be, your equipment is too old.  So,

22  yes, there could be different messages.

23           But, again, the key point here is that the

24  deception, the deceptive communications, are happening

25  in the individual households.  And because it's a

CONFIDENTIAL

Page 214

1   complicated message, right, in terms of the -- the --

2   the kinds of deception that was going on, it has to be

3   done, you know, at least some of it, face-to-face.

4          Now, as you know, we didn't say that all six

5   million ADT customers were -- would be -- had to be

6   exposed this way.  So, we actually under -- understated

7   how much it would cost by only going after about

8   12 percent of the customers.  But, the key point is that

9   the message has to be delivered face-to-face.  That's

10  the key point.  Because, that's where the locust of

11  damage is.

12      Q.   Okay.  Dr. Winer, I understand that's one of

13  the points you're trying to make, but that wasn't my

14  question.  I'll get back to that point, because I want

15  to hear more about your FTC study that's the basis for

16  why it has to be in the same mode that the deceptive

17  message was delivered.

18          But, my question right now is, how -- we talked

19  about how, in the U-Haul vs. -- in the Pods vs. U-Haul

20  case, you were able to quantify the misimpressions.

21  Now, you've just stated that the statements that were

22  received by different customers in this case were

23  different, so that's already a difference between the

24  U-Haul vs. Pods case, correct?  In U-Haul, all the

25  statements -- all the misstatements that the customers

CONFIDENTIAL

Page 215

1   were exposed to were on the websites, so they were

2   all -- everyone was being exposed to the same deceptive

3   statement.  Correct?

4        A.   Well, let me respond to that.  In fact, there

5   were only a couple different messages that the -- the

6   Vivint salespeople were using, apparently.  So, it's not

7   like there were 10 or 15 different messages they were

8   saying.  There were far fewer than that.

9        Q.   How do you know?  Were you -- were you at the

10  doors when the messages were given?

11       A.   Well, we got the samples from the -- from the

12  depositions.  We got it from the -- from the audio.

13  It's kind of all -- the same few seem to come through

14  consistently.

15       Q.   Okay.  So, you based your knowledge on the

16  hearsay -- samples of hearsay evidence that you

17  reviewed, correct?

18            MR. HOBBS:  Object to form.

19            THE WITNESS:  I'm not going to refer to it as

20       hearsay.  That's a legal term and I don't know what

21       it means.

22  BY MR. BROWN:

23       Q.   Okay.  Well, I'll represent to you that hearsay

24  evidence -- well, let's not go into a lecture, at this

25  late hour, on -- on the legal meaning of hearsay.

CONFIDENTIAL

Page 216

1        What's important to my -- what -- the question

2   I need to ask is, you are not able to -- you don't have

3   direct knowledge of exactly what statements were made

4   by each of the Vivint representatives to each of the

5   customers that they allegedly approached door-to-door,

6   correct?

7        A.   We have the information on the messages that

8   they delivered from the encounters that I have in my

9   report.  I don't have all of them that were delivered by

10  the Vivint salespeople to people that I don't know who

11  they visited.

12       Q.   Okay.  And the sources for that are the

13  deposition transcripts that you reviewed and the

14  audio -- and the six or -- the six deposition

15  transcripts you reviewed and the six or seven audio

16  calls that you reviewed, correct?

17       A.   Yeah.

18            Counselor, we've seen these before.  We saw

19  them in the CPI case, as well, as you well know.

20       Q.   Sir -- I'm going to cut you off, Dr. Winer.  We

21  don't have time to talk about a different case.  I'm

22  talking about this case.

23            My question for you is, your basis -- you claim

24  that you know what the handful of messages were that

25  were delivered to customers at their doors.  And I'm

CONFIDENTIAL

Page 217

 1    asking you, what is your basis for that knowledge?

 2              MR. HOBBS:  Hold on.  I -- I object to the form

 3        of that and that misstates testimony.

 4              THE WITNESS:  Well, I'll just repeat what I

 5        said before.  I mean, we looked at seven -- we had

 6        seven audio recordings, we had six depositions, we

 7        had a bunch of social media posts.  I can't -- I

 8        can't claim to know the whole universe of what was

 9        said, but I think we have a pretty good idea of at

10        least a number of the things that were said in these

11        sales encounters.

12    BY MR. BROWN:

13        Q.   Okay.  So, the basis for that are the ADT --

14    or, excuse me, the social media posts, the six or seven

15    audio files that you reviewed, and the six deposition

16    transcripts that you reviewed.  Correct?

17              MR. HOBBS:  Object to form.  Misstates

18        testimony and also ambiguous.

19    BY MR. BROWN:

20        Q.   You can answer, Dr. Winer.

21        A.   Well, that's what I'm --

22        Q.   You can answer, Dr. Winer.

23        A.   That's what I'm relying on.  That's what we

24    relied on with GBX to develop this -- well, let me put

25    it another way.  We don't necessarily require to know

CONFIDENTIAL

Page 218

1   what actually was said there.  We just need to know that

2   something was said of a deceptive nature.  So, we don't

3   necessarily need to know exactly what was said.  We just

4   need to know that we have to visit the households to

5   correct the deceptive practices that were engaged by

6   Vivint.

7       Q.   Okay.  And like -- one other point and then

8   we'll talk more about the FTC study.  How -- what -- in

9   the U-Haul vs. Pods case, you were able to quantify --

10  regardless of what exactly was said, you were able to

11  quantify the number of people that were exposed to

12  deceptive messages on the web pages by counting the page

13  views, correct?

14      A.   That's correct.

15      Q.   How did you quantify the number of customers

16  that were exposed to deceptive statements in this case?

17          MR. HOBBS:  Object to form.  Improper

18          hypothetical, misstates opinions.

19          THE WITNESS:  Well, since we weren't able to

20          get any information from your client, we didn't have

21          any information about how many Vivint cust- --

22          Vivint salespeople visited ADT clients.  Secondly,

23          we know -- and it's in my report -- that many more

24          people don't report problems than do.  And, so,

25          there's a significant multiplier, times the number

CONFIDENTIAL

Page 219

1          of people who were, in fact, exposed to the

2          deceptive practices.  And, so, it's definitely a

3          large number of people who were exposed to these

4          deceptive messages.  And, so, we have to rectify

5          that by going into the houses and educating the

6          people or re-educating the ADT customers.

7     BY MR. BROWN:

8          Q.   Other than saying it's a large number of

9     people, can you quantify the number of people who were

10    exposed to alleged deceptive practices by Vivint in this

11    case?

12               MR. HOBBS:  Same objection.

13               THE WITNESS:  I don't know the exact number of

14          people who were exposed, because of the lack of

15          information produced -- not produced by your client.

16          And also the fact that you can't always measure word

17          of mouth, how much people are talking to each other.

18          It's impossible to know.  And even some people who

19          are deceived, maybe they were happy with Vivint's

20          equipment and aren't going to complain at all.  So,

21          if you take it altogether, many, many, people need

22          to receive this information.

23    BY MR. BROWN:

24          Q.   Is -- the number of people that were exposed to

25    Vivint's deceptive conduct in this case, does that

CONFIDENTIAL

Page 220

1    impact the quantity of the damages that you have arrived

2    at in this case?

3        A.   We don't know the exact number of people who

4    were exposed to the deceptive messages.

5        Q.   And if you did know the number of people who

6    were exposed to the deceptive messages, would that

7    impact your opinions in this case as to the $27 million

8    number?

9        A.   Well, it would certainly be useful to know.  I

10   mean, we could use that as a starting point and try to

11   estimate how many people did not complain from the --

12   you know, the pyramid effect of complaints.  But, it

13   would be -- definitely be useful to know, yes.

14       Q.   And we know, from your prior testimony today,

15   that ADT tracks the number of people -- the -- that

16   leave ADT to go to particular competitors, correct?

17           MR. HOBBS:  Object to form.  Misstates

18       testimony.

19   BY MR. BROWN:

20       Q.   I'll rephrase.

21           Did ADT provide you any information based on

22   its tracking of customers that leave ADT to go to

23   Vivint?

24       A.   No.

25       Q.   Did you ask for that information?

CONFIDENTIAL

Page 221

1      A.   As I said earlier today, the exact number, or

2   the numbers leaving, is -- was not the point of what I

3   was trying to do.

4      Q.   It wouldn't impact your conclusion as to the

5   $27 million number?

6      A.   Even if I had the numbers from ADT, I had no

7   numbers from Vivint.  So, what -- what was I supposed

8   to do?  I had no -- I had -- we had insufficient

9   information to do what you think we ought to do.

10     Q.   All right.  Let's talk about this FTC study.

11  You're saying the basis for your opinion that the

12  remedial -- or -- not remedial, but the information

13  campaign needs to -- needs to be delivered, at least in

14  part, door-to-door, is an FTC study that says that the

15  deceptive message needs to be corrected in the same mode

16  that it was delivered.  Correct?

17     A.   It has to target the same customers and it has

18  to be delivered through the same medium or media in

19  which the deceptive message was delivered.

20     Q.   What have you done in this case to make sure

21  that the information campaign is targeting the same

22  customers that were visited by Vivint sales

23  representatives?

24     A.   Our analogy to that is just, all ADT -- ADT

25  customers who are vulnerable to the messages.  So --

CONFIDENTIAL

Page 222

1    Q.   But, you told me earlier today that, even if an

2    ADT customer has not yet been visited by a Vivint sales

3    representative that they are still a subject of your

4    information campaign?

5    A.   I don't see how that's inconsistent with what I

6    said.  I said that, if they're an ADT customer, then

7    they are in the set of people to be targeted, whether

8    they've been visited or not.  So, you're

9    mischaracterizing what I said, or getting it wrong.  One

10   or the other.

11   Q.   I think I misunderstand it.  Because, I thought

12   you just told me that one of the conclusions of the FTC

13   study was that you had to target the same customers that

14   had received the misinformation?

15   A.   Well, in this case, the -- all the ADT

16   customers are potential receivers of the misinformation.

17   So, that's my -- that's the basis for our analysis.

18   Q.   But, you told me earlier that, even if an ADT

19   customer had not been visited by Vivint, they're still a

20   subject of your information campaign?

21   A.   Yes.  That's because of the inoculation effect

22   that I've described.

23   Q.   Okay.  So, doesn't that go against what the

24   FTC -- FTC's study suggests?

25   A.   It's the same -- it's not the same customers,

CONFIDENTIAL

Page 223

1    it's the same target audience -- the same target
2    audience that is being focused on by the deceptive
3    campaign.  So, if they're going after, say, teenagers,
4    okay, it wouldn't necessarily just be teenagers who
5    received the message, it would be all teenagers who
6    could be possible receptors of the campaign.
7         Q.   Okay.  Is the FTC -- excuse me.  Is the FTC
8    study that you're referring to cited in your report?
9         A.   No.  But, I have it.  I'd be happy to send it
10   to you.
11        Q.   Why did -- why didn't you --
12        A.   I have it in my file.
13        Q.   -- have it in your report?
14        A.   It's just part of my background knowledge.
15   I -- I've been involved with this kind of thing for a
16   while.  I didn't put every -- as I told you at the
17   beginning of the deposition, I didn't put everything I
18   know in the source list or everything I've read.
19        Q.   Other than the FTC study that you didn't list
20   in your report, is there any other basis for your
21   opinion that the information campaign must be delivered
22   in the same mode, to the same customers, as the -- as
23   the deceptive statement was made in?
24        A.   I mean, that just makes sense, from a marketing
25   strategy standpoint.  That, if the deceptive campaign

CONFIDENTIAL

Page 224

1    is targeting a certain -- certain audience, through a

2    certain medium, it's just intuitive sense that you

3    should -- if there has to be a corrective campaign, it

4    should go to the same target audience using the same

5    media.  I mean, that's just, to me, you know, basic

6    marketing.

7         Q.   It's common sense?

8         A.   I don't know if I'd call it common sense, but

9    it may be just -- it may be basic marketing.

10        Q.   What -- is it -- so, you said that it's

11   intuitive.  Do you mean that it would be intuitive to

12   anyone?

13        A.   It would be intuitive to marketing managers who

14   have to execute these campaigns.

15        Q.   I'm going to direct your attention to

16   Paragraph 84 of Exhibit 1, which is your expert report.

17        A.   Okay.

18        Q.   In your first sentence, you say, "In my

19   opinion, ADT's efforts to mitigate the damage caused by

20   Vivint have been significant, though not sufficient to

21   repair the damage already done by Vivint."

22             Did I read that right?

23        A.   Yes, I see that.

24        Q.   What is your basis for the conclu- -- for that

25   conclusion?

CONFIDENTIAL

Page 225

1    A.   Which part of the conclusion?  The significant

2    part or not sufficient part?

3    Q.   Both.  What's your basis for your conclusion

4    that the efforts have been significant?

5    A.   Well, we already went through, in Paragraph 82,

6    the social campaign, the newsletters, et cetera.  So,

7    they have undertaken some efforts to mitigate the --

8    the deceptive information.  But, at the same time, the

9    practices continue.

10        Again, we don't know who Vivint is targeting,

11   because we don't have any information on customers that

12   they're calling on.  We know that they're -- as I said

13   before, there are customers that might -- that maybe

14   were deceived, maybe they're happy with Vivint and

15   they're not going to complain.  So, we just -- we just

16   don't know how many other people out there have been

17   deceived and -- and have not received or been affected

18   by the mitigation campaign.

19   Q.   What information did you use to reach the

20   conclusion that ADT's efforts to mitigate the damage

21   caused by Vivint have not been sufficient to repair the

22   damage?

23   A.   I'm using my judgment as a marketing expert as

24   to how effective those kinds of campaigns are.  I mean,

25   they're limited, they're useful.  But, people don't read

CONFIDENTIAL

Page 226

1    e-mails, people don't open direct mail.  The direct mail

2    open rate is extremely low, in the single digits.  All

3    these kinds of things make these programs less effective

4    than it can be.  So, there's still many people who are

5    not being reached by them.

6        Q.   What you just referred to were a bunch of

7    general pieces of information that aren't specific to

8    this case.  Did you rely on any specific data or

9    information related to this case to determine that ADT's

10   mitigation efforts have not been sufficient to repair

11   the damage?

12       A.   I don't know --

13           MR. HOBBS:  Object to form.

14           THE WITNESS:  -- what the reach rates are, or

15       open rates are, of those -- of those campaigns.  So,

16       I don't know all of the statistics associated with

17       those.  As I said, just from my opinion of these

18       kinds of campaigns, I know there are a lot of people

19       that aren't reached, as I said before.

20   BY MR. BROWN:

21       Q.   If you -- if you found out that the reach rates

22   of those campaigns were very high, would that impact

23   your analysis in this case?

24       A.   Well, I'd have to take a look at -- you know,

25   study, looking at how many people read the insert, how

CONFIDENTIAL

Page 227

1    many people opened the e-mails.  Any of the social media

2    kinds of -- like, the metrics, like, shares, or likes,

3    or things like that.  It might have an impact on -- on

4    how big a campaign is necessary.

5        Q.   Did you ask for any of that information in this

6    case?

7        A.   No, I didn't.

8        Q.   Why not?

9        A.   Because, my -- my -- my feeling is, based upon

10   all of the actions that Vivint continues to take, is

11   that there's still a lot of people that need to be

12   reached.  And this is happening -- continues to happen

13   in peoples' households and so we continue to need some

14   kind of remediation.

15       Q.   Did you do anything to quantify the impacts of

16   ADT's mitigation efforts, thus far?

17       A.   Well, I think you've already asked me that.

18   And my answer was, no.

19       Q.   Did you do anything to quantify what's left, in

20   terms of damages that need to be mitigated, to ADT's

21   brand?

22       A.   That's not going to be possible.  There's just

23   not enough information to be able to do that.

24       Q.   Dr. Winer, do you do academic research?

25       A.   Of course.  You've seen my CV, right?

CONFIDENTIAL

Page 228

1    Q.   I have.  What is the field -- I'm sure I can't

2    describe it as well as you -- what is the field of your

3    academic research?

4    A.   Well, there actually is several areas where I

5    conduct research, advertising effectiveness.  I've done

6    a lot of work modeling the effects of advertising on

7    household purchasing.  Done a lot of work on the effects

8    of price -- what we call psychological pricing, how

9    people react to price at point of purchase.  I've done

10   some research in general methodology, research

11   methodology.  So, a number of areas.

12   Q.   Is part of your research specific to -- to

13   quantifying the effective advertising?

14   A.   Yes.

15   Q.   Okay.  When you conduct your academic research,

16   do you apply the scientific method?

17   A.   Yes, I do.  For most cases, not all.  Let me

18   quantify that.  Not every paper is -- involves data

19   collection.  Some of them are just theory papers.  But,

20   the empirical papers, yes, I do.

21   Q.   Okay.  And when you conduct research using the

22   scientific method, you begin by stating a hypothesis.

23   Correct?

24   A.   Well, you begin by doing literature review, you

25   know, background kinds of reading, which then lead to

CONFIDENTIAL

Page 229

1    the generation of a hypothesis, which then leads to the

2    generation of -- or to data collection, which then leads

3    to testing the hypotheses and then drawing conclusions.

4        Q.   Okay.  And when you state a hypothesis, that is

5    a prediction you're making of -- of something in the

6    world?

7        A.   Yes.  Your -- your hypothesis is that

8    advertising has an effect on people and the no

9    hypothesis is that advertising has no effect.  Something

10   like that.

11       Q.   Okay.  And then, you test your hypothesis, I

12   think you said, by gathering data and seeing if that

13   data matches your hypothesis or not?

14       A.   Well, I wouldn't state it that way.  But, you

15   do collect data on some statistical analyses, test the

16   hypothesis, and see whether or not you accept the --

17   your hypothesis or reject it.

18       Q.   Okay.  If your hypothesis doesn't match the

19   data that you collect, do you still continue to put

20   forth that hypothesis?

21       A.   Well, it depends on the kind of study.  But,

22   sometimes, what you have to do is, you go back to the

23   drawing board, go back to the literature.  Find out, is

24   there something you missed?  Is there something more

25   complicated?  Maybe it's not just a simple effect.

CONFIDENTIAL

Page 230

1    Maybe it's what we call an interaction effect, some
2    other thing is affecting it.  So, you kind of go back
3    and do a little bit more research, a little bit more
4    reading, and find out, you know, am I really wrong or is
5    there something I missed?
6        Q.   So, you might, based on -- you know, it sounds
7    like you're cycling back to the beginning of the -- of
8    the analysis.  Is that right?
9        A.   That's often what people do with scientific
10   method.
11       Q.   And, so, you may then modify your hypothesis if
12   you need to.  Is that right?
13       A.   Yes.
14       Q.   And then you would conduct more testing of the
15   hypothesis, right?
16       A.   That's correct.
17       Q.   And I think you indicated that your -- this
18   type of research is empirical research.  Is that right?
19       A.   Yes.  It involves data collection.  I mean,
20   some -- some research is theoretical, where you're just
21   stating propositions or it's a literature review paper
22   or something that doesn't involve data collection.
23       Q.   But, imperative research has to do with
24   collecting data -- stating a hypothesis and then
25   collecting data, to see if that empirical information,

CONFIDENTIAL

Page 231

1    the data that you collect, matches what you have

2    hypothesized.  Is that right?

3        A.    That -- that is the classic scientific method.

4    There are other approaches to research, that -- that

5    people use.  They create case studies and try to draw

6    general conclusions from a number of case studies.  So,

7    the scientific method isn't the only approach to doing

8    research.

9        Q.    Okay.  But, it is an approach that you use when

10   you're doing empirical research?

11       A.    Well, not exclusively.  But, I do use it a lot,

12   yes.

13       Q.    Okay.  Do you apply that same method -- I think

14   we've talked about a few different examples today of

15   litigation cases that you're -- you have been involved

16   in, correct?

17       A.    That's correct.

18       Q.    Do you apply -- the scientific method, as

19   you've described it, for your empirical research, do you

20   apply that same method in the litigation projects that

21   you're involved in?

22       A.    Well, generally, the litigation projects are --

23   are quite different.  You're not always -- you're not

24   necessarily testing hypotheses.  And sometimes you have

25   to use science, but not necessarily the scientific

CONFIDENTIAL

Page 232

1    method.

2         So, for example, in the present litigation, you

3    know, we're not using the classic scientific method, but

4    we are using a scientific approach.  We built a model

5    based upon the assumption of a certain number of people

6    that need to be exposed to the -- to the personal

7    message and we quantified it using data that we're able

8    to collect and came up with a number.  So, there's

9    science there, but it's not always the scientific method

10   that's used in the litigation studies.

11        Q.   Well, let's look at the conclusion you reached

12   in Paragraph 84.  That the mitigation efforts that ADT

13   has conducted thus far are not sufficient to repair the

14   damage done by Vivint.  If we take that and if we start

15   with that as a hypothesis, I assume you don't just go

16   straight to assuming that's true, correct?  You have to

17   start with it as a hypothesis, right, that the -- you

18   might assume that the efforts were not sufficient to

19   repair the damage done by Vivint.  That would be a

20   hypothesis, correct?

21        A.   There are actually two hypotheses in this one

22   sentence.  One could be, ADT's efforts to mitigate the

23   damage caused by Vivint have been significant.  That

24   could be a hypothesis.

25        Q.   Okay.

CONFIDENTIAL

Page 233

1     A.   A second hypothesis could be that the damage to

2  ADT's brand is still significant.  I don't know, I'm

3  wordsmithing on the fly.  But, what I'm saying is, there

4  could be a second hypothesis here.

5     Q.   Okay.  Let's -- let's focus on that second

6  hypothesis.  Can you state it for me again what the

7  second hypothesis would be?

8     A.   There was still significant damage to the ADT

9  brand caused by Vivint's deceptive actions.  That would

10  be Page 1.  The alternative would be, if not, it would

11  be the -- the null.  The negative of that.

12     Q.   In other words, there's not damage left?

13     A.   Correct.

14     Q.   Okay.  And what did you do to test those two

15  hypotheses and which is actually true?

16     A.   I didn't test those hypotheses.  As I said

17  before, there is insufficient data to be able to test

18  them.

19     Q.   Did -- did you try to obtain data that you

20  could use to test them?

21     A.   Well, as I -- as I've also said before, a good

22  chunk of the data would come from Vivint, which we've

23  been unable to obtain.  So, there's just not enough

24  information out there, so we had to take a different

25  approach.

CONFIDENTIAL

Page 234

1          Q.   Okay.  The -- what -- so, what is the different

2     approach that you took?

3          A.   It's the approach that we described -- I

4     described in the -- in the report.

5          Q.   Okay.  And what is that approach that you took

6     instead of testing those hypotheses?

7          A.   We started with --

8               MR. HOBBS:  Object to form.  I don't know if

9          the -- (unintelligible).

10              COURT REPORTER:  I -- I can't hear you.

11              THE WITNESS:  I couldn't hear.

12              MR. HOBBS:  Object to form.

13              THE WITNESS:  Well, it's the same approach that

14         we've done -- used in several -- several cases.  We

15         start with the assumption that people -- in this

16         case, ADT customers -- need to be communicated with

17         face-to-face, all right?  So, we started with that.

18         Then, we count, well, how many -- how many ADT

19         customers are there, all right?  Well, I think, from

20         my recollection, there's six million.  Well, it's

21         unrealistic to develop a program to reach six

22         million customers in their individual homes.  So,

23         we took a more conservative approach and instead

24         took the top 20 percent.  Looked at the distribution

25         of ADT customers in different cities, took the top

CONFIDENTIAL

Page 235

1       20 percent of the cities, which resulted in about

2       750,000 customers and developed a plan to reach them

3       individually, and the plan to reach the other

4       88 percent would be using a more conventional media.

5   BY MR. BROWN:

6       Q.   And what is the more conventional media?

7       A.   Direct mail, e-mail campaign, and social media

8   posts.

9       Q.   And those other methods are much less

10  expensive, correct?

11      A.   That's correct.

12      Q.   And why -- why did you decide to go against the

13  FTC study that you have touted to me?  Why did you

14  decide to go against that study and say, well, we're

15  supposed to reach the same customers in the same mode,

16  but in this case we don't have to reach all the

17  customers.  Why -- why did you make that determination?

18          MR. HOBBS:  Object to form.  Misstates

19      testimony.

20          THE WITNESS:  Well, I tried to be realistic.

21      To reach six million ADT customers and multiply it

22      by the cost of doing that would result in a number

23      that is high, put it that way.  It would be, I don't

24      know, $500 million.  I don't know exactly what the

25      number is, but not realistic.  Not realistic.

CONFIDENTIAL

Page 236

1    BY MR. BROWN:

2        Q.   Would it be not a realistic -- would it be --

3    would it cost more than ADT's brand had been damaged?

4        A.   Well, this was my estimate of the damage to the

5    ADT brand.  So, what we did was, we said, well, you

6    know, the damage to the brand takes place in the house.

7    So, we go to the house, communicate with them, to try to

8    repair the damage.  So, this is in effect what we think

9    the damage to the ADT brand is.

10       Q.   Okay.  I -- I'm going to get back to how we

11   value that, what the brand damage is.  But, first I'd

12   like to take you to Figure 3 of Exhibit 1.

13       A.   Um-hum.

14       Q.   This is what you were referring to when you

15   made the decision to target just the top 20 cities where

16   ADT has customers, correct?

17       A.   That's correct.

18       Q.   So, you've got a -- what you call a histogram

19   here, where you lay out the top 20 cities where ADT has

20   customers, correct?

21       A.   That's correct.

22       Q.   Why did you choose 20 cities?  Why not seven

23   cities?

24       A.   Well, we wanted to be able to reach enough

25   people where not only are we reaching the people, but

CONFIDENTIAL

1    we're also going to be able to facilitate maybe

2    spreading more information through word of mouth.  It

3    was a balance between reaching enough people and

4    spreading it out too much and getting an extremely high

5    number.  So, it was my judgment that this would provide

6    the balance.  It was a judgment call.

7        Q.   What data did you use to reach that balance

8    determination?

9        A.   Well, I think we -- we tried to look at

10   distribution, again, of the customers over the cities.

11   And as you can see from the histogram, you can see that

12   there are -- the two top cities are Chicago and Houston

13   in the system.  And then, we just look at the pattern

14   and we provided the information in one of the exhibits

15   in the back.  And, again, I just used my judgment to try

16   to balance getting the message out to enough people

17   while keeping the cost at a reasonable number.  So, it

18   was my judgment, as I said before.

19       Q.   And was that judgment informed by the shape of

20   this histogram?

21       A.   Yes, it was.

22       Q.   So, if we look at this histogram, after we

23   get to -- to -- after we get past Orlando, and we get

24   into Phoenix, Philadelphia -- excuse me, Phoenix,

25   Indianapolis, Philadelphia, Jacksonville, Columbus, it

CONFIDENTIAL

Page 238

1    seems like there's a bit of a plateau that occurs in

2    this section of the histogram.  Is that a fair

3    description?

4         A.   Yes.  I wouldn't disagree that it does

5    seemingly flatten out at Columbus, to some extent.

6         Q.   So, did you consider just using the top

7    seven -- Houston, Chicago, San Antonio, Miami, Los

8    Angeles, Las Vegas, and Dallas, I think that's the top

9    seven -- before that plateau starts to occur?

10        A.   Yes, we did consider alternatives.  You know,

11   we looked at fewer cities, we looked at more cities.

12   And as I said, we talked about it.  We talked about it

13   with GBX people and we thought that this was a

14   reasonable balance, as I said before, between trying to

15   get the message out to enough people, but not getting a

16   ridiculous number at the end of the day.

17        Q.   Did you do a -- did you actually do a

18   calculation, or did anyone that you know of do a

19   calculation based on just choosing the top -- fewer --

20   based on using fewer of the 20 places?

21        A.   Yeah.  We did a sensitivity analysis of

22   stopping somewhere -- somewhere where you point out

23   and -- versus, adding cities.  And as I said, we just

24   developed a -- kind of a middle ground.

25        Q.   What was the alternative -- what was the

CONFIDENTIAL

Page 239

1   conclusion of that alternative analysis where you looked

2   at fewer cities?

3       A.   Well, it would have been a smaller number,

4   obviously.

5       Q.   Do you remember what the number was?

6       A.   No, I don't remember.

7       Q.   Less than 27 million?

8       A.   Huh?

9       Q.   Less than 27 million?

10      A.   Less than 27 million.

11      Q.   And would that be a plausible analysis?  If

12  another expert did that kind of analysis and chose, you

13  know, say, seven cities, or some number fewer than 20,

14  and worked out the calculations in the same way you did,

15  but used a fewer number of cities, would that also lead

16  to a reasonable estimate of what the damages might be in

17  this case?

18      A.   Well, I think -- I'm not going to rule out the

19  possibility that another expert might choose another

20  stopping point.  They could choose one that's -- that's

21  further to the right.

22      Q.   Right.

23      A.   They could choose one further to the left.  So,

24  I -- I don't know what the answer is other than saying

25  another expert could come up with a different answer,

CONFIDENTIAL

Page 240

1    sure.

2         Q.   What would you tell that other expert that

3    wanted to use fewer cities, to tell them that their

4    analysis is not as good as your analysis?

5              MR. HOBBS:  Object to form.

6              THE WITNESS:  I would never say it's not as

7         good.  I would just say it's different.

8    BY MR. BROWN:

9         Q.   Okay.  So -- so that -- a different analysis

10   that another expert might do, based on fewer cities, may

11   also lead to a plausible estimate of damages in this

12   case?

13        A.   But, they might also have more cities.  So,

14   if you added the ones -- the ones that come after

15   Washington -- is it Washington?  Yes.  If you added

16   some cities that come after Washington, maybe the other

17   expert would say we need to reach more households

18   face-to-face.  I'm not going to say what that other

19   expert or other experts might do.

20        Q.   Can you say any more about why you chose 20?

21        A.   As I said, I thought it was a reasonable

22   balance between the number of households reached and --

23   and the damages amount.

24        Q.   Okay.

25              MR. BROWN:  I think we're at a good stopping

CONFIDENTIAL

Page 241

1          point and need to change the media.

2               THE WITNESS:  Okay.

3               MR. BROWN:  Let's go ahead and take a break at

4          this point.

5               VIDEOGRAPHER:  All right.  Stand by, please.

6          This is the end of Media Number 5 in the testimony

7          of Dr. Russell Winer.  We're now going off the

8          record, and the time being 6:45 p.m., Eastern.

9               MR. BROWN:  Okay.  I can do -- let's do -- if

10         you don't mind let's do 10 minutes.  We can do 10

11         minutes here and that will help me get organized, as

12         I think we're in our last push, here.

13              MR. HOBBS:  Yeah.  And how much time do we have

14         left on the seven hours?

15              MR. BROWN:  Well, after the last break, we

16         had --

17              VIDEOGRAPHER:  We're at 364 minutes right now.

18              MR. BROWN:  Okay.

19              MR. HOBBS:  So --

20              VIDEOGRAPHER:  Just under an hour.

21              MR. HOBBS:  So, back in five minutes is

22         alright?

23              MR. BROWN:  I said, 10, please.

24              MR. HOBBS:  Yeah.

25              (Whereupon, a recess was held at 6:45 p.m., and the

CONFIDENTIAL

Page 242

1        deposition resumed at 6:57 p.m.)

2            VIDEOGRAPHER:   This is the beginning of Media

3        Number 6 in the testimony of Dr. Russell Winer.

4        We're back on the record.   The time is 6:57 p.m.,

5        Eastern.

6    BY MR. BROWN:

7        Q.    Okay.   Dr. Winer, I want to go to some of the

8    exhibits to Exhibit 1 of your report.   Well, first of

9    all, going back to the figures.   So, on Page 42 of your

10   report, Figure 2, can you tell me who created Figure 2

11   of your report?

12       A.    GBX did, under my direction.   It was my --

13   my -- my idea to find out where the 250 ADT customers

14   who had created the WAV files -- where they lived.

15       Q.    And then, you -- so, you directed GBX to shade

16   in all of the states where the 250 ADT customers that

17   you indicated are represented by the over 1,300 ADT

18   calls that we've been talking about today?

19       A.    That's correct.

20       Q.    Did you do anything to verify the information

21   that was produced by GBX?

22       A.    No, I did not.

23       Q.    Other than directing them to create Figure 2,

24   did you have any involvement in the creation of

25   Figure 2?

CONFIDENTIAL

Page 243

1      A.   No.

2      Q.   How about Figure 3?  Who created Figure 3,

3  which is Page 45 of Exhibit 1?

4      A.   Yes.  Again, GBX at -- at my direction.  I

5  suggested looking at a histogram of the ADT customers

6  to help us determine how many in-home visits to do.

7      Q.   And did you tell them the number of cities to

8  look for?

9      A.   No.  If you look in -- I don't remember the

10 exhibit number, but one of the exhibits has all -- has

11 many cities in it.  Exhibit 4 has down to Chesapeake,

12 which has 8,457 customers.  So, all the cities are in

13 Exhibit 4.

14     Q.   Okay.  And who was involved in the

15 discussion -- you mentioned earlier that you considered

16 different numbers of cities to focus on.  Who was

17 involved in the discussion where you were discussing the

18 number of cities that you should use?

19     A.   I did it with my team at GBX, with Mark and

20 maybe some other people.  I don't remember who exactly.

21 But, it was a joint decision.

22     Q.   Do you remember anyone else being in the room

23 besides Mark?

24     A.   I know he has some people that work -- work

25 with him.  I don't remember who exactly was in the room

CONFIDENTIAL

Page 244

1  at the time.

2      Q.   Was anyone from ADT in the room?

3      A.   No.

4      Q.   How about ADT's counsel?

5      A.   They're always -- either Eric or Charlie Eblen

6  are always there.

7      Q.   Okay.  And did they give any input on the

8  number of cities -- did -- did any of the attorneys from

9  Shook, Hardy & Bacon give any input on the number of

10  cities that should be used?

11      A.   No.  Not at all.

12      Q.   Did you share with them the results of your

13  alternative analyses that you had done, including what

14  the damages would be if you use the alternative

15  analyses?

16      A.   Well, as I said, they were on every -- somebody

17  was on every meeting.  So, when we did the alternative

18  analyses, somebody was there.  I don't know which --

19  which attorney from Shook was there.

20      Q.   Do you have -- obviously, they didn't make it

21  into the report, but did you ever write up any of these

22  alternative analyses that GBX did?

23      A.   No.

24      Q.   They don't exist anywhere in any kind of fixed

25  form?

CONFIDENTIAL

Page 245

1       A.   I mean, you could almost do it in -- you know,

2   in your head, you know, the way it is.  But, no, I

3   don't -- I haven't written it up.  I don't have any

4   notes or anything.

5       Q.   Do you have any spreadsheets that relate to

6   those analyses?

7       A.   I don't have them.  It's possible that GBX

8   people do, but I don't.

9       Q.   How about Figure 4?  Who created Figure 4?

10      A.   Who created Figure 4?  It's just a -- just a

11  table with numbers in it.  I did not -- I'm not good

12  at -- I'm pretty good at typing in Word, but I'm not too

13  good at figures, so I believe somebody from GBX must

14  have done that.

15      Q.   Okay.  Did you direct them on how to -- what

16  information should be in Figure 4?

17      A.   Oh, yes.  For sure.

18      Q.   Okay.  So, what was your direction to them?

19      A.   Well, the direction was, try to figure out,

20  first of all, how many salespeople would be needed to

21  cover the 750,000 customers.  We made some assumptions.

22  We assumed eight customer visits per day, assumed a

23  three-month campaign, and that got us to the sales

24  representative force.  It's pretty simple division.

25      Q.   What -- what led you to choose eight customer

CONFIDENTIAL

Page 246

1    visits per day?

