UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

Case No. 20-23391-CIV-COOKE/GOODMAN

ADT LLC, and The ADT Security Corporation,

      Plaintiffs,

          v.

Vivint Smart Home, Inc. f/k/a Mosaic
Acquisition Corp.; and Legacy Vivint Smart
Home, Inc. f/k/a Vivint Smart Home, Inc.

      Defendants.

_____

# EXPERT REPORT OF ERIC MATOLO, PH.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

**Table of Contents**

**I.**     **Introduction** .................................................................................................... **2**

   A.   Assignment .............................................................................................. 2

   B.   Education, Experience, and Qualifications ............................................. 2

   C.   Information & Materials Relied Upon .................................................... 4

**II.**    **Summary of Conclusions** ................................................................................. **4**

**III.**   **Case Background: Plaintiffs, Defendants, and Allegations** ......................... **5**

   A.   Plaintiff .................................................................................................... 5

      1.   ADT, LLC ........................................................................................ 5

      2.   The ADT Security Corporation ...................................................... 6

   B.   Defendant ................................................................................................ 6

   C.   Plaintiff's Allegations Against Defendant .............................................. 6

**IV.**   **Royalty Analysis** .............................................................................................. **7**

   A.   Royalty as a Measurement of Damages .................................................. 7

   B.   Royalty Determination Methods ............................................................ 9

      1.   Market Measures for Royalty Rate ............................................... 10

        a)   Trademark licenses ...................................................................... 10

        b)   Dealer Revenue Sharing Agreements .......................................... 11

   C.   Royalty Calculation – ADT Market Measure ...................................... 13

      1.   ADT Dealer Revenue Sharing Model .......................................... 13

      2.   Adjustments to ADT Dealer Revenue Sharing Model ................. 16

      3.   Calculation of Royalty Rate Related to Defendants ..................... 17

   D.   Royalty Calculation – Industry Representative Market Measure .......... 18

      1.   Representative Dealer Revenue Sharing Model ............................ 18

      2.   Adjustments to Representative Dealer Revenue Sharing Model ............ 22

      3.   Calculation of Royalty Rate Related to Defendant – Industry Market Measure ....... 22

   E.   Conservative Nature of The Royalty Calculation ................................. 24

   F.   Lost Dealer Revenue to ADT ............................................................... 25

   G.   Vivint Revenues .................................................................................... 25

**V.**     **Pre-Judgment Interest** ................................................................................. **26**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

## I.    Introduction

### A.    Assignment

1. I have been engaged by Shook Hardy & Bacon, LLP, counsel for ADT LLC and The ADT Security Corporation (collectively "ADT" or "Plaintiff"), to provide expert analysis and, if necessary, expert testimony in the above listed matter pending in the United States District Court for the Southern District of Florida, under Case No. 20-23391-CIV-COOKE/GOODMAN.  I understand ADT has accused Vivint Smart Home, Inc. and Legacy Vivint Smart Home, Inc. (collectively, "Vivint" or "Defendant")[1] of false and deceptive sales practices, including false affiliation with ADT.[2]

2. I have been asked to analyze and opine, from an economic perspective, on the appropriateness and quantification of royalty damages relating to ADT's claims of violation of the Lanham Act, and common law Unfair Competition, as alleged in ADT's Amended Complaint.[3]  The analysis of the royalty damages was conducted through an evaluation of evidence relevant to the facts of the case available at the time of submitting this report.[4]

3. On December 20, 2017, ADT and Vivint's predecessor settled a lawsuit initiated by ADT relating to the same alleged unlawful conduct by Vivint sales representatives during the years leading up to and including 2017.[5]  The analysis here relates to Vivint's conduct occurring subsequent to December 20, 2017.

### B.    Education, Experience, and Qualifications

4. I am a Vice President at Cirque Analytics, LLC, an economic consulting firm with U.S. offices in California, Washington D.C., and Jackson Hole.  Cirque Analytics provides

---

[1] Vivint Smart Home, Inc. f/k/a Mosaic Acquisition Corp., and Legacy Vivint Smart Home, Inc. f/k/a Vivint Smart Home, Inc.

[2] First Amended Complaint, ¶1.

[3] First Amended Complaint, ¶1.  My opinions and conclusions regarding royalty damages are not intended to provide any indication regarding the appropriateness or reasonableness of any other form of remedy.

[4] I understand discovery is ongoing in this case.  If additional relevant information becomes available, we will update our analysis and opinions appropriately.

[5] First Amended Complaint, ¶2.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

economic, financial, and statistical research and analysis to private and public sector clients in the United States and abroad.

5.  I hold a Ph.D. and an M.A. in economics from the University of California at Santa Barbara, and a B.A. in economics/mathematics from the University of California at Santa Barbara.  I have been actively employed in the area of economic analysis and/or economic instruction for over 14 years.  After completing graduate education, I worked as an economist and expert for the economics consulting firm Nathan Associates.  I am, or have been, a member of multiple professional associations, including the American Bar Association, American Economic Association, Licensing Executives Society, Los Angeles Intellectual Property Law Association, and the Orange County Intellectual Property Law Association.  I have taught economics at the University of Southern California and have served as a referee for the *International Journal of the Economics of Business*.  I have also written articles on intellectual property damages.

6.  I have conducted economic analyses for a variety of situations, including anticompetitive conspiracy, contracts disputes, economic and fiscal impacts, intellectual property (e.g., patents, trademarks, trade dress, trade secrets, false advertising, and/or copyrights), and labor disputes.  This experience includes analyses of lost profits, reasonable royalties, and unjust enrichment.  The various products and intellectual property rights I have analyzed have covered many different industries, including semiconductor technology, software, wireless technology, apparel, medical devices, medical instruments, concession services, music and entertainment, automotive, energy management systems, consulting services, and various consumer goods.  I have provided expert analysis for projects in the context of litigation as well as projects involving business matters outside of litigation.  For litigation matters, I have provided expert analysis for both plaintiffs and defendants.

7.  Cirque Analytics charges $525 per hour for work in this matter. Professional staff members employed by Cirque Analytics working under my direction have hourly billing rates that range from $250 to $675. Neither my compensation nor Cirque Analytics' is contingent upon the outcome of this case.

3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

8. My curriculum vitae is attached to this report as **Appendix A**. Also included in **Appendix A** are lists of the matters involving testimony at deposition or trial in the past four years, along with lists of publications for at least the past ten years.

### C.    Information & Materials Relied Upon

9. In preparing this report, I have reviewed various documents and materials provided to me in this case. Those documents include, but are not limited to, information provided by ADT, information provided by Vivint, publicly available product and company information, and the First Amended Complaint. Additionally, I have interviewed Susan Gates, Director – Financial Planning and Analysis for ADT; Frank Cona, Vice President and Chief IP Counsel for ADT; Kenneth Rosen, Senior Director of Dealer Sales for ADT; Michael Barnes, Founding Partner of Barnes Associates, Inc.; and Brandon Hess, President of Crorzar LLC.  The complete set of documents, materials, and information received are listed in this report and/or in the attached **Appendix B**.  My analysis and conclusions are based on the information available to me.  I understand discovery is ongoing.  If additional relevant information becomes available, I will update our analysis accordingly.

## II.   <u>Summary of Conclusions</u>

10. For the purposes of the analysis, I have assumed that Defendant will be found liable for violation of the Lanham Act and/or the Unfair Competition claim, as alleged by Plaintiffs.  Given this assumption, I have conducted my analysis and prepared this report.  Based on my analysis and review of the evidence and the facts of the case available to-date, I have determined the following:

- Damages to Plaintiff can be modeled in the form of a running royalty; and

- Plaintiff's damages in the form of a royalty amount to approximately 22 percent of revenues earned from home monitoring, security and automation products/services for accounts generated during the timeframe I have been instructed by counsel to consider

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

which is from December 20, 2017 to present.[6]  Based on the relationship of the parties and the theoretical royalty framework, the royalty would be economically applicable to Vivint's direct-to-home commercial footprint as it overlaps with ADT's footprint.

## III.   <u>Case Background: Plaintiffs, Defendants, and Allegations</u>

### A.   Plaintiff

11. ADT, LLC is a subsidiary of ADT, Inc., a Delaware corporation formerly known as Prime Security Services Parent, Inc.[7]  ADT, Inc. is a provider of monitored security, interactive home and business automation, and related monitoring services across the United States and Canada.[8]  ADT, Inc.'s additional subsidiaries include ADT Holdings, Inc., Prime Security Services Borrower, LLC, Prime Security Services Holdings, LLC, and the ADT Security Corporation.[9]  ADT was founded in 1874, with a mission "to help [its] customers protect and connect to what matters most—their families, homes, and businesses."[10]  Excluding contracts monitored but not owned, ADT, Inc. currently serves approximately 7.2 million residential and business customers, making it the largest provider of monitored security for homes and small businesses in the U.S. and Canada.[11]

#### 1.   ADT, LLC

12. Plaintiff ADT, LLC (dba ADT Security Services), a subsidiary of ADT, Inc., is a Delaware limited liability company with its principal place of business at 1501 Yamato Road, Boca Raton, Florida.[12]  ADT, LLC is an operating company that runs the ADT

---

[6] I offer no opinion in this report as to whether Plaintiffs should be awarded additional damages in the form of compensatory damages due to lost accounts or reinstallations, enhanced damages, punitive damages, litigation costs, attorney fees, injury to reputation or goodwill, or other relief.  Moreover, by calculating the damages, we do not imply nor hold the opinion that damages, instead of a permanent injunction, would be an adequate remedy to compensate Plaintiffs for wrongful conduct by the defendants and those acting in concert with them.

[7] Form 10-K, ADT Inc., FYE 2017, p. 1, Exhibit 21.

[8] Form 10-K, ADT Inc., FYE 2017, p. 2.

[9] Form 10-K, ADT Inc., FYE 2017, Exhibit 21.

[10] Form 10-K, ADT Inc., FYE 2017, p. 2.

[11] Form 10-K, ADT Inc., FYE 2017, p. 2.

[12] First Amended Complaint, ¶12.  See https://www.adt.com/about-adt/legal/trademark.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

alarm services business in the United States, and uses the ADT Trademarks under license from The ADT Security Corporation.[13]

### 2.   **The ADT Security Corporation**

13. Plaintiff The ADT Security Corporation is a holding company that owns the ADT trademarks.[14]  Similar to ADT, LLC, The ADT Security Corporation is a subsidiary of ADT, Inc., and is a Delaware corporation with its principal place of business located at 1501 Yamato Road, Boca Raton, Florida.[15]

### B.   **Defendant**

14. Vivint is a provider of home systems for security, home automation, and energy management.[16] The company sells, services, and monitors smart home and security systems across the U.S. and Canada.[17]  Headquartered in Provo, Utah,[18] Vivint has grown to be one of the largest security companies in North America.[19]

### C.   **Plaintiff's Allegations Against Defendant**

15. Vivint and ADT are direct competitors in the market for residential security services and equipment.  The companies market substantially similar goods and services to largely the same residential customer base.[20] Additionally, Vivint operates in every state where ADT sells alarm systems.[21]  ADT alleges that through unauthorized use of the ADT trade name, Defendants are taking over ADT accounts.[22]  ADT further alleges this unauthorized use may have been part of Defendants' business strategy, which includes presentation of false and/or misleading statements to customers.  Vivint aims to have

---

[13] First Amended Complaint, ¶12.

