UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case Number: 20-23391-CIV- GOODMAN
[Consent Case]

ADT LLC; and The ADT Security
Corporation,

      Plaintiffs/Counterclaim Defendants,

          v.

Vivint Smart Home, Inc. f/k/a Mosaic
Acquisition Corp.; and Legacy Vivint Smart
Home, Inc. f/k/a Vivint Smart Home, Inc.,

      Defendants/Counterclaimants.

_____ /

## ADT'S OPPOSITION TO VIVINT'S MOTION *IN LIMINE*

## <u>INTRODUCTION</u>

Defendants Vivint Smart Home, Inc. and Legacy Vivint Smart Home, Inc. (collectively "Vivint") seek to preclude nearly all evidence relating to Vivint's years of egregious deceptive sales practices. This evidence will establish that Vivint's conduct is, and has consistently been, intentional, systemic, widespread, and damaging to consumers and competitors alike. Vivint's arguments to exclude this highly probative evidence ask the Court to embrace a hyper-myopic and impractical interpretation of the Federal Rules of Evidence that would eliminate all circumstantial evidence and would require ADT to prove intent and every individual instance of Vivint's wrongful conduct through customer testimony alone. This would require hundreds (if not thousands) of deceived customers to testify at a trial that would last months on end and would remove from the jury's consideration Vivint's own documents evidencing that Vivint's leadership was aware of, condoned, and protected Vivint's deceptive sales tactics for many years. The Court should reject Vivint's efforts to try this case in a sanitized, fictitious vacuum.

ADT's proof—through both direct and circumstantial evidence—will demonstrate that Vivint condoned, protected, and encouraged deceptive sales practices for many years. For example, Vivint entered consent decrees and paid hefty settlements with at least 15 attorneys general in states across the nation for the exact behavior at issue. Yet, rather than learn any lesson from these punishments and stop the deceptive conduct, Vivint's sales practices only became more egregious over time, demonstrating that the conduct is intentional and remained profitable. Even 8-figure settlements with both ADT in 2017 and the Department of Justice in 2020 have failed to deter Vivint's deceptive sales conduct. And even after ADT brought this suit documenting hundreds of additional complaints of Vivint's sales misconduct, ADT has only continued to receive more and more reports from its customers regarding the same shenanigans. In response,

Vivint has taken no action to investigate the complaints ADT has documented or to discipline any of its salesforce as a result. Based on this evidence, a jury could conclude that Vivint's refusal to curtail deceptive conduct is intentional, and that Vivint's professed measures to put an end to the conduct, what little they may be, are mere window dressing.

## LEGAL STANDARDS

In fairness to the parties and their ability to put on their case, a court should exclude evidence *in limine* only when it is clearly inadmissible on all potential grounds. The movant has the burden of demonstrating that the evidence is inadmissible on any relevant ground. Unless evidence meets this high standard, evidentiary rulings should be deferred until trial . . . ." *Ctr. Hill Cts. Condo. Ass'n, Inc. v. Rockhill Ins. Co.*, No. 19-CV-80111, 2020 WL 496065, at *1 (S.D. Fla. Jan. 30, 2020) (citing *United States v. Gonzalez*, 718 F. Supp. 2d 1341, 1345 (S.D. Fla. 2010)) (internal quotations omitted).

This Court disfavors motions *in limine* and prefers to address the admissibility of evidence as such issues arise at trial. *Begualg Inv. Mgmt., Inc. v. Four Seasons Hotel Ltd.*, No. 10-22153-CIV, 2013 WL 750309, at *1 (S.D. Fla. Feb. 27, 2013). Furthermore, a motion *in limine* "remains subject to reconsideration by the court throughout the trial." *Stewart v. Hooters of Am., Inc.*, No. 8:04-CV-40-T-17-MAP, 2007 WL 1752843, at *1 (M.D. Fla. June 18, 2007).

## ARGUMENT

### I. CUSTOMER COMPLAINTS ARE ADMISSIBLE, RELEVANT, AND RELIABLE EVIDENCE.

Vivint seeks to exclude "Customer Complaints," which it broadly defines as "recordings of phone calls between customers and ADT, Vivint, or both, as well as any written notes, reports, or spreadsheet summary purporting to document the customers' recollection of their alleged interactions with Vivint on those recordings." (D.E. 114 at 2.) Vivint's sweeping effort to

generically bucket and exclude all "Customer Complaints"—where each category has separate probative value and non-hearsay uses—demonstrates how overreaching Vivint's Motion is. Regardless, all customer complaints in this case – both the complaints made to ADT and those made to Vivint (and Vivint's documentation of its investigation of such complaints) – are admissible and relevant for several non-hearsay uses. Additionally, these same records of customer complaints, regardless of form, contain party admissions, which are also not hearsay. And, finally, they are evidence of customer confusion, which the Eleventh Circuit has recognized not only as non-hearsay, but critical evidence under the Lanham Act.

**A. All Customer Complaints Are Admissible for Non-Hearsay Purposes.**

All customer complaints produced in this case regarding Vivint's deceptive sales practices are admissible for multiple non-hearsay purposes. "An out-of-court statement is not hearsay, and may be admitted into evidence, if it is offered for some purpose other than to prove the truth of the matter asserted." *United States v. Cochran*, 682 F. App'x 828, 835 (11th Cir. 2017). ADT seeks to admit customer complaints for many non-hearsay purposes: showing that Vivint had knowledge and notice of the deceptive sales practices of its sales representatives; showing that Vivint acted with intent by failing to rectify known deceptive sales practices or adequately discipline the offending sales representatives; proving actual confusion under the Lanham Act; and demonstrating how many customers were harmed by Vivint's deceptive sales practices for ADT's damages calculations. These are well recognized non-hearsay uses of such evidence that courts, including this one, have admitted in analogous circumstances.

