UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case Number: 20-23391-CIV- GOODMAN
[Consent Case]

ADT LLC; and The ADT Security
Corporation,

      Plaintiffs/Counterclaim Defendants,

        v.

Vivint Smart Home, Inc. f/k/a Mosaic
Acquisition Corp.; and Legacy Vivint Smart
Home, Inc. f/k/a Vivint Smart Home, Inc.,

      Defendants/Counterclaimants.

                                       /

**ADT'S OPPOSITION TO VIVINT'S MOTION
TO EXCLUDE DR. RUSSELL S. WINER**

Almost identical to his opinions admitted in *CPI Security Services, Inc. v. Vivint Smart Home, Inc.*, Case No. 3:20-CV-00504-FDW-DSC (W.D. N.C.), and very similar to his testimony admitted and repeatedly reaffirmed by the court in *PODS Enterprises, LLC v. U-Haul Int'l, Inc.*, 126 F. Supp. 3d 1263, 1283 (M.D. Fla. 2015), in this case Dr. Winer offers opinions to assist the jury in assessing whether and in what amount ADT has been damaged by Vivint's widespread deceptive sales practices directed at ADT's customers in largely undocumented, in-person interactions throughout the United States.  Dr. Winer derived his opinions by applying generally-accepted marketing principles and peer-reviewed academic literature regarding consumer complaint behavior and the value of brands to the unique facts of the case.  He explains how and why Vivint's conduct has damaged ADT's brand and reputation, and how and why that damage extends far beyond the specific customers who have called ADT to report Vivint's misconduct under the "tip of the iceberg" concept—a doctrine supported by Vivint's own internal documents analyzing consumer behavior, and uncontroverted by Vivint's rebuttal expert, Brian Buss.[1]  In fact, in cases Vivint has prosecuted against competitors for the same conduct ADT alleges against Vivint here, Vivint has gone so far as to claim that this principle is so uncontroversial it is capable of judicial notice:

> It is commonly accepted and the Court may take Judicial Notice of the fact that only a limited number of affected customers, roughly 4%, actually will take the time to complain.  *See* Sheila Kessler, Measuring and Managing Customer Satisfaction, American Society for Quality 63-64 (1996).  Therefore, the customers who have complained to Vivint about Defendants' unlawful activities likely represent only a fraction of the Vivint customers who have fallen victim to Defendants' improper conduct.  More problematic, it is those who do not complain, and thus remain unidentified, who are likely to have ended their relationship with Vivint.  *See* Jerry Plymire, *Complaints as Opportunities*, Business Horizons (Mar.-Apr. 1991)
> (available at http://findarticles.com/p/articles/mi_m1038/is_n2_v34/ai_10544096/) (last visited March 23, 2012) (explaining that only 4% of dissatisfied customers complain, but that 91% of dissatisfied customers will never return and each of these dissatisfied customers will likely also repeat their complaints to eight to ten of their friends).  Defendants' campaign to smear Vivint's reputation and goodwill is pervasive and consistent—and can be presumed to reach far beyond those Vivint customers who have reached out to Vivint to complain.

---

[1] (*See* Buss Dep., *CPI v. Vivint*, **Ex. A**, 96:17-99:15.) Notably, Buss is not a marketing expert; he's a CFA with a BA in Biology & Economics and an MBA. He has no expertise within the fields of marketing, branding, and consumer behavior.

(Vivint Mot. for Prelim. Inj., *Vivint, Inc. v. Elite Security*, **Ex. B**, at 4 n.1.)

At base level, Dr. Winer opines that Vivint's dissemination of false and misleading information to ADT's customers over multiple years has damaged ADT's brand and reputation in significant ways, even if the full impact of the conduct may be difficult to circumscribe. Dr. Winer also opines that correcting the misinformation introduced by Vivint's 4,000+ strong salesforce would, by necessity, require broad remedial messaging, including through the same in-person marketing channel in which Vivint has spread the falsities, in order to both identify the recipients of Vivint's misinformation and correct the varied types of misimpressions implanted by Vivint's salesforce. The fact that the exact number and identities of the ADT customers affected by Vivint's conduct cannot be known with any precise arithmetic is not a *failing* of Winer's opinions, as Vivint argues. Instead, it is one of the very reasons his opinions are helpful to the jury's understanding of the issues in trying to determine the breadth, scope, and impact of Vivint's conduct on ADT.

Dr. Winer endorses a remedy that Vivint tacitly concedes has been approved not only by the Eleventh Circuit but also by many courts beyond it in considering damages under the Lanham Act and related unfair competition claims. Rather than engaging in the highly-speculative guessing-game proposed by Vivint's rebuttal expert, which requires the creation and comparison of past and present brand valuations and venturing as to innumerable factors that may have contributed to any change in value over time, Dr. Winer considers what, specifically, the cost would be to correct the misinformation introduced by Vivint into the marketplace—that is, through a "corrective advertising" or, more aptly here, a "remedial information" campaign. In calculating the costs to run such a campaign, Dr. Winer's methodology entails plugging in verifiable inputs into demonstrable formulas in just the type of way contemplated by *Daubert*

and Rule 702.

Vivint does not challenge Dr. Winer's impeccable qualifications; it would be futile to do so. Instead, Vivint tilts at windmills—slaying imaginary giants that Vivint misconstrues within Dr. Winer's opinions, the law, or both. But just as the *CPI* and *PODS* courts recognized in admitting Dr. Winer's prior opinions, and as the Eleventh Circuit has also repeatedly instructed, the types of attacks Vivint mounts are, at most, "directed to credibility and inferences the jury could [draw] from the evidence;" they are not bases for exclusion. *PODS Enterprises*, 126 F. Supp. 3d at 1283. And to the extent Vivint identifies *bona fide* challenges associated with correcting the damages flowing from its misconduct, the law charges those challenges against Vivint the wrongdoer, not ADT the victim.