2        A.   Well, we talked about it.  How many -- how

3    many houses do we think a representative could visit,

4    on, say -- I wouldn't say eight hours.  I don't remember

5    the exact discussion.  I don't think you would want to

6    get a sales call at 9:00 in the morning.  But, you know,

7    a reasonable number of hours -- maybe 10:00 or 11:00 to

8    5:00 p.m. -- in a neighborhood, assuming they're in a

9    neighborhood.  How many of these visits could they make,

10   and spend maybe a half-hour, or a certain amount of

11   time, with each one of them, talking about the issues,

12   and warning them -- warning them about Vivint's

13   practices -- Vivint's practices and doing this on an

14   individual basis, trying to find out if they had any

15   prior experience with Vivint or not.  So, it was a

16   very -- pretty customized.  It's -- it's very -- very

17   individual.

18       Q.   Well -- so, would these be -- these visits to

19   the customers' residences, I think you -- you testified

20   earlier, based on the FTC study, that the mode should be

21   similar to the mode in which the deceptive practices

22   occurred.  But, these sound longer than the sales calls

23   that -- that you've been discussing.  I think, at one

24   place in your report, you say that sales calls could

25   last just seconds.  Is that right?

CONFIDENTIAL

Page 247

1      A.   I don't recall that.  Can you point it out?

2      Q.   Maybe it was something you testified to.  You

3   testified that some sales calls lasted seconds or

4   minutes, I believe.

5      A.   I don't see how a sales call could last

6   seconds, to be honest, but -- anyway, I -- I can't

7   respond to that.

8      Q.   Okay.  Well, would these sales -- these visits,

9   as part of your information campaign, would you expect

10  them to be longer than -- than sales calls --

11     A.   Oh, yeah.

12     Q.   -- conducted?

13     A.   I think, the length of a sales call would be

14  highly variable.  I mean, a sales call, somebody could

15  come in and be dismissed.  Or, as we saw in the Ring

16  Doorbell one, not even get in the front door.  So, it

17  could be -- could be short.  If the person gets in, is

18  persuasive, if the panel has to be replaced or even new

19  equipment put in, it could be -- could be longer.  So, I

20  think, the -- the variance around these calls, that I'm

21  recommending, would be much lower than it is around a

22  sales call.

23     Q.   Did you ask ADT for any information about the

24  number of customers a visit -- an ADT dealer, sales

25  representative, was able to reach in a particular day?

CONFIDENTIAL

Page 248

1      A.    No.  We just estimated how long these

2   particular calls would take, allowed for some travel

3   time around the neighborhood, lunch, that kind of thing,

4   and estimated they could do eight.  Again, they're not

5   sales calls, so they would be very different from what

6   a dealer would say they would do on a sales call.

7      Q.    So, how are they different than sales calls?  I

8   think you indicated -- I think you chose the -- well,

9   here, you say, sales representative force, 1,036.

10  That's the number of people -- you call them sales

11  representatives, don't you?

12     A.    Yeah, that's the way they're labeled.  But,

13  they're not doing any selling.  The idea here is purely

14  informational.  It's sort of a -- again, very -- sort of

15  customized.  They would have an interview scheme set up.

16  They would ask them, first, have they been called by a

17  Vivint salesperson?  If so, you know, what did the

18  salesperson say?  Not every Vivint sales call

19  necessarily is deceptive.  I'm not saying that.  And if

20  they have any --

21     Q.    If the person -- let me cut you off there.  If

22  the person says they haven't been visited by a Vivint

23  salesperson, does -- does the information campaign

24  person walk away at that point?

25     A.    No.  I mean, as I said earlier in the

Page 249

1   deposition, there's still the inoculation part of it,

2   right?  That -- what they would do is say that Vivint

3   has a history and has also demonstrated that they

4   would -- or, they could provide misleading information,

5   sometimes, or half-truths, untruths.  And that they

6   should -- they should be aware of that.  That, if

7   anybody calls from -- from Vivint, don't necessarily --

8   don't let them change your equipment, don't listen to

9   them, if they say, well, ADT has been acquired by

10  Vivint.  And --

11       Q.   Would part of --

12       A.   And contact customer -- a customer service at

13  ADT and let them know.  So, maybe a half-hour.

14       Q.   Okay.  So, would the -- would the information

15  that they -- that the -- well, first of all, the people

16  who are visiting -- doing these door-to-door visits, are

17  they ADT employees?

18       A.   Yes.  I think sales representative force is a

19  bit of a misnomer.  I don't -- I can't think, right now,

20  off the top of my head, what to call them.  But, they're

21  not going to do any selling.

22       Q.   But, you based the damages estimation on the --

23  the salary for a sales representative, didn't you?

24       A.   Well, that's because there is no such person at

25  ADT, right now, for doing what we want to do.  In fact,

CONFIDENTIAL

Page 250

1    we used $194, which is very conservative, which is the

2    cost of a first-year salesperson.  So, we were

3    conservative on that number.

4         Q.    Yeah.  But -- so -- but, salespeople usually

5    work on commission.  Are these people going to be

6    working on commission?

7         A.    No, this is salary.

8         Q.    So, you're basing the -- the cost on what it

9    would cost for the salary of a salesperson, correct?

10        A.    That's correct.

11        Q.    Are you -- are the people who are -- these ADT

12   employees that are going door-to-door, are they allowed

13   to make sales, as part of their visit?

14        A.    Well, you know, I haven't gotten to the detail

15   of writing an exact script for them.  But, our

16   conceptualization of this would be -- the answer would

17   be, no.

18        Q.    They'll be prohibited from making sales?

19        A.    Well, look, if one of the -- if one of the

20   customers they're talking to says, I need a new -- a new

21   panel, or something like that, then the salesperson --

22   or the person would jot that down and maybe provide that

23   information back to the district office.  But, the

24   purpose of this is not -- not to make a sales call.

25        Q.    What -- what if the person they approach is no

CONFIDENTIAL

Page 251

1    longer an ADT customer and is now a Vivint customer.

2    Would they then be allowed to sell them ADT?

3         A.   Well, they're only going to be working off an

4    ADT customer list.

5         Q.   Well, what if the customer list is not up to

6    date and the -- and the person they visited has, since

7    the customer list was generated, moved to Vivint?

8         A.   The intention is not to get Vivint customers to

9    switch to ADT or back to ADT.  So, I would say that

10   they'll just say, thank you, and go to the next one.

11        Q.   So, if they -- if the person that they approach

12   is not an ADT customer, they'll walk away?

13        A.   That's my conceptualization of this process.

14        Q.   But, if the person is an ADT customer, even if

15   they've never been visited by Vivint, then there's still

16   more discussion to be had?

17        A.   Correct.

18        Q.   And as you've described, you -- you would then

19   perform the inoculation?

20        A.   That's correct.

21        Q.   Okay.  Is there going to be a script that these

22   people are supposed to follow?

23        A.   There's always a script with people like this.

24   I mean, they're not going to have it in their hands.

25   But, yes, there's going to be -- because, there's going

CONFIDENTIAL

Page 252

1    to be what we call, branches, you know?  If they say

2    this, then do this.  If they say something else, do

3    something else.  So, yes, there will have to be

4    training.  In fact, we have a budget in there for

5    training, $1,500 for recruiting and training cost,

6    per employee.  And part of that training will be on the

7    script.

8         Q.   Would the people be able to say negative things

9    about Vivint?

10        A.   Well, if they've been visited by Vivint, and

11   they've been -- had been deceived or, what they felt,

12   you know, lied to or created confusion, yes, they will

13   say some negative things about Vivint.

14        Q.   What if -- what if the person -- what if the

15   ADT person says, I've never been visited by Vivint.

16   Will the salesperson who's visiting them still say

17   negative things about Vivint?

18        A.   Well, that's the inoculation, right?  That

19   Vivint has been visiting some -- has been visiting some

20   ADT clients and been saying that, we've acquired ADT.

21   We've got an arrangement with them to swap out -- you

22   know, whatever the line happens to be.

23        Q.   Okay.  And let's say the ADT customer says, I

24   have been visited by Vivint, but they didn't say

25   anything deceptive to me.  Does the sales call end or do

CONFIDENTIAL

Page 253

1      they still need to be inoculated?

2          A.   I would say they would still need to be

3      inoculated.  But, it would be a different -- it would --

4      it's the inoculation talk, it's not the, you've been

5      deceived by Vivint talk.

6          Q.   What if the -- what if -- what if the

7      customer -- well, so, how many different branches of

8      this script is there going to be?

9          A.   I don't know.  As I said, I didn't write it

10     out.  It's not in -- it's not in the report.  I'd have

11     to give it some thought.  So, I'm not going to -- I'm

12     not going to say anything off the top of my head, right

13     now.

14         Q.   When are you going to give it more thought?

15     Before trial?

16         A.   I don't plan to -- to present -- I don't -- I

17     don't plan to present the presentation at trial, no.

18         Q.   How -- how -- how will the visits be -- will

19     the visits be coordinated with the other portions of the

20     information campaign?  And -- well, first of all, will

21     the people who are receiving door-to-door visits, will

22     they also receive other communications?

23         A.   No, they won't receive -- the 88 percent --

24     12 percent receive the in-home, 88 percent receive the

25     e-mails, direct mail, social media.

CONFIDENTIAL

Page 254

1      Q.   How will you be able to tell if the information

2   campaign is successful?

3      A.   Well, you can follow up.  What I would

4   recommend -- although it's not in the report -- is, you

5   follow up with interviews, or a survey of some type, to

6   see whether or not, you know, it's -- it's helped them.

7      Q.   Is -- is that part of your information

8   campaign?

9      A.   No.  It's not in this -- it's not in this

10   budget.

11      Q.   What if you did that analysis now?  Would you

12   perhaps determine that the campaign isn't needed or the

13   same scope of campaign isn't required?

14      A.   Well, you can't get at the nuances of these

15   personal interactions with a survey.  I mean, first of

16   all, survey response rates are very low.  And, secondly,

17   what happened between a Vivint salesperson and the

18   customer is something that is very hard to characterize

19   with a survey.  So, I don't think that a survey would be

20   very appropriate here.

21      Q.   Okay.

22      A.   Prior -- prior -- as you said, prior to the

23   campaign.

24      Q.   I'm going to direct your attention back to

25   Exhibit 1 to the deposition.  I'm now looking at

CONFIDENTIAL

Page 255

1    Exhibit 1 of Exhibit 1, which is entitled, ADT Media

2    Spend.  It appears to be an e-mail chain from a Shannon

3    Hendrickson to Dan McGrath.  Who is Shannon Hendrickson?

4         A.   She's the Chief Marketing Officer, ATT -- ADT.

5         Q.   She's ADT's Chief Marketing Officer?

6         A.   Yes.

7         Q.   How long has she --

8         A.   Actually, technically, Vice-President of

9    Marketing.

10        Q.   How long has she held that position?

11        A.   I have no idea.

12        Q.   Did you speak to her in relation to this case?

13        A.   Yes, I did.

14        Q.   When did you speak to her?

15        A.   I don't know the exact date.  It's in a

16   footnote.

17        Q.   Who is Dan McGrath?

18        A.   Dan McGrath is General Counsel and the

19   Vice-President Deputy General Counsel.

20        Q.   So -- so, in this e-mail chain, Dan McGrath is

21   sending some information to Shannon Hendrickson about

22   ADT media spends, correct?

23        A.   Yes.  This is just a -- their estimate of how

24   much they -- well, her estimate of how much they spend

25   on TV each year and how much they spend on print.

CONFIDENTIAL

Page 256

1      Q.   Okay.  Do you know where this information in

2  the body of Dan McGrath's e-mail came from?

3      A.   You mean, those numbers?  The 45 million and

4  48?

5      Q.   And the 93, yes.  The 45 million and the 48.

6  The 93 is 45 plus 48, correct?

7      A.   Yes.  It came from Shannon Hendrickson.

8      Q.   Well, but here Dan is sending them to Shannon?

9      A.   I'm sorry.  Could you repeat that?  I didn't

10  hear that clearly.

11      Q.   In this e-mail from Dan McGrath, dated

12  August 6th, 2021, at 1:47 p.m., Dan McGrath is sending

13  this information to Shannon Hendrickson.  So, my

14  question is, where did Dan McGrath get the information?

15      A.   Well, if you read above what you've

16  highlighted, it says -- Dan McGrath is writing Shannon,

17  "We're wrapping up our expert report.  On this piece

18  of our damages case, you made the following statements

19  in an earlier e-mail."  So, it came from

20  Shannon Hendrickson.

21      Q.   Do you have a copy of the earlier e-mail?

22      A.   This is the only e-mails I have.

23      Q.   Okay.  Do you know where Shannon Hendrickson

24  developed that information?

25      A.   Well, as the Vice President of Marketing, I

Page 257

1     assume she knows what their advertising budgets are.

2     So, she must just know them off the top of her head.

3          Q.   Do you know -- did you ask her for copies of

4     the advertising budgets?

5          A.   No.  I -- we took this as a given that she

6     knows what they are.

7          Q.   Did you do anything to verify that the

8     information she gave you was correct?

9          A.   No.

10         Q.   Let's go to Exhibit 2.  This one, we've talked

11    about.  Let's go to Exhibit 3.  Okay.

12              So, we're now at Page 114 of the PDF page

13    number for Exhibit 1 to the deposition, which is,

14    Exhibit 3, ADT Customer Initiatives.

15         A.   Yes, I have it.

16         Q.   Okay.  Where did the information in Exhibit 3

17    come from?

18         A.   Well, this is the supporting documentation for

19    that paragraph that we went through on the mitigation

20    efforts.

21         Q.   So, this is a description of the mitigation

22    efforts that ADT undertook already?

23         A.   Paragraph 82, that we already went through.

24         Q.   I'm asking you.  This is the description of the

25    mitigation efforts that ADT already undertook in

CONFIDENTIAL

Page 258

1    relation to Vivint's alleged misconduct?

2        A.   That's correct.

3        Q.   Okay.  And where did you get this information?

4        A.   I believe we got it from Shannon Hendrickson.

5        Q.   To your knowledge, who created this document?

6        A.   I didn't hear you.  Could you say it again?

7        Q.   To your knowledge, who created Exhibit 3?

8        A.   I don't know for sure.

9        Q.   Do you know what data was used to pull together

10   Exhibit 3?

11       A.   You say, what data was used for this exhibit?

12       Q.   Yeah.  What -- do you know what source

13   documents -- Exhibit 3 appears to be a couple of tables

14   that summarize information about what was done.  Do you

15   know what source documents were used to create these

16   tables?

17       A.   No, I don't.

18       Q.   Do you know where the information that's

19   presented here came from?

20       A.   As I said before, it's either from

21   Shannon Hendrickson herself or from her marketing

22   department at ADT.

23       Q.   Did you talk to anyone at the marketing

24   department of ADT about any of these initiatives?

25       A.   No, I did not.

CONFIDENTIAL

Page 259

1          Q.   Did you request any back-up for Exhibit 3?

2          A.   No.

3          Q.   Did you do anything to verify the information

4     in Exhibit 3?

5          A.   No.

6          Q.   Let's go to Exhibit 4.  This is the -- the city

7     counts that you referred to earlier.  So, we have here

8     a list of cities that's sorted by the number of ADT

9     customers in that city.  Is that right?

10         A.   Correct.

11         Q.   So, the first column is the number of ADT

12    customers in -- or, excuse me, the first column is the

13    name of the city, the second column is the number of ADT

14    customers in that city?

15         A.   Yes.

16         Q.   And what's the third column?

17         A.   It's a cumulative count.  Which, you get

18    from --

19         Q.   Who --

20         A.   I'm sorry.  You get -- you get from adding

21    the -- all the previous numbers together.

22         Q.   Okay.  Do you know who put this data together?

23         A.   I believe it was GBX.  Because, this is our

24    analysis that we used for the -- for the report.

25         Q.   Do you know who at GBX put this together?

CONFIDENTIAL

Page 260

1      A.   No, I don't.

2      Q.   Do you know where the data -- the underlying

3   data came from?

4      A.   Well, they must have gotten it from ADT.

5      Q.   Do you know where they got it from ADT?

6      A.   No, I don't.

7      Q.   Did you do anything to verify the accuracy of

8   the information in this exhibit?

9      A.   No, I did not.

10     Q.   Do you know why they included a column for

11  cumulative?

12     A.   Yes.  Because, if you take a look back at

13  Figure 4, the graph has a histogram of the number of --

14  of customers in each city and it also has a cumulative

15  curve that represents the total.  And that was again

16  what we looked at, to try to balance the total number of

17  customers that we would visit with the total expense of

18  visiting individual households.

19          So, it gives you an idea of, as you're going,

20  you know, down the city, with the number of -- number

21  of customers, how many total customers are being

22  considered.

23     Q.   So, as you're going down the list, you always

24  know how many total customers you would be at if you cut

25  the list off at that point?

CONFIDENTIAL

Page 261

1      A.   Correct.

2      Q.   So, if you wanted to get to, say, three

3   quarters of a million customers, and you have this

4   cumulative column, you could quickly see, oh, okay, all

5   I need to do is get to Washington, and I'll be at three

6   quarters of a million customers?

7      A.   That's what --

8      Q.   Correct?

9      A.   That's what cumulative curves do, yes.

10     Q.   Okay.  And if your goal in putting this

11  information together was to get to a certain number

12  of customers to visit, this would be an easy way to

13  determine that quickly?  By having this cumulative

14  count, we could quickly say, if I want to get to

15  750 million customers, as I run down this, I'll know

16  when I get there?

17     A.   Well, 750,000, yes.

18     Q.   Yeah, I'm sorry.  750,000?

19     A.   I think they wish it was 750 million.

20     Q.   Who wishes?

21     A.   ADT wishes they had 750 million customers.

22     Q.   Okay.  All right.  Let's go on to the next

23  exhibit.  Exhibit 5, Daily Compensation.  This appears

24  to be an e-mail exchange between Dan McGrath and

25  Mark Pelofsky.  Now, Mark we talked about earlier.

CONFIDENTIAL

Page 262

1    Dan McGrath is the General Counsel or one of the General

2    Counsels of ADT?

3        A.   He's the Vice-President and Deputy General

4    Counsel.

5        Q.   Okay.  And Mark Pelofsky is one of the

6    principals at GBX?

7        A.   Correct.

8        Q.   Do you know who Kritika Kuppuswami is?

9        A.   Yes.  She works at GBX.

10       Q.   How about Charlie Eblen?

11       A.   He's an attorney at Shook.

12       Q.   And Eric Hobbs is the attorney that's

13   representing ADT on the line now, correct?

14       A.   Correct.

15       Q.   Okay.  What was -- what is -- what information

16   is being communicated in this e-mail?

17       A.   Well, to be able to come up with the total

18   amount of the remedial campaign, one of the inputs has

19   to be how much each one of these ADT representatives

20   would be paid when they call on the customers.

21            So, we -- we -- as you can see in the table

22   there, we actually took a fairly conservative view of

23   that and took the lowest number, based upon people who

24   were in their jobs less than one year.

25       Q.   So, in this salary, the average annualized

CONFIDENTIAL

Page 263

1    compensation -- this is the average annualized

2    compensation for an ADT salesperson who's been in their

3    job for less than a year?

4         A.   Right.

5         Q.   Okay.  Is this person -- these ADT

6    salespersons, are they normally people who go

7    door-to-door to customers?

8         A.   I don't know how they deploy their sales force.

9    I know they have district offices.  Maybe people go into

10   the office and some of them work in the office, some of

11   them may call door-to-door.  I don't know exactly how

12   ADT does it.

13        Q.   Okay.  At one point, you indicate that one

14   reason you found your analysis to be conservative is

15   that you did not take into account the fact that ADT's

16   field staff turned over at an approximate rate of

17   64 percent a year, correct?

18        A.   Correct.

19        Q.   That's in Paragraph 110 of your expert report?

20        A.   Let me just double-check that, please.  Yes.

21   In the first year, that's correct.

22        Q.   Okay.  How many of -- well, first of all, does

23   that refer to the sales representatives that you're

24   using for this first table, or is that -- as you've

25   said, field staff, is that the same as sales

CONFIDENTIAL

Page 264

representatives?

    A.   Well, these people would not be salespeople, so the turnover rate might be different from the 64 percent.  I think our -- the only point here is that, if you take a look at the number of people required, that we show in table -- I'm sorry, Figure 4, it would in reality have to be larger than 1,036, to account for the fact that there's turnover.

    Q.   How much turnover -- that was turnover for a year, 64 percent.  How much turnover happens in the first 90 days?  Because, isn't your campaign only 90 days long?

    A.   I don't know what the turnover rate is for 90 days.

    Q.   Wouldn't that be --

    A.   We don't have that data.

    Q.   Did you ask for it?

    A.   No.

    Q.   This second table here, what does this table represent?  The -- the second table in Exhibit 5.

    A.   We didn't use this information.

    Q.   Do you know why 64 percent is highlighted in this table?

    A.   No, I don't.

    Q.   Okay.  Do you know what this information is?

CONFIDENTIAL

Page 265

1        A.    Well, actually, it does have the turnover

2    rates -- 64, rolling six months, annualized.

3              I'm sorry, I misspoke before.  We did use this

4    information.  It has the turnover rates that we referred

5    to in that paragraph.

6        Q.    Okay.  So, you used this number?  For rolling

7    12 months, you used this 64 percent number?

8        A.    Yeah.  Where it says, resi reps, those would be

9    residential.

10        Q.    Those are residential sales reps?

11        A.    Correct.

12        Q.    Why didn't you use this rolling four months

13    number?

14        A.    We didn't use any number.  All that would have

15    done -- if I used 24 percent for any number, it would

16    have increased the number of -- of representatives

17    needed and it would have increased the 27 million to

18    something higher.

19        Q.    Well, in Paragraph 110, you mentioned the

20    64 percent number.  Why didn't you mention the

21    24 percent number?

22        A.    I don't know.  I don't remember.

23        Q.    Okay.  Do you know who highlighted the 64

24    percent number?

25        A.    No, I don't.

CONFIDENTIAL

Page 266

1        Q.    Let's go on to Exhibit 6, ADT Marketing Costs.

2              So, this is an e-mail exchange between

3    Shannon Hendrickson, who again -- we talked about

4    before.  And it's from Shannon Hendrickson to

5    Mark Pelofsky, who we've talked about, and Dan McGrath.

6    And again we have Kritika Kuppuswami, who you've

7    indicated was a GBX employee, correct?

8        A.    Correct.

9        Q.    Okay.  So, the purpose of this e-mail is to

10   confirm additional marketing information that was

11   conveyed to GBX by Shannon Hendrickson?

12       A.    That's correct.

13       Q.    And it also says that Dan McGrath was

14   involved -- well, it suggests he might have been

15   involved.  Do you know if any of this information -- any

16   of the substantive information in this e-mail came from

17   Dan McGrath?

18       A.    No, I don't.  It's marketing data, so I assume

19   it was mainly from Shannon.

20       Q.    Okay.  Do you know where Shannon received the

21   information?

22       A.    What I remember, we had a phone conversation,

23   which is referred to in the report.  And these are just

24   notes confirming what Shannon said, in that

25   conversation, would be needed to reach the other

CONFIDENTIAL

Page 267

1    88 percent of ADT's customers.

2       Q.  So, who suggested this design of how to reach

3    the other 88 percent?  Was that Shannon's idea of how to

4    reach those 80- -- other 88 percent?

5       A.  Well, it was my idea to have a hybrid campaign

6    with some door-do-door and some using more conventional

7    methods.  We then asked her how much it would cost or

8    what she would do for a typical campaign.  And so, we

9    used her numbers for that.  But, it was my idea to

10    develop the concept of the hybrid campaign.

11       Q.  So, I get that your idea was to have a hybrid

12    campaign with some traditional methods and -- and some

13    door-to-door information dissemination.  And then you

14    went to Shannon and asked her how to design the

15    non-door-to-door portion of that campaign, correct?

16       A.  Correct.  And she said that it would take about

17    $3 million to use a targeted marketing effort, using

18    both online and traditional media.

19       Q.  And do you know how she reached those

20    conclusions?

21       A.  I assume she just used her experience, what

22    they've done in the past.

23       Q.  Did you do anything to verify that those

24    conclusions were reasonable?

25       A.  No, I did not.

CONFIDENTIAL

Page 268

1      Q.   Do you -- do you know what information she used

2    to inform these conclusions?

3      A.   As I said, I assume she used either her own

4    experience or past campaigns that were similar in

5    nature.

6      Q.   Did you ask to see copies of the budgets from

7    those past campaigns?

8      A.   No, I didn't.

9      Q.   Did you do anything to verify the information

10    that she provided in this e-mail?

11      A.   No, I did not.  I took her word that that's

12    what they've done in the past and that would be a

13    reasonable estimate of what we would do here.

14      Q.   Did you consider any other potential designs

15    for the non-door-to-door portion of the information

16    campaign?

17      A.   Well, I think these are the typical ones that

18    you would use if you went to TV.  It would cost a lot

19    more money.  So, I think this is a fairly conservative

20    estimate of how to reach the other 88 percent.

21      Q.   And did you have any -- well, who else was

22    involved in creating this design for the

23    non-door-to-door portion of your information campaign?

24      A.   We just used the numbers that Shannon gave us

25    for that campaign.

CONFIDENTIAL

Page 269

1       Q.   Okay.  And do you know if anyone else besides

2    Shannon was involved in coming up with these numbers?

3       A.   No, I don't.

4       Q.   And you don't know what source data she used to

5    come up with these numbers?

6       A.   No, I don't.

7       Q.   Do you know if she performed any calculations

8    to come up with these numbers?

9       A.   No.

10      Q.   Did you do anything to test the information

11   that she gave you?

12      A.   No.  I -- we just took it at face value, based

13   again on her experience that this is the way that she

14   would reach those other customers.

15      Q.   Do you personally have experience valuing

16   brands?

17      A.   Yes.

18      Q.   Okay.  What experience do you have in valuing

19   brands?

20      A.   Well, I teach -- in my -- my marketing

21   management course, I have a session on how to estimate

22   brand value, different approaches to estimating brand

23   value.  We talked about examples in class.  So, that's

24   the experience that I have.  I've also done some brand

25   valuation in other cases.

CONFIDENTIAL

Page 270

1    Q.   Did you do any brand valuation in this case?

2    A.   Our brand valuation in this case was the

3    remedial campaign.  What it would take to repair the

4    brand damage done by Vivint is the $27 million to

5    specifically repair this part of their brand image, due

6    to Vivint's activities.

7    Q.   Briefly, the cumulative customer counts that

8    were included in the histogram, did that include

9    business customers, as well as residential customers?

10   A.   I don't know the -- the answer to that.  But,

11   I know that the data we wanted was for residential

12   customers.  So, I assume the data that we got -- that

13   GBX got from ADT was residential customers.  We're not

14   interested in the -- in the business-to-business sector.

15   Q.   If it included both business and residential

16   customers, would that change your analysis or change

17   your conclusions?

18   A.   Well, you know, if we had to do door-to-door

19   calls on business customers, that would certainly

20   increase the -- if this was just residential data, it

21   would certainly increase the remedial -- remedial

22   campaign budget.

23   Q.   Okay.  And did -- did any of the alleged

24   misconduct in this case relate to commercial business

25   customers or only residential customers?

CONFIDENTIAL

Page 271

1     A.   I've only considered residential customers.

2     Q.   To your knowledge, the allegations in this case

3     relate only to residential customers, correct?

4     A.   That's correct.

5     Q.   Did you -- in Paragraph 45 of your report --

6     let me get there.  I'm going to share it.  Now, we're

7     sharing again Exhibit 1 to the report.  And now I want

8     to go to Paragraph 45 on Page 17.

9          In Paragraph 45 in the report, you mentioned a

10    Harris Poll that was conducted in 2018.  What -- and

11    then you've described the results of that Harris Poll

12    and you found that ADT's brand was very strong based on

13    the results of that Harris Poll in 2018.  Correct?

14    A.   Yes.

15    Q.   Did you redo that analysis, or did anyone

16    request that that analysis be redone, at any other point

17    in time?

18    A.   Well, I read the original report, which I --

19    which we referenced.  It has the data in it.

20         Harris is obviously a very reputable company in

21    the polling business and market research.  I actually

22    know the CEO of Harris and it's an excellent company, so

23    I have no reason to question the numbers that they have.

24    Q.   I'm sorry, that wasn't the question that I

25    asked.  I wasn't asking you if you questioned the

CONFIDENTIAL

Page 272

1    numbers they had, I'm asking you, did you try to get

2    them to do this analysis again later on?  So, that you

3    got this analysis in 2018 and you found that ADT's brand

4    is very strong.  Did you do an analysis in 2020, to see

5    if ADT's brand had been affected by the alleged

6    misconduct in the case?

7        A.    Even -- even if I -- even if we had a poll from

8    2020, it wouldn't necessarily tell us whether Vivint's

9    misconduct affected its brand.

10       Q.    Why not?

11       A.    Because, the effect that the misconduct had was

12   on a very specific portion of ADT's brand.  It's only

13   the perceptions that the customers have of the brand

14   name.  There's a lot that goes into the overall brand

15   equity or brand name, other information that's out there

16   in the marketplace.  So, the overall brand name, right,

17   is like a macro or a large scale kind of estimate of the

18   brand value.  But, we're only looking at a particular

19   part of that brand and how it was damaged and the part

20   that was damaged on -- in the households on a

21   household-by-household basis.

22            So, that would not necessarily tell us whether

23   it went up or down.  It wouldn't necessarily be a causal

24   effect of Vivint's actions.

25       Q.    So, why is this 2018 Harris Poll relevant,

CONFIDENTIAL

Page 273

1    then?  You just told me it doesn't tell you anything

2    about the particular segment of the brand or the

3    customers that -- that we're talking about in this case.

4    If that's true, then why is the 2018 version of this

5    report relevant?

6         A.   What I'm trying to do is to establish a

7    baseline that ADT is the best known and the best brand

8    in the home security business and so it's also most

9    vulnerable to any activities that Vivint might -- might

10   partake of at the household level.  So -- and, you know,

11   they're in the security business and so it's really

12   important to ADT that they protect the brand name.

13        Q.   So, you established this baseline in 2018.

14   But, do you do anything to then -- did you do any

15   analysis that you could then compare to this baseline?

16        A.   No.

17        Q.   Did anyone do that analysis?

18        A.   No.

19        Q.   You testified earlier that you're trained in

20   doing brand valuation, but you didn't do that in the

21   analysis in this case?

22        A.   I think I responded to that earlier -- a couple

23   minutes ago -- that an overall brand value is not what

24   is relevant here.  What's relevant is what was the brand

25   damage that was done by these particular actions that

CONFIDENTIAL

Page 274

1    Vivint undertook.  You can't find that from looking at

2    overall brand equity estimates and so it would not be

3    helpful.

4         Q.   So, in terms of ADT's brand, is ADT's brand

5    still the strongest brand in the alarm services

6    industry?

7         A.   I don't have the 2020 data, but it's always

8    been the strongest brand in the business.  It's by far

9    the biggest company, and, you know, my educated guess

10   would be it's still the strongest brand in that

11   industry.

12        Q.   Okay.  And what's that assumption based on?

13        A.   Just my knowledge of different industries, the

14   number of ADT signs I see on lawns, you know?  I haven't

15   done a study, but I would be shocked if ADT was not

16   still the number one brand overall in the home security

17   business.

18        Q.   How does the analysis that you've done in this

19   case distinguish between an ADT customer that was

20   visited by a Vivint representative and one who was never

21   visited by a Vivint representative?

22        A.   As I said earlier, both groups need to have

23   the remedial communications, one to inoculate against

24   future Vivint visits, the other to try to reassure the

25   households that, ADT is a strong brand, it still stands

CONFIDENTIAL

Page 275

1    behind them, the number one brand overall in security

2    industry.  And, so, both groups need -- need it.

3         Q.   Did you do any analysis to determine if ADT's

4    attrition rate was affected by the alleged misconduct in

5    this case?

6         A.   No, I did not.

7         Q.   Are you aware if ADT's attrition rate increased

8    or decreased from the period from 2017 to 2020?

9         A.   No.  I don't know what it did.

10        Q.   If you found out that ADT's attrition rate

11   actually declined significantly, from 13.7 percent in

12   2017 to 13.1 percent in 2020, would that impact your

13   analysis in this case?

14        A.   No.

15        Q.   If ADT's attrition rate declined, how is ADT

16   damaged by Vivint's conduct over this period?

17             MR. HOBBS:  Object to form.

18             THE WITNESS:  Well, what we don't -- what we

19        don't know is what it would have been, had Vivint

20        not practiced those deceptions.  So, just the fact

21        that the attrition rate went down, which is good for

22        ADT, it doesn't mean it wouldn't have gone down

23        more, had it not been for the deceptive practices of

24        Vivint.  So, you can't draw a causal link between

25        that decline and Vivint not having an impact on

CONFIDENTIAL

Page 276

1      ADT's performance.

2   BY MR. BROWN:

3      Q.   So, you're saying ADT may have had even less

4   attrition, other than -- after -- if it had not been for

5   Vivint's misconduct?

6      A.   Yes, that's what I'm saying.

7      Q.   Okay.  Where is your analysis that it attempts

8   to figure out what the source of the attrition is for

9   ADT?  What amount could be attributed to Vivint's

10  misconduct and what amount is expected, based on ADT's

11  other operations?

12     A.   I haven't performed such an analysis.

13     Q.   Have you considered performing that type of

14  multi-varied analysis?

15     A.   No, I did not.

16     Q.   Okay.  Do you do that type of analysis in your

17  research?

18     A.   Well, it would be, as you said, multi-varied.

19  You would have to develop a model of their attrition

20  rate, you'd have to have time series data over a number

21  of years, and you would have to collect -- you'd have to

22  develop a pretty complicated model to try to explain it.

23  But, I did not do that here.

24     Q.   Okay.  Did you consider doing that?

25     A.   No, I did not.

CONFIDENTIAL

Page 277

1          Q.    Are you capable of doing it?

2          A.    Capable in what sense?

3          Q.    Do you have the experience and the knowledge

4     and the expertise to do that type of analysis?

5          A.    Yes, I do.

6          Q.    How do you distinguish, in your analysis,

7     between an ADT customer that was subjected to a

8     deceptive sales practice -- sales practice by Vivint,

9     from one who was not subjected to a deceptive sales

10    practice by Vivint?

11         A.    Could you repeat the question again?

12         Q.    How do you distinguish, in your analysis,

13    between an ADT customer that was subjected to a

14    deceptive sales practice by Vivint from one who has not

15    been subjected to a deceptive sales practice by Vivint?

16         A.    I think I've answered this multiple times.  I

17    think both groups need to be -- or have some

18    communications in person, whether they have been visited

19    by a Vivint salesperson or whether they have not.  So,

20    the analysis does not draw a distinction between the two

21    kinds of -- of customers.

22         Q.    How does your analysis distinguish between an

23    ADT customer that was deceived by a misrepresentation

24    from a Vivint representative from one who was not

25    deceived?

CONFIDENTIAL

Page 278

1     A.   It doesn't.

2     Q.   Does it matter to your analysis if an ADT

3 customer was deceived by Vivint, but later found out --

4 later discovered the truth and was no longer deceived?

5     A.   That's a little complicated.  Could you restate

6 it, please?

7     Q.   I'll -- I'll -- I'll rephrase.

8         How does your ADT -- how does your analysis

9 distinguish from an ADT customer who has some remaining

10 negative feelings about their interaction with Vivint,

11 from say a customer who was deceived and is still

12 deceived by misrepresentations by Vivint?