[14] First Amended Complaint, ¶11.

[15] First Amended Complaint, ¶11.

[16] Vivint, "About Vivint," https://www.vivint.com/company/about-us.

[17] Form 10-K, Vivint Smart Home, Inc., FYE 2020, p. 93.

[18] Form 10-K, Vivint Smart Home, Inc., FYE 2020, p. 45.

[19] Form 10-K, Vivint Smart Home, Inc., FYE 2020, p. 93.

[20] First Amended Complaint, ¶27.

[21] First Amended Complaint, ¶27; Vivint, "Vivint Service Locations," accessed Jul. 8, 2021, https://www.vivint.com/locations; ADT, "ADT Security Local Service Areas," accessed on Aug 9, 2021, https://www.adt.com/local.

[22] First Amended Complaint, ¶¶1-4, 28-35.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

customers believe that they are affiliated with ADT and are performing upgrades to the ADT systems, when in fact the accounts are actually being transferred to Vivint.[23] According to Plaintiff, Defendant's practices of using false sales pitches to confuse customers, including unauthorized use of ADT's trade name, violates the Lanham Act, and constitutes unfair competition.[24]

16. According to Plaintiff, Defendant's sales agents would utilize false tactics to deceptively gain the trust of the ADT customers and gain access into their homes. Once inside, the sales agents would trick customers into signing a new contract with Vivint under the guise that their current ADT equipment was simply being upgraded.[25] These deceptive practices would often result in the customers ultimately terminating their existing ADT contracts, and signing new contracts with Vivint.[26] In some cases, the customers unknowingly ended up with a new Defendant alarm system, but contractual obligations to both the Defendant and ADT.[27]

## IV. <u>Royalty Analysis</u>

### A. Royalty as a Measurement of Damages

17. Defendant may have knowingly and deliberately attempted to use false and misleading sales presentations to establish the appearance of an affiliation with ADT.[28] Under an assumption of liability, this in fact would be the case. Defendant doing so is an indication of value associated with ADT's intangible assets. In other words, Defendant's attempts to claim an affiliation with ADT suggests that Defendant values the use of ADT's intangible assets, namely its commercial reputation, brand value, goodwill, and trade name.

---

[23] First Amended Complaint, ¶¶1-4, 28-35.
[24] First Amended Complaint, ¶1.
[25] First Amended Complaint, ¶¶1-4, 28-35.
[26] First Amended Complaint, ¶¶1-4, 28-35.
[27] First Amended Complaint, ¶35.
[28] First Amended Complaint, ¶¶1-4, 28-37.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

18. Over the last 30 to 40 years, intangible assets, on average for companies, have become an increasingly greater component of corporate value.  For example, in the mid-1970s, intangible assets were generally around 17 percent of corporate value, and by the mid-2000s, that number had grown to 80 percent.[29]  According to ADT, our "brands are among the most respected, trusted, and well-known brands in the monitored security industry" and the "strength of our brands is a key competitive advantage and contributor to our success."[30]  In addition, third party security industry analysts have identified the ADT brand as an iconic brand and the most trusted, recognized, and experienced name for home security.[31]

19. Owners of intangible assets that are willing to grant usage rights to third parties typically require fair compensation for use or the option to use such assets.  Royalties are a common method for owners of intangible assets, *e.g.* trade names, to be compensated for allowing others to have the option to use the intangible assets. In fact, ADT works with third-party dealers to obtain of a portion of its new customers.[32]  For example, historically, third-party dealers have accounted for approximately 40 percent of ADT's new customers in 2015, and approximately 50 percent of new accounts in 2017.[33]  And, as will be discussed more fully below, when ADT dealers sign up customers, they retain a portion of the contract revenue and ADT receives a portion, effectively creating a royalty payment obligation for the dealer to obtain the right to show potential customers his/her affiliation with ADT.[34]

---

[29] Parr, R.L. (2007). *Royalty Rates for Licensing Intellectual Property*. Hoboken, NJ: John Wiley & Sons, Inc.

[30] Form 10-K, ADT Inc., FYE 2017, p. 3.

[31] *See* http://www.thehomesecurityadvisor.com/do-just-adt-stickers-and-signs-prevent-crimes/; *See also* http://www.securitysales.com/in-depth/adt_execs_plans_2017/.

[32] Form 10-K, ADT Inc., FYE 2020, p. 6.

[33] Form 10-K, The ADT Corporation, FYE 2015, p. 4; and Form 10-K, ADT Inc., FYE 2017, p. 15.

[34] It is understood that use of the ADT name can be powerful for dealers and result in increased sales. (*See, e.g.*, An Insider's Guide to Security Dealer Programs, "Top 10 Things to Know About Alarm Dealer Programs," accessed Jun. 30, 2021, http://www.alarmprogramadvisor.com/top-10-things-alarm-dealer-programs/ ("The kind of branding you get by becoming an authorized dealer for ADT can be a very powerful force for your sales team and could potentially help close a few extra sales.")).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

20. More broadly, it is not uncommon that home security companies work with third-party dealers to obtain new customers.[35]  Brinks and Alert 360 are examples of additional companies that work with dealers.  Also discussed below, for other alarm company dealers, when they sign up customers, they retain a portion of the contract revenue and the home security company receives a portion following revenue share arrangements similar to the ADT dealer arrangement.

21. Thus, given the value of ADT's intangible assets (*e.g.* intellectual property and brand value), the general significant nature of intangible assets in terms of portion of corporate value, Defendant's decision to use such assets owned and used by Plaintiff, and the typical royalty method of compensation for third-party use of intangible assets, it is reasonable to consider royalties as a form of damages for Defendant's attempts to affiliate with ADT during their sales routines.

**B.      Royalty Determination Methods**

22. In determining the economic value of intangible assets, one, or a combination of three forms of economic measures are generally considered: income measures; cost measures; and market measures.[36]

23. Income measures relate to an evaluation of revenue and/or profits tied to the sales of products and services covered by the assets.[37]  Cost measures relate to the amount of resources spent to develop and commercialize the assets, or the amount of resources that would be required to pursue and adopt an alternative set of intangible assets rather than the set of assets-in-suit.[38]  Market measures include established transactional market outcomes related to the assets, or similar assets, which have occurred in the

---

[35] An Insider's Guide to Security Dealer Programs, "Alarm Dealer Program Comparison," accessed Jun. 30, 2021, http://www.alarmprogramadvisor.com.

[36] Glick, Mark A., Lara A. Reymann, and Richard Hoffman, *Intellectual Property Damages: Guidelines and Analysis*, (2003), p. 104.

[37] Glick, Mark A., Lara A. Reymann, and Richard Hoffman, *Intellectual Property Damages: Guidelines and Analysis*, (2003), pp. 104-105.

[38] Glick, Mark A., Lara A. Reymann, and Richard Hoffman, *Intellectual Property Damages: Guidelines and Analysis*, (2003), pp. 118-119.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

marketplace.[39]  Market measures, when available, are often valuable sources of information for intangible asset valuation exercises because the measures account for market realities that cannot always be easily quantified by a third-party examiner based on other available information.  An important requirement of a true market measure or the fair market value of a property, business, security, or intangible asset is that the value for the asset being valued was derived though a potential buyer and seller operating through an arm's length transaction, based on comparable types and levels of commerce. An arm's length transaction is "one in which the buyers and sellers of a product act independently and do not have any relationship to each other.  The concept of an arm's length transaction assures that both parties in the deal are acting in their own self-interest and are not subject to any pressure or duress from the other party.  It also assures third parties that there is no collusion between the buyer and seller."[40]  Supply chains can, and commonly have, multiple commercial levels.  Moreover, "[i]n general, family members and companies with related shareholders are said not to be transacting at arm's length."[41]

24. Thus, in selecting a market measure it is first important to ensure that it is a true arm's length transaction.  Secondly, an important requirement for appropriate use of market measures is to properly account for any differences between the facts surrounding the market measure and those relating to the asset valuation task at hand.

       1.    **Market Measures for Royalty Rate**

           **a)**    **Trademark licenses**

25. I am aware of certain trademark licenses entered into by home security companies. These licenses typically involve a running royalty rate as a percentage of sales. While these agreements are informative as to the structure of the royalty rate (*i.e.*, % of sales), material differences between the licenses and the arrangement at issue here prevent them from being proper market measures.

---

[39] Glick, Mark A., Lara A. Reymann, and Richard Hoffman, *Intellectual Property Damages: Guidelines and Analysis*, (2003), pp. 113-118.

[40] Investopedia, "Arm's Length Transaction," https://www.investopedia.com/terms/a/armslength.asp.

[41] Investopedia, "Arm's Length Transaction," https://www.investopedia.com/terms/a/armslength.asp.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

26. One notable difference is that some of the trademark licenses are not arm's length but rather transactions between affiliated entities. Another difference is the trademark licenses are not necessarily agreements between competitors, whereas ADT and Vivint compete for customer accounts. This is relevant because the opportunity cost of licensing is greater when licensing to a competitor. A third difference between the established trademark agreements and an arrangement between ADT and Vivint is that some of the trademark licenses require the licensee to expend resources to building and maintaining the company and the brand. Here, Vivint is using the fully developed and funded ADT company brand.

**b) Dealer Revenue Sharing Agreements**

27. As discussed above, ADT works with third-party dealers in order to obtain new customers. Thus, ADT has an established ADT dealer revenue sharing agreement and model in place with its own third-party dealers which it utilizes to effectively establish dealer royalty payments. The dealer revenue sharing agreement which ADT has in place for hundreds of dealers[42] is an established market transaction model that indicates what contract revenue sharing portion ADT is willing to accept and what revenue sharing portion dealers are willing to pay for the dealers to be able to use ADT's intangible assets and sell security and monitoring contracts with an affiliation with ADT. The dealer revenue sharing agreement was agreed upon between ADT and its dealers in an arm's length transaction, given ADT and its dealers have significantly different interests, are operated by entirely different decision makers, and negotiated the agreement with only their own self-interest in mind. Secondly, the ADT dealer revenue sharing agreement is highly comparable to what is at issue in this case, namely, Vivint's use of the ADT trade name, brand, reputation and goodwill.[43] Vivint is taking full advantage of ADT's brand, reputation, and goodwill without paying for it as ADT's authorized dealers do via their agreement. Thus, a royalty valuation model suitable for the claims at issue in this case would be a market measure approach, using ADT's established dealer revenue sharing model as the benchmark market measure.