**1. Vivint's own documents recording years of complaint patterns and how little it did in response to those complaints prove notice and knowledge (valid non-hearsay uses).**

The customer complaints in Vivint's possession go to the very heart of this case—

misrepresentations about an affiliation with the customer's alarm company; lying about buying out a competitor's contract; and myriad other false representations that Vivint sales representatives have regularly used to trick customers into switching alarm providers. These complaints are admissible evidence of Vivint's notice and knowledge of deceptive sales practices spanning many years emanating from geographic areas throughout the country involving numerous sales people.

Out of court statements are admissible to prove notice and knowledge. *See, e.g.*, *United States v. Lee*, 427 F.3d 881, 896–97 (11th Cir. 2005) (holding that the District Court did not abuse its discretion by admitting a letter and an email for the non-hearsay purpose of showing notice that the financial transactions at issue "were not recognized and were unlawful"); *United States v. Postal*, 589 F.2d 862, 888 (5th Cir. 1979) (finding out of court statements admissible to prove intent to distribute marijuana).

Following this Court's order compelling production, Vivint produced documents showing it received more the 75,000 complaints about the conduct of its sales representatives during the timeframe at issue in this lawsuit. (*See* Vivint spreadsheet collecting customer complaints, attached hereto as **Ex. A**.) And of this universe of complaints, Vivint's legal department also investigated a subset of over 1,000 customer complaints of dishonest or deceptive activity of the sales representatives, many of whom were highly productive leaders in its salesforce for many years. (*See* Hansen Dep. 43:7-15, Exhibit 2, Jan. 16, 2023, attached hereto as **Ex. B**.) The supposed purpose driving this compliance review was to determine what, if any, punishment was needed to deter future misconduct. (*See* Banks Decl. at ¶ 5, attached hereto as **Ex. C**.) Yet despite records proving Vivint's extensive knowledge of the magnitude of this problem, Vivint has taken virtually no meaningful steps to punish dishonest sales representatives or to deter deceptive sales practices. These customer complaints, found within Vivint's own records, are highly probative, relevant

evidence that Vivint has had knowledge and notice of its sales representatives' deceptive sales practices for many years.

Other courts in this District considering this same evidentiary issue have agreed with ADT that these customer complaints are admissible to prove knowledge and notice. In a prior lawsuit brought by ADT against Vivint (*Vivint I*), ADT sought to admit customer complaints like the ones at issue here. The Honorable Donald Middlebrooks held that, "[a]lthough the recordings [of customer complaints] contain hearsay and may not be admitted as evidence for the truth of the statements, in the event they have relevance for a non-hearsay purpose such as notice, any objection shall be dealt with at trial." *See ADT LLC v. Vivint, Inc.*, No. 17-CV-80432-MIDDLEBROOKS, Doc. 201 (S.D. Fla. Dec. 8, 2017) (attached hereto as **Ex. D**).

Furthermore, in another prior Lanham Act lawsuit brought by ADT in this jurisdiction against Alder Holdings, LLC (*Alder*), the Honorable Robin Rosenberg also permitted customer complaints to come into evidence for the non-hearsay purpose of proving Alder's knowledge and notice of its sales representatives' conduct. *See ADT LLC v. Alder Holdings, LLC et al.*, No. 17-CV-81237-ROSENBERG, Doc. 335 (S.D. Fla. Apr. 29, 2019) ("The Court agrees with Judge Reinhart that unsworn customer complaints, evidence of other lawsuits and investigations, and evidence of alleged deceptive sales practices occurring prior to May 24, 2017, ***are admissible to show Defendants' knowledge and notice***") (emphasis added) (attached hereto as **Ex. E**).

**2. Vivint's own documentation of customer complaints is also admissible as a party admission.**

Vivint's own documentation of the customer complaints it received, the actions it took to investigate the complaints, and Vivint's conclusions about the complaints are party admissions under FRE 801(d)(2). *See* Fed. R. Evid. 801(d)(2). Party admissions are non-hearsay. *Id.*; *see also United States v. Gray*, 443 F. App'x 515, 521 (11th Cir. 2011). In the parties' previous lawsuit,

Judge Middlebrooks recognized this and held that Vivint's own documentation and response to complaints it received are not excluded by hearsay rules. (*See* **Ex. D**) (holding that Vivint's responses to BBB complaints are not hearsay under Rule 801(d)(2)).

Further, these party admissions are highly probative evidence because Vivint's statements made to customers in its investigation of customer complaints are critical to a jury's understanding that Vivint's conduct was systemic and intentional, not the isolated acts of bad apples.

> ### 3. Vivint's failure to investigate or respond to the innumerable customer complaints ADT provided Vivint regarding its sales representatives' deceptive sales practices is evidence that Vivint's conduct is intentional.

Over two years ago, ADT provided Vivint with hundreds of complaints ADT received about Vivint's sales practices and over 1,300 customer audio calls describing the complaints. When ADT filed this lawsuit, it attached as an exhibit to the complaint a spreadsheet detailing customer complaints of approximately 250 ADT customers who reached out to ADT to report the deceptive conduct of Vivint sales representatives. (D.E. 1-1.) Throughout discovery, ADT has supplemented that spreadsheet and corresponding production of customer records to document additional complaints that have been reported *even since ADT filed this suit*, the latest list topping 385 complaints. These documents provide extensive information about the customers and the nature of the deceptive conduct—including thousands of verbatim audio recordings of the inbound complaints made to ADT about Vivint. Where available, these documents also provide Vivint with the name of the sales representative who engaged in the deceptive behavior and other information relating to each incident. Vivint has made clear that, in fact, it did nothing with all this information to detect patterns of bad conduct, discipline offenders or remunerate defrauded customers. (*See, e.g.*, **Ex. B** at 18:6-20:2.)