## ARGUMENT

The Eleventh Circuit cautions that "the rejection of expert testimony is the exception rather than the rule." *Moore v. Intuitive Surgical, Inc*. 995 F.3d 839, 851 (11th Cir. 2021) (reversing exclusion of expert and citing Fed. R. Evid. official notes). "'The presumption is that expert testimony is admissible, so that once a proponent has made the requisite threshold showing, further disputes go to weight, not admissibility.'" *Simmons v. Ford Motor Co.*, 576 F. Supp. 3d 1136, 1140 (S.D. Fla. 2021). In exercising its "gatekeeping" role, therefore, the trial court "must remain chary not to improperly use the admissibility criteria to supplant a plaintiff's right to a jury trial: 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Moore*, 995 F.3d at 850 (quoting *Daubert*). Vivint fails to show that Dr. Winer's opinions are exceptionally unreliable requiring wholesale exclusion.

I.   **The Lanham Act Broadly Permits the Award of "Any Damages Sustained by the Plaintiff," Including Brand Damages and the Costs to Repair Them.**

   A.   *Binding precedent permits the remedy—as does the weight of all other authority and even the cases cited by Vivint.*

   The Lanham Act broadly permits a plaintiff to recover for all forms of damage caused by the defendant's unlawful conduct, including the defendant's profits, "any damages sustained by the plaintiff," and costs of the action. 15. U.S.C. § 1117(a).  Consistent with this broad statutory language and in recognition of the Act's express intent to protect parties "engaged in . . . commerce against unfair competition" and to "prevent fraud and deception in such commerce," 15 U.S.C. § 1127, courts have recognized a wide breadth of available remedies.  As the Eleventh Circuit has put it, the Lanham Act "is, of course, useless in many instances if damages for the infringement are not recoverable."  *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1566 n.2 (11th Cir. 1986).  Accordingly, "'damages sustained by the plaintiff' include 'all elements of injury to the business of the trademark owner proximately resulting from the infringer's wrongful acts' such as the costs of corrective advertising or injury to business reputation or goodwill."  *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1241 (11th Cir. 2008) (quoting *Ramada Inns*, 804 F.2d at 1564-65).  In awarding those damages, the Act confers "wide discretion in determining a just amount of recovery."  *Ramada Inns*, 804 F.2d at 1564-65.

   In line with these principles, the Eleventh Circuit and courts within it have extended the Lanham Act's remedies to damages to a plaintiff's brand and reputation, even where those damages may be difficult to ascertain and even where the estimated costs to correct the damage have not yet been expended. For example in *Ramada Inns*—remarkably, not cited once in Vivint's motion—the Eleventh Circuit affirmed an award of corrective advertising damages supported by the testimony of a marketing expert who opined that the defendant's conduct

necessitated broad remedial messaging for the entire Southeastern region of the United States where the plaintiff operated—even though the plaintiff had not yet engaged in such campaign. 804 F.2d at 1564.  In affirming that award, the Eleventh Circuit rejected claims, much like Vivint's here, that the expert's estimates "were too speculative" and based on a campaign that was overbroad and "uncertain." *Id.*  Similarly, in *Aronowitz*, the Eleventh Circuit affirmed an award of damages, based on the testimony of the plaintiff's chief financial officer, as to the estimated costs associated with potential corrective actions that could be used to address the confusion created in the marketplace by the defendant's acts (even though the plaintiff had not yet expended such costs).  513 F.3d at 1241.  There the plaintiff did not even support the damages claim with an expert—testimony from the plaintiff's CFO was sufficient.  *See id.*

Vivint fails to distinguish these binding Eleventh Circuit authorities—and fails to even cite *Ramada Inns* at all.[2] Instead, Vivint points to case law outside of this Circuit that is either inapposite or actually supportive of Dr. Winer's opinions.

For example, Vivint cites a 1970s opinion from the Tenth Circuit, *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365 (10th Cir. 1977), one of the first cases ever to discuss a rudimentary form of "corrective advertising."  But in *Big O Tire*, the Tenth Circuit actually approved of an award of $678,302 in damages to the trademark-owner plaintiff for prospective corrective advertising.  *Id.* at 1375.  In fact, the court permitted recovery of such damages without any supporting expert testimony, instead sustaining that award based on a crude calculation amounting to 25% of the amount spent by defendant Goodyear on the infringing

---

[2] In another case not cited by Vivint, this Court awarded prospective corrective advertising without regard to prior spend by the plaintiff. *See Punch Clock, Inc. v. Smart Software Dev.*, 553 F. Supp. 2d 1353, 1359 (S.D. Fla. 2008) (Cohn, J.) (approving $1 million+ in corrective advertising damages premised upon the prospective costs of seven years of advertising via Google AdWords, the equivalent period of the defendant's infringement).

advertising in the geographic areas in which the plaintiff did business. *Id.* Indeed, it is *this* form of "corrective advertising" damages—*i.e.*, a blunt percentage of the amount spent by the trademark infringer on the infringing activity—which has been criticized by scholars as potentially speculative or arbitrary. *See, e.g.*, Terence P. Ross, *Intellectual Property Law: Damages & Remedies*, § 4.03[1], 4-23 to -24 (2015) (discussing how the standard used by the Tenth and Eighth Circuits pegging corrective advertising awards to 25% of the infringer's advertising has been criticized by commentators). Here, ADT's claims are not rooted in an across-the-board 25% award of Vivint's spend in conducting its door-to-door sales program, even though that simplistic approach sanctioned by at least two circuit courts would result in significant multimillion dollar award in this case. Instead, Dr. Winer presents a specific, itemized campaign aimed at fixing the harm resulting from Vivint's conduct.