13     A.   My assumption again is that both types of

14 consumers need to be communicated with on an individual

15 basis as much as possible.

16     Q.   Okay.

17         MR. BROWN:  I'm going to go ahead and pass the

18        witness at this time.  I do have further questions

19        that I would like to ask of this witness.  In

20        addition, there were multiple times during the

21        deposition where the witness mentioned sources that

22        have not yet been produced in this case.  So, if

23        we actually obtain copies of those sources, I want

24        to reserve the right to question the witness on

25        those sources.  And there were other topics that,

CONFIDENTIAL

Page 279

1        unfortunately, we didn't have time to get to.  So,

2        I will reserve the ability to seek to continue the

3        deposition for those reasons.  But, for the purposes

4        of today, I will pass the witness.

5               MR. HOBBS:  Okay.  And I just have a couple

6        questions, Dr. Winer, and then I know we all got

7        to get on our way.

8                     CROSS EXAMINATION

9    BY MR. HOBBS:

10       Q.   I just want to start off where Mr. Brown left.

11   I mean, would -- would it be helpful to your analysis if

12   Vivint was able to supply information as to how many ADT

13   customers it has approached during the relevant period?

14              MR. BROWN:  Object to form.

15              THE WITNESS:  Definitely.

16   BY MR. HOBBS:

17       Q.   Is that something that you've asked for?

18       A.   Yes.  We've tried to get that information, but

19   Vivint has not provided it to us yet.

20       Q.   And along the same lines -- along the same

21   lines, would it be helpful to your analysis if Vivint

22   was able to specify how many ADT customers complained to

23   Vivint about being approached in a deceptive manner?

24       A.   Yes, I agree that that would also be useful

25   information.  But, again, we've gotten no -- nothing

CONFIDENTIAL

Page 280

1    from Vivint.

2         MR. HOBBS:  Okay.  And those are my only

3    questions.

4         MR. BROWN:  No further questions from me on

5    that.

6         VIDEOGRAPHER:  So, Mr. Brown and Mr. Hobbs

7    both concur that today's deposition of this witness

8    has concluded?

9         MR. BROWN:  I -- I agree that it's concluded.

10   We've gone as far as we can today.  But, I reserve

11   my rights to seek to continue the deposition for the

12   reasons I've stated.

13        VIDEOGRAPHER:  Okay.  So, it's being suspended,

14   then.  Correct?

15        MR. HOBBS:  Well, no.  I'm not going to agree

16   to that, no.  Mr. Brown can reserve his -- his --

17   what he's stated on the record.  But, I'm not going

18   to agree that we're going to keep going.

19        MR. BROWN:  That's fine.  If we need to make a

20   motion, we'll make a motion.  And -- you know,

21   I've -- I've stated my position on the record,

22   and -- but, in the meantime, we can consider the

23   deposition concluded.  And if we seek to re-open it

24   for the reasons I've stated, then we will move --

25   make that argument in a motion.

CONFIDENTIAL

Page 281

1          VIDEOGRAPHER:  All right.  Please stand by,

2     then.  This concludes the deposition --

3          MR. HOBBS:  Wait.  Wait.  Before we go off the

4     record, the expert report in this case has been

5     rendered on a highly confidential, with attorney

6     eyes only basis.  The opinion is based on the

7     report.  And, therefore, under the protective order

8     entered in the case, I would also designate the

9     deposition testimony as highly confidential,

10     attorney eyes only, as well.

11          COURT REPORTER:  Okay.

12          VIDEOGRAPHER:  All right.  This concludes

13     today's testimony given by Dr. Russell Winer.  The

14     total number of media -- media units used in this

15     recording was six and they will be retained by

16     Veritext Legal Solutions.

17          We are now off the video record, the time being

18     7:57 p.m., Eastern.  Please stand by while I turn

19     the recorders off.

20          And we're clear.

21          COURT REPORTER:  Okay.  Before we address

22     getting the exhibit to me, Mr. Brown, you did

23     represent earlier that you were going to order this

24     deposition be transcribed?

25          MR. BROWN:  Yes, please.

CONFIDENTIAL

Page 282

1          COURT REPORTER:  Okay.  And I will get with

2     your secretary on the format.

3          Mr. Hobbs, would you like a copy?

4          MR. HOBBS:  Yes, please.

5          COURT REPORTER:  Okay.  Thank you.

6          Mr. Brown, are you going to e-mail me the

7     exhibit?  And I'll have --

8          MR. BROWN:  Yes.  I will e-mail you the

9     exhibit, Ms. Roberts.  And I'll copy Mr. Hobbs, in

10    case he has any issue.  But, I don't think he will.

11         COURT REPORTER:  Okay.

12         VIDEOGRAPHER:  Mr. Brown, you've already

13    expressed that you don't want a video at this time.

14         Mr. Hobbs, do you want one?

15         MR. HOBBS:  We would only want a copy if

16    Mr. Brown was obtaining a copy, as the taking

17    attorney.  So, at this point, if there is not a

18    request from Mr. Brown, we would not request a copy

19    of the video.

20         VIDEOGRAPHER:  Thank you, sir.

21         COURT REPORTER:  And would the witness like to

22    read?

23         MR. BROWN:  Dr. Winer, would you like to review

24    the transcript and sign or waive that right?

25         THE WITNESS:  I would like to be able to sign

CONFIDENTIAL

Page 283

1        it, yes.

2              MR. HOBBS:  You can send it to us and we'll get

3        it to Dr. Winer.

4              COURT REPORTER:  Okay.  Thank you, all.

5              VIDEOGRAPHER:  Have a good evening, everybody.

6              MR. BROWN:  Thank you, Dr. Winer.  Thank you,

7        Eric.  Thank you, Diane and Tim.

8        (The videotaped deposition was concluded at 7:59 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 284

1                    CERTIFICATE OF OATH

2

3     STATE OF FLORIDA    )

4     COUNTY OF ORANGE    )

5

6          I, Diane C. Roberts, FPR, Notary Public, State

7     of Florida, certify that Dr. Russell S. Winer appeared

8     before me via videoconference on August 30, 2022, and

9     was duly sworn.

10

11         Signed this 14th day of September 2022.

12

13

                        *Diane C. Roberts*

14                      Diane C. Roberts, Court Reporter

                        Notary Public, State of Florida

15                      My Commission Number HH-027866

                        Expires on 10-31-2024

16

17                      Type of Identification Produced:

                        Driver's License

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 285

1                CERTIFICATE OF DEPOSITION TRANSCRIPT

2

3    STATE OF FLORIDA    )

4    COUNTY OF ORANGE    )

5

6            I, Diane C. Roberts, FPR, Notary Public,

7    State of Florida, was authorized to and did

8    stenographically report the videotaped videoconference

9    deposition of Dr. Russell S. Winer, that a review of the

10   transcript was requested; and that the foregoing

11   transcript, Pages 4 through 283, is a true and accurate

12   record of my stenographic notes.

13           I FURTHER CERTIFY that I am not a relative, or

14   employee, or attorney, or counsel of any of the parties,

15   nor am I a relative or employee of any of the parties'

16   attorney or counsel connected with the action, nor am I

17   financially interested in the action.

18

19           DATED this 14th day of September 2022.

20

21

22

                        *Diane C. Roberts*

23                      Diane C. Roberts,

                        Court Reporter

24

25

CONFIDENTIAL

Page 286

1                    ERRATA SHEET
           DO NOT WRITE ON TRANSCRIPT, ENTER CHANGES HERE
2              IN RE:    ADT VS. VIVINT SMART HOME, ET AL.
               CASE NO:  1:20-cv-23391-MGC
3              DATE:     AUGUST 30, 2022
               WITNESS:  DR. RUSSELL S. WINER
4          I, Dr. Russell S. Winer, wish to make the
       following corrections:
5

       PAGE        LINE           CORRECTION & REASON
6
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19     _____
20     _____
21     _____
22         Under penalties of perjury, I declare that I have
       read the foregoing document, and the facts stated are
23     true.
24     _____
       DATE            DR. RUSSELL S. WINER
25     Job No. CS5384054

CONFIDENTIAL

Page 287

1    Eric Hobbs, Esq.

2    ehobbs@shb.com

3                        September 14, 2022

4    RE:   ADT, Et Al v. Vivint Smart Home, Inc., Et Al

5         8/30/2022, Russell S. Winer (#5384054)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                   Yours,

23                   Veritext Legal Solutions

24

25

CONFIDENTIAL

**[& - 2019]**

Page 1

**&**

**&**   2:3 5:16 17:3
26:24 34:16
37:12 80:15
112:7 158:14
244:9 286:5

**0**

**027866**   284:15

**1**

**1**   3:11 4:16 11:8
11:10,12,25 13:4
42:23 47:4,6
53:9 57:17
58:16 65:17
71:21 72:2
74:17 76:14
78:8 81:8,17
82:4 83:6 90:12
91:19 108:3,8
109:5 143:18,20
154:19 155:14
156:23 157:25
162:2,21,24
163:20,23
164:11 172:8,18
173:10 174:4,6
174:22 176:7
179:4,6,7,8,11
180:2,14 181:7
181:10,18 189:3
189:23 195:16
196:20 198:19
199:17,19,20
204:18 224:16
233:10 236:12
242:8 243:3
254:25 255:1,1

257:13 271:7
**1,036**   248:9
264:7
**1,300**   14:1 15:1,9
15:11,12,12,13
15:23 16:13
21:18,19,24
23:19,21,25 24:8
24:13 25:7,7,9
25:20,23 26:14
26:14,25 27:15
27:18 29:7
30:13,23 31:9
32:24 33:5,14,15
33:25 34:2,7,8
34:19,24 36:7,14
37:6 38:23
39:24 40:3,10,14
40:20,24 41:4
42:10 59:19,19
59:23 60:4
63:22,25 64:12
64:14 72:8,13,16
72:19,25 75:18
75:21,24 80:1
84:6 242:17
**1,340**   86:25 87:3
**1,342**   75:21,22
76:7
**1,500**   252:5
**10**   17:10,10
25:15 57:23
58:4,5 109:1
118:14 183:13
198:10 215:7
241:10,10,23
**10-31-2024**
284:15

**100**   125:8 145:6
**10:00**   246:7
**11**   3:11
**110**   263:19
265:19
**114**   257:12
**11:00**   246:7
**11:27**   1:14 4:5
57:7
**12**   46:5 125:7
163:20,22,25
214:8 253:24
265:7
**12:51**   57:7
**12:52**   57:19 58:7
**13**   21:19,23
23:21 25:23
33:4 195:13
**13.1**   275:12
**13.7**   275:11
**14**   164:9 166:9
287:3
**14th**   284:11
285:19
**15**   58:1 107:17
165:2 215:7
**1660**   2:3
**17**   271:8
**17th**   2:3
**19**   14:17 42:25
83:5
**192**   91:23,24
**194**   250:1
**1980s**   205:21
**1:10**   58:6
**1:13**   58:8,12
**1:20**   1:3 4:22
286:2

**1:47**   256:12

**2**

**2**   58:10 71:20,25
72:7 74:18,19
75:8,22 76:12
78:8 81:8,16
82:4 90:9 105:1
107:13 109:3
172:10 173:10
177:13 195:17
195:18,20
196:13,14,16
197:3 199:17
242:10,10,23,25
257:10
**20**   25:17 28:11
108:8 234:24
235:1 236:15,19
236:22 238:20
239:13 240:20
**2012**   184:4
195:12
**2013**   184:4
189:10
**2014**   184:13
**2015**   183:5
**2017**   93:8 127:11
183:2,18,20
192:24 193:2
275:8,12
**2018**   183:19
203:18 205:5
271:10,13 272:3
272:25 273:4,13
**2019**   200:6 201:2
205:5

CONFIDENTIAL

**[2020 - 72]**

**2020**   272:4,8
   274:7 275:8,12
**2021**   86:15
   155:25 203:19
   205:6 256:12
**2022**   1:13 4:6
   284:8,11 285:19
   286:3 287:3
**21**   156:6 157:12
**21st**   203:18
**22778**   284:13
   285:22
**23391**   1:3 4:22
   286:2
**24**   265:15,21
**25**   143:19,19
**250**   34:3,6,25
   36:8,9,13 37:5
   37:14 38:15,22
   76:6 242:13,16
**26**   154:20 155:13
**27**   177:18,19,24
   178:14 188:19
   188:20 195:21
   196:18 197:4,8
   197:15,17,21
   200:19 202:9
   220:7 221:5
   239:7,9,10
   265:17 270:4
**279**   3:3
**28**   166:25 167:1
   179:10 180:2
**283**   285:11
**284**   3:4
**285**   3:5
**286**   3:6

**287**   3:7
**29**   179:4,6,8,10
   180:2,8 181:9
**2:28**   107:15,19
**2nd**   183:5

**3**

**3**   107:22 154:4
   236:12 243:2,2
   257:11,14,16
   258:7,10,13
   259:1,4 267:17
**30**   1:13 179:10
   179:14 180:2
   284:8 286:3
   287:17
**30th**   4:6
**31**   179:11 180:2
   181:18
**32801**   2:9
**33**   184:3,3,21
**35**   189:23
**350**   65:7 67:15
   68:17 70:20
**357**   62:20 63:19
   63:20 64:3,7,13
   64:21,24 65:8,19
   65:20 66:12
   68:24 71:12
   72:25 77:23
   78:2 83:9,11
   84:11,24 85:8
   87:5
**36**   198:20 204:17
**364**   241:17
**3:02**   107:20,24

**4**

**4**   154:14 198:6
   243:11,13 245:9
   245:9,10,16
   259:6 260:13
   264:6 285:11
**42**   242:9
**45**   12:16 243:3
   256:3,5,6 271:5
   271:8,9
**450**   2:3,9
**47**   171:19
**48**   14:18,19 24:1
   43:7 59:22
   61:18 75:23
   83:3,5 256:4,5,6
**49**   83:23
**4:11**   154:6,11
**4:20**   154:12,16

**5**

**5**   58:25 198:15
   241:6 261:23
   264:20
**50**   11:24,24
   42:20,23 43:3,12
   46:9 47:1 88:25
   88:25 91:18,20
   91:21 94:10,12
   128:7 189:25
**500**   235:24
**51**   42:21 67:15
   108:7,8 110:15
   110:23 111:14
   119:5 129:8
   136:5 140:1
**52**   42:21

**53**   126:13
**5384054**   287:5
**54**   43:15
**55**   46:9
**56**   46:9 81:9,16
   82:3
**57**   81:9,16 82:3
**58**   81:9,16 82:4
**5:00**   246:8
**5:29**   198:8,12
**5:39**   198:13,17

**6**

**6**   3:3 163:22
   164:10 242:3
   266:1
**61**   50:14,18 51:4
   143:17,19
   150:20 152:14
**64**   263:17 264:3
   264:10,22 265:2
   265:7,20,23
**650**   2:9
**67**   13:4 47:6
**68**   52:24 53:8,13
   145:16
**69**   53:13 145:16
**6:45**   241:8,25
**6:57**   242:1,4
**6th**   256:12

**7**

**70**   53:14 58:20
   59:6 155:13
   156:22 157:25
   162:2
**70s**   206:17 209:2
**72**   59:7 167:1
   168:24

**[74 - adt]**                                                                 Page 3

**74** 183:11
**75** 182:3,4
**750** 261:15,19,21
**750,000** 125:1,5
125:10 235:2
245:21 261:17
261:18
**76** 72:1 74:18
184:15,21
**77** 76:14 188:23
189:1,3,16,18
**78** 81:8
**7:57** 281:18
**7:59** 1:14 283:8

**8**

**8** 171:19 173:4
**8,457** 243:12
**8/30/2022** 287:5
**80** 107:10 189:23
190:24 191:3
267:4
**80202** 2:4
**80s** 206:17
**82** 90:12 201:6
225:5 257:23
**84** 224:16 232:12
**88** 235:4 253:23
253:24 267:1,3,4
268:20

**9**

**90** 264:11,12,14
**900** 83:15,16
**93** 183:4 256:5,6
**950** 64:14 79:9
84:10 85:17,17
86:18 87:4

**9:00** 246:6
**9th** 86:15

**a**

**a.m.** 1:14 4:5
**ability** 152:22,22
279:2
**able** 45:12 70:12
102:2,3,9 111:11
137:22 164:19
170:18 201:21
202:13 210:21
212:16,24
214:20 216:2
218:9,10,19
227:23 232:7
233:17 236:24
237:1 247:25
252:8 254:1
262:17 279:12
279:22 282:25
**academic** 164:19
169:11,13
205:22 227:24
228:3,15
**accept** 229:16
**accepted** 29:9
**access** 22:12,15
22:16,21 23:4,5
23:21,24 29:7,8
48:20 49:2 55:5
72:19 145:10,13
145:19 146:6
151:19,23
**accessed** 55:9
**account** 133:3
170:16 263:15
264:7

**accounts** 120:3
190:4
**accumulated**
12:18
**accuracy** 31:6
168:14,23 260:7
287:9
**accurate** 128:17
285:11
**accurately** 174:2
**accusations**
187:20
**accused** 193:9
**acknowledgm...**
287:12
**acquainted** 17:8
**acquired** 249:9
252:20
**acquiring**
213:20
**acquisition** 9:12
**act** 190:7,11
195:11
**action** 86:18
131:20 196:21
197:12 210:1
285:16,17
**actions** 14:20
32:19 142:5
143:6 149:25
164:3,17 165:3
171:18,25
172:17 173:2
174:9 181:24
182:4,9,14,20,25
183:9,17 186:24
199:12 227:10
233:9 272:24

**273:25**
**activities** 205:23
207:21 270:6
273:9
**actual** 15:17,19
23:10
**added** 240:14,15
**adding** 238:23
259:20
**addition** 42:13
165:11 170:7,9
278:20
**additional** 59:1
72:21 73:5 74:9
157:15 165:14
201:22 202:2
266:10
**additionally**
164:17
**address** 281:21
**adjust** 206:22
**adt** 1:4 4:18 5:17
8:1,7,12,13,15
8:15,20,24 10:10
13:17 14:21
15:25 16:6 26:5
26:12,13,22
28:22 29:2
34:14 37:8,9,15
37:17,17,19 38:7
38:10,13,14,16
38:17,20,24,25
39:1,2,6 48:5
49:15,23 50:6,15
51:10,20 67:21
72:3,8 75:10,12
75:20,25 76:4,18
76:20,21,23 77:8

CONFIDENTIAL

77:11,17 80:12
80:12,13,18
81:18,24 83:17
85:20 89:3
91:10,23,24
92:15 93:14,24
93:25 94:5,17,19
94:23,24 95:15
96:8,12,19 97:4
97:9,14,17,22
98:5,8,11,14,17
98:20,23 99:15
99:16 100:3,15
100:24 101:1,2,4
101:5,12,14
103:4,11,19,21
103:23 104:1,3,6
104:11,13,24
105:8,12,14
106:3,17 107:5
108:9,12 109:14
109:14,17,20,23
111:23 112:1,6,6
112:8,9,20 113:3
113:5,17,23
114:7,8,9,10,13
114:18,23,24
115:1,4,9,22
116:16 117:2,8
119:6,9,9,9,15
119:16,21,24
120:1,5,8,18
121:1,2,11,14,15
121:15,18,18,22
121:22 122:2,2
122:11,22 123:1
123:4,5,10,10,13
123:14,23 124:2

124:3,4,14 125:4
125:8,13,19
126:3 127:16,24
128:12 129:10
130:3,4,14,16,25
131:4,11,13,16
131:21 132:1,2
132:10,12,19,20
132:20,25
133:16,17 135:1
135:17 136:7,7
136:13,13 137:4
137:8,12,19,22
137:23,25 138:2
138:11,13,17
139:2,11 140:13
140:21 141:2,8
141:16,22 142:3
142:13,22 143:3
143:5,9 144:6,13
145:10,13
146:18,19,21
147:13,18,23
148:15 149:17
150:7,11 151:23
152:4,13,22
153:5,7,9,16
160:6,9,13,16
161:1 163:25
164:14,14,19,22
165:7,25 171:18
171:24 173:7,9
173:12 174:10
176:24 178:12
178:20,24
181:23 182:15
182:18,21,21
183:9,15,23

186:7 187:5,6,13
187:14,15
189:15 190:11
190:15,16,19
192:2,11,13,23
193:1,6,22 194:9
194:20 196:23
197:2,16 198:22
198:25 199:4,15
200:11 201:1,5,6
201:21 202:13
202:22,23,24
203:2,2,13,19,24
204:21 205:8
213:20 214:5
217:13 218:22
219:6 220:15,16
220:21,22 221:6
221:24,24 222:2
222:6,15,18
232:12 233:8
234:16,18,25
235:21 236:5,9
236:16,19
242:13,16,17
243:5 244:2
247:23,24 249:9
249:13,17,25
250:11 251:1,2,4
251:9,9,12,14
252:15,20,20,23
255:1,4,22
257:14,22,25
258:22,24 259:8
259:11,13 260:4
260:5 261:21
262:2,13,19
263:2,5,12 266:1

270:13 273:7,12
274:14,15,19,25
275:15,22 276:3
276:9 277:7,13
277:23 278:2,8,9
279:12,22 286:2
287:4
**adt's**   82:10 84:2
86:1 91:1 101:6
101:7 103:13
105:13 114:15
117:23,24 164:4
164:15 165:20
168:9 173:21
175:16 181:25
185:5 188:11
204:11,15,17,23
204:25 205:10
206:2 224:19
225:20 226:9
227:16,20
232:22 233:2
236:3 244:4
255:5 263:15
267:1 271:12
272:3,5,12 274:4
274:4 275:3,7,10
275:15 276:1,10
**adt00000191**
91:16,22
**adt00000191....**
45:5,24
**adt00000192**
91:16
**advance**   135:5
**adverting**
209:23

**advertising**
101:16 115:24
115:25 116:3,4,7
116:14 206:15
206:16,19,20,24
207:4,11,15,16
207:21 208:2,5
208:14,23,25
209:22 210:6
211:12 228:5,6
228:13 229:8,9
257:1,4
**aegis**   133:13
**affect**   86:5 100:4
111:4,6 112:18
113:12,20,22
114:11 115:5
125:9,14,21
126:5 127:10
139:8,10
**affidavit**   145:16
145:20 146:9
**affiliation**   117:7
186:7
**affiliations**   5:5
**agencies**   163:9
165:6 190:5
**agency**   172:17
209:7
**aggressive**
164:22
**ago**   12:4 17:10
18:18 20:1
32:18,18 45:16
46:5 56:12
115:7 273:23
**agree**   4:14 101:9
139:23 279:24

280:9,15,18
**agreed**   3:14
**agreements**
184:6
**ahead**   10:18,19
12:24 14:2
31:20 33:8
35:22 36:2 38:6
43:9 44:6 45:1
46:25 49:9 68:6
107:8 117:17
173:5 194:12
241:3 278:17
**al**   1:4,7 4:18,19
286:2 287:4,4
**alarm**   183:10
188:7,8 189:13
189:13 194:1,7
274:5
**alert**   199:22
**allegations**
83:24 84:1,2,7
85:20 86:1
147:13 164:12
165:20 181:25
185:5 271:2
**alleged**   10:10
29:2 95:20
103:23 108:11
115:3,22 116:18
116:23 117:1
125:20 126:4
127:19 128:8,20
129:2,3 130:12
130:13 137:8
144:5 149:12
150:6 163:25
164:3 165:13,13

186:24 190:10
192:23 199:1
219:10 258:1
270:23 272:5
275:4
**allegedly**   94:4
96:22 97:11,13
106:4,19 194:6
216:5
**alleges**   13:17
148:15
**alleviated**
204:24
**alleviating**
188:17
**allotted**   287:20
**allow**   7:6 73:16
**allowed**   32:11
148:21 248:2
250:12 251:2
**alluded**   86:12
**alright**   241:22
**alternative**
233:10 238:25
239:1 244:13,14
244:17,22
**alternatives**
238:10
**altogether**
219:21
**ambiguous**
100:7 217:18
**amount**   70:21
115:21 195:21
196:17 199:3,15
211:19 212:14
240:23 246:10
262:18 276:9,10

**analogous**   135:9
**analogy**   135:8
221:24
**analyses**   21:7
229:15 244:13
244:15,18,22
245:6
**analysis**   8:14,24
9:25 10:15
18:19 20:23
41:14 44:17
76:20 96:21
97:7,10,21 100:4
105:6,16 111:6
112:19 113:12
113:20,22
114:11 115:5,20
123:22 124:13
124:16,18,20,21
125:14,21 126:6
127:10 137:16
137:20 138:17
139:8,10 141:23
148:4 149:20
167:5 168:3
172:5 176:3,17
176:18 177:7,9
180:6 182:22
183:17 187:4
191:22,22
192:22,25
195:16 199:17
203:7 206:23
207:2 208:13,15
209:11,12 210:8
210:19,20
222:17 226:23
230:8 238:21

239:1,11,12
240:4,4,9 254:11
259:24 263:14
270:16 271:15
271:16 272:2,3,4
273:15,17,21
274:18 275:3,13
276:7,12,14,16
277:4,6,12,20,22
278:2,8 279:11
279:21
**analyze** 85:23
173:6
**analyzed** 51:13
64:16,18,21 73:1
116:21
**analyzing** 32:12
**angeles** 238:8
**annualized**
262:25 263:1
265:2
**answer** 7:6,8
30:18 33:9
36:16 44:5
76:25 116:1
119:1 122:14
124:7 150:16,17
156:12 169:2
175:8 181:3
196:3,6 203:10
204:9 217:20,22
227:18 239:24
239:25 250:16
270:10
**answered** 29:17
101:19 124:17
129:5 132:16
133:6 140:19

277:16
**answers** 156:18
**antonio** 238:7
**anybody** 249:7
**anymore** 104:15
105:10 138:14
**anyway** 196:1
247:6
**apologize** 13:23
27:4 75:5
124:11 211:22
211:23
**apparently**
91:25 215:6
**appear** 164:17
**appearance** 5:3
5:5
**appeared** 284:7
**appears** 44:11
75:21 110:21
143:19 203:21
255:2 258:13
261:23
**appendix** 12:24
12:25 13:5,13
46:22,24 47:2,5
47:9,13 49:17
50:1,3,20 52:24
53:8,8,14 55:7
58:21 71:19
162:23 174:15
**applicable** 287:8
**apply** 228:16
231:13,18,20
**appreciate** 196:5
**approach** 114:21
130:23 178:12
178:25 197:3,16

231:7,9 232:4
233:25 234:2,3,5
234:13,23
250:25 251:11
**approached**
173:7 216:5
279:13,23
**approaches**
153:22 231:4
269:22
**appropriate**
41:13,17,20
195:20 196:17
202:14 254:20
**appropriately**
42:5 88:1
**approximate**
29:6 263:16
**approximately**
15:1,12 21:19,23
23:21,25 24:8,12
25:7,20,23 26:14
26:25 27:17
30:13 31:9 33:4
33:15,25 34:2,7
34:19 36:7,14
37:5 38:23
39:24 40:10,14
40:24 42:9
59:19,23 63:22
63:24,25 64:12
75:24 83:15
84:6 85:17
**april** 203:18,18
**aquisition** 1:7
**area** 77:6
**areas** 56:2
175:25 228:4,11

**argue** 137:20
**argued** 205:14
**argument**
280:25
**arising** 173:13
**arnott** 18:14,16
19:23 20:4
**arrangement**
153:8 252:21
**arrived** 220:1
**article** 183:5
206:13
**articles** 47:21
48:1 170:1
**ascertain** 86:9
**aside** 177:2
**asked** 27:2 45:25
46:2 62:1 79:16
88:22 118:6
119:7,12,22
124:17 129:5
132:16 133:6
139:5,7,18
140:19 147:10
147:16,21 148:5
148:11 150:3,13
161:3 166:2,6
167:6 168:4
173:6,11 175:25
176:4,6 181:5
184:22,25 185:7
185:14 186:8
199:9 211:16
227:17 267:7,14
271:25 279:17
**asking** 50:4
51:24 65:17
72:21 73:3 74:7

97:20 110:17,19
112:11 123:4
147:2,3 157:14
157:16 178:15
217:1 257:24
271:25 272:1
**aspect** 19:8
185:20
**aspects** 185:10
**assignment**
173:4,25 176:7
177:22
**associated** 113:4
145:13 146:6,18
188:7 226:16
**association**
101:7 105:8
**assuage** 116:15
**assume** 7:14
9:22 76:8 78:10
100:21 102:5,11
147:10,12,16,22
148:11 149:23
232:15,18 257:1
266:18 267:21
268:3 270:12
**assumed** 41:20
87:13 213:14
245:22,22
**assuming** 122:7
232:16 246:8
**assumption**
76:19,22 77:2
78:13 148:1,5
232:5 234:15
274:12 278:13
**assumptions**
245:21

**assurance**
152:24 153:1,2
**att** 255:4
**attached** 11:11
287:11
**attempt** 29:21
73:5 74:9
138:18 170:24
186:19
**attempted**
151:22 153:23
199:12
**attempts** 121:1
203:20 276:7
**attention** 43:11
108:6 139:25
167:3 180:7
181:17 189:22
224:15 254:24
**attitude** 113:17
**attorney** 2:5 5:6
118:3 182:8,14
182:25 183:8
184:16 186:24
187:20 191:12
244:19 262:11
262:12 281:5,10
282:17 285:14
285:16 287:13
**attorneys** 2:11
18:1 68:7,8,13
112:8 123:6
150:11 182:5,20
183:17 184:4
244:8
**attributed** 276:9
**attrition** 275:4,7
275:10,15,21

276:4,8,19
**audience** 205:25
223:1,2 224:1,4
**audio** 4:13 13:25
14:1,4,7,14,21
15:7,12,12,13,14
15:17,18,19,23
16:13 21:18,20
21:24 22:1,2,10
23:13,21,25 24:4
24:7 25:1,7,9,10
25:20,23,25 26:6
26:12,13,14,25
27:6,10,11,12,18
28:8,11,15,18,25
28:25 29:6,7,12
29:16,22 30:1,13
31:9,14 32:3,4,5
32:10,11,15,16
32:21,22 33:5,14
33:15,25 34:19
34:21,22 36:7,17
36:21 37:6 38:2
38:23 39:12,21
39:24 40:3,10,14
40:18,24,24 41:9
42:10,13 45:6,7
45:8,10,13,18,20
45:23 46:8,12,17
46:17 47:12
48:11,13,16
49:15,24 52:13
59:4,12,16,19
62:18 63:20
64:1,12,12 65:1
65:20 66:12
69:3,6,17,23
70:4,8,11,24

71:8,11,12 72:2
72:13,16,19,22
73:5,6 74:10,10
75:12 76:1,4,5,7
76:15 78:8,8,9
78:15,23 80:1,7
81:24,24 82:3
89:2,6,13,16,17
89:19,22 90:1,2
90:6,13,15,18,18
90:25 91:1,15
92:6 102:23
104:25 108:11
108:16 109:9,22
110:5 111:17,19
111:24,25 127:4
127:7 172:15,24
174:8 215:12
216:14,15 217:6
217:15
**audios** 163:6
175:14
**august** 1:13 4:6
86:15 157:12
189:10 256:12
284:8 286:3
**author** 179:15
179:21,24
180:11 181:8,13
**authorized**
285:7
**authors** 170:11
170:22,25
179:12
**available** 61:4
62:24 63:7
73:11 123:16
159:5,10 160:3,4

CONFIDENTIAL

287:6
**avenue** 2:9
**average** 262:25
263:1
**aware** 12:10
21:17 31:10,13
35:10 56:14,18
57:12 59:15
159:13 161:5,8
181:7 183:7
189:15 207:14
249:6 275:7

**b**

**b** 3:9 12:25 13:5
13:13 46:22
47:2,5,9,13 50:1
50:20 52:24
53:8,8,14 55:7
58:21 143:23
144:2,15 162:21
162:23 174:15
**back** 15:22
21:17 34:18
48:24 57:24
58:11 67:10
74:4,16 76:11
83:2 89:8 91:18
102:19,20 106:8
107:23 108:1,18
109:2 114:8,10
114:14 119:4
120:3,10,14,17
122:7 124:12
126:1,13 129:8
135:7 136:5,23
139:3 143:5
150:19 154:10

154:15 166:22
167:1 171:17
196:11 198:16
206:14 209:2
211:18,24
214:14 229:22
229:23 230:2,7
236:10 237:15
241:21 242:4,9
250:23 251:9
254:24 259:1
260:12
**background**
118:21 223:14
228:25
**bacon** 2:3 5:17
17:3 26:24
34:16 37:12
80:15 112:7
158:14 244:9
**bad** 65:23 66:5
69:15,17 131:11
183:23 193:12
193:21 194:18
**badge** 145:25
**badly** 193:16
**balance** 237:3,6
237:7,16 238:14
240:22 260:16
**ballpark** 19:25
**banker** 128:16
**base** 125:7
**based** 22:13
24:15 26:10
34:24 76:22
77:2 78:13
89:17 124:16
138:23 150:17

169:8,11 170:19
208:10 210:9
211:12 215:15
220:21 227:9
230:6 232:5
238:19,20
240:10 246:20
249:22 262:23
269:12 271:12
274:12 276:10
281:6
**baseline** 273:7
273:13,15
**basic** 224:5,9
**basically** 78:15
112:15
**basing** 207:2
250:8
**basis** 77:1 93:21
94:6,12 96:1
127:5 145:18
146:7,10 147:3
169:22 171:6,12
172:21 174:5,11
178:4 182:1,9,25
189:19 190:24
195:15 205:18
214:15 216:23
217:1,13 221:11
222:17 223:20
224:24 225:3
246:14 272:21
278:15 281:6
**bates** 49:23 61:6
**bathroom**
195:25
**bear** 27:3

**beginning** 5:6
42:25 53:12
58:9 59:6 76:11
107:21 128:24
148:12 154:13
154:22 163:16
163:18 198:14
223:17 230:7
242:2
**begins** 164:10
**behalf** 5:17
**behaved** 193:15
193:16
**behavior** 39:15
70:20 113:2
132:3 134:14,24
138:7,24 139:16
148:10,19,24
152:19 165:4,12
183:23 191:9
195:1,2,2,3,8,11
**behaviors** 165:8
195:6
**belief** 94:6,13
127:5 169:8
**believe** 9:8 19:14
21:18 27:12
28:24 31:18
34:3,6,20 38:22
38:22 45:20
47:16 51:1 87:3
89:2 90:5,24
97:13,16 98:3,4
98:8 99:17
100:3,16,22
101:14,19
114:25 120:8,8
121:11 122:11

151:6 158:6,12
158:17 170:15
177:11 178:11
181:19 194:19
195:7 202:14
204:25 206:10
245:13 247:4
258:4 259:23
**believed**   96:21
96:25 97:2,11,12
97:19,21 98:13
**believes**   106:4
106:18
**best**   7:5 26:4,8
92:5 273:7,7
**beyond**   73:15
**big**   20:22 60:21
75:16 124:4
181:3 227:4
**biggest**   274:9
**binder**   22:19,19
22:22 23:1,15,20
30:9 48:24 55:3
55:7,13 159:5,7
159:11
**bit**   171:22 230:3
230:3 238:1
249:19
**board**   229:23
**body**   59:1 256:2
**boilerplate**
104:7
**books**   12:17 53:9
53:10
**bothering**   157:4
**bottom**   53:12
75:3 140:1
164:10 180:8