---

[42] Form 10-K, ADT Inc., FYE 2020, p. 6.

[43] First Amended Complaint, ¶1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

28. However, despite the similarities between ADT's dealer revenue sharing model and a royalty applicable for Defendants, there are some differences that need to be accounted for. For example, factored into the actual ADT revenue sharing model is the fact that ADT incurs costs to provide the alarm service, whereas with a royalty arrangement related to Defendants, ADT would not incur such costs. Therefore, to properly apply the market measure approach, certain adjustments will need to be made to the established ADT model.

29. More broadly, as also discussed above, home security companies commonly work with third-party dealers in order to obtain new customers. In other words, similar to ADT, other industry participants have established dealer revenue sharing agreements and models in place with their own third-party dealers. Collectively, the industry dealer revenue sharing agreements in place serve as established market transaction models. The dealer revenue sharing agreements agreed upon between home security companies and the dealers are also analyzed to develop an industrywide representative model. The representative industry model may serve as an alternative market measure and a cross-check against the ADT-specific market measure.

30. As with the ADT dealer revenue sharing model, there are some differences between dealer revenue sharing models and a royalty applicable for Defendant that need to be accounted for. Therefore, to properly apply the market measure approach, certain adjustments (to account for ADT not incurring monitoring costs for the accounts Vivint obtains) will need to be made to the established representative dealer model. Ultimately, the dealer agreement structure that reasonably serves as the benchmark is a representative dealer arrangement comprised of average industry terms.

31. The royalty for modeling damages will be computed in the next section through the following three steps: (i) outlining the ADT dealer revenue sharing model, including the effective running royalty in the dealer relationships; (ii) identifying the adjustments that need to be made to the model; and (iii) applying the adjustments and computing the royalty applicable for Defendant. Following the royalty based on the established ADT dealer model, is the alternative royalty calculation based on the industry representative dealer revenue sharing model.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

## C.   Royalty Calculation – ADT Market Measure

### 1.   ADT Dealer Revenue Sharing Model

32. ADT's dealer revenue sharing model is used to determine the portion of customer contract revenue retained by the dealer and the portion owed to ADT.  The model is based on a representative security and monitoring system and service package based on common features.[44]  Typically, in return for obtaining a new customer contract, ADT dealers retain a portion of the contract revenue through two forms of payment; first is an up-front payment, and second is an ongoing share of the recurring monthly contract revenue.[45]  The up-front payment is based on a multiple of the monthly contract amount and is subject to a charge-back period, typically around 12-15 months, where the dealer must pay back any up-front payment if a contract is cancelled within the charge-back period.[46]

33. ADT has created an analytical model to identify the value (the Net Present Value, or "NPV"[47]) to ADT of the dealer relationship.  This model allows ADT to identify the value of various categories of dealers, such as the size of dealers measured by monthly contract volume.  The ADT dealer model can and has been used to identify alternative compensation structures that are economically equivalent to ADT (in terms of NPV).  More specifically, the model can be used to identify an alternative amount of up-front versus ongoing payments to dealers that still results in the same NPV to ADT.[48]  To maintain the NPV to ADT, any reduction in the up-front payment amount would be offset with a particular corresponding increase in the portion of the ongoing revenue share, and

---

[44] As discussed below, the model accounts for the mix of purchased ADT security systems/contracts.

[45] Interview of Susan Gates; interview of Kenneth Rosen; Form 10-K, ADT Inc., FYE 2020, pp. 6-7.

[46] Interview of Susan Gates of ADT; interview of Kenneth Rosen of ADT; Form 10-K, ADT Inc., FYE 2020, p. 6.

[47] NPV analysis is a method of evaluating projects and investments by discounting future costs and benefits on a common basis (*i.e.* to the same time period using an appropriate discount rate) so they can be compared "apples-to-apples" (Goolsbee, A., Levitt, S., & Syverson, C. (2013). *Microeconomics*. New York, NY: Worth Publishers). In other words, given that a dollar today is not the same as a dollar tomorrow, NPV analysis accounts for risk and time value of money.

[48] I understand ADT has used this model to create an alternative payment structure for new dealers that desire larger up-front payments in exchange for less ongoing payments (interview of Susan Gates of ADT).  This model was created in the ordinary course of business as of 2016 and continued to serve as a benchmark through at least 2019 (interview of Susan Gates of ADT).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

vice versa.  Thus, the ADT model can be used to identify a fully running royalty payment structure (that is, no up-front payment) that provides value that is economically equivalent to ADT (*i.e.*, with the same NPV).

34. The model used to determine account NPV and ADT dealer revenue sharing is based on a variety of inputs and parameters to fully account for the performance of a customer account.  Enumerated below are the inputs and parameters used in ADT's dealer revenue sharing model to determine the NPV of an account and portion of account revenue retained by the dealer versus that retained by ADT itself:[49]

- Recurring Account Revenue
  - Monthly recurring revenue paid by customers
    - Average recurring amount based on average ADT Pulse and Automation signup rates[50,51]
    - Billed amount used to compute recurring revenue share
    - Cost-adjusted amount used to compute up-front payment based on multiple

- Incremental Costs
  - Costs to Serve
    - Maintenance, customer service & monitoring, billing & collection, etc.

- Dealer Revenue Sharing Parameters
  - Up-front cost multiple (# of months)
  - Recurring revenue percentage

- Attrition and Contract Life
  - Annual attrition rates

---

[49] Interview of Susan Gates of ADT; ADT00010352.

[50] ADT Pulse is a more advanced automated system and service integrated with climate and light control and video (https://www.adtpulse.com/home/what-is-pulse.html).

[51] ADT's authorized dealer program accounts for roughly 40 percent of its new customers (Form 10-K, The ADT Corporation, FYE 2015, p. 4).  Hence, we have relied on inputs used in the ADT dealer revenue sharing model (specifically the ADT Pulse and Automation sign up rates) to estimate the royalty rather than the average revenue across all customers because the latter accounts for revenues that were not necessarily originated by ADT's authorized dealers.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

- o Charge-back period and charge-back rates
- o Typical contract life (# of years)
- Discount rate and Taxes
  - o Weighted average cost of capital
  - o Corporate tax rate

*******

35. **Table 1** (and attached Exhibit 1) summarizes the calculations from ADT's dealer revenue sharing model for a representative high-level ADT dealer and customer contract. For example, as shown in **Table 1**, for a high-level dealer (*i.e.*, dealer generating high number of accounts), the recurring revenue sharing retained by the dealer is ▮▮▮▮ of the recurring contract revenue from the customer and an up-front payment based on a 35.6 month multiple.[52] The remaining contract revenue, factoring in attrition, charge-backs, incremental costs, and resales, results in NPV payments to ADT amounting to ▮▮▮▮ for the account.

36. To model the royalty applicable in this case, the revenue sharing can be converted to a revenue sharing equivalent with no up-front model. For instance, using ADT's dealer revenue sharing model, holding the high-level representative account NPV constant at ▮▮▮▮, converting the up-front payment and recurring revenue sharing model to recurring revenue-only revenue sharing yields ▮▮ percent retained by the dealer and ▮▮ percent retained by ADT.[53]

---

[52] I understand the "500+" high-level category would apply for Vivint given the size of Vivint.

[53] The share retained by ADT is 42 percent based on the average dealer (*see* **Exhibit 1**).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

**Table 1**
**ADT Dealer Revenue Sharing Model**



Complete version with notes and sources attached as exhibit

## 2. Adjustments to ADT Dealer Revenue Sharing Model

37. This ▮▮▮ percent figure does not represent the royalty suitable for this case as it is applicable to the scenario where ADT provides monitoring services and incurs the related

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

16

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

costs. To determine a royalty applicable to the hypothetical licensees (*i.e.*, Defendants in this case) where ADT is not providing the monitoring service, an additional adjustment is applied to the royalty figure; this adjustment, and ultimate royalty, will be computed in the following section.

3.   **Calculation of Royalty Rate Related to Defendants**

38. As shown in **Table 1** (and attached **Exhibit 1**), the representative monthly recurring contract revenue figure is ▮▮▮. Applying the ▮▮ percent ADT revenue share royalty to the monthly contract revenue figures yields ▮▮▮, as seen in **Table 2** (and attached **Exhibit 2**).[54] However, in a royalty arrangement with Defendants, ADT would not incur the incremental costs to service/monitor the contracts sold by Defendants, thus it would not be expected that ADT would receive revenue sharing to cover such costs. Therefore, the ADT revenue sharing figure can be reduced to maintain the NPV levels as established by the revenue sharing model. In other words, a reduction in the monthly outlay (i.e., cost to serve) by ADT for an account should be offset by a reduction to the monthly monies received for an account (i.e., recurring contract revenue) to maintain the NPV. As shown in **Table 2** (and attached **Exhibit 2**), reducing the ▮▮▮ ADT revenue sharing figure to account for ADT's avoidance of the ▮▮▮ servicing costs yields a net revenue sharing amount to ADT of ▮▮▮.[55] This adjusted ▮▮▮ recurring revenue sharing figure for ADT, taken as a percentage of monthly contract revenue (▮▮▮), represents a 22 percent royalty per **Table 2** (and attached **Exhibit 2**).[56]

---

[54] Applying the 42 percent dealer average royalty yields ▮▮▮ (*see* **Exhibit 2**).

[55] Reducing the ▮▮▮ figure (based on the dealer average royalty) by ▮▮▮ results in a net revenue sharing amount to ADT of ▮▮▮ (*see* **Exhibit 2**). It would not be appropriate to deduct profits in addition to costs, given that Vivint's deceptive business practices result in less alarm monitoring profit to ADT, for which ADT would demand a sufficiently higher royalty, not a discount, to be equally well-off.

[56] The ▮▮▮ dealer average revenue sharing figure represents a 26.3 percent royalty (*see* **Exhibit 2**).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

17

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

**Table 2**
**Calculation of Royalty Rate**

| | High-level Dealer | Dealer Average |
|---|---|---|
| Monthly Recurring Contract Revenue | | |
| Revenue Sharing Only (no up-front payment) | | |
| ADT Revenue Share Royalty | | |
| Avoided Service Costs | | |
| Net Revenue Sharing | | |
| Royalty Rate | **21.9%** | **26.3%** |



Complete version with notes and sources attached as exhibit

39. Based on the above computations, it is determined that a 22 percent royalty, applicable to net sales, is appropriate for this case.[57] Since the defendants have not in fact paid any royalty to ADT, they have benefited from the avoidance of royalty via these payments. That is, Defendants profits are higher than they would have been by at least the amount of avoided royalty.