During this case, ADT also deposed a number of the customers it had disclosed as witnesses where the customers described under oath the deceptive conduct of Vivint's sales representatives. Shockingly, Vivint's corporate representatives could not point to any investigation regarding the allegations levied against innumerable sales leaders and sales representatives undertaken based upon this testimony. (*See* **Ex. B** at 10:12-11:15.) If Vivint truly sought to curtail deceptive sales practices or thought that just a few bad apples were responsible for the conduct, it would surely review the complaints and any corresponding audio recordings, reach out to the customers affected, and interview the sales representatives at issue about the alleged deceptive conduct. More importantly, for a company with a long history of regulatory problems caused by deceptive sales practices, surely some disciplinary action would be taken against the sales representatives who engaged in this behavior.

Yet Vivint admitted in its 30(b)(6) deposition that it did absolutely nothing with the trove of information documenting its salesforce's misconduct in this case. (**Ex. B** at 18:6-20:2.) Despite explicit 30(b)(6) topics asking Vivint to specify which of the 385+ complaints it deems legitimate, and which ones it disputes, Vivint cannot (or refuses to) say whether any of these well-documented complaints involved deceptive sales practices by its salesforce. (**Ex. B** at 7:19-9:20, 11:23-12:7, 13:19-24.) It cannot (or refuses to) say that it has spoken to a single sales representative based on the information in the 1300 calls. (**Ex. B** at 17:22-18-13.) Moreover, Vivint cannot say that it reprimanded a single sales representative based on the information ADT provided to Vivint. (**Ex. B** at 10:2-11, 11:6-11.) All this despite the fact that other documents Vivint produced—after being compelled by the Court to do so—confirm that many of the complaints at issue were found to be "Affiliation Misrepresentations" after Vivint's own investigation, a term Vivint uses to refer to a situation where a sales person intimates an association with the potential customer's existing alarm

provider (*i.e.*, ADT). (**Ex. B** at 55:5-19, 59:25-60:6.)

Vivint's complete indifference to the wealth of information that could help Vivint eradicate deceptive conduct is highly probative and relevant to the issue of whether Vivint intends for its sales representatives to engage in deceptive sales practices and even rewards them for same. Because intent is an element of both ADT's Lanham Act claim and its punitive damage claim, it is essential that the jury consider this evidence to show what Vivint knew about complaint patterns and how little it did to curtail the behavior. *See N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1220 (11th Cir. 2008) (explaining that the defendant's intent, meaning whether "the defendant hope[s] to gain competitive advantage by associating his product with the plaintiff's" is one of the seven factors relevant to determining whether a likelihood of confusion exists under the Lanham Act); *see also Williams v. First Advantage LNS Screening Sols. Inc.*, 947 F.3d 735, 765 (11th Cir. 2020) (for a punitive damages award, "a defendant's intent plays an important role in gauging the extent of the reprehensibility" of the defendant's conduct).

### 4. Customer complaints to both ADT and Vivint are evidence of actual confusion under the Lanham Act.

To meet its burden of proof on its Lanham Act claim, one factor a jury must consider is whether Vivint's conduct was "likely to cause confusion" about affiliation between the brands. *See* 15 U.S.C. § 1125(a)(1)(A). As the Eleventh Circuit has unequivocally held, while evidence of actual confusion "is not necessary" under the Lanham Act because "[o]ne merely has to show that the likelihood of confusion exists," "evidence of actual confusion ***is the best evidence of a likelihood of confusion***." *Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 137 (11th Cir. 2022) (emphasis added); *see also Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1185 (11th Cir. 1985) ("Actual confusion by a few customers is the best evidence of likelihood of confusion by

many customers"). The overall strength of such evidence depends on "the number of instances of confusion," "the kinds of persons confused" and the "degree of confusion." *Wreal*, 38 F.4th at 137.

The customer complaints made to ADT about Vivint's deceptive conduct suggesting Vivint was affiliated with ADT are replete with instances of actual customer confusion caused by Vivint's statements—as are Vivint's own records. (*See* DE 119-01.) In accordance with *Wreal*, ADT intends to use these customer complaints as evidence of actual confusion – that numerous unrelated ADT customers spread all over the country were confused by Vivint's deceptive sales practices – to prove that Vivint's statements were, in fact, likely to cause confusion as defined by the Lanham Act.

### 5.  Customer complaints are evidence of the number of ADT customers harmed.

ADT intends to use its own spreadsheet that catalogues all customers who have submitted complaints about Vivint's deceptive sales practices to prove the number of ADT customers who have reported complaints about Vivint. This too is a non-hearsay use of this spreadsheet that should be permitted. *Wreal*, 38 F.4th at 137 (number of instances of confusion relevant to consideration of Lanham Act claim).

At minimum, the Court should permit a redacted version of ADT's spreadsheet documenting complaints about Vivint, as at least one court in this jurisdiction has permitted in a prior identical Lanham Act case. In *Alder*, the Court permitted ADT to use its complaint spreadsheet with the "customer comments" section redacted, allowing for admission of other non-hearsay fields such as Customer ID, Date of Report, Competitor Company Name, Contract, Customer Name, Street Address, City, State, Zip Code, Date of Activity, and Call Date. (*See Alder* Trial Exhibit P9, attached hereto as **Ex. F**.) The *Alder* defendants made a motion *in limine* "to exclude all references to the existence and substance of customer complaints for the truth of the

matter, regardless of the source of the evidence…" *See ADT LLC v. Alder Holdings, LLC et al.*, No. 17-CV-81237-ROSENBERG, Doc. 218 (S.D. Fla. Feb. 22, 2019) (attached hereto as **Ex. G**). The Honorable Robin Rosenberg denied this motion without prejudice (*id.*), and following a hearing with Magistrate Judge Reinhart, the spreadsheet was admitted with the customer comments field redacted but all the information in the aforementioned categories remained unredacted.