Vivint also cites *PBM Products, Inc. v. Mead Johnson & Co.*, 174 F. Supp. 2d 417, 422 (E.D. Va. 2001). But there, again, the court actually permitted recovery of estimated corrective advertising costs under the Lanham Act over the defendant's objections that such an award would be too speculative because the plaintiff had not yet engaged in the campaign. *Id.* at 422. The plaintiff, PBM, proffered a marketing expert (Armstrong) who opined that correcting the false information spread by defendant Mead regarding the plaintiff's infant formula would require $80.3 million in prospective advertising. *Id.* at 419. Notably, like Dr. Winer's opinions here, PBM's expert Armstrong opined that the estimated costs for a corrective campaign would necessarily be high "because, unlike defendant Mead, PBM did not have an existing sales force, it will have to hire and train additional personnel, and it will have to design a comprehensive campaign." *Id.* at 422-23. Armstrong also opined, similar to Dr. Winer, that it would be more difficult and costly to reverse defendant-Mead's misinformation than it was for Mead to spread

it.  *Id.* at 423.  Based on those opinions, the court denied Mead's motion for summary judgment

on corrective advertising damages and permitted the claims to go to the jury.  *Id.*[3]

As noted by Terence Ross's treatise, "Damage awards for prospective advertising now

have been approved by a number of courts," and "[t]he trend in the circuit courts is toward

allowance of damages for the cost of prospective advertising, although with some restrictions

imposed."[4]  Ross, *Intellectual Property Law: Damages & Remedies*, § 4.03[1], 4-23, -24.  For

example, the Ninth Circuit has recognized (more than once) that corrective advertising costs are

a form of "compensatory damages" representing the value a trademark has lost due to the

defendant's infringement.  *Adray v. Adry–Mart, Inc.*, 76 F.3d 984, 988–89 (9th Cir. 1995).

### B. A Florida federal court admitted Dr. Winer's substantially similar opinions supporting the award of $45 million of corrective advertising damages, explicitly rejecting the same arguments Vivint raises here.

Following the binding Eleventh Circuit precedent, just a few years ago in another

Lanham Act action the Middle District of Florida admitted Dr. Winer's substantially similar

opinions relating to the estimated costs to correct potential confusion resulting from a

defendant's Lanham Act violations.  *PODS Enterprises, LLC v. U-Haul Intern., Inc.*, 126 F.

Supp. 3d 1263 (M.D. Fla. 2015).  There plaintiff PODS prosecuted Lanham Act claims for U-

Haul's infringement of the words "pod" and "pods," registered trademarks of the plaintiff.  *Id.* at

---

[3] Vivint's reliance on *Monahan* is also unavailing.  That court recognized that "[a]ny harm to [plaintiff's] brand caused by this consumer confusion *is compensable*, and therefore, at least in theory, [the plaintiff] could recover the costs of a corrective advertising campaign that would effectively repair that harm." *Monahan Prods. LLC v. Sam's East, Inc.*, 463 F. Supp. 128, 147 (D. Mass. 2020) (emphasis added).  The court did not permit a corrective advertising remedy because the injury alleged was that the defendant's conduct resulted in the plaintiff's strollers being sold at a discount, not any actual reputational harm.  As Dr. Winer opines here, Vivint's conduct has harmed ADT's brand and reputation, and his remedial campaign is designed to rectify that damage.

[4] The "restrictions imposed" relate to those awards that are premised on a blunt percentage of the *defendant's* marketing spend, as in *Big O Tire*.  As Ross explains, "There is significant doubt . . . as to whether such awards should be based on the advertising expenditures of the infringer." *Id.*

1271.  Dr. Winer opined that U-Haul's actions damaged PODS's brand by creating a likelihood of customer confusion and potential false association between U-Haul's and PODS's products. *Id.* at 1282.  Dr. Winer also opined, as he does here, that correcting the negative impacts of U-Haul's conduct on the purchasing public would require PODS to engage in a broad remedial campaign to correct the potential misimpressions inflicted by U-Haul.  *Id.*  Also like his opinions in this case, Dr. Winer opined that the campaign would need to be directed at a similar audience that potentially received the "misimpressions" from U-Haul's conduct and that the campaign would need to be carried out through the same marketing channel by which the misimpressions had been introduced by U-Haul (the internet).  *Id.* at 1283.  He further testified that correcting the potential misimpressions would actually require *more* marketing activity than U-Haul's original tortious conduct based on academic literature supporting that it takes at least three times the amount of marketing to effectively reach the target audience with an effective corrective message that sticks.  *Id.*  Using the same methodology he employs in this case, Dr. Winer applied data regarding the estimated costs to administer such a campaign and concluded that a reasonable corrective advertising campaign would cost PODS approximately $95.4 million.  *Id.*  The jury ultimately awarded a verdict of $60.7 million, including $45 million in damages tied to the need for corrective advertising.  *Id.* at 1271, 1283.

In admitting Dr. Winer's opinions and ruling on U-Haul's post-trial motions, the Honorable Senior Judge James D. Whittemore repeatedly rejected U-Haul's objections, just like Vivint's here, that Dr. Winer's testimony was unreliable, overbroad, and not permitted by law. *See id.* at 1283-84.  Judge Whittemore specifically rejected U-Haul's claim that an award of corrective advertising damages was not permissible because PODS had not shown it had actually spent money in an attempt to correct the alleged misimpressions before trial.  *Id.* at 1284.  Citing

*Aronowitz*, Judge Whittemore held that the Eleventh Circuit has sanctioned corrective advertising damages "without regard to the relevant advertising spent by either party." *Id.* Judge Whittemore similarly rejected U-Haul's argument, like Vivint's here, that Dr. Winer's methodology was overbroad and unreliable because it would result in consumers receiving corrective messaging who may never have actually received or become confused by U-Haul's infringing statements, holding that such objections, at most, went to weight and not admissibility. *Id.* at 1283.

### C. The Western District of North Carolina also recently admitted Dr. Winer's nearly-identical opinions in a nearly-identical action against Vivint.