**branches**   252:1
253:7
**brand**   93:14
124:22 137:19
137:24 138:14
143:5 164:2,5,6
171:19 173:9,12
173:21 176:21
176:22,24
178:12,20,24
196:23 197:2,17
204:25 205:10
227:21 233:2,9
236:3,5,6,9,11
269:22,22,24
270:1,2,4,5
271:12 272:3,5,9
272:12,13,14,15
272:16,18,19
273:2,7,12,20,23
273:24 274:2,4,4
274:5,8,10,16,25
275:1
**brands**   269:16
269:19
**break**   35:14 49:2
57:3,9,15,22
60:7,8 61:11
72:18 107:8
118:2 154:1
195:25 196:4,7
198:4 241:3,15
**brenda**   18:13,16
19:23 20:3
**brewing**   211:13
**brian**   2:12 5:12

**briefly**   163:19
270:7
**bring**   143:17
149:23
**bringing**   147:18
147:23
**brings**   21:7
**broad**   143:2
**broaden**   191:10
**broken**   33:12
34:21 35:5
78:11 81:4
**brought**   102:6
**brown**   2:7 3:3
5:7,8 6:7,10
11:5,13 13:22,24
26:23 27:16
28:1 30:24
31:17,24 32:1
36:5 37:2 38:1,9
40:8 43:8 46:6
52:22 56:24
57:1,5,8,11,15
57:23 58:3,5,13
60:25 63:13,15
69:11,22 70:5
71:3 73:12,19
74:3,15 75:19
77:9 78:1 79:11
80:23 81:6,20
82:14 84:16
85:24 86:11
88:8,21,24 91:5
92:4,7 97:5 99:4
99:14 100:10
101:10,22 106:1
106:13,25 107:8
107:18,25

181:9 209:3

108:15 112:5
124:10,24
125:18 126:11
129:7 130:10
131:2 132:6,17
133:14,25
134:19 136:3,24
137:14 139:24
140:15,22 141:6
141:19 142:6,19
143:7,15 149:7
150:1,12 153:24
153:25 154:2,8
154:10,17 155:2
155:9 156:7,11
157:2,9,18,22,23
161:25 162:9,19
166:1,8 171:10
174:1 175:12
176:5,15 177:16
178:3 179:3
185:12 186:2,15
188:4 192:9,18
192:20 193:14
196:2,10 197:5
197:18 198:3,10
198:18 207:12
208:12 212:13
215:22 217:12
217:19 219:7,23
220:19 226:20
235:5 236:1
240:8,25 241:3,9
241:15,18,23
242:6 276:2
278:17 279:10
279:14 280:4,6,9
280:16,19

**[brown - campaign]**

281:22,25 282:6
282:8,12,16,18
282:23 283:6
**brownjr** 2:10
**budget** 202:25
203:1 252:4
254:10 270:22
**budgets** 257:1,4
268:6
**build** 143:5
**built** 232:4
**bullet** 49:14
**bunch** 217:7
226:6
**business** 26:19
99:8 117:22
131:1 164:4
165:9 184:1
188:11 270:9,14
270:14,15,19,24
271:21 273:8,11
274:8,17
**buss** 2:12 5:12
**buss's** 24:16
**buy** 152:7 187:8

**c**

**c** 1:17 2:1 4:1
17:17,21 284:6
284:14 285:6,23
**calculate** 124:21
208:19
**calculation**
202:8 238:18,19
**calculations**
239:14 269:7
**call** 10:9 15:20
32:25 33:6,11

34:22 35:13
36:23,24 45:9
55:2 60:8,11,11
60:13 68:5
76:23 78:10
81:21 87:2
88:19 92:14,24
92:25 93:2,6,13
93:20 94:8,22
95:12 98:2,7,8
98:10 103:11,22
104:1,6,13,17,20
104:22,23 105:4
109:14 110:1
115:25 116:6
118:13 119:7,9
119:10,12,17
122:7,19 130:23
136:16 137:7
146:15 153:7
161:2 176:1
185:19,21
206:23 207:1
208:18 224:8
228:8 230:1
236:18 237:6
246:6 247:5,13
247:14,22 248:6
248:10,18
249:20 250:24
252:1,25 262:20
263:11
**called** 14:12
16:16 17:12,17
19:3 35:10,12
36:15 37:17
48:3 53:14
60:12 61:14

76:20 94:17
95:15 111:2
116:2,4 134:6,22
134:25 135:6
144:8 154:21
189:13 207:14
248:16
**calling** 119:16
207:10 225:12
**calls** 10:10 14:22
15:1 28:22 33:1
33:13 34:1,24
35:5,10,18,20
36:8,9,18 38:8
38:10,23 39:19
46:17 49:16
59:24 65:24
66:5 75:10,12,18
83:23 84:5,6
85:18 109:17,19
109:23 110:2
112:17 118:1
119:18 120:13
124:3 134:5
136:7,13 137:4
142:14,18
144:13 148:7
164:13 166:14
166:15 195:9
216:16 242:18
246:22,24 247:3
247:10,20 248:2
248:5,7 249:7
270:19
**cameras** 4:9
**campaign** 25:5
29:20 65:15
66:8 101:16,21

105:20 113:19
115:24 116:1,3,5
116:7,10,12,19
117:4 125:15,22
126:6 129:23
131:7 132:5,14
132:22 133:5,8
133:13,20 134:7
134:18 135:11
135:17,21
138:25 139:17
140:23,25 142:8
142:11,17 143:2
143:3,8 152:16
153:12,22
163:10 172:11
173:20 176:21
178:6 185:15,20
185:20 186:10
187:15,17 188:1
188:16 199:13
199:23,24
200:15,22,25
201:18 203:9
205:20,23 209:7
209:18 211:8,8
221:13,21 222:4
222:20 223:3,6
223:21,25 224:3
225:6,18 227:4
235:7 245:23
247:9 248:23
253:20 254:2,8
254:12,13,23
262:18 264:11
267:5,8,10,12,15
268:16,23,25
270:3,22

CONFIDENTIAL

**[campaigns - character]**                                                                 Page 11

| | | | |
|---|---|---|---|
| **campaigns** 191:6 | 93:11 100:5,12 | 199:17 208:8,14 | **causal** 272:23 |
| 202:17 203:6 | 100:17 101:15 | 208:23 209:1,13 | 275:24 |
| 224:14 225:24 | 101:16,24 102:3 | 209:16 210:8,8 | **caused** 135:12 |
| 226:15,18,22 | 102:13 106:7,11 | 211:1,10,13,17 | 173:9 224:19 |
| 268:4,7 | 106:23 111:6 | 211:17,18,20,21 | 225:21 232:23 |
| **campbell** 209:3 | 113:4 114:4 | 211:24,25 212:1 | 233:9 |
| **cancel** 119:25 | 122:21 123:7,9 | 212:10,15 213:4 | **ceo** 271:22 |
| 129:10 130:5,25 | 123:22 124:14 | 213:7,11 214:20 | **certain** 54:10 |
| 131:4 | 125:2,6,11,15,23 | 214:22,24 | 70:21 76:8 |
| **cancellation** | 126:7 129:24 | 216:19,21,22 | 129:22 130:15 |
| 129:15,21 | 130:17 131:15 | 218:9,16 219:11 | 224:1,1,2 232:5 |
| 187:19 | 134:10 135:9 | 219:25 220:2,7 | 246:10 261:11 |
| **capable** 277:1,2 | 138:10,19 146:2 | 221:20 222:15 | **certainly** 28:23 |
| **captured** 144:9 | 146:21 147:11 | 226:8,9,23 227:6 | 80:14 120:16 |
| **care** 122:3 | 147:12,16,19,24 | 231:5,6 234:16 | 141:4 191:24 |
| **career** 12:16 | 148:14 149:8,10 | 235:16 239:17 | 210:4 220:9 |
| **careful** 98:16 | 153:5 154:24 | 240:12 255:12 | 270:19,21 |
| **carries** 140:20 | 155:6,22 156:8 | 256:18 270:1,2 | **certainty** 71:6 |
| **case** 1:3 4:22 | 156:20,21 158:2 | 270:24 271:2 | **certificate** 3:4,5 |
| 6:23 8:2,5 9:3 | 158:8 160:2,11 | 272:6 273:3,21 | 284:1 285:1 |
| 9:17,18,25 10:1 | 160:14,24 161:6 | 274:19 275:5,13 | **certify** 284:7 |
| 12:14,24 14:5 | 161:9,17,22 | 278:22 281:4,8 | 285:13 |
| 16:19 17:10,13 | 162:4 163:5 | 282:10 286:2 | **cetera** 12:18 |
| 18:2,16,20,23,25 | 165:4,9,13,13,20 | **cases** 16:24 17:2 | 42:21 135:2 |
| 19:7,13 20:7,7 | 165:25 166:18 | 17:6 20:4 21:3 | 149:21 225:6 |
| 21:10,13 24:11 | 168:3 169:23 | 65:23 183:14,14 | **chain** 255:2,20 |
| 24:14,18,19 28:5 | 171:7,13,24 | 184:7 210:5 | **chance** 82:6 |
| 28:19 29:2,23 | 174:10 180:4 | 211:11 228:17 | **change** 9:25 |
| 40:2,11,15,22 | 181:23 182:1,6 | 231:15 234:14 | 24:17 82:7,10 |
| 42:6 44:8 50:23 | 182:10,13,22 | 269:25 | 86:21 93:10,16 |
| 54:8,9,13 56:5 | 185:5 187:24 | **categories** | 156:12 241:1 |
| 56:16,19 57:13 | 189:19 190:24 | 175:21 177:5,8 | 249:8 270:16,16 |
| 65:15 70:25 | 191:3,16 193:17 | 177:20,23 | **changes** 286:1 |
| 71:13 73:2 74:6 | 193:18,20 194:3 | 178:16 | 287:10 |
| 79:5,22 81:13 | 194:9,16,20 | **category** 117:25 | **changing** 45:22 |
| 82:7,11 84:3 | 195:19,21 | **catherine** 42:20 | **character** |
| 85:20 86:2,6,22 | 196:15,17 | 108:9 | 180:14,21 |
| 87:3,20 88:16 | 198:23 199:1,10 | | |

characterize 254:18
characterizing 73:17
charge 202:9
charles 20:22
charlie 244:5 262:10
check 263:20
chesapeake 243:11
chicago 237:12 238:7
chief 201:17 255:4,5
choose 43:25 44:13,14 236:22 239:19,20,23 245:25
choosing 238:19
chose 43:23 44:1 65:2,8 66:14,17 239:12 240:20 248:8
chosen 62:12,14 63:3 77:23 78:2 79:8,17
chunk 233:22
citations 22:20 169:25
cite 169:20 174:16
cited 12:15 59:1 157:17 223:8
cities 234:25 235:1 236:15,19 236:22,23 237:10,12

238:11,11,23 239:2,13,15 240:3,10,13,16 243:7,11,12,16 243:18 244:8,10 259:8
city 188:21 189:5 259:6,9,13 259:14 260:14 260:20
claim 166:20 216:23 217:8
claims 29:19 135:1 147:18,23
clarified 107:5
clarify 57:10
class 269:23
classic 209:1 231:3 232:3
clause 142:2
clear 87:9 95:7 146:12 156:25 165:3 183:25 281:20
clearly 96:4 97:19 142:4 256:10
click 23:4,8
client 218:20 219:15
clients 218:22 252:20
close 57:2
cloud 22:13
coast 188:21 189:5,8
collect 229:15,19 231:1 232:8

276:21
collecting 230:24,25
collection 190:5 228:19 229:2 230:19,22
collectively 8:20 10:14
columbus 237:25 238:5
column 259:11 259:12,13,16 260:10 261:4
combination 171:14
come 7:20 15:22 24:3,6 43:23 57:24 93:23 94:18 96:11 105:20 115:6 153:17 175:20 212:20 215:13 233:22 239:25 240:14,16 247:15 257:17 262:17 269:5,8
comes 102:8 132:24
comfortable 149:22
coming 178:13 269:2
comma 99:23
comments 163:8
commercial 270:24
commission 250:5,6 284:15

commit 148:14 150:6 174:6
committed 148:15 149:12 172:4 173:18 174:24 175:22 192:22 194:6,8 209:24 210:2
common 99:7 120:2 121:10 224:7,8
communicate 68:3 170:25 206:3,5,7 236:7
communicated 68:4 234:16 262:16 278:14
communicating 112:23
communication 163:10 192:5 211:8
communications 138:25 142:16 176:20 204:13 213:10,24 253:22 274:23 277:18
companies 20:12 20:23 98:18 105:12 165:6 182:18 183:10
company 10:9 16:16 17:12,17 19:2 20:11,16,17 20:19 28:8 30:15,21,25 31:3 75:16 94:25

CONFIDENTIAL

95:2,18 99:5
100:25 101:8
103:5 105:12
115:11,14,16
120:4 127:14
131:12 152:23
153:6 164:2,6
169:6 183:23
189:13 191:1
193:8 194:1,8
195:3,3 208:20
212:21,21
271:20,22 274:9
**compare** 273:15
**compensation**
261:23 263:1,2
**competent**
152:21
**competing** 165:6
**competitor** 99:6
117:21 120:20
120:25 121:3,19
123:11
**competitors** 94:1
98:19 122:18
146:14 220:16
**complain** 219:20
220:11 225:15
**complained**
279:22
**complaint** 14:21
50:9 78:16,18
147:13 150:7
164:13 185:10
**complaints**
14:13 34:25
37:17 51:8
171:20 220:12

**complementary**
171:4
**complete** 7:6
13:9 32:16
**completed**
287:17
**compliance**
190:6
**complicated**
141:12 214:1
229:25 276:22
278:5
**component**
187:14 191:25
**components**
50:24
**computer** 49:6
53:25 55:11,12
**concept** 267:10
**conceptualizat...**
250:16 251:13
**concerns** 116:16
**conclu** 224:24
**concluded** 280:8
280:9,23 283:8
**concludes** 281:2
281:12
**concluding**
149:22
**conclusion** 67:12
124:25 125:9
136:6 138:9
146:7,11 147:4
148:9,16,17
150:5 165:17
172:17,22 174:5
174:21,24 176:6
177:6,8,17,24

178:4 192:25
195:9,20 196:16
197:7,20 205:18
221:4 224:25
225:1,3,20
232:11 239:1
**conclusions**
65:11 66:2 67:5
67:6 70:22
93:10 163:5,17
165:19 169:22
222:12 229:3
231:6 267:20,24
268:2 270:17
**concur** 280:7
**conditions** 111:7
**conduct** 87:12
135:18 182:21
182:24 183:8,9
183:18,19
184:13 186:23
187:23 189:12
189:16 192:11
219:25 228:5,15
228:21 230:14
275:16
**conducted** 4:7
59:18 192:12
193:1 209:12
232:13 247:12
271:10
**confidence** 169:7
**confident** 94:2
**confidential** 1:6
281:5,9
**confirm** 132:8
156:18 266:10

**confirmed**
103:22
**confirming**
266:24
**confused** 31:21
92:15 104:2,10
104:15 105:7,7
105:10,18 106:2
106:16 117:11
139:9 205:16
**confusing**
209:19
**confusion**
105:22 117:7
129:18 252:12
**conjunction**
80:10
**connected**
285:16
**connection** 4:10
**conservative**
234:23 250:1,3
262:22 263:14
268:19
**consider** 72:21
238:6,10 268:14
276:24 280:22
**considered** 9:4
9:18 10:3,6,8
13:5 196:4
243:15 260:22
271:1 276:13
**considering**
24:14
**consistent** 85:1
165:4,12 211:6
**consistently**
193:9 215:14

CONFIDENTIAL

constraint  80:4
consultants
  16:15
consulting   16:18
  84:19
consumer
  184:22 185:1,4,7
  185:14 186:4,6,8
  212:2,11
consumers
  117:11 133:10
  148:11,19 164:5
  164:20 185:20
  185:23,25
  207:24 211:7
  212:5,8 278:14
contact   28:7
  78:19 81:4,22
  134:7 142:22
  249:12
contacted   106:6
  106:22 119:6,11
  134:9,11,16
contacting
  119:15
contacts   80:19
  80:25 81:5,18
contained   213:2
content   27:25
  52:10 111:5
contents   68:17
context   180:23
continue   4:13
  73:23 152:19
  154:18 175:9
  194:19,21 225:9
  227:13 229:19
  279:2 280:11

continued
  193:21,23
  194:17
continues   205:1
  205:6 227:10,12
continuing   53:13
  59:7 193:11
  195:8,11
contract   77:16
  91:10 110:14,20
  110:22,24 111:5
  111:8,8 113:10
  114:18 129:10
  130:6,25 131:4
contracts   96:9
  112:8,10,20
  113:5,7
contradict   79:21
contrarian   71:15
contrary   27:23
  71:16 84:13
  85:2
contributed
  177:6
conventional
  235:4,6 267:6
conversation
  24:24 32:13
  128:15 266:22
  266:25
conveyed   266:11
convinced   25:4
  163:12 196:22
coordinated
  253:19
copies   22:10,13
  30:2 31:19
  32:16 49:3,5,11

51:15,25 53:21
53:24 112:8,18
113:4 158:10,20
158:21 257:3
268:6 278:23
287:14
copy   10:19,22,23
  11:2,6 47:17
  55:10,12 77:16
  108:23 110:24
  144:14 256:21
  282:3,9,15,16,18
cornerstone
  20:13,16,22
corp   1:7 9:12
corporate   8:6
corporation   8:13
  8:16
correct   11:2
  15:19 18:7 26:9
  31:15 37:22
  38:24 43:1,4,13
  43:14,21 44:25
  55:14 58:18,22
  59:8 64:1,4,5,8,9
  65:5,6,12 66:3
  66:18 69:10,25
  70:3 71:22 78:5
  78:6 83:7,24
  84:22 85:16
  86:15,16 87:7
  89:4,5 91:16
  92:9 99:11
  100:13 102:10
  102:25 103:1,5
  103:20 105:1
  108:4,9 110:3
  117:4,5 119:23

121:16,20,24
125:2,3,6 127:24
131:21 135:25
136:2,8,19 137:2
137:18 143:23
144:6,10 145:1
151:15,20,21,24
152:6,9,12
154:24 155:19
158:9 163:1,2,23
172:11,19,20
173:2,3,21
175:18,22
180:17,19
181:21 182:23
184:17 186:25
187:1,21 188:12
188:13,22 189:6
189:10,13,25
190:1 194:1,2,10
195:15 199:2
200:8,21 201:10
202:10 206:19
207:19 210:3,11
210:12,15,16,23
211:3,5 212:5
213:3 214:24
215:3,17 216:6
216:16 217:16
218:5,13,14
220:16 221:16
228:23 230:16
231:16,17
232:16,20
233:13 235:10
235:11 236:16
236:17,20,21
242:19 250:9,10

251:17,20
255:22 256:6
257:8 258:2
259:10 261:1,8
262:7,13,14
263:17,18,21
265:11 266:7,8
266:12 267:15
267:16 271:3,4
271:13 280:14
**corrected**  114:20
185:15 186:9
221:15
**correcting**  209:9
**correction**  95:4
286:5
**corrections**
209:20 286:4
**corrective**
206:20,24 207:4
207:10,14,16,21
208:2,4,14,22,25
209:22,23 210:1
210:5 224:3
**correctly**  35:6
43:20 72:4
88:12
**correspondence**
197:13
**corroborate**
164:12
**cost**  133:2
176:20 177:14
177:18 200:11
202:5 203:24
210:14 214:7
235:22 236:3
237:17 250:2,8,9

252:5 267:7
268:18
**costs**  184:9
188:7 200:13,14
200:18 201:15
202:4 266:1
**coughing**  118:21
**coughs**  117:13
**counsel**  3:15
4:18 5:4,20
10:22,23 17:3
61:5 149:23
158:12,13
159:16 160:16
161:1 244:4
255:18,19 262:1
262:4 285:14,16
287:14
**counselor**  19:21
57:21 63:2
119:20 216:18
**counsels**  262:2
**count**  234:18
259:17 261:14
**counterclaim**
161:8,11
**counterclaima...**
1:15 2:11
**counting**  218:12
**counts**  259:7
270:7
**county**  284:4
285:4
**couple**  118:24
175:5 215:5
258:13 273:22
279:5

**course**  12:21
26:19 97:12
147:20 227:25
269:21
**court**  1:1 4:20,24
5:18,21 6:1 7:3
30:17 38:6
53:15 74:3,5
92:3 106:10,14
124:11,13 126:3
156:1 162:16,18
175:3,8 184:9
196:10,12 207:6
207:9 234:10
281:11,21 282:1
282:5,11,21
283:4 284:14
285:23
**cover**  11:15
129:14 130:6,25
131:5 133:2
185:18 245:21
**covered**  197:14
**cpi**  193:20,25
194:7,16 216:19
**create**  173:20
231:5 242:23
258:15
**created**  30:21,22
30:25 31:3
210:9 242:10,14
243:2 245:9,10
252:12 258:5,7
**creating**  41:24
268:22
**creation**  242:24
**credence**  193:10

**credibility**
176:13
**credit**  190:4,6,11
190:17
**criteria**  28:2,17
28:23
█████  3:3 42:20
43:4,13,20 44:10
44:23 46:14,18
89:1,4,7,14 90:6
90:14,16,19,22
90:25 91:2,8,10
91:13 92:8,15,19
92:22 93:1,5,18
94:4,5,6,13,17
94:23 95:5
96:20,21 98:2
99:16,17 100:2
100:14,22,25
101:23,25 102:4
102:5,8,13 103:7
103:12,17 104:2
104:2,10,14
105:7,17 106:2
106:16 128:8,9
128:23 129:4,9
279:8
**cs**  287:15
**cs5384054**  1:25
286:25
**culpable**  148:10
148:18,24
150:15 185:6
**cumulative**
259:17 260:11
260:14 261:4,9
261:13 270:7

CONFIDENTIAL

**curious** 210:25
**current** 195:1
**curve** 260:15
**curves** 261:9
**cust** 218:21
**customer** 13:16
14:13,21 26:18
29:18 32:9
34:25 35:12
36:19 37:16,18
38:8,10,24 39:1
39:3 44:8 45:9
49:16 51:8
52:12 75:10,12
76:18,21,23,23
77:6,6,11 92:15
97:10 98:1,23,25
101:4,14 108:9
112:24 113:1,5,9
113:13,23,23
114:5,9,13,23,24
114:24 115:1,4,8
115:18,18,21,23
120:10,16,19
121:2,4,8,18,19
121:22,23 122:2
122:9 124:20
125:7,13 128:7
129:19 130:14
130:16,22,24
131:11,14
132:12,20,25
133:16,18,19
134:8,22,23
142:20,23 144:6
145:15,21 146:2
146:2,17 147:1,3
147:6,8 150:20

151:23 152:4,13
152:16,21,23
153:8,12,14,16
154:21,23 155:4
155:5,20 156:15
156:19,21
157:24 158:5
159:9,10,15
160:9,10,24,25
161:6,20 162:1,7
163:4 171:20,21
172:14 187:25
222:2,6,19
245:22,25
249:12,12 251:1
251:1,4,5,7,12
251:14 252:23
253:7 254:18
257:14 270:7
274:19 277:7,13
277:23 278:3,9
278:11
**customer's**
50:15 113:16
144:6 145:10,13
**customers** 10:11
13:17 25:2
28:22 34:4,7
35:2,9,10,20
36:8,9,13,15
37:5,7,8,10,15
37:15,17,19
38:13,14,16,17
38:20,25 43:16
45:21 50:12
72:3 75:17 76:6
76:20 77:8 98:6
112:1,2,9,14,20

112:20 114:7
117:24,24
119:25 120:13
121:7 122:12,23
123:2,10,13,23
124:1,3,14,23
125:1,5,8,10,19
126:3 132:1,2
134:5 135:17,24
143:3,9,9 149:5
149:17 150:22
151:6 152:25
153:11,23
159:17 160:6
161:17,22
164:14,15,22
173:8 182:16
184:8 187:15
190:15,15,16,20
192:23,24 193:2
199:22 200:8
201:8,11,14
202:1,10,15
203:13,16,25
204:2,5,7 205:15
206:2 214:5,8,22
214:25 216:5,25
218:15 219:6
220:22 221:17
221:22,25
222:13,16,25
223:22 225:11
225:13 234:16
234:19,22,25
235:2,15,17,21
236:16,20
237:10 242:13
242:16 243:5,12

245:21 246:19
247:24 250:20
251:8 259:9,12
259:14 260:14
260:17,21,21,24
261:3,6,12,15,21
262:20 263:7
267:1 269:14
270:9,9,12,13,16
270:19,25,25
271:1,3 272:13
273:3 277:21
279:13,22
**customized**
246:16 248:15
**cut** 216:20
248:21 260:24
**cv** 1:3 4:22
227:25 286:2
**cycling** 230:7

**d**

**d** 3:1 4:1 171:23
**daily** 261:23
**dallas** 238:8
**damage** 97:14
176:21 178:11
178:20,23,25
179:2 196:23
197:1,16 205:6
205:10 206:4
210:8 214:11
224:19,21
225:20,22
226:11 232:14
232:19,23 233:1
233:8,12 236:4,6
236:8,9,11 270:4

**[damage - definitely]** Page 17

273:25
**damaged** 164:1
236:3 272:19,20
275:16
**damages** 19:12
124:22 176:19
178:5 195:21
196:17 200:19
202:9 208:9,9,20
210:18,19 220:1
227:20 239:16
240:11,23
244:14 249:22
256:18
**dan** 255:3,17,18
255:20 256:2,8
256:11,12,14,16
261:24 262:1
266:5,13,17
**dash** 18:14
**data** 212:21
226:8 228:18
229:2,12,13,15
229:19 230:19
230:22,24,25
231:1 232:7
233:17,19,22
237:7 258:9,11
259:22 260:2,3
264:16 266:18
269:4 270:11,12
270:20 271:19
274:7 276:20
**date** 1:13 92:24
93:5 127:9
157:16 158:4
251:6 255:15
286:3,24

**dated** 86:15
183:5 256:11
285:19
**davenport**
170:14,17
**davenports**
170:20
**day** 137:23
161:10 179:19
238:16 245:22
246:1 247:25
284:11 285:19
**days** 118:24
185:23 264:11
264:12,14
287:17
**dealer** 247:24
248:6
**deceived** 135:6
136:8,11,14,17
136:18,18 137:1
137:5,8 140:17
140:24 142:3
219:19 225:14
225:17 252:11
253:5 277:23,25
278:3,4,11,12
**december**
183:20
**deception**
122:10 129:18
130:11,12 131:6
131:6,13,19,19
131:21,22
132:10,11,11
133:4 188:11
213:17,24 214:2

**deceptions**
275:20
**deceptive** 10:10
13:18 25:4 29:1
39:15 103:12
116:23,24 117:2
117:20 119:7,12
121:24 122:3,8
122:23 123:2
125:20 126:4
130:21 132:8,19
132:25 133:1,3,9
133:12 134:14
135:10 138:24
139:16 148:10
148:18 149:4,12
152:19 164:15
166:15 168:6,9
172:4,9,18,22
173:13,18 174:6
174:25 175:22
176:14 182:6
185:1 186:4
189:9,21 191:5
192:12 193:1,5
193:12 194:7,9
194:20 195:8
196:24 200:7
201:7 203:20
205:2,22,23
206:15,16
207:23 209:25
210:21 211:9
212:2,4,17 213:2
213:13,20,24
214:16 215:2
218:2,5,12,16
219:2,4,10,25

220:4,6 221:15
221:19 223:2,23
223:25 225:8
233:9 246:21
248:19 252:25
275:23 277:8,9
277:14,15
279:23
**decide** 148:3
235:12,14
**decided** 69:9,12
69:13 159:11
**decides** 148:2
**decision** 79:25
80:3,5,8,9,13,16
150:10 236:15
243:21
**declare** 286:22
**decline** 275:25
**declined** 275:11
275:15
**decreased** 275:8
**defend** 207:25
**defendant** 9:18
10:1 16:25 54:8
**defendants** 1:8
1:15 2:11 3:10
5:9,11,13 9:3,17
10:14 11:12
**defense** 2:13
4:18
**definitely** 80:17
98:6 119:3
121:5 133:21,24
134:15 183:11
187:17 219:2
220:13 279:15

**delegated**  41:14
**deliver**  203:25
**delivered**  116:11
116:12 206:1
214:9,17 216:8,9
216:25 221:13
221:16,18,19
223:21
**delivery**  205:19
**demanded**
209:16
**demonstrate**
190:14
**demonstrated**
249:3
**denver**  2:4
**department**
258:22,24
**depend**  122:9
**depends**  4:9
229:21
**deploy**  263:8
**depo**  31:25
157:11
**deponent**  3:16
287:13
**deposed**  6:16
**deposing**  287:13
**deposition**  1:12
3:5,16 4:7,17
6:23 7:2,18 8:19
10:13,20,21
11:10 12:6
42:24 47:4
53:19 54:3,8,10
55:1,6 56:1,5,9
56:15 58:8,17
60:18 61:11,24

63:8 71:22 72:2
73:25 74:17
81:4,8 83:6
90:13 107:20
108:3,8 109:6
118:10,15,19,23
143:18,20
154:12,19 156:8
158:1,7 164:14
166:14 170:2
174:7 179:7,8
198:13,20
216:13,14
217:15 223:17
242:1 249:1
254:25 257:13
278:21 279:3
280:7,11,23
281:2,9,24 283:8
285:1,9
**depositions**  25:2
53:18 54:14,15
55:16,20 56:18
57:12 71:8
148:8 149:21
154:22,23 155:5
155:6,20,21
156:13,15,19,21
157:10,13,15,25
158:2,3,6,11,22
158:24 159:9,10
159:15,17,23
160:6,10,10,13
160:17,20,24
161:1,6,15,16,20
161:21 162:1,3,7
162:8,10,13,14
163:4,7 171:21

172:14,24
174:15 175:14
215:12 217:6
**deputy**  255:19
262:3
**describe**  119:8
119:13,22 166:9
176:18 177:1
198:21 199:5
228:2
**described**
131:18 145:8
155:17 165:19
166:4 172:8
183:8 204:15
205:9 209:13
222:22 231:19
234:3,4 251:18
271:11
**describing**  92:25
150:21 151:2
**description**
68:24 238:3
257:21,24
**design**  267:2,14
268:22
**designate**  281:8
**designs**  268:14
**detail**  145:25
148:7 153:22
169:4,6,16
173:15 250:14
**detailed**  166:24
169:9,19
**details**  19:16
161:11 184:16
**determination**
26:3 66:22

235:17 237:8
**determine**  23:18
28:17 29:5
101:12 120:18
121:2,14,15,19
121:23 122:2
148:23 150:6
159:14 169:14
176:17 178:17
183:14 204:10
204:20 210:21
212:16 226:9
243:6 254:12
261:13 275:3
**determined**
41:16 175:21
**determining**
113:17
**develop**  66:7
176:20 197:15
197:24 205:3
217:24 234:21
267:10 276:19
276:22
**developed**  208:9
235:2 238:24
256:24
**developing**
197:4
**diane**  1:17 4:25
283:7 284:6,14
285:6,23
**difference**
214:23
**different**  9:23
17:24 21:4 34:3
34:25 36:23
51:2 81:10 87:5

[different - doors]                                                                 Page 19

94:25 95:2,18
99:3 103:4
110:1 117:9,25
133:15 153:17
166:10 184:19
209:11 212:8
213:9,18,19,19
213:22 214:22
214:23 215:5,7
216:21 231:14
231:23 233:24
234:1,25 239:25
240:7,9 243:16
248:5,7 253:3,7
264:3 269:22
274:13
**differently** 63:21
64:11
**difficult** 168:16
**digits** 226:2
**diminished**
138:1,15
**direct** 3:3 6:6
30:1 31:3 40:17
56:8 65:19
69:16 139:25
160:16 178:8,10
178:14 180:7
181:17 189:22
197:13 202:17
216:3 224:15
226:1,1 235:7
245:15 253:25
254:24
**directed** 27:5
29:25 39:9,11
65:22 66:1 69:2
69:5 70:11

141:8 147:12,22
167:3,6,25
188:16 242:15
**directing** 28:24
43:3,11 242:23
**direction** 71:10
87:11 197:24
198:1 242:12
243:4 245:18,19
**directions** 87:9
**directly** 127:22
**disagree** 238:4
**discern** 141:23
**disclose** 188:7
**disclosed** 72:3
**discovered**
176:11 278:4
**discovery** 16:3
**discuss** 68:18
118:5,6
**discussed** 50:17
117:20 143:23
150:4 173:14
181:20 189:16
190:23 191:20
197:19
**discusses** 108:9
**discussing** 69:3
69:6 178:17
195:19 196:15
197:7 199:18
243:17 246:23
**discussion** 119:8
119:13 122:7
187:10 243:15
243:17 246:5
251:16

**discussions**
80:11
**dismissed**
247:15
**dissemination**
267:13
**distinct** 109:13
**distinction** 8:15
8:24 9:23 10:4
10:15 36:11
174:19 277:20
**distinguish**
98:19 114:6
152:25 169:15
183:16 274:19
277:6,12,22
278:9
**distributed**
211:10
**distribution**
234:24 237:10
**district** 1:1,1
4:20,21 250:23
263:9
**division** 1:2 4:21
245:24
**doctor** 211:15
**document** 47:6
152:19 164:19
258:5 286:22
**documentation**
257:18
**documents** 48:4
49:15,25 50:5
53:15 59:1
63:19 91:12
258:13,15

**doing** 6:8 7:2,17
21:7 41:17
54:12 67:8
101:2 113:14
118:7 124:20,20
131:13 143:4
144:22 206:20
207:23 210:24
228:24 231:7,10
235:22 246:13
248:13 249:16
249:25 273:20
276:24 277:1
**donald** 76:16,16
77:10,14,16,20
78:25 80:19
81:1
**door** 96:6 124:25
124:25 125:10
125:10 126:16
152:17,17 164:1
164:1 216:5,5
221:14,14
247:16 249:16
249:16 250:12
250:12 253:21
253:21 263:7,7
263:11,11 267:6
267:6,13,13,15
267:15 268:15
268:15,23,23
270:18,18
**doorbell** 50:16
144:9 151:3,5
247:16
**doors** 215:10
216:25

CONFIDENTIAL

**[doorstep - employ]**                                                    Page 20

**doorstep** 151:14
**double** 263:20
**doubt** 115:10,21
  117:2,6,10,18,19
  117:22,25
  129:18
**doubts** 116:16
  116:17
**download** 55:10
  55:12
**dozen** 67:1,4,5
  88:23
**dr** 1:12 3:2 4:17
  6:3,8,15 32:2
  57:12,18 58:10
  58:14 61:14
  63:17 73:2 74:6
  99:23 107:14,22
  108:2 118:1
  154:5,14,20
  155:4 156:12
  157:24 198:6,15
  198:21 214:12
  216:20 217:20
  217:22 227:24
  241:7 242:3,7
  279:6 281:13
  282:23 283:3,6
  284:7 285:9
  286:3,4,24
**draw** 9:23 10:15
  64:14 231:5
  275:24 277:20
**drawing** 194:24
  229:3,23
**drawn** 15:2
  59:25 60:4,22
  67:6

**drew** 191:8
**drink** 27:3
  117:15
**drive** 49:7,7
**driver's** 284:17
**drives** 22:13
**due** 138:7
  139:16 142:5
  190:16 210:15
  270:5
**duly** 6:4 284:9
**duped** 94:23
  95:6,16,25 96:2
  96:6 97:1,18
  102:10,15 103:3
**duplicative**
  33:16,18,21,22

**e**

**e** 2:1,1 3:1,9 4:1
  4:1 6:14 10:22
  10:23 11:2 16:9
  18:9,13,14 22:6
  49:12 158:20
  159:2,3 199:14
  226:1 227:1
  235:7 253:25
  255:2,20 256:2
  256:11,19,21,22
  261:24 262:16
  266:2,9,16
  268:10 282:6,8
**earlier** 27:24
  28:6,20 34:20
  35:4 42:12
  45:15 59:18
  70:7 75:6 76:2
  81:3 84:12