### D. Royalty Calculation – Industry Representative Market Measure

#### 1. Representative Dealer Revenue Sharing Model

40. This section addresses the alternative royalty calculation based on the industry representative dealer revenue sharing model. As with the ADT model, as part of the dealer revenue share arrangement, in return for obtaining a new customer contract, dealers typically retain a (majority) portion of the contract revenue value through two possible forms of payment; first is an up-front payment, and second is an ongoing share of the recurring monthly contract revenue.[58] The up-front payment is subject to a charge-back period, typically around 12 months, where the dealer must pay back any up-front payment if a contract is cancelled within the charge-back period.[59]

---

[57] Given the computation of the 22 percent royalty, the appropriate royalty base would be the contract revenue paid by customers.

[58] *See, e.g.*, An Insider's Guide to Security Dealer Programs, "Alarm Dealer Program Comparison," accessed Jun. 30, 2021, http://www.alarmprogramadvisor.com.

[59] *See, e.g.*, An Insider's Guide to Security Dealer Programs, "Alarm Dealer Program Comparison," accessed Jun. 30, 2021, http://www.alarmprogramadvisor.com; An Insider's Guide to Security Dealer Programs, "Top 10 Things to Know About Alarm Dealer Programs," accessed Jun. 30, 2021, http://www.alarmprogramadvisor.com/top-10-things-alarm-dealer-programs/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

41. An analytical model may be created to identify the value (the Net Present Value, or "NPV") to the home security company of the dealer relationship. This model allows for the identification of the incremental value of dealers and corresponding accounts from dealers for home security companies. Modeling contracts based on the NPV is common industry practice for dealer programs.[60] Furthermore, the model addressed here may be used to identify alternative compensation structures that are economically equivalent to home security companies (in terms of NPV). More specifically, the model can be used to identify an alternative amount of up-front versus ongoing payments to dealers that still results in the same NPV to the home security company. Thus, the model can be used to identify a fully running royalty payment structure (that is, no up-front payment) that provides value that is economically equivalent to the home security company (*i.e.*, with the same NPV).[61]

42. As with the ADT model, the model used to determine incremental account NPV and dealer revenue sharing is based on a variety of inputs and parameters to account for the performance of a customer account. The inputs and parameters used in a representative dealer revenue sharing model to determine the NPV of an account and portion of account revenue retained by the dealer versus that retained by the home security company itself are as follows:

- <u>Recurring Account Revenue</u>
  - o Monthly recurring revenue paid by customers
    - ▪ Average recurring amount
    - ▪ Billed amount used to compute recurring revenue share
    - ▪ Cost-adjusted amount used to compute up-front payment based on multiple

---

[60] *See, e.g.*, An Insider's Guide to Security Dealer Programs, "Top 10 Things to Know About Alarm Dealer Programs," accessed Jun. 30, 2021, http://www.alarmprogramadvisor.com/top-10-things-alarm-dealer-programs/ ("All security dealer programs value contracts based on the present value of the future stream of revenues.").

[61] This modeling approach is used in practice as shown by the ADT model discussed above.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

- Incremental Costs
  - Costs to Serve
    - Maintenance, customer service & monitoring, etc.
- Dealer Revenue Sharing Parameters
  - Up-front cost multiple (# of months)
  - Recurring revenue percentage
- Attrition and Contract Life
  - Annual attrition rate
  - Charge-back period and charge-back rate
  - Typical contract life (# of years)
- Discount rate
  - Weighted average cost of capital

*******

43. To construct the representative industry dealer model, input and parameter values were selected to represent the industry overall. To account for industry fluctuations and multiple years of alleged wrongdoing, when available, values over the last three years were considered. Review of company specific and industrywide data allowed for the identification and calculation of industry averages and norms for each input and parameter. The figures and corresponding calculations are discussed in more detail in the attached exhibits.

44. **Table 3** (and attached **Exhibit 3**) summarizes the calculations from the dealer revenue sharing model for a representative dealer and customer contract, including the upfront payment.  For example, as shown in **Table 3** (and attached **Exhibit 3**), the recurring revenue sharing retained by the dealer is 3 percent of the recurring contract revenue from the customer and an up-front payment based on a 35 month multiple.  The remaining contract revenue, factoring in attrition, charge-backs, and incremental costs results in incremental NPV (pre-tax) payments to the home security company amounting to $658 for the account.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

**Table 3**
**Home Security Systems Industry Dealer Revenue Sharing**
**With Upfront Payment and Ongoing Revenue Sharing**

| Description | Value |
|---|---|
| Attrition rate: | 11.9% |
| Customer relationship (years): | 15.0 |
| Recurring Monthly Revenue (RMR): | $50.0 |
| Ongoing revenue share to dealer: | 3.0% |
| Monthly costs to serve: | $10.5 |
| WACC: | 9.5% |
| **Present value of total RMR, net of costs & rev. share:** | **$2,049** |
| Upfront multiple to dealer: | 35.0 |
| Interactive pass-through %: | 10.0% |
| Upfront multiple to dealer net of pass-through: | 31.5 |
| Charge-back %: | 11.7% |
| **Upfront payment to dealer after pass-through & charge-back:** | **$1,391** |
| **Total Net Present Value:** | **$658** |

Complete version with notes and sources attached as exhibit

45. To model the royalty applicable in this case, the revenue sharing can be converted to a revenue sharing equivalent with no up-front model.  For instance, using the representative dealer revenue sharing model, holding the representative account NPV constant at $658, converting the up-front payment and recurring revenue sharing model to recurring revenue-only revenue sharing yields 54.6 percent retained by the dealer and 45.4 percent retained by the home security company. This adjustment is summarized in **Table 4** (and attached **Exhibit 4**).

21

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

**Table 4**
**Home Security Systems Industry Dealer Revenue Sharing**
**No Upfront Payment and Ongoing Revenue Sharing Only**

| Description | Value |
|---|---|
| Attrition rate: | 11.9% |
| Customer relationship (years): | 15.0 |
| Recurring Monthly Revenue (RMR): | $50.0 |
| **Ongoing revenue share to dealer:** | **54.6%** |
| Monthly costs to serve: | $10.5 |
| WACC: | 9.5% |
| **Present value of total RMR, net of costs & rev. share:** | **$658** |
| Upfront multiple to dealer: | - |
| Interactive pass-through %: | - |
| Upfront multiple to dealer net of pass-through: | - |
| Charge-back %: | - |
| **Upfront payment to dealer after pass-through & charge-back:** | **$0** |
| **Total Net Present Value:** | **$658** |

Complete version with notes and sources attached as exhibit

2.     **Adjustments to Representative Dealer Revenue Sharing Model**

46. This 45.4 percent figure does not represent the royalty suitable for this case as it is applicable to the scenario where the security company provides monitoring services and incurs the related costs. To determine a royalty applicable to the hypothetical licensee (*i.e.*, Defendant in this case) where the security company (*i.e.*, Plaintiff in this case) is not providing the monitoring service, an additional adjustment is applied to the royalty figure; this adjustment, and ultimate royalty, will be computed in the following section.

3.     **Calculation of Royalty Rate Related to Defendant – Industry Market Measure**

47. As shown in **Table 3** (and attached **Exhibit 3**), the representative monthly recurring contract revenue figure is $50. Applying the 45.4 percent ADT revenue share royalty to the monthly contract revenue figures yields $22.7, as seen in **Table 5** (and attached **Exhibit 5**). However, in a royalty arrangement with Defendants, ADT would not incur the incremental costs to service/monitor the contracts sold by Defendants, thus it would

22

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

not be expected that ADT would receive revenue sharing to cover such costs. Therefore, the ADT revenue sharing figure can be reduced to maintain the NPV levels as established by the revenue sharing model. In other words, a reduction in the monthly outlay (*i.e.*, cost to serve) by ADT for an account should be offset by a reduction to the monthly monies received for an account (*i.e.*, recurring contract revenue) to maintain the NPV. As shown in **Table 5** (and attached **Exhibit 5**), reducing the $22.7 ADT revenue sharing figure to account for an alarm company's avoidance of the $10.5 servicing/monitoring costs yields a net revenue sharing amount to ADT of $12.2.[62] This adjusted $12.2 recurring revenue sharing figure for ADT, taken as a percentage of monthly contract revenue ($50), represents a 24.4 percent royalty per **Table 5** (and attached **Exhibit 5**).[63]

**Table 5**
**Calculation of Royalty Rate**

| Description | Industry Figures |
|---|---|
| Recurring Monthly Revenue (RMR): | $50.0 |
| Revenue Sharing % (no upfront payment): | 45.4% |
| Alarm Company Revenue Share: | $22.7 |
| Avoided Service Costs: | $10.5 |
| Net Revenue Sharing: | $12.2 |
| Royalty Rate: | **24.4%** |

Complete version with notes and sources attached as exhibit

48. Based on the above computations, according to the industry representative model, it is determined that a 24.4 percent royalty, applicable to net sales, is appropriate for this

---

[62] It would not be appropriate to deduct profits in addition to costs, given that Vivint's deceptive business practices result in less alarm monitoring profit to ADT, for which ADT would demand a sufficiently higher royalty, not a discount, to be equally well-off.

[63] The relevant cost to consider is the recurring cost for monitoring. Based on the ADT dealer revenue sharing model this figure may be lower than the $10.5 used in the model here. Company financial disclosures used for the industry cost figures present cost to serve figures that encompass addition costs such as portions of acquisition costs and service calls which may generate additional revenue. Examples of these costs are summarized in **Exhibit 3.3**. Using these greater cost figures in the model yields a royalty of approximately 21 percent (see **Alternative Exhibits 3-5**).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

case.[64]  This conclusion is generally in line with the royalty based on the ADT model.
Recall that the ADT model computes different rates based on dealer size and the average
dealer range returns 26.3 percent and the high performing dealer calculation returns 21.9
percent (see **Table 2**).

### E.     Conservative Nature of The Royalty Calculation

49. There is another difference between the determination of the royalty applicable for ADT
dealers and that applicable for Defendant.  In comparing Defendant's alleged violations
and ADT dealers' sales processes, the sales strategies for dealers are more restricted and
limited to the guidelines set forth by ADT.  For example, all ADT dealers are monitored
by ADT, and required to follow certain business practices, and adhere to dealer program
guidelines and dealer agreement.[65]  In addition, dealers typically are required to agree to
exclusivity with the security company, including ADT.[66]  Also, dealers are typically
required to follow the same high-quality standards for sales and installation as those
imposed for the company-owned field offices.  In addition, all marketing and advertising
materials are to be pre-approved by the security company.