Here, Vivint attempts an even broader motion *in limine* than the overly broad motion *in limine* that was denied in *Alder*. Vivint attempts to exclude all customer complaints for all purposes (not just the truth of the matter asserted) and argues that ADT should be limited to live customer witness testimony only. (D.E. 114 at 2-3.) First, even if this Court were to require the customer comments to be redacted, the Customer ID, Date of Report, Competitor Company Name, Contract, Customer Name, Street Address, City, State, Zipcode, Date of Activity, and Call Date do not implicate hearsay concerns. ADT will offer the spreadsheet, in conjunction with testimony about how the inbound complaints are received and documented, as evidence of how many customers have reported Vivint's sales misconduct and from where the complaints originated. Neither of those purposes invokes hearsay rules.

Second, at least one court in this jurisdiction has already rejected the notion that ADT is limited to live customer witness testimony to prove its Lanham Act claims. In *ADT LLC et al v. Alarm Protection LLC*, another Lanham Act case very similar to the case at bar, the Honorable Robin Rosenberg granted ADT's motion *in limine* to bar argument suggesting ADT's trial witnesses are the only confused customers. *See ADT LLC et al v. Alarm Protection LLC et al.*, No. 15-CV-80073-ROSENBERG, Doc. 345 (S.D. Fla. Jan. 30, 2017), (attached hereto as **Ex. H**.) The same is required here. On one hand, Vivint wants to limit ADT to proving its damages with

customer testimony (D.E. 114 at 2-3), but Vivint also challenged the number of customer depositions that ADT could take in this case before finally consenting to a total of fifteen depositions. (*See* D.E. 77 (ADT motion to exceed deposition limit of 10); D.E. 82 at 5 (noting that the parties agree to permit each side to conduct a total of 15 customer witness depositions).) ADT exhausted the depositions it was permitted to take. It is beyond dispute that 15 customers is far fewer than the number that have been affected by Vivint's conduct. Just as Judge Rosenberg acknowledged in *Alder*, here Vivint cannot, on the one hand, limit the number of depositions ADT can take of customers affected by Vivint's conduct, and then turn around, on the other hand, and say that ADT's proof is limited to just those customers.

Accordingly, ADT's customer complaint spreadsheet is admissible for the non-hearsay purpose of showing the number of customers who reported complaints about Vivint's deceptive sales practice. Further, ADT's presentation of evidence should not be limited to just its testifying customer witnesses, as Vivint objected to permitting ADT to depose any more than 15 customers.

### B. Vivint's Purported Reliability Concerns with the Customer Complaints Are Misplaced and Do Not Support Exclusion.

Vivint spills much ink trying to convince this Court that the customer complaints "lack trustworthiness" because "ADT coaches its customers to believe that a deceptive sales practice was committed;" because "ADT customers express faulty memories or fail to attribute statements to Vivint;" and because "ADT customers have motives to misrepresent interactions." (D.E. 114 at 5-9.) However, at most, these arguments bear only on the weight that should be assigned to these customer complaints, not the admissibility of them, which is a question for the jury. *See, e.g.*, *Vaughn v. Carnival Corp.*, 571 F. Supp. 3d 1318, 1322 (S.D. Fla. 2021) ("The Court notes that any dispute as to the authenticity of the handout beyond this threshold [of a prima facie case for authenticity] goes to the weight of the evidence to be determined by the jury, not admissibility.");

*Lindley v. Taylor*, No. 2:10-CV-141-VEH, 2016 WL 6157774, at *6 (N.D. Ala. Oct. 24, 2016) (denying a motion *in limine* because the concerns about the photographs at issue went to the weight of the evidence rather than admissibility); *see also Acevedo v. NCL (Bahamas) Ltd.*, 317 F. Supp. 3d 1188, 1197 (S.D. Fla. 2017) ("[A]ny weaknesses in the factual underpinnings of [the expert's] opinion go to the weight and credibility of his testimony, not to its admissibility.").

Truth is, ADT has now thoroughly documented over 385 complaints ADT has received about Vivint's deceptive sales practices, including by producing all records ADT received about the complaints, all records (including work product) documenting ADT's investigation of such complaints, and thousands of audio recordings verbatim reflecting the customers' complaints and reports of being confused following Vivint's sales calls. Even if one were to assume Vivint's attacks against a few of these complaints were merited, Vivint *at most* has identified *a handful* (less than 10) of the 385 complaints that it disputes as reporting deceptive sales conduct by its salesforce. Vivint has not, and cannot, challenge the validity of the hundreds of other complaints *not identified in Vivint's motion* that ADT has thoroughly documented. (*See* **Ex. B**, at 11:23-12:11.)