Just as Vivint flouts the binding and most on-point authority in this Circuit, Vivint also ignores any discussion of the fact that another federal district court thoroughly vetted and admitted Dr. Winer's nearly identical-opinions in a companion case against Vivint involving nearly-identical claims, facts, and theories. *CPI Security Services, Inc. v. Vivint Smart Home, Inc.*, Case No. 3:20-CV-00504-FDW-DSC (W.D. N.C.). Vivint's silence about this authority is troubling given that counsel for the parties here are the exact same counsel in *CPI v. Vivint*.

Almost exactly as he does in this case, in *CPI v. Vivint* Dr. Winer opined that: 1) there was abundant evidence that Vivint's sales misconduct harmed CPI's brand equity; 2) based on authoritative research regarding consumer complaints, the available evidence in terms of reported complaints represents only the very tip of the iceberg of a widespread phenomenon, which by its very nature is difficult to circumscribe; 3) the only way to fully discover all recipients of the misinformation spread by Vivint's sales force through an in-person marketing channel (and then correct the misinformation) would be to conduct a similar in-person campaign, especially given Vivint's failure, refusal or inability to provide complete records regarding the customers it has visited and the customers who have reported sales misconduct; and 4) for CPI,

- 9 -

the costs to conduct such a campaign to attempt to restore CPI's brand equity would exceed $10 million.[5]  (*See generally* Dr. Winer Rep., *CPI v. Vivint*, **Ex. C**.)

The Honorable Frank D. Whitney received full briefing from the parties and held a *Daubert* hearing on January 10, 2022. In response to the same arguments Vivint raises here, Judge Whitney ruled unequivocally that Dr. Winer's opinions satisfied Rule 702 and were admissible on CPI's claims:

> The testimony of Russell Winer clearly satisfies the requirements of Rule 702. [Dr.] Winer derives his opinions by generally accepted marketing principles and abundant peer reviewed academic literature. Based on the parties' testimony, the Court finds Dr. Winer's, 'remedial information campaign' is 'corrective advertising' by a different name. Accordingly, defendant's motion in limine to exclude testimony of Russell Winer pursuant to Rule 702, is denied.

(*CPI v. Vivint*, No. 3:20-CV-00504 (W.D. N.C.), Jan. 10, 2022 Hrg. Tr., **Ex. D**, 45:14-24.)

Ignoring this ruling completely, Vivint does nothing to explain how or why Judge Whitney's analysis was wrong (it wasn't), how or why Dr. Winer's opinions were different compelling a different result (they weren't), or how or why the law applicable to Lanham Act remedies in the Fourth Circuit is different than the Eleventh Circuit compelling a different outcome (it's not). Granting Vivint's motion would not only require this Court to ignore binding Eleventh Circuit precedent and the overwhelming weight of authority outside of it, but also to pretend that multiple federal district court judges considering Dr. Winer's substantially similar opinions somehow all got it wrong.

---

[5] CPI's customer base is limited to the Southeast United States and largely concentrated in North and South Carolina, reducing the scope of the audience requiring a remedial message.

## II. Contrary to Vivint's Strawman Arguments, Dr. Winer's Opinions "Fit," They are Based Upon a Reliable Methodology, and They are Helpful to the Jury's Understanding of Critical Issues.

In support of its prayer to whole-cloth exclude Dr. Winer's opinions in spite of the abundant authority supporting its admissibility, Vivint constructs a series of strawman arguments that misconstrue Dr. Winer's actual opinions and methodology, and the law. Indeed, Dr. Winer's opinions are specifically tailored to remedy the harm resulting from Vivint's door-to-door sales misconduct. The opinions "fit," *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 988-89 (11th Cir. 2016), and they are both reliable and helpful to the jury's understanding of significant issues in this case. *Id.*; *see also City of St. Petersburg v. Total Containment, Inc.*, 2009 WL 3335013 at *12 (S.D. Fla. Mar. 19, 2009).

### A. Dr. Winer's opinions elucidate the difficulty of ascertaining and correcting the full scope damages resulting from Vivint's conduct, and yet his cost-to-correct opinion is still grounded in a reliable and clearly-articulated methodology.

As explained thoroughly in his 124-page report, Dr. Winer's opinions embrace the difficulty of quantifying the damage to ADT resulting from Vivint's misconduct. In fact, Dr. Winer's opinions are helpful in showing just how hard (or even impossible) it is to determine the full scope of those who have been affected by Vivint's misinformation and to correct the resulting damage. To summarize, Dr. Winer opines that:

- Vivint's actions have harmed ADT's brand equity, as supported by abundant evidence of customer confusion resulting from Vivint's conduct which is geographically widespread and numerically voluminous, especially considering well-accepted underreporting phenomena.

- Vivint's failure or refusal to document the universe of ADT customers its 4,000+ door-to-door sales people have visited over the relevant 5+ year timespan, as well as the customers who have reported deceptive sales practices by Vivint's salesforce to Vivint, contributes to the challenge of identifying the recipients of Vivint's misinformation requiring a remedial message. (In fact, *if Vivint had complete and reliable information*, Dr. Winer would have used that to help determine which consumers may require remedial messaging.)

- Especially given Vivint's professed ignorance of the affected ADT customers, any remedy to adequately restore ADT's brand equity would, by necessity, need to be broad in order to effectively identify recipients of the misinformation and administer a corrective message.

- The conduct in this case—lies and misstatements by highly-trained sales people intended to deceive unsuspecting consumers through unsolicited sales visits—is by its very nature extremely difficult if not impossible to circumscribe. The only way to actually reach the potential recipients and administer a corrective message would be through the same in-person sales channel in which the misinformation was spread, which would allow for the necessary individualized conversations to correct Vivint's misstatements.[6]

It is a fundamental tenet of damages law both generally and under the Lanham Act that where the tortfeasor's conduct makes it difficult to pinpoint or prove the scope of damage, that difficulty is construed against the wrongdoer—not the victim—and does not preclude recovery. *E.g.*, *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931).  For example in *Ramada Inns*, the case ignored entirely by Vivint's motion, the Eleventh Circuit recognized that "Lanham Act damages **may be awarded even when they are not susceptible to precise calculations**."  804 F.2d at 1565 (emphasis added). The court explained:

> Where the wrong is of such a nature as to preclude exact ascertainment of the amount of damages, plaintiff may recover upon a showing of the extent of damages as a matter of just and reasonable inference, although the result may be only an approximation. The wrongdoer may not complain of inexactness where his actions preclude precise computation of the extent of the injury.