86:12 89:2,12
  105:10 113:15
  117:20 143:21
  159:22 181:19
  197:13 210:5
  221:1 222:1,18
  243:15 246:20
  248:25 256:19
  256:21 259:7
  261:25 273:19
  273:22 274:22
  281:23
**early** 124:19
  205:21 206:17
**easier** 47:18
**easily** 206:6
**eastern** 1:14 4:5
  57:19 58:6,12
  107:15,24 154:6
  154:16 198:8,17
  241:8 242:5
  281:18
**easy** 261:12
**eblen** 244:5
  262:10
**educate** 143:3
  207:24
**educated** 274:9
**educating**
  203:19 219:5,6
**educational**
  208:1
**effect** 220:12
  222:21 229:8,9
  229:25 230:1
  236:8 272:11,24
**effective** 131:25
  153:18 205:13

225:24 226:3
  228:13
**effectiveness**
  204:11,20 228:5
**effects** 228:6,7
**efficient** 32:12
**effort** 25:13
  204:13 267:17
**efforts** 198:22,25
  199:5,16 204:11
  204:14,16,17,20
  204:23 205:5,8
  224:19 225:4,7
  225:20 226:10
  227:16 232:12
  232:18,22
  257:20,22,25
**ehobbs** 2:4 287:2
**eight** 16:23 20:1
  21:3 245:22,25
  246:4 248:4
**either** 78:4 144:1
  199:17 244:5
  258:20 268:3
**elaborate** 156:25
  157:5
**elapsed** 60:17
**electronic** 22:19
  22:22 23:1,15,20
  54:22,24,25 55:7
  55:13 158:20,21
  159:7,11
**else's** 115:19
**empirical** 228:20
  230:18,25
  231:10,19
**employ** 205:2

**employee** 126:16
126:23 127:6,13
127:20 252:6
266:7 285:14,15
**employees** 20:9
20:13,20 103:13
249:17 250:12
**encounter**
111:18 118:19
118:23 206:8
**encounters**
216:8 217:11
**engaged** 165:5
218:5
**enlarge** 74:20
**ensure** 87:23
88:2
**enter** 114:18
286:1
**entered** 113:10
281:8
**entire** 24:23
45:23 46:8
55:10,15,20
73:10 87:7 88:3
191:11
**entirely** 73:15
212:7
**entirety** 53:1
69:24 70:6,10
75:8 83:13
92:10 110:4
119:19 145:2
**entities** 8:1,8
9:17,23 10:5,16
**entitled** 255:1
**entity** 8:7,10,11
8:25 9:4,6 10:3

10:7,7
**entry** 50:9
**environment**
114:20
**equal** 6:24
**equipment**
126:18 137:12
137:22,24
138:13 153:9
213:21 219:20
247:19 249:8
**equity** 137:25
164:5 272:15
274:2
**eric** 2:2 5:16
35:24 73:12
118:11 157:4
170:5 244:5
262:12 283:7
287:1
**errata** 3:6 286:1
287:11,13,17
**erratas** 287:15
**errors** 12:10,11
**esq** 287:1
**esquire** 2:2,7,8
**essentially**
167:17 168:18
173:16
**establish** 178:23
273:6
**established**
196:25 197:11
273:13
**establishes**
150:14 196:20
**establishment**
192:1

**estimate** 87:2
138:6 139:14
208:9 212:20,21
220:11 236:4
239:16 240:11
255:23,24
268:13,20
269:21 272:17
**estimated** 248:1
248:4
**estimates** 200:12
200:14 274:2
**estimating**
269:22
**estimation**
249:22
**et** 1:4,7 4:18,19
12:18 42:21
135:2 149:21
225:6 286:2
287:4,4
**evening** 126:16
127:1 283:5
**eventually**
150:24
**everybody** 120:3
154:10 283:5
**everyday** 128:15
**evidence** 14:20
24:11,25 28:21
65:13,14,14 66:1
66:5,6,10 67:8
70:22 71:7,17
148:17,23 149:3
149:11,15 150:4
150:14,18
164:12 165:14
165:18,23 166:3

168:25 171:3,4,6
171:12,18
174:20,21,22,23
175:21 176:11
177:4,6 183:22
191:15,21 193:5
193:21,23
194:24 202:17
215:16,24
**exact** 8:11 19:24
32:19 33:19,20
62:23 86:25
104:17 128:1,19
129:3 139:13
219:13 220:3
221:1 246:5
250:15 255:15
**exactly** 14:8 16:2
45:16 46:5,11
60:4,20,21 64:23
86:10,24 90:2
92:11 120:15
128:4,8 173:3
190:18,18
210:24 211:2
212:2,4 216:3
218:3,10 235:24
243:20,25
263:11
**examination** 3:3
3:3 6:6 279:8
**examined** 6:5
**example** 92:14
100:8 101:23
186:23 188:5
232:2
**examples** 42:20
67:5 69:14,16

70:20 184:20
187:19 190:14
231:14 269:23
**excellent** 271:22
**exchange** 261:24
266:2
**exclusively**
231:11
**excruciating**
148:7
**excuse** 10:20
27:3 29:7 32:2
83:17 117:13,15
122:20 132:25
165:10 170:8
217:14 223:7
237:24 259:12
**execute** 224:14
**executing** 191:5
**exercise** 170:12
**exhibit** 3:10,11
11:10,12,25 13:4
42:23 47:4,6
49:18 53:9
58:16,16 65:17
69:17 71:20,21
71:25 72:2,7
74:17,18,19 75:8
75:22 76:12,14
81:8,8,16,17
82:4,4 83:6 89:8
90:9,12 91:19
105:1 108:3,8,18
109:3,5 143:18
143:20,23 144:2
144:15 154:19
155:14 156:23
157:25 162:2,21

162:21,24
163:20,23
164:11 179:4,6,7
179:8,11 180:2
181:10,18 189:3
189:23 193:11
198:19 204:18
224:16 236:12
242:8 243:3,10
243:11,13
254:25 255:1,1
257:10,11,13,14
257:16 258:7,10
258:11,13 259:1
259:4,6 260:8
261:23,23
264:20 266:1
271:7 281:22
282:7,9
**exhibits** 237:14
242:8 243:10
**exist** 30:14 31:12
205:6 244:24
**existed** 70:14
**existence** 210:16
**exit** 121:8
**expect** 199:21
247:9
**expected** 276:10
**expended** 199:15
**expense** 260:17
**expenses** 129:14
129:22,22 130:6
130:15 131:1,5
131:20 199:4
**expensive**
235:10

**experience** 77:3
77:5 164:21
169:5 246:15
267:21 268:4
269:13,15,18,24
277:3
**expert** 2:13 3:11
5:13 10:20,24
11:2,15,25 12:3
12:5,15 13:7,14
42:24,25 47:4,7
58:17,20,21 59:2
59:7,13,15,21
71:22,25 73:2
74:6 81:9 83:3,6
90:12 105:20,21
108:2,4,7 109:5
110:18 147:20
154:19 164:2
181:18 212:19
212:20,25
224:16 225:23
239:12,19,25
240:2,10,17,19
256:17 263:19
281:4
**expertise** 12:22
277:4
**experts** 240:19
**expires** 284:15
**explain** 276:22
**explains** 164:20
**explicit** 146:18
208:22
**explicitly** 124:19
**exposed** 98:1
135:8 143:10
153:11 212:5,9

212:12 213:12
214:6 215:1,2
218:11,16 219:1
219:3,10,14,24
220:4,6 232:6
**expressed**
282:13
**extensive** 164:18
**extent** 173:8
178:18,19
212:25 238:5
**extremely** 226:2
237:4
**eyeballs** 209:15
212:23
**eyes** 281:6,10

**f**

**f** 1:7 18:9,13
**face** 116:11,11
205:13,13,19,19
206:7,7,9,9
214:3,3,9,9
234:17,17
240:18,18
269:12
**facebook** 168:17
200:2
**facilitate** 237:1
**fact** 60:2 69:24
96:14,17 97:2,3
113:14,15
114:12 120:6
124:18 137:15
138:13,22,23
140:11 145:18
148:6,9,10,14,17
148:18 149:4,4

**[fact - files]** Page 23

150:6,15 152:2
152:10 172:4
176:13 183:4
192:22 209:6
215:4 219:1,16
249:25 252:4
263:15 264:8
275:20
**factor** 113:17
**facts** 96:13
126:12 286:22
**failed** 185:6,13
186:7
**failing** 184:21,25
185:22 187:10
**fails** 287:19
**fair** 7:15 126:12
131:1 190:6,11
196:4 238:2
**fairly** 112:24,25
262:22 268:19
**faithfully** 111:17
**fake** 169:13,15
169:19
**fall** 133:12
**false** 100:14
101:13 132:2
186:18 187:2,4,7
**fan** 157:2
**far** 13:10 37:16
164:18 195:14
195:19 196:15
197:7,20 199:16
204:11 215:8
227:16 232:13
274:8 280:10
**faster** 11:23

**fault** 101:6
**favorable** 139:2
**feel** 35:9 112:10
115:16 123:20
139:1 141:13,16
142:15
**feeling** 105:19
131:15 140:4
141:21,22 142:4
227:9
**feelings** 105:22
107:4 140:21
141:2,7 142:12
142:22 278:10
**feels** 137:23
141:20 142:20
**felt** 24:24 140:7
140:17 252:11
**fewer** 20:21,23
33:1,13 215:8
238:11,19,20
239:2,13,15
240:3,10
**field** 112:15
228:1,2 263:16
263:25
**fifteen** 58:3
**figure** 48:23
76:13 89:21
95:5 102:19
121:9 177:13
178:25 236:12
242:10,10,23,25
243:2,2 245:9,9
245:10,16,19
260:13 264:6
276:8

**figured** 96:7
**figures** 242:9
245:13
**file** 11:8 23:5
24:23 32:10,11
34:22 35:14
44:24 45:5,6,7,8
45:10,13,18,24
46:8,12,20 49:17
62:11 63:6,6
76:15 78:20
80:5 89:19
91:23,24 223:12
**filed** 4:20
**files** 13:16,25
14:1,4,7,14 15:7
15:12,13,14,16
15:17,18,19,24
15:24 16:4,14
21:18,20,21,24
22:2,3,10,14
23:10,13,22,25
24:4,7,9,13,17
25:1,7,9,10,20
25:23 26:1,6,12
26:14,14,17,20
26:22,25 27:6,10
27:11,12,18 28:9
28:11,15,18,25
28:25 29:6,7,12
29:16,22 30:1,2
30:3,4,5,7,13
31:9,10,14 32:3
32:4,5,15,16,21
32:22,25 33:5,12
33:14,15,25 34:2
34:8,19,21 35:1
35:5 36:7,14,17

36:21,22 37:6
38:3,23 39:12,13
39:14,21,24 40:3
40:10,14,17,18
40:20,20,24,25
41:4,9,9 42:10
42:13 45:20
46:17 47:13
48:5,11,12,13,16
49:15,18,23,25
50:6 51:8,25
59:4,12,16,20
60:22 62:13,18
62:23 63:3,21,22
63:24,25 64:1,10
64:12,12,21,24
65:20 66:12,17
67:15,18,21,21
68:17,24 69:3,6
69:17,23,25 70:4
70:8,11,15,16,24
71:8,11,12 72:8
72:13,16,19,22
73:5,6 74:10,10
75:9,12,22 76:1
76:4,7,15 77:19
77:22 78:4,7,24
79:1,3,4,7,12,21
80:25 81:5,10,15
82:3,15 83:9,11
83:15,16,18
84:24 85:8,17,17
85:19 86:18
89:3,6,9,13,14
89:16,17,22 90:1
90:2,3,4,6,13,16
90:18,25,25 91:1
91:15 92:6

CONFIDENTIAL

**[files - forth]**                                      Page 24

104:25 108:11
108:16,19,22
109:9,12 110:5
144:13 159:25
217:15 242:14
**fill** 67:10
**financially**
285:17
**find** 11:18 12:11
14:2 63:16 77:1
95:18 104:9
110:16 126:14
149:11 167:4,13
167:20 168:1,2,4
168:5,11 170:14
170:17 202:14
229:23 230:4
242:13 246:14
274:1
**finding** 14:3
**fine** 43:9 107:18
189:25 280:19
**fines** 184:9
**finish** 7:8 45:3
128:25
**finishing** 128:22
**firm** 5:16 16:18
17:11 84:19
**first** 6:4,17
11:14 17:8,13
22:24 24:22
28:3 29:15 34:6
47:20 74:20
76:14 78:7
95:13 101:24
106:12 115:8
119:14,17
167:14 173:18

174:24 177:7,21
179:5 181:2
191:14,21,25
192:6,10,10,14
192:17,21 193:4
205:17 224:18
236:11 242:8
245:20 248:16
249:15 250:2
253:20 254:15
259:11,12
263:21,22,24
264:11
**five** 154:8 184:5
184:12 241:21
**fixed** 244:24
**fl** 2:9
**flash** 49:7
**flatten** 238:5
**florida** 1:1,18
4:21 188:21
189:5,8 284:3,7
284:14 285:3,7
**fly** 128:3 233:3
**focus** 137:20
233:5 243:16
**focused** 56:2
143:21 223:2
**focuses** 202:20
**follow** 97:1
102:12 104:13
119:8,13 122:19
251:22 254:3,5
**followed** 119:21
180:22
**following** 119:25
122:22 132:7
134:21 135:15

181:8 256:18
286:4
**follows** 6:5
**football** 17:16,21
18:16 19:2,9
20:7
**footnote** 43:15
46:9 145:16
155:13 156:22
157:25 162:2
183:4 255:16
**footnotes** 30:10
91:21
**force** 134:5
245:24 248:9
249:18 263:8
**foregoing**
285:10 286:22
**forewarned**
132:4 187:11
**form** 13:20
19:23 22:22
26:15 27:13,20
37:1,23 40:6
43:5 46:1 52:20
54:22,24 55:1
56:20 69:7,20
70:1 71:1 73:8
73:14,22 75:14
77:4,21 79:6
80:21 81:2,19
82:13 84:8
85:21 86:7 88:4
88:17 91:3
96:24 98:15
99:13 100:6,18
101:18 105:24
108:14 112:3

125:17,24
129:25 130:18
131:23 132:16
133:6,12,22
136:1,20 137:10
139:20 140:9,19
141:3,10,25
142:10,24
143:12 149:1,13
150:9 153:20
154:25 155:24
156:4 161:24
162:5 165:22
171:9 173:23
175:2,7,23 176:9
177:10,25
178:21 185:8
186:12 188:3
191:23 192:15
195:23 197:9,22
207:5,7 212:6
215:18 217:2,17
218:17 220:17
226:13 234:8,12
235:18 240:5
244:25 275:17
279:14
**format** 15:14
23:1,3 158:16,18
282:2
**formed** 17:12
18:5
**former** 190:16
**formerly** 9:11,13
**forms** 148:8
**forth** 149:23
229:20

forward 114:18
found 14:20
  27:10 29:17
  40:20 65:4
  94:24 103:4,7,17
  143:22 147:17
  147:23 155:13
  167:9,10,10,12
  167:17 169:14
  171:4 180:6
  226:21 263:14
  271:12 272:3
  275:10 278:3
foundation
  112:13 133:23
  138:24 140:13
  148:9 149:18
  159:19 196:21
  197:11 212:6
founded 20:6
four 48:6,11
  49:23 175:1,9,10
  175:13,20
  176:11 177:5,7
  177:20,23 178:8
  178:10,14,16
  265:12
fpr 284:6 285:6
frame 114:3
  156:5
fraudulent 191:7
free 88:18
front 108:23
  149:15 151:14
  247:16
ftc 163:8 171:25
  181:23 189:24
  190:3 191:13

205:21 206:10
  206:11,16,18
  214:15 218:8
  221:10,14
  222:12,24 223:7
  223:7,19 235:13
  246:20
ftc's 222:24
full 6:12 15:3
  24:24,24 59:25
fully 96:11
fundamental
  165:10
funds 203:4
further 11:21
  172:5 173:14
  239:21,23
  278:18 280:4
  285:13
future 114:2
  135:1,12,12,17
  135:22 139:2
  142:14 153:16
  194:16 274:24

g

g 4:1
gain 145:10,12
  145:19 146:6
  151:19,22
gathering
  229:12
gbx 16:16,17,20
  16:24 17:2,5,8,9
  17:12,14 18:5,6
  19:23 20:5,6,9
  20:13,17,18,20
  21:4,5,9,13,18

21:19,20 22:4,5
  22:11 24:9,12
  25:8,10,19,22,25
  26:3,11 27:5
  28:4,5,14,17,25
  29:8,11,15,16,25
  33:23 35:17
  36:6,12,12 37:21
  38:11 39:9,11,20
  39:23 40:9,17,19
  40:23 41:3 42:1
  44:2,3,17,18,20
  51:13,23 52:3,4
  52:5,7,9,15,18
  56:7 59:18 62:4
  64:20,21 65:19
  66:1,9,15,17,25
  67:13,14,25 68:1
  68:13,16,20,21
  68:23 69:12,14
  69:16 70:11,16
  71:12 72:10,15
  73:2 74:6 78:5
  79:24 80:3,11
  83:10,17 84:9,23
  85:15,18 87:8,11
  88:1,11 112:7
  123:6 144:13
  166:12 167:5,10
  181:12 217:24
  238:13 242:12
  242:15,21 243:4
  243:19 244:22
  245:7,13 259:23
  259:25 262:6,9
  266:7,11 270:13
gbx's 180:5

general 12:21
  139:15 169:17
  182:5,9,14,20,25
  183:17 184:4
  186:24 187:20
  191:12 226:7
  228:10 231:6
  255:18,19 262:1
  262:1,3
generally 68:9
  165:11 196:4
  231:22
generals 183:9
  184:16
generated 62:16
  251:7
generation 229:1
  229:2
gestalt 183:24
  195:6
getting 63:9
  101:1 107:9
  131:25 132:1,12
  222:9 237:4,16
  238:15 281:22
give 5:23 6:22,25
  14:16 19:25
  20:19,25 61:6
  63:5 67:17,19
  87:11 98:25
  136:21 169:25
  176:6 184:20
  244:7,9 253:11
  253:14
given 25:3 96:22
  103:8,18,23
  106:5,19 215:10
  257:5 281:13

**[gives - happened]**

**gives**  87:1
184:19 197:23
260:19
**giving**  135:5
184:20
**go**  4:14 6:15
10:12,18,18
11:18,21 12:24
12:24 14:1,15,25
21:17 31:20
33:8 34:6 35:22
36:2 38:6 42:22
43:9 44:6 45:1
46:25 47:2,14
48:24 49:9,19,22
50:2 67:10 68:6
71:19,24 73:14
75:3 77:24 83:2
88:25 89:8 90:8
90:8 91:18
102:19 103:2
104:9,12 107:8
108:1,18,24,24
117:17 120:24
120:25 122:6
123:14,23 124:2
124:15 125:9,13
125:19 126:4,13
135:7 136:5
157:3 163:15,19
163:20 166:22
170:16 171:17
173:5 179:4
188:19 194:12
198:20 209:1
211:18 212:8
215:24 220:16
220:22 222:23

224:4 229:22,23
230:2 232:15
235:12,14 236:7
241:3 242:7
251:10 257:10
257:11 259:6
261:22 263:6,9
266:1 271:8
278:17 281:3
**goal**  261:10
**god**  5:24
**goes**  102:3
111:19 161:3
172:17 272:14
**going**  4:4 7:14
10:19 31:17
34:18 44:5 47:5
49:1,21 53:7
57:2,18 58:14,15
58:21 61:23
65:16 70:19
71:20,24,24
73:16 74:3,16
76:11,25 81:7
83:2 101:3,9
102:3 107:10,14
107:23 108:1,21
109:2 111:9
114:16,18
115:11 118:16
120:19 121:2,19
122:10 123:11
123:11 124:10
124:11 126:17
126:25 129:8
132:3 133:11
134:24 137:22
137:25,25

143:17 147:17
148:6 149:15,18
149:23,25
150:19 154:5,18
155:23 163:13
163:20 164:24
170:14 179:4,5
180:7 181:1,17
182:3 186:17,17
189:22 191:10
192:21 196:10
198:7,19,20
199:23 205:7,12
205:13 211:16
211:24 214:2,7
215:19 216:20
219:5,20 223:3
224:15 225:15
227:22 236:10
237:1 239:18
240:18 241:7
242:9 249:21
250:5,12 251:3
251:21,24,25,25
253:8,11,12,14
254:24 260:19
260:23 271:6
278:17 280:15
280:17,18,18
281:23 282:6
**good**  4:3 5:7,15
6:8,10 7:9 69:14
217:9 233:21
240:4,7,25
245:11,12,13
275:21 283:5
**gotten**  105:13
250:14 260:4

279:25
**government**
163:9 165:5
171:25 172:16
173:1 174:9
175:16 181:23
**grand**  124:20
**graph**  260:13
**greenberg**  2:8
5:8,10
**ground**  238:24
**group**  20:23
26:21 27:7,9
28:3,4,14 167:5
168:1 180:6
**groups**  274:22
275:2 277:17
**gtlaw.com**  2:10
**guess**  31:21
56:21 96:18
152:21 156:5
167:18 174:20
274:9

| **h** |
| --- |

**h**  3:9 17:17,21
**half**  67:1,4,5
88:23 246:10
249:5,13
**hand**  5:21
**handful**  216:24
**hands**  251:24
**happen**  104:15
104:16,18
168:21 227:12
**happened**  60:15
95:8 104:19
105:3 111:18

119:8,13,22
122:1 124:5
126:25 141:12
210:7 254:17
**happening** 121:7
142:18 213:24
227:12
**happens** 99:7
128:16 252:22
264:10
**happy** 63:11
121:9 156:25
157:5 170:2
219:19 223:9
225:14
**hard** 22:13 49:6
104:4,7 254:18
**hardy** 2:3 5:16
17:3 26:24
34:16 37:12
80:15 112:7
158:14 244:9
**harm** 97:22
106:7,13,14,14
106:22 124:21
135:12,21,22
173:9,12,21
204:24
**harmed** 143:5,6
**harmful** 164:23
**harming** 171:18
**harris** 271:10,11
271:13,20,22
272:25
**haul** 208:8,18
209:12,16 210:9
211:2,21,24
212:1,9,11,15

214:19,19,24,24
218:9
**haul's** 208:10
209:16
**head** 7:20,20
102:4 131:15
245:2 249:20
253:12 257:2
**hear** 22:24 24:16
128:24 207:6
214:15 234:10
234:11 256:10
258:6
**heard** 4:11 36:3
**hearing** 175:4
**hearsay** 215:16
215:16,20,23,25
**held** 58:7 107:19
154:11 198:12
241:25 255:10
**helmet** 19:2 20:7
**helmets** 17:16,22
18:17 19:10
**help** 5:24 29:19
129:9,10 241:11
243:6
**helped** 254:6
**helpful** 274:3
279:11,21
**hendrickson**
255:3,3,21 256:7
256:13,20,23
258:4,21 266:3,4
266:11
**hh** 284:15
**high** 189:9
226:22 235:23
237:4

**higher** 265:18
**highlight** 67:2
**highlighted**
256:16 264:22
265:23
**highly** 247:14
281:5,9
**histogram**
236:18 237:11
237:20,22 238:2
243:5 260:13
270:8
**historical** 25:3
**history** 163:8
249:3
**hit** 205:24,25
**hobbs** 2:2 3:3
5:15,16 13:20
26:15 27:13,20
31:21 35:25
36:2 37:1,23
38:5 40:6 43:5
46:1 52:20
56:20 58:1,4
63:11,14 68:9,16
68:20 69:7,20
70:1 71:1 73:8
73:17 74:13
75:14 77:4,21
79:6 80:21 81:2
81:19 82:13
84:8 85:21 86:7
88:4,17 91:3
96:24 98:15
99:13 100:6,18
101:18 105:24
108:14 112:3
124:17 125:17

125:24 126:9
129:5,25 130:18
131:23 132:16
133:6,22 134:3
136:1,20 137:10
139:20 140:9,19
141:3,10,25
142:10,24
143:12 149:1,13
150:9 153:20
154:9,25 155:7
155:23 156:2,3
156:24 157:5,11
157:21 161:13
161:24 162:5
165:22 166:5
171:9 173:23
175:2,7,23 176:9
177:10,25
178:21 185:8,17
186:12 188:3
191:23 192:15
193:3 195:23
196:19 197:9,22
198:9 207:5,8
208:7 212:6
215:18 217:2,17
218:17 219:12
220:17 226:13
234:8,12 235:18
240:5 241:13,19
241:21,24
262:12 275:17
279:5,9,16 280:2
280:6,15 281:3
282:3,4,9,14,15
283:2 287:1

**hold**  45:3 99:19
106:15 217:2
**home**  1:7 4:19
9:8,11,13,13,22
10:1,2 93:23
94:18 96:11
128:11 144:6
145:11,13,20
151:11,20,23
243:6 253:24
273:8 274:16
286:2 287:4
**homeowners**
186:19
**homes**  116:10
148:20 200:24
206:3 213:17
234:22
**honest**  84:18
130:23 247:6
**honor**  187:18
**hotel**  169:18
**hour**  57:25 58:4
58:6 215:25
241:20 246:10
249:13
**hours**  241:14
246:4,7
**house**  236:6,7
**household**
213:15 228:7
272:21,21
273:10
**households**
65:25 67:9
213:19,25 218:4
227:13 240:17
240:22 260:18

272:20 274:25
**houses**  219:5
246:3
**houston**  237:12
238:7
**huge**  20:16,17,18
**huh**  7:22 239:8
**hum**  47:8,22
75:2,5,6 206:12
236:13
**hundred**  15:2
59:24
**hurts**  137:19
140:12
**hybrid**  267:5,10
267:11
**hypotheses**
24:13 229:3
231:24 232:21
233:15,16 234:6
**hypothesis**
228:22 229:1,4,7
229:9,11,13,16
229:17,18,20
230:11,15,24
232:15,17,20,24
233:1,4,6,7
**hypothesized**
231:2
**hypothetical**
100:7 125:25
133:23 142:25
186:13 218:18

**i**

**idea**  20:10,25
25:16 124:5
134:12 139:15

203:1 217:9
242:13 248:13
255:11 260:19
267:3,5,9,11
**identification**
11:7,9 284:17
**identified**  58:16
165:5
**identify**  29:21
63:5 66:1
170:11,22
173:11
**identifying**
203:20
**image**  270:5
**immediately**
20:6
**impact**  70:25
71:13 93:13
100:24 123:22
124:13 138:9,10
146:24,25 163:4
164:18 177:8
191:3,15,21
192:11,25
195:19 196:16
197:7,20 199:16
220:1,7 221:4
226:22 227:3
275:12,25
**impacts**  93:14
227:15
**imperative**
230:23
**implement**
177:14
**implemented**
25:5 149:6

192:6
**implications**
207:22
**implies**  192:4
**imply**  65:6 89:18
**important**  7:4
7:18 8:23 10:15
97:7,10,20 99:9
100:4 105:6
143:14 176:3
191:24 216:1
273:12
**importantly**
201:13
**impossible**
168:18 169:3
219:18
**imprecise**  138:8
**impression**
114:13 127:15
130:4
**improper**  100:6
125:24 133:22
142:24 157:1,7
186:12 218:17
**inaccurate**
168:20
**inappropriate**
73:13,15
**inappropriately**
95:19
**incident**  50:24
**incidental**  165:9
**include**  62:22
164:13 191:11
201:21 270:8
**included**  14:9,10
34:7 63:20

**[included - informed]** Page 29

64:25 68:24
76:4 200:20
260:10 270:8,15
**includes** 175:16
200:15
**including** 5:4
143:9 144:13
152:18 173:14
191:12 244:13
**inconsistent**
222:5
**incorporated**
4:19 9:9,11
**incorrect** 97:11
97:13 103:9,18
103:19,24
**incorrectly**
95:17
**increase** 202:3
270:20,21
**increased** 202:3
265:16,17 275:7
**incur** 202:3
**incurred** 199:4
**independent**
190:5
**index** 49:16
**indianapolis**
237:25
**indicate** 24:12
169:17 187:2
188:10 263:13
**indicated** 27:24
28:20 129:14
200:18 230:17
242:17 248:8
266:7

**indicates** 60:3
**indicating** 89:9
124:1
**indication** 20:19
146:5 180:25
**indicator** 62:11
199:11
**individual** 27:9
36:7 89:20 90:3
213:25 234:22
246:14,17
260:18 278:14
**individually**
235:3
**individuals** 21:4
176:1 213:17
**induce** 186:19
**industries**
274:13
**industry** 165:6
274:6,11 275:2
**infer** 193:16
194:8
**inference** 96:1
**inferences**
194:23,25 195:4
**inferring** 95:24
194:6 195:10
**inform** 268:2
**information**
25:5 26:4 27:22
29:20 30:8
33:20 37:18,21
37:22,25 39:7
44:8 48:25
51:14,19 60:20
66:7,8,20 67:7
67:11,17,19 79:9

79:14,18,20
81:12 84:13,21
85:2,25 87:4
90:1 92:1 95:12
97:11,14 98:6,24
98:25 99:1
100:15 101:21
102:22 103:8,18
103:22 106:4,18
110:10 111:14
111:23 112:2,16
112:22,24
113:19 115:24
116:10,15,19
117:4,12,21
122:12,12
123:16,25 124:1
124:2 125:15,22
126:6 129:23
131:7 132:5,14
132:22 133:5,8
133:13,20 134:7
135:5,11,16,21
138:18 140:23
140:25 142:8,11
144:12 146:23
148:8 152:16
153:12,21
161:21 162:3
168:15 170:18
170:19 171:15
172:2,6,11,13,23
173:20 176:12
177:8,20,23
178:6,9,10,16,23
185:15 186:10
187:15,17,25
188:1,16 189:18

190:23 191:2
195:18 196:14
197:6,14,19
200:10,15 202:2
202:10,21
205:19 206:4,21
207:17 212:10
212:12 216:7
218:20,21
219:15,22
220:21,25 221:9
221:12,21 222:4
222:20 223:21
225:8,11,19
226:7,9 227:5,23
230:25 233:24
237:2,14 242:20
245:16 247:9,23
248:23 249:4,14
250:23 253:20
254:1,7 255:21
256:1,13,14,24
257:8,16 258:3
258:14,18 259:3
260:8 261:11
262:15 264:21
264:25 265:4
266:10,15,16,21
267:13 268:1,9
268:15,23
269:10 272:15
279:12,18,25
**informational**
116:12 248:14
**informed** 25:8
132:3 134:23
161:4 237:19

CONFIDENTIAL

initial  6:13
initially  40:19
  52:3
initiatives
  257:14 258:24
injuries  19:9
inoculate  135:11
  135:17 142:13
  274:23
inoculated  253:1
  253:3
inoculation
  134:12,20 135:3
  135:4 153:4
  185:19 222:21
  249:1 251:19
  252:18 253:4
input  80:13,16
  244:7,9
inputs  262:18
insecure  115:16
insert  202:6,13
  226:25
inserted  200:7
  201:7,7,25
inserting  202:2
inserts  201:12
  201:16,22
  202:18 203:13
instagram  200:3
instance  122:15
  122:16 151:18
  152:4 208:21
insufficient
  221:8 233:17
intake  78:8,8,9
  78:14

intend  159:22
intended  142:12
  143:2
intending  156:7
intent  138:5,20
intention  251:8
interacted  21:13
interaction
  50:12 51:3
  52:12,14 92:25
  96:16 105:19
  109:14 115:2,3
  116:18 129:20
  130:2,11,13
  136:7 141:12
  144:5 151:14
  230:1 278:10
interactions
  29:18 52:16
  65:24 67:8,23
  68:13 76:6
  81:25 82:2,10,24
  89:3 94:5
  108:12 115:22
  254:15
interested
  124:22 139:13
  156:17 194:23
  270:14 285:17
internal  26:17
  164:15
internet  4:10
interpretation
  96:3
interpreted
  99:21
interrupt  211:16

interrupted
  129:1
interrupting
  211:23
interview  248:15
interviews  121:8
  254:5
intrusion  164:22
intuitive  224:2
  224:11,11,13
investigated
  206:17 209:6
investigation
  187:21 188:6
investigations
  173:1 191:13
investigative
  184:9
investment
  128:16
invoices  200:8
  201:8 202:1,6,14
involve  16:25
  17:3 230:22
involved  17:15
  19:2 25:12,16
  28:15 41:24
  92:14 105:13
  122:21 189:15
  223:15 231:15
  231:21 243:14
  243:17 266:14
  266:15 268:22
  269:2
involvement
  20:5 242:24
involves  228:18
  230:19

irrelevant  56:1
  138:4 203:6,8
issue  18:20
  105:11 114:15
  137:18 165:8
  182:6 282:10
issues  122:17
  190:16 246:11

**j**

j  2:2
jackie  81:11,12
  82:16
jacksonville
  237:25
job  1:25 147:20
  149:25 150:3
  263:3 286:25
jobs  262:24
joint  187:14
  243:21
josh  31:21 43:6
  56:21 63:11
  73:11 156:25
joshua  2:7 5:8
  60:25
jot  250:22
judgment
  225:23 237:5,6
  237:15,18,19
june  200:6 201:1
jury  88:15 148:2
  148:22 149:9,16
  149:22 150:3,14