50. These restrictions explained and reinforced through ADT dealer training.[67]  The benefit
for ADT with these restrictions is that the company can better monitor the performance
and representation of the dealers, thereby better protecting its brand.  In other words,
ADT dealer guidelines and contracts, together with training reinforcement, increase the
value to the home security company of authorized dealer arrangements beyond simply
revenue sharing.[68]  While ADT training and various programs are in place that dealers
must to attend and abide by, these are intended to benefit ADT by ensuring that dealers

---

[64] Given the computation of the 24.4 percent royalty, the appropriate royalty base would be the contract revenue paid by customers.

[65] Interview of Kenneth Rosen of ADT.

[66] *See, e.g.*, An Insider's Guide to Security Dealer Programs, "Alarm Dealer Program Comparison," accessed Jun. 30, 2021, http://www.alarmprogramadvisor.com; Form 10-K, ADT Inc., FYE 2020, p. 6.

[67] Interview of Kenneth Rosen of ADT.

[68] Interview of Kenneth Rosen of ADT.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

follow the established protocol and do not tarnish the brand in any way.[69]  On the other hand, Defendant is not under any obligation to follow ADT policies, nor are they subject to the monitoring and standards set forth by ADT.

51. This lowered degree of control by ADT would require a higher royalty payment than that reflected in the actual ADT dealer relationships and revenue sharing structure.  Thus, the royalty calculated above necessarily understates the actual royalty that would apply.[70]  I am not aware of a means to reasonably determine the amount by which the calculated royalty (the 22 percent) understates the royalty applicable to Defendant's actions in this case.  This premium may only exist in concept, as I understand that ADT would not in actuality agree to accept a royalty of any amount to grant Defendant permission to undertake the accused actions of this case.[71]  Thus, I conclude that a royalty applicable to the accused actions in this case is at least 22 percent.

### F.    Lost Dealer Revenue to ADT

52. As discussed above, ADT and its dealers share the revenue and, thus, the value of the monitoring contracts.  As such, there is a connection between the avoided royalty discussed above and royalty revenue received by ADT.  Whatever royalty was avoided by Defendants was at the same time lost to ADT.  Thus, any calculation of avoided royalty is also a calculation of lost royalties, and lost royalty-based profits, to ADT.[72]

### G.    Vivint Revenues

53. Given the computation of the 22 percent royalty, the appropriate royalty base would be the contract recurring monthly revenue paid by customers.  The allegations, and thus royalty, at issue relate to Vivint's direct to home (i.e., door to door) sales.  Vivint public filings provide information on new subscribers by year.  In addition, information relating to the direct to home sale channel's contribution to total Vivint sales is available.  With the targeting of ADT customers, market share data can be applied to isolate the share of direct to home sales potentially related to prior ADT customers.  These calculations are

---

[69] Interview of Kenneth Rosen of ADT.

[70] Interview of Kenneth Rosen of ADT; interview of Frank Cona of ADT.

[71] Interview of Frank Cona of ADT.

[72] Recall, the royalty calculation discussed above is net of ADT's costs related to security monitoring.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

summarized below in **Table 6** (and attached **Exhibit 6**).  With the structure of the market measures, from an economic perspective, it would be inappropriate to apply further adjustment to the contract revenue based strictly on customers identified as switching to Vivint solely due to use of the brand.

**Table 6**
**Vivint Customer Breakdown Table**

| Year ended December 31, | New Subscribers | % Direct-to-Home | Direct-to-Home Subscribers | Cumulative DTH Subscribers | Annual Revenue (RMR @ $50) | ADT Market Share (net of Vivint) | ADT Share |
|---|---|---|---|---|---|---|---|
| 2020 | 343,434 | 39% | 133,939 | 491,705 | $295,022,802 | 18.75% | $55,316,775 |
| 2019 | 316,403 | 57% | 180,350 | 357,765 | $214,659,246 | 18.75% | $40,248,609 |
| 2018 | 322,574 | 55% | 177,416 | 177,416 | $106,449,420 | 18.75% | $19,959,266 |
| | | | | Total: | $616,131,468 | 18.75% | $115,524,650 |

Complete version with notes and sources attached as exhibit

54. Application of the 22 percent royalty rate yields $25.4 million.

## V.  Pre-Judgment Interest

55. We are aware that pre-judgment interest may be awarded on damages.  If asked, we will compute pre-judgment interest at trial.

August 9, 2021

*Eric Matolo*
_____
Eric Matolo

26

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Appendix A



# ERIC MATOLO, PH.D.
## Vice President

4 Park Plaza, Suite 1930
Irvine CA 92614
www.cirqueanalytics.com

T: (949) 594-1603      E: matolo@cirqueanalytics.com

Dr. Matolo specializes in the economic analysis of complex business matters. He is a consulting and testifying expert, and conducts expert analyses relating to antitrust, class certification, commercial damages, intellectual property, and labor. Examples of Dr. Matolo's experience include matters involving breach of contract, patent infringement, trademark infringement, copyright infringement, unfair competition, false advertisement, misappropriation of trade secrets, anticompetitive conspiracy, unlawful monopolization, wrongful termination, malpractice, pyramid scheme, economic and fiscal impacts of business operations, and business operations forecasts. Dr. Matolo's project experience includes matters covering a wide range of industries.

Dr. Matolo has also taught economics at the University of Southern California and served as a referee for the *International Journal of the Economics of Business*.

## EDUCATION

Ph.D.   University of California, Santa Barbara. Economics, 2008
M.A.    University of California, Santa Barbara. Economics, 2004
B.A.    University of California, Santa Barbara. Economics/Mathematics, 2003

## PROFESSIONAL EXPERIENCE

2021-Present   Cirque Analytics LLC, Vice President

2007-2021       Nathan Associates Inc.
                *Vice President*:              2018 - 2021
                *Principal Economist*:      2015 - 2018
                *Managing Economist*:     2009 - 2015
                *Senior Economist*:         2007 - 2009

2013-2015       University of Southern California, Economics Lecturer

Jackson Hole, WY                Irvine, CA                Los Angeles, CA                Washington, DC

CIRQUE
ANALYTICS

**Appendix A**

Eric Matolo, Ph.D.
Vice President

## SELECTED CONSULTING EXPERIENCE

### Antitrust and Competition

- Evaluated economic damages related to breach of contract involving cloud storage services.
- Evaluated antitrust harm involving alleged anticompetitive exclusive agreements relating to non-lethal weapons projectiles.
- Analyzed lost profits damages related to alleged unlawful monopolization involving foot care devices.
- Evaluated common impact and damages, and unjust enrichment, related to an alleged undisclosed automotive defect.
- Evaluated relevant markets, market power, common impact, and direct purchaser damages involving a horizontal exclusive agreement among manufacturers of neuromodulator products for cosmetic use.
- Evaluated business practices in the context of allegations regarding a supplier of nutritional and personal care products operating a pyramid scheme.
- Evaluated damages related to allegations of interference and anticompetitive conspiracy regarding technology used in DRAM memory.
- Evaluated relevant markets and market power, and evaluated licensing structure as part of affirmative defenses for patent misuse for tying and double royalties, all related to the manufacture of flash memory devices.

### Commercial Disputes / General Litigation

- Evaluated economic damages related to breach of contract involving solar energy projects.
- Evaluated economic damages related to breach of fiduciary duties and fraudulent acquisition of government contracts.
- Evaluated economic damages related to alleged breach of contract involving enterprise software for loan generations, processing, and servicing.
- Evaluated lost profits damages related to alleged breach of joint venture and non-disclosure agreements, and misappropriation of trade secrets involving mobile device application technology.
- Evaluated lost profits and impact to company value damages related to alleged breach of contract, intentional interference, and unfair competition involving long distance connection and conference calling solutions.
- Evaluated damages related to alleged breach of contract and unfair competition involving liquid repair and protection products for engine, cooling system, transmission, power steering system, body, and/or tire leaks or corrosion.
- Statistical sampling and damages evaluations regarding malpractice claims relating to class certification.
- Evaluated lost profits and disgorgement of profits damages related to alleged breach of contract, theft of trade secrets, and unfair competition associated with unlawful and unfair solicitation and raiding of employees in the virtualization and cloud computing infrastructure solutions industry.



**Appendix A**

Eric Matolo, Ph.D.
Vice President

- Evaluated replacement cost and lost profits damages related to alleged intentional interference involving femtocell wireless communications product suppliers.
- Evaluated damages related to alleged breach of contract involving retail automotive tires and wheels.
- Evaluated damages related to allegations of breach of written contract and negligence regarding technology used in aerospace equipment.
- Evaluated lost profits from counterclaims of fraud, breach of contract, and interference related to disaster recovery and construction services.
- Evaluated sampling and statistical analysis of lost revenue resulting from an alleged breach of contract related to medical billing practices.
- Evaluated lost profits damages related to an alleged breach of contract for concession services at amusement parks

## Employment and Labor

- Evaluated economic damages related to alleged wage violations in the trucking industry.
- Evaluated economic impact of alleged wrongful termination from city police force.
- Evaluated economic impact of alleged wrongful termination from industrial solutions industry position.
- Evaluated economic impact of alleged breach of contract and wrongful constructive discharge from renewable energy and land lease industry position.
- Evaluated economic impact of alleged wrongful termination from restaurant chain.
- Evaluated common impact and damages related to alleged unpaid wages owed to cellular phone retail store employees due to a flawed commission system.
- Evaluated lost profits and disgorgement of profits damages related to alleged unlawful and unfair solicitation and raiding of employees and theft of trade secrets the virtualization and cloud computing infrastructure solutions industry.
- Evaluated economic impact of alleged wrongful termination from public transportation operating agency.
- Evaluated economic impact of alleged wrongful termination from school district.
- Evaluated cost savings and defendant's profits related to allegations of theft of trade secrets by departing employees in the naval engineering and design industry.

## Impact Analysis

- Analyzed the impact of changes in the oil and gas industry on the current and future state of Oklahoma and Texas economies, and the impact of the changes in the state economies on Class II gaming in Oklahoma.
- Analyzed the financial, economic, and fiscal impacts of a proposed multipurpose resort facility in the State of California.
- Performed economic impact study to evaluate and quantify the regional and state economic and fiscal impacts of a proposed multipurpose resort facility in the State of Arizona.
- Analyzed the regional economic and fiscal impacts of a proposed multipurpose resort facility in the State of Washington.

CIRQUE
A N A L Y T I C S

**Appendix A**

Eric Matolo, Ph.D.
Vice President

- Performed economic impact study to evaluate and quantify the regional and state economic and fiscal impacts of gaming and business operations located in the State of Oklahoma.