In fact, during discovery ADT gave Vivint the opportunity to dispute any of the 300+ complaints that ADT has put at issue, but Vivint refused to do so. For example, in its Second Set of Interrogatories to Vivint served on March 9, 2022, ADT asked Vivint to "[p]lease identify each and every customer [identified by ADT] that Vivint contends was not subject to a Deceptive Sales Practice, and the basis for why Vivint contends the interaction was not a Deceptive Sales Practice notwithstanding the voluminous documentation ADT has produced substantiating each incident." (ADT's Second Intrgs. to Defs. at Intrg. 18, attached hereto as **Ex. I**.) Vivint refused to answer this Interrogatory, standing only on its meritless and nonsensical objections. (Vivint's Resp. to ADT's

Second Intrgs. to Defs. at Resp. 18, attached hereto as **Ex. J**.) Thus, Vivint had nine months prior to the filing of the Motion to identify which of the customer complaints it contends did not, in fact, describe a deceptive sales practice. It cannot now change its sworn discovery responses after already being afforded the opportunity to dispute any complaint, where ADT then would have agreed, if the challenge was merited, to drop such complaint from this suit.

Similarly, ADT included in its 30(b)(6) notice to Vivint topics requesting Vivint to specify which of the documented complaints Vivint conceded involved deceptive sales practices, and which ones it legitimately disputed. Just as it did in the written discovery, Vivint refused to say which of the complaints it concedes involved deceptive sales practices and which ones Vivint disputes. (**Ex. B** at 7:19-9:20, 11:23-12:7, 13:19-24.) Instead, Vivint has employed the ostrich defense by simply refusing to look at the complaints, except for the handful it apparently now tries to dispute in its motion. (*See id.*)

In its motion, Vivint has cherry-picked certain statements from certain recordings of certain customer complaints and asks this Court to exclude the entirety of the customer complaints without providing the rest of the context surrounding those statements. (D.E. 114 at 5-9.) Vivint's arguments lack merit for several reasons. First, Vivint cites to limited portions of certain recordings but ignores all the other evidence documenting why ADT classified such complaint as a deceptive sale.[1] Making matters worse, at the deposition of ADT's corporate representative where Vivint sought to discuss limited portions of the calls it cherry-picked for certain limited customers, Vivint refused, in violation of Federal Rule of Evidence 106, to permit ADT's counsel to introduce *other portions* of the calls being discussed that, in fairness, ought to have been considered on Vivint's

---

[1] For many customers, there are multiple complaint calls (often resulting in the customer being transferred internally at ADT, or calling more than once). Sometimes, one call may not substantively discuss the deceptive nature of Vivint's sales approach but those issues are then discussed in other recordings.

questions relating to the portions it sought to highlight. *See* Fed. R. Evid. 106 ("If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part — or any other writing or recorded statement — that in fairness ought to be considered at the same time.").

The need to consider the entirety of any customer complaint is abundantly clear from Vivint's Motion. In citing the cherry-picked customer complaint recordings, Vivint omits portions of the recordings that are relevant to the deceptive sales practice claim. For example:

Vivint cites Customer Guerra claiming that she simply switched to Vivint for "more stuff and less money." (Vivint Mot. at 5.)  But Ms. Guerra also described her actual confusion that she thought Vivint *was with ADT*, which Vivint conveniently leaves out of the transcript cited in its motion. (D.E. 114 at Ex. G, 9:15-22) ("It's true. It's true. It's true. ***I thought it was you guys***. I mean, because they came -- first came one lady, and she was telling me. And then when I was going to sign, I said, 'I'm very faithful to the people that I have my services. So, no, I won't change services.") Further, Ms. Guerra stated when the Vivint rep came back again, "I thought that it was – I thought it was your company, either ADT or Protection 1. I thought it was the same company." (*Id.* at 10:25-11:2.) Only after Ms. Guerra went "more deep in the conversation" in the second encounter did the rep disclose that Vivint was actually a different company. (*Id.* at 11:3-10.) Ms. Guerra further explained, in pieces of the transcript omitted by Vivint's motion, that "He didn't say it was Protection 1. He said that they were enhancing my services, getting better things and – but I thought it was the same company." (*Id.* at 12:1-8.)

Vivint cites a call from Ms. Martinez claiming that Martinez "does not allege any deceptive conduct." (D.E. 114 at 8.) Yet, again, *in the same call Vivint cites* Ms. Martinez relayed that the Vivint representative knocked on her door, asked for her by name, and said he was offering her

new equipment "for free." (D.E. 114 at Ex. J, 6:22-25.) Specifically, he said, "I see you have ADT," and then "started talking about the doorbell monitor and showing me on his tablet everything and did I have it programmed to my – my smart phone. And if I didn't, he could show me" (*id.* at 11:7-15)—in other words, intimating that the representative was associated with her existing ADT system. "Not once did he introduce himself," (*id.* at 11:17-18), and Ms. Martinez "couldn't get a word in to shut him down." (*Id.* at 11:14-15.) Vivint leaves all of this out in its attempt to mischaracterize Ms. Martinez's complaint as not alleging any deceptive sales conduct.

For Customer Cox, Vivint contends that "Ms. Cox's daughter called to complain on her behalf and says she did not know what Vivint allegedly said to her mother. She admits not even her mother could recall…" (D.E. 114, at 8.) But *in the very same transcript Vivint cites*, Ms. Cox's daughter relayed that her mother "initially thought it was an upgrade on ADT," (D.E. 114 at Ex. E, 20:21-22), but only later came to understand the representative was with Vivint. (*Id.* at 2:22-4:6.)

Vivint similarly cites Mr. Trawick as someone who supposedly only reported being "solicited" by Vivint, as opposed to being deceptively sold; yet Vivint leaves out that Mr. Trawick reported *in the same call cited by Vivint* that the Vivint agent "kind of acted like . . . – like he was representing Protection 1."[2] (D.E. 114 at Ex. I, 4:10-13.)