*Id.* (internal citations to Supreme Court precedent omitted); *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1520 (11th Cir. 1990) (same).  "[D]amages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of

---

[6] Notably, at least for a period of time, Vivint itself deployed an in-person force known as the "SWAT" team in response to reports of deceptive sales practices by Vivint competitors around the country. (*See* Dep. of Jason Corbridge, **Ex. E**, 38:18-40:8.) As one former employee explained, "There's a lot of benefit of having someone there in person. They could explain – some of the pitches that were used, just kind of like on the other side of the coin . . . ." (*Id.* at 39:12-23.) An in-person team is "[h]ugely more effective" and "[t]here's so much white noise and scam stuff over the phones that it's not very effective." (*Id.* at 39:24-40:8.)

computation is afforded." *Borg-Warner Corporation v. York-Shipley, Inc.*, 293 F.2d 88, 95 (7th Cir. 1961) (quoted by the Eleventh Circuit in *Ramada Inns*, 804 F.2d at 1565).

Vivint elides this authority completely. As Vivint would have it, Dr. Winer's opinions should be excluded precisely because Vivint has made it so difficult to know who has been deceived. That turns the law on its head. And, in point of fact, this is exactly why Dr. Winer's opinions are helpful to the jury's understanding of the issues: his expertise will aid the jury in understanding just how damaging the conduct is because it is so difficult to discover and "clean up" after-the-fact. Of course, if the jury doesn't agree with some or any of Dr. Winer's testimony, it does not have to award the full amount of damages Dr. Winer endorses.

Notably, Vivint never actually takes issue with Dr. Winer's computation quantifying the costs to carry out his recommended campaign. Under that approach, Dr. Winer determined, through demonstrable mathematical formula and verifiable inputs laid out in his report, the costs that would be required to deploy corrective information to sufficiently restore ADT's brand to its *ante*-Vivint-sales-misconduct status. Nowhere in Vivint's motion does Vivint demonstrate how those calculations are unreliable, unsound, or based on faulty math. And, in any event, the methodology is repeatable, testable, and subject to any criticism based on the arithmetic clearly laid out in the report—precisely the type of methodology endorsed by Rule 702.

### B. Vivint misconstrues Dr. Winer's opinions, and at most the attacks go to weight and not admissibility.

Vivint's objections either ignore the law entirely or misconstrue Dr. Winer's opinions. None supports exclusion.

**Dr. Winer's cost-to-correct is a measure of present actual damage.** First and foremost, Vivint's objections appear rooted in a fundamental misunderstanding of Dr. Winer's opinion. Dr. Winer's valuation opinion is a measure of present actual damages caused by

Vivint's conduct, not a remedy aimed at "future" damage or a form of "punitive" damages as Vivint seems to suggest. Indeed, as the term "remedial information" itself implies, the corrective messaging is intended to "remediate" the harms of the false information already introduced by Vivint into the marketplace.  As one prominent intellectual property treatise explains, "In cases where the damage to reputation is very difficult to measure, the cost of corrective advertising, established through the testimony of advertising personnel and sufficient expert analysis, may be a means of proving the amount of actual damage to the mark's reputation."  Mark A. Glick *et al.*, *Intellectual Property Damages: Guidelines and Analysis*, 331 (2003); *see also Adray*, 76 F.3d at 988–89 (reversing trial court and holding that prospective corrective advertising expenditures are "compensatory damages" representing the value a trademark has lost due to the defendant's infringement). That is exactly what Dr. Winer's opinions represent here.  In fact, as Dr. Winer has testified at length in both this case and *CPI v. Vivint*, using a cost-to-correct approach to valuate the damage to ADT's brand resulting from Vivint's conduct is really the *only* reliable way of isolating the amount of damages specifically attributable to Vivint's conduct versus the panoply of other factors that may have impacted ADT's brand value over time.  (Winer Dep., *CPI v. Vivint*, **Ex. F**, 52:17-55:19, 308:3-23; Winer Dep., *ADT v. Vivint*, **DE 119-13**, 270:1-6, 273-274:4, 275:15-276:25.)  Vivint's rebuttal expert Brian Buss agrees that cost-to-correct can be an appropriate measure of actual damages. (Buss Dep., *CPI v. Vivint*, **Ex. A**, 86:6-11, 32:2-7; *see also id.* at 86:13-89:25 (explaining that his alternative approach to quantifying brand damages would require a "difficult" "multipart" process for which there is insufficient data).) He has even proposed a corrective advertising remedy himself in a previous commercial defamation case in which he served as the plaintiff's expert!  (Buss Dep., *CPI v. Vivint*, **Ex. A**, 27:14-29:13.)

Dr. Winer's valuation is perhaps best understood by a simple analogy. Imagine a classic sports car—say a 1967 vintage Corvette. The vehicle is involved in a front-end collision, damaging various aspects of the vehicle, some obvious (front bumper, engine compartment, and engine), and some not (such as the frame). The question is: by what amount has the vehicle been damaged? Sure, one *could* try to quantify that damage by rendering a wholesale Kelly Blue Book appraisal of the vehicle both prior to and after the accident—the difference between the two being the measure of damage caused by the accident. Of course, using that methodology would require multiple assumptions as to what the pre- and post- accident values were, as well as what *actually caused* any differentiation in value before and after the accident based on multiple factors—the cost actually paid to acquire the Corvette (and whether that was reasonable), what the classic Corvette market was at each respective time, what the broader economic climate was with respect to used vehicles, the lists goes on. Or, as an alternative approach, one could engage a vintage sports car mechanic to both diagnose the damage and determine the costs necessary to actually restore the vehicle to its *ante*-accident status, *that* cost being the value of the damage.