**k**

k  1:7 18:9,13
kansas  188:6

| | | | |
|---|---|---|---|
| **keep** 46:25 49:21 | 20:14,15,16,17 | 90:20,21 91:4 | 202:25 203:2,10 |
| 53:7 73:17 | 21:8,9,12,20 | 93:7,8,9,12,17 | 203:11,12,15,24 |
| 280:18 | 22:7,9 23:3,6,10 | 95:5,22 96:10,14 | 204:2,5,7,10 |
| **keeping** 237:17 | 23:24 24:15 | 98:21,21,23 | 205:4 207:17,18 |
| **key** 213:23 214:8 | 25:6,11,12,15,18 | 100:25 101:2,5 | 207:20 209:2,7 |
| 214:10 | 25:19 26:2,3,18 | 102:14 104:4,16 | 210:4 211:7,11 |
| **kind** 19:8,17 | 26:24 27:9,23,24 | 104:18,21,22,24 | 212:8 214:3,4 |
| 25:4 29:20 | 28:7,10,17 29:13 | 105:5 107:2 | 215:9,20 216:10 |
| 74:20 112:15,24 | 30:14,17,21 31:2 | 109:12 111:13 | 216:19,24 217:8 |
| 122:7 123:24 | 31:12 33:17,17 | 112:11 113:1,25 | 217:25 218:1,3,4 |
| 132:3 133:9 | 33:21,21 34:1 | 114:1,6,14,17 | 218:23 219:13 |
| 134:12,13,24 | 35:1,12,14,15,16 | 115:8,12 116:12 | 219:18 220:3,5,9 |
| 135:4,4 145:25 | 36:10,11,16 37:6 | 116:13,15,21 | 220:12,13,14 |
| 149:5 158:17 | 37:16 38:14,18 | 120:2,6,12,15,18 | 223:18 224:5,8 |
| 163:10 169:1 | 38:25 39:4,5 | 121:1,5,6,6,9,25 | 225:10,12,16 |
| 172:7 177:12 | 41:1,11,16,19,22 | 121:25 122:5,6 | 226:12,16,18,24 |
| 187:14 192:4 | 41:23 42:1,8 | 122:14 123:12 | 228:25 230:4,6 |
| 194:16 196:21 | 43:19,22 44:18 | 123:23 124:14 | 232:3 233:2 |
| 209:18,20 | 44:20 46:7,13,23 | 127:8,9,19 128:1 | 234:8 235:24,24 |
| 215:13 223:15 | 47:15 48:9 49:2 | 128:4,8,19 129:2 | 236:6 238:10,18 |
| 227:14 229:21 | 49:8 52:15 | 133:9,17 134:6 | 239:13,24 |
| 230:2 238:24 | 53:16 55:18,25 | 137:7 138:23 | 243:24 244:18 |
| 239:12 244:24 | 56:14 62:15 | 141:15,17,21 | 245:1,2 246:6 |
| 248:3 272:17 | 64:6,7,23 65:22 | 144:19 145:12 | 248:17 249:13 |
| **kinds** 41:19 | 67:1,7,9,22 68:4 | 145:23 149:17 | 250:14 252:1,12 |
| 130:6 167:7 | 70:10,14,17,21 | 155:25 159:2 | 252:22 253:9 |
| 187:16 199:14 | 75:20,25 76:1,2 | 160:5,8,9,12,25 | 254:6 255:15 |
| 214:2 225:24 | 76:4,8,16,18 | 161:1,11,14,16 | 256:1,23 257:2,3 |
| 226:3,18 227:2 | 78:8,17,20,22,23 | 161:19 167:21 | 258:8,9,12,15,18 |
| 228:25 277:21 | 78:25 79:3,24 | 167:22 169:12 | 259:22,25 260:2 |
| **knew** 114:9 | 80:3,18,24 81:15 | 174:15 176:4 | 260:5,10,20,24 |
| 125:8 211:2 | 81:17,23,24 82:1 | 180:16,21,22 | 261:15 262:8 |
| 212:1,4 | 82:9,20,22,24 | 185:10,23,24 | 263:8,9,11 |
| **know** 6:16,22 | 83:1,9,14 84:5 | 190:13,17,18,21 | 264:13,22,25 |
| 7:11,22 8:7,9,9 | 84:17,22,25 85:9 | 191:7 199:3,7,20 | 265:22,23 |
| 8:25 9:5 10:16 | 85:11,12,13,22 | 199:23 200:12 | 266:15,20 |
| 13:3,10 15:14 | 86:8,18 87:13,19 | 201:3,11,13,15 | 267:19 268:1 |
| 17:15 18:25 | 87:21 88:9,23 | 201:21 202:5,17 | 269:1,4,7 270:10 |

**[know - listened]**                                                                    Page 32

270:11,18
271:22 273:10
274:9,14 275:9
275:19 279:6
280:20
**knowing** 86:3
**knowledge** 12:19
26:8,11 29:24
30:12 33:14
72:6 75:11 77:7
119:24 170:16
215:15 216:3
217:1 223:14
258:5,7 271:2
274:13 277:3
**known** 9:11,13
87:9 168:21
273:7
**knows** 257:1,6
**kreitzer** 2:8 5:10
**kritika** 262:8
266:6
**kuppuswami**
262:8 266:6

**l**

**l** 3:13 18:9,13
**labeled** 78:8
171:24 181:22
248:12
**labeling** 78:12
**lack** 156:4
219:14
**laid** 138:24
**large** 1:18 20:11
134:4 166:21,21
200:3,23 219:3,8
272:17

**largely** 124:7
**larger** 160:2,10
264:7
**las** 238:8
**lasted** 247:3
**late** 206:17
215:25
**law** 5:16 184:7
**lawns** 274:14
**lawsuit** 165:7
181:25 183:12
183:12
**lawsuits** 193:9
**lay** 112:13
236:19
**lead** 67:12 70:22
71:10 113:18
228:25 239:15
240:11
**leads** 197:2
229:1,2
**leave** 115:9
136:4 150:23
151:11,24 152:2
152:11 184:21
184:22,25 185:1
185:6,7,13,14,22
185:25 186:8,9
187:10 220:16
220:22
**leaves** 120:9
121:2 122:3
131:11
**leaving** 120:19
121:15,16,18,22
122:13 123:10
123:14 221:2

**lecture** 215:24
**led** 177:11
178:11,12
245:25
**left** 64:13 114:7
114:9 115:1,4
117:2 118:7
123:23 124:2,3
124:14 125:8,13
125:19 126:3
129:19 140:4
142:3 227:19
233:12 239:23
241:14 279:10
**legacy** 9:12 10:1
**legal** 4:24,25
215:20,25
281:16 287:23
**legitimate** 84:18
98:25
**lend** 176:13
**lends** 193:10
**length** 247:13
**lenz** 2:14 4:23
**letter** 3:7 206:6
**level** 169:4 170:7
170:9 202:19
273:10
**liability** 19:9
**liable** 147:17,23
**license** 284:17
**lie** 96:15 99:2
100:22 131:6
**lied** 252:12
**lies** 101:5
**likes** 227:2
**limit** 66:23 70:21

**limited** 66:21
211:18 225:25
**line** 5:12 118:3
252:22 262:13
286:5
**lines** 279:20,21
**lingering** 105:18
107:4 114:16
141:1,7
**link** 178:8,10,14
275:24
**list** 12:20 13:1,6
13:9 22:16,18,19
23:14 72:8,14
89:10 156:14
162:15,16,20
174:14 223:18
223:19 251:4,5,7
259:8 260:23,25
**listed** 13:13
46:22 47:13,23
47:25 48:4
49:18,25 52:24
53:10,16,18
54:14 55:6
56:15,17 75:22
76:15 90:13
156:22 157:25
162:2
**listen** 24:6,22
32:4,14,15 45:10
45:13 70:3,15,18
70:24 79:25
84:6,10,11 86:9
89:22 111:16
249:8
**listened** 24:4,7
24:17 27:6 32:9

**[listened - making]**                                                                 Page 33

32:10,15 35:17
45:11,16,17,20
45:23 46:3,4,8
46:12 65:1 70:8
70:10,12 79:23
83:12,24 89:19
90:3,5 108:22
111:21
**lists**  9:11 63:2
**literature**  164:19
228:24 229:23
230:21
**litigant's**  17:18
**litigants**  17:16
**litigated**  193:20
**litigation**  16:3
16:18 17:6
26:20 141:15
175:15,16
181:20 182:12
191:11,12 208:3
231:15,20,22
232:2,10
**litigations**
175:17
**little**  11:21
171:21 230:3,3
278:5
**lived**  242:14
**lives**  82:22
**llc**  8:12,15
**llp**  2:3
**locally**  49:6
53:25
**location**  1:16
**locust**  213:15
214:10

**long**  25:19 32:22
33:1 35:13
57:21 118:13
248:1 255:7,10
264:12
**longer**  106:3,18
136:17,18 137:8
246:22 247:10
247:19 251:1
278:4
**look**  9:10 23:18
24:3 42:18
46:23 50:14
54:17 64:16
65:22 67:1
77:24 95:7,11,11
110:15,18
111:13 119:4
142:1 161:3
169:4 171:17
183:4,24 195:5
197:24 208:17
209:4,8 226:24
232:11 237:9,13
237:22 243:8,9
250:19 260:12
264:5
**looked**  25:1
31:11 39:14
54:16,19 56:12
66:4,9 67:11
144:23,25
166:16 183:21
201:14 217:5
234:24 238:11
238:11 239:1
260:16

**looking**  28:20
55:18 67:7
76:12 81:9
109:6 112:16
170:7,9 179:10
206:15 226:25
243:5 254:25
272:18 274:1
**lookout**  103:14
**looks**  109:11
119:11 203:23
**loretta**  42:20
43:4,13,20 44:10
44:23 46:14
89:1,4,7,14
90:14,16,22,25
91:2 92:15 93:5
**los**  238:7
**losing**  121:7
**lost**  124:20,23
**lot**  12:17 20:21
20:23 55:25
60:16,17 75:15
84:12,19 102:18
117:10 120:16
170:20 208:10
210:5 226:18
227:11 228:6,7
231:11 268:18
272:14
**loud**  7:19,23
**low**  202:19 226:2
254:16
**lower**  209:15
247:21
**lowercase**
208:11

**lowest**  262:23
**lunch**  118:11
248:3

**m**

**macro**  272:17
**mail**  10:23 11:2
22:6 49:12
159:2 205:12
206:7 226:1,1
235:7,7 253:25
255:2,20 256:2
256:11,19,21
261:24 262:16
266:2,9,16
268:10 282:6,8
**mailed**  10:22
16:9 200:8
201:8 203:13
**mailing**  200:11
200:16 202:1,9
**mailings**  200:21
**mails**  159:3
199:14 226:1
227:1 253:25
256:22
**main**  28:6 93:15
168:25 171:3,6
171:11 174:20
174:20,22,23
177:5
**major**  19:2
173:17 206:16
**making**  130:8
170:6 186:18
187:7 190:17
194:24,25 195:4
229:5 250:18

**malpractices**
28:21
**management**
77:7 269:21
**managers**
149:17 174:15
224:13
**mandated** 190:3
**manner** 41:20
56:8 279:23
**manufacturer**
19:3
**marbles** 209:3
**mark** 18:9,15
19:22 20:3 21:6
21:14 28:7 85:5
85:10,12,14,14
99:24 118:3
243:19,23
261:25,25 262:5
266:5
**marked** 11:7
108:3
**market** 271:21
**marketed** 173:7
**marketing** 12:16
19:20 189:21
191:5 193:5
201:17 202:17
223:24 224:6,9
224:13 225:23
255:4,5,9 256:25
258:21,23 266:1
266:10,18
267:17 269:20
**marketplace**
113:16 114:17
132:4 133:11

134:24 143:4
146:14 272:16
**match** 229:18
**matches** 229:13
231:1
**material** 56:1
70:13,14
**materials** 13:5
**matter** 4:18 5:14
50:15 96:10,20
96:21 98:11,12
117:6,14,18
139:5,6,7,18,19
139:21,22
140:16 187:3
278:2
**matters** 138:13
140:2,7,17
**mcgrath** 255:3
255:17,18,20
256:11,12,14,16
261:24 262:1
266:5,13,17
**mcgrath's** 256:2
**mean** 9:21 16:4
22:18 26:17
27:17 33:19,19
51:9 54:5 56:11
63:23 66:9,15
69:12 72:10
75:16 79:14,17
85:14 89:18
92:24 93:12
98:3,7 100:23
105:9 112:7
113:25 114:1
115:9 117:9,10
117:10 120:24

121:5 123:4
130:1 131:12
133:7 134:20
137:21 138:9
141:11,11
142:15 155:12
156:13 157:18
157:18 158:13
167:10 168:16
176:19 185:23
187:12 188:23
189:1 201:24
208:16,25
209:22,23 212:8
217:5 220:10
223:24 224:5,11
225:24 230:19
245:1 247:14
248:25 251:24
254:15 256:3
275:22 279:11
**meaning** 215:25
**means** 33:21
78:14 180:22
209:24 215:21
**meant** 67:4 75:6
89:15 93:2 96:5
101:17 102:9
**measure** 138:21
197:1,16 219:16
**measures** 204:13
**measuring** 138:5
**media** 4:16 25:3
57:17 58:10
71:9 107:9,13,21
116:13 154:1,4
154:14 163:7,7
164:16 166:16

166:17,20,23
167:4,5,18 168:1
168:1,2,5,8,11
168:15 170:10
171:22 172:15
172:25 174:8
175:14 179:11
180:1,3,5,8
198:15 199:13
199:24 217:7,14
221:18 224:5
227:1 235:4,6,7
241:1,6 242:2
253:25 255:1,22
267:18 281:14
281:14
**medium** 206:1
211:9 221:18
224:2
**meeting** 244:17
**memory** 60:14
**mention** 59:3
193:19 265:20
**mentioned** 13:6
43:12 48:11
59:13,16,20
173:10 175:11
193:19 243:15
265:19 271:9
278:21
**mentioning**
167:8
**mentions** 43:12
**merged** 93:24
94:19 96:12,19
128:12
**merger** 128:14

**merging** 97:4,9
97:16 98:8
**message** 202:13
203:21,25 204:3
206:1 213:18,19
213:20 214:1,9
214:17 221:15
221:19 223:5
232:7 237:16
238:15
**messages** 211:9
213:22 215:5,7
215:10 216:7,24
218:12 219:4
220:4,6 221:25
**messaging**
105:13 200:7
201:7,25
**method** 42:8
228:16,22
230:10 231:3,7
231:13,18,20
232:1,3,9
**methodology**
207:3 228:10,11
**methods** 235:9
267:7,12
**metrics** 227:2
**mgc** 1:3 286:2
**miami** 1:2 4:21
238:7
**michael** 2:8 5:10
**micro** 74:23
**middle** 6:13
196:5 238:24
**million** 75:17
177:18,19,24
178:14 183:13

189:25 195:21
196:18 197:4,8
197:15,17,21
200:19 202:9
214:5 220:7
221:5 234:20,22
235:21,24 239:7
239:9,10 256:3,5
261:3,6,15,19,21
265:17 267:17
270:4
**mind** 29:14
96:10,13 101:25
102:15,18,21,23
111:10 115:10
117:3 129:19
241:10
**minute** 49:22
136:21
**minutes** 56:12
57:5,23,25 58:1
58:3,4,5 107:11
115:7 118:14
154:8 198:9,10
241:10,11,17,21
247:4 273:23
**misbehavior**
100:9 190:25
192:1,7
**mischaracterizes**
38:5
**mischaracteriz...**
73:20 222:9
**misconduct**
112:14 148:15
150:7 192:23
199:1 210:2
212:25 258:1

270:24 272:6,9
272:11 275:4
276:5,10
**misimpression**
186:6
**misimpressions**
207:20 208:10
208:18,19 209:9
210:15 212:15
214:20
**misinformation**
96:22 98:1
113:15 114:19
206:22 207:23
213:15,16
222:14,16
**misinterpreted**
89:24
**misleading**
164:21 169:12
186:18 187:3,5,8
187:11 249:4
**misnomer**
249:19
**misrepresentat...**
130:12 137:9
153:15,18
173:14 209:25
277:23
**misrepresentat...**
130:2,7 278:12
**misrepresenting**
72:24 96:13
**missed** 229:24
230:5
**missing** 46:14,15
**misspoke** 265:3

**misstatements**
214:25
**misstates** 70:1
73:8 100:18
130:18 142:25
173:23 177:25
192:15 217:3,17
218:18 220:17
235:18
**misunderstand**
222:11
**misunderstood**
147:21
**mitigate** 199:1
205:3 224:19
225:7,20 232:22
**mitigated** 227:20
**mitigation**
198:22 199:4,16
204:11,13,15,17
204:20,23 205:8
225:18 226:10
227:16 232:12
257:19,21,25
**mode** 214:16
221:15 223:22
235:15 246:20
246:21
**model** 178:24
197:4,25 232:4
276:19,22
**modeling** 228:6
**modify** 230:11
**moment** 49:19
**monetary**
210:18,18
**money** 199:3,7
199:15 268:19

CONFIDENTIAL

**month**  245:23
**months**  46:5
  265:2,7,12
**morning**  4:3 5:7
  5:15 6:8,10
  10:21 159:6
  246:6
**mosaic**  9:12
**mosiac**  1:7
**motion**  280:20
  280:20,25
**mouth**  219:17
  237:2
**move**  182:3
  184:2 280:24
**moved**  154:20
  251:7
**moving**  184:15
  188:5 189:3
**multi**  276:14,18
**multiple**  8:1,7
  9:2 32:25 33:12
  35:1,5,11,13,20
  36:8,15,18,22
  81:5,5 89:11
  90:3,4 277:16
  278:20
**multiplier**
  218:25
**multiply**  235:21
**mutually**  145:22

**n**

**n**  2:1,8 3:1,13
  4:1 6:14 18:14
  18:14
**name**  4:23 6:12
  6:13 8:9,10,11

11:8 17:18,19
18:12 30:25
43:20 63:6
76:16 81:10
88:21 89:10
167:8 259:13
272:14,15,16
273:12
**named**  43:4 89:1
  108:9 179:15
**names**  21:16
  28:13 41:22
  43:16
**naturally**  199:25
**nature**  218:2
  268:5
**nearly**  205:12
**necessarily**
  32:10 67:22
  187:12 188:10
  217:25 218:3
  223:4 231:24,25
  248:19 249:7
  272:8,22,23
**necessary**  106:6
  106:21 125:4
  133:19 141:1
  142:22 143:8
  152:13,15
  177:12 202:13
  227:4
**need**  57:3 60:20
  73:21 86:20
  100:12,17
  101:20 111:3
  116:18 123:12
  125:10 131:9
  132:2 133:4

152:24 153:1,2
153:11 172:10
173:20 185:25
195:25 205:2,24
205:25 216:2
218:1,3,4 219:21
227:11,13,20
230:12 232:6
234:16 240:17
241:1 250:20
253:1,2 261:5
274:22 275:2,2
277:17 278:14
280:19
**needed**  25:5
  29:20 70:13
  112:10 114:20
  118:11 123:20
  138:23 139:17
  163:11 202:20
  202:23 210:9,13
  210:14 245:20
  254:12 265:17
  266:25
**needing**  187:25
**needs**  97:14,22
  107:5 115:23
  117:3 129:23
  130:17 131:7,16
  132:13,21 133:3
  134:23 142:8
  149:6 164:23
  185:15 186:9
  192:5 221:13,13
  221:15
**negative**  67:20
  67:22 93:13
  96:15 98:6,11,14

98:17,18,20,24
99:1,6,10,16,18
100:2,24 101:5
101:13 105:14
105:18,22 106:4
106:18 107:4
114:13 117:21
141:2,7,13,16
142:12,15,21
233:11 252:8,13
252:17 278:10
**negatively**  93:14
  142:20
**neighbor**  101:3
**neighborhood**
  126:17 246:8,9
  248:3
**neighbors**  98:4
**neither**  7:22
**never**  68:15
  115:1,4 133:16
  133:18 136:18
  138:4 143:10
  206:25 208:22
  240:6 251:15
  252:15 274:20
**nevertheless**
  182:19,22
  188:14 189:18
**new**  205:3
  247:18 250:20
  250:20
**newsletters**
  203:19 225:6
**nice**  123:24
**nine**  167:18,20
  167:23

**[nodding - obtained]**                                              Page 37

**nodding**  7:20
**noise**  36:3
**non**  267:15
  268:15,23
**normal**  26:19
  117:22 128:14
**normally**  263:6
**notary**  1:18
  284:6,14 285:6
**note**  4:7 31:17
  75:23 170:6
  287:10
**noted**  103:13
**notes**  245:4
  266:24 285:12
**notices**  187:19
**noticing**  5:6
**notification**  3:7
**nuances**  206:5
  254:14
**null**  233:11
  ▬▬▬  76:16,16
  77:10,14,20
  78:16,25 80:19
  81:1
  ▬▬▬  77:16
**number**  4:16,22
  14:16 18:18
  24:10 42:19
  45:19 53:18
  57:17 58:10
  61:6 62:21,23
  80:6 86:25
  89:25 107:13,22
  138:12 139:10
  139:13,14,14
  154:4,14 157:12
  159:17 166:10

166:21,21
174:22 178:9,13
180:14 198:2,6
198:15 200:19
205:21 210:9
212:16,20,23
213:1,12 217:10
218:11,15,25
219:3,8,9,13,24
220:3,5,8,15
221:1,5 228:11
231:6 232:5,8
235:22,25 237:5
237:17 238:16
239:3,5,13,15
240:22 241:6
242:3 243:7,10
243:18 244:8,9
246:7 247:24
248:10 250:3
257:13 259:8,11
259:13 260:13
260:16,20,20
261:11 262:23
264:5 265:6,7,13
265:14,15,16,20
265:21,24
274:14,16 275:1
276:20 281:14
284:15
**numbered**  49:23
**numbers**  124:23
221:2,6,7 243:16
245:11 256:3
259:21 267:9
268:24 269:2,5,8
271:23 272:1

**numeric**  180:21
**numerous**  182:4
  182:8
**nunyabiz714**
  180:11

**o**

**o**  3:13 4:1 18:9
  18:13,14,14
**oath**  3:4 6:5,18
  284:1
**object**  13:20
  26:15 27:13,20
  37:1,23 40:6
  43:5 46:1 52:20
  56:20 69:7,20
  70:1 71:1 73:8
  73:14,22 75:14
  77:21 79:6 81:2
  82:13 84:8
  85:21 86:7 88:4
  88:17 91:3
  96:24 98:15
  99:13 100:6,18
  101:18 105:24
  108:14 112:3
  125:17,24
  129:25 130:18
  131:23 132:16
  133:6,22 136:1
  136:20 137:10
  139:20 140:9,19
  141:3,10,25
  142:10,24
  143:12 149:1,13
  150:9 153:20
  154:25 155:23
  161:24 162:5

165:22 171:9
173:23 175:2,7
175:23 176:9
177:10,25
178:21 185:8
186:12 188:3
191:23 192:15
195:23 197:9,22
207:5,7 212:6
215:18 217:2,17
218:17 220:17
226:13 234:8,12
235:18 240:5
275:17 279:14
**objecting**  156:3
**objection**  73:13
  74:13 80:21
  124:17 126:9
  129:5 134:3
  155:7 156:24
  157:6,7,13 166:5
  175:4,6 185:17
  192:19 193:3
  196:19 208:7
  219:12
**objections**  5:2
  73:21,23,24
  157:3
**objective**  84:14
**obtain**  15:24
  39:7 51:6 73:5
  74:9 138:18
  144:11 158:10
  233:19,23
  278:23
**obtained**  15:25
  16:2

obtaining
  282:16
obvious   65:23
  146:21
obviously   34:25
  108:21 114:1
  213:18 239:4
  244:20 271:20
occur   135:23
  238:9
occurred   91:23
  127:8,10 130:13
  135:22,23
  151:14 160:24
  172:19,23 183:1
  184:13 187:24
  189:10 204:25
  210:15,22
  246:22
occurrences
  103:14
occurring
  183:19 213:10
  213:17
occurs   238:1
odd   83:15
offensive   185:4
office   250:23
  263:10,10
officer   201:17
  255:4,5
offices   182:5
  263:9
offset   199:12
  205:22
oh   22:6 106:14
  120:2 156:13
  162:18 179:9,9

189:1 206:23
245:17 247:11
261:4
ohio   187:20
okay   7:12,17,25
  8:4,14,23 9:1,5
  9:10,16,20 10:6
  10:12,17,18 11:1
  11:20,23 12:23
  13:4,9,11 14:3,7
  14:15,19 15:6,17
  15:22 16:7,11
  17:2,5,13 18:15
  19:11,22,25 20:9
  20:18,25 22:22
  23:6,12,17 24:3
  26:10,13 27:2
  28:10 29:21
  30:6,16 31:16,21
  31:24 32:2,7
  34:5,18 35:3
  36:1 37:9,20
  38:2,6 39:2,17
  39:20 42:22
  43:9,11,15,22
  44:18 45:8,10,17
  45:22 46:7,13,16
  46:21 47:6,12,20
  48:3,10,23 49:1
  49:19,22 50:8,20
  51:11,15,18,21
  51:24 52:15
  53:7,12,21,24
  54:25 55:5,9,19
  57:8,15 58:24
  59:6 60:1,13
  61:6,9,19 62:9
  62:15,21 63:5,10

63:13,19 65:16
67:3,13 72:1,6
74:5 75:7,11,20
76:1,11,18,25
78:7,17 79:20,25
81:7,15 83:15
86:5,17 88:21,25
90:5,8,10 91:15
91:18 92:19
93:21 94:22
95:4 97:6,20,24
98:16,17 99:5,9
99:21 100:1,14
100:22,23
101:11,23 102:8
102:22 104:9,19
104:24 105:16
106:14,15 107:7
108:1,23 109:8
109:12,25 110:4
110:24 111:4,9
111:13 113:3
116:2,25 117:6
117:16,17,20
118:5,9,15 119:4
119:19,21
120:18 123:16
124:7 127:13
128:1,6 129:8
131:3 135:15
136:5,6,22
137:15 138:8,16
139:25 140:23
142:7 144:11
145:18 146:9
147:2,7,16 150:2
150:13,19 151:5
151:9,13,17

152:1,10,13,25
153:24 154:3,9
154:18 155:12
156:7,17 157:21
157:21 158:10
158:19 160:5
161:5,14 163:3
163:14,21,22
164:9 165:2,2
166:9,17,22
167:2,3,13,20
168:22 169:20
170:4,7,21 171:5
172:7,13 174:2,4
174:13,18
175:19 176:6,16
176:22,25
177:20 178:9
179:4,20 180:7
180:13 181:5,12
182:8 183:16
185:13 186:16
187:2 189:12
190:21,23
191:10,19
194:22 195:17
196:8,12,13
197:6,19 198:3,9
198:11,19 199:3
200:10 201:5,15
203:11,18 205:7
205:16 207:2,13
208:13 209:11
210:7,20,25
211:23 213:5
214:12 215:15
215:23 216:12
217:13 218:7

222:23 223:4,7
224:17 228:15
228:21 229:4,11
229:18 231:9,13
232:25 233:5,14
234:1,5 236:10
240:9,24 241:2,9
241:18 242:7
243:14 244:7
245:15,18 247:8
249:14 251:21
252:23 254:21
256:1,23 257:11
257:16 258:3
259:22 261:4,10
261:22 262:5,15
263:5,13,22
264:25 265:6,23
266:9,20 269:1
269:18 270:23
274:12 276:7,16
276:24 278:16
279:5 280:2,13
281:11,21 282:1
282:5,11 283:4

**old**   126:18
213:21

**once**   17:19 47:3
58:14,15 64:14
71:21 74:17

**ones**   14:9,10
15:8 27:25 29:4
30:20 31:11
42:15 60:5 63:3
64:15,15,17,18
83:21 87:20
160:3 166:19
167:14,16

169:16 180:5
240:14,14
268:17

**online**   267:18
**open**   226:1,2,15
280:23

**opened**   227:1
**operate**   159:23
**operates**   165:11
**operation**
120:17

**operations**
120:16 121:4
276:11

**opine**   101:16
166:6

**opined**   185:16
188:1 205:22

**opining**   141:1
**opinion**   14:5
24:18 71:13
93:16 101:15
105:20,21
148:13 156:10
164:3 190:24
191:21 192:12
193:11 195:15
208:4 221:11
223:21 224:19
226:17 281:6

**opinions**   12:14
13:12 18:22
19:12 24:11,18
29:22 56:3 65:5
70:25 77:2 79:5
79:22 81:13
82:7,11 84:25
86:6,21 138:10

161:4 163:23
171:7,12 182:1,9
182:12 189:19
191:3,16,20
218:18 220:7

**opportune**   154:1
**opposed**   120:21
**opposing**   61:5
**orange**   2:9 284:4
285:4

**order**   106:6,22
120:13 179:1
281:7,23

**organization**
167:6

**organized**
241:11

**original**   30:4
34:18 75:9
144:25 271:18

**originals**   144:24
**orlando**   2:9
237:23

**ought**   221:9
**outcome**   18:25
**outline**   173:11
**outside**   20:4
26:19 30:15,21
190:5

**overall**   183:21
191:8 192:7
193:7 272:14,16
273:23 274:2,16
275:1

**overturf**   179:15
179:24

**p**

**p**   2:1,1 3:13 4:1
18:9,11,13

**p.a.**   2:8
**p.m.**   1:14 57:19
58:6,7,8,12
107:15,19,20,24
154:6,11,12,16
198:8,12,13,17
241:8,25 242:1,4
246:8 256:12
281:18 283:8

**page**   3:1,9 11:14
11:15,18,24,24
12:1 13:4 14:16
14:17 42:25
47:6 52:24 53:8
53:13,13,14
58:20 59:6,7
72:1 74:18 75:1
76:14 81:8 83:5
90:12 108:8
143:19 154:20
155:13 163:22
164:10 166:25
167:1 179:4,5,8
179:10,14 180:8
181:9,18 184:3,3
184:21 189:23
198:20 204:17
212:20,22
218:12 233:10
242:9 243:3
257:12,12 271:8
286:5

**pages**   109:1
180:2,2 210:10
210:16,22 211:2

CONFIDENTIAL

**[pages - people]**

Page 40

211:4,5 212:3,17
213:2 218:12
285:11
**paid** 262:20
**paint** 194:13
**palm** 188:21
189:5,8
**panel** 247:18
250:21
**paper** 47:16
54:21,23 200:8
201:7,8 202:1
228:18 230:21
**papers** 12:17
169:14,20
205:22 206:14
228:19,20
**para** 164:24
**paragraph** 14:17
14:18,19 24:1
42:20,21,21,23
43:3,7,12 44:4,9
44:23 45:12
46:9 47:1 50:14
50:18 51:4
59:22 61:18
75:23 83:3,5,23
88:25,25 91:18
91:21 94:10,12
108:7,8 110:15
110:23 111:14
119:5 126:13
128:7 129:8
136:5 137:13
140:1 143:17,19
150:20 152:14
163:20,22,25
164:9 165:2

166:9 167:1
168:24 171:19
173:4 182:3,4
183:11 184:15
184:15,21
188:19,20,23
189:3,4,16,18,23
190:2,24 191:3
201:6 224:16
225:5 232:12
257:19,23
263:19 265:5,19
271:5,8,9
**paragraphs** 183:22
**parse** 183:8,13
**part** 12:18 22:25
23:16 30:8
39:15 51:13,19
65:13,13,14,23
66:6,6 69:18
70:18 79:13
100:9 116:9
117:21 122:18
131:10 132:5
134:6,17 135:10
135:15,16,19,20
141:4 142:16
144:12 148:13
148:22 149:9
152:16,20 153:3
163:14 165:17
165:19 169:22
171:6 174:11
175:19 176:16
176:18,19 177:9
177:21 182:1,9
182:12 185:5,19

187:17 189:19
189:20 190:25
191:1,4,4,8
192:7,8 193:7
200:18,19,22,23
200:23,25 202:8
206:8 208:20
209:23 221:14
223:14 225:1,2,2
228:12 247:9
249:1,11 250:13
252:6 254:7
270:5 272:19,19
**partake** 273:10
**participants**
4:10
**particular** 33:11
44:8 56:8 114:3
118:8 119:2
130:1 152:20,23
153:7 206:15
213:13,18
220:16 247:25
248:2 272:18
273:2,25
**particularly**
164:4 192:2
**parties** 3:15 4:14
285:14,15
**parts** 50:25
78:11 116:8
130:4 172:7
212:9
**party** 17:20,24
190:4 194:3
209:24 210:2
**pass** 278:17
279:4

**passed** 37:25
38:2
**patience** 198:4
**pattern** 85:2
165:4,7,12
183:21 189:20
190:25 191:5
192:1,7 193:8
237:13
**pay** 129:21,22
130:15 131:20
184:8
**paying** 115:15
201:22
**payments**
190:17
**pdf** 11:24 158:17
257:12
**pelofsky** 18:9,15
19:22 20:3 21:6
28:7 60:2,6,8
61:2,9,10,14,15
85:14 261:25
262:5 266:5
**penalties** 6:20
286:22
**people** 21:7,9,12
25:12,15,16,17
26:22 27:10
28:4,4,11,14
35:17 38:11
65:24 89:25
116:20 128:15
134:10 138:17
138:25 139:5,11
139:15 142:12
142:17 149:18
149:24 161:2

168:20 169:19
187:8,10 203:11
207:3,20 209:9
212:16 213:1,12
216:10 218:11
218:24 219:1,3,6
219:9,9,14,17,18
219:21,24 220:3
220:5,11,15
222:7 225:16,25
226:1,4,18,25
227:1,11 228:9
229:8 230:9
231:5 232:5
234:15 236:25
236:25 237:3,16
238:13,15
243:20,24 245:8
248:10 249:15
250:5,11 251:22
251:23 252:8
253:21 262:23
263:6,9 264:2,5
**people's**   116:10
**peoples**   227:13
**pepsi**   211:14,14
**percent**   53:3
125:7 145:6
214:8 234:24
235:1,4 253:23
253:24,24
263:17 264:4,10
264:22 265:7,15
265:20,21,24
267:1,3,4 268:20
275:11,12
**perception**
105:14

**perceptions**
159:19 272:13
**perform**   251:19
**performance**
276:1
**performed**   269:7
276:12
**performing**
276:13
**period**   21:3
56:22 88:7
114:6 275:8,16
279:13
**periods**   192:24
**perjury**   6:20
286:22
**perpetrating**
112:14
**person**   28:10
93:17,23 94:17
94:17 95:13,13
96:6,11,17 98:12
101:4 116:25
117:3 128:10
135:11 137:24
139:6 142:3
145:12,19 146:5
146:12 147:4
181:3 185:24
247:17 248:21
248:22,24
249:24 250:22
250:25 251:6,11
251:14 252:14
252:15 263:5
277:18
**personal**   116:9,9
200:23 232:6

254:15
**personally**   16:11
16:12 51:24
60:25 61:2 78:3
81:11 144:14
269:15
**personnel**   24:9
25:8 39:6 41:3
**persuasive**
247:18
**philadelphia**
237:24,25
**phoenix**   237:24
237:24
**phone**   34:22
68:4 103:22
104:1,17,20,22
104:23 105:4
109:14,16 118:1
118:13 120:13
120:17 122:19
266:22
**phrase**   140:3
**physical**   158:20
**pick**   70:12
**picture**   124:5
191:8
**piece**   202:20,22
202:23,24 203:3
256:17
**pieces**   226:7
**place**   4:14 47:1
143:25 163:15
196:22 197:12
206:3 236:6
246:24
**places**   49:24
213:9 238:20

**plaintiff**   1:5 2:5
8:4,10,11
**plaintiffs**   8:2,19
**plan**   101:24
149:8 150:3
235:2,3 253:16
253:17
**plans**   161:2
**planted**   115:10
**plateau**   238:1,9
**plausible**   239:11
240:11
**please**   4:6 5:3,19
7:7,11,23 8:25
10:16 30:18
36:4 43:10
44:19 50:3
57:16,20 74:2,20
99:20 106:9
107:12,16 126:2
136:22 154:3,7
175:4 241:5,23
263:20 278:6
281:1,18,25
282:4
**plenty**   193:20
**plus**   256:6
**pods**   208:6,8,11
208:20 209:12
209:16,17,19
210:8,8,10 211:1
211:17,18,21
212:21 214:19
214:24 218:9
**point**   28:6 49:14
93:15 103:7,17
113:24,25
114:13 115:12

130:21 135:14
136:10,25 139:3
146:20 148:19
173:10,10,18,19
196:24 213:23
214:8,10,14
218:7 220:10
221:2 228:9
238:22 239:20
241:1,4 247:1
248:24 260:25
263:13 264:4
271:16 282:17
**points**  54:20
55:18 65:2,9,10
173:17 198:1
214:13
**poll**  271:10,11
271:13 272:7,25
**polling**  271:21
**poor**  185:3
**population**  87:2
88:3,7 134:17
160:2
**portion**  14:15
16:3 34:22
59:13 111:19
176:25 195:16
267:15 268:15
268:23 272:12
**portions**  36:23
51:2 56:4,7,8
70:23 81:21
109:13,13 110:1
253:19
**posed**  196:3
**position**  40:21
114:6 139:17

148:13 163:9
165:25 255:10
280:21
**positive**  168:12
**possession**  21:24
75:13 91:1
**possibility**
187:16 239:19
**possible**  26:5,16
48:7 70:23 71:4
71:11 79:4,7,20
79:23 85:25
96:5 97:25
104:19,21 105:3
105:15 136:4
144:21,23
145:23 153:14
153:16 168:6
202:12 204:23
205:1,8,11 223:6
227:22 245:7
278:15
**post**  168:20
169:4,7,9,16
170:15 180:8,19
209:18
**postage**  200:20
201:22 202:3,5,9
202:12
**posted**  22:7
**postings**  164:16
**posts**  25:3 71:9
164:16 166:16
166:18,20,23
167:4,7,18 168:1
168:2,5,9,11,15
168:17,23
169:13 170:10