**Patents**

- Evaluated lost profits and reasonable royalty damages related to alleged patent infringement involving VoIP technology.
- Evaluated reasonable royalty damages involving surgical template systems.
- Evaluated lost profits, price erosion, and reasonable royalty damages related to alleged patent infringement involving online account security/user authentication technology.
- Evaluated reasonable royalty damages related to alleged patent infringement involving video game character animation technology.
- Evaluated reasonable royalty damages related to alleged patent infringement involving wireless telecommunication technology in the context of industry standards and FRAND licensing commitments.
- Evaluated reasonable royalty damages related to alleged patent infringement involving consumer wellness products.
- Evaluated reasonable royalty damages related to alleged patent infringement involving video compression technology in the context of industry standards and FRAND licensing commitments.
- Analyzed lost profits and reasonable royalty damages related to alleged patent infringement involving mobile phone accessories.
- Evaluated lost profits and reasonable royalty damages related to alleged patent infringement involving real-time monitoring and visualization systems used with electric power grids.
- Evaluated lost profits and reasonable royalty damages related to alleged patent infringement involving child car seats, strollers, and travel systems.
- Evaluated reasonable royalty damages related to alleged patent infringement involving balloon catheters.
- Analyzed reasonable royalty damages related to alleged patent infringement involving navigation applications used in mobile devices.
- Evaluated lost profits and reasonable royalty damages related to alleged patent infringement and unfair competition involving padded protective athletic apparel.
- Evaluated reasonable royalty damages related to alleged patent infringement involving accused module location technology in Microsoft's .NET Framework.
- Researched and analyzed reasonable royalty rates for patent license agreements covering 802.11 technologies.
- Evaluated lost profits and reasonable royalty damages related to alleged patent infringement involving artificial disc implants.
- Evaluated reasonable royalty damages related to alleged patent infringement involving elevator technology.
- Evaluated damages related to allegations of patent infringement, unfair competition, and Lanham Act violations involving bone plate implants, screws and instruments.



Appendix A                                    Eric Matolo, Ph.D.
                                              Vice President

- Evaluated reasonable royalty damages related to alleged patent infringement involving light emitting diode semiconductor technology.
- Evaluated reasonable royalty damages related to alleged patent infringement involving electronic sourcing and procurement business software.
- Evaluated reasonable royalty damages related to alleged patent infringement involving wireless technology.
- Evaluated a reasonable royalty related to alleged patent infringement involving wireless technology in the context of industry standards and FRAND licensing commitments.
- Evaluated damages associated with claims of patent infringement regarding modem technologies.
- Evaluated lost profits and reasonable royalty damages related to alleged patent infringement involving artificial vertebral disc implants.
- Evaluated reasonable royalty damages in connection with allegations of patent infringement related to a component of a tortilla production line.
- Evaluated relevant markets and market power, and evaluated licensing structure as part of affirmative defenses for patent misuse for tying and double royalties, all related to the manufacture of flash memory devices.
- Evaluated reasonable royalty and unjust enrichment damages in connection with allegations of design patent infringement related to branded athletic hats.
- Evaluated lost profits, reasonable royalty, unjust enrichment, and corrective advertising damages related to allegations of patent infringement, trademark infringement, trade dress infringement, false advertising, and unfair competition related to massage furniture and products.
- Evaluated market value of technology and unjust enrichment damages related to an inventorship dispute regarding spinal implant systems.

### Trademarks, Trade dress, Trade secrets, Copyrights

- Evaluated damages related to alleged use of a fraudulently registered trademark involving credit unions.
- Analyzed damages related to alleged trademark infringement and false advertising involving hamburger chain restaurants.
- Evaluated lost profits damages related to alleged breach of joint venture and non-disclosure agreements, and misappropriation of trade secrets involving mobile device application technology.
- Analyzed damages related to alleged Lanham Act violations and tortious interference involving homeopathic over-the-counter ear and eye care products.
- Analyzed damages related to alleged false advertising involving rehab services.
- Analyzed damages related to alleged Lanham Act violations involving makerspaces.
- Analyzed defendants' profits damages related to alleged trade dress infringement and unfair competition involving aftermarket automotive products.
- Evaluated defendants' profits damages related to alleged trademark infringement, unfair competition, false advertising, trade dress infringement, and trade secrets misappropriation involving non-lethal weapons projectiles.

CIRQUE
ANALYTICS

**Appendix A**

Eric Matolo, Ph.D.
Vice President

- Analyzed damages related to alleged Lanham Act violations and unfair competition involving home security, monitoring, and automation systems and services.
- Analyzed defendant's profits and lost profits damages related to alleged trademark infringement, false designation of origin, unfair competition, and cybersquatting involving edible fruit arrangements and gifts.
- Analyzed defendants' profits and lost profits damages related to alleged trademark infringement, trademark counterfeiting, false designation of origin, trade dress infringement, unfair competition, and copyright infringement involving mobile phone accessories.
- Analyzed defendants' profits and lost profits damages related to alleged trademark infringement, trademark counterfeiting, false designation of origin, unfair competition, and copyright infringement involving fashion jewelry.
- Analyzed defendants' profits damages related to alleged trademark infringement, false designation of origin, and unfair competition involving marketing and business development publishing and training services.
- Evaluated lost profits and disgorgement of profits damages related to alleged theft of trade secrets associated with unlawful and unfair solicitation of employees in the virtualization and cloud computing infrastructure solutions industry.
- Evaluated damages related to alleged trademark infringement and unfair competition involving retail automotive tires and wheels.
- Evaluated damages related to allegations of patent infringement, unfair competition, and Lanham Act violations involving bone plate implants, screws and instruments.
- Evaluated damages related to copyright infringement involving music composition.
- Evaluated damages associated with claims of trademark and trade dress infringement related to advertising and marketing services through mobile wireless communications.
- Evaluated lost profits, reasonable royalty, unjust enrichment, and corrective advertising damages related to allegations of patent infringement, trademark infringement, trade dress infringement, false advertising, and unfair competition related to massage furniture and products.
- Evaluated lost royalty revenue and unjust enrichment related to allegations of trademark infringement involving children's clothing.
- Evaluated cost savings and unjust enrichment damages in connection with allegations of misappropriation of trade secrets related to electronic engineering and design packages used in US naval craft architecture.



Eric Matolo, Ph.D.
Vice President

## PUBLICATIONS & PRESENTATIONS

"Expert Evidence in IP Litigation: What You Must Know and Do in the 2019 Landscape," The Knowledge Group Webcast, January 10, 2019.

"Economic Considerations for Automotive Product Liability Matters," Bowman and Brooke LLP CLE Series, October 2018.

"FRAND Commitments and Royalties for Standard Essential Patents," with S. Bosworth and R. Mangum. In A. Bharadwaj, et al. (Eds.), *Complications and Quandaries in the ICT Sector: Standard Essential Patents and Competition Issues*, 2017.

"Corrective Advertising in Lanham Act Damages: The Use and Misuse of Past Advertising Expenditures," with S. Bosworth and R. Mangum. *The Trademark Reporter*, May-June 2017.

"Patent Uncertainty and Firm Behavior," 2008, manuscript.

"Patents as Real Options: An Empirical Analysis," 2008, manuscript.

## PAST & CURRENT PROFESSIONAL MEMBERSHIPS

American Bar Association

American Economic Association

Licensing Executive Society

Los Angeles Intellectual Property Law Association

Orange County Intellectual Property Law Association

## HONORS & AWARDS

Distinguished Research Fellowship, Department of Economics, UCSB, 2007

Research Grant, Department of Economics, UCSB, 2007

Graduate Fee Fellowship, Department of Economics, UCSB, 2005

Outstanding Teaching Assistant Award, Department of Economics, UCSB, 2004

National Scholars Honor Society Award of Achievement, 2004-2007

Eric Matolo, Ph.D.
Vice President

## TESTIMONY & REPORTS

*Katzkin Leather, Inc. v. Roadwire, LLC, and Classic Soft Trim, Inc.,* United States District Court, Central District of California, Western Division (2021). Submitted expert report on damages on behalf of Plaintiff.

*M.A. Mobile Ltd. v. Indian Institute of Technology Kharagpur,* United States District Court, Northern District of California (2019). Submitted expert report on damages on behalf of Defendant.

*ADT LLC v. Security Networks, LLC, and Vision Security, LLC,* United States District Court, Southern District of Florida (2019). Provided deposition testimony and submitted expert report on damages on behalf of Plaintiff.

*ADT LLC and ADT US Holdings, Inc. v. Northstar Alarm Services LLC, and Vision Security, LLC,* United States District Court, Southern District of Florida (2019). Provided deposition testimony and submitted expert report on damages on behalf of Plaintiffs.

*Adriana Guzman, et al. v. Chipotle Mexican Grill, Inc., et al.,* United States District Court, Northern District of California (2019). Provided deposition testimony and submitted expert report on damages on behalf of Defendants.

*TechShop, Inc. v. Dan Rasure, et al.,* United States District Court, Northern District of California (2018-2019). Provided trial testimony, deposition testimony, and submitted expert reports on damages on behalf of Plaintiff.

*Juan Pablo Aldana Lira v. Chipotle Mexican Grill, Inc., et al.,* United States District Court, Northern District of California (2018). Provided deposition testimony and submitted expert report on damages on behalf of Defendants.

*Advanced Flow Engineering, Inc. v. Injen Technology Company, Ltd., et al.,* United States District Court, Central District of California (2017). Submitted expert report on damages on behalf of Plaintiff.

*United Tactical Systems, LLC v. Real Action Paintball, Inc., et al.,* United States District Court, Northern District of California (2017). Submitted expert reports on behalf of Plaintiff and Counter-Defendant.

*Edward L. Blendermann v. LifeWave, Inc.,* United States District Court, Southern District of Florida (2017). Submitted expert report on damages on behalf of Defendant.

*Paul B. Butler v. Porsche Cars North America, Inc.,* United States District Court, Northern District of California, San Jose Division (2017). Submitted expert report in support of motion for class certification.

*Mitsubishi Electronic Corp., et al. v. Sceptre, Inc.,* United States District Court, Central District of California (2015). Provided deposition testimony and submitted expert report on damages and FRAND royalties on behalf of Defendant.

Appendix A

Eric Matolo, Ph.D.
Vice President

*Yunxia Wang, Fengqin Xu, and Qun Xu, et al. v. EFT Holdings, Inc., and Jack J. Qin, et al.,* United States District Court, Central District of California (2015). Provided deposition testimony and submitted a declaration in support of motion for class certification.

*Bar's Products, Inc. v. Bar's Products International, LTD., et al.,* United States District Court, Eastern District of Michigan (2012-2014). Provided trial testimony, deposition testimony, and submitted expert report on damages on behalf of Counterclaimant.

*Synthes USA, LLC et al v. Diverse Surgical Supplies, Inc., et al*, United States District Court, District of Arizona (2010 - 2012). Provided deposition testimony and submitted expert reports on damages on behalf of Plaintiff.

*Synthes USA, LLC et al v. Syntec Scientific (USA) Corporation, Whittemore Enterprises, Inc., et al*, United States District Court, Central District of California, Western Division (2011). Submitted expert report on damages on behalf of Plaintiff.