ADT could go on and on explaining how Vivint has grossly mischaracterized the few complaints Vivint attempts to dispute in its motion, but these squabbles about credibility of the complaints to ADT underscore that these are credibility issues for the jury to weigh. At bottom, Vivint already had its opportunity in discovery to dispute any of the 385+ complaints that ADT has thoroughly documented. Having already answered written discovery refusing to do so, and

---

[2]   ADT acquired Protection1 through a merger effective April 2017. *See* https://www.protection1.com/ceoletter/faqs/.

refusing to answer related questions in binding testimony at its 30(b)(6) deposition, Vivint's arguments attempting to dispute a handful of the 385 complaints through selective quotation and omission are too little too late. It certainly does not support wholesale exclusion of the evidence, most of which Vivint does not challenge.

## II. VIVINT'S REFUSAL TO CURTAIL ITS DECEPTIVE SALES CONDUCT DESPITE AGREEING TO DO SO WITH 15 STATE ATTORNEYS GENERAL AND THE UNITED STATES DEMONSTRATES THE CONDUCT IS INTENTIONAL, A CRITICAL ISSUE IN THE CASE.

Vivint's deceptive sales practices have been a cornerstone of its financial growth for 15 years. In that timeframe, Vivint has agreed to injunctions, consent decrees, assurances of voluntary compliance, and/or financial settlements regarding its deceptive sales practices with at least fifteen state attorneys general and the United States Department of Justice. Vivint also settled a previous civil lawsuit brought by ADT for $10M in 2017. But the hefty, cumulative cost of these regulatory consumer protection penalties and litigation settlements did not motivate Vivint to alter its deceptive sales model. Rather than change its behavior, Vivint built this into its costs of doing business. Indeed, the evidence in this case will show that despite knowing the scope of the problem, who the worst offenders were, and paying for the consequences of the behavior, Vivint nonetheless protected its most problematic leaders and their teams because the profits still offset the litigation and regulatory cost incurred. Unsurprisingly, because Vivint never curtailed the unscrupulous behavior of these highly productive national sales teams, the conduct of Vivint's salesforce became more egregious over time. This is strong evidence of intent and the scope and duration of this misconduct, which supports ADT's Lanham Act and punitive damages claims.

### A. The Agency Materials and Lawsuits Show What Vivint Knew About the Scope of Its Deceptive Sales Problem and How Little It Did to Stop the Behavior.

ADT intends to use documents from Better Business Bureau ("BBB") Complaints, lawsuits

brought by state and federal agencies, and other investigations ("Agency Materials and Lawsuits") as evidence that Vivint had notice and knowledge of the fact that its sales representatives were engaging in deceptive sales practices. As explained in Section I(A)(3), it is permissible to use these records, to the extent they invoke hearsay considerations at all, to prove notice rather than to prove the truth of the matter asserted. *See generally Lee*, 427 F.3d at 896–97.

In *Vivint I*, ADT sought to use BBB complaints to prove Vivint's notice and knowledge of customer complaints unrelated to ADT from across the country. The Honorable Donald Middlebrooks held that "[b]ecause ADT may offer the BBB complaints for purposes other than to prove the truth of the complaints, it is inappropriate to exclude them as hearsay at this time." (*See* **Ex. D**.) There is no reason to depart from Judge Middlebrooks' prior ruling with respect to this evidence.

### B. Vivint's Statements Made in the Agency Materials and Lawsuits Are Party Admissions.

The Agency Materials and Lawsuits are replete with instances where Vivint made statements regarding complaints against it or investigations into Vivint's sales practices, with which ADT seeks to cross-examine Vivint's company witnesses. The Federal Rules of Evidence are clear that statements made by an opposing party "made in an individual or representative capacity" are not hearsay.  Fed. R. Evid. 801(d)(2).

Just as ADT seeks to do here, in *Vivint I*, ADT sought to admit Vivint's Chief Compliance Officer's responses to many of the customer complaints made to the BBB on behalf of Vivint. The Honorable Donald Middlebrooks held that "Mr. Wilcox's statements made on behalf of Vivint qualify as statements made by an opposing party and thus are excepted from the rule against hearsay pursuant to Rule 801(d)(2) of the Federal Rules of Evidence." (*See* **Ex. D**.) Similarly, any

statements made by or on behalf of Vivint in the Agency Materials and Lawsuits are admissible as party admissions and are not subject to the rule against hearsay.

**C. The Agency Materials and Lawsuits Are Admissible "Other Bad Act" Evidence Under Fed. R. Evid. 404(b).**

ADT does not intend to use any "character" evidence for any prohibited "action in conformity therewith" purpose. (*See* D.E. 114 at 18.) But Vivint's motion ignores that the Federal Rules of Evidence expressly permit "other bad act" evidence for other purposes. Specifically, FRE 404(b)(2) clearly permits ADT to use the Agency Materials and Lawsuits to establish Vivint's "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Vivint will argue at trial that all companies have a few bad apples, or that customers occasionally become "confused" due to their own fault or misunderstanding. FRE 404(b)(2) permits ADT to use the Agency Materials and Lawsuits to show Vivint's pervasive misconduct in the market to prove that Vivint's misconduct is not an accident, but, instead, is a longstanding pattern of misconduct that spans many years, sales representatives, and geographic areas. *See Andresen v. Maryland,* 427 U.S. 463, 483 (1976) ("proof of similar acts is admissible to show intent or the absence of mistake"); *Glados, Inc. v. Reliance Ins. Co.,* 888 F.2d 1309, 1311 (11th Cir. 1987); *Carson v. Polley,* 689 F.2d 562, 573 (5th Cir. 1982) ("intent, of course, may be shown through extrinsic proof of prior acts").