The latter approach is similar to the one employed by Dr. Winer here: rather than engaging in the speculative process proposed by Vivint's rebuttal expert Buss, he instead chose to determine what the necessary costs would be to adequately correct the misinformation introduced into the marketplace by Vivint denigrating ADT's brand. The fact that the "fix" has not yet occurred does not render the opinion a speculative award of "future" or "punitive" damages.  It's a measure (the *best available measure*, according to Dr. Winer) of the amount of damage presently inflicted by Vivint's conduct.[7]

---

[7] Vivint's motion pretends that Dr. Winer's remedy is somehow disproportionate to the value of ADT's brand. The evidence at trial will show that during the past six years alone, ADT has

**The remedy is tailored to correcting the disinformation spread by Vivint's salesforce.**   Vivint's other attacks on Dr. Winer's analysis again misinterpret his reasoning and ADT's claims, and they raise objections that the law ultimately charges against Vivint as tortfeasor. Vivint complains that Dr. Winer's recommended campaign would result in ADT customers who were never approached or misled by Vivint also receiving a remedial message, and therefore it is overbroad and not "tailored" to correcting Vivint's misconduct. Those are exactly the kinds of objections that Judge Whittemore rejected in *PODS v. U-Haul* where U-Haul argued that Dr. Winer's corrective remedy would result in consumers receiving corrective marketing (there, internet advertisements) who may never have actually seen or become confused by U-Haul's infringing statements. *See id.* at 1283 (holding that such objections, at most, went to weight and credibility not admissibility).  Indeed, it is incidental to *any* corrective advertising campaign that there will be recipients of the corrective message who may never have received or become confused by the initial misleading message by the Lanham Act violator—unless the exact universe of recipients of the false/misleading information (and those who thereafter became confused) could be identified. To be sure, Dr. Winer has explained that the remedial campaign he endorses would result in consumers receiving remedial information who may not need it. But that does not mean that the remedy is impermissibly overbroad. Instead, as Dr. Winer repeatedly testified at his deposition in the excerpts cited by Vivint, broadly engaging the audience who may have received the misinformation is the *only* effective way to suss out all of those left deceived or confused by Vivint's misconduct and to administer a corrective message. To the extent Vivint takes issue with that predicament, the Eleventh Circuit disagrees that it counts against ADT.  *See Ramada Inns*, 804 F.2d at 1564-65.

---

expended well over $1 billion building and promoting its brand and goodwill, the overall value of which far exceeds the corrective remedy Dr. Winer endorses.

Another analogy helps illustrate the point. As Dr. Winer explained at his deposition, the misinformation spread by Vivint's sales force is in many ways similar to a virus. (Winer Dep., *ADT v. Vivint*, **DE 119-13**, 134:20-135:20).  Once released into the community, it becomes very difficult to reliably track and clamp down on, especially given its ability to spread beyond an initial recipient who may not even be aware he or she has been infected. One recipient of Vivint's misinformation may not herself "believe" it, but she may pass it along, or share her frustration resulting from the experience, with a much wider audience. (*Id.* at 100:14-101:21.) Actually identifying those who've been infected requires widespread and thorough vetting/testing, and the affected population isn't limited to just those who outwardly show symptoms or report their infection to authorities. This same idea is why Dr. Winer explains that fixing the misinformation spread by Vivint's 4,000-person strong sales force over multiple years throughout the country would require very broad messaging, beyond even the initial or readily-identifiable cases of confusion, to effectively root out the virus and restore ADT's brand. Simply because there may be many "negative tests" along the way does not mean that the remedy is overbroad; it's simply the *only way* to identify and cure those who've actually been affected.[8]

---

[8] Vivint also seems to misunderstand the scope of the misinformation at issue in this lawsuit. It is correct that ADT has asserted "false association" claims under the Lanham Act, but ADT's claims are not limited solely to assertions of association between Vivint and ADT. For starters, the Lanham Act itself applies beyond just false association and covers any misrepresentations regarding "the nature, characteristics, qualities or geographic origin" of the defendant's or plaintiff's "goods, services or commercial activities," 15 U.S.C. § 1125(a); *Babbit Electronics, Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1181 (11th Cir. 1994) ("Section 1125(a) . . . covers false advertising or description whether or not it involves trademark infringement."). And, in addition to its Lanham Act claim, ADT also asserts claims for common law unfair competition (Count II), trade slander/commercial disparagement (Count III), and tortious interference with business relationships (Count IV)—none of which are limited to just false association. Common law unfair competition is an umbrella cause of action for any conduct contrary to honest practice in industrial and commercial matters. *Tobinick v. Novella*, 142 F. Supp. 3d 1275, 1282-83 (S.D. Fla. 2015) (Rosenberg, J.) The elements of trade slander are 1) that the defendant communicated a "false statement"; 2) about the plaintiff; 3) to a third party; and 4) the party suffered damages

Actually, Dr. Winer's proposed remedial campaign is, by design, conservative and limited to consider matters of efficiency so as to not be broader than is necessary to accomplish its restorative goal.  (Winer Rep., **DE 119-15**, at ¶¶ 101-102.)  For example, while Dr. Winer opines that an effective campaign should try to reach all ADT customers in the same channel as Vivint's in-person visits, he has designed the in-person aspect of the campaign to focus only on ADT's top-20 cities in the geographic locations from which there have been reports of Vivint's misleading practices, encompassing a fraction of ADT's customer base. (*Id.*) While approaching this smaller subset would necessarily result in many affected customers not receiving like-for-like in-person interactions, Dr. Winer believes it would be the most cost-effective balance on the spectrum of possible approaches. (*Id.* at ¶ 102.) If Vivint disagrees with the scope of the recommended remedy, certainly Vivint can argue its view to the jury in support of a smaller award. Truth be told, Dr. Winer's damages number could have been much, much larger.