170:11,22 171:1
171:6,22 172:15
172:25 174:8
175:15 179:12
180:1,3 200:2,2
217:7,14 235:8
**potential**  146:2
173:11 222:16
268:14
**practice**  13:18
65:23 117:20,22
119:24 120:9
121:24 122:4,22
123:1 131:1
132:9 133:3,10
133:12 159:21
185:2,3 195:8
277:8,8,10,14,15
**practiced**  193:5
275:20
**practices**  13:18
25:4 28:21 29:1
66:5 69:15,17
103:12,13
116:23,24 117:2
122:24 123:3
125:20 126:5
135:10 140:25
149:5,12 153:4
159:20 168:6,9
172:4,9,18,22
173:19 174:7,25
175:22 176:14
184:6,16 187:12
189:21 191:7
192:13 193:1,6
193:12,12,21,24
194:7,9,14,14,18

194:20 196:24
199:23 205:2
207:18,24,25
218:5 219:2,10
225:9 246:13,13
246:21 275:23
**practicing**
176:14 191:6
**precise**  9:5
**precisely**  10:7
127:19
**prediction**  229:5
**predictor**  194:16
**predicts**  195:1,3
**premises**  107:3
184:22,25 185:7
185:13,22 186:8
187:10
**preparation**
12:6
**preparing**  32:20
**present**  2:12 5:4
68:7,8,14 232:2
253:16,17
**presentation**
253:17
**presented**
258:19
**preserve**  73:21
**preserves**  73:22
**president**  255:8
255:19 256:25
262:3
**pressure**  189:9
**pretenses**  132:2
**pretty**  93:22
128:17 152:21
166:13 183:25

194:17 217:9
245:12,24
246:16 276:22
**prevent** 135:12
135:21
**previous** 58:24
165:7 171:24
181:22 187:9
259:21
**previously** 29:17
38:12 139:4
174:18
**price** 228:8,9
**pricing** 228:8
**primarily** 21:6
**principal** 85:15
206:21
**principals** 17:9
17:14 18:5,5,8
85:16 262:6
**principle** 213:9
**print** 108:25
109:1 255:25
**prior** 10:21
128:7 174:10
175:15,17
181:25 183:1,18
183:19 191:11
192:11,24
220:14 246:15
254:22,22,22
**pro** 189:13
**probably** 26:18
35:17 39:6 85:5
142:3
**problem** 101:7
101:11 131:16
141:14,15

**prop** 209:4
**properties** 87:9
**propositions**
230:21
**protect** 273:12
**protective** 281:7
**provide** 24:10
149:18 181:12
220:21 237:5
249:4 250:22
**provided** 44:15
44:20 66:20
72:9 158:12,16
158:21,25
159:16 191:2
200:6 201:5,6
237:14 268:10
279:19
**providers** 188:8
**providing**
159:18 160:14
**psychological**
228:8
**public** 1:18
284:6,14 285:6
**pull** 258:9
**purchase** 148:19
196:24 228:9
**purchases**
186:20
**purchasing**
228:7
**purely** 248:13
**purpose** 8:14
86:23 87:1
135:16,20
152:18 172:1
250:24 266:9

**purposes** 8:18
10:13 11:8,9
123:20 148:4
279:3
**push** 241:12
**put** 6:17 65:7
66:21 70:20
94:9 104:5
149:15 150:7
159:3 165:24
166:19 183:13
191:18 202:18
209:3,7,15,18
210:1 211:8
217:24 223:16
223:17 229:19
235:23 247:19
259:22,25
**puts** 207:17
**putting** 208:10
261:10
**pyramid** 220:12

**q**

**quality** 4:8,9
**quantification**
197:8
**quantified**
212:14 213:11
232:7
**quantify** 177:23
178:19 197:25
212:24 214:20
218:9,11,15
219:9 227:15,19
228:18
**quantifying**
228:13

prevent 135:12

**problems** 115:14
164:20 205:4
206:5 218:24
**proceed** 5:20
87:10
**proceeding** 5:2
**process** 251:13
**processes** 26:18
**produce** 112:12
198:2
**produced** 6:4
48:3 49:15,25
50:5,15 72:3,14
72:15 75:10
111:2 146:23
219:15,15
242:21 278:22
284:17
**product** 17:15
115:19,19
209:19,20
**profession**
128:17
**professor** 12:17
**program** 23:6,7
192:5 200:3,13
205:3 208:1
234:21
**programs** 201:4
205:5 226:3
**prohibited**
250:18
**projects** 231:20
231:22
**promise** 129:20
**promises** 130:7

**quantity**  178:5
  197:20 220:1
**quarter**  45:17
  46:3 80:6
**quarters**  261:3,6
**question**  7:7,8
  7:11,14,15 13:21
  33:23 34:5,18
  35:3 36:4 43:9
  43:10 45:3
  54:18 57:9 69:4
  74:1 76:25
  89:24 92:21
  97:6,7 99:19,20
  99:23 106:8
  107:3 109:21
  110:17 112:11
  116:25 117:14
  120:5 121:1
  122:6 124:8,12
  126:1 128:19,22
  128:25 130:5
  132:23 133:16
  136:22 147:21
  155:24 156:4
  157:7 162:6,12
  191:10 196:3,5,6
  196:9 202:2
  203:8,10 204:19
  211:19 212:1
  214:14,18 216:1
  216:23 256:14
  271:23,24
  277:11 278:24
**questioned**
  271:25
**questions**  7:24
  63:18 65:17

118:18,22 119:2
  278:18 279:6
  280:3,4
**quick**  75:3
**quickly**  261:4,13
  261:14
**quite**  202:19
  231:23
**quotation**
  187:18
**quote**  88:10
  186:16
**quotes**  102:17
  127:21

**r**

**r**  2:1,7 4:1 6:14
  18:14
**raise**  5:21
**random**  40:19
  40:23,25 41:2,3
  41:5,10,12,13,17
  41:24 42:5,9
  59:19,20 60:21
  61:16 62:2,5,12
  62:16,19,23 63:4
  63:17,20 64:3,7
  64:10,14,15,17
  64:21,25 65:21
  67:14 68:18,25
  71:12 72:25
  77:24 78:2 79:8
  79:13,17 83:10
  83:21 86:23,23
  86:24 87:1,8,12
  87:14,20,21,25
  88:6,19

**randomly**  15:9
  83:16
**rate**  226:2
  263:16 264:3,13
  275:4,7,10,15,21
  276:20
**rates**  226:14,15
  226:21 254:16
  265:2,4
**rationale**  66:7
**reach**  120:12
  143:9 225:19
  226:14,21
  234:21 235:2,3
  235:15,16,21
  236:24 237:7
  240:17 247:25
  266:25 267:2,4
  268:20 269:14
**reached**  65:5,12
  66:2 79:22
  93:11 163:5
  165:18,20 184:5
  191:16 203:12
  204:2,8 226:5,19
  227:12 232:11
  240:22 267:19
**reaching**  14:5
  81:13 174:5
  236:25 237:3
**react**  228:9
**read**  9:14 12:17
  14:23 15:4 32:4
  43:17 55:19,22
  55:24 72:4 74:4
  89:19 92:17
  95:1 103:15
  106:8 124:12

126:1,19 127:17
  129:11 136:21
  136:23,23
  145:17 150:25
  155:4 162:14
  164:7,24 165:15
  176:12 184:10
  184:23 186:21
  188:8 190:8
  196:11 201:9
  206:6,14 223:18
  224:22 225:25
  226:25 256:15
  271:18 282:22
  286:22 287:9
**reader**  102:18
**readership**
  202:19
**reading**  3:16
  8:12 54:6
  228:25 230:4
**reaffirm**  152:22
**real**  169:15
**realistic**  235:20
  235:25,25 236:2
**reality**  264:7
**realizes**  136:10
  136:17,25
**really**  7:4 27:24
  73:21 96:10
  105:9 113:17
  140:4 141:20
  142:4 171:14
  208:16 230:4
  273:11
**reason**  87:3
  88:13 148:6
  194:19 195:7

CONFIDENTIAL

**[reason - referring]** Page 45

263:14 271:23
286:5 287:11
**reasonable**
237:17 238:14
239:16 240:21
246:7 267:24
268:13
**reasonably** 94:2
**reasons** 279:3
280:12,24
**reassure** 274:24
**rebuttal** 19:14
**rebutting** 19:18
**recall** 12:3 14:4
14:8 16:8,10
17:25 18:1,4,19
18:22 19:1,1,4
19:10,21 20:6,8
23:23 27:7
32:17,19 36:20
36:25 37:11,13
38:12,18 40:12
40:13 48:5,14,17
48:19 49:4,10,13
50:6 52:6,8,21
53:3,6 54:7
56:25 57:14
68:2,11,22 70:7
90:1 91:25
92:12 104:22
119:15 146:4,7
159:1 185:9,11
210:20 247:1
**receipt** 287:18
**receive** 10:23
16:7,11,12 22:1
22:3,5 23:13
30:6 37:18,20

48:18 51:15
52:2,5 53:5,21
54:21,21,25
67:16 72:12,16
73:4 74:8 78:14
92:19,22 144:14
144:19 158:24
187:25 219:22
253:22,23,24,24
**received** 11:1,11
16:13 21:19,20
22:4,10 23:12
31:18,19 37:21
37:24 48:16
51:12,14,20,24
52:4,15,19 61:3
93:5 144:16,18
159:2 214:22
222:14 223:5
225:17 266:20
**receivers** 222:16
**receives** 134:17
**receiving** 78:15
92:16 253:21
**receptors** 223:6
**recess** 58:7
107:19 154:11
198:12 241:25
**recognize** 11:15
12:1
**recollection**
90:15 92:5
109:8 234:20
**recommend**
202:16 206:8
254:4
**recommended**
69:14 114:21

**recommending**
247:21
**record** 4:4,15
5:6 6:11,17 7:21
25:3 31:18 47:3
57:19 58:11,12
71:9,9 72:1
107:15,23 154:6
154:15 157:3
198:7,16 241:8
242:4 280:17,21
281:4,17 285:12
**recorded** 4:12
4:16 15:1 59:23
78:10
**recorder** 57:20
**recorders**
107:16 281:19
**recording** 4:9,13
33:19,20 86:9
102:20 111:17
111:20 119:14
119:16 127:22
127:23 203:20
281:15
**recordings** 14:21
33:5 72:3 76:5
80:1,7,18 81:25
82:9 102:24
109:22,22
111:24,25 127:4
149:20 164:13
166:14 172:15
172:24 174:8
217:6
**recruiting** 252:5
**rectify** 179:1
219:4

**redo** 271:15
**redone** 271:16
**reduce** 173:12
**redundant** 204:6
**refer** 8:20 10:13
47:16,17 182:4
215:19 263:23
**reference** 12:20
23:4 167:14
176:2
**referenced** 22:17
24:1 46:8 59:1
78:24 144:2,15
167:16 271:19
287:6
**references** 22:20
23:8 44:24
91:22 210:10
**referencing**
42:23 50:10
56:22 189:4
**referred** 13:25
14:1 43:7 46:21
51:5 168:5,9
206:10 207:3
226:6 259:7
265:4 266:23
**referring** 8:19
9:6 12:25 13:1
14:11 47:9
49:16 50:7,22
51:22 60:23
63:1 84:2 91:22
130:5 156:15
162:7,8,20
166:10 176:23
188:20 189:24
193:25 204:12

**[referring - rendered]**                                        Page 46

223:8 236:14
**refers** 78:9
**refresh** 90:15
109:8
**refusal** 187:18
**refuses** 185:24
**regard** 164:4
**regarding** 40:17
104:2 110:10
129:21
**regardless**
114:22 115:2
140:24 145:8
156:9 157:19
158:2 171:5
218:10
**reinforces**
146:20
**reject** 229:17
**rejoined** 114:23
**relate** 76:15
182:15,17,20
184:12 190:11
192:11 245:5
270:24 271:3
**related** 12:23
18:16 19:12
28:18 46:14,16
89:3,6 90:6,14
91:1,12 96:8
102:23 108:16
112:2,8 117:2,6
117:19 122:20
123:6,9 128:17
131:19,21,22
132:11,19 133:1
138:19 181:20
182:5 183:9,10

183:18 189:12
226:9
**relates** 117:11
129:20 130:14
132:9 183:4
**relating** 36:22
78:24 81:12
90:16 92:8
111:25 117:7
**relation** 14:5
56:16 77:19
81:12 82:15
83:10,18 102:24
109:9 111:15
154:23 155:6
180:3 199:10
255:12 258:1
**relationship**
77:6 90:21
104:3,10 106:3
106:17 177:21
187:6
**relative** 285:13
285:15
**relatively** 146:23
193:22 195:6
200:23
**relevant** 27:10
27:12,18 54:20
55:18 56:2,3,5
92:1 113:8,9
115:20 137:16
138:2,9,16
182:22 203:7
272:25 273:5,24
273:24 279:13
**relied** 12:13,20
13:2,7,12 127:7

217:24
**rely** 12:21 94:10
102:16 226:8
**relying** 93:19
166:18 217:23
**remainder** 39:23
40:3 63:21,23
64:11 67:14
70:15
**remained** 105:7
**remaining** 30:23
116:17 142:21
278:9
**remains** 105:7
140:24
**remedial** 25:5
29:20 66:7
101:21 113:19
115:23 132:5
133:7,13 134:6
138:25 143:2
153:12,21
163:10 192:5
196:21 197:12
202:21 204:12
206:21 221:12
221:12 262:18
270:3,21,21
274:23
**remediation**
227:14
**remedied** 97:15
97:22 107:6
130:17 131:9,17
132:13,21 133:4
164:23
**remedies** 173:12

**remedy** 100:12
100:17 101:17
105:21 106:6,10
106:22 129:23
131:7 141:1
142:9,12 149:6
163:13 172:6,10
173:21 176:19
176:21 177:12
177:13,15
197:25
**remember** 16:2
17:15,16,18,20
19:7,15,17,24
21:16 22:6,8
28:13 33:1
34:13,15,17 37:4
45:16 46:5,11,19
47:1 63:8 89:11
92:11 104:5,17
108:21 109:15
109:16,18,19,25
110:6 111:21
119:20 144:16
144:17,17 145:3
145:23,25
158:18 239:5,6
243:9,20,22,25
246:4 265:22
266:22
**reminded** 60:2,6
60:18 61:12
62:10,20 137:23
**reminders** 6:17
**remotely** 4:8 5:4
**rendered** 155:25
156:6,10 157:11
208:4 281:5

**[rendering - representatives]**                                         Page 47

| | | | |
|---|---|---|---|
| **rendering**   29:23 | 42:18,24,25 44:4 | 216:9 218:23,24 | 264:20 281:23 |
| **rep**   135:23 | 44:7 45:19 | 223:8,13,20 | **representation** |
| 150:23 | 46:10,22 47:5,7 | 224:16 234:4 | 129:21 153:15 |
| **repair**   179:1 | 50:11,18 52:24 | 242:8,10,11 | **representative** |
| 206:4 224:21 | 55:4 58:17,20,22 | 244:21 246:24 | 29:4,6 87:7,24 |
| 225:21 226:10 | 59:2,7,8,13,16 | 253:10 254:4 | 88:3,7 92:16,20 |
| 232:13,19 236:8 | 59:21 61:18 | 256:17 259:24 | 92:23 93:6,18 |
| 270:3,5 | 62:14,21 65:3,5 | 263:19 266:23 | 94:7,14 95:21 |
| **repairing**   206:4 | 65:8,12 66:3,21 | 271:5,7,9,18 | 96:23 98:13 |
| **repeat**   13:21 | 67:2,10 68:19 | 273:5 281:4,7 | 99:15 100:1,15 |
| 30:18 36:4 | 70:13,20 71:22 | 285:8 | 100:21 101:13 |
| 44:19 69:4 | 71:25 75:23 | **reported**   1:17 | 103:9,11,21,23 |
| 109:21 118:20 | 76:19 81:9 83:3 | 126:15 128:10 | 104:6,14 106:5 |
| 132:23 138:20 | 83:7 84:14,20 | 145:17 146:3 | 106:20 115:4 |
| 196:8 217:4 | 86:13 89:17 | **reporter**   1:17 | 128:2,9,20 129:3 |
| 256:9 277:11 | 90:12 93:15 | 4:24 5:19,21 6:1 | 129:4,9,13 130:8 |
| **repeatedly** | 96:17 98:22 | 7:3 30:17 38:6 | 130:14,22 131:4 |
| 150:22 151:10 | 108:1,2,4,7 | 74:4,5 92:3 | 132:9,18,24 |
| 151:23 152:10 | 109:5 110:18 | 106:10,14 | 136:11,14,19 |
| **rephrase**   13:22 | 113:8,18 115:12 | 124:11,13 126:3 | 137:1,5,9 144:5 |
| 24:5 155:3 | 116:3,21 123:21 | 156:1 162:16,18 | 145:9,20,24 |
| 161:15 178:18 | 124:19 138:6 | 175:3,8 196:10 | 146:11,13 147:5 |
| 192:18,18 | 140:14 143:17 | 196:12 207:6,9 | 151:7,11 152:8 |
| 220:20 278:7 | 143:25 149:16 | 234:10 281:11 | 152:11 153:5,7 |
| **replaced**   247:18 | 150:5 154:20,21 | 281:21 282:1,5 | 153:17 159:23 |
| **report**   3:11 8:12 | 155:16,18,25 | 282:11,21 283:4 | 186:3,5 187:4 |
| 9:10 10:20,22,24 | 156:5 157:12,16 | 284:14 285:23 | 222:3 245:24 |
| 11:1,3,7,16,25 | 157:17,20 158:4 | **reporting**   119:7 | 246:3 247:25 |
| 12:3,5,8,11,15 | 160:7 163:16 | 119:12 190:7,11 | 248:9 249:18,23 |
| 12:21 13:2,7,12 | 164:20 166:19 | **reports**   80:5 | 274:20,21 |
| 13:14,15,25 14:9 | 167:15,16,19 | 86:25 89:17 | 277:24 |
| 14:11,12,15,17 | 169:1,20 171:16 | 137:4 164:15 | **representatives** |
| 18:20 22:17,21 | 172:5 173:17 | 166:15 | 125:5 135:24 |
| 24:1,16,25 25:1 | 174:17 176:2 | **repository**   55:3 | 143:10 150:23 |
| 27:8 29:19 | 177:1 181:18 | **represent**   4:23 | 151:18,19,22 |
| 30:10,20 31:12 | 191:18 198:21 | 11:5 51:2 81:17 | 152:1 216:4 |
| 32:19,20 38:15 | 199:6 204:16 | 89:25 112:25 | 221:23 248:11 |
| 39:16 42:15,16 | 205:9 207:1 | 180:25 215:23 | 262:19 263:23 |

264:1 265:16
**represented**  19:4
   34:1,3,22 36:7
   36:13 37:5
   39:15 76:7
   81:16 85:19
   112:25 114:3
   242:17
**representing**
   4:25 5:9,11
   17:23,24 262:13
**represents**  30:9
   189:20 260:15
**reprimanding**
   184:17
**reproduce**
   111:17
**reps**  265:8,10
**reputable**
   271:20
**reputation**  164:5
**request**  31:20,22
   110:24 111:14
   111:23 112:1,18
   113:3 259:1
   271:16 282:18
   282:18
**requested**
   285:10
**require**  187:24
   217:25
**required**  125:1
   125:15,22 126:7
   178:5 200:20
   202:21 205:19
   254:13 264:5
**requirement**
   113:18

**requires**  163:13
   172:5
**requiring**  184:8
**research**  20:13
   169:11 227:24
   228:3,5,10,10,12
   228:15,21 230:3
   230:18,18,20,23
   231:4,8,10,19
   271:21 276:17
**resend**  63:11
**reserve**  278:24
   279:2 280:10,16
**reserved**  3:17
**resi**  265:8
**residences**
   246:19
**residential**  265:9
   265:10 270:9,11
   270:13,15,20,25
   271:1,3
**residents**  188:21
   189:5,9 203:19
**residual**  107:4
**respect**  155:24
   156:4
**respective**  3:15
**respond**  215:4
   247:7
**responded**
   273:22
**response**  7:18,19
   7:24 45:2 47:24
   104:7 192:19
   199:20 254:16
**responses**
   169:19

**rest**  27:17
**restate**  43:10
   74:1 78:19
   178:7 278:5
**restitution**  184:8
**result**  125:20
   126:4 235:22
**resulted**  189:24
   197:17 235:1
**results**  244:12
   271:11,13
**resume**  11:22
**resumed**  58:8
   107:20 154:12
   198:13 242:1
**retained**  5:14
   281:15
**return**  198:19
   287:13,17
**review**  12:5 14:7
   15:8,20 25:19
   26:7,13,20 28:18
   29:12,16 32:23
   39:25 40:4,10,15
   40:18 42:14
   46:16 54:3,13
   55:15 56:19
   57:13 64:24
   65:20 66:12
   69:24 72:12
   77:19,22 78:3,5
   81:11 82:2,3,6
   82:15 83:20
   85:18 86:18,22
   89:6,13 90:18
   91:10,12 108:11
   108:16 110:4,7
   110:10 119:17

158:11 159:12
   159:15 160:17
   160:21 166:11
   166:12 167:23
   172:23 173:6
   174:7 179:11,23
   180:3 190:6
   228:24 230:21
   282:23 285:9
   287:7
**reviewed**  12:10
   13:16 14:6,14
   15:2,7 22:2 25:6
   25:8,10,23 26:1
   26:11,22,25
   27:11 28:8,11
   31:14 32:3
   36:18,22 39:21
   41:9 42:13 48:8
   48:13 53:19
   54:2,3,9,10
   55:13 56:16
   59:24 66:14,17
   72:23 73:7
   74:11 83:21
   85:8,12 89:2,13
   89:15,18 90:2,15
   90:24 92:2,4,6
   92:12 102:24
   109:9 111:25
   119:18 127:5
   150:14 152:15
   154:23 155:5,10
   155:11,21 156:8
   156:9,14,16,20
   157:9,14,19,20
   158:1,5,6 163:4
   164:11 165:14

165:18 166:17
166:19,20
167:15,24
172:21 179:18
215:17 216:13
216:15,16
217:15,16
**reviewing**   14:4
28:15 175:20
**riddell**   19:3,5
**ridiculous**
170:12 238:16
**right**   5:21 9:14
14:3,23 15:4,7
15:18 34:23
43:17 44:3
49:13,14 50:4
57:6,16 63:14
65:17 71:19
72:24 74:16
75:21 83:2
86:13 87:11
90:11 92:17
94:20 95:1
98:18,20 100:24
101:5,6 103:15
103:19,24,25
104:25 105:2
107:12 109:2,4,7
111:20 115:14
117:10,12
119:22 125:7
126:19 127:17
129:11,16
131:12,24
134:12 137:19
138:21,22 139:1
139:16 140:5,8

140:16,18
143:16 146:19
150:25 163:17
163:19 164:7,25
165:15 169:1
178:12 180:13
184:2,10,23
186:21 190:8
195:13 196:20
196:22,25
197:15 198:5,23
201:9 203:22
205:11 210:17
210:17 211:11
212:24 214:1,18
221:10 224:22
227:25 230:8,12
230:15,18 231:2
232:17 234:17
234:19 239:21
239:22 241:5,17
246:25 249:2,19
249:25 252:18
253:12 259:9
261:22 263:4
272:16 278:24
281:1,12 282:24
**rights**   280:11
**ring**   50:9,16
143:22 144:1,2,8
144:9 151:3,5
152:15 247:15
**rise**   211:13,13
**river**   20:22
**roberts**   1:17
4:25 282:9
284:6,14 285:6
285:23

**rolling**   265:2,6
265:12
**room**   243:22,25
244:2
**roughly**   75:17
80:6 84:10
**rows**   81:9,16
**rule**   239:18
**rules**   184:7
**rulings**   206:18
**run**   261:15
**russell**   1:12 3:2
4:17 6:3,13
57:18 58:10
107:14,22 154:5
154:14 198:6,15
241:7 242:3
281:13 284:7
285:9 286:3,4,24
287:5

**s**

**s**   1:12 2:1,9 3:2,9
3:13,13 4:1,17
6:3,13 17:17,21
18:9,13,14,14
284:7 285:9
286:3,4,24 287:5
**salary**   249:23
250:7,9 262:25
**sales**   10:10 13:18
28:22 29:1
65:24 66:5
92:16,20,23 93:2
93:6,13,18 94:7
94:14 96:23
98:7,10 103:8,12
106:5,19 115:3

119:7,12 121:24
122:4,24 123:3
125:4,20 126:5
130:23 132:9,25
133:3 134:4
135:10,23
136:11,14,16,19
137:1,5,9 138:7
142:14,18
146:15 149:5,12
164:15 166:15
168:9 172:9,18
172:22 173:13
173:19 174:6,25
175:22 176:14
182:6 184:6,16
185:1,3,21 186:3
187:11 189:9
192:12 193:1
194:9 195:8
200:7 201:7
203:20 205:18
217:11 221:22
222:2 245:23
246:6,22,24
247:3,5,8,10,13
247:14,22,24
248:5,6,7,9,10
248:18 249:18
249:23 250:13
250:18,24
252:25 263:8,23
263:25 265:10
277:8,8,9,14,15
**salesmen**   188:6
**salespeople**
134:15 152:20
164:1 191:1

[salespeople - security]                                                Page 50

| | | | |
|---|---|---|---|
| 215:6 216:10 | sampling 86:24 | 252:15,23 | second 78:7 |
| 218:22 245:20 | 87:1,8,12,22,25 | 256:16 265:8 | 104:22 105:3 |
| 250:4 264:2 | 88:19 | 266:13 | 117:16 119:15 |
| **salesperson** | **san** 238:7 | **scale** 272:17 | 136:16 173:19 |
| 50:13 52:12 | **sandra** 90:19 | **scamming** 98:5 | 176:16,18 177:2 |
| 94:3 96:4 97:3,8 | **satisfy** 172:2,2 | **scares** 185:22 | 177:9 191:22 |
| 98:22 112:23 | **saved** 49:6 | **scenario** 132:23 | 192:3 233:1,4,5 |
| 117:23 146:8 | **saw** 104:25 | 132:24 | 233:7 259:13 |
| 248:17,18,23 | 151:2 156:14 | **scheme** 248:15 | 264:19,20 |
| 250:2,9,21 | 209:15 216:18 | **schutt** 17:17,23 | **secondly** 24:24 |
| 252:16 254:17 | 247:15 | 19:5 | 193:7 218:22 |
| 263:2 277:19 | **saying** 20:18 | **science** 231:25 | 254:16 |
| **salesperson's** | 32:9 33:4 45:23 | 232:9 | **seconds** 175:5 |
| 117:12 | 75:6 93:20 | **scientific** 163:11 | 246:25 247:3,6 |
| **salespersons** | 99:18 101:4,4 | 228:16,22 230:9 | **secretary** 282:2 |
| 263:6 | 117:21,23 156:2 | 231:3,7,18,25 | **section** 14:12 |
| **sample** 29:18 | 194:11,13 195:5 | 232:3,4,9 | 42:18,19,19,25 |
| 40:20,23,25 41:2 | 209:8 215:8 | **scope** 125:21 | 43:7 47:20,20,25 |
| 41:4,6,10,11,13 | 219:8 221:11 | 126:6 254:13 | 48:3 49:25 50:5 |
| 41:13,17,24 42:5 | 233:3 239:24 | **scratch** 147:11 | 53:8,10,14 58:25 |
| 42:9 59:19,20 | 248:19 252:20 | **screen** 4:12 | 59:3,6,8 154:21 |
| 60:21 61:16,17 | 276:3,6 | 10:19 54:11,11 | 155:15,17 |
| 62:2,5,12,16,19 | **says** 14:19 15:11 | 54:15 58:15 | 157:17 163:19 |
| 62:24 63:4,17,20 | 43:15 47:21 | 71:20 74:16 | 166:22 171:15 |
| 64:4,7,10,14,15 | 49:15 59:22 | 144:22 | 171:19,23 173:1 |
| 64:17,22,25 | 78:20 94:22 | **script** 250:15 | 181:19 191:11 |
| 65:21 66:13 | 95:20 98:11 | 251:21,23 252:7 | 191:18 198:21 |
| 67:15 68:18,25 | 101:13 102:18 | 253:8 | 199:5 204:15,16 |
| 71:12 72:25 | 103:2,3 110:23 | **scroll** 53:15 | 238:2 |
| 77:24 78:3 79:8 | 130:24 131:4 | 71:24 75:1,4 | **sections** 58:25 |
| 79:13,17 80:6 | 132:18 137:12 | 81:7 | 178:14 |
| 83:22 86:24 | 140:4,6 141:20 | **scrolled** 75:7 | **sector** 270:14 |
| 87:6,15,20,24 | 142:1 153:8 | **scrolling** 53:12 | **secure** 137:23 |
| 88:2,6 159:24 | 163:23,25 165:3 | 83:4 | **security** 8:13,16 |
| 160:1 163:11 | 184:4 188:6 | **sean** 170:14,17 | 93:25 95:8,14,17 |
| 167:17 | 191:6 201:5 | 170:17,20 | 95:19,21,23 |
| **samples** 215:11 | 207:18 221:14 | **search** 90:11 | 97:17 115:11,14 |
| 215:16 | 248:22 250:20 | 168:8 | 115:15,16 |

128:13 152:23
184:1 273:8,11
274:16 275:1
**see**  11:20 24:23
33:3 39:14
42:17 46:13
47:12 49:16,24
50:2,20 53:9,16
53:18 59:3 69:9
72:18 76:13
77:25 81:10
89:10 90:9
91:21,22 92:13
93:15 95:12
108:19 110:19
111:3 122:23
145:15 154:10
161:4 167:7
171:18 179:16
180:9,12,14
181:22 182:7
194:19 199:13
200:1 222:5
224:23 229:16
230:25 237:11
237:11 247:5
254:6 261:4
262:21 268:6
272:4 274:14
**seed**  115:10
**seeing**  151:6
229:12
**seek**  105:21
279:2 280:11,23
**seeks**  105:16
122:11
**seemingly**  238:5

**seen**  4:11 120:17
121:5 144:17
150:18 181:2,6
202:18 216:18
227:25
**segment**  273:2
**select**  42:9
**selected**  15:9
24:10 25:25
26:6 27:14
28:25 42:5 64:3
64:6,7 68:18
69:24 71:13
75:20,25 78:5
79:13 83:10,16
83:17 160:9,13
**sell**  152:8 251:2
**selling**  116:9,14
159:19 184:1
193:12 248:13
249:21
**send**  30:2 40:18
66:25 68:6,23
69:16 125:4
200:20 201:16
223:9 283:2
**sending**  255:21
256:8,12
**sends**  202:15
**sense**  8:21 32:8
223:24 224:2,7,8
277:2
**sensitivity**
238:21
**sent**  16:1 51:9,18
52:3,7,9 54:19
60:3,19 144:13
201:11 203:15

203:19 204:5,7
287:14
**sentence**  64:19
140:3 184:3
190:2 224:18
232:22
**separate**  34:1
50:21 51:1
80:25 81:17,21
104:19 109:13
109:16 110:2
179:15 194:1
**separately**  23:13
**september**  183:5
284:11 285:19
287:3
**series**  276:20
**service**  26:18
37:18 76:21,24
77:6 98:23
120:4,9,16,21
121:4 188:8
249:12
**services**  114:15
119:25 183:10
194:1,7 274:5
**servicing**  117:24
**session**  269:21
**set**  14:20 15:3
59:25 64:1
73:10 75:9
83:10,17 87:7
160:10 177:2
222:7 248:15
**sets**  89:15
**settled**  183:12
193:9

**settlement**  184:5
189:24 191:13
193:7
**settlements**
184:12
**seven**  14:8 15:7
22:2 23:12,18
24:4,6 25:25
26:6 27:5,11
28:25 29:6,10,12
30:1 31:14 32:3
32:14,16,21,22
36:17,21 38:2
39:12,21 41:8
48:11,13,15 65:2
65:4,8 66:14,17
66:23,25 69:3,5
69:9,9,23,25
70:11,24 72:22
73:6 74:10 78:4
79:14 89:13,15
89:16,23 111:24
112:1,2,9,20
149:20 183:22
188:25 216:15
217:5,6,14
236:22 238:7,9
239:13 241:14
**shade**  242:15
**shaking**  7:20
**shannon**  255:2,3
255:21 256:7,8
256:13,16,20,23
258:4,21 266:3,4
266:11,19,20,24
267:14 268:24
269:2

[shannon's - solemnly]                                                    Page 52

**shannon's** 267:3
**shape** 237:19
**share** 10:19,19
    54:11,15 58:15
    58:15 71:20
    74:16 144:22
    154:18 244:12
    271:6
**shares** 227:2
**sharing** 11:6
    65:16 71:21
    108:2 271:7
**shb.com** 2:4
    287:2
**she'll** 102:9
    111:11
**sheet** 3:6 286:1
    287:11
**shocked** 120:7
    274:15
**shook** 2:3 5:16
    17:3 26:24
    34:16 37:12
    80:15 112:7
    158:13 244:9,19
    262:11
**short** 164:21
    195:24 247:17
**shorthand** 1:17
**show** 7:21 264:6
**showed** 29:1
    89:9 145:24
**shown** 82:3
    145:10 147:4
    180:1
**shows** 98:22
    194:17

**shut** 73:24
**sic** 101:12
    170:17 188:19
**sign** 96:8 110:22
    282:24,25
    287:12
**signature** 11:18
    11:19 12:1,1
    284:13 285:22
**signed** 110:13,20
    111:5,7 284:11
    287:20
**significant** 67:22
    218:25 224:20
    225:1,4 232:23
    233:2,8
**significantly**
    275:11
**signing** 3:16
    12:3
**signs** 274:14
**similar** 27:22
    144:22 159:22
    187:9 201:1
    211:25 246:21
    268:4
**simple** 229:25
    245:24
**single** 212:11
    226:2
**sir** 57:4 72:4
    77:1 216:20
    282:20
**sit** 70:9 102:2
**site** 22:7 209:16
**sitting** 28:16
**situation** 141:18

**situations** 134:8
**six** 14:8 15:7
    20:1 22:2 23:12
    23:18 24:3,6
    25:25 26:6 27:5
    27:11 28:25
    29:5,10,11,25
    31:13 32:3,14,16
    32:21,22 36:17
    36:21 38:2
    39:11,21 41:8
    48:10,11,12,15
    66:23,25 67:4
    69:2,5,23,25
    70:11,24 72:22
    73:6 74:10
    75:17 78:4
    79:14 89:13,15
    89:16,23 111:24
    111:25 112:2,9
    112:19 154:23
    155:4,5,10,11,12
    155:13,15,17,20
    156:16 157:24
    158:22 159:14
    159:23 161:20
    162:1 163:4
    183:22 214:4
    216:14,14,15
    217:6,14,15
    234:20,21
    235:21 265:2
    281:15
**size** 41:11 61:16
**sized** 74:23
**skeptical** 150:22
    151:6,10