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

# Appendix B - Materials Cited

**Legal Materials**
• First Amended Complaint, Oct. 13, 2020.

**SEC Filings**
• Form 10-K, The ADT Corporation, FYE 2015.
• Form 10-K, ADT Inc., FYE 2017.
• Form 10-K, ADT Inc., FYE 2020.
• Form 10-K, Vivint Smart Home, Inc., FYE 2020.
• Form 1-S/A, Vivint Smart Home, Inc., 2020.
• Form 10-K, Monitronics International, FYE 2017.
• Form 10-K, Monitronics International, FYE 2018.
• Form 10-K, Monitronics International, FYE 2019.
• Form 10-K, Monitronics International, FYE 2020.

**Academic**
• Parr, R.L. (2007). *Royalty Rates for Licensing Intellectual Property*. Hoboken, NJ: John Wiley & Sons, Inc.
• Glick, Mark A., Lara A. Reymann, and Richard Hoffman, *Intellectual Property Damages: Guidelines and Analysis*, (2003).
• Goolsbee, A., Levitt, S., & Syverson, C. (2013). *Microeconomics*. New York, NY: Worth Publishers.

**Publicly Available Materials**
• ADT, "ADT Security – Trademark," accessed on Aug. 9, 2021, https://www.adt.com/about-adt/legal/trademark.
• ADT, "Pulse," accessed on Aug 9, 2021, https://www.adt.com/pulse.
• ADT, "ADT Security Local Service Areas," accessed on Aug 9, 2021, https://www.adt.com/local.
• ADT News, "ADT Reports First Quarter Fiscal 2016 Results,"  https://news.adt.com/news-releases/news-release-details/adt-reports-first-quarter-fiscal-2016-results.
• Vivint, "About Us," accessed on Aug. 9, 2021, https://www.vivint.com/company/about-us.
• Vivint, "Vivint Service Locations," accessed Jul. 8, 2021, https://www.vivint.com/locations.
• The Home Security Advisor, "ADT Stickers and Signs – Do They Prevent Crimes?," accessed on Aug. 9, 2021, http://www.thehomesecurityadvisor.com/do-just-adt-stickers-and-signs-prevent-crimes/.
• Security Sales & Integration, "ADT execs Outline Ambitious Plans for 2017," accessed on Aug. 9, 2021, http://www.securitysales.com/in-depth/adt_execs_plans_2017/.
• An Insider's Guide to Security Dealer Programs, "Top 10 Things to Know About Alarm Dealer Programs," accessed Jun. 30, 2021, http://www.alarmprogramadvisor.com/top-10-things-alarm-dealer-programs/.
• An Insider's Guide to Security Dealer Programs, "Alarm Dealer Program Comparison," accessed on Aug 9, 2021, http://www.alarmprogramadvisor.com.
• Barnes Associates, "Security Alarm Industry Overview & Update," Barnes Buchanan Conference, April 2021.

**Bates-stamped Documents**
• ADT000010352.

**License Agreements**
• Trademark Agreement between ADT US Holdings, Inc. and ADT Security Systems, Oct. 1, 2016.
• Trademark Agreement between ADT US Holdings, Inc. and ADT Puerto Rico, LLC., Oct. 1, 2012.
• Trademark Agreement between ADT Canada Inc. and ADT Security Services Canada, Inc., Jul. 7, 2015.
• Trademark Agreement between ADT US Holdings Inc. and ADT Canada Inc., Jul. 7, 2015.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

# Appendix B - Materials Cited

- US PTO Notice of Recordation of Assignment between ADT Holdings, Inc. and The ADT Security Corporation, Jul. 18, 2018.
- US PTO Notice of Recordation of Assignment between ADT US Holdings, Inc. and ADT Holdings, Inc., Jun. 27, 2018.
- Trademark Agreement between The ADT Security Corporation and ADT Security Systems, Dec. 31, 2017.

**Interviews**
- Interview of Susan Gates of ADT.
- Interview of Frank Cona of ADT.
- Interview of Kenneth Rosen of ADT.
- Interview of Michael Barnes of Barnes Associates.
- Interview of Brandon Hess of Crorzar.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

**Exhibit 1**
**ADT Dealer Revenue Sharing Model**

| | A-1 Grid Terms | If ADT Only Paid Revenue Sharing |
|---|---|---|

**Revenue**
  Pulse Take Rate
  Automation
  Billed RPU/MRR
  Funded RPU/MRR
  Gross Multiple
  Charge-back period
  % Charge-back
  Net Funded Multiple

**Cost to Serve**
  Maintenance
  Customer Service (incl. monitoring)
  Bad Debt
  Billing & Collection
  Total[1]

**Revenue Sharing**

**Attrition**
  Yr1
  Yr2
  Yr3
  Yr4
  Yr5
  Yr6
  Yr7
  Yr8
  Yr9
  Yr10
  Yr11
  Yr12
  Yr13
  Yr14
  Yr15

**Tax Rate**
**WACC**

**NPV Incr. (15 yr)**



**Notes & Sources:**
*See ADT000010352.*
[1] Total differs from source document due to rounding.
[2] Computed by Cirque Analytics.

HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

**Exhibit 2**
**Calculation of Royalty Rate**

| | High-level Dealer | Dealer Average |
|---|---|---|
| Monthly Recurring Contract Revenue[1] | | |
| Revenue Sharing Only (no up-front payment)[2] | | |
| ADT Revenue Share Royalty[3] | | |
| Avoided Service Costs[1] | | |
| Net Revenue Sharing[4] | | |
| Royalty Rate[5] | 21.9% | 26.3% |

<u>**Notes & Sources:**</u>

[1] See Exhibit 1.

[2] Calculated by subtracting the revenue sharing percentage to the dealer (see Exhibit 1) from 100%.

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

**Exhibit 3**
**Home Security Systems Industry Dealer Revenue Sharing**
**With Upfront Payment and Ongoing Revenue Sharing**

| Description | Value |
|---|---|
| Attrition rate:[1] | 11.9% |
| Customer relationship (years):[2] | 15.0 |
| Recurring Monthly Revenue (RMR):[3] | $50.0 |
| Ongoing revenue share to dealer:[4] | 3.0% |
| Monthly costs to serve:[5] | $10.5 |
| WACC:[6] | 9.5% |
| **Present value of total RMR, net of costs & rev. share:[7]** | **$2,049** |
| Upfront multiple to dealer:[8] | 35.0 |
| Interactive pass-through %:[9] | 10.0% |
| Upfront multiple to dealer net of pass-through:[10] | 31.5 |
| Charge-back %:[11] | 11.7% |
| **Upfront payment to dealer after pass-through & charge-back:[12]** | **$1,391** |
| **Total Net Present Value:[13]** | **$658** |

**Notes & Sources:**

[1] See Exhibit 3.1. Average of the Industry-wide figures is used.

[2] Based on studies performed by ADT to determine expected life of customer relationship (ADT 2020 10-K, p. 66).

[3] See Exhibit 3.2.

[4] Industry publication indicates dealers may earn 10% when attrition is less than 5%, and earn 5% when attrition is less than 10%. (An Insider's Guide to Security Dealer Programs, "Top 10 Things to Know About Alarm Dealer Programs," accessed Jun. 30, 2021, http://www.alarmprogramadvisor.com/top-10-things-alarm-dealer-programs/) Based on the inverse 1 to 1 relationship between attrition and revenue share, the revenue shared is 3% when attrition is 12%.

[5] Based on 79% margin for existing subscribers. (Vivint 2020 10-K, p. 12)

[6] Based on average of WACC for selected alarm companies. Data from Barnes Associates.

[7] Prevent value of contract recurring revenue, revenue share, and costs. Calculation based on growing annuity formula.

[8] Barnes Associates, "Security Alarm Industry Overview & Update," *Barnes Buchanan Conference*, April 2021 at slide 66.

[9] An Insider's Guide to Security Dealer Programs, "Top 10 Things to Know About Alarm Dealer Programs," accessed Jun. 30, 2021, http://www.alarmprogramadvisor.com/top-10-things-alarm-dealer-programs/.

[10] Equal to [8]*(1-[9]).

[11] Typical charge-back period is 12 months. (http://www.alarmprogramadvisor.com/top-10-things-alarm-dealer-programs/). Thus annual attrition rate applied.

[12] Equal to [3]*[10]*(1-[11]).

[13] Equal to [7] minus [12].

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

**Exhibit 3.1**
**Attrition Rate** [1]

| Company | 2017 | 2018 | 2019 | 2020 | Average |
|---|---|---|---|---|---|
| Vivint | 11.0% | 12.3% | 13.9% | 12.4% | 13.2% |
| BRINKS | 15.7% | 17.1% | 17.0% | 14.9% | 16.0% |
| ADT | 13.7% | 13.3% | 13.4% | 13.1% | 13.3% |
| Rest of Market | N/A | 11.1% | 11.5% | 11.2% | 11.4% |
| Industry Avg | N/A | 11.6% | 12.1% | 11.7% | 11.9% |

**Notes & Sources:**

See *Vivint 2020 10-K, page 53; Monitronics International 2018 10-K, page 22; Monitronics 2020 10-K page 30; ADT 2020 10-K page 54; ADT 2018 10-K page 43;* and *Barnes Associates, "Security Alarm Industry Overview & Update," Barnes Buchanan Conference, April 2021 at slide 31.*

[1] Attrition rate is the aggregate number of canceled smart home and security subscribers during the 12-month period divided by the monthly weighted average number of Total Subscribers.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

**Exhibit 3.2**
**Recurring Monthly Revenue (RMR)**

| Company | 2017 | 2018 | 2019 | 2020 | 2017 - 2020 Average |
|---|---|---|---|---|---|
| Vivint [1] | $54.92 | $52.67 | $51.44 | $48.95 | $52.00 |
| BRINKS [2] | $44.04 | $45.27 | $45.12 | $44.50 | $44.73 |
| ADT [3] | $48.65 | $48.16 | $49.07 | $52.81 | $49.67 |

**Notes & Sources:**

*See Vivint 2020 10-K, page 61; Vivint 2020 1-S/A, page 73; Monitronics International 2017 10-K, page 27; Monitronics International 2018 10-K, page 26; Monitronics 2020 10-K, page 32; and Exhibit 3.2a.*

[1] Average Monthly Service Revenue per user in the Vivint 10-K filings is defined as the contracted recurring monthly service billings, divided by the total subscribers for the period.

[2] Values for BRINKS are found in 10-K filings as Average RMR per subscriber. No further information is given as to how the figure is calculated.