**D. The Agency Materials and Lawsuits are Highly Probative, and Rule 403 Considerations Do Not Support Exclusion.**

Vivint, citing FRE 403, argues that the Agency Materials and Lawsuits should be excluded because they are unduly prejudicial, to wit "Vivint would be unfairly prejudiced by ADT portraying it as a 'bad' company based on the mere receipt of unsubstantiated complaints, and/or its participation in litigation." (D.E. 114 at 18-19.) Vivint's argument ignores controlling Eleventh

Circuit precedent that holds that Rule 403's exclusion is an "exceptional remedy" that is "invoked sparingly." *United States v. Williams*, 816 F.2d 1527, 1532 (11th Cir. 1987) ("This court has invariably held that determining prejudice to outweigh probativeness under rule 403 is an exceptional remedy.").

*Williams* illustrates just how high that bar is set—Rule 403 requires exclusion of relevant proof of prior acts *only* when they "are of such a heinous nature that they are likely to sway the jury irrevocably to a decision of guilt," and it found that evidence of defendant's rapes of other victims did not rise to such a "heinous" level as to be excludable under Rule 403. *Id.* Vivint has defrauded customers throughout the United State for many years. Innumerable attorneys general and other law enforcement agencies from around the country have investigated Vivint for these frauds. While Vivint's pervasive pattern of defrauding ADT's customers *fairly* makes Vivint look bad—and ADT will ask the jury to award punitive damages based upon it—the evidence supporting this proposition does not risk the same level of *unfair* prejudice as something as heinous as violent sexual assault. *Williams, supra.*

The two cases Vivint cites to support its Rule 403 argument are readily distinguishable. First, Vivint cites *A.T.O. Golden Construction Corp. v. Allied World Insurance Company*, 2018 WL 5886663, at *8-9 (S.D. Fla. Nov. 9, 2018). That case is a breach of contract action with no tort claims asserted, therefore the admissibility of evidence to prove willful and wanton conduct for punitive damages was irrelevant since punitive damages are not available in a breach of contract case. *See Perdue Farms Inc. v. Hook*, 777 So. 2d 1047, 1053 (Fla. Dist. Ct. App. 2001). Second, Vivint cites *Bui v. Minority Mobile Sys*., *Inc.*, No. 15-21317-CIV, 2016 WL 6518804, at *1 (S.D. Fla. Jan. 28, 2016). But, as set forth above, even that court explained that "[p]rior acts of a party, such as previous lawsuits, are generally not permitted to prove the character of a party on a

particular occasion, ***though they can be used to prove motive, intent, preparation, plan, or
knowledge.***" *Bui*, No. 15-21317-CIV, 2016 WL 6518804, at *1 (emphasis added). The Court's
order in that case provided no analysis as to how the plaintiffs in that case planned to use the
evidence of prior lawsuits. ADT, on the other hand, has been clear that it plans to use the Agency
Materials and Lawsuits as evidence of Vivint's motive, intent, preparation, plan, and knowledge
regarding deceptive sales practices.

Vivint's 403 arguments are also overbroad. Vivint has not asked the Court to exclude
specific documents or portions of documents from the trial. Instead, it has moved *in limine* to
exclude entire categories of evidence based solely on their origins, with no showing whatsoever
as to how any particular document might cause Vivint undue prejudice, or otherwise fall within
FRE 403's ambit. As the Court has noted, unless documents are "clearly inadmissible on all
potential grounds," evidentiary rulings on them "should be deferred until trial so that questions of
foundation, relevancy, and potential prejudice may be resolved in proper context." *Gonzalez*, 718
F. Supp. 2d at 1345. Because Vivint has not asked the Court to exclude particular documents, it is
impossible to say in the abstract whether *any* document found in any investigation, complaint, or
lawsuit against Vivint, might be so "clearly inadmissible on all potential grounds" as to warrant
an order *in limine* excluding them all regardless of content.

### III. VIVINT'S OWN STATEMENTS FROM THE LANHAM ACT LAWSUITS IT PROSECUTED AGAINST OTHER COMPETITORS ARE ADMISSIBLE, PROBATIVE, AND RELEVANT EVIDENCE.

For many years, in sworn testimony in lawsuits where Vivint was the plaintiff suing
competitors for the same deceptive door-to-door practices at issue in this case, Vivint has made
numerous party admissions that are now damning to its case with the shoe now being on the other
foot. Vivint argues that documents and other evidence from these lawsuits are inadmissible under

FRE 802, 404(b), and 403 and that "ADT improperly intends to paint Vivint as a litigious character that lacks validity in its current defenses." (D.E. 114 at 19-20.) However, ADT does not intend to paint Vivint as litigious and has a number of admissible, relevant uses for the evidence from the lawsuits Vivint has filed against competitors. Instead, ADT intends to use Vivint's 801(d)(2) party admissions for many relevant purposes.

For example, Vivint's in-house counsel previously swore under oath what Vivint itself considers to be a "slam" and how damaging slams are:

> 4.   One of my duties and responsibilities at Vivint is to work with our Customer Service Department to track situations where a customer has been "slammed" by a sales representative of another alarms sales company. We use the term "slam" to describe when a competitor contacts a current Vivint customer and uses false or misleading statements in an attempt to have the customer cancel their Vivint service in favor of the competitor's or enter into a second redundant service contract.
>
> 5.   Responding to "slams" is a priority of Vivint as we consider the conduct to be damaging to our business and goodwill and to be damaging to the industry as a whole. I will frequently try to contact representatives implicated in customer slams to explain the problem and try to curb the conduct. I have a background as a sales representative and am familiar with sales representative – customer dynamics.

(Vivint Mot. for Prelim. Inj., *Vivint, Inc. v. Elite Security*, attached hereto as **Ex. L**, at PDF p. 23.) Vivint's records in this case are littered with references to the fact that Vivint sales representatives "slammed" ADT customers. Admissions like the above from Vivint's in-house counsel's sworn affidavit refute Vivint's newfound litigation theory *in this case* that a "slam" sometimes results from legitimate competitive business conduct. In this case, because Vivint's own documents will show that Vivint "slammed" hundreds or thousands of ADT customers to switch them over, Vivint now wants to re-define "slam" as something more ambiguous.

Other examples abound. When Vivint has sued competitors for deceptive sales practices, it has lamented just how damaging this *very same* deceptive door-to-door conduct is to Vivint's brand, goodwill, and reputation. That party admission should also hold true when held up to a mirror, and it is Vivint's own deceptive conduct that harms others. Relatedly, Vivint has repeatedly advocated (and its internal documents take the same position) that inbound customer complaints about deceptive sales practices are underreported by a ratio of at least twenty-to-one, not even considering the number of individuals who are not aware of the conduct because they "fell" for the deceptive practice. (*See, e.g.*, Vivint BBB Complaint Analysis, VIVINT113114-175, at 31, attached hereto as **Ex. K**.) That is, for every deceived customer who complains, there are at least 20, likely many more, who do not (for a variety of reasons). (*Id.*) Vivint even advocated that these marketing principles are so well known that *that they are facts capable of judicial notice under Fed. R. Evid. 201*. (*See* Vivint Mot. for Prelim. Inj., *Vivint, Inc. v. Elite Security*, attached hereto as **Ex. L**, at 4 n.1. (emphasis added).) Vivint's admissions that complaints of deceptive sales practices in this industry are so dramatically underreported are highly probative of liability and damages issues in this case, including for illustrating to the jury why Vivint's conduct has persisted in spite of numerous governmental and private lawsuits directed at stopping the conduct.

Finally, as to Vivint's FRE 403 argument, Vivint has failed to specifically articulate any unfair prejudice it would suffer from the admission of this evidence. These issues are critical to a jury's consideration of this case; thus, while they may be harmful to Vivint's defense, there is nothing unfair about using Vivint's prior statements against it. Vivint's admissions in testimony and documents are clear, plainly relevant, and not substantially outweighed by any FRE 403 concerns.

IV. **ADT'S DAMAGES EVIDENCE IS ADMISSIBLE AND ALL DAMAGES WERE TIMELY DISCLOSED.**

Vivint also rehashes the arguments from the two *Daubert* motions it has filed in this case in an attempt to attack ADT's theory of damages. ADT has fully briefed these issues in its responses to the *Daubert* Motion to Exclude Testimony of Dr. Russell S. Winer and the *Daubert* Motion to Exclude Testimony of Dr. Eric Matolo.

Additionally, Vivint claims that some unspecified aspect of ADT's damages claim should be excluded because it was not timely disclosed. (D.E. 114 at 24.) This allegation makes no sense—ADT has disclosed its damages computations numerous times throughout discovery. First, on December 4, 2020, ADT served its initial disclosures with a detailed description of how it planned to calculate its damages, noting that the exact figures would be dependent upon the outcome of discovery. (*See* ADT's Initial Disclosures at 6-8, attached hereto as **Ex. M**.) Second, on July 13, 2022, ADT served a second supplemental disclosure providing even more granular detail regarding ADT's damage calculation model, including a mathematical formula with an example provided, based on discovery developed in the case. (*See* ADT's Second Supplemental Initial Disclosures at 7-9, attached hereto as **Ex. N**.) Third, on November 18, 2022, ADT put up its finance director, Stanley Scott, for a 30(b)(6) deposition on a number of topics, including "the identification of the disclosure of those damages and the computation and factual basis thereof," as a part of which ADT even supplied a demonstrative exhibit detailing how the formula detailed in ADT's Second Supplemental Disclosure plays out. (*See* Defs.' Second Am. Notice of Rule 30(b)(6) Depo. of Pltfs. at Topic 5, attached hereto as **Ex. O**.) During Mr. Scott's deposition, which lasted more than four hours, Counsel for Vivint had a full opportunity to cross-examine Mr. Scott on ADT's damages calculation, including specifically the valuation of ADT's lost account damages. And finally, on December 29, 2022, prior to the close of discovery, ADT yet again

supplemented its damages disclosures to provide updated numbers of complaints since ADT had received several more complaints about Vivint's practices since ADT served its prior disclosures. (*See* ADT's Third Supplemental Initial Disclosures, attached hereto as **Ex. P**.) ADT's claims at trial will follow the disclosures ADT has extensively made throughout the discovery period regarding its damages.

<u>**CONCLUSION**</u>

For the foregoing reasons, Vivint's Motion *in Limine* should be denied.

Dated:  January 24, 2023                          Respectfully submitted,

**SHOOK, HARDY & BACON L.L.P.**

*s/ Jennifer A. McLoone*
Jennifer A. McLoone (FBN 29234)
jmcloone@shb.com
201 S. Biscayne Blvd., Suite 3200
Miami, Florida 33131
T:  (305) 358-5171
F:  (305) 358-7470

-and-

*s/ Charles C. Eblen*
Charles C. Eblen (*admitted pro hac vice*)
ceblen@shb.com
2555 Grand Blvd.
Kansas City, Missouri 64108
T:  (816) 474-6550
F:  (816) 421-5547

-and-

*s/ Eric J. Hobbs*
Eric J. Hobbs (*admitted pro hac vice*)
ehobbs@shb.com

Daniel E. Rohner (*admitted pro hac vice*)
drohner@shb.com
1660 17th Street, Suite 450
Denver, Colorado 80202
T:  (303) 285-5300 | F: (303) 285-5301

*Counsel for Plaintiffs/Counterclaim
Defendants ADT LLC and The ADT Security
Corporation*