**The "inoculation" effect does not preclude the remedy.** Vivint similarly reproaches Dr. Winer because he explained that, in addition to ferreting out and correcting existing misimpressions resulting from Vivint's conduct, the corrective campaign he endorses would also have the benefit of "inoculating" customers against further confusion resulting from Vivint's ongoing actions. As before, Vivint misunderstands that *any* corrective campaign in *any* context results in the avoidance of "future" harm by preventing ongoing confusion—which is the exact

---

as a result of the statement(s). *E.g.*, *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1140 (M.D. Fla. 2007). To prove tortious interference, a plaintiff must show that the defendant intentionally and "unjustifiably" interfered with the plaintiff's business relationships, where "unjustifiable" conduct includes any type of "misrepresentations" or other improper conduct. *See* Florida Supreme Court Pattern Jury Instruction (Civil) 408.6.  In addition to false claims of association, Dr. Winer's remedial campaign is also rightly directed at correcting these types of misrepresentations. In fact, Dr. Winer endorses an in-person corrective campaign precisely because Vivint's misrepresentations take so many different forms and oftentimes turn on nuances of the respective pitch such that correcting the false information requires individualized conversations.

point of conducting such messaging. For these reasons, courts presented with the question of whether Lanham Act damages can include costs to prevent future confusion, even after the defendant's actions have stopped,[9] have answered in the affirmative.  *See, e.g.*, Ninth Circuit Model Jury Instruction 15.27 - Trademark Damages (listing as recoverable damages, "4. The **expense of preventing customers from being deceived**" and "5. The **cost of future corrective advertising reasonably required to correct any public confusion caused by the infringement**." (emphasis added)); Seventh Circuit Pattern Jury Instruction 13.6.3 – Actual Damages (listing as recoverable damages "Cost of corrective advertising. This is [the amount spent by Plaintiff to counteract the effects of Defendant's infringement] [and] [**the amount necessary to dispel any public confusion that lingers after Defendant's infringement has stopped**]." (emphasis added, brackets in original)).[10] Returning to the vaccine analogy, once the virus has begun to spread, the only way to truly stop it is to not only treat those who have already become infected but to also treat those at risk of being deceived as the misinformation continues to spread in the marketplace.

**Dr. Winer's opinions regarding customer confusion are amply supported by the record.**  Throughout its motion, Vivint pretends that there are only a handful of records supporting Dr. Winer's opinions regarding the reported incidents of Vivint's sales force misleading and confusing ADT's customers, and that Dr. Winer somehow improperly relies on a "sampling" of the broader evidence. Vivint repeatedly obfuscates the records that Dr. Winer personally reviewed *himself* versus the records that he enlisted a team of assistants to aid in reviewing given how expansive the body of evidence is. It's unclear what aspect of Dr. Winer's

---

[9] Significantly here, Vivint's actions are ongoing: ADT has received hundreds of reports of Vivint's sales misconduct even since the filing of this suit.

[10] The Eleventh Circuit has not adopted a pattern Lanham Act/trademark damages instruction.

opinions Vivint is actually seeking to exclude based on this complaint (making it difficult for ADT to respond), but regardless the argument goes nowhere.

In fact, in spite of the inherent difficulties of tracking the types of confusion caused by Vivint's misrepresentations, Dr. Winer opines that there is substantial evidence that Vivint's sales misconduct has caused many consumers to become "actually confused" to Vivint's purported association with ADT, supporting the need for remedial information.  (Winer Rep., **DE 119-15**, at ¶ 97.)  One category of evidence he reviewed, in addition to other documentation detailing the complaints about Vivint made to ADT, (*id.* at ¶ 14), was recorded audio calls by customers reporting deceptive sales practices by Vivint to ADT.[11] Dr. Winer has testified that, given the volume of these recordings, he and his team reviewed only a smaller set of 357 such recordings to get a sense of the types of complaints being made about Vivint and the potential confusion Vivint's conduct was creating with ADT's customers. (At trial, through other fact witnesses, ADT will establish that the set of 1,300+ recordings comprises in-bound complaints made to ADT regarding Vivint's deceptive sales conduct.) Oddly, Vivint's argument seems to be that some unspecified aspect of Dr. Winer's opinions should be excluded because he did not consider *even more* evidence of Vivint's wrongdoing—that Dr. Winer's team sampled and reviewed "only" 357 of the 1,300-plus complaint recordings supplied by ADT rather than *all* of

---

[11] At the time Dr. Winer rendered his report, Vivint had not provided *any* information about the volume of reports <u>Vivint</u> had received about deceptive sales conduct by its sales force, even though the academic literature is clear that Vivint would be the entity most likely to receive complaints about its salesforce's conduct. Since that time, following this Court's order compelling production, Vivint has produced a spreadsheet with over 75,000 complaint entries (what Vivint calls "feedback cases"). Vivint claims it investigates each such complaint and comes to a conclusion about the complaint. Yet, Vivint has redacted the column in the spreadsheet it produced showing its conclusion classifying the respective complaints, despite this Court's order overruling Vivint's claims of privilege relating to such information. [*See* DE 62.] Other documents make clear that the information withheld would show how many complaints Vivint classified as "affiliation misrepresentations" or "slams," terms it frequently uses to refer to the same sales misconduct at issue here.

them.[12] The argument is a red herring because Dr. Winer is clear that the recordings actually reviewed—in conjunction with all the other evidence he considered and cited in his report—were sufficient, even if they represented only a smaller set of the total documented evidence of Vivint's practices. (*See, e.g.*, Winer Rep., **DE 119-15**, at ¶ 48 (explaining that he and his team reviewed several hundred[13] of over 1,300 customer complaint calls made available to him by ADT); *id.* at ¶ 62 ("The examples above are not meant to be exhaustive"); *id.* at ¶ 96 (detailing the locations from which several hundred complaints have originated).)

As would be expected, the 1,300+ customer call recordings cited in Dr. Winer's report have all been produced to Vivint and Vivint's rebuttal expert for review in this case.  And based on his review of that same evidence, Vivint's own expert (Buss) confirmed that there are hundreds of examples within these recordings of ADT customers becoming confused by Vivint's false and misleading sales pitches. (Dep. of Brian Buss, *ADT v. Vivint*, **Ex. G** [filed under seal], 82:1-84:24.) Significantly, of the 202 unique customers encompassed by the 357 audio files reviewed by Dr. Winer's team, ***Vivint's own expert concluded that at least 93 such customers (46%) reported confusion about a Vivint sales representative making a claim or implication of association with ADT***.  (*Id.* at 84:14-85:21; Rep. of Brian Buss, **Ex. H** [filed under seal], at PDF p. 73, Schdl. 5a).  Of course, if Vivint takes issue with quantum of examples Dr. Winer cites in his report, it is free to cross examine him on that basis. But it is no reason to exclude any portion of Dr. Winer's opinions, especially when Vivint's own expert confirms Dr. Winer's findings.

---

[12] The Rules of Evidence do not require ADT to pay a senior marketing professor at NYU to personally listen to thousands of hours of tape recordings; Dr. Winer was well within bounds to delegate those tasks to his team. Vivint's rebuttal expert did the same thing.

[13] Upon request from Vivint after service of Dr. Winer's report in August of 2021, ADT supplied Vivint a spreadsheet identifying exactly which 357 calls Dr. Winer's team randomly selected for review from the set of 1,300+. Vivint's rebuttal expert has made no effort whatsoever to show that the reviewed set of call recordings was "unrepresentative" of the broader set, and, in any event, this objection does not support exclusion.

As the Eleventh Circuit has unequivocally held, while evidence of actual confusion "is not necessary" under the Lanham Act because "[o]ne merely has to show that the likelihood of confusion exists," "evidence of actual confusion is the best evidence of a likelihood of confusion." *Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 137 (11th Cir. 2022) (reversing sum. j. on Lanham Act claim granted by Lenard, J.); *see also Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1185 (11th Cir. 1985) ("Actual confusion by a few customers is the best evidence of likelihood of confusion by many customers"). Therefore, the Eleventh Circuit has held that even a "very little" amount of actual confusion is "highly probative." *Wreal*, 38 F.4th at 137.  The overall strength of such evidence depends on "the number of instances of confusion," "the kinds of persons confused," and the "degree of confusion." *Id.* Here, Dr. Winer's analysis of the complaints made to ADT regarding Vivint's sales conduct revealed that multiple unrelated individuals spread across the country had all become *actually confused* by Vivint's deceptive statements—as did the analysis of Vivint's own expert!  The fact that Dr. Winer did not review records relating to *hundreds more* incidents of Vivint's deceptive practices does not render his analysis unreliable.[14]

**III.  Dr. Winer's Opinions Are Not Legal Conclusions and Will Assist the Jury in Determining Whether ADT's Brand Has Damaged and the Type and Amount of Remedial Messaging Necessary to Restore It.**

Vivint's last argument makes no sense. Dr. Winer will not be called to "tell the jury what result to reach." Nor will he offer any "legal conclusions." Instead, Dr. Winer will explain, from

---

[14] Vivint also seems to take issue with the fact that Dr. Winer did not conduct a survey. That was not necessary in this case given the abundance of evidence of actual customer confusion— including the dozens of customers who will testify at trial. And, the Eleventh Circuit has "moved away from relying on survey evidence" as critical in proving confusion. *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1341 n.5 (holding that the absence of survey evidence was not dispositive on the issue of actual confusion); *Safeway Stores, Inc. v. Safeway Disc. Drugs*, Inc., 675 F.2d 1160, 1167 n.10 (11th Cir. 1982) (survey evidence not necessary).

his expert marketing perspective, how and why Vivint's conduct is damaging to ADT's brand equity requiring corrective messaging, and what specific course of conduct would be required to attempt to restore it. "An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704; *see also Hanson v. Waller*, 888 F.2d 806, 811-12 (11th Cir. 1989) (discussing Rule 704 and holding that it was not impermissible for accident reconstruction expert to opine in negligence action that crash was "just pure accident"). Obviously the jury will decide whether Vivint is legally liable based on the totality of evidence, and if so, what amount of damages to award. Dr. Winer's marketing and branding expertise will aid the jury, not supplant it, in making those determinations.

Dated:  January 24, 2023                    Respectfully submitted,

                                             **SHOOK, HARDY & BACON L.L.P.**

                                             *s/ Jennifer A. McLoone*
                                             Jennifer A. McLoone
                                             Florida Bar No. 029234
                                             jmcloone@shb.com
                                             201 S. Biscayne Blvd., Suite 3200
                                             Miami, Florida 33131
                                             Tel:  (305) 358-5171
                                             Fax: (305) 358-7470

                                                    -and-

                                             *s/ Charles C. Eblen*
                                             Charles C. Eblen (*admitted pro hac vice*)
                                             ceblen@shb.com
                                             2555 Grand Blvd.
                                             Kansas City, Missouri 64108
                                             Tel:  (816) 474-6550
                                             Fax: (816) 421-5547

                                                    -and-

                                             *s/ Eric J. Hobbs*
                                             Eric J. Hobbs (*admitted pro hac vice*)
                                             ehobbs@shb.com

Daniel E. Rohner (*admitted pro hac vice*)
drohner@shb.com
1660 17th Street, Suite 450
Denver, Colorado 80202
Tel:  (303) 285-5300
Fax: (303) 285-5301

*Counsel for Plaintiffs/Counterclaim*
*Defendants ADT LLC and The ADT Security*
*Corporation*