**skimmed** 55:17
    55:25
**skip** 186:17
**skipping** 164:9
**slash** 180:14,22
    181:7
**slow** 47:14
**slowly** 47:14
    53:15
**small** 29:18
    45:19 200:23
**smaller** 239:3
    ▮▮▮▮ 81:11,12
    81:18,25 82:10
    82:16,18
**smart** 1:7 4:19
    9:8,11,12,13,22
    10:1,2 286:2
    287:4
**snippets** 14:13
**social** 25:2 71:8
    163:7,7 164:16
    166:16,17,20,23
    167:4,5,18,25
    168:1,2,4,5,8,11
    168:15 170:10
    171:22 172:15
    172:25 174:8
    175:14 179:11
    180:1,3,5,8
    199:13,24 217:7
    217:14 225:6
    227:1 235:7
    253:25
**software** 23:7
**sold** 153:6
**solemnly** 5:22

solidifies   97:2
solutions   4:24
  5:1 281:16
  287:23
somebody   38:15
  115:19 118:20
  134:25 146:22
  168:17 169:17
  244:16,18
  245:13 247:14
someone's
  121:15
soon   13:3
sorry   18:10
  22:24 27:8,21
  29:13 33:10
  35:23 39:10
  44:6,19 49:9,19
  51:9 54:5 68:6
  69:4 77:5 83:3
  89:16 92:21
  95:4 106:21
  109:21 126:14
  128:22,24
  139:22 156:3
  162:11,23
  174:13 175:3
  176:10 179:9
  188:24 196:11
  201:23 207:18
  256:9 259:20
  261:18 264:6
  265:3 271:24
sort   97:2 128:14
  169:16 171:3
  194:14 248:14
  248:14

sorted   259:8
sought   183:25
sound   246:22
sounds   7:9
  128:17 230:6
soup   209:3,4,6,8
  209:10
source   51:7
  168:25 223:18
  258:12,15 269:4
  276:8
sources   22:17
  23:14 55:3
  117:9 156:14
  162:15,17,20
  164:11,13
  166:10,11
  171:14 174:14
  175:1,10 176:11
  176:12 178:9,10
  216:12 278:21
  278:23,25
southern   1:1
  4:21
speak   77:13
  82:18 91:8
  110:7 255:12,14
speaking   73:13
  73:24 157:2
specific   12:19
  42:19 67:17
  93:22 169:25
  176:23 226:7,8
  228:12 272:12
specifically
  12:23 13:15
  28:8 29:14
  61:17 62:13

156:19 174:16
  183:12 270:5
specificity   170:8
  170:10
specify   56:21
  279:22
specifying   156:5
spell   17:19 18:10
spelled   43:19
spelling   43:16,23
  43:25 44:1,13,14
  44:15,20
spend   118:12
  246:10 255:2,24
  255:25
spends   255:22
spent   179:1
  199:7 201:18
  211:14 212:22
split   17:11
spoke   60:10
spot   126:14
spreading   237:2
  237:4
spreadsheet   60:3
  60:19 61:3,7,13
  62:11,24 63:1
  69:8 77:25
spreadsheets
  245:5
spring   205:5
st   2:3
staff   21:7 41:18
  41:21 42:2
  87:17 88:11
  263:16,25
stages   191:20

stand   12:8 57:16
  84:20 102:12
  107:12 154:3,7
  202:20,22,23,24
  203:3,21 241:5
  281:1,18
standard   122:18
standpoint
  223:25
stands   274:25
start   7:6 15:10
  15:11 39:10
  47:15 76:11,12
  101:1 189:1
  232:14,17
  234:15 279:10
started   234:7,17
starting   11:14
  43:6 74:18
  166:23 220:10
starts   14:17
  154:21 180:9
  204:17 238:9
state   1:18 5:3,5
  6:12 73:19
  83:23 101:25
  111:10 124:19
  171:24 181:23
  182:4,8,14,20,25
  183:17 184:7,7
  186:24 190:3
  229:4,14 233:6
  284:3,6,14 285:3
  285:7
stated   76:2
  93:22 94:17,23
  153:5 154:22
  174:2 214:21

**[stated - sure]** Page 54

280:12,17,21,24
286:22
**statement**
127:15 132:19
133:1 188:15,15
209:25 210:1
215:3 223:23
**statements**
130:21 186:19
187:3,5,8,16
210:22 211:1
212:2,4,17 213:2
213:13 214:21
214:25 216:3
218:16 256:18
**states** 1:1 100:22
184:5 242:16
**stating** 228:22
230:21,24
**statistical**
229:15
**statistician** 62:4
88:19
**statisticians**
41:18,21,23 42:1
87:17,19
**statistics** 226:16
**stayed** 169:18
**stemming**
129:14
**stenographic**
1:17 285:12
**stenographically**
285:8
**step** 172:8,10,18
174:4,6,24 176:7
177:7,13,13
191:21,22,25

192:3,6,10,21
195:16,17,18,20
196:13,14,16,20
197:3 199:17,17
199:19,20
**steps** 87:23
**stipulated** 3:14
**stop** 65:16 73:12
**stopped** 99:21
113:23
**stopping** 238:22
239:20 240:25
**stored** 23:10
53:24
**story** 96:19
**straight** 232:16
**strategy** 223:25
**stream** 181:1
**strike** 76:3
126:13
**strong** 271:12
272:4 274:25
**strongest** 274:5
274:8,10
**strongly** 165:8
**studies** 231:5,6
232:10
**study** 19:15,17
19:20 214:15
218:8 221:10,14
222:13,24 223:8
223:19 226:25
229:21 235:13
235:14 246:20
274:15
**stuff** 109:1
**stupid** 140:4,8
140:17 141:21

141:22,22 142:4
**subject** 13:17
115:23 116:19
117:3 121:23
123:2 132:14
133:19 152:14
152:14 181:1
187:6 222:3,20
**subjected** 100:14
117:1 122:23
212:3 277:7,9,13
277:15
**submitted**
145:16
**subscribing**
114:15
**substance** 93:13
**substantiate**
60:14
**substantive**
266:16
**successful**
132:12 254:2
**suffered** 190:15
190:20
**sufficient** 148:23
149:3,10 150:5
224:20 225:2,21
226:10 232:13
232:18
**suggest** 56:4
119:1
**suggested** 29:12
243:5 267:2
**suggests** 164:3
165:8 206:2
222:24 266:14

**suite** 2:3,9
**summarize**
163:16,18
258:14
**summary** 68:23
163:23
**supplementary**
169:1
**supplied** 27:15
**supply** 279:12
**support** 24:13
29:19,22 38:24
39:1,3 79:5
83:24 84:7,25
85:19 86:1
96:17 148:17,17
163:9 165:24
168:2
**supported** 27:8
65:4 66:2,4 67:5
174:21
**supporting**
24:11 149:3
257:18
**supportive** 39:19
40:21 65:11
84:22 145:22
**supports** 139:17
174:23
**supposed** 88:6
88:10 221:7
235:15 251:22
**sure** 11:19 22:9
47:15 63:13,25
70:10 74:22
75:15 80:24,24
92:2,3 93:3
95:22 101:11

108:20 120:23
121:25 123:15
133:17 134:21
201:24 221:20
228:1 240:1
245:17 258:8
**surprised** 26:21
**survey** 254:5,15
254:16,19,19
**suspended**
280:13
**suspicions**
105:11 115:13
**suspicious** 101:2
**sustained** 200:3
**swap** 252:21
**swapping** 153:9
**swear** 5:19,22
**swimming** 209:5
**switch** 115:18
126:18 130:24
132:1,1,12,20
139:3 140:12
141:17 146:16
152:5 251:9
**switched** 96:15
131:14 137:12
137:15 138:2,11
138:17 139:1,5,6
139:7,11,15,19
139:23 140:12
**switches** 130:8
137:17 138:4,6
138:12,21,22,23
139:16
**switching**
130:15 131:5
133:2 188:7

196:1,1
**sworn** 5:22 6:4
284:9
**system** 93:25
94:20 95:9,14,17
95:19,22,23
96:14 97:18
128:13 187:9
188:8 237:13
**systems** 77:8
184:1 193:13

**t**

**t** 3:9,13,13 17:17
17:17,21,21
18:14,14
**table** 245:11
262:21 263:24
264:6,19,19,20
264:23
**tables** 258:13,16
**tactics** 134:14
173:8,13 182:6
189:10
**take** 4:13 50:14
57:3,9,15,22
86:17 87:23
88:5 107:8,17
110:15 117:15
117:15 128:5
131:20 154:8
161:3 171:17
183:24 195:24
196:4,7,22
197:12 198:3
208:17 209:17
210:10 219:21
226:24 227:10

232:14 233:24
236:12 241:3
248:2 260:12
263:15 264:5
267:16 270:3
**taken** 1:13,15
4:17 46:19
56:18 57:13
64:13 127:21
155:22 156:20
156:21 157:13
157:15 158:2,3,8
159:17 160:1,6
160:11,18 161:1
161:15,21 162:4
165:25 172:3
**takes** 209:25
236:6
**talk** 7:5 31:22,24
88:20 101:3
118:9,15,18,22
126:25 127:2
128:15 134:7
144:1 166:23
170:25 172:16
172:25 174:9
195:17 196:13
216:21 218:8
221:10 253:4,5
258:23
**talked** 42:12
80:3 115:7
118:7 128:7
159:5,22 171:20
171:21 172:14
177:5,21 191:19
192:3 214:18
231:14 238:12

238:12 246:2
257:10 261:25
266:3,5 269:23
**talking** 8:25
23:14 35:8
44:22 73:12
99:1,2 114:2
127:23 131:21
156:18 171:23
172:24 179:7
192:10 204:14
211:17,20,20,25
216:22 219:17
242:18 246:11
250:20 273:3
**talks** 43:4 89:1
133:8,9
**target** 205:24
211:7 221:17
222:13 223:1,1
224:4 236:15
**targeted** 222:7
267:17
**targeting** 221:21
224:1 225:10
**taste** 131:11
**taxes** 182:6
**teach** 269:20
**team** 15:2 16:15
28:8 51:23
59:24 80:2
112:6 243:19
**technically**
255:8
**technology** 4:8
**teenagers** 223:3
223:4,5

**[tell - think]**                                                                  Page 56

| | | | |
|---|---|---|---|
| **tell** 7:13 28:2 | 113:2 123:11 | 217:18 220:14 | 227:3 252:8,13 |
| 29:11,13,16 | 153:9,9 172:6,16 | 220:18 235:19 | 252:17 |
| 32:22 35:19,19 | 174:4 177:4 | 241:6 242:3 | **think** 11:20 |
| 36:6,12 39:12,20 | 183:24 191:8 | 281:9,13 287:9 | 12:24 13:11 |
| 39:23 40:2,9,23 | 192:21 197:24 | 287:18 | 14:1 32:10 35:7 |
| 41:5 52:18,18 | 206:18 211:12 | **testing** 229:3 | 39:18 43:6,9 |
| 56:7 61:10,23 | 214:1 227:20 | 230:14 231:24 | 50:13 52:3 |
| 62:4,7,9,15,18 | 274:4 | 234:6 | 56:22,24 71:14 |
| 66:25 67:13,14 | **test** 72:18 229:11 | **text** 24:23 94:9 | 73:20 75:7,17 |
| 70:16 71:16 | 229:15 233:14 | 104:8 201:3 | 76:2 80:2 86:12 |
| 74:19 76:9 | 233:16,17,20 | 211:5 212:3 | 88:22 93:25 |
| 77:10,13 84:23 | 269:10 | **thank** 5:18 6:1 | 94:1 97:1 107:9 |
| 84:23 85:2,4 | **testified** 6:5 15:6 | 6:15 58:14 | 111:11 113:7,13 |
| 87:14 88:21 | 34:19 35:4 54:9 | 74:25 95:4 | 114:12,19 |
| 98:3 104:4,7 | 59:18 70:17 | 162:18 175:8 | 115:17 116:4 |
| 111:11 122:9 | 89:2,12 139:4 | 189:1 198:4 | 122:8 126:24 |
| 148:22 149:10 | 181:19 246:19 | 207:9 251:10 | 132:7 135:15 |
| 150:22 151:9,10 | 247:2,3 273:19 | 282:5,20 283:4,6 | 140:1 143:21 |
| 160:23 168:1 | **testify** 101:25 | 283:6,7 | 145:22 146:17 |
| 203:2 213:1,11 | 102:4,13 111:9 | **theoretical** | 149:14,14 150:8 |
| 240:2,3 242:10 | 148:21 149:8,24 | 230:20 | 150:10,21 |
| 243:7 254:1 | 150:3,13 166:2,3 | **theory** 228:19 | 152:18 153:3,11 |
| 272:8,22 273:1 | 175:19,25 | **thesis** 140:14 | 157:7 159:3 |
| **telling** 40:13 | **testifying** 19:11 | **thing** 7:17 62:1 | 162:23 181:5 |
| 151:7 | 73:18 106:7,11 | 99:9,10 146:18 | 185:25 188:23 |
| **tells** 136:8,13 | 106:23 | 169:3 199:21 | 197:1 199:11 |
| **ten** 16:23 21:3 | **testimony** 3:2 | 223:15 230:2 | 202:16,19 217:9 |
| 198:9 | 5:22 6:22,23,24 | 248:3 | 221:9 222:11 |
| **teri** 179:15,24 | 38:5 45:22 | **things** 7:22,23 | 227:17 229:12 |
| **term** 208:24 | 57:17 58:10 | 12:14,20 13:1,6 | 230:17 231:13 |
| 215:20 | 70:2 73:9,20 | 13:13 41:19 | 234:19 236:8 |
| **terminology** | 100:19 107:13 | 67:11 98:18 | 237:9 238:8 |
| 93:4 | 107:22 130:19 | 99:6 134:8 | 239:18 240:25 |
| **terms** 15:23 | 142:25 147:6,7 | 168:12,20 | 241:12 246:3,5 |
| 60:20 63:16,19 | 148:22 149:9 | 172:15 173:4,16 | 246:19,23 |
| 65:19 76:5 | 154:5,14 173:24 | 174:16,20 | 247:13,20 248:8 |
| 78:23 80:4 | 178:1 192:16 | 199:14 207:19 | 248:8 249:18,19 |
| 102:15 112:19 | 198:6,15 217:3 | 217:10 226:3 | 254:19 261:19 |

**[think - transcripts]**

264:4 268:17,19
273:22 277:16
277:17 282:10
**third** 141:17
190:4 259:16
**thought** 24:10
89:23 94:24
103:3 131:15
147:3 222:11
238:13 240:21
253:11,14
**thousand** 63:23
**threat** 164:3
**three** 50:8,20,24
50:24,24 51:1
52:23 53:1
57:25 81:10,17
144:1,14 145:2,7
200:2 245:23
261:2,5
**tim** 283:7
**time** 1:14 4:4 5:3
7:10 8:23 17:11
31:20 39:20
52:25 56:22
57:19 58:12
60:17 80:4
98:19 99:7
102:19 107:15
107:24 113:24
114:1,3 118:7,12
136:16 137:7
154:1,6,15 156:5
160:6,21 162:4
162:10 168:20
192:24 198:8,16
211:19 216:21
225:8 241:8,13

242:4 244:1
246:11 248:3
271:17 276:20
278:18 279:1
281:17 282:13
287:19
**timeframe** 287:8
**timeline** 95:7
**times** 16:22,23
35:11,13 36:15
88:23 105:10
139:12 218:25
277:16 278:20
**timothy** 2:14
4:23
**title** 90:14
**titled** 13:5 48:1
53:9 58:25
59:10 72:2
204:16
**today** 4:6 5:10
6:9,24 7:2,18
28:16 32:17
60:18 70:9
102:2 111:9
118:10,25
144:22 145:4,6
220:14 221:1
222:1 231:14
242:18 279:4
280:10
**today's** 58:17
280:7 281:13
**told** 28:6 34:12
35:21 37:3,4,9
38:12,15,17
39:18 41:2,3
55:24 56:12

60:16 61:2,4
63:2 67:3,24
68:16 71:15
84:15,17 85:1
93:23 94:18
96:12,16,18
103:11 126:17
127:13 128:11
129:9 136:19
142:2 151:23
152:10,11
161:10,12 222:1
222:12,18
223:16 273:1
**top** 47:15 48:6
53:13 164:10
179:14 184:2,3
234:24,25
236:15,19
237:12 238:6,8
238:19 249:20
253:12 257:2
**topic** 206:16
**topics** 196:1
278:25
**total** 58:3 64:1
80:6 89:22 90:2
95:2 103:4
197:17 260:15
260:16,17,21,24
262:17 281:14
**totally** 94:25
95:2
**touted** 235:13
**track** 71:9
123:13 137:17
170:18 177:3

**tracking** 123:2
124:23 220:22
**tracks** 123:10
220:15
**traditional**
267:12,18
**trail** 182:11
**trained** 103:14
273:19
**training** 252:4,5
252:5,6
**transcribed**
281:24
**transcript** 3:5,17
11:11 32:11
43:24 45:6
46:13,16 53:5
54:16 55:10,15
56:1 282:24
285:1,10,11
286:1 287:6,20
**transcripts**
15:18,20 30:5,6
30:11,12,20,22
31:1,4,7,10,13
31:19 32:5
42:13,14,16
46:21 47:12,23
47:25 48:4,7,12
48:15,18,21 49:4
49:6,11,24 53:10
53:16,19,22 54:2
54:4,10 55:1,6
55:20,23 56:5,9
56:15 59:4,12,16
164:14 166:15
174:7 216:13,15
217:16

| | | | |
|---|---|---|---|
| **traurig**  2:8 5:8 | **truth**  5:23,23,24 | **turned**  263:16 | **typical**  267:8 |
| 5:11 | 112:25 114:17 | **turning**  190:4 | 268:17 |
| **travel**  248:2 | 128:5 168:19 | **turnover**  264:3,8 | **typically**  159:4 |
| **travelocity** | 278:4 | 264:9,9,10,13 | **typing**  245:12 |
| 169:12 | **truthful**  169:7 | 265:1,4 | **u** |
| **treated**  63:21 | **truths**  249:5 | **tv**  255:25 268:18 | **u**  3:13 17:17,21 |
| 64:11 | **try**  7:23 57:24 | **tweet**  180:17,23 | 208:8,10,18 |
| **trial**  6:23,25 | 111:17 120:2,9 | 181:9 | 209:12,16,16 |
| 102:3 111:3 | 120:13 121:8 | **tweets**  168:18 | 210:9 211:2,21 |
| 148:2,21 149:22 | 130:23 134:7,13 | 179:15,18,23 | 211:24 212:1,9 |
| 161:3 166:2,6 | 138:20 143:4,5 | 181:1,8,13 | 212:11,15 |
| 175:20 253:15 | 146:15 157:22 | **twenty**  188:25 | 214:19,19,24,24 |
| 253:17 | 170:8,21 199:12 | **twitter**  170:15 | 218:9 |
| **tricked**  96:3,4 | 199:21,25 205:3 | 170:17 180:19 | **u.s.**  4:20 |
| 102:17 113:14 | 206:22 220:10 | 181:3 200:2 | **uh**  7:22,22,22 |
| **tried**  170:11 | 231:5 233:19 | **two**  17:9 21:14 | **ultimate**  124:25 |
| 209:14 235:20 | 236:7 237:15 | 50:21 56:12 | **ultimately**  65:2 |
| 237:9 279:18 | 245:19 260:16 | 76:15 78:11,23 | 66:2,4 |
| **tries**  120:18 | 272:1 274:24 | 79:21 80:25 | **um**  47:8,22 68:5 |
| 121:14,15,18,22 | 276:22 | 90:13,15 91:15 | 75:2,5,6 206:12 |
| 122:2 133:10 | **trying**  7:11 | 104:25 109:11 | 236:13 |
| 153:7 | 11:23 35:3,4,9 | 109:25 116:8 | **unable**  233:23 |
| **true**  11:2 35:11 | 77:1 84:13 | 145:22 172:7 | **unclear**  157:8,9 |
| 35:11 86:14 | 89:21 101:12 | 173:4,16,16 | **underlying** |
| 87:6 99:10 | 112:13 114:5 | 179:15 191:19 | 260:2 |
| 100:20 114:22 | 116:15 124:21 | 194:25 195:2 | **understand**  6:18 |
| 114:25 147:14 | 128:25 145:10 | 200:2,2 232:21 | 6:20 7:10,13 8:2 |
| 165:21 169:10 | 145:12,19 146:5 | 233:14 237:12 | 8:4,6 9:2,16 |
| 182:15,24 183:3 | 152:8 157:6 | 277:20 | 14:25 33:3,11 |
| 189:11 190:21 | 174:18 187:8 | **type**  68:23 158:7 | 35:6 54:18 |
| 190:21 212:7,15 | 194:13 197:25 | 158:18 187:23 | 59:22 156:2 |
| 212:19 232:16 | 207:24 209:21 | 188:14,15 | 174:19 209:21 |
| 233:15 273:4 | 214:13 221:3 | 230:18 254:5 | 214:12 |
| 285:11 286:23 | 238:14 246:14 | 276:13,16 277:4 | **understanding** |
| **trust**  88:11 | 273:6 | 284:17 | 30:14,19 140:2 |
| 114:17 | **tuesday**  4:6 | **typed**  44:3,10 | 174:4 182:17 |
| **trusted**  88:1 | **turn**  108:6 | **types**  182:5 | 194:5 |
| | 143:16 281:18 | 278:13 | |

**understated**
  214:6
**understood**   7:14
  37:3
**undertaken**
  198:24 225:7
**undertook**
  198:22,25
  257:22,25 274:1
**undone**   205:10
**unfortunately**
  279:1
**unhappy**   121:10
  141:18
**unintelligible**
  33:7 234:9
**unique**   33:1,13
  33:13 34:6 35:9
  35:9 37:5 76:6
**unit**   198:6
**united**   1:1
**units**   281:14
**universe**   217:8
**unquote**   88:10
**unrealistic**
  234:21
**unresponsive**
  124:7
**untruths**   249:5
**upgrade**   93:25
  94:20 95:14,21
  97:17 128:12
**upgraded**   95:8
  95:17,19,23
**upset**   140:4,8,18
  141:21,22,22,24
  142:4,7

**use**   7:23 42:16
  69:9,12,13 93:3
  134:15 135:3
  149:4 167:25
  173:13 177:22
  178:2,17,19
  195:25 208:24
  220:10 225:19
  231:5,9,11,25
  233:20 237:7
  240:3 243:18
  244:14 264:21
  265:3,12,14
  267:17 268:18
**useful**   14:21
  65:7 79:10,15,18
  220:9,13 225:25
  279:24
**usually**   164:20
  250:4

**v**

**v**   1:6 287:4
**vague**   100:7
  207:5,8
**valuation**   269:25
  270:1,2 273:20
**value**   138:14
  164:6 208:17,19
  209:15 212:22
  236:11 269:12
  269:22,23
  272:18 273:23
**valued**   209:14
  210:14 211:12
**valuing**   269:15
  269:18

**variable**   247:14
**variance**   247:20
**varied**   276:14,18
**variety**   164:2
**various**   10:16
  181:20 198:21
**vegas**   238:8
**vegetables**   209:4
  209:5
**venture**   187:14
**verbal**   7:19,24
**verified**   43:16
**verify**   25:22 31:6
  34:10 37:14
  38:19 41:12
  42:4 87:25
  126:22 168:14
  168:18,22 169:3
  190:3 242:20
  257:7 259:3
  260:7 267:23
  268:9 287:9
**verifying**   104:14
**veritext**   4:24,25
  281:16 287:14
  287:23
**veritext.com**
  287:15
**version**   273:4
**versus**   238:23
**vice**   255:8,19
  256:25 262:3
**video**   4:4,13,16
  50:9,11,15,16,17
  51:25 52:11,13
  57:19 58:11
  107:23 143:22
  144:1,4,4,8,9,11

  145:9,19,24
  146:5,9 147:4
  151:3,5,13
  152:15 154:6
  198:7 281:17
  282:13,19
**videoconference**
  1:16 2:2,7 3:2
  284:8 285:8
**videographer**
  2:14 4:3 5:18
  57:1,2,4,16 58:9
  107:12,21
  153:25 154:3,13
  198:5,14 241:5
  241:17,20 242:2
  280:6,13 281:1
  281:12 282:12
  282:20 283:5
**videos**   50:21,21
  50:24 51:1,6,9
  51:16 52:16,19
  52:23 53:2,3,5
  144:2,15,25
  145:2,7,8 150:21
  200:4,5
**videotaped**   1:12
  3:2 283:8 285:8
**view**   149:11
  150:4 209:23
  262:22
**viewed**   144:20
  144:21 213:1
**views**   212:20,22
  218:13
**violated**   184:7
**violations**
  190:10

CONFIDENTIAL

**[virtual - vivint's]**                                                            Page 60

| | | | |
|---|---|---|---|
| **virtual**   4:8 | 29:18 37:19 | 132:8,9,10,11,13 | 192:8,12,22,25 |
| **virus**   135:4,7,9 | 39:16 50:13 | 132:18,19,20,24 | 193:5 194:6 |
| **visit**   92:16,19,22 | 52:12 54:8 | 133:1,2,10,17,18 | 199:1 205:1,24 |
| 125:5 127:8 | 65:23 66:6 67:8 | 134:4,9,11,15,16 | 207:17 215:6 |
| 135:13,24 | 67:23 69:18 | 134:23 135:1,10 | 216:4,10 218:6 |
| 187:24 218:4 | 78:21 79:1 | 135:13,18,23 | 218:21,22 |
| 246:3 247:24 | 82:25 84:2 | 136:11,14,19 | 219:10 220:23 |
| 250:13 260:17 | 85:20 92:16,20 | 137:1,5,9 138:3 | 221:7,22 222:2 |
| 261:12 | 92:23 93:6,18,23 | 138:11,18 | 222:19 224:20 |
| **visited**   93:17 | 93:24 94:3,7,14 | 139:11 140:25 | 224:21 225:10 |
| 94:7,13 125:10 | 94:18,19 95:8,13 | 141:8,13,14,23 | 225:14,21 |
| 126:22 127:6 | 95:21,22 96:4,9 | 142:7,14,16,21 | 227:10 232:14 |
| 133:17,18 | 96:11,12,13,18 | 143:4,10 144:5 | 232:19,23 |
| 152:17 212:17 | 96:19,23 97:3,4 | 145:9,14,20,24 | 233:22 246:15 |
| 216:11 218:22 | 97:8,9,16 98:2,9 | 146:6,8,11,13,16 | 248:17,18,22 |
| 221:22 222:2,8 | 98:10,13 99:15 | 146:22 147:5,17 | 249:2,7,10 251:1 |
| 222:19 248:22 | 100:1,9,15,21 | 147:18,22 148:9 | 251:7,8,15 252:9 |
| 251:6,15 252:10 | 103:8,13,18 | 148:14,18,24 | 252:10,13,15,17 |
| 252:15,24 | 104:3,11 105:8 | 149:4,11 150:6 | 252:19,24 253:5 |
| 274:20,21 | 106:3,5,17,19 | 150:15,23 151:7 | 254:17 270:4 |
| 277:18 | 110:14,20,22 | 151:10,17,18,22 | 273:9 274:1,20 |
| **visiting**   249:16 | 111:6 112:14,23 | 152:1,5,7,11,20 | 274:21,24 |
| 252:16,19,19 | 113:4,6,10 114:8 | 153:5,6,17,23 | 275:19,24,25 |
| 260:18 | 114:10 115:3,19 | 161:6,8,10,14,17 | 277:8,10,14,15 |
| **visits**   116:9 | 115:22 116:18 | 164:3 165:5 | 277:19,24 278:3 |
| 125:1 200:24 | 117:7,22 120:3 | 167:8 168:12 | 278:10,12 |
| 243:6 245:22 | 122:17 123:5,14 | 171:24 172:3 | 279:12,19,21,23 |
| 246:1,9,18 247:8 | 123:23,25 124:1 | 173:7,18 174:6 | 280:1 286:2 |
| 249:16 253:18 | 124:2,3,6,15 | 174:10,24 | 287:4 |
| 253:19,21 | 125:9,14,19,21 | 175:17,21 | **vivint's**   14:20 |
| 274:24 | 126:4,5,16,17,22 | 176:13 181:20 | 69:15 70:20 |
| **vivid**   146:23 | 127:6,13,14,19 | 181:23 182:1,11 | 71:9 116:23 |
| **vivint**   1:7 4:19 | 128:2,8,10,11,11 | 182:21 183:12 | 117:1 138:7 |
| 5:9,11,13 9:4,6,7 | 128:20 129:2,4,9 | 183:25 184:6,8 | 142:5 143:6 |
| 9:8,11,12,13,19 | 129:13,20 130:3 | 184:17 185:6,13 | 149:24 159:19 |
| 9:20,22 10:1,2,4 | 130:8,9,13,15,16 | 185:22 186:3,5,7 | 163:8 164:1,16 |
| 10:7,14,16 16:5 | 130:22 131:3,12 | 187:4,9 189:25 | 164:17,21 165:3 |
| 16:25 28:21 | 131:19,19,22 | 190:3 191:5,12 | 165:8,9 168:6 |

**[vivint's - winer]**

171:18 173:13
187:11 190:6,10
191:1,9 192:1
193:21 194:14
194:19,25 195:2
195:10 196:23
199:12 219:19
219:25 233:9
246:12,13 258:1
270:6 272:8,24
275:16 276:5,9
**vivinthome**
180:9,13
**voluntary** 184:5
**vs** 4:19 208:6,8
209:12 211:13
211:21 214:19
214:19,24 218:9
286:2
**vulnerable**
221:25 273:9

**w**

**w** 6:14 18:14
**wait** 7:7 57:20
99:20 107:16
175:4 281:3,3
**waive** 282:24
**walk** 248:24
251:12
**wall** 128:3
**want** 10:9 12:19
32:8 33:9 57:21
67:11 71:19
84:22,25 108:6
110:18 121:5,6
132:7 139:25
156:24 157:1

177:2 184:2
188:19 211:15
211:15 214:14
242:7 246:5
249:25 261:14
271:7 278:23
279:10 282:13
282:14,15
**wanted** 60:14
65:3,9,11 67:3,4
70:21 146:17
159:15 160:17
236:24 240:3
261:2 270:11
**warn** 133:10
134:25 142:17
**warned** 185:25
**warning** 153:4
188:20 189:4,8
246:12,12
**warnings** 200:7
201:6
**warns** 187:15
**washington**
240:15,15,16
261:5
**watch** 52:23
53:1 134:13,14
145:2
**watched** 53:4
145:6
**water** 27:4
**wav** 15:16,19,23
16:14 23:21
30:4 33:12
35:14 44:24
45:5 46:20 51:7
60:21 62:11,13

63:3 72:8 75:9
78:20 79:1,3,4
79:21 80:25
81:10,15 91:23
91:24 144:13
159:25 242:14
**way** 22:21 78:11
86:3 88:6,9
114:11 159:4
165:11 169:14
190:12 193:15
203:10 212:23
214:6 217:25
229:14 235:23
239:14 245:2
248:12 261:12
269:13 279:7
**ways** 164:2
195:11 201:1
**we've** 31:19 57:6
58:24 60:16
69:3,6 84:19
107:10 115:6
118:24 166:13
171:20,23
172:23 177:5
178:17 181:6
191:19,20 192:3
195:18 196:14
197:6,14,19
199:18 211:11
213:8,8 216:18
231:14 233:22
234:14 242:18
252:20,21
257:10 266:5
279:18,25
280:10

**web** 210:10,16
210:22 211:2,5
211:11 212:3,17
218:12
**website** 164:17
208:11,18
209:17,19 212:9
212:11 213:16
**websites** 59:10
215:1
**weight** 6:24 71:7
165:14,23 166:3
**welcome** 47:16
47:17 73:19
110:18
**went** 24:9 71:10
114:7,8,10,10,14
202:6 212:11
225:5 257:19,23
267:14 268:18
272:23 275:21
**wesson** 18:14,16
19:23 20:4
**widespread**
164:23
**win** 120:3,10,13
120:17 122:7
**winer** 1:12 3:2
4:17 6:3,8,14,15
32:2 57:12,18
58:11,14 63:17
73:2 74:6 99:23
107:14,22 108:2
118:1 154:5,15
154:20 155:4
156:12 157:24
175:5 198:7,16
198:21 214:12

**[winer - year]**                                                             Page 62

216:20 217:20
217:22 227:24
241:7 242:3,7
279:6 281:13
282:23 283:3,6
284:7 285:9
286:3,4,24 287:5
**wish**   261:19
286:4
**wishes**   261:20,21
**witness**   4:11
5:13,19,25 6:4
13:21 26:16
27:14,21 30:19
35:24 36:1,3
37:24 38:7 40:7
46:2 52:21
56:25 57:6,21
69:8,21 70:3
71:2 74:1,12,14
75:15 77:5,22
79:7 80:22 81:3
84:9 85:22 86:8
88:5,18,22 91:4
92:5 96:25
98:16 100:8,20
101:19 102:6,8
105:25 106:8,24
107:10,17 112:4
117:12 124:16
124:18 126:1,8
126:10 129:6
130:1,20 131:24
133:7,24 134:4
136:2,21 137:11
139:21 140:10
140:20 141:4,11
142:1,11 143:1

143:13 149:2,14
150:10 153:21
155:1,8 162:6,17
165:23 166:6
173:25 175:10
175:24 176:10
177:11 178:2,22
185:9,18 186:14
191:24 192:17
193:4 195:22,24
196:8,20 197:10
197:23 198:11
207:10 208:8
212:7 215:19
217:4 218:19
219:13 226:14
234:11,13
235:20 240:6
241:2 275:18
278:18,19,21,24
279:4,15 280:7
282:21,25 286:3
287:8,10,12,19
**witnesses**   112:12
161:2
███   42:20 108:9
108:12,17 109:6
109:10,17,20,23
110:8,11,19
111:5,15 119:5,6
119:9,10,11,21
126:14,15,22,25
127:2,6,15,20,23
128:2 136:7,7,10
136:25 138:15
**woman**   43:4
89:1

**wondering**
54:13
**word**   55:22,24
96:3 106:11
135:3 158:17
219:16 237:2
245:12 268:11
**words**   36:23
67:15 102:16
128:1,19 129:3
233:12
**wordsmithing**
233:3
**work**   16:15 17:5
20:3 60:18
74:24 77:8
153:15 159:4
208:4 228:6,7
243:24,24 250:5
263:10
**worked**   16:19,20
16:24 17:2,9,14
18:15 20:8,12
21:4,5,6,12
84:19 239:14
**working**   17:10
18:2,4 21:9 28:3
28:5 250:6
251:3
**works**   57:24
58:2 154:2
198:10 262:9
**world**   229:6
**worn**   182:11
**worse**   113:13
115:13
**worst**   115:17

**wrapping**
256:17
**write**   45:12 67:9
84:21 119:6
244:21 253:9
286:1
**writing**   250:15
256:16
**written**   245:3
**wrong**   98:5
195:4 222:9
230:4
**wrote**   24:25
32:19 44:7,9
86:13 160:7

| x |
|---|

**x**   3:1,9

| y |
|---|

**y**   18:9,13
**yeah**   11:23 13:22
33:10 45:4
74:25 93:3
102:11 134:22
140:10 154:2
156:17 157:18
159:8 162:25
166:16 167:1
189:1 196:2
198:10 204:14
216:17 238:21
241:13,24
247:11 248:12
250:4 258:12
261:18 265:8
**year**   12:4,16
19:24 32:18
45:15 86:13,17

CONFIDENTIAL

**[year - youtube]**                                                           Page 63

93:8 183:1,18,19
184:13 190:7
193:2 250:2
255:25 262:24
263:3,17,21
264:10
**years**   12:22
17:10 18:18
20:1 183:1,1
194:18 276:21
**youtube**   199:13
200:4,5

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.