[3] See Exhibit 3.2a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

**Exhibit 3.2a**
**ADT RMR per Subscriber**

| Year | Average Subscriber Count[1] | Total RMR | RMR per Subscriber [2] |
|------|------|------|------|
| 2020 | 6,500,000 | $343,243,000 | $52.81 |
| 2019 | 6,850,000 | $336,128,000 | $49.07 |
| 2018 | 7,200,000 | $346,751,000 | $48.16 |
| 2017 | 6,882,500 | $334,810,000 | $48.65 |

**Notes & Sources:**

See *ADT 2020 10-K, page 4; ADT 2019 10-K, page 2; ADT 2018 10-K, page 40; ADT 2017 10-K, pages 2 and 41; and https://news.adt.com/news-releases/news-release-details/adt-reports-first-quarter-fiscal-2016-results.*

[1] Average Subscriber Count is manually calculated as ( (Beginning Subscriber Balance + Ending Subscriber Balance) / 2 ) for the year.

[2] RMR per Subscriber is calculated as the Total RMR for a given year, divided by the average number of subscribers for the same year.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

**Exhibit 3.3**
**Avoided Monthly Service Cost**

| Year | Vivint Cost to Serve per Subscriber [1] | BRINKS Estimated Cost to Serve per Subscriber [2] | Average Cost to Serve per Subscriber |
|---|---|---|---|
| 2018 - 2020 Average | $13.50 | $10.72 | $12.26 |
| 2020 | $10.50 | $11.17 | $10.84 |
| 2019 | $13.73 | $10.57 | $12.15 |
| 2018 | $16.27 | $11.32 | $13.80 |
| 2017 | N/A | $9.82 | $9.82 |

**Notes & Sources:**

*See Vivint 2020 10-K, pages 54 and 61; and Exhibit 3.3a.*

[1] Vivint Cost to Serve per Subscriber is the average monthly service cost incurred during the period, including monitoring, customer service, field service and other support costs, field service and other support costs, less total non-recurring smart home services billings and cellular network maintenance fees, divided by total subscribers for the period.

[2] Brinks Estimated Cost to Serve per subscriber is calculated by dividing the total "Cost of Services" for the period, by the total number of Subscriber for the same period, divided by 12 months. See Exhibit 3.3a.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

**Exhibit 3.3a**
**BRINKS Cost to Serve**

| Year | Average Subscriber Count [1] | Cost of Services | Estimated Cost to Serve per Subscriber [2] |
|------|------|------|------|
| 2020 | 890,689 | $119,390,000 | $11.17 |
| 2019 | 884,754 | $112,274,000 | $10.57 |
| 2018 | 948,873 | $128,939,000 | $11.32 |
| 2017 | 1,011,394 | $119,193,000 | $9.82 |

**Notes & Sources:**

See *Monitronics International 2020 10-K, pages 30-31;* and *Monitronics International 2018 10-K, pages 22 and 25* .

[1] Average Subscriber Count is calculated as ( (Beginning Subscriber Balance + Ending Subscriber Balance) / 2 ) for the year.

[2] Estimated Cost to Serve per Subscriber is calculated as the Total Cost of Services for a given year, divided by the average number of subscribers for the same year.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

**Exhibit 4**
**Home Security Systems Industry Dealer Revenue Sharing**
**No Upfront Payment and Ongoing Revenue Sharing Only**

| Description | Value |
|---|---|
| Attrition rate: | 11.9% |
| Customer relationship (years): | 15.0 |
| Recurring Monthly Revenue (RMR): | $50.0 |
| **Ongoing revenue share to dealer:** | **54.6%** |
| Monthly costs to serve: | $10.5 |
| WACC: | 9.5% |
| **Present value of total RMR, net of costs & rev. share:** | **$658** |
| Upfront multiple to dealer: | - |
| Interactive pass-through %: | - |
| Upfront multiple to dealer net of pass-through: | - |
| Charge-back %: | - |
| **Upfront payment to dealer after pass-through & charge-back:** | **$0** |
| **Total Net Present Value:** | **$658** |

Notes & Sources:

See Exhibit 3 for applicable notes and sources.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

**Exhibit 5**
**Calculation of Royalty Rate**

| Description | Industry Figures |
|---|---|
| Recurring Monthly Revenue (RMR):[1] | $50.0 |
| Revenue Sharing % (no upfront payment):[2] | 45.4% |
| Alarm Company Revenue Share:[3] | $22.7 |
| Avoided Service Costs:[4] | $10.5 |
| Net Revenue Sharing:[5] | $12.2 |
| Royalty Rate:[6] | **24.4%** |

**Notes & Sources:**

[1] See Exhibit 3, Exhibit 3.2.

[2] Calculated as 1 minus the ongoing revenue share to the dealer (see Exhibit 4).

[3] Calculated as (RMR * Rev Share %).

[4] Based on Monthly costs to serve. See Exhibit 3, Exhibit 3.3.

[5] Calculated as (Alarm Company Revenue Share - Avoided Service Cost).

[6] Calculated as (Net Revenue Sharing / RMR).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

**Exhibit 6**
**Vivint Customer Breakdown Table**

| | a | b | c | d | e | f | g |
|---|---|---|---|---|---|---|---|
| Year ended December 31, | New Subscribers [1] | % Direct-to-Home [2] | Direct-to-Home Subscribers [3] | Cumulative DTH Subscribers [4] | Annual Revenue (RMR @ $50) [5, 6] | ADT Market Share (net of Vivint) [7] | ADT Share [8] |
| 2020 | 343,434 | 39% | 133,939 | 491,705 | $295,022,802 | 18.75% | $55,316,775 |
| 2019 | 316,403 | 57% | 180,350 | 357,765 | $214,659,246 | 18.75% | $40,248,609 |
| 2018 | 322,574 | 55% | 177,416 | 177,416 | $106,449,420 | 18.75% | $19,959,266 |
| | | | | Total: | $616,131,468 | 18.75% | $115,524,650 |

**Notes & Sources:**

[1] See Vivint 2020 10-K at page 53; Vivint 2019 10-K at page 61.

[2] See Vivint 2020 10-K at pages 12 and 50–51; APX Group Holdings, Inc 2018 10-K at page 13.

[3] $c = b * a$

[4] $d = d_{n-1} + c$

[5] $e = d * \$50 * 12\ months$

[6] See Exhibit 3.

[7] See Barnes Associates Industry Overview, April 2021 at slide 30.

[8] $g = e * f$

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

**Exhibit 3 Alt**
**Home Security Systems Industry Dealer Revenue Sharing**
**With Upfront Payment and Ongoing Revenue Sharing (Alternative Costs to**

| Description | Value |
|---|---|
| Attrition rate:[1] | 11.9% |
| Customer relationship (years):[2] | 15.0 |
| Recurring Monthly Revenue (RMR):[3] | $50.0 |
| Ongoing revenue share to dealer:[4] | 3.0% |
| Monthly costs to serve:[5] | $12.3 |
| WACC:[6] | 9.5% |
| **Present value of total RMR, net of costs & rev. share:[7]** | **$1,954** |
| Upfront multiple to dealer:[8] | 35.0 |
| Interactive pass-through %:[9] | 10.0% |
| Upfront multiple to dealer net of pass-through:[10] | 31.5 |
| Charge-back %:[11] | 11.7% |
| **Upfront payment to dealer after pass-through & charge-back:[12]** | **$1,391** |
| **Total Net Present Value:[13]** | **$563** |

**Notes & Sources:**

[1] See Exhibit 3.1. Average of the Industry-wide figures is used.

[2] Based on studies performed by ADT to determine expected life of customer relationship (ADT 2020 10-K, p. 66).

[3] See Exhibit 3.2.

[4] Industry publication indicates dealers may earn 10% when attrition is less than 5%, and earn 5% when attrition is less than 10%. (An Insider's Guide to Security Dealer Programs, "Top 10 Things to Know About Alarm Dealer Programs," accessed Jun. 30, 2021, http://www.alarmprogramadvisor.com/top-10-things-alarm-dealer-programs/) Based on the inverse 1 to 1 relationship between attrition and revenue share, the revenue shared is 3% when attrition is 12%.

[5] Based on 2018 - 2020 average costs to serve per subscriber for BRINKS and Vivint. See Exhibit 3.3.

[6] Based on average of WACC for selected alarm companies. Data from Barnes Associates.

[7] Prevent value of contract recurring revenue, revenue share, and costs. Calculation based on growing annuity formula.

[8] Barnes Associates, "Security Alarm Industry Overview & Update," *Barnes Buchanan Conference*, April 2021 at slide 66.

[9] An Insider's Guide to Security Dealer Programs, "Top 10 Things to Know About Alarm Dealer Programs," accessed Jun. 30, 2021, http://www.alarmprogramadvisor.com/top-10-things-alarm-dealer-programs/.

[10] Equal to [8]*(1-[9]).

[11] Typical charge-back period is 12 months. (http://www.alarmprogramadvisor.com/top-10-things-alarm-dealer-programs/)  Thus annual attrition rate applied.

[12] Equal to [3]*[10]*(1-[11]).

[13] Equal to [7] minus [12].

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADT LLC, et al. v. Vivint Smart Home, Inc., et al.

**Exhibit 4 Alt**
**Home Security Systems Industry Dealer Revenue Sharing**
**No Upfront Payment and Ongoing Revenue Sharing Only**
**(Alternative Costs to Serve)**

| Description | Value |
|---|---|
| Attrition rate: | 11.9% |
| Customer relationship (years): | 15.0 |
| Recurring Monthly Revenue (RMR): | $50.0 |
| **Ongoing revenue share to dealer:** | **54.6%** |
| Monthly costs to serve: | $12.3 |
| WACC: | 9.5% |
| **Present value of total RMR, net of costs & rev. share:** | **$563** |
| Upfront multiple to dealer: | - |
| Interactive pass-through %: | - |
| Upfront multiple to dealer net of pass-through: | - |
| Charge-back %: | - |
| **Upfront payment to dealer after pass-through & charge-back:** | **$0** |
| **Total Net Present Value:** | **$563** |

<u>**Notes & Sources:**</u>
See Exhibit 3 for applicable notes and sources.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Exhibit 5 Alt**
**Calculation of Royalty Rate (Alternative Costs to Serve)**

| Description | Industry Figures |
|---|---|
| Recurring Monthly Revenue (RMR):[1] | $50.0 |
| Revenue Sharing % (no upfront payment):[2] | 45.4% |
| Alarm Company Revenue Share:[3] | $22.7 |
| Avoided Service Costs:[4] | $12.3 |
| Net Revenue Sharing:[5] | $10.4 |
| Royalty Rate:[6] | **20.9%** |

**Notes & Sources:**

[1] See Exhibit 3, Exhibit 3.2.

[2] Calculated as 1 minus the ongoing revenue share to the dealer (see Exhibit 4).

[3] Calculated as (RMR * Rev Share %).

[4] Based on Monthly costs to serve. See Exhibit 3, Exhibit 3.3.

[5] Calculated as (Alarm Company Revenue Share - Avoided Service Cost).

[6] Calculated as (Net Revenue Sharing / RMR).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY