# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

CPI SECURITY SYSTEMS, INC.,
Plaintiff and Counterclaim Defendant,

v.

Civil Action No. 3:20-CV-00504-FDW-DSC

VIVINT SMART HOME, INC. f/k/a Mosaic Acquisition Corp.; and LEGACY VIVINT SMART HOME, INC. f/k/a Vivint Smart Home, Inc.,
Defendant and Counterclaimants.

VIDEOTAPED DEPOSITION OF BRIAN BUSS
Zoom Videoconference
Friday, October 8, 2021

REPORTED BY:
Katherine West, RPR
CSR No. 14386
Pages 1 - 155

Videotaped deposition of BRIAN BUSS, taken on behalf of the Plaintiff and Counterclaim Defendant, via Zoom videoconference, beginning at 9:02 a.m. PDT and ending at 2:25 p.m. PDT, on Friday, October 8, 2021, before Katherine West, RPR, CSR No. 14386, reporting remotely via videoconference.

The signature of the witness was not waived.

A P P E A R A N C E S

FOR PLAINTIFF AND COUNTERCLAIM DEFENDANT (appearing via videoconference):

SHOOK, HARDY & BACON L.L.P.
By: Daniel E. Rohner, Esq.
Eric J. Hobbs, Esq.
1660 17th Street
Suite 450
Denver, Colorado 80202
303.285.5300
drohner@shb.com
ehobbs@shb.com

FOR DEFENDANTS AND COUNTERCLAIMANTS (appearing via videoconference):

GREENBERG TRAURIG, LLP
By: Joshua R. Brown, Esq.
450 South Orange Avenue
Suite 650
Orlando, Florida 32801
407.420.1000
brownjr@gtlaw.com

CLYDE SNOW & SESSIONS
By: Matthew A. Steward, Esq.
201 South Main Street
Suite 1300
Salt Lake City, Utah 84111
801.322.2516
mas@clydesnow.com

ALSO PRESENT (appearing via videoconference):
Elanne Zambrano, Videographer

E X A M I N A T I O N
I N D E X

WITNESS: BRIAN BUSS

| EXAMINATION BY: | PAGE |
|---|---|
| MR. ROHNER | 6 |

E X H I B I T
I N D E X

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Expert Report of Brian Buss | 14 |
| Exhibit 2 | Expert Report of Professor Russell S. Winer, PhD | 14 |

ZOOM VIDEOCONFERENCE; FRIDAY, OCTOBER 8, 2021
9:02 a.m. PDT - 2:25 p.m. PDT
* * * * * * * * * *

THE VIDEOGRAPHER: Okay. Good morning, everyone. We are on the record. The time is 9:02 a.m. Pacific Time. Today is October 8, 2021. My name is Elanne Zambrano. I'm a video technician with Veritext Legal Solutions located in Los Angeles, California.

We are recording these proceedings over videoconference technology due to COVID-19. This is the video deposition of Brian Buss in the action entitled CPI Security Systems, Inc. versus Vivint Smart Home, Inc. This deposition is being taken on behalf of plaintiffs and counterclaim defendant. The case number is 3:20-CV-00504-FDW-DSC.

Now would you all please identify yourself and who you represent, starting with the noticing attorney.

MR. ROHNER: Yes. This is Dan Rohner. I am from Shook, Hardy and Bacon, and I represent CPI Security Systems, Inc. On the line from my firm is Eric Hobbs also representing CPI.

MR. BROWN: Hello. This is Joshua Brown with Greenberg Traurig representing the defendants in the case, and on the line with me is Matt Steward of Clyde Snow also representing the defendants in the case.

THE VIDEOGRAPHER: Okay. If that's everyone, thank you. Now, will the court reporter please administer the oath.

BRIAN BUSS,

called as a witness by and on behalf of the Plaintiff and Counterclaim Defendant, and having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. ROHNER:

Q Good morning, Mr. Buss.

A Good morning.

Q As I just said, my name is Dan Rohner, and I represent the plaintiff in this case, CPI Security Systems. I've had a look at your background and qualifications, and so I know that you've testified before, but I would like to go over a couple ground rules that are particularly relevant to a Zoom deposition if that's okay with you.

A Go right ahead.

Q Sure. So as you know, we're on Zoom which sometimes can create at times delays in answers. Typically not, but sometimes it can. So I'm going to work hard to wait until you're done with your answer before I ask the next question, and I'd ask if you'd agree to do the same. If I'm asking a question, just

wait until I finish it and ensure that I'm done before you answer it.

Does that make sense?

A It does.

Q Also, if there's a question that you don't understand, please do let me know. I will do my best to rephrase it. If you answer a question, I'm going to assume that you understood what I was asking.

Is that fair?

A I get it. That's fair.

Q Okay. If at any point you need a break, please let me know. This is -- I'm not interested in people feeling uncomfortable. We can jump back on quickly. So if you need to use the restroom or need to grab a bite, just let me know and we'll take a break at an appropriate stopping point.

Okay?

A That sounds fair.

Q And that being said, from a scheduling standpoint, I know you're on the West Coast. I am in Mountain Time, and there's counsel for the defendant that's on East Coast time. I'm not sure who has eaten and who hasn't eaten, so it's 10:00 my time, 9:00 your time. I'm thinking that probably around noon your time, 1:00 my time, is when I might take a slightly longer

break to allow everyone to get a bite to eat. So if that helps with your planning, I just want to let everyone know that.

MR. ROHNER: And I know, Josh, that puts you back late. I hope you maybe already had a bite.

MR. BROWN: If needed, I have a granola bar.

MR. ROHNER: Got it. Perfect.

BY MR. ROHNER:

Q All right. Great. So let's get started. Mr. Buss, you've been, as I understand it, retained by Greenberg Traurig to provide expert opinions in this case; is that correct?

A Yes.

Q And tell me: What is your understanding of the expertise that you are applying to give your opinions in this case?

A You know, my professional experience and expertise in business and financial analysis and applying financial analysis and business analysis to the analysis and calculation of economic damages.

Q Are you an expert in marketing?

A No.

Q Are you an expert in advertising?

A No.

Q Do you have any expertise in calculating the

cost of a corrective advertising campaign?

A I have reviewed corrective -- I think the term you used was corrective advertising campaigns. I have reviewed those calculations in the past when they are presented as economic damages calculations.

Q Okay. You mentioned you've done that in the past. Describe for me your past experiences with reviewing calculations of cost associated with corrective advertising campaigns.

A Well, there's situations somewhat similar to this case where I was asked to review such a calculation and provide opinions about that calculation's reasonableness as well as accuracy and also that calculation's reasonableness as a measure of economic damages.

Q Okay. And was that in a litigation?

A Yes.

Q What was the name of the litigation?

A You know, I would have to take a look at my CV. I don't remember one specific case name offhand.

Q Was there more than one case where you've done that?

A Yes. It's happened several times over the years.

Q How many cases can you remember where you've

given that type of opinion?
A You know, a ballpark of three or so.
Q Three. Okay.
Of the three that you think you've dealt with, what do you remember factually about any of the cases? We'll start with the first one that you can --
MR. BROWN: I'm going to object to form. Misstates the witness' testimony.
You can answer.
THE WITNESS: So I believe you asked me what I remember about the fact -- the factual circumstances of the cases that I referenced.
BY MR. ROHNER:
Q Well, actually, let me take a step back. Sitting here today, do you remember any of the names of any of the parties for those three cases?
MR. BROWN: Object to form.
THE WITNESS: Sorry. I don't at the time -- at the moment. I would have to review my -- my, you know, case list and practice history to dig -- to recall those names.
BY MR. ROHNER:
Q Okay. Do you remember any of the jurisdictions where these cases took place?
A No.

Q Do you remember whether you were providing testimony on behalf of the plaintiff or the defendant?
A Not off the top of my head.
Q And that leads me to the question I had asked before. Do you -- what do you remember, if anything, about the factual allegations in any of those cases?
MR. BROWN: Object to form.
THE WITNESS: You know, based on recollection, they all involved some claims of trademark infringement or confusion. You know, they were, as I suspect but I'm starting to get into the realm of guessing and I don't want to do that, that they were Lanham Act claims.
Yeah. That's what I remember at the moment.
BY MR. ROHNER:
Q Okay. Did any of the cases involve allegations of deceptive sales practices?
MR. BROWN: Object to form.
THE WITNESS: Yeah, I don't recall.
BY MR. ROHNER:
Q Did any of the cases involve door-to-door sales?
MR. BROWN: Object to form.
THE WITNESS: I don't recall.
BY MR. ROHNER:
Q Do you recall ever being used as an expert

witness in a case that involved door-to-door sales?
A Not off the top of my head, but that doesn't mean a no.
Q Have you had any training in corrective advertising campaigns?
MR. BROWN: Object to form.
THE WITNESS: No.
BY MR. ROHNER:
Q Have you done any research related to corrective advertising?
A Yes.
Q Describe -- well, let me actually add a more specific.
Besides your work as an expert witness reviewing materials associated with a specific litigation, have you done any research related to corrective advertising?
A Well, I'm not exactly sure if I understood your question correctly. I have done research and I have only seen a corrective advertising calculation in the context of a dispute or litigation. And in reviewing those calculations and in, you know, my professional study and research as an economic damages expert, I have, you know, reviewed some case law and precedent and calculations for -- of corrective

advertising remedies from cases that were outside the scope of the cases I've worked on personally.
And I have, you know, reviewed the available literature on damages calculations and in addressing your question specifically about where the literature covers corrective advertising as an economic damages remedy.
Q Other than reviewing legal case law and precedent and literature related to economic damages, any other research that you've done personally that's relevant to corrective advertising?
A That's what comes to mind at the moment.
Q Is there anything that would refresh your recollection about additional research you've done?
A I can't think of anything right now.
Q We were talking before about what cases you may have worked on that involved the issue of corrective advertising. I'm going to share, if I can remember how to do it here, our Exhibit 1 which is your report. And you may recall that your report included a list of cases in which you've provided testimony at trial or in deposition. And I'm going to pull that up and show that to you. I believe we also emailed to opposing counsel Exhibit 1 and Exhibit 2 which is your report and Dr. Winer's report.

Did you receive those?
A I did.
Q Okay.
(Exhibit 1 and Exhibit 2 were marked for identification.)
BY MR. ROHNER:
Q Sorry. I'm just trying to get my computer working here.
A No. That's the fun of Zoom depositions.
MR. ROHNER: Let's just go off the record real quick because I've run into a snag.
THE VIDEOGRAPHER: We're going off the record. The time is 9:17 a.m.
(Off the record.)
THE VIDEOGRAPHER: We are going on the record. The time is 9:23 a.m.
BY MR. ROHNER:
Q Okay. Mr. Buss, while we were on the break, I pulled up your -- what I believe to be your expert report that you filed on August 16, 2021, in this case, and we've marked it as Exhibit 1 for your deposition.
Do you recognize -- I have the cover page showing right now. Do you recognize that?
A It looks like the cover page of my expert report, yes.

Q And by any chance, do you have a hard copy of the report with you as well?
A I can get one.
Q Well, probably for now, we're fine. I think at some point as we go through the report, some witnesses have found that particularly in these expert depositions, they found it easier to have their hard copy with them rather than relying on me to scroll back and forth to show them spots in the deposition and so I think that probably would make sense and I apologize for not confirming that earlier. I just thought of that.
A That's all right.
Q But why don't we -- I'm going to scroll for you to -- attached to your exhibit was essentially a listing of your background and experiences that included a list of cases.
Do you recall that?
A Yes.
Q And going back, I had asked you questions specifically about cases that you've testified in where the issue of corrective advertising was something you opined about, and you could not recall the names of those cases. So if you would, could you look through the listing that you have attached to your report and tell me if by reviewing that, it refreshes your

recollection as to the cases where you testified regarding corrective advertising. And what I'll do is once you've gone through a page, just let me know, and then I'll scroll to the next page.
A I mean --
MR. BROWN: Hold on, Brian. Hold on, Brian.
THE WITNESS: Go ahead.
MR. BROWN: Object to form. Mischaracterizes the witness' testimony. Go ahead, Brian.
THE WITNESS: Thank you, Josh.
This report was -- I have submitted an additional expert report since the date I submitted this report, and the additional report is in a case similar to this one. It's a case, ADT versus Vivint, and that case involved a review of a corrective advertising calculation. So it wouldn't be on this page because I hadn't submitted that report at the time I submitted this report.
BY MR. ROHNER:
Q So one of the cases you were -- when you talk about the three cases earlier in your testimony, one of those cases was ADT versus Vivint?
A You know, I hadn't --
MR. BROWN: Brian.
Object to form. Object to form.

Mischaracterizes the witness's testimony.
Go ahead.
THE WITNESS: Got to remember to pause for you there. Sorry.
Yeah. You know, unfortunately, it had just slipped my mind at the time but, you know, now looking at this, that one jumped back into my memory as the case is ADT versus Vivint.
BY MR. ROHNER:
Q Okay. And that's a report that you've submitted after the report that you've submitted in this case; correct?
A Yes.
Q Okay. So you do believe there have been other cases besides ADT versus Vivint where you've provided testimony related to corrective advertising?
A Yes.
Q Okay. And so, again, looking at the -- your listing of cases that are attached to your report in this case, I'd like you to look through it. I'll scroll for you unless you have a copy that's easier for you to review, and then I would like you to let me know if you can identify the cases that you were referring to.
A Yeah. There's -- none of the cases on this first page involve the corrective advertising, so let's

go to the next page.
Q Okay. Here's the next page. Oops. If I can get it right.
A Can you scroll up a little?
Q Yeah. Hold on.
A We're all struggling with the technology at the same time.
Q There you go. There's page 2.
A The case that is the fourth one from the top, Universal Life Church versus American Marriage Ministries, one of the proposed measures of economic damages was a corrective advertising calculation.
Q Okay.
A That's it for the cases -- well, sorry. The one at the bottom, Stockdale, Stockdale versus Stockdale, one of the proposed remedies was a corrective advertising.
Q Okay.
A The Mission Healthcare, one of the proposed remedies was a corrective advertising calculation. And the same for the Eagle Rock Resort case.
Q Anything else on that page?
A No.
Q Okay. Just scroll down to page 28.
A The Solar Sun Rings, I recall I had a

corrective advertising calculation, but as you can tell by the date, that's over five years ago, and it -- I really couldn't tell you for sure without digging up that file.
Q Okay. Anything else on that page?
A No.
Q Page 29?
A Yeah. I don't believe a corrective advertising calculation was an element of any of these cases.
Q Okay. And scrolling to the top of page 30.
A Yeah. Those three cases listed on this page would not have involved a corrective advertising calculation.
Q So I'm going to scroll back, and why don't we -- I'm going to ask you some questions starting with the most recent that you mentioned. Well, actually, probably the second most recent. You mentioned the Vivint and ADT case which is going on now; right?
A Yes.
Q Okay.
A It's my understanding it is still a live case.
Q Yeah. And so the first case you mentioned after that was Uniform Life Church. Let me just find that one.

MR. BROWN: It's on page 26, if that helps.
BY MR. ROHNER:
Q That does help.
A There you go. You got it.
Q There we go. Got it. Okay.
So that's Universal Life Church Monastery Storehouse versus American Marriage Ministries. It's a 2019 case in the District of Washington; is that right?
A I think you said 2019, but the date there is 2020.
Q Yeah. Well, yeah. I guess the case caption is 2019.
A Oh, okay.
Q And it sounds like maybe your testimony was in 2020. Is that --
A That's probably correct.
Q Okay. Well, tell me about this case. What -- what were the -- in your view, what were the key facts at issue in terms of the allegations that required discussion of corrective advertising?
MR. BROWN: Object to form.
THE WITNESS: Well, as far as I know, the case is still a live case, so I want to be a little careful in how I answer just in case there's anything that's subject to confidentiality. So let me think of how

to --
BY MR. ROHNER:
Q Well, let me ask you a slightly different question, then, that hopefully will not create that risk.
What's your understanding of what the allegations in the Complaint were in Universal Life Church Monastery Storehouse versus American Marriage Ministries?
A So as I recall, the allegations related to defamation and trademark infringement. The plaintiff accused the defendant and the defendant counterclaimed that the parties' trade names and trademarks were being used in online advertising.
Q And which party was seeking corrective advertising damages?
A The plaintiff.
Q And were you hired on behalf of the plaintiff or the defendant?
A The defendant.
Q Okay. In Universal Life, were there any allegations of deceptive sales practices?
A I don't recall.
Q In Universal Life, were there any allegations related to door-to-door sales?

Page 22

A No.
Q If you know, have any -- has any testimony or opinions related to corrective advertising been excluded by the Court in Universal Life?
A I don't know one way or the other.
Q And what was the form of corrective advertising that was being asked for as a remedy in Universal Life?
A Stretching my recollection here. Don't hold me to this, but I think it involved an email campaign and search -- Google ads campaign, search -- internet search ads.
Q And was it your opinion that the campaign being requested was unreasonable in that case?
A In that case, I -- it didn't -- it hasn't progressed to the point where I have formalized an opinion on damages at this point.
Q Okay. It's not a case where you submitted a report yet?
A Correct. I was deposed, but I didn't submit a report.
Q Okay. And in your deposition, you did not express an opinion as to the reasonableness of the request for corrective advertising?
A That's correct.

Page 23

Q Did the other side, did the plaintiff, submit an expert report supporting a claim for corrective advertising?
A I don't recall.
Q The next case you mentioned was Stockdale. I believe that was on the same page.
A Yeah. It's at the bottom.
Q Yeah. It's at the bottom there. Okay. Stockdale Investment Group versus Stockdale Capital Partners. You testified in 2019. What can you tell me factually about that case?
A The plaintiff claimed trademark infringement and confusion. The case involved two real estate companies.
Q Were there any allegations of deceptive sales practices?
A I don't recall one way or the other.
Q Were there any allegations related to door-to-door sales?
A No.
Q Who -- was it the plaintiff seeking corrective advertising damages?
A Yes.
Q And did you provide an opinion as to the appropriateness or reasonableness of the requested

Page 24

corrective advertising damages?
A I guess that was an element of my opinion, yes.
Q Okay. And what was your opinion with respect to whether corrective advertising damages were appropriate or reasonable in that case?
A Going off memory, so it may not be completely accurate, but as I recall, my opinion involved something like, you know, the plaintiff was not able to establish any confusion and therefore is not able to establish any harm and that, therefore, any mechanism of economic damages was unnecessary.
Q Did you give an opinion in that case as to whether or not there was actual confusion?
A Yes.
Q And what was your opinion with respect to whether or not there was actual confusion?
A You know, like I just said, the plaintiff was unable to establish any confusion.
Q It says you provided deposition testimony and an expert report. Has that case gone to trial yet?
A Yes. It did go to trial.
Q Okay. Did you testify at trial?
A No.
Q Was any aspect of your opinion that was

Page 25

expressed either in your report or in your deposition testimony excluded by the Court?
A No.
Q Do you know if at trial, evidence was presented related to corrective advertising?
A No.
Q Do you know if the Court excluded in that case any evidence or opinion testimony related to corrective advertising?
A I do not know.
Q Okay. Was there a reason you didn't testify at trial?
A Yes.
Q What was the reason?
A The plaintiff dropped the case after presenting their evidence, so the defendant never called witnesses.
Q Got it.
A There's probably a more legal way to say that, but that's what it sounded like to me.
Q Okay. The next case you mentioned was Mission Healthcare. Let me see if I can find that one. Yeah, there it is. On page 27, do you see that? It's Mission Healthcare Services versus Bridge Home Health & Hospice.
A Yes.

Page 26

Q This is a 2018 case. Let's see. Okay.
What can you tell me factually about the Mission Healthcare Service case?
A Well, as I recall, it was a case involving two home health service providers where employees of the plaintiff left and started a competing company which led to a lawsuit for whatever reason. There was -- obviously, I was engaged by the plaintiff. I don't know if that's obvious. I've underlined the party who engaged me in each of these cases.
Q I just started to figure that out. I appreciate it.
A Sometimes people ask about that, so I just want to -- let's see. Yeah. So plaintiff engaged me to calculate damages. You know, under a number of damages theories. One of the theories I considered in conducting my analysis was a corrective advertising calculation, but I did not present that as one of my opinions. And I believe the Bridge Home Health filed a counterclaim and did seek corrective advertising, but the case did not progress to the point where I offered an opinion. I had started to do the analysis reviewing that calculation, but then they resolved the case.
Q Got it.
The next case you mentioned was Eagle Rock

Page 27

Resort. Let me find that one. Oh, there. It's on the same page. Eagle Rock Resort versus Janet Carlin.
In Eagle Rock, you also represented the plaintiff again; is that right?
A Yes.
Q Okay. What can you tell me factually were the allegations in Eagle Rock Resort?
A That was, as I recall and from the notes on this page, that was primarily a disparagement and defamation case. The plaintiff owned a resort property, and some of the residents at the resort property were, well, posting allegedly untrue statements about the resort.
Q Your CV says that you prepared a report regarding the impact of the disparaging and defamatory statements and economic damages in that case. Did your report include any assessment or description of potential corrective advertising damages?
A As I recall, my report proposed a corrective advertising remedy or outlined how it could be done, but I lacked the data at the time my report was submitted to do an actual calculation.
Q When you say you lacked the data to do a calculation, are you referring to do a calculation regarding what the corrective advertising would actually

Page 28

cost?
A Correct.
Q Okay. Was it your opinion in that Eagle Rock Resort case that corrective advertising would be an appropriate measure of damages?
A I think the opinion, as I recall, had -- were to do with that it could rather than it would -- that it -- you know, without being able to finalize the calculation, I couldn't offer a final opinion that it was an appropriate remedy.
Q Well, let me ask you this: So you mentioned that it could have -- I think you testified that your opinion was that it could be an appropriate remedy but you were unable to put a dollar value on that remedy would be.
Is that fair?
MR. BROWN: Object to form.
THE WITNESS: Yeah. More or less, I think that's kind of what I said.
BY MR. ROHNER:
Q Okay. Did you give any -- well, take a step back.
Did that case involve any issues with customer confusion?
A Not that I recall, no.

Page 29

Q Okay. You described it as being -- as folks -- that there was allegations that people had placed defamatory and disparaging information out to the public?
A Yes.
Q And the corrective advertising that you proposed was designed to remedy the -- what was alleged to be the false and disparaging information?
A Yes.
Q And in that case, was it your opinion that taking action to remedy false information could be an appropriate measure of damages in that type of case?
A Yes.
Q What was -- what was the information that you were missing in the Eagle Rock Resort case that prevented you from calculating what it would cost to perform the corrective advertising campaign?
A Well, as I recall, the defendant was, I guess, either unwilling or unable to provide information and data about the reach of the comments that they had made. And by "reach," I mean how many people the messages had been sent to and how many people had seen or read the messages.
Q Did your opinion identify alternatives to corrective advertising damages that were necessitated by

Page 30

the lack of information regarding, as you described it, the reach of the disparaging comments?
MR. BROWN: Object to form.
THE WITNESS: Yeah. As I recall, I also provided an economic damages calculation based on plaintiff's lost profits.
BY MR. ROHNER:
Q Now, had you had the information related to -- that you say you needed to do a calculation of what it would have cost for corrective marketing, in your opinion, would the plaintiff in that case have been entitled to both measures of damages?
MR. BROWN: Object to form. Improper hypothetical. You can answer, if you can answer.
THE WITNESS: You know, I don't recall if I suggested an additive or two alternative calculations because the analysis was somewhat incomplete due to limited information and I didn't have the ability to reconcile or compare two different measures, but, you know, even in that particular case, you know, if the two measures represented some amount of windfall for the plaintiff, you know, I would have definitely had the opinion that, you know, these are two alternative measures to correct the harm. But because I couldn't complete the math, so to speak, I don't think my opinion

Page 31

got that far where I was reconciling two different measures.
BY MR. ROHNER:
Q And, again, the math you're referring to was the math required for you to determine how much it would cost to perform the corrective advertising campaign to remedy the allegedly false and disparaging comments; correct?
MR. BROWN: Object to form. Misstates testimony.
THE WITNESS: Sorry, Josh.
I believe the answer to your question is yes.
BY MR. ROHNER:
Q In that case, did you identify any other basis for concluding that correct -- other than the lack of data to calculate the cost, was there any other basis for not seeking corrective advertising damages?
MR. BROWN: Object to form.
THE WITNESS: Yeah. A little hard to answer your question. I guess, I mean, it wasn't my opinion of what type of damages they should be seeking. I was there to provide a quantitative measure of economic damages, and I approached that task by exploring different damages calculation methodologies.
///

Page 32

BY MR. ROHNER:
Q And you understand one accepted damages calculation methodology is corrective advertising?
A Yeah. Well, I guess, let me phrase it this way: I mean, I understand that corrective advertising is an accepted measure of damages or has been an accepted measure of damages in some cases.
Q Okay. This case was -- we were just referring to, the Eagle Rock Resort case, was a defamation and disparagement case; correct?
A Yes.
Q And you also understand that corrective advertising has been considered an accepted measure of damages in Lanham Act cases; correct?
A Yes.
Q Okay. And I appreciate that as we go deeper in this list, we may be getting farther and farther away from your ability to recall, but I'm still going to point your attention to the last case you mentioned which was the Sun -- Solar Sun Rings. And I saw that that's, what, five years ago, but let's see what you remember about that.
Solar Sun Rings, Inc. versus Secard Pools, et al. You were representing the plaintiff in that case; correct?

Page 33

A Yes.
Q And that was a Lanham Act case; right?
A Yes.
Q What do you remember about the factual allegations in Solar Sun Rings?
A That the case involved use of trademark and trade names on these plastic inflatable devices that you'd put on top of your pool to keep the heat in your pool.
Q And the plaintiff was alleging that the defendant was infringing on those trademarks and trade names?
A Yes.
Q Were there any allegations of deceptive sales practices?
A I can't recall.
Q Were there any allegations related to door-to-door sales?
A No.
Q I believe your CV indicates that you provided expert testimony and an expert report; is that right?
A Yes.
Q Okay. What do you remember about your opinion in that case as it relates to corrective advertising?
A I remember it was one of the remedies I

Page 34

considered as a measure of economic damages. I don't recall if I developed the calculation or provided an explanation why it was not a reasonable measure for that case, but I do recall that my damages opinion, I guess, focused on plaintiff's lost profits rather than alternative measures of damages.

Q But sitting here today, you don't know whether you offered an opinion as to whether corrective marketing was a reasonable or appropriate measure of damages in that case?

A No. I mean, like I just said, as I recall, I think I opined that it was not a reasonable measure.

Q Okay. And you believe that was included in your report?

A I think so, but it's been a while.

Q Yeah. And do you have any recollection as to whether you testified at your deposition regarding corrective advertising?

A Yeah, I don't remember the deposition testimony.

Q Did you testify at trial in that case?

A There was no trial in that case, as far as I recall.

Q Sitting here today, do you recall any case where you provided an opinion that corrective marketing

Page 35

damages was an appropriate and reasonable measure of damages in a case?

MR. BROWN: Let me just interject. Dan, you're using the term "corrective marketing" now. Before you were using "corrective advertising." Is there a distinction there?

MR. ROHNER: I didn't intend there to be one, so why don't I ask the question again because you're right. I've been saying "advertising."

BY MR. ROHNER:

Q First off, let me ask a prefatory question just to clear up my mistake. Apparently, I said both "corrective advertising" and "corrective marketing." Based on your experience, do you understand that there's any distinction between those two terms or concepts?

A I'm not aware of any distinction. You know, to be honest, I haven't heard the term "corrective marketing." I typically see or hear the term "corrective advertising." But, you know, I probably overstepped and just assumed you meant the same concept.

Q Right. Well, I did, but let me ask the question again so the record's clear.

Sitting here today, are you aware of any case where you have been of the -- any case where you've been an expert where you were of the opinion that corrective

Page 36

advertising damages were appropriate and reasonable?

A I cannot. In the cases that we've discussed, it was a methodology I considered, but to my recollection, you know, other measures of damages were more appropriate in those cases that we discussed.

Q Have you written any articles related to corrective advertising damages?

A I don't think so.

Q Have you made any presentations related to corrective advertise -- outside of your testimony as an expert, have you made any presentations related to corrective advertising?

A I mean, it's a topic that has been an element of presentations I've given about trademark and defamation damages, but it has not been the sole topic of any presentation I recall giving.

Q Okay. There's -- on page -- there's a listing starting on page 30 of your report of publications and presentations. I'd like you, if you would, to look down those listings and see if you can identify any of those publications or presentations where corrective advertising was a portion of either the publication or the presentation. And I can scroll down as needed.

A I mean, again, it's never the primary topic of the conversations or the presentations, but on the page

Page 37

you have, there was two -- two presentations in 2019, "Internet Tools for Intellectual Property Analysis," and "Investigating Online IP Infringement and Calculating Damages." I mean, those presentations would have at least in a cursory way mentioned corrective advertising as a mechanism for calculating damages.

Q Do you know for either of those presentations whether there were materials that are available that would show the aspect of the presentation that related to corrective advertising?

A Do I know if they're available? I'd have -- I'd have to look.

Q Do you have materials reflecting the presentation -- those two presentations that you just identified?

A They're probably on our company's -- in our company's files.

Q Okay. If you want to scroll down or I can scroll down here. That's where we left off. Do you see any publications or presentations where the issue of corrective --

A You know, I don't recall if it was or was not, but based on the topic, the second one from the top with the "Employing Internet and Social Media Analytical Tools in Valuation and Damages," you know, without

Page 38

specific recollection, the nature of that topic can cover corrective advertising.
Q And sitting here today, do you have a specific recollection that it did?
A A fifty-fifty recollection. So it likely did, I guess.
Q All right. I'm going to scroll down. Okay. Just three more on the last page.
A Yeah. None of those ones. And those were a pretty long time ago.
Q Okay. I wanted to go back to the case we were talking about, the prior case where you didn't have the inputs, the data necessary to compute what the cost would be and that -- you said that related to the reach of the disparaging or defamatory comments.
Do you recall that?
A Yes.
MR. BROWN: Object to form.
BY MR. ROHNER:
Q Besides the data related to the reach, was there anything else you were missing that would have allowed you to calculate the cost of corrective advertising in that case?
A Not that I recall, no.
Q Thanks for going through all that with me,

Page 39

Mr. Buss. I know that it's a lot of old cases.
So I wanted to go back using -- since we have your report open, I want to talk a little bit about your education and the certifications that you list here.
I believe you should have in front of you page 30 of your report which reflects your education, certification, background, and your employment experience.
Do you see that?
A I do see that.
MR. BROWN: Let me just object to form. This is -- you kind of have a habit, Dan, of saying what the document says, and then it's not clear whether you're asking him to verify that or not or whether you're going to ask him a question about it. But I just want to point that out. If you want him to verify what's on the page, then ask him that. But your statement of what's on the page is not testimony.
MR. ROHNER: Understood. I was just making sure we're looking at the same page, Josh.
MR. BROWN: Okay. That's great.
MR. ROHNER: I'm sure if I say something incorrect about his education, he will let me know.
BY MR. ROHNER:
Q Do you see on page 30 where it says "Education

Page 40

and Certification"?
A I do.
Q Okay. This reflects -- it references Claremont McKenna College, bachelor of arts in biology and economics, 1993.
Do you see that?
A Yes.
Q Did you, while at Claremont McKenna, take any classes in marketing or advertising?
A You know, that's almost 30 years ago. I recall a marketing class, yes.
Q And then you went and got -- looks like you got your MBA in 2011; is that right?
A That's correct.
Q What was -- did you have a focus or a -- or a specialty as part of your receiving your master's in business administration?
A No.
Q Did you take any marketing classes for your MBA?
A Yes.
Q What marketing classes did you take?
A You know, I don't remember the exact titles, but there was definitely several courses in, you know, marketing management, branding, advertising,

Page 41

entrepreneurship which includes a lot of marketing and promotion.
Q Did you take any classes specific to advertising?
A You know, one of the professors, as I recall, was kind of a published specialist in advertising and branding, so there was definitely an emphasis on, I guess you could call it "advertising management," you know, the measuring and metrics of advertising effectiveness.
Q Have you ever taught any classes on -- related to marketing?
A No.
Q Have you ever taught any classes related to advertising?
A No.
Q Have you ever written any articles specific to marketing?
A No.
Q Have you ever written any articles specific to advertising?
A No.
Q Prior to this case and I believe you mentioned that there's a case that you're involved in between ADT and Vivint, do you have any experience with the home

Page 42

security industry?
A Not that I recall.
Q Prior to this case and the case where you're representing Vivint with ADT, did you have any experiences with or interactions with Vivint?
A No.
Q Okay. I'm going to direct your attention to -- I'm going to scroll in the report here, but it's the last couple pages of your actual report as opposed to the -- well, actually, let me take a step back. I'm going to ask you some general questions about how your report is structured and how -- so I make sure I understand the different sections in it, Mr. Buss.
You may recall that there are a number of headings with subheadings that reference summaries and then -- and then heading at the end that's called "Opinions." So the first thing I'm going to ask you about is these last two pages, page 21 and 22. So I'm putting it up -- hopefully you can see that. On your screen, do you see the heading that says "Opinions"?
A I do, yes.
Q And all the way down to your signature?
A Yes.
Q Okay. First question is: Is that your signature on page 22 of the report?

Page 43

A Yes.
Q Okay. And also, just to kind of go back and confirm, the report that we've been looking at with my share screen and the report that was emailed to you, both of which are marked as Exhibit 1, is that in fact a true and correct copy of your report that you issued in this case?
A Well, from the pages I've seen, I believe it is, yes.
Q So directing your attention to this -- these last two pages where the heading says "Opinions," below that are five bullet points.
Do you see that?
A I do.
Q Okay. Other than these listed bullet points, do you have any other opinions that you intend to offer in support of CPI's defenses in this case?
MR. BROWN: Object to form. And I think you mean Vivint.
MR. ROHNER: Sorry. Yes. Let me restate that.
BY MR. ROHNER:
Q Other than the five bullet points on page 21 and 22, do you have any other opinions you intend to offer in support of Vivint's defenses in this case?

Page 44

MR. BROWN: Object to form.
THE WITNESS: You know, at this point, those are the result of my review of the information and documents I've seen, so, you know, those would at least form the crux of any opinions I would offer. I might in the future, obviously, be asked to review additional information or, you know, build on these opinions or provide other opinions.
BY MR. ROHNER:
Q Leaving aside what you might do in the future, based on additional information, sitting here today, are you aware of any other opinions you intend to offer in this case?
MR. BROWN: Object to form.
THE WITNESS: Go ahead. Sorry. Was someone saying something?
MR. BROWN: I just said, "Object to form." Go ahead.
THE WITNESS: Nothing comes to mind at the moment.
BY MR. ROHNER:
Q Okay. Why don't we -- I want to start with this first bullet point, make sure I understand it.
You state "Neither the Winer report nor the Mangum report provides either a measurement or

Page 45

calculation of actual harm suffered by CPI, or a measurement or calculation of additional benefits achieved by the defendants."
So my first question as to that, what I just read to you, is that your opinion or is that an observation of those two reports?
MR. BROWN: Object to form.
THE WITNESS: I mean, I guess that's a terminology thing. I mean, that is -- that is my observation for those two reports, and that observation forms the basis for the opinion that is stated in the full text of that bullet.
BY MR. ROHNER:
Q Okay.
A I guess and informs other analyses and opinions in this report.
Q Can the costs of corrective advertising be a measure of actual harm suffered by a party in a case?
A Well, the very nature of the calculation is more of a remedy intended to repair the harm as opposed to a measure of the actual harm. I think it can be a -- you know, it can be a reasonable amount that is equivalent to the harm because damages as a remedy -- economic damages as a remedy is intended to repair the harm. And if the circumstances support using corrective

advertising to repair the harm, then it can be not necessarily a measurement of the actual harm but a measure of a remedy to repair the harm.

Q I want to make sure I understand that. Explain to me, based on your understanding, what the difference is between actual harm versus what it would cost to repair harm.

A Well, you know, what comes to mind is that measuring actual harm is a bit backward-looking or it is backward-looking. You're measuring an impact of something that has happened in the past. Now, there are circumstances where the actual harm could be expected to continue into the future, but that's an element of the damages calculation as opposed to a measure or calculation of the actual harm that has occurred.

And corrective advertising is the calculation of the cost that would be required to do something in the future; right? The concept of the calculation is what it would cost today or in the near future to address the harm.

Q Why isn't the costs that would be needed to correct the harm not also a measure of the underlying harm?

A Well, I think I just explained that. I mean, you're looking at things from a different time period.

Q So if a -- as an example, in this case, we're dealing with alleged brand damage; correct?

A I'm not sure.

Q Okay. There are allegations that the plaintiff has made that their brand has been damaged by conduct by Vivint; correct?

A Yeah. As I recall, that sounds like some of the allegations that I saw in the Complaint.

Q Okay. You have reviewed the Complaint; correct?

A Yes.

Q And you factored in the allegations of wrongdoing by Vivint in the analysis that you did for your expert report; correct?

MR. BROWN: Object to form.

THE WITNESS: Yes. I mean, that is one of the documents I considered.

BY MR. ROHNER:

Q Okay. If a brand has been damaged, isn't it true that the cost to repair that damage can be a proper measure of damages to remedy the harm?

A Yeah. I guess, you know -- let me -- I guess we've got a little bit of a terminology thing and you're using terms that I might use differently. So the corrective advertising remedy is intended to repair the

harm or return the harmed party to the same position they were before the harm. So the numerical amount that is the result of the calculation can be equivalent to the actual harm that was suffered, but it isn't necessarily a direct measure of the harm suffered. It's a remedy -- it's the calculation, you know, of the time, effort, and expense to return the plaintiff to their original position or not necessarily the plaintiff but the alleging party, whoever it is.

Q Well, let me ask you this: Aren't all damages designed to return the harmed party to the position they would have been in but for the conduct of the defendant?

A Yeah. That's my understanding of the purpose or the context of an economic damages calculation.

Q Okay. And isn't it true that corrective advertising damages are designed to return the party to the position they would have been but for the wrongful conduct of the defendant?

A Yeah. I agree with that more or less.

Q So I'm trying, then, to understand what you view as the difference between providing money damages for corrective advertising to return a party to the position they would have been but for the wrongful conduct, versus some other payment in the form of damages that is designed to return the party to the same

position they would have been but for the wrongful conduct.

What's the difference?

A Well, so the opinion I'm offering here is that there has not -- I have not seen in this case anyone provide a measure of how or when CPI was harmed. Now, there is a calculation of corrective advertising that appears to presume that there's been some harm, but there's been no measure of lost customers or lost revenue or lost profits suffered by CPI.

Q So one measure of harm could be proof of lost profits; correct?

A Yes.

Q And one measure of harm could be -- well, let me take a step back.

One measure of harm could be the cost for corrective advertising to put the harmed party in the position they would have been but for the wrongful conduct; isn't that right?

A I mean, I don't disagree with you, but I think we're kind of mixing terms up here. So my observation is that neither the Winer report nor the Mangum report have made an effort or provided an analysis that indicates how and when CPI was harmed.

Now, the Winer report proposes a corrective

advertising calculation in an attempt to repair a harm that hasn't been established or quantified.

Q Let's break that down a little bit. So you understand that the jury will make the determination as to whether or not CPI has been harmed; isn't that right?

MR. BROWN: Object to form.

THE WITNESS: Yes.

BY MR. ROHNER:

Q And if the jury determines that CPI was harmed, isn't it true that corrective advertising is one of many acceptable methods to calculate the value of that harm?

MR. BROWN: Object to form.

THE WITNESS: Yeah, I don't disagree with you in theory. I think you've stated the rules and the purpose of the calculation correctly.

BY MR. ROHNER:

Q So is it your testimony that in order to present an opinion in support of corrective advertising, that there must first be a determination of liability by the jury?

A Well, yeah. I mean, I guess if the jury finds that the defendant is not liable, then there would be no need for any form of a damages calculation.

Q Correct.

And if the jury determines that the defendant is liable, then the question becomes: Is corrective advertising an appropriate measure of those damages; isn't that right?

A That sounds fair. Yeah. The jury can decide if corrective advertising is an appropriate remedy.

Q So if the jury in this case decides that CPI's brand was harmed by wrongful conduct by Vivint, can corrective advertising be an appropriate remedy?

MR. BROWN: Object to form.

THE WITNESS: It can, yes.

BY MR. ROHNER:

Q Okay. If the jury finds that CPI was harmed by the conduct of Vivint, is it your opinion that corrective advertising is not an appropriate remedy in this case?

MR. BROWN: Object to form.

THE WITNESS: I don't think I've written that in my report. I think what I've said is the corrective advertising as presented in the Winer report would not be a reasonable remedy in this case.

BY MR. ROHNER:

Q Okay. So as I'm -- we were talking about this first bullet point. I want to make sure I understand your position.

First, you're of the opinion that there's not information in the reports of Mr. Mangum and Mr. Winer to support, in your view, a determination of liability; correct?

MR. BROWN: Object to form. Mischaracterizes witness's testimony.

THE WITNESS: Yeah. I don't see in the Winer report or the Mangum report a measurement of actual harm, so I'm not -- from those two documents, it's unclear that the plaintiff has established that there was a harm. And so as the -- as written in my report there, it says "therefore a calculation of actual damages may be unnecessary."

BY MR. ROHNER:

Q Right. But that -- that last opinion that a calculation of actual damages may be unnecessary is dependent upon, ultimately, whether the jury determines that CPI -- whether CPI was harmed by the conduct of Vivint; isn't that right?

MR. BROWN: Object to form.

THE WITNESS: Sure. Yeah. My opinion is limited to, "Hey, I don't see it in those two reports."

BY MR. ROHNER:

Q Got it. Do you know if Mr. Winer was asked to opine on the liability of Vivint?

A I don't know.

MR. BROWN: Object to form.

THE WITNESS: I don't know what he was asked. I mean, I don't know what he was asked to do, but, you know, as I recall, there's a statement describing his assignment in his report.

BY MR. ROHNER:

Q And is your opinion in this first bullet point dependent upon the jury making the determination that in fact Vivint is not liable?

MR. BROWN: Object to form.

THE WITNESS: I don't -- I think that's not what this opinion is about. I mean, this opinion is that, that -- those calculations are not in either report and unless there's some other evidence available to show the harm, then a calculation of actual damages may be unnecessary.

BY MR. ROHNER:

Q So is it your opinion that in order to -- in order for corrective advertising to be reasonable, a plaintiff must also prove lost profits?

A I don't think I've said that or implied that. But that's also kind of outside -- we're still talking about just this first bullet point here; right?

Q Correct.

Page 54

A Okay.
Q What I'm trying to drill down on is your understanding of what a measurement or calculation of actual harm is and when we -- when I asked you questions and we were drilling down in terms of corrective advertising damages versus an actual harm calculation, you seemed to draw a distinction between those two things. There's a difference between actual harm and corrective advertising.
Is that your view?
A Yes.
MR. BROWN: Object to form.
THE WITNESS: I would say yes.
BY MR. ROHNER:
Q So --
A That's what I've said previously, yeah.
Q So it's your opinion that corrective advertising is not a measure of actual harm?
A Yeah. You know, the way I typically see corrective advertising calculated is a calculation of the cost to do something in the near future as opposed to a calculation of actual harm which would be something more like, you know, a measurement or analysis that shows a decline in financial performance or a measurement that shows a change in the value of an

Page 55

asset.
Q But notwithstanding that distinction, you do agree that the purpose of corrective advertising damages is to place the damaged party in the same position they would have been but for the wrongful conduct; correct?
A Yeah. I mean, obviously, if the corrective advertising calculation presented a number that was far greater than the harm suffered, it would be an unreasonable measure of damages.
Q If a party's brand is damaged, is it fair for them to expect to be put in the position where they're -- the damage to their brand, the harm, is remedied through the damages?
A Just struggling with how you said that question. But yeah, I mean the basic purposes of economic damages is to repair the harm suffered by the claiming party.
Q Okay. So I want to make sure I understand. Is it your position that there are times when the cost to repair the harm is too expensive to actually repair?
A I don't think I said that, no.
Q Okay. So is it your position that the cost to repair the harm can be unreasonable?
A I think it would be my position that a calculation that presented, whether that calculation is

Page 56

corrective advertising or lost profits or any other measure of damages, the amount calculated and presented as a damages award can be unreasonable because that amount is disassociated from the actual harm suffered by the claiming party.
Q Okay. And can the actual harm suffered by the claiming party -- can it be the cost to repair?
A Yeah. Hypothetically, the cost to repair can match the actual harm. And I guess if it's a reasonable damages remedy, then it should match the measure of the actual harm.
I mean, I guess the flip side of that is if the -- if the calculation of the remedy was, you know, disassociated from the measure of harm, somebody would be getting -- paying too much or getting a windfall or getting too little and paying too little.
Q Okay. I'm going to go down to your next bullet point which is -- and I'll read this to you. "The 25 call transcripts relied upon in the Winer report may not be representative of CPI's total customer population, are not sufficient evidence of harm, are not evidence of lost customers, and do not indicate a need for a corrective advertising campaign to correct potential customer confusion."
Did I read that correctly?

Page 57

A You did.
Q Okay. And so I want to make sure I -- you have some multiple -- it looks like multiple opinions in here, so I want to break it down a little to make sure we're on the same page. The 25 call transcripts, those are the transcripts that are referenced in Dr. Winer's report; correct?
A Yes.
Q And are you assuming that the 24 call transcripts are the only evidence CPI will provide of improper conduct by Vivint?
A Well, at the time I wrote this report, those were the -- that was the only evidence I was aware of. I have learned since producing this report that there -- CPI may present additional customers.
Q Okay. Well, now, you reviewed Mr. -- Dr. Winer's report before you did your report; correct?
A Yes.
Q And you understood that Dr. Winer represented in his report that there would be -- he understood that there will be 25 additional customers that would testify at trial or up to 25 additional customers, so you're aware of that; correct?
MR. BROWN: Object to form.
THE WITNESS: I don't recall seeing that in

Page 58

his report, but if I did, I missed it.
BY MR. ROHNER:
Q Okay. Now, Mr. Winer also stated in his report that he had reviewed a Vivint customer spreadsheet that identified complaints from former CPI customers along with a corresponding index identifying the names and addresses of such customers.
Were you aware of that piece of evidence that Dr. Winer reviewed?
A I don't recall that one specifically. I don't recall seeing a Vivint spreadsheet.
Q Have you received any information from Vivint regarding complaints made to Vivint about -- about deceptive practices by Vivint sales force?
MR. BROWN: Object to form.
THE WITNESS: I don't recall seeing something specific like these call transcripts, no.
BY MR. ROHNER:
Q Okay. Did you -- did you receive a review of spreadsheet identifying customers of Vivint that made complaints to Vivint about deceptive practices by Vivint sales staff?
MR. BROWN: Object to form. Dan, if you have a particular Bates number, seems like you're talking about a particular document. If you're asking about a

Page 59

particular document, can you put it in front of him?
MR. ROHNER: Well, I don't know if I have the document. I can -- it's what's referenced in Dr. Winer's report. It's Vivint 1352. But my question was: Has he received anything from Vivint that reflected or described complaints by customers to Vivint about Vivint sales force conduct?
So that's -- it's a broader question.
A Yeah. I mean, I think we -- I'd have to go review the list of documents I relied on. It's been a couple months or so since I looked at all this stuff. And then there's also been a similar case.
Q Sure.
A I think just to avoid error, I'd prefer if we could refer to something specific.
Q Well, let me ask you a different question: If Vivint had information relevant to complaints made to Vivint about deceptive practices in their sales force, would that be relevant to you as to whether CPI had been harmed by Vivint's conduct?
A It could be. I guess I would need to review that information to make a full determination.
Q Going back to the bullet point we were just talking about, you say "The 24 call transcripts relied upon in the Winer report may not be representative of

Page 60

CPI's total customer population."
Correct?
A Yes.
MR. BROWN: Object to form.
BY MR. ROHNER:
Q What did you do to investigate or determine whether the call transcripts referenced in the Winer report were representative of CPI's total customer population?
A Well, as I recall, it's probably described in my report. You know, I looked at the information CPI provided about its total customer count. I reviewed CPI's website to see what types of customers they had. And, you know, I inquired if there were -- if CPI had recordings about customers calling for other reasons.
Q Did you inquire as to whether Vivint had recordings of customers calling, complaining about improper conduct by Vivint sales folks?
A You know, I don't -- I don't -- at the moment, I don't recall exactly what I requested, but I recall topics along that line or conversations covering that topic would be a better way to say it.
Q Okay. You also say in this bullet point that "The 24 call transcripts ... are not sufficient evidence of harm."

Page 61

Do you see that?
A Yes.
Q Okay. Now, just to be clear, you're only considering those 24 call transcripts in making the determination that they're not sufficient evidence of harm; correct?
A Yes.
Q You have not -- you have not -- you're not aware -- well, you don't know one way or the other whether CPI will present other evidence of harm besides the 24 call transcripts; correct?
A Yeah. I mean, to the extent it has not been provided to me in this case, I haven't seen it.
Q Okay. And you also understand that ultimately, the jury will determine whether CPI has presented evidence of harm; isn't that right?
A The jury will determine if CPI presents evidence? I think, I guess -- that sounds funny. It sounds like the jury will decide if CPI has been harmed, not what evidence CPI would decide to provide.
Q That's a good answer, but let me ask a better question so I get a clear record here.
It's your understanding that the jury will make the determination as to whether the evidence presented by CPI of harm actually proves harm to CPI?

A Yes.
Q And you're not offering an opinion as to whether the evidence that will ultimately present -- be presented by CPI of harm is sufficient evidence of harm; correct?
MR. BROWN: Object to form.
THE WITNESS: I mean, I guess as an expert, I can provide my analysis and opinion of the evidence provided, but it is the jury and trier of fact's role to decide if harm is established or not. Now, I'm not a lawyer, so I don't know the proper way to say that, but that's my understanding.
BY MR. ROHNER:
Q Specific to this bullet point, your opinion, again, is limited to your analysis of the 24 call transcripts; right?
A Correct.
MR. BROWN: Object to form. Misstates his -- witness's testimony.
THE WITNESS: I guess, do you mind if we take a break in the near future?
BY MR. ROHNER:
Q We can take a break now. That's fine.
A Okay.
Q How long do we need? You want to do 15

minutes?
A Five minutes. Five, ten minutes is fine.
MR. ROHNER: Why don't we do ten so that will give me more time to use the restroom.
THE WITNESS: Perfect.
MR. ROHNER: Does that work for you, Josh?
MR. BROWN: Yeah. So coming back at about 55 minutes after the hour?
MR. ROHNER: Sure.
THE VIDEOGRAPHER: We're going off the record. The time is 10:46 a.m.
(Off the record.)
THE VIDEOGRAPHER: We are going on the record. The time is 11:02 a.m.
BY MR. ROHNER:
Q Okay. Mr. Buss, when we broke, we were talking about bullet point number 2 on page 22 which is the -- under the heading "Opinions" you have in this case.
Do you have that page in front of you again?
A Yeah. You have it up to the screen, so I can see it.
Q Okay. Perfect. Great. So we were talking about bullet point 2. The second sentence in bullet point 2 says "Therefore, the reliance on the 24 call

transcripts makes the corrective advertising opinion in the Winer report an unreasonable and speculative indication of economic damages for this case."
Do you see that?
A I do.
Q Again, and so your opinion is -- let me ask a better question. You don't have an opinion as to whether additional evidence of harm that might be presented at trial could justify corrective advertising in this case, do you?
A Well, I haven't -- yeah. I mean, the Winer report focuses on those 24, and I haven't -- I don't know what that other evidence would be, so I haven't done an analysis of that other evidence.
Q And well, we mentioned you haven't received any information from Vivint about complaints made to them; correct?
MR. BROWN: Object to form.
THE WITNESS: No. I don't specifically know what you're referring to. I mean, I don't recall seeing any.
BY MR. ROHNER:
Q Well, let's do this: I'm going to pull up Exhibit 2 which is Dr. Winer's report, and I'm going to -- one second. Okay. You should see on your screen

Exhibit 2 which is a copy of Dr. Winer's report.
A Yes.
Q And I'm not sure -- do you have the hard copy as well or not at this point?
A I could get it. I don't have it with me at the moment.
Q I don't think we need it this moment. So I'm going to scroll down to page 35 of Dr. Winer's report. And this is in a section where Dr. Winer is talking about the geographic scope of Vivint's actions.
Do you see that?
A Okay.
Q This is paragraph 89. And he says "To understand the scope of the problem caused by Vivint and to begin the process of considering a remedy, I reviewed available information about the geographic spread of Vivint's actions. There are three sources of data for this analysis: Number 1, a Vivint customer spreadsheet, Vivint 1352.csv, that identifies complaints from former CPI customers, along with the corresponding index identifying the names and addresses of such customers."
Do you see that?
A Yes.
Q Did you review Vivint 1352, the Vivint customer spreadsheet referenced in Mr. Winer's report?

Page 66

A Yes. But I guess we reviewed it in the context of seeing -- checking the geographies, so my team and I reviewed it in the context -- because that is how we understood it was used in Winer's report.
Q But you understood that that spreadsheet was a listing of complaints from former CPI customers that were made to Vivint about Vivint; correct?
A I did not understand that, no.
Q Okay. So in reaching your opinion in bullet point 2 that we were talking about, you did not -- you don't have an opinion as to whether the information on Vivint's spreadsheet 1352.csv would change your opinion as to the reasonableness or appropriateness of corrective advertising damages?
MR. BROWN: Object to form.
THE WITNESS: Yeah. No. My -- the opinion that was the context of this conversation, that second bullet point, is about the 24 call transcripts and what I believe to be the Winer report's use of the 24 call transcripts to establish a pattern -- a broader pattern of harm and confusion.
BY MR. ROHNER:
Q And, again, you did not consider this Vivint spreadsheet for that opinion; correct?
A Not --

Page 67

MR. BROWN: Object to form.
THE WITNESS: -- for that specific bullet point, no.
BY MR. ROHNER:
Q Okay. Okay. I'm going back to the Exhibit 1. Do you see Exhibit -- are we back on your report there?
A Yes.
Q Okay. Great.
I want to talk a bit about the next bullet point. It says "The Winer report discusses various brand metrics but does not appear to provide any actual measurements specific to the CPI brand nor provide a valuation of CPI's brand assets."
And just stopping there, is that an opinion or is that just an observation of your review of the report?
MR. BROWN: Object to form.
THE WITNESS: I mean, I guess if we're classifying it in some way, that is my observation -- that is a summary of the observations that lead to the opinion stated in that bullet.
BY MR. ROHNER:
Q Got it. So in your opinion, in order to seek corrective damages, does there need to be a valuation done of a brand asset?

Page 68

A No.
Q Does there need to be actual measurements specific to the CPI brand? In order to justify corrective advertising.
A No.
Q If that's the case, then why does the failure to include that information render -- let me ask you -- let me take a step back. I'm getting ahead of myself.
I apologize. I was reading -- you have a precursor to a question that's coming later. Use that as you will, but I got tripped up here.
A I reserve the right to the fact that you're confused, I might be equally confused.
Q Right. Right. No.
So this bullet point 3, you make the point that there are -- that your position is "The Winer report doesn't include actual measurements specific to the CPI brand nor provide a valuation of CPI's brand assets." And then you say, "Therefore the brand commentary in the Winer report does not provide any information relevant to a calculation of economic damages in this Case."
Correct?
A Yes. That's what it says.
Q Now, is it your -- is it your position that

Page 69

the failure to provide actual measurements specific to the CPI brand or the failure to provide a valuation of CPI's brand assets precludes a calculation of economic damages?
A No. And that's not what it says there.
Q Okay. What -- explain to me what's different between not having those things precluding an economic damages analysis versus them not being relevant to the calculation of economic damages.
MR. BROWN: Object to form.
THE WITNESS: The discussion of brand metrics in the Winer report is unspecific to the parties and the facts in this case. And so therefore, while it is a discussion of different brand measures and metrics that can be developed, it doesn't provide any relevant information about the alleged harm in this case and is also doesn't provide any relevant information for any calculation of damages.
BY MR. ROHNER:
Q Now, it does provide information as to explain what brands are; correct?
A In general, yes.
Q Yeah. And it does provide information as to generally how -- how brands can be valued; correct?
MR. BROWN: Object to form.

Page 70

THE WITNESS: Well, I mean, by my recollection, it doesn't go much further than saying brands have value. It doesn't mention the methodologies or analyses used to value brands.
BY MR. ROHNER:
Q Okay. And in this case, the measure of damages proposed by Dr. Winer is corrective advertising? That's the term you used to describe his opinion; correct?
A Yeah. I guess I use that term. I think -- I don't know if he actually ever uses the term "corrective advertising" in his report.
Q And so my question is, getting back to the first question I asked you, does the failure to provide actual measurements specific to the CPI brand or the failure to provide a valuation of CPI's brand preclude the awarding of -- of corrective advertising damages?
A I mean, like I said, not necessarily. But for the corrective advertising analysis to demonstrate how it's reasonable and accurate for the alleged harm, I would -- I would hope that and I would think that best practice is to provide some measures of brand performance or strength or value that are specific to the brand that claims it was harmed.
Q I want to direct your attention to the next

Page 71

bullet point you have. It says "The Corrective Advertising Opinion in the Winer report is based on speculative and unreasonable assumptions and therefore does not provide a reasonable calculation of economic damages for this Case."
Do you see that?
A I do.
Q And what are -- what are the speculative and unreasonable assumptions that you're referring to in this opinion?
A Well, they are discussed in the body of the report.
Q Okay.
A But, I mean, did you --
Q We'll go -- I'll take you there. I'm not -- I agree, it's not a memory test. But I think there -- well, I won't comment on the report. I want to -- I want to make sure we're kind of talking about the same things. But sitting here today, with the previse that we'll look at your report and you can correct or add once we look at the body of the report, what are the assumptions -- unreasonable assumptions that you're referencing in this bullet point --
A Yeah. Sure.
Q -- that you're aware of?

Page 72

A From top of mind, there's the assumption that the corrective advertising or whatever the term Winer uses for the remedy, there's the assumption that -- excuse me. I have a frog in my throat. Excuse me. Sorry. There's the assumption that the campaign would need to address all of CPI's current customers based on the customer count provided by CPI.
Q Okay.
A There's an assumption that the -- about the length of time and the salary that would be paid to the personnel who would undertake the campaign.
Q Okay.
A And there are assumptions about the additional costs, you know, and I can't remember how Winer coins them, but he's basically used, as I recall, like, 25 percent of marketing costs as an additional support charge in addition to the door-to-door campaign proposed and outlined in the Winer report.
Q Okay. Anything else that you can remember right now?
A Yeah. You know, I mean, there's analysis in my report, there's a schedule where I walk through each of the assumptions and show, you know, the impact of alternative assumptions, so I'm sure there's others.
Q Okay. So each of the assumptions you've

Page 73

identified so far all relate to the actual computation of the amount that would be required to engage in the corrective advertising campaign advised by Dr. Winer; is that fair?
A Yes.
MR. BROWN: Object to form.
BY MR. ROHNER:
Q With respect to this bullet point, this third bullet point on page 22, are there any assumptions that you believe were unreasonable with respect to Dr. Winer's determination that corrective advertising just as a concept is an appropriate measure of damages in this case?
A Well, this bullet we're talking about right now is focused on the form of his calculation, not the rationale for his calculation.
Q Got it.
Okay. The fourth bullet point, "As the Winer report does not consider alternative measures of economic damages, the corrective advertising opinion reaches a speculative and unreasonable conclusion based entirely on one measurement approach."
Am I reading that correctly?
A Yeah. Pretty much. You had a little pause in there that I wouldn't have done.

Q I want to understand your opinion. Is it your opinion that -- that a measure of damages become -- is speculative or unreasonable simply because there may be other measures of damages that exist?
A I think that's a jump from what I've said, but I do think it is best practice as a damages analyst to consider alternative measures and to at least explore the -- what the alternative measure is calculating and, if you get two different indications, explain why one approach is more appropriate or more reasonable than the other.
Q Okay. Do you know if Dr. Winer is an expert in lost profits analysis?
A Do I know if he is? I don't know if he is.
Q Okay. Now, you understand there was another expert that's been named by CPI, Dr. Mangum?
A Yes.
Q And he provided an opinion related to royalty?
A Yes.
Q Okay. And is the fact that -- well, let me ask a better question here.
You understand that a party is not obligated to utilize one expert to address all potential damage computations; correct?
A Sure.

Q Right. And if Dr. Winer is not an expert in lost -- calculating lost profits, would you agree that it would be inappropriate for him to opine as to what those lost profits might be?
A I mean, I guess if he feels uncomfortable reviewing other approaches to calculating damages, you know, that's fine. But it is, in my opinion, based on my experience as a financial analyst and a damages analysis -- damages analyst and a valuation analyst, that to form a reasonable conclusion about a dollar amount damages award, you know, it's important for the damages analyst to consider other measures.
Q Are you -- well, let's talk a bit about the body of your report. Hold on one second.
The first -- I'm going to go to page 5 of your report, which is -- which is a section titled "Approaches to Calculating Damages."
Do you see that?
A Yes.
Q And I'll represent to you and I can show you if you need me to -- everything before this is more your description of the two reports and the case and claims that are at issue. Okay? So I don't want you to feel like I've -- that's what -- I'm kind of skipping ahead to your -- this first section on approaching --

approaches to calculating damages.
MR. BROWN: I'm going to -- to the extent that was a question, I'm going to object to form.
MR. ROHNER: Sure.
BY MR. ROHNER:
Q Would you like to look at the first four pages before we talk about approaches to calculating damages?
A No.
Q Okay. So halfway -- the second paragraph here, you reference the Complaint and you quote from the Lanham Act.
Do you see that?
A Yes.
Q And you're familiar generally with this provision of the Lanham Act that describes damages?
A Yes.
Q Okay. And you understand that under the Lanham Act, that a plaintiff can recover the defendant's profits; right?
A Yes. Sorry. I wasn't sure you were done with your question.
Q Sorry. That was -- correct?
A Yes.
Q Any damages sustained by the plaintiff; correct?

A Yes.
Q And the cost of the action?
A Yes.
Q And you -- because of the "and" in there, you understand that those are not exclusive, those can be additive; correct?
A Again, my understanding is it all depends on the circumstances of the dispute and the opinions of the trier of fact.
Q Correct. Right now I'm asking you what you understand this section of the Lanham Act to mean. You understand that with the -- with the listing of, one, defendant's profits, two, any damages sustained by plaintiff, and three, the cost of the action, that those potential recoveries can be additive; correct?
MR. BROWN: Object to form.
THE WITNESS: Yeah. I do understand that in some circumstances, they can be additive, yes.
BY MR. ROHNER:
Q Right. And you're not giving an opinion as to what kind of remedies are permissible under the Lanham Act; right?
MR. BROWN: Object to form.
(Reporter clarification.)
THE WITNESS: My answer was "no."

Page 78

BY MR. ROHNER:

Q Okay. Scrolling down a little bit here, on the top paragraph of page 6, you say, "I understand if a plaintiff is unable to provide a reasonable measure of when, how and if it was harmed any award of economic damages result in a -- would result in a windfall or unforeseen gain for the plaintiff."

Do you see that?

A Yes. And sorry. There's a helicopter outside my office, and so I'm having trouble hearing you a bit. But I think you just basically read the sentence.

Q I did. We can wait a minute. Is it -- does it sound like it's leaving?

A I hope so.

Q Yes. I read that first sentence of paragraph 2.

A Okay.

Q And so my question is what -- you say "I understand." What's that understanding based on?

A You know, my experience doing damages calculations and working as a litigation consultant, that also comes from, you know, the materials on damages that I've read over the years, and that also comes from discussions with the counsel that retained me in this case.

Page 79

Q Right. And your understanding is -- what you're describing there is a legal requirement in order for a party to be awarded economic damages; correct?

MR. BROWN: Object to form.

THE WITNESS: Yeah. More or less, I understand that that -- you know, that's not the damages analyst's determination, but that's more a legal -- I don't know. That's been established practice in law or something like that.

BY MR. ROHNER:

Q You're not giving that as an opinion in this case?

A No. No.

Q Okay. The next line says, "Therefore, in this case, the plaintiff should provide a measurement of its alleged harm for a calculation of damages to be reasonable."

Do you see that?

A Yes.

Q And a measurement of alleged harm could be the calculation of damages; isn't that true?

A Well --

MR. BROWN: Object to form.

THE WITNESS: -- I guess we talked about this quite a bit previously. I mean, I understand that's --

Page 80

that's the plaintiff's position. You know, based on what I've seen in this case, I'm not sure it's an appropriate measure of the alleged harm because the alleged harm, you know, happened in the past and the corrective advertising or corrective marketing or whatever we're calling it campaign is kind of forward-looking. And I don't think that -- that anything I've seen from the plaintiff's experts has measured or analyzed how CPI suffered because of what they allege in this case.

BY MR. ROHNER:

Q But you also understand that the jury is going to make that determination as to whether and how CPI suffered; isn't that right?

A Oh, of course.

Q Yeah.

(Reporter clarification.)

MR. BROWN: I meant to say object to form.

Mr. Buss, if you could pause a little bit, give me that chance, I would appreciate it.

THE WITNESS: Yeah. Thank you. Thanks for the reminder.

BY MR. ROHNER:

Q Going down to the next section, you say "Neither Expert" -- this is a heading -- "Neither Expert

Page 81

Report Reviews Actual Financial Performance."

Do you see that?

A Yes. Well, I did. You just --

Q Sorry.

A I got it. Yeah. It's back now.

Q Okay. I apologize for moving while you're reading.

First, is it your opinion that in order to award -- in order for corrective advertising damages to be reasonable or appropriate, that there needs to be a review of actual financial performance of a company?

A I think you used the term "needs," and I'm not saying it's, you know, a necessary requirement. We'll let the, you know, jury and trier of fact determine what was needed. But I think it would be relevant for the calculations presented by -- especially the Winer report in this case based on the information that I reviewed.

Q Okay. Why do you think it would be relevant, the financial performance of CPI?

A Well, because I -- from the data provided by CPI, I see no indication that they have experienced a decline in financial performance.

Q Is it your opinion that in order for there to be a need for corrective advertising, the financial statements of a company need to reflect a decline in

Page 82

performance?

A Well, that would be one place I would look. You know, if the -- if the party that claims they were harmed can show that they expected to achieve a greater level of performance and then didn't achieve that expected level of performance, that might be another place to look.

But you know, as a damages analyst, you know, our job is to come up with a fair and reasonable amount that would remedy the harm. And it would -- you know, I believe it is best practice for a damages analyst to at least explore how the claiming party was harmed before just proceeding to calculate a number.

Q And it's your opinion that that harm has to be reflected in the financial statements?

A No. I gave you an example of how it might not be reflected in the financial statements but would still be reasonable.

Q What would be an example of a situation where harm would not be reflected in the financial statements but would still be reasonable?

A Well, the one I just told you about where maybe they had an expectation of a certain level of performance that wasn't achieved. But there could possibly be others, but the one that jumped to mind and

Page 83

the one I addressed in your prior question, yeah. I mean, it could be a difference between expected performance and actual performance or it could be reflected in the financial statements. It could be the creation of a situation where future results will be lower than expected and that hasn't yet been reflected in the financial reports.

Q Okay. And you --

A We're all talking hypothetically here, I guess, but --

Q Sure.

A -- I didn't see any of those or any analysis that attempted to do any of that in the Winer report.

Q Hypothetically, when you're -- when anyone is reviewing the financial reports of a company, you'd agree that there are a multitude of factors that can impact on the success or failure of a company from a financial statement standpoint?

A Yes.

Q Factors, many of which the company has no control over?

A That can be the case, yes.

Q And those factors can be factors that actually increase their financial performance in an unexpected way or decreases it in an unexpected way; correct?

Page 84

A Yes.

Q Okay. And that in the case of an allegation that a party has been damaged by the, you know, improper conduct of a competitor, that is something that -- that damage is something that, like any other factor, could be reflected in the financial statements or might not be; true?

MR. BROWN: Object to form.

THE WITNESS: Sure. Yes. I think I understand your question.

BY MR. ROHNER:

Q Well, and I can ask, you know, a little more detailed question. You can have a situation where a third party causes damage to you as a company, but at the same time, because of other market factors, your market share actually increases or your -- your income for that year and revenue increases because of something totally unrelated to the bad conduct by the third party; correct?

MR. BROWN: Object to form. Improper hypothetical.

THE WITNESS: Yeah. Hypothetically, yes.

BY MR. ROHNER:

Q And in that case, you know, the harm might not be the -- well, wouldn't be -- if in that hypothetical,

Page 85

the company's revenue and profits and income increase during that period of time, the harm isn't that increase; the harm is the difference between that increase and what it might have been but for the wrongful conduct; correct?

MR. BROWN: Object to form.

THE WITNESS: Yeah. Hypothetically, yes.

BY MR. ROHNER:

Q Okay. And you would agree with me -- well, let me ask you: Do you agree with me that in order to parse that question out as to differentiating between what a company earned and what they might have earned but for the wrongful conduct would require a pretty complicated analysis of a number of different factors; true?

A Yeah. I mean, that's -- that's why we have experts to do that kind of work. It's not an easy task, but, you know, if the calculation of damages is unrelated to an attempt to measure that specific harm, then it's -- it's a speculative measure of damages.

Q Well, that's one of the harms; right? One of the harms that you could be attempting to fix with damages is that difference between your financial results that you actually achieved versus what you would have achieved but for the wrongful conduct?

A Yeah. I mean, that kind of is a way to describe the role of the damages expert is to, you know, do the analysis and the measurement and the calculations that are specific to the harm and eliminate those other factors.

Q And another measure of the harm could be identifying what it would cost to correct the conduct that was done that harmed your company; correct?

MR. BROWN: Object to form. Asked and answered.

THE WITNESS: Hypothetically, yes.

BY MR. ROHNER:

Q Now as part -- you reference the financial statements of both CPI and Vivint in your report. Did you do any kind of analysis of the financial statements to parse out how the alleged wrongful conduct might have impacted on CPI's financial results?

A I would say yes, although that analysis was largely, you know, hindered by the lack of detail provided in CPI's financial results.

Q Okay. Tell me, what's the additional information that you would need in order to perform the measurements and calculations that you -- that you state in your report should have been done by Dr. Winer?

MR. BROWN: Object to form. Vague as to which

analyses you're talking about.

BY MR. ROHNER:

Q Let me ask a better question. What's the additional information you would need in terms of the financial performance of CPI to perform the measurements that -- and calculations of harm that your opinion is Dr. Winer should have performed?

MR. BROWN: Object to form.

THE WITNESS: I mean, I can give a couple examples that come to mind. Hopefully, I can get most of it. I would be interested in seeing financial reports for the consumer or home segment of CPI, you know, distinct from their business and new home business segments or any other business segments or divisions or operating units that CPI has. Because I think, as you know, the financial results provided to me in this case for CPI were consolidated results without detail by customer type or division.

I would be interested in seeing budgets or forecasts or planning documents that were prepared in the normal course of business by CPI to explore how their performance differed from expectations and forecasts.

I would want to know more detail about the costs and expenses that are incurred at the different

business units. In other words, what types of marketing and operations and support expenses would be required to maintain, you know, the consumer segment, the business segment, the new home segments, and other segments.

I would want to know some more details about the specific types of revenue generated from the consumer business segment. You know, typically in this security services business, there's a service element and an equipment element to the revenues generated by the companies, so we would need to get data and information that would help me understand those two types of revenue and if available for the -- you know, the home or consumer segment.

Those are the big ones that come to mind.

BY MR. ROHNER:

Q So for the -- for the four that you mentioned, explain to me how that information could be used to parse the impact of the alleged wrongdoing by Vivint on the financial results of the CPI?

MR. BROWN: Object to form. Compound.

THE WITNESS: Well, I think it's a little artificial to break that up, just one would be able to complete that -- one of the things I described would be able to complete that analysis on its own.

You know, ideally, we would want more or most

of that information that I described in order to do that type of parsing that you're describing. It's also a process of, you know, reviewing the marketplace and the events and how -- where and when the company operated to eliminate the impact of other factors.

You know, I mean, the big one that comes to mind these days is how COVID-19 has changed business performance for different types of companies. You know, you would need to be able to understand and measure not just how COVID-19 may have impacted their operations but how, you know, any -- any negative news that came out about the company might have impacted their operations.

So it's a multipart process, and I wouldn't profess that it's easy to do, but, you know, no one said our job would be easy. But, you know, without an attempt to at least explore the impact of those other factors, like you mentioned, there's no real way to evaluate if the proposed remedy is reasonable to the harm caused.

BY MR. ROHNER:

Q Just to take a step back, I mean, what you describe as a multipart, sounds like, multifactor analysis, pretty complicated; correct?

A Like I said, we don't get paid to do things that are easy.

Q And I'm assuming -- well, would it be fair to say that in all likelihood, there are data points and information that you didn't include on your list that ultimately you would need to do that analysis?
A You know, very likely. I guess in my experience, you know, we ask for data, we receive data, we ask follow-up questions about the data. So yeah, I mean, I think you get your initial set of information, and then that leads to further questions.
Q As part of your analysis in this case, have you asked for any of that information? Yeah.
A I mean, at least informally, I recall asking counsel about the availability of, you know, breakout of CPI's financial performance for the consumer and the business and the new home segments that are evident on CPI's website. And, you know, it is standard practice for my team and I to, you know, ask and inquire about, you know, what -- are there budgets and forecasts and business planning documents that have been asked for or provided in the case.
Q I'm going to ask you a slightly different question now. We were talking before about potential Lanham Act damages, one of which is the profits of the wrongdoer; correct?
A Correct.

Q And in order to determine the profits of the wrongdoer, would you similarly be required to review financial statements and information related to the wrongdoers' performance during the period of time they are alleged to have engaged in wrongful conduct?
A Yes.
Q Okay. Similarly, would you be required to go through this multistep, complicated analysis in order to parse out what portion of the profits are attributable to the wrongful conduct?
A It's a slightly different process based on my experience and practice, but it does involve a lot of the same types of information.
Q Okay. Have you received the information from Vivint to perform that kind of analysis of their financial performance during the period of time relevant to this lawsuit?
A Yeah. And as I recall, there is a discussion of those calculations in this report towards the end where I offer them up as an alternative measure of economic damages in contrast to the opinion presented in the Winer report for the disgorgement calculation. I guess I would say we were able to develop kind of the first step which is the calculation of the possible incremental profits from a theoretical amount of

unjustly achieved customers.
Q All right.
A But I didn't complete that analysis with the second part which was an apportionment of that amount of incremental profits specific to the alleged -- the allegations in this case.
Q And with respect to that calculation you're talking about, you based it -- those calculations on the 24 transcripts that are referenced in the Winer report; correct?
A Yeah. As I recall, that's the number that gets the calculation started.
Q Okay. And I believe that as part of your calculation, you also applied a concept that's set forth in the Winer report that a small percentage of people that have complaints actually make complaints?
Do you recall that?
A Yeah. I mean, we can see it in the schedules here if you go to that page. But --
Q I'd be happy to pull that up. Hold on.
A It's probably -- as I recall, it's the last schedule.
Q Last schedule. Okay. I'm showing you what's called "Schedule 3." Is that --
A Yeah. Probably one more. One or two more.

Q There's Schedule 2. This looks like --
A Yeah. It's a higher-numbered schedule. So scrolling the other way.
Q Oh, okay.
A One more. Two more, maybe. Schedule 6. Yeah. This is it.
Q Got it. Okay.
So in this alternative calculation that you did, you have "Complaints, 24"; correct?
A Yes.
Q And that's just relying on the 24 complaints that are referenced in the Winer report; correct?
A Yes. That's the basis for the number 24.
Q Right. You have not done any computation that would include complaints that were made to Vivint; right?
A Correct.
Q And this would not include any customers that might have been the subject of deceptive practices that have not been made aware that they were deceived; correct?
MR. BROWN: Object to form.
THE WITNESS: Well, I guess that kind of encompasses the 5 percent ratio there, right, because -- well, you know, it's kind of unclear exactly what the

Page 94

95 percent implies, but yeah, the next step is increasing the 24 to 480 for those customers who did not complain.

BY MR. ROHNER:

Q Right. And, well, let me ask you about that. What's your understanding -- the studies that are referenced in Dr. Winer's report, what's your understanding of the explanation in those studies as to the reasons that the 95 percent don't complain?

MR. BROWN: Object to form. Vague as to which study you're referring to.

THE WITNESS: You know, this is probably -- warrants a whole topic of discussion, but my basic understanding is that the Winer report is using -- is citing this 95 percent ratio to support a hypothetical concept that there is a larger portion or larger number of customers who haven't filed a complaint and that evidence of a small number of complaints can point to a broader pattern of behavior.

BY MR. ROHNER:

Q Okay. So my question is -- well, and I'm not -- I set it up that way. I didn't mean to infer that I already asked it. I think it's a new question.

Do you have an opinion as to the reliability or applicability of the reports referenced in

Page 95

Dr. Winer's expert-witness report that discuss this general notion that less -- that a small percentage of people that have complaints actually make complaints?

MR. BROWN: Object to form. Same objection.

THE WITNESS: So couple things: When I prepared this report, I had not had a chance to review the studies that were cited in the Winer report because, for whatever reason, I understood -- I understand they hadn't been produced yet.

I have since seen those studies. I am not -- in my review of those studies, I didn't -- I couldn't find where the 95 percent reference was from, and my review of those studies kind of informed me that they were talking about, you know, relatively dated examples and different industries. So I wasn't exactly -- I wouldn't necessarily agree that 95 percent is a factually accurate number by which to extrapolate a certain amount of known complaints to a broader population.

But that said, you know, I mean, I understand that that's one of the numbers that Winer kind of uses to justify a broader marketing campaign as a damages remedy and because 95 is the -- the 95 percent is the number that Winer points to as his conclusion, and that number seems to be kind of a catchall for all the

Page 96

different studies and observations he makes, I just went ahead and used the 95 percent to really kind of imply a -- you know, an upper bound or a maximum number of potentially impacted customers based on the 24.

And, of course, if there's evidence that some of those 24 really weren't confused or were not the received deceptive sales practices, then I think the reasonable starting point to this calculation would be a lower number. And, of course, as you've demonstrated or pointed me to, there may be evidence of additional customers who may have been received deceptive sales practices. And if the jury or whoever finds that they are the victim of deceptive sales practices, this kind of metric here or this calculation could be used for a larger starting number.

BY MR. ROHNER:

Q Got it.

Couple questions. First, in your report, you don't offer any opinion suggesting that -- that the 5 percent, 95 percent ratio is unreliable or inappropriate, do you?

MR. BROWN: Object to form.

THE WITNESS: Yeah. Sorry. I recall commenting on it. I don't remember what I said.

///

Page 97

BY MR. ROHNER:

Q Right. Well, are you an expert -- do you consider yourself to be an expert in the kind of marketing research and analysis that led to the percentages that are referenced in Dr. Winer's report?

A No.

MR. BROWN: Object to form.

THE WITNESS: But I think my comment would be that I was unable to review the 95 percent at the time I wrote the report and that, you know, the studies done to derive the 95 percent may be observations from different industries and different customer circumstances and not necessarily appropriate in this case.

BY MR. ROHNER:

Q Do you know if Vivint itself has used the 5 percent-95 percent ratio in analyzing its own complaints by customers?

A I don't know one way or the other.

Q Okay. If Vivint actually used the same ratio, would that impact your opinion at all?

MR. BROWN: Object to form. Improper hypothetical.

THE WITNESS: You know, I guess I'm willing to consider any evidence that's relevant to the case, so yeah, I mean, it's something I would consider. I don't

Page 98

know how it would impact my observations or opinions.

BY MR. ROHNER:

Q And second clarification. I think you mentioned that if there's evidence presented that there were more than 24 complaints at issue, you would agree that applying -- if you applied that ratio, the total complaints would be -- would increase commensurate with the increase in reported complaints?

MR. BROWN: Object to form.

THE WITNESS: Yeah. I guess the way you said that was a little off.

BY MR. ROHNER:

Q I think you said that -- well, let me rephrase it. I believe you testified that if evidence was presented that suggested that that 24 number was low and it was in fact higher, then -- then applying this analysis, your total complaints number 480 would also increase by that -- pursuant to that same ratio; isn't that right?

A Yeah.

MR. BROWN: Object to form.

THE WITNESS: Using this same methodology and the same -- all things being equal, if you change the starting point, the end number would be higher.

///

Page 99

BY MR. ROHNER:

Q Well, let me ask you a question just in terms of the general concept. Leave out whether it's 5 percent, 95 percent or some other ratio.

Is it -- do you have any opinion as to whether the concept that less people complain than actually experience conduct that might justify a complaint?

A Well, I guess, I mean, the concept seems reasonable, and based on the studies I saw after I completed this report, you know, it seemed that in multiple circumstances, those studies have borne out that relationship. But I don't -- you know, the devil's in the details, and it doesn't appear that there's been any study for this specific industry or for CPI's own customer set.

Q Now, if you were doing this analysis, you would want to know if Vivint had received complaints, wouldn't you?

A I mean, it would be an input -- if I was trying to calculate the unjust benefit of Vivint, the focus of the analysis would be on the number of unjustly achieved new customers at Vivint.

Q But it would also be relevant to determining whether the conduct had a widespread impact, wouldn't it?

Page 100

MR. BROWN: Object to form. Vague.

THE WITNESS: Yeah. I mean, theoretically, it could be relevant. It's just a matter of what does the actual data show.

BY MR. ROHNER:

Q Correct. And in order to assess that, you would actually need to receive and review the data from Vivint regarding the complaints that were made to Vivint; right?

A Yes.

Q And by referencing the 24 complaints that Dr. Winer has in his report, you're not suggesting that a separate group of complaints that might have been received by Vivint are not relevant?

A You know, I don't have any opinion about those other complaints to Vivint because I haven't had the opportunity to review or analyze those documents.

Q And if the jury ultimately found that Vivint had actually received hundreds of complaints related to CPI customers complaining about deceptive trade practices by Vivint, that's what -- you would factor that into your analysis of what the appropriate damages were; correct?

MR. BROWN: Object to form.

THE WITNESS: I could do that, yes.

Page 101

BY MR. ROHNER:

Q And if the evidence showed that Vivint had received hundreds of complaints from CPI customers related to conduct deceptive trade practice -- deceptive practices by Vivint salespeople, that it would impact on or could potentially impact on a determination as to the geographic scope and breadth of the problem; correct?

MR. BROWN: Object to form. Compound.

THE WITNESS: Yeah. Once again, I mean, I can't draw -- yeah. If the data is relevant to different geographies, then yes, it could be informative about the geographic scope.

BY MR. ROHNER:

Q But to date, that's not an analysis that you've done?

A That's correct.

MR. ROHNER: Okay. It's 1:00 here. And if it's okay with everybody, I actually -- I came in early today, so I ate on the early side, and so if it would be okay for us to take a slightly longer break, maybe 30 minutes, so that I can grab a sandwich. And then just for planning purposes, I don't think I have probably more than an hour or two when we come back.

MR. BROWN: Okay.

///

BY MR. ROHNER:
Q Does that work?
A That works for me.
MR. BROWN: That works me.
THE WITNESS: Do we get to hold you to that extra hour or so estimate or --
BY MR. ROHNER:
Q Ask Josh if we can hold people to their representations as to how much time they have.
A I'll let you guys have that fight. I'll stay out of it.
Q I'm just kidding. I'll say what Josh said. I mean, I try and, you know, stick with what I expect is going to happen, but I understand and I agree with Josh. Sometimes we're just wrong.
MR. BROWN: Yep.
MR. ROHNER: So we'll do our best.
MR. BROWN: Do our best. That sounds reasonable to me. I mean, obviously, Dan, you know I'm later here, so I would rather take shorter breaks, but a half an hour is very reasonable and sounds like if your estimate is correct or close, we'll still end at a reasonable time. So that's fine with me.
MR. ROHNER: Okay. Sounds good. So how about until 1:35 or 1:35 Mountain?

MR. BROWN: That works for me.
MR. ROHNER: Okay. Sounds good. Thanks, guys.
THE VIDEOGRAPHER: We're going off the record. The time is 12:05 p.m.
(Off the record.)
THE VIDEOGRAPHER: We are going on the record. The time is 12:44 p.m.
BY MR. ROHNER:
Q Okay, Mr. Buss. Thanks for allowing us to take a quick break. I think I got three bites in, but that is hopefully all I'll need here.
I'm going to reshare your report here. Oh, resume. Got it. All right. Are you seeing your report?
A Yes.
Q Okay. One of the things that you mentioned earlier in your testimony was this notion that -- that a lost profits analysis should have been done to then compare to the corrective marketing to see if the corrective marketing was a reasonable number.
Do you recall that testimony?
MR. BROWN: Object to form. Mischaracterizes the prior testimony of the witness.
///

BY MR. ROHNER:
Q Let me ask you: Is your opinion that a lost profits analysis should have been done by Dr. Winer?
A I mean, it's my opinion that Mr. Winer should have at least considered it and explained why he thought it was not a reasonable measure. I don't think I said a lost profits analysis has to be done, but I probably said something like, you know, a measure of actual harm or a measure, you know, and analysis of change in financial performance or, you know, lack of performance to expectations should have been presented in either the Winer or the Mangum report, you know, to demonstrate that CPI has been harmed related to the allegations in this case.
Q Okay. We talked -- I think you talked earlier about the analysis with respect to a review of the financial statements and the number of factors that you contend Mr. Winer should have looked at.
Do you recall that testimony?
A Yes.
Q So I want to focus your attention now on this concept of doing a lost profits analysis. Okay?
Would you agree that in order to do a lost profits analysis, you would need to know the number of customers that switched from CPI to Vivint as a result

of the alleged wrongful conduct?
A Yeah. That would be a good starting point, yes.
Q Well, and actually, even before you could figure out which customers switched from CPI to Vivint as a result of the wrongful conduct, wouldn't you -- wouldn't you need to know the number of customers that switched from CPI to Vivint?
A Yeah. That makes sense. I mean, that would -- you would have to establish -- yeah. I mean, those would both be good -- those would be the starting points for that analysis; right? Yeah.
Q Okay. I want to turn to page 10. I'll show it on your screen here. Towards the top, you have a list of bullet points of information that -- hold on. Let me -- top of the page here. Well, I'll read the paragraph. You say, "I have not seen any evidence indicating an amount of Vivint's revenues or operating profits are the result of the alleged wrongful actions, nor have I seen any information from CPI or its damages experts indicating any amount of revenues or profits which could be attributed to the Alleged Wrongful Actions. Such evidence might include" -- and then you have a list of bullet points. First is "A list of customers who have switched to Vivint from CPI due, at

least in part, to the Alleged Wrongful Actions."
You haven't seen that information; correct?
A That's correct.
Q Do you know if Vivint has provided that information, a list of customers who switched to them from CPI?
A I do not know.
Q Okay. And do you know -- did you know that CPI actually requested that information from Vivint, and Vivint has indicated that they don't have it?
MR. BROWN: Object to form.
THE WITNESS: You know, I'm -- I don't know -- I can't tell you about what you just said because I don't know if that happened or not.
BY MR. ROHNER:
Q Okay. But you do agree it's information that would be relevant to making a determination as to the number of customers that actually switched from CPI to Vivint?
A Yeah. I mean, as stated there in my report. I mean, I think --
Q Now, if that information is not available, does that render the ability to do a lost profits computation as a form of damages more difficult?
A Yeah, I suppose so.

Q And next bullet point you have is "A list of customers who were actually confused by Vivint's Alleged Wrongful Actions."
Do you see that?
A Yes.
Q Now, before you could have a list of customers who were actually confused, you would probably first need a list of customers that Vivint actually made sales calls on, wouldn't you?
MR. BROWN: Object to form.
THE WITNESS: Yeah. I mean, I guess that would be one source of that information. That's one that I can think of at the moment. There could be others, I guess.
BY MR. ROHNER:
Q Do you know if Vivint actually keeps track of the potential customers they make sales calls on?
A I don't know one way or the other.
Q Okay. Now, if Vivint doesn't keep track of who they make sales calls on, does that render an expert's ability to do a lost profits analysis more difficult?
MR. BROWN: Object to form. Improper hypothetical.
THE WITNESS: I guess it can.

BY MR. ROHNER:
Q If you don't know who the customers were that were approached and you don't know who the customers were that switched from CPI to Vivint, how can you perform a lost profits analysis that's tied to those switches due to alleged wrongful conduct?
A Well, if you're doing a lost profits analysis, one place to start would be the customers who have left CPI, and I think the data would be specific -- you know, you could start with the set of customers who have left CPI and then start to whittle down that number to identify which ones could have left because of some conduct by Vivint.
Q All right. And I believe your report reflects that over this period of time, I think it was 89 -- I think the number you used in the report was 89,000 customers left CPI?
A You know, as I recall, that's the number that data provided by CPI indicates.
Q Okay. And so that would give us the piece of who left CPI. The information as to who ended up at Vivint would have to come from Vivint, wouldn't it?
MR. BROWN: Object to form.
THE WITNESS: I mean, that would be -- that seems like a reasonable source of that information.

BY MR. ROHNER:
Q Okay. And so if you can't get that information from Vivint, wouldn't you agree that performing a lost profits analysis is virtually impossible?
MR. BROWN: Object to form.
THE WITNESS: There's multiple ways to skin a cat. I mean, I -- you -- I don't think it's virtually impossible. It's -- CPI needs to investigate, you know, their own data, their own sales data within that consumer segment. You know, I think there are other ways to do it. I'm not sure what internal information CPI keeps or has that could be leveraged to do that analysis. But, you know, I think -- I mean, the Winer report didn't explain why that analysis or at least the request for that type of information from CPI wasn't done.
BY MR. ROHNER:
Q You don't know if CPI has that information, do you?
A I don't know.
Q If you were trying to whittle down the customers that might have been impacted by Vivint's sales conduct, wouldn't you also want to know where Vivint geographically, even down to the neighborhoods,

where Vivint salespeople made calls on customers?

MR. BROWN: Object to form.

THE WITNESS: You know, that's, again, another piece of information that could be helpful.

BY MR. ROHNER:

Q Have you seen any evidence that would reflect where Vivint made sales calls on CPI customers?

A Not that I recall, no.

Q And did you know that in response to discovery, Vivint has said they don't keep track of that?

A I don't know what Vivint's discovery responses are. I don't recall seeing what Vivint's discovery responses were.

Q Have you asked for that information from Vivint?

A I don't recall one way or the other.

Q I'd like you to turn to Exhibit -- or I'm sorry, page -- I have to turn for you. I'm going to look at page 17 of your report. Okay. Actually, why don't we start with 16 because that's the beginning of the section.

So I want to kind of walk through this and make sure I understand what your opinion is with respect to the corrective advertising opinion of Dr. Winer. And

then also you include in your report your own analysis, and I want to make sure I understand how you came up with that analysis. Okay?

MR. BROWN: If we're moving to a new section, Dan, can we take a brief break?

MR. ROHNER: Sure. Do you have a reason, Josh? We've been on the record for about ten minutes.

MR. BROWN: I apologize. I need to grab a bathroom break. It will be quick.

MR. ROHNER: Oh, yeah. What do you need? Ten minutes?

MR. BROWN: Five minutes. Five, ten. Five should do it.

MR. ROHNER: Sure.

MR. BROWN: I apologize.

MR. ROHNER: Sure. That's fine.

THE VIDEOGRAPHER: We're going off the record. The time is 12:58 p.m.

(Off the record.)

THE VIDEOGRAPHER: We are going on the record. The time is 1:07 p.m.

BY MR. ROHNER:

Q Thank you. I'm switching -- I'm actually taking a step back because of Mr. Brown's little break, I thought of a question I didn't ask about data you had

before. So I'm sharing my screen again. I'm on the same page with the bullet points we talked about regarding information that you identified that you believe would be relevant.

In the paragraph above those bullet points, you discuss the fact that CPI operates only in Tennessee, Georgia, North Carolina, and South Carolina.

Do you see that reference in the paragraph?

A I do, yes.

Q And you also make the point that only a portion of Vivint's revenues and operating profits may overlap with CPI's geographic area of operations.

Do you see that?

A Yes, I do.

Q Now, in order to do an analysis of lost profits to CPI or disgorgement of revenue to Vivint, in your opinion, would it be relevant that the, you know, lost profits or the revenue is tied to those states where CPI operates?

A Well, I mean, I'm not sure I understand your question only because, I mean, how would CPI claim a lost customer if the customer was outside the territory where CPI operates?

Q That's -- yeah. And I wasn't -- it wasn't a trick question. I was actually -- that's exactly what I

was asking.

What would be relevant to you in that analysis is the revenue to Vivint in the states where CPI operates. It wouldn't be relevant that they earned revenue in California or somewhere where CPI doesn't operate; is that fair?

A I mean, you know, and just to make sure, we're kind of talking about two different analytical processes here: one, the calculation of lost profits, and two, the calculation of profits available for disgorgement. So I just want to make sure. Are you asking about both or one or --

Q Well, let me ask you: Is the geographic region in which CP operates -- CPI operates relevant to both calculations?

A I mean, I guess in different ways; right? I mean, for the lost profits calculation, we'd be focusing on the profits that CPI did not achieve because of the alleged wrongful actions in this case.

So by -- because CPI has a specific geographic territory in which it operates, I would have to presume that any claims lost customer would reside or have a home within that geographic territory; right? But, you know, I guess if there was some reason why someone had a CPI account or CPI services outside that territory,

Page 114

that's a different question.
But, you know, the lost profits calculation would focus on those customers that CPI can demonstrate were lost to CPI because of the alleged wrongful actions as opposed to any other reason why someone might leave CPI.
Q Sure. And as part of that, there would need to be evidence that Vivint also was engaging in business activities in those geographic areas; correct?
A Yeah. I guess, you know, if Vivint didn't operate in that territory, it would be a bigger stretch to figure out how they caused a lost customer at CPI.
Q Got it.
So I had asked you a slightly different question before, but wouldn't you agree that it would be relevant to learn from Vivint what geographic areas they're actually engaging in door-to-door sales in order to make that determination and do that calculation?
A Well, and by that calculation, you mean specifically the lost profit calculation.
Q Correct. Sorry. Yes.
A Yeah. Well, it could be relevant. I mean, if evidence was presented that Vivint had not conducted deceptive sales practices or caused trademark confusion or any of the other alleged wrongful actions, in one of

Page 115

the states that CPI operates, then I think that we'd have to parse out any customer population that was lost because there would be -- it would seem to me that hypothetically, there would be no evidence of any wrongdoing in that territory, so CPI could not have lost that customer because of the alleged wrongful actions.
Q And that might not be tied or necessarily dependent on the state as a whole. There could be counties or even neighborhoods where Vivint does or doesn't operate; correct?
A Sure.
Q And do you know whether Vivint keeps track of the towns, neighborhoods, counties that they conduct door-to-door sales in?
A I don't know one way or the other.
Q But that's information that would be relevant to that analysis; correct?
MR. BROWN: Object to form.
THE WITNESS: Yeah. I guess, like I said, it's one way to skin that cat; right? It could be used, but I think there's -- if you didn't have it, you know, then it would be up to the plaintiff to explore other ways to develop that measurement.
BY MR. ROHNER:
Q In terms of the revenue piece that we were

Page 116

talking about, so you drew that distinction. In terms of revenue of Vivint that might be then relevant to a disgorgement analysis, would you agree that -- well, I believe you say in your report that the relevant set of revenue is the revenue that's directly attributable to those geographic regions where both CPI and Vivint operate; correct?
MR. BROWN: Object to form.
THE WITNESS: Well, yeah. I mean, if the allegation is that Vivint unjustly achieved a customer because of the alleged wrongful actions that occurred in a specific territory, then it would be kind of unreasonable to imply that revenue was unjustly achieved outside of that territory. I guess that just kind of -- common sense.
BY MR. ROHNER:
Q Do you know if Vivint keeps track of their revenue in such a way that they can differentiate between revenue that was earned in one state versus a different state?
A I don't believe Vivint had the ability to develop data specific to the states in which their sales occurred.
Q So if Vivint can't develop data specific to the states in which it occurred, you would agree that

Page 117

doing a disgorgement analysis based on the revenue achieved by Vivint would be hampered?
MR. BROWN: Object to form.
THE WITNESS: No. Like I said, that's one source of the information, but, you know, if that information isn't available, then you need to find other information that might be informative.
BY MR. ROHNER:
Q Okay. Would you agree that generally speaking, that when you're trying to determine what might be an appropriate measure of damages, you consider the facts specific to each case and the information and data that's actually available to consider?
MR. BROWN: Object to form.
THE WITNESS: I think the answer to that is yes.
BY MR. ROHNER:
Q Well, tell me: If you were making a determination as to different methodologies to measure damages, if one of the methodologies lacked significant portions of the data needed to perform the calculation, would that impact on your potential decision to use a different methodology?
MR. BROWN: Object to form.
THE WITNESS: Yeah. I mean, I guess it's

Page 118

common sense that if certain important information wasn't available, that the analyst might, you know, put less stock in the answer indicated by that more speculative calculation.

BY MR. ROHNER:

Q Right. I'd like -- I'm going to flip the report to page 16. Actually, top of 16 and beginning of 17. Okay.

And we had been -- I had started some questioning, and then I went back, and I apologize for that. I had started some questioning where I explained I'm going to kind of ask you a little bit about your comments as to Mr. Winer's corrective advertising opinion. That's how you describe it. And also, you include in your report your own alternative potential computations of corrective marketing damage amount.

Do you recall that in your report?

A Yes.

Q Okay. So first is at the top of page 17, here you identify two components of Dr. Winer's corrective advertising opinion. The first is 9.5 million to hire and train door-to-door employees, and then the second bullet point is 1.3 million for a marketing campaign.

So let's -- in the next paragraph, you say, "The Corrective Advertising Opinion may not be an

Page 119

appropriate application of the corrective advertising methodology, incorporates aggressive calculation inputs, and does not consider alternative methods to achieve an equivalent level of corrective communication."

Did I read that correctly?

A Yes.

Q Okay. So this next heading, "Inappropriate Application of Corrective Advertising Methodology," this is your explanation as to why Dr. Winer is not applying this methodology correctly; is that fair?

MR. BROWN: Object to form.

THE WITNESS: Yes.

BY MR. ROHNER:

Q Okay. So you're talking about the two components here. The -- and you start out with a discussion of the second component, the 1.3 million for a marketing campaign. And as I read this generally, you don't agree that 25 percent of CPI's marketing expense was an appropriate input for determining the marketing spend that was justified for the corrective advertising campaign; is that fair?

A I don't see in the Winer report how use of that 25 percent is supported or explained.

Q Okay. Have you done any analysis to determine whether a different percentage could be more

Page 120

appropriate?

A You know, that's a bit of a tough question. I mean, I've seen some kind of legal rulings where 25 percent was applied as kind of a maximum, but to be honest, I've never really seen a justification for that 25 percent amount.

Q So, well, explain to me. What -- in your opinion, what are the factors that should be looked at in determining what the appropriate percentage would be in this case?

MR. BROWN: Object to form.

THE WITNESS: Let's see. You know, this might not be an exhaustive list, but I think if there's going to be such a, you know, percentage of marketing expense applied as a remedy, it should be the percentage of the marketing activities that are, you know, subject to this case whereas Winer applies the 25 percent to the total CPI marketing and CPI operates in a couple different business segments. Some of which are -- seem to be outside of the allegations in this case.

I think the 25 percent needs to be supported by, you know, an analysis to show that that's at least a reasonable approximation of the marketing activities that would accomplish, you know, the goal of correcting the harm as opposed to just saying, "Hey, they spent

Page 121

this much in the past. Let's throw 25 percent on it."

You know, I think you also need to have an understanding of what comprised the marketing expenses reported by the company; right? So maybe that's -- some of those marketing expenses are unrelated to the form and format of the proposed remedy.

BY MR. ROHNER:

Q In your report, three paragraphs down from where we were just looking, it's the paragraph that starts with the word "Therefore."

Do you see that?

A I do.

Q It says "Therefore, the Winer Report's use of 25 percent in addition to the estimated cost of the hypothetical campaign would be inappropriate. Also, the use of CPI's total marketing expense, rather than Vivint's expense for door-to-door selling activities in the allegedly impacted geographies would be inappropriate."

I want to -- I don't understand. Well, let me ask you this: Why, in your opinion, is it Vivint's expense for door-to-door selling activities that's relevant to determining what the CPI marketing expense should be?

MR. BROWN: Object to form.

Page 122

THE WITNESS: Well, it's my understanding that CPI does not undertake door-to-door selling activities. And so unfortunately in this case, there's not a benchmark available from CPI's own experiences for which someone could say that the benchmark that could be used as an indication of the cost to correct the harm.

So the only data about door-to-door selling activities is data from Vivint. Now, I guess I just said, "the only data." I'm sure there are other entities that conduct door-to-door selling activities in those territories, but we don't know who they are, and there doesn't seem to have been any research presented by the plaintiff's experts indicating what other possible door-to-door selling benchmarks are out there.

BY MR. ROHNER:

Q Okay. So let me explain my confusion, and then I'll ask the question. We were talking earlier that you had identified two components to Dr. Winer's corrective marketing campaign damage assessment. You know, one piece was the -- was the 9.5 million to hire and train door-to-door employees, and the second piece was this 1.3 million for a marketing campaign.

Remember those two components?

A Yeah. Those are the two components presented in the Winer report.

Page 123

Q When you're talking about using Vivint's expense for door-to-door selling activities, are you talking about the first component of Winer's damages assessment or the second component?

A Yeah. Well, I think I'm making the point that CPI -- the 25 -- in the Winer report, 25 percent is applied to CPI's total marketing expense and that CPI's total marketing expense is not a relevant benchmark for marketing to support door-to-door selling activities because CPI's total marketing expense is comprised of activities unrelated to door-to-door selling.

Q So what's the basis for that opinion that it's not an appropriate, I guess, type of marketing expense given the fact that Vivint does door-to-door sales and CPI does not? What's the basis for that opinion?

A Well, the basis for that statement is that CPI, to my understanding, is CPI doesn't do door-to-door and that Winer applies 25 percent to the total marketing dollars reported in CPI's summary financial results.

Q Does Vivint only do door-to-door marketing?

A My understanding is they do substantial other marketing beyond door-to-door.

Q Sure. And so I'm -- I guess I'm just trying to -- I'm trying to understand in your view what's -- what the basis is for drawing that distinction between

Page 124

door-to-door sales versus general marketing as to why the 25 percent number that Dr. Winer uses is inappropriate.

A I think I just explained that; right? I mean, CPI -- or what Mr. -- Dr. Winer, whatever his name is, the Winer report provides a calculation that is 25 percent of CPI's total marketing expense. The Winer report doesn't fully explain why that's the appropriate mechanism for the calculation or why the 25 percent should be additive to the specific cost of conducting the marketing -- the door-to-door marketing campaign.

And the Winer report doesn't appear to benchmark or compare the result of applying 25 percent to CPI's actual marketing expense to any other activity that might be relevant to correcting the alleged harm in this case.

Q Okay. And so as I'm hearing you, it sounds like those were all observations you made of things that are not in his report; correct?

A Yes.

Q And have you done any analysis to determine what you think is a more appropriate percentage of marketing expense?

A No. I don't have an opinion as to a -- if there's a better percentage to use or if the calculation

Page 125

should be based entirely on the percentage, I guess, or -- but I do believe I'm offering the opinion in this report that there's no basis presented in the Winer report for having the two components be additive.

Q Is it your opinion that they should not be additive?

A I think the Winer report hasn't provided enough explanation to affirmatively demonstrate that they should be additive.

Q And you haven't done any independent analysis to make that determination either; correct?

A I guess other than what we've just discussed.

Q Okay. The next paragraph down, you talk about the cost to obtain a new subscriber through Vivint's direct-to-home sales channel. And you place a number on that of 2,495.

Do you see that?

A I guess -- yeah. I didn't come up with that number. That number is in a document from Vivint.

Q Got it. So you just note that that is the cost that Vivint attributes to the cost to obtain a new subscriber; correct?

A I think what you said is correct. I wasn't sure if you were asking a question or not. So --

Q Okay.

Well, help me understand, explain to me how that number that Vivint's cost to obtain a new customer, how that factors into your analysis of what would be a more appropriate and reasonable corrective advertising campaign damage number.

A Well, because that's a -- that is the cost that Vivint has incurred over the years to do the type of activity that the Winer report is proposing in its corrective advertising campaign, right? Vivint does conduct door-to-door sales operations and the Winer report proposes a door-to-door marketing campaign. So the data from Vivint is at least an available benchmark to determine what the cost might be to do door-to-door activity to communicate with a population of customers.

Q Okay. Explain to me the difference between the $55.19 number and the $1,091 number that you reference in your report.

A Per the document I was provided by Vivint, $55 is the amount per customer for marketing activities, and the 1,000 is the amount per customer when you include both marketing activities and employee compensation.

Q And then, presumably, there are other costs attributable to acquiring a customer that are unrelated to the marketing and unrelated to the employee costs; is that fair?

A Yes.

Q Okay. And you're just relying on Vivint's numbers for those, for -- you're relying on Vivint's records and their determination as to what the marketing cost is and what the employee costs are?

A Oh, is that -- are you asking me if that's correct?

Q Yes. Correct. Sorry.

A Yes. It's based on a document provided to me by Vivint.

Q Did you do any kind of analysis to verify those amounts that were provided by Vivint?

A I did discuss the amounts on that report with someone from the management at Vivint.

Q Who did you talk to?

A The name is referenced somewhere in my report. I want to -- I want to say Justin. Justin. I can't remember the last name at the moment.

Q But it's something you believe you referenced in the report? It's somewhere in there, the name?

A Correct.

Q Okay. All right. Well, then I won't hold you to Dustin. Justin.

A It could be Dustin. I might have gotten it wrong.

Q Okay. Did you do anything to verify with third-party sources what would be a typical marketing expense or employee cost to acquire a customer in the security industry?

A I did do some research to find compensation amounts from various sources for, you know, jobs in the -- sales jobs in this industry, yes.

Q But the calculations that are reflected in -- on page 18 of your report are tied to these numbers that you received from Vivint?

A The numbers presented on this page of my report, yes, are reflective of the document provided to me by Vivint.

Q Okay. And so kind of going down, I scrolled down a little bit while we were talking, but at the top of page 18, utilizing those two numbers, the 55.19 and the 1,091, you present what you contend is a more reasonable budget expense per customer, that it's likely within this range of 55.19 and 1,091; is that correct?

A The per-customer amount, yes.

Q Okay. And so once you determine -- I mean, do you have an opinion as to where between $55.19 and $1,091 that marketing expense should fall?

MR. BROWN: Object to form.

THE WITNESS: No.

BY MR. ROHNER:

Q Have you done any kind of analysis to determine as between $55.19 per customer and $1,091 per customer, that the cost -- the budgeted expense per customer should fall?

A No. But I do note that, you know, you will note that the results of these calculations on this page are similar to the results of the possible lost profit and possible unjust revenue calculations that we talked about earlier. So, you know, it's not fair to say that I haven't done anything because I've at least compared and reconciled these numbers with those other calculations.

Q Right. Well, I guess my question is more as between the low estimate, the lowest estimate you have on this page 18, and the highest estimate you have on this page 18, have you done any kinds of analysis to make a determination as to where, in your opinion, that number should fall?

MR. BROWN: Object to form.

THE WITNESS: No.

BY MR. ROHNER:

Q Why not?

A Well, the assignment I had and the purpose of this report is to review and address the calculations

Page 130

and opinions in the Winer report. Based on the highest number from these potential calculations, I can -- you know, anyone can reasonably see that these numbers are substantially less than the 10 million proposed and presented in the Winer report. I didn't go any further because I didn't really think that there was much more needed to indicate that the Winer report calculation is unreasonable.

Q Okay. Now, the high value you have on page 18, so the maximum amount you've identified, is the $523,800; is that correct?

A Yes.

Q And that's based on there only being proof of 480 customers being impacted; correct?

MR. BROWN: Object to form.

THE WITNESS: I believe it's correct, yes.

BY MR. ROHNER:

Q It's 480 times the high end of your estimate which was $1,091; correct?

MR. BROWN: Object to form.

THE WITNESS: I believe that's correct, yes.

BY MR. ROHNER:

Q Right. And that 480 number is tied -- is based exclusively on the 24 customer complaints that Dr. Winer references in his report; right?

Page 131

MR. BROWN: Object to form.

THE WITNESS: Yes.

BY MR. ROHNER:

Q Okay. So using this same calculation, this same analysis, if the evidence were to show that there were hundreds of complaints about Vivint sales conduct as opposed to 24, would you agree that that would significantly increase the maximum value of the advertising campaign that you reference in your report?

MR. BROWN: Object to form.

THE WITNESS: Yeah. I guess hypothetically, you know, to be fair, if, you know, the jury or the trier of fact found that a corrective advertising campaign needed to address a larger number of customers, then that -- this would be a reasonable way to quantify the corrective advertising -- the cost of the corrective advertising needed. But I think further analysis would need to be done to determine if it's the $55.19 per customer or the $1,091 per customer.

BY MR. ROHNER:

Q Okay. And you haven't done that analysis?

A At this point, no.

Q Okay. And you don't have an opinion as to how many customers were actually impacted; correct?

A Yeah. I think that's the trier of fact's

Page 132

role, right, is to determine how many people were actually impacted. But I guess from my review of the information presented in the Winer report, it appears that even some of the 24 customers may not have been deceived or confused or, you know, lost to CPI.

Q Is it possible to do a corrective -- well, let me ask a different question. Hold on.

You understand that Vivint is in -- it's in part in the business of securing customers through door-to-door sales; correct?

A I understand that that is one marketing tactic employed by Vivint.

Q Right. And you understand that as part of that process, teams of salespeople work in certain geographic areas and essentially go door to door to solicit customers; correct?

A Yes. That's basically my understanding of the door-to-door sales process.

Q Right. And does it strike you as fair that when sales people are going door to door, that the pitches and methodologies they use to present to potential customers are, you know, generally consistent?

MR. BROWN: Object to form. Vague.

THE WITNESS: Yeah, I don't have any opinions on that.

Page 133

BY MR. ROHNER:

Q Okay. Would it surprise you that a salesperson that's trained to go door to door presents a similar, for lack of a better term, pitches to potential customers?

MR. BROWN: Same objection.

THE WITNESS: I guess would it surprise me that they use a similar pitch each time they go door to door? I mean, I guess I don't -- yeah, I don't really have an opinion on that.

BY MR. ROHNER:

Q Okay.

A I was trying to decipher your question there.

Q You know, you're not the first to have struggled to decipher my question.

A Well, it probably won't be the last time today either, right?

Q No. Probably not.

Well, when you're trying -- when you're determining how to apply a corrective -- well, let me ask a better question. The numbers you've utilized for -- for coming up with what you say is a more reasonable corrective marketing campaign, is tied to customers that can -- a number of customers that can actually be identified as having been impacted; correct?

Page 134

MR. BROWN: Object to form.
THE WITNESS: Well, I mean, that's based on my experience and, you know, study and education, that's -- a critical element of the corrective advertising calculation. I mean, there's essentially two parts to it: What's the size of the audience, and then what's the cost to reach that audience.
BY MR. ROHNER:
Q And the size that you're using is the size that's based on 24 complaints that are referenced in the Winer report; correct?
MR. BROWN: Object to form.
THE WITNESS: Correct. Yeah. The 24 comes from the Winer report.
BY MR. ROHNER:
Q And ultimately, the size that will be applied with respect to determining a damage calculation is going to be the number that a jury decides were impacted by the conduct; correct?
MR. BROWN: Object to form. Improper hypothetical.
THE WITNESS: You know, I -- I suppose that that's one way that the number could be derived, right, that the jury would just come up with a number.
///

Page 135

BY MR. ROHNER:
Q Well, and also, that there may be evidence that's presented at trial that suggests that there were more than 24 customers who were impacted by wrongful conduct; is that fair?
A You know, I don't know what you're going to present or what's going to be presented at trial. But yeah, I mean, I guess if there is additional evidence, then, you know, that evidence would have to be reviewed and analyzed and the jury would make a determination if they -- there was impact.
Q Now, if Vivint doesn't keep track of the customers that they actually approach and doesn't keep track of the revenue they receive in the geographic regions where they work, is it possible to truly determine the total number of potential customers who are impacted by the wrongful conduct and that might require corrective advertising?
MR. BROWN: Object to form.
THE WITNESS: Hypothetically, I imagine there -- there could be. I guess I haven't seen somebody attempting other approaches other than just kind of saying, "Well, Vivint didn't tell us, so we can't do it."
///

Page 136

BY MR. ROHNER:
Q I just want to make sure I understand your answer. You said, "Vivint didn't tell us and we didn't do it." Can you tell me Vivint didn't tell us what and we didn't do what?
MR. BROWN: Object to --
THE WITNESS: Now, I guess --
MR. BROWN: Wait. Hold on. Object to form. Mischaracterizes the witness's testimony.
If you can answer the question, proceed.
THE WITNESS: I was referring to the hypothetical we were working in where you were explaining information that Vivint had -- that you stated Vivint hasn't provided, and I was -- my comment was -- yeah. How do I say it in a more clear way? That I haven't seen any analysis from the plaintiff's experts that they attempted to resolve that issue by using alternative forms of data.
BY MR. ROHNER:
Q Okay. You can't say and you don't know who -- what number of CPI customers were actually affected by the alleged wrongful conduct; correct?
A I haven't seen any analysis that shows that, no.
Q And you haven't done your own analysis?

Page 137

A No. I wasn't asked to.
Q Okay. I'm going to direct your attention to one of your schedules. Got it. Okay.
This is Schedule 3. We were looking at this, I think, a little earlier. Maybe we --
A I don't think we've looked at this other than scrolling past it.
Q Got it. So what I want to understand is you have here at the bottom, you have a section called "Impact of Alternative Inputs."
Do you see that?
A I do.
Q And I want to make sure I understand kind of what these alternative inputs are that you're plugging in and the basis for them. Okay?
I assume that at the top of these -- each of these columns is the input that Dr. Winer used; is that right?
A Yes.
Q The one that -- and this -- I don't know what the exhibit eventually will look like, but what I'm looking at right now has -- there are blue-colored numbers and then there's a grayed -- gray or black number. And at the top of each of these, for "Customer Count," for "Salary," for "CPI Marketing," the black

Page 138

number at the top is the input that Dr. Winer used; correct?
A Yes.
Q Okay. And so looking at "Customer Count," I see that the input he used was 202,000. Then you have three alternatives. You have the 24 customers, and that's the 24 customer complaints that are referenced in Dr. Winer's report; correct?
A The 24 transcripts, yes.
Q Okay. And then the next count is 480 customers. That's multiplying the 24 customers by 20 pursuant to that 5 percent-95 percent ratio; correct?
A Yes.
Q Okay. Now, on the results side, the results under both the 24 and the 480 are the same, so the first question I have is: Is that a mistake or is there something I'm missing?
A I don't believe it's a mistake. As I recall, we kind of questioned how that happened too, but what's happening is the -- there's kind of -- the way the Winer report corrective advertising calculation is built, it defaults to a minimum amount because of the 25 percent addition. So under a certain customer count, the number -- the cost to do the campaign no longer has any impact on the total result of the two-part calculation.

Page 139

Q Okay. I think I understand that. I may have to come back to that. So your testimony is that that's a product of the actual computation that Dr. Winer does or that the equation he used for that calculation; is that fair?
A Yeah. In other words, each table there represents what would happen if you change one and only one of the inputs in the Winer calculation or the form -- the complete formula presented in the Winer report.
Q Okay. Then you have a number 25,000. Where does that number come from?
A Just a, you know, placeholder number to show the impact of a slightly larger number but a number less than the total population of CPI's customers.
Q Okay. Did you do any kind of analysis in coming up with that placeholder number?
A No. It is purely a placeholder number.
Q Okay.
A I would hope that the table would still work if you picked 15,000 or 50,000.
Q Okay. Heading over to the salary -- the 74,563, that's the number that Dr. Winer uses; correct?
A Yes.
Q And then I believe you have a different

Page 140

schedule. We can go back to it if needed. But you had a different schedule that used some third-party sources for other potential salaries, including Vivint; correct?
A Yes. So yeah. I did some research to find alternative compensation amounts for, you know, what could be relevant benchmarks for the marketing campaign outlined by -- in the Winer report.
Q And are you offering an opinion as to which of those potential alternative salaries would be more appropriate than the salary amount used by Dr. Winer?
A I don't offer an opinion saying one specific amount is the more appropriate amount, but the opinion I'm offering is that Winer seems to have limited his research to one observation and has not tested the impact of alternative benchmarks or alternative inputs.
Q Okay. Whether there are alternative benchmarks or not, have you done any kind of analysis to make a determination as to which benchmark is most appropriate?
A Well, from the research presented in this report, it does appear that the number used in the Winer report is at the high end of the observed range -- of the range of research observations.
Q Okay. The fact that it's at the high end, does that mean that it's not an appropriate input --

Page 141

A No. I didn't say that. I said that's an observation.
Q Okay. So you don't have an opinion as to which of the various inputs is appropriate?
A Correct.
Q Okay. The next column you have is the "CPI Marketing." Now, I assume that's a reference to a CPI marketing budget?
A Correct. Yes.
MR. BROWN: I'm sorry. I didn't -- I wasn't sure if that question was over. Just let me object to form on that one.
BY MR. ROHNER:
Q When you say "CPI marketing," you're referring to CPI's marketing budget?
A Yeah. It's explained on this page a little higher up. It says "Marketing Budget based on Plaintiff's responses the Defendant's RFPs (per the Winer Report, page 41, footnote 87)." And then, you know, I do look at Schedule 1, the average annual marketing cost reported is 15.3 million, but the Winer report uses 15.5 in its calculation. So the table at the bottom right of this page is the impact of using an alternative input.
Q Got it. And so the first input down is

2.5 million. What's the basis for that as an alternative input?
A I've put in numbers that are all lower than the 15.5 because I understand from CPI's limited, you know, summary financial results that 15.5 would be the marketing budget related to all of CPI's marketing activities for all of their business segments. And since the alleged wrongful actions occurred only in the -- or appeared to have occurred only in the home segment for CPI, it would be reasonable to presume that some of CPI's marketing expenses, some of the 15.3 million marketing expenses are expenses in support of operations outside the residential or home marketplace.
Q You've done -- you haven't done any analysis of CPI's marketing budget to differentiate between your 2.5 million, your 5 million, and your 10 million as to what, in your view, would be the appropriate number to use for the 25 percent calculation?
A Yeah. I didn't receive any information that specified what CPI's marketing budget for its home segment is or was. Those numbers are placeholders. The intent is not to show the impact of the specific number but the range of possible results from using an alternative input.

Q Hold on a second. I apologize.
I'm pretty close to done, but let me -- why don't we take five minutes and let me go through my notes and make sure.
MR. BROWN: Okay.
MR. ROHNER: Okay.
MR. BROWN: So just for ease, can we say come back at ten after the hour?
MR. ROHNER: Yes. Ten after. Perfect.
MR. BROWN: Great.
THE VIDEOGRAPHER: We're going off the record. The time is 2:02 p.m.
(Off the record.)
THE VIDEOGRAPHER: We are going on the record. The time is 2:13 p.m.
BY MR. ROHNER:
Q Okay. I do still have a few more questions, but I don't expect that it's going to take very long.
So I -- hopefully, you're seeing -- I think I'm screen sharing. I've pulled up page 20 of the report. And I want to ask you specifically about one of the alternatives you identify for a corrective advertising campaign, concerns utilizing different methods to communicate with customers than door-to-door sales.

Do you recall that portion of your opinion?
A More or less, yes.
Q Yeah. And if you'll look at the top of the first full paragraph of this page 21 of your report, it says "Rather than build a door-to-door marketing function, a combination of email, letters, online communications, and phone calls could achieve an equivalent amount of customer contact and communication at less cost, using less expensive resources."
My first question is: What kind of analysis did you do to make the determination that a combination of emails, letters, online communications, and phone calls would achieve an equivalent amount of customer contact?
A As I said, I said it "could." I don't know that it would or it wouldn't. But it's not something that's explored in the Winer report, so I'm merely offering this up as a critique of Winer's reliance on one calculation mechanism.
Q But sitting here today, you don't have an opinion as to whether or not using a combination of email, letters, online communications, and phone calls would, in fact, achieve an equivalent amount of customer contact; correct?
MR. BROWN: Object to form.

THE WITNESS: I guess further analysis would need to be done to make sure that is correct, but it's -- the critique here is that the Winer report didn't explore that.
BY MR. ROHNER:
Q And at this point, you haven't explored that either; correct?
MR. BROWN: Object to form.
THE WITNESS: I have not been asked to develop that type of analysis at this point.
BY MR. ROHNER:
Q Okay. In determining whether email, letters, online communications, and phone calls would be sufficient for corrective advertising, would it be relevant to you what Vivint does when they learn the customer of theirs might have received deceptive information from a competitor?
A I think --
MR. BROWN: Object to form. Hold on. Object to form. You can go ahead.
THE WITNESS: Sorry.
I guess you said, "Would it be relevant to know what Vivint does?" Did you mean CPI or Vivint?
BY MR. ROHNER:
Q I meant Vivint.

Page 146

A Oh, okay. Can you just rephrase your question again? I kind of got hung up and I thought you used the wrong name.

Q Sure. In determining whether emails, letters, online communications, and phone calls could achieve an equivalent amount of customer contact, would it be relevant to you what Vivint does when they learn that a customer may have received deceptive information from a competitor?

MR. BROWN: Object to form.

THE WITNESS: I guess I don't know how to answer that. I did not explore what Vivint does if Vivint feels one of Vivint's customers was approached with a deceptive sales practice. It was not a topic that I looked into.

BY MR. ROHNER:

Q If the evidence were to show that Vivint had a team of salespersons that they flew to areas where they learned that a third party -- a third-party competitor was deceptively stealing clients, stealing customers, in order to have those salespersons speak with the customers directly in person, would that be relevant to your determination as to whether emails, letters, online communications, and phone calls are equivalent to face-to-face meetings?

Page 147

MR. BROWN: Object to form.

THE WITNESS: I don't think I can answer that without kind of understanding more about the -- the tactic or the processes that you're alluding to.

BY MR. ROHNER:

Q Okay. And to date, that's not any kind of analysis that you've done?

A Yeah. I haven't --

MR. BROWN: Object to form.

THE WITNESS: I haven't -- I haven't done that. That's --

BY MR. ROHNER:

Q Sorry. I'm scrolling ahead here for a couple more questions.

The lettering on this Schedule 5 is pretty small, so I've blown it up. Hopefully you can read it.

A I can read it. Yes.

Q Okay. And so this is Schedule 5 to your report. And I -- first, tell me what this is.

A This is a review of the 24 transcripts that are attached to and cited in the Winer report.

Q Okay. Did you just review the transcripts, or did you also listen to the recordings as well?

A I believe I relied on -- I only had the transcripts.

Page 148

Q Okay. And you looked at these transcripts and created this schedule to summarize indications of possible harm alleged to have been inflicted by Vivint; is that fair?

MR. BROWN: Object to form.

THE WITNESS: Yeah. For the most part, yes.

BY MR. ROHNER:

Q Right. And so you reviewed the transcripts, among other things, to see if the transcripts confirmed that there was actually or possibly a communication by a Vivint salespeople associating themselves with CPI; correct?

MR. BROWN: Object to form. Lack of foundation.

THE WITNESS: Yeah. I mean, you said I reviewed the transcripts amongst other things. I mean, this schedule is based entirely on the transcripts.

BY MR. ROHNER:

Q Okay.

A The --

Q And --

MR. BROWN: Let him finish the answer. Go ahead.

THE WITNESS: And yeah. This is a schedule that is my review of the text in those transcripts.

Page 149

BY MR. ROHNER:

Q You did your own independent analysis of the text in those transcripts; correct?

A Yeah. I guess I wouldn't call it -- I mean, whatever you want to call it. I mean, I looked at the comments in the transcripts and looked for statements that indicated confusion or statements that indicated an implied association by the Vivint rep with the -- or somehow affiliated with CPI. I looked to see if the -- if there was evidence from the transcript that the specific customer who called in for that transcript left CPI and went to Vivint. And, you know, to the extent possible, looked through the commentary in the transcript to see if, you know, some perception of the customer's from what they had said in the transcript warranted a corrective advertising effort.

Q And as part of that analysis, your conclusion with respect to statements reflecting association with CPI was that 17 of the 24 either possibly or in fact reflected associated with CPI in the transcript?

MR. BROWN: Object to form.

THE WITNESS: Correct. In other words, the -- I counted in the 17 any time it looked -- there was even a hint of association.

///

BY MR. ROHNER:
Q Okay. And that's -- so based on your analysis, 17 of the 24 included at least a hint of association with CPI; correct?
MR. BROWN: Object to form.
THE WITNESS: Yes. And you've got to also realize that this is just a review of the text in the transcripts. I haven't seen or heard other interactions between CPI and these same customers, if some exist, or, you know, if the transcript is as accurate transcription of the actual call. But subject to those provisions, yeah, based on the text alone, if there was some hint of an association.
BY MR. ROHNER:
Q Right. And you also haven't reviewed any transcripts of communications between Vivint and customers that claimed that Vivint engaged in deceptive practices or associated themselves with CPI; correct?
A Yeah. I'm not aware of such information.
Q Okay. I have nothing further.
MR. BROWN: Okay. We will read, and we will order a transcript. The -- hopefully we have a standing order. If we do not, then go -- please reach out to Paula Castro and she'll tell us -- tell you what we -- what our order is.

THE COURT REPORTER: Thank you.
THE VIDEOGRAPHER: Should we go off the record now?
MR. ROHNER: Yes.
(Whereupon, at 2:25 p.m. the deposition was concluded.)

COURT REPORTER'S CERTIFICATE

STATE OF CALIFORNIA:

I, Katherine West, RPR, Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the witness in the foregoing deposition was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth in the foregoing cause; that the deposition was taken before me at the time and place herein named; that said deposition was reported by me in shorthand and transcribed, through computer-aided transcription, under my direction; and that the foregoing transcript is a true record of the testimony elicited at proceedings had at said deposition to the best of my knowledge, skills, and ability to discern testimony via videoconference transmission.

I do further certify that I am a disinterested person and am in no way interested in the outcome of this action or connected with or related to any of the parties in this action or to their respective counsel.

In witness whereof, I have hereunto set my hand this 27th day of October, 2021.

Katherine West, RPR
CSR No. 14386
Expiration: December 31, 2021

Joshua Brown, Esq.
brownjr@gtlaw.com

October 28, 2021

RE: CPI Security Systems, Inc, v. Vivint Smart Home, Inc.
10/8/2021, Brian Buss (#4811576)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at erratas-cs@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

CPI Security Systems, Inc, v. Vivint Smart Home, Inc.

Brian Buss (#4811576)

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE______________________

________________________________________________

REASON__________________________________________

PAGE_____ LINE_____ CHANGE______________________

________________________________________________

REASON__________________________________________

PAGE_____ LINE_____ CHANGE______________________

________________________________________________

REASON__________________________________________

PAGE_____ LINE_____ CHANGE______________________

________________________________________________

REASON__________________________________________

PAGE_____ LINE_____ CHANGE______________________

________________________________________________

REASON__________________________________________

PAGE_____ LINE_____ CHANGE______________________

________________________________________________

REASON__________________________________________

______________________________ ______________

Brian Buss Date

CPI Security Systems, Inc, v. Vivint Smart Home, Inc.

Brian Buss (#4811576)

ACKNOWLEDGEMENT OF DEPONENT

I, Brian Buss, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

____________________________ _______________

Brian Buss Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF _______________, 20___.

_________________________

NOTARY PUBLIC

**&**

**&** 3:4,16 25:24

**0**

**00504** 1:6 5:15

**1**

**1** 1:25 4:9 13:19 13:24 14:4,21 43:5 65:18 67:5 141:20
**1,000** 126:20
**1,091** 126:16 128:17,19,23 129:3 130:19 131:19
**1.3** 118:23 119:16 122:22
**10** 105:13 130:4 142:17
**10/8/2021** 153:5
**10:00** 7:23
**10:46** 63:11
**11:02** 63:14
**12:05** 103:5
**12:44** 103:8
**12:58** 111:18
**1300** 3:17
**1352** 59:4 65:24
**1352.csv** 65:19 66:12
**14** 4:9,10
**14386** 1:25 2:5 152:19
**15** 62:25
**15,000** 139:21
**15.3** 141:21 142:12
**15.5** 141:22 142:4 142:5
**155** 1:25
**16** 14:20 110:21 118:7,7
**1660** 3:6
**17** 110:20 118:8,19 149:19,23 150:3
**17th** 3:6
**18** 128:9,16 129:16 129:17 130:10
**19** 5:10 89:7,10
**1993** 40:5
**1:00** 7:25 101:17
**1:07** 111:21
**1:35** 102:25,25

**2**

**2** 4:10 13:24 14:4 18:8 63:17,24,25 64:24 65:1 66:10 78:16 93:1
**2,495** 125:16
**2.5** 142:1,17
**20** 138:11 143:20 155:15
**201** 3:17
**2011** 40:13
**2018** 26:1
**2019** 20:8,9,12 23:10 37:1
**202,000** 138:5
**2020** 20:10,15
**2021** 1:17 2:4 5:1 5:6 14:20 152:13 152:19 153:3
**21** 42:18 43:23 144:4
**22** 42:18,25 43:24 63:17 73:9
**24** 57:9 59:24 60:24 61:4,11 62:15 63:25 64:12 66:18,19 92:9 93:9,11,13 94:2 96:4,6 98:5,15 100:11 130:24 131:7 132:4 134:10,13 135:4 138:6,7,9,11,15 147:20 149:19 150:3
**25** 56:19 57:5,21 57:22 72:16 119:18,23 120:4,6 120:17,21 121:1 121:14 123:6,6,18 124:2,7,9,13 138:22 142:19
**25,000** 139:11
**26** 20:1
**26652** 152:18
**27** 25:23
**27th** 152:13
**28** 18:24 153:3
**29** 19:7
**2:02** 143:12
**2:13** 143:15
**2:25** 2:4 5:2 151:5

**3**

**3** 68:15 92:24 137:4
**30** 19:11 36:18 39:6,25 40:10 101:21 153:17
**303.285.5300** 3:7
**31** 152:19
**32801** 3:13
**35** 65:8
**3:20** 1:6 5:15

**4**

**407.420.1000** 3:14
**41** 141:19
**450** 3:6,12
**480** 94:2 98:17 130:14,18,23 138:10,15
**4811576** 153:5 154:2 155:2

**5**

**5** 75:15 93:24 96:20 97:16 99:4 138:12 142:17 147:15,18
**50,000** 139:21
**523,800** 130:11
**55** 63:7 126:18
**55.19** 126:16 128:16,19,22 129:3 131:18

**6**

**6** 4:5 78:3 93:5
**650** 3:13

**7**

**74,563** 139:23

**8**

**8** 1:17 2:4 5:1,6
**801.322.2516** 3:18
**80202** 3:7
**84111** 3:18
**87** 141:19
**89** 65:13 108:15
**89,000** 108:16

**9**

**9.5** 118:21 122:20
**95** 94:1,9,15 95:12 95:16,23,23 96:2 96:20 97:9,11,16 99:4 138:12
**9:00** 7:23
**9:02** 2:3 5:2,5
**9:17** 14:13
**9:23** 14:16

**a**

**a.m.** 2:3 5:2,5 14:13,16 63:11,14
**ability** 30:18 32:18 106:23 107:21 116:21 152:10
**able** 24:9,10 28:8 88:22,24 89:9 91:23
**acceptable** 50:11
**accepted** 32:2,6,7 32:13
**accomplish** 120:24
**account** 113:25
**accuracy** 9:13 153:9
**accurate** 24:8 70:20 95:17 150:10
**accused** 21:12
**achieve** 82:4,5 113:18 119:3 144:7,13,23 146:5
**achieved** 45:3 82:24 85:24,25 92:1 99:22 116:10 116:13 117:2
**acknowledgement** 155:3
**acknowledgment** 153:12
**acquire** 128:3
**acquiring** 126:23
**acquisition** 1:7
**act** 11:12 32:14 33:2 76:11,15,18 77:11,22 90:23
**action** 1:6 5:11 29:11 77:2,14 152:12,12
**actions** 65:10,17 105:19,23 106:1 107:3 113:19 114:4,25 115:6 116:11 142:8
**activities** 114:9 120:16,23 121:17 121:22 122:2,8,10 123:2,9,11 126:19 126:21 142:7
**activity** 124:14 126:8,14
**actual** 24:14,17 27:22 42:9 45:1 45:18,21 46:2,6,9 46:12,15 48:4 52:8,12,16 53:16 54:4,6,8,18,22 56:4,6,9,11 67:11 68:2,17 69:1 70:15 73:1 81:1 81:11 83:3 100:4 104:8 124:14 139:3 150:11
**add** 12:12 71:20
**addition** 72:17 121:14 138:23
**additional** 13:14 16:12,13 44:6,11 45:2 57:15,21,22 64:8 72:13,16 86:21 87:4 96:10 135:8
**additions** 155:6
**additive** 30:16 77:6,15,18 124:10 125:4,6,9
**address** 46:20 72:6 74:23 129:25 131:14
**addressed** 83:1
**addresses** 58:7 65:21
**addressing** 13:4
**administer** 6:3
**administration** 40:17
**ads** 22:11,12
**adt** 16:14,22 17:8 17:15 19:19 41:24 42:4
**advertise** 36:10
**advertising** 8:23 9:1,3,9 12:5,10,17 12:20 13:1,6,11,18 15:21 16:2,15 17:16,25 18:12,17 18:20 19:1,9,13 20:20 21:14,16 22:3,7,24 23:3,22 24:1,5 25:5,9 26:17,20 27:18,20 27:25 28:4 29:6 29:17,25 31:6,17 32:3,5,13 33:24 34:18 35:5,9,13,19 36:1,7,12,22 37:5 37:10 38:2,23 40:9,25 41:4,6,8,9 41:15,21 45:17 46:1,16 47:25 48:16,22 49:7,17 50:1,10,19 51:3,6 51:9,15,20 53:20 54:6,9,18,20 55:3 55:7 56:1,23 64:1 64:9 66:14 68:4 70:7,12,17,19 71:2 72:2 73:3,11,20 80:5 81:9,24 110:25 118:13,21 118:25 119:1,8,20 126:4,9 131:9,13 131:16,17 134:4 135:18 138:21 143:23 145:14 149:16
**advised** 73:3
**affiliated** 149:9
**affirmatively** 125:8
**aggressive** 119:2
**ago** 19:2 32:21 38:10 40:10
**agree** 6:25 48:19 55:3 71:16 75:2 83:16 85:9,10 95:16 98:5 102:14 104:23 106:16 109:3 114:15 116:3,25 117:9 119:18 131:7
**ahead** 6:19 16:7,9 17:2 44:15,18 68:8 75:24 96:2 145:20 147:13 148:23
**aided** 152:8
**al** 32:24
**allegation** 84:2 116:10
**allegations** 11:6 11:16 20:19 21:7 21:10,22,24 23:15 23:18 27:7 29:2 33:5,14,17 47:4,8 47:12 92:6 104:13 120:20
**allege** 80:10
**alleged** 29:7 47:2 69:16 70:20 79:16 79:20 80:3,4

86:16 88:18 91:5
92:5 105:1,19,22
106:1 107:2 108:6
113:19 114:4,25
115:6 116:11
124:15 136:22
142:8 148:3
**allegedly** 27:12
31:7 121:18
**alleging** 33:10
48:9
**allotted** 153:20
**allow** 8:1
**allowed** 38:22
**allowing** 103:10
**alluding** 147:4
**alternative** 30:16
30:23 34:6 72:24
73:19 74:7,8
91:20 93:8 118:15
119:3 136:18
137:10,14 140:5,9
140:15,15,16
141:24 142:2,25
**alternatives** 29:24
138:6 143:22
**american** 18:10
20:7 21:8
**amount** 30:21
45:22 48:2 56:2,4
73:2 75:11 82:9
91:25 92:4 95:18
105:18,21 118:16
120:6 126:19,20
128:20 130:10
138:22 140:10,12
140:12 144:8,13
144:23 146:6
**amounts** 127:12
127:13 128:6
140:5

**analyses** 45:15
70:4 87:1
**analysis** 8:18,19
8:19,20 26:17,22
30:17 37:2 47:13
49:23 54:23 62:8
62:15 64:14 65:18
69:8 70:19 72:21
74:13 75:9 83:12
85:14 86:3,15,18
88:24 89:23 90:4
90:10 91:8,15
92:3 97:4 98:17
99:16,21 100:22
101:14 103:19
104:3,7,9,16,22,24
105:12 107:21
108:5,7 109:4,14
109:15 111:1,3
112:15 113:2
115:17 116:3
117:1 119:24
120:22 124:21
125:10 126:3
127:11 129:2,17
131:5,17,21
136:16,23,25
139:16 140:17
142:15 144:10
145:1,10 147:7
149:2,17 150:3
**analyst** 74:6 75:8
75:9,9,12 82:8,11
118:2
**analyst's** 79:7
**analytical** 37:24
113:8
**analyze** 100:17
**analyzed** 80:9
135:10

**analyzing** 97:16
**angeles** 5:8
**annual** 141:20
**answer** 6:23 7:2,7
10:9 20:24 30:14
30:14 31:12,19
61:21 77:25
117:15 118:3
136:3,10 146:12
147:2 148:22
**answered** 86:10
**answers** 6:21
**apologize** 15:10
68:9 81:6 111:8
111:15 118:10
143:1
**apparently** 35:12
**appear** 67:11
99:13 124:12
140:21
**appeared** 142:9
**appearing** 3:3,10
3:21
**appears** 49:8
132:3
**appended** 155:7
**applicability**
94:25
**applicable** 153:8
**application** 119:1
119:8
**applied** 92:14 98:6
120:4,15 123:7
134:16
**applies** 120:17
123:18
**apply** 133:20
**applying** 8:15,19
98:6,16 119:9
124:13

**apportionment**
92:4
**appreciate** 26:12
32:16 80:20
**approach** 73:22
74:10 135:13
**approached** 31:23
108:3 146:13
**approaches** 75:6
75:17 76:1,7
135:22
**approaching**
75:25
**appropriate** 7:16
24:6 28:5,10,13
29:12 34:9 35:1
36:1,5 51:3,6,9,15
73:12 74:10 80:3
81:10 97:13
100:22 117:11
119:1,19 120:1,9
123:13 124:8,22
126:4 140:10,12
140:19,25 141:4
142:18
**appropriateness**
23:25 66:13
**approximation**
120:23
**area** 112:12
**areas** 114:9,16
132:15 146:18
**articles** 36:6 41:17
41:20
**artificial** 88:22
**arts** 40:4
**aside** 44:10
**asked** 9:11 10:10
11:4 15:19 22:7
44:6 52:24 53:3,4
54:4 70:14 86:9

90:11,19 94:23
110:15 114:14
137:1 145:9
**asking**   6:25 7:8
39:14 58:25 77:10
90:12 113:1,11
125:24 127:6
**aspect**   24:25 37:9
**assess**   100:6
**assessment**   27:17
122:19 123:4
**asset**   55:1 67:25
**assets**   67:13 68:19
69:3
**assignment**   53:6
129:24
**associated**   9:8
12:15 149:20
150:18
**associating**   148:11
**association**   149:8
149:18,24 150:4
150:13
**assume**   7:8 137:16
141:7
**assumed**   35:20
**assuming**   57:9
90:1
**assumption**   72:1,3
72:5,9
**assumptions**   71:3
71:9,22,22 72:13
72:23,24,25 73:9
**ate**   101:19
**attached**   15:14,24
17:19 147:21
153:11
**attempt**   50:1
85:19 89:16
**attempted**   83:13
136:17

**attempting**   85:22
135:22
**attention**   32:19
42:7 43:10 70:25
104:21 137:2
**attorney**   5:17
153:13
**attributable**   91:9
116:5 126:23
**attributed**   105:22
**attributes**   125:21
**audience**   134:6,7
**august**   14:20
**availability**   90:13
**available**   13:3
37:8,11 53:15
65:16 88:12
106:22 113:10
117:6,13 118:2
122:4 126:12
153:6
**avenue**   3:12
**average**   141:20
**avoid**   59:14
**award**   56:3 75:11
78:5 81:9
**awarded**   79:3
**awarding**   70:17
**aware**   35:16,23
44:12 57:13,23
58:8 61:9 71:25
93:20 150:19

**b**

**b**   4:7
**bachelor**   40:4
**back**   7:13 8:5
10:14 15:8,19
17:7 19:15 28:22
38:11 39:2 42:10
43:2 49:15 59:23
63:7 67:5,6 68:8

70:13 81:5 89:21
101:23 111:24
118:10 139:2
140:1 143:8
**background**   6:14
15:15 39:7
**backward**   46:9,10
**bacon**   3:4 5:19
**bad**   84:18
**ballpark**   10:2
**bar**   8:6
**based**   11:8 30:5
35:14 37:23 44:11
46:5 71:2 72:6
73:21 75:7 78:19
80:1 81:17 91:11
92:8 96:4 99:9
117:1 125:1 127:9
130:1,13,24 134:2
134:10 141:17
148:17 150:2,12
**basic**   55:15 94:13
**basically**   72:15
78:11 132:17
**basis**   31:14,16
45:11 93:13
123:12,15,16,25
125:3 137:15
142:1
**bates**   58:24
**bathroom**   111:9
**beginning**   2:3
110:21 118:7
**behalf**   2:2 5:13 6:5
11:2 21:18
**behavior**   94:19
**believe**   10:10
13:23 14:19 17:14
19:8 23:6 26:19
31:12 33:20 34:13
39:5 41:23 43:8

66:19 73:10 82:11
92:13 98:14
108:14 112:4
116:4,21 125:2
127:19 130:16,21
138:18 139:25
147:24
**benchmark**   122:4
122:5 123:8
124:13 126:12
140:18
**benchmarks**
122:14 140:6,15
140:17
**benefit**   99:20
**benefits**   45:2
**best**   7:6 70:21 74:6
82:11 102:17,18
152:10
**better**   60:22 61:21
64:7 74:21 87:3
124:25 133:4,21
**beyond**   123:22
**big**   88:14 89:6
**bigger**   114:11
**biology**   40:4
**bit**   39:3 46:9 47:23
50:3 67:9 75:13
78:2,10 79:25
80:19 118:12
120:2 128:15
**bite**   7:15 8:1,5
**bites**   103:11
**black**   137:23,25
**blown**   147:16
**blue**   137:22
**body**   71:11,21
75:14
**borne**   99:11
**bottom**   18:15 23:7
23:8 137:9 141:23

**bound** 96:3
**brand** 47:2,5,19 51:8 55:10,12 67:11,12,13,25 68:3,18,18,19 69:2 69:3,11,14 70:15 70:16,22,24
**branding** 40:25 41:7
**brands** 69:21,24 70:3,4
**breadth** 101:7
**break** 7:11,15 8:1 14:18 50:3 57:4 62:21,23 88:22 101:20 103:11 111:5,9,24
**breakout** 90:13
**breaks** 102:20
**brian** 1:15 2:1 4:3 4:9 5:11 6:4 16:6 16:6,9,24 153:5 154:2,24 155:2,4 155:12
**bridge** 25:24 26:19
**brief** 111:5
**broader** 59:8 66:20 94:19 95:18 95:22
**broke** 63:16
**brown** 3:12 5:22 5:22 8:6 10:7,17 11:7,17,22 12:6 16:6,8,24 20:1,21 28:17 30:3,13 31:9,18 35:3 38:18 39:11,21 43:18 44:1,14,17 45:7 47:15 50:6 50:13 51:10,17 52:5,20 53:2,11 54:12 57:24 58:15 58:23 60:4 62:6 62:18 63:7 64:18 66:15 67:1,17 69:10,25 73:6 76:2 77:16,23 79:4,23 80:18 84:8,20 85:6 86:9 86:25 87:8 88:20 93:22 94:10 95:4 96:22 97:7,21 98:9,21 100:1,24 101:8,24 102:4,16 102:18 103:1,23 106:11 107:10,23 108:23 109:6 110:2 111:4,8,12 111:15 115:18 116:8 117:3,14,24 119:11 120:11 121:25 128:24 129:20 130:15,20 131:1,10 132:23 133:6 134:1,12,20 135:19 136:6,8 141:10 143:5,7,10 144:25 145:8,19 146:10 147:1,9 148:5,13,22 149:21 150:5,21 153:1
**brown's** 111:24
**brownjr** 3:14 153:2
**budget** 128:18 141:8,15,17 142:6 142:16,21
**budgeted** 129:4
**budgets** 87:19 90:18
**build** 44:7 144:5
**built** 138:21
**bullet** 43:12,15,23 44:23 45:12 51:24 53:8,24 56:18 59:23 60:23 62:14 63:17,24,24 66:9 66:18 67:2,9,21 68:15 71:1,23 73:8,9,14,18 105:15,24 107:1 112:2,5 118:23
**business** 8:18,19 40:17 87:13,13,14 87:21 88:1,3,7,8 89:7 90:15,19 114:8 120:19 132:9 142:7
**buss** 1:15 2:1 4:3,9 5:11 6:4,10 8:10 14:18 39:1 42:13 63:16 80:19 103:10 153:5 154:2,24 155:2,4 155:12

**c**

**c** 3:1
**calculate** 26:15 31:16 38:22 50:11 82:13 99:20
**calculated** 54:20 56:2
**calculating** 8:25 29:16 37:3,6 74:8 75:2,6,17 76:1,7
**calculation** 8:20 9:11 12:20 16:16 18:12,20 19:1,9,14 26:18,23 27:22,24 27:24 28:9 30:5,9 31:24 32:3 34:2 45:1,2,19 46:14,15 46:16,18 48:3,6,14 49:7 50:1,16,24 52:12,16 53:16 54:3,6,20,22 55:7 55:25,25 56:13 68:21 69:3,9,18 71:4 73:15,16 79:16,21 85:18 91:22,24 92:7,12 92:14 93:8 96:8 96:14 113:9,10,17 114:2,18,19,20 117:21 118:4 119:2 124:6,9,25 130:7 131:4 134:5 134:17 138:21,25 139:4,8 141:22 142:19 144:19
**calculation's** 9:12 9:14
**calculations** 9:4,5 9:8 12:22,25 13:4 30:16 53:14 78:21 81:16 86:3,23 87:6 91:19 92:8 113:15 128:8 129:7,9,13,25 130:2
**california** 5:8 113:5 152:3,4
**call** 41:8 56:19 57:5,9 58:17 59:24 60:7,24 61:4,11 62:15 63:25 66:18,19 149:4,5 150:11
**called** 6:5 25:16 42:16 92:24 137:9 149:11

**calling** 60:15,17 80:6
**calls** 107:9,17,20 110:1,7 144:7,13 144:22 145:13 146:5,24
**campaign** 9:1 22:10,11,13 29:17 31:6 56:23 72:5 72:11,17 73:3 80:6 95:22 118:23 119:17,21 121:15 122:19,22 124:11 126:5,9,11 131:9 131:14 133:23 138:24 140:6 143:23
**campaigns** 9:3,9 12:5
**capital** 23:9
**caption** 20:11
**careful** 20:23
**carlin** 27:2
**carolina** 1:1 112:7 112:7
**case** 5:14,24,25 6:13 8:12,16 9:11 9:20,21 10:20 12:1,24 13:8 14:20 16:13,14,15 17:7,12,20 18:9,21 19:19,22,23 20:8 20:11,17,22,23,24 22:14,15,18 23:5 23:11,13 24:6,13 24:21 25:7,15,21 26:1,3,4,21,23,25 27:10,16 28:4,23 29:10,12,15 30:11 30:20 31:14 32:8 32:9,10,19,24 33:2 33:6,24 34:4,10,21 34:22,24 35:2,23 35:24 38:11,12,23 41:23,24 42:3,3 43:7,17,25 44:13 45:18 47:1 49:5 51:7,16,21 59:12 61:13 63:19 64:3 64:10 68:6,22 69:13,16 70:6 71:5 73:13 75:22 78:25 79:12,15 80:2,10 81:17 83:22 84:2,24 87:16 90:10,20 92:6 97:13,24 104:14 113:19 117:12 120:10,17 120:20 122:3 124:16
**cases** 9:25 10:5,12 10:16,24 11:6,15 11:20 13:1,2,16,20 15:16,20,23 16:1 16:20,21,22 17:15 17:19,23,24 18:14 19:10,12 26:10 32:7,14 36:2,5 39:1
**castro** 150:24
**cat** 109:8 115:20
**catchall** 95:25
**cause** 152:6
**caused** 65:14 89:19 114:12,24
**causes** 84:14
**certain** 82:23 95:18 118:1 132:14 138:23
**certificate** 152:1
**certification** 39:7 40:1
**certifications** 39:4
**certified** 152:4
**certify** 152:5,11
**chance** 15:1 80:20 95:6
**change** 54:25 66:12 98:23 104:9 139:7 154:4,7,10 154:13,16,19
**changed** 89:7
**changes** 153:10 155:6
**channel** 125:15
**charge** 72:17
**charlotte** 1:2
**checking** 66:2
**church** 18:10 19:24 20:6 21:8
**circumstances** 10:11 45:25 46:12 77:8,18 97:12 99:11
**cited** 95:7 147:21
**citing** 94:15
**city** 3:18
**civil** 1:6
**claim** 23:2 112:21
**claimed** 23:12 150:17
**claiming** 55:17 56:5,7 82:12
**claims** 11:9,12 70:24 75:22 82:3 113:22
**claremont** 40:4,8
**clarification** 77:24 80:17 98:3
**class** 40:11
**classes** 40:9,19,22 41:3,11,14
**classifying** 67:19
**clear** 35:12,22 39:13 61:3,22 136:15
**clients** 146:20
**close** 102:22 143:2
**clyde** 3:16 5:24
**clydesnow.com** 3:19
**coast** 7:20,22
**coins** 72:14
**college** 40:4
**colorado** 3:7
**colored** 137:22
**column** 141:6
**columns** 137:17
**combination** 144:6,11,21
**come** 82:9 87:10 88:14 101:23 108:22 125:18 134:24 139:2,12 143:7
**comes** 13:12 44:19 46:8 78:22,23 89:6 134:13
**coming** 63:7 68:10 133:22 139:17
**commensurate** 98:7
**comment** 71:17 97:8 136:14
**commentary** 68:20 149:13
**commenting** 96:24
**comments** 29:20 30:2 31:7 38:15 118:13 149:6

**common** 116:15
118:1
**communicate**
126:14 143:24
**communication**
119:4 144:8
148:10
**communications**
144:7,12,22
145:13 146:5,24
150:16
**companies** 23:14
88:10 89:8
**company** 26:6
81:11,25 83:15,17
83:20 84:14 85:12
86:8 89:4,12
121:4
**company's** 37:16
37:17 85:1
**compare** 30:19
103:20 124:13
**compared** 129:11
**compensation**
126:21 128:5
140:5
**competing** 26:6
**competitor** 84:4
145:17 146:9,19
**complain** 94:3,9
99:6
**complaining** 60:17
100:20
**complaint** 21:7
47:8,9 76:10
94:17 99:7
**complaints** 58:5
58:13,21 59:6,17
64:16 65:19 66:6
92:16,16 93:9,11
93:15 94:18 95:3

95:3,18 97:17
98:5,7,8,17 99:17
100:8,11,13,16,19
101:3 130:24
131:6 134:10
138:7
**complete** 30:25
88:23,24 92:3
139:9 155:8
**completed** 99:10
153:17
**completely** 24:7
**complicated** 85:14
89:23 91:8
**component** 119:16
123:3,4
**components**
118:20 119:15
122:18,23,24
125:4
**compound** 88:20
101:8
**comprised** 121:3
123:10
**computation** 73:1
93:14 106:24
139:3
**computations**
74:24 118:16
**compute** 38:13
**computer** 14:7
152:8
**concept** 35:20
46:18 73:12 92:14
94:16 99:3,6,8
104:22
**concepts** 35:15
**concerns** 143:23
**concluded** 151:6
**concluding** 31:15

**conclusion** 73:21
75:10 95:24
149:17
**conduct** 47:6
48:12,18,24 49:2
49:19 51:8,14
52:18 55:5 57:11
59:7,20 60:18
84:4,18 85:5,13,25
86:7,16 91:5,10
99:7,24 101:4
105:1,6 108:6,13
109:24 115:13
122:10 126:10
131:6 134:19
135:5,17 136:22
**conducted** 114:23
**conducting** 26:17
124:10
**confidentiality**
20:25
**confirm** 43:3
**confirmed** 148:9
**confirming** 15:11
**confused** 68:13,13
96:6 107:2,7
132:5
**confusion** 11:10
23:13 24:10,14,17
24:19 28:24 56:24
66:21 114:24
122:16 149:7
**connected** 152:12
**consider** 66:23
73:19 74:7 75:12
97:3,24,25 117:11
117:13 119:3
**considered** 26:16
32:13 34:1 36:3
47:17 104:5

**considering** 61:4
65:15
**consistent** 132:22
**consolidated**
87:17
**consultant** 78:21
**consumer** 87:12
88:3,7,13 90:14
109:11
**contact** 144:8,14
144:24 146:6
**contend** 104:18
128:17
**context** 12:21
48:14 66:2,3,17
**continue** 46:13
**contrast** 91:21
**control** 83:21
**conversation**
66:17
**conversations**
36:25 60:21
**copies** 153:14
**copy** 15:1,8 17:21
43:6 65:1,3
**corp** 1:7
**correct** 8:12 17:12
20:16 22:20,25
28:2 30:24 31:8
31:15 32:10,14,25
40:14 43:6 46:22
47:2,6,10,14 49:12
50:25 52:4 53:25
55:5 56:23 57:7
57:17,23 60:2
61:6,11 62:5,17
64:17 66:7,24
68:23 69:21,24
70:9 71:20 74:24
76:22,25 77:6,10
77:15 79:3 83:25

84:19 85:5 86:7,8
89:23 90:24,25
92:10 93:9,12,17
93:21 100:6,23
101:7,16 102:22
106:2,3 114:9,21
115:10,17 116:7
122:6 124:19
125:11,22,23
127:7,8,21 128:19
130:11,14,16,19
130:21 131:24
132:10,16 133:25
134:11,13,19
136:22 138:2,8,12
139:23 140:3
141:5,9 144:24
145:2,7 148:12
149:3,22 150:4,18
155:8
**correcting**  120:24
124:15
**corrections**  155:6
**corrective**  9:1,2,3
9:9 12:4,10,17,20
12:25 13:6,11,17
15:21 16:2,15
17:16,25 18:12,16
18:20 19:1,8,13
20:20 21:15 22:3
22:6,24 23:2,21
24:1,5 25:5,8
26:17,20 27:18,19
27:25 28:4 29:6
29:17,25 30:10
31:6,17 32:3,5,12
33:24 34:8,18,25
35:4,5,13,13,17,19
35:25 36:7,10,12
36:21 37:5,10,21
38:2,22 45:17,25

46:16 47:25 48:15
48:22 49:7,17,25
50:10,19 51:2,6,9
51:15,19 53:20
54:5,9,17,20 55:3
55:6 56:1,23 64:1
64:9 66:14 67:24
68:4 70:7,11,17,19
71:1 72:2 73:3,11
73:20 80:5,5 81:9
81:24 103:20,21
110:25 118:13,16
118:20,25 119:1,4
119:8,20 122:19
126:4,9 131:13,16
131:16 132:6
133:20,23 134:4
135:18 138:21
143:22 145:14
149:16
**correctly**  12:19
50:16 56:25 73:23
119:5,10
**corresponding**
58:6 65:20
**cost**  9:1,8 28:1
29:16 30:10 31:6
31:16 38:13,22
46:7,17,19 47:20
49:16 54:21 55:19
55:22 56:7,8 77:2
77:14 86:7 121:14
122:6 124:10
125:14,21,21
126:2,6,13 127:5
128:3 129:4
131:16 134:7
138:24 141:21
144:9
**costs**  45:17 46:21
72:14,16 87:25

126:22,24 127:5
**counsel**  7:21 13:23
78:24 90:13
152:12 153:14
**count**  60:12 72:7
137:25 138:4,10
138:23
**counted**  149:23
**counterclaim**  1:5
2:2 3:3 5:14 6:6
26:20
**counterclaimants**
1:9 3:10
**counterclaimed**
21:12
**counties**  115:9,13
**couple**  6:16 42:9
59:11 87:9 95:5
96:18 120:18
147:13
**course**  80:15
87:21 96:5,9
**courses**  40:24
**court**  1:1 6:2 22:4
25:2,7 151:1
152:1
**cover**  14:22,24
38:2
**covering**  60:21
**covers**  13:6
**covid**  5:10 89:7,10
**cp**  113:14
**cpi**  1:4 5:12,19,21
6:13 45:1 49:6,10
49:24 50:5,9
51:13 52:18,18
57:10,15 58:5
59:19 60:11,14
61:10,15,17,19,20
61:25,25 62:4
65:20 66:6 67:12

68:3,18 69:2
70:15 72:7 74:16
80:9,13 81:19,21
86:14 87:5,12,15
87:17,21 88:19
100:20 101:3
104:13,25 105:5,8
105:20,25 106:6,9
106:18 108:4,9,11
108:17,19,21
109:9,13,16,19
110:7 112:6,16,19
112:21,23 113:3,5
113:14,18,20,25
113:25 114:3,4,6
114:12 115:1,5
116:6 120:18,18
121:23 122:2
123:6,15,17,17
124:5 132:5
136:21 137:25
141:6,7,14 142:10
145:23 148:11
149:9,12,19,20
150:4,9,18 153:4
154:1 155:1
**cpi's**  43:17 51:7
56:20 60:1,8,13
67:13 68:18 69:3
70:16 72:6 86:17
86:20 90:14,16
99:14 112:12
119:18 121:16
122:4 123:7,7,10
123:19 124:7,14
139:15 141:15
142:4,6,11,16,21
**create**  6:21 21:4
**created**  148:2
**creation**  83:5

**critical** 134:4
**critique** 144:18
  145:3
**crux** 44:5
**cs** 153:15
**csr** 1:25 2:5
  152:19
**current** 72:6
**cursory** 37:5
**customer** 28:23
  56:20,24 58:4
  60:1,8,12 65:18,25
  72:7 87:18 97:12
  99:15 112:22,22
  113:22 114:12
  115:2,6 116:10
  126:2,19,20,23
  128:3,18,20 129:3
  129:4,5 130:24
  131:19,19 137:24
  138:4,7,23 144:8
  144:13,23 145:16
  146:6,8 149:11
**customer's** 149:15
**customers** 49:9
  56:22 57:15,21,22
  58:6,7,20 59:6
  60:13,15,17 65:20
  65:21 66:6 72:6
  92:1 93:18 94:2
  94:17 96:4,11
  97:17 99:22
  100:20 101:3
  104:25 105:5,7,25
  106:5,18 107:2,6,8
  107:17 108:2,3,8
  108:10,17 109:23
  110:1,7 114:3
  126:14 130:14
  131:14,24 132:4,9
  132:16,22 133:5

  133:24,24 135:4
  135:13,16 136:21
  138:6,11,11
  139:15 143:24
  146:13,20,22
  150:9,17
**cv** 1:6 5:15 9:20
  27:14 33:20

**d**

**d** 4:1,7
**damage** 47:2,20
  55:12 74:23 84:5
  84:14 118:16
  122:19 126:5
  134:17
**damaged** 47:5,19
  55:4,10 84:3
**damages** 8:20 9:5
  9:15 12:23 13:4,6
  13:9 18:12 21:16
  22:17 23:22 24:1
  24:5,12 26:15,15
  27:16,18 28:5
  29:12,25 30:5,12
  31:17,21,23,24
  32:2,6,7,14 34:1,4
  34:6,10 35:1,2
  36:1,4,7,15 37:4,6
  37:25 45:23,24
  46:14 47:21 48:10
  48:14,16,21,25
  50:24 51:3 52:13
  52:16 53:16 54:6
  55:3,9,13,16 56:2
  56:3,10 64:3
  66:14 67:24 68:22
  69:4,8,9,18 70:7
  70:17 71:5 73:12
  73:20 74:2,4,6
  75:6,8,9,11,12,17
  76:1,7,15,24 77:13

  78:6,20,22 79:3,6
  79:16,21 81:9
  82:8,11 85:18,20
  85:23 86:2 90:23
  91:21 95:22
  100:22 105:20
  106:24 117:11,20
  123:3
**dan** 5:18 6:12 35:3
  39:12 58:23
  102:19 111:5
**daniel** 3:5
**data** 27:21,23
  29:20 31:16 38:13
  38:20 65:17 81:20
  88:10 90:2,6,6,7
  100:4,7 101:10
  108:9,19 109:10
  109:10 111:25
  116:22,24 117:13
  117:21 122:7,8,9
  126:12 136:18
**date** 16:12 19:2
  20:9 101:14 147:6
  154:24 155:12
**dated** 95:14
**day** 152:13 155:15
**days** 89:7 153:17
**dealing** 47:2
**dealt** 10:4
**deceived** 93:20
  132:5
**december** 152:19
**deceptive** 11:16
  21:22 23:15 33:14
  58:14,21 59:18
  93:19 96:7,11,13
  100:20 101:4,4
  114:24 145:16
  146:8,14 150:17

**deceptively**
  146:20
**decide** 51:5 61:19
  61:20 62:10
**decides** 51:7
  134:18
**decipher** 133:13
  133:15
**decision** 117:22
**declare** 155:4
**decline** 54:24
  81:22,25
**decreases** 83:25
**deemed** 155:6
**deeper** 32:16
**defamation** 21:11
  27:10 32:9 36:15
**defamatory** 27:15
  29:3 38:15
**defaults** 138:22
**defendant** 1:5,9
  2:2 3:3 5:14 6:6
  7:21 11:2 21:12
  21:12,19,20 25:16
  29:18 33:11 48:12
  48:18 50:23 51:1
**defendant's** 76:18
  77:13 141:18
**defendants** 3:10
  5:23,25 45:3
**defenses** 43:17,25
**definitely** 30:22
  40:24 41:7
**delays** 6:21
**demonstrate**
  70:19 104:12
  114:3 125:8
**demonstrated**
  96:9
**denver** 3:7

**dependent** 52:17
  53:9 115:8
**depends** 77:7
**deponent** 153:13
  155:3
**deposed** 22:20
**deposing** 153:13
**deposition** 1:15
  2:1 5:11,13 6:18
  13:22 14:21 15:9
  22:22 24:20 25:1
  34:17,19 151:5
  152:5,7,7,9
**depositions** 14:9
  15:7
**derive** 97:11
**derived** 134:23
**describe** 9:7 12:12
  70:8 86:2 89:22
  118:14
**described** 29:1
  30:1 59:6 60:10
  88:23 89:1
**describes** 76:15
**describing** 53:5
  79:2 89:2
**description** 4:8
  27:17 75:22
**designed** 29:7
  48:11,16,25
**detail** 86:19 87:17
  87:24
**detailed** 84:13
**details** 88:5 99:13
**determination**
  50:4,20 52:3 53:9
  59:22 61:5,24
  73:11 79:7 80:13
  101:6 106:17
  114:18 117:19
  125:11 127:4

129:18 135:10
  140:18 144:11
  146:23
**determine** 31:5
  60:6 61:15,17
  81:14 91:1 117:10
  119:24 124:21
  126:13 128:21
  129:3 131:18
  132:1 135:16
**determines** 50:9
  51:1 52:17
**determining** 99:23
  119:19 120:9
  121:23 133:20
  134:17 145:12
  146:4
**develop** 91:23
  115:23 116:22,24
  145:9
**developed** 34:2
  69:15
**devices** 33:7
**devil's** 99:12
**differed** 87:22
**difference** 46:6
  48:21 49:3 54:8
  83:2 85:3,23
  126:15
**different** 21:3
  30:19 31:1,24
  42:13 46:25 59:16
  69:6,14 74:9
  85:14 87:25 89:8
  90:21 91:11 95:15
  96:1 97:11,12
  101:11 113:8,16
  114:1,14 116:20
  117:19,23 119:25
  120:18 132:7
  139:25 140:2

143:23
**differentiate**
  116:18 142:16
**differentiating**
  85:11
**differently** 47:24
**difficult** 106:24
  107:22
**dig** 10:20
**digging** 19:3
**direct** 42:7 48:5
  70:25 125:15
  137:2
**directing** 43:10
**direction** 152:8
**directly** 116:5
  146:22
**disagree** 49:20
  50:14
**disassociated** 56:4
  56:14
**discern** 152:10
**discovery** 110:10
  110:12,13
**discuss** 95:1 112:6
  127:13
**discussed** 36:2,5
  71:11 125:12
**discusses** 67:10
**discussion** 20:20
  69:11,14 91:18
  94:13 119:16
**discussions** 78:24
**disgorgement**
  91:22 112:16
  113:10 116:3
  117:1
**disinterested**
  152:11
**disparagement**
  27:9 32:10

**disparaging** 27:15
  29:3,8 30:2 31:7
  38:15
**dispute** 12:21 77:8
**distinct** 87:13
**distinction** 35:6,15
  35:16 54:7 55:2
  116:1 123:25
**district** 1:1,1 20:8
**division** 1:2 87:18
**divisions** 87:14
**document** 39:13
  58:25 59:1,3
  125:19 126:18
  127:9 128:12
**documents** 44:4
  47:17 52:9 59:10
  87:20 90:19
  100:17
**doing** 78:20 99:16
  104:22 108:7
  117:1
**dollar** 28:14 75:10
**dollars** 123:19
**door** 11:20,20 12:1
  12:1 21:25,25
  23:19,19 33:18,18
  72:17,17 114:17
  114:17 115:14,14
  118:22,22 121:17
  121:17,22,22
  122:2,2,7,7,10,10
  122:14,14,21,21
  123:2,2,9,9,11,11
  123:14,14,17,17
  123:20,20,22,22
  124:1,1,11,11
  126:10,10,11,11
  126:13,13 132:10
  132:10,15,15,18
  132:18,20,20

133:3,3,8,9 143:24
143:24 144:5,5
**dr** 13:25 57:6,17
57:19 58:9 59:4
64:24 65:1,8,9
70:7 73:3,11
74:12,16 75:1
86:24 87:7 94:7
95:1 97:5 100:12
104:3 110:25
118:20 119:9
122:18 124:2,5
130:25 137:17
138:1,8 139:3,23
140:10
**draw** 54:7 101:10
**drawing** 123:25
**drew** 116:1
**drill** 54:2
**drilling** 54:5
**drohner** 3:8
**dropped** 25:15
**dsc** 1:7 5:15
**due** 5:10 30:17
105:25 108:6
**duly** 6:6 152:6
**dustin** 127:23,24

**e**

**e** 3:1,1,5 4:1,1,7,7
154:3,3,3
**eagle** 18:21 26:25
27:2,3,7 28:3
29:15 32:9
**earlier** 15:11
16:21 103:18
104:15 122:17
129:10 137:5
**early** 101:18,19
**earned** 85:12,12
113:4 116:19

**ease** 143:7
**easier** 15:7 17:21
**east** 7:22
**easy** 85:17 89:14
89:15,25
**eat** 8:1
**eaten** 7:22,23
**economic** 8:20 9:5
9:14 12:23 13:6,9
18:11 24:11 27:16
30:5 31:22 34:1
45:24 48:14 55:16
64:3 68:21 69:3,7
69:9 71:4 73:20
78:5 79:3 91:21
**economics** 40:5
**education** 39:4,6
39:23,25 134:3
**effectiveness**
41:10
**effort** 48:7 49:23
149:16
**ehobbs** 3:8
**either** 25:1 29:19
36:22 37:7 44:25
53:14 104:11
125:11 133:17
145:7 149:19
**elanne** 3:22 5:7
**element** 19:9 24:2
36:13 46:13 88:8
88:9 134:4
**elicited** 152:9
**eliminate** 86:4
89:5
**email** 22:10 144:6
144:22 145:12
**emailed** 13:23
43:4
**emails** 144:12
146:4,23

**emphasis** 41:7
**employed** 132:12
**employee** 126:21
126:24 127:5
128:3
**employees** 26:5
118:22 122:21
**employing** 37:24
**employment** 39:7
**encompasses**
93:24
**ended** 108:21
**engage** 73:2
**engaged** 26:8,10
26:14 91:5 150:17
**engaging** 114:8,17
**ensure** 7:1
**entirely** 73:22
125:1 148:17
**entities** 122:10
**entitled** 5:11 30:12
**entrepreneurship**
41:1
**equal** 98:23
**equally** 68:13
**equation** 139:4
**equipment** 88:9
**equivalent** 45:23
48:3 119:4 144:8
144:13,23 146:6
146:24
**eric** 3:5 5:20
**errata** 153:11,13
153:17
**erratas** 153:15
**error** 59:14
**especially** 81:16
**esq** 3:5,5,12,16
153:1
**essentially** 15:14
132:15 134:5

**establish** 24:9,10
24:19 66:20
105:10
**established** 50:2
52:10 62:10 79:8
**estate** 23:13
**estimate** 102:6,22
129:15,15,16
130:18
**estimated** 121:14
**et** 32:23
**evaluate** 89:18
**events** 89:4
**eventually** 137:21
**everybody** 101:18
**evidence** 25:4,8,16
53:15 56:21,22
57:10,13 58:8
60:24 61:5,10,16
61:18,20,24 62:3,4
62:8 64:8,13,14
94:18 96:5,10
97:24 98:4,14
101:2 105:17,23
110:6 114:8,23
115:4 131:5 135:2
135:8,9 146:17
149:10
**evident** 90:15
**exact** 40:23
**exactly** 12:18
60:20 93:25 95:15
112:25
**examination** 4:4
6:8
**examined** 6:7
**example** 47:1
82:16,19
**examples** 87:10
95:14

**excluded** 22:3
25:2,7
**exclusive** 77:5
**exclusively** 130:24
**excuse** 72:4,4
**exhaustive** 120:13
**exhibit** 4:8,9,10
13:19,24,24 14:4,4
14:21 15:14 43:5
64:24 65:1 67:5,6
110:18 137:21
**exist** 74:4 150:9
**expect** 55:11
102:13 143:18
**expectation** 82:23
**expectations**
87:22 104:11
**expected** 46:12
82:4,6 83:2,6
**expense** 48:7
119:18 120:14
121:16,17,22,23
123:2,7,8,10,13
124:7,14,23 128:3
128:18,23 129:4
**expenses** 87:25
88:2 121:3,5
142:11,12,12
**expensive** 55:20
144:9
**experience** 8:17
35:14 39:8 41:25
75:8 78:20 90:6
91:12 99:7 134:3
**experienced** 81:21
**experiences** 9:7
15:15 42:5 122:4
**expert** 4:9,10 8:11
8:21,23 11:25
12:14,24 14:19,24
15:6 16:12 23:2

24:21 33:21,21
35:25 36:11 47:14
62:7 74:12,16,23
75:1 80:25,25
86:2 95:1 97:2,3
**expert's** 107:21
**expertise** 8:15,18
8:25
**experts** 80:8 85:17
105:21 122:13
136:16
**expiration** 152:19
**explain** 46:5 69:6
69:20 74:9 88:17
109:15 120:7
122:16 124:8
126:1,15
**explained** 46:24
104:5 118:11
119:23 124:4
141:16
**explaining** 136:13
**explanation** 34:3
94:8 119:9 125:8
**explore** 74:7 82:12
87:21 89:16
115:22 145:4
146:12
**explored** 144:17
145:6
**exploring** 31:23
**express** 22:23
**expressed** 25:1
**extent** 61:12 76:2
149:12
**extra** 102:6
**extrapolate** 95:17

**f**

**f** 1:7,8
**face** 146:25,25

**fact** 10:11 43:5
53:10 68:12 74:20
77:9 81:14 98:16
112:6 123:14
131:13 140:24
144:23 149:19
**fact's** 62:9 131:25
**factor** 84:5 100:21
**factored** 47:12
**factors** 83:16,20
83:23,23 84:15
85:14 86:5 89:5
89:17 104:17
120:8 126:3
**facts** 20:18 69:13
117:12
**factual** 10:11 11:6
33:4
**factually** 10:5
23:11 26:2 27:6
95:17
**fails** 153:19
**failure** 68:6 69:1,2
70:14,16 83:17
**fair** 7:9,10,18
28:16 51:5 55:10
73:4 82:9 90:1
113:6 119:10,21
126:25 129:10
131:12 132:19
135:5 139:5 148:4
**fall** 128:23 129:5
129:19
**false** 29:8,11 31:7
**familiar** 76:14
**far** 20:22 31:1
34:22 55:7 73:1
**farther** 32:17,17
**fdw** 1:7 5:15
**feel** 75:23

**feeling** 7:13
**feels** 75:5 146:13
**fifty** 38:5,5
**fight** 102:10
**figure** 26:11 105:5
114:12
**file** 19:4
**filed** 14:20 26:19
94:17
**files** 37:17
**final** 28:9
**finalize** 28:8
**financial** 8:18,19
54:24 75:8 81:1
81:11,19,22,24
82:15,17,20 83:4,7
83:15,18,24 84:6
85:23 86:13,15,17
86:20 87:5,11,16
88:19 90:14 91:3
91:16 104:10,17
123:19 142:5
**find** 19:24 25:22
27:1 95:12 117:6
128:5 140:4
**finds** 50:22 51:13
96:12
**fine** 15:4 62:23
63:2 75:7 102:23
111:16
**finish** 7:1 148:22
**firm** 5:20
**first** 6:6 10:6
17:25 19:23 35:11
42:17,24 44:23
45:4 50:20 51:24
52:1 53:8,24
70:14 75:15,25
76:6 78:15 81:8
91:24 96:18
105:24 107:7

118:19,21 123:3
133:14 138:15
141:25 144:4,10
147:19 152:6
**five**  19:2 32:21
43:12,23 63:2,2
111:12,12,12
143:3
**fix**  85:22
**flew**  146:18
**flip**  56:12 118:6
**florida**  3:13
**focus**  40:15 99:21
104:21 114:3
**focused**  34:5 73:15
**focuses**  64:12
**focusing**  113:17
**folks**  29:2 60:18
**follow**  90:7
**follows**  6:7
**footnote**  141:19
**force**  58:14 59:7
59:18
**forecasts**  87:20,23
90:18
**foregoing**  152:5,6
152:9 155:5
**form**  10:7,17 11:7
11:17,22 12:6
16:8,25,25 20:21
22:6 28:17 30:3
30:13 31:9,18
38:18 39:11 43:18
44:1,5,14,17 45:7
47:15 48:24 50:6
50:13,24 51:10,17
52:5,20 53:2,11
54:12 57:24 58:15
58:23 60:4 62:6
62:18 64:18 66:15
67:1,17 69:10,25

73:6,15 75:10
76:3 77:16,23
79:4,23 80:18
84:8,20 85:6 86:9
86:25 87:8 88:20
93:22 94:10 95:4
96:22 97:7,21
98:9,21 100:1,24
101:8 103:23
106:11,24 107:10
107:23 108:23
109:6 110:2
115:18 116:8
117:3,14,24
119:11 120:11
121:5,25 128:24
129:20 130:15,20
131:1,10 132:23
134:1,12,20
135:19 136:8
139:9 141:12
144:25 145:8,19
145:20 146:10
147:1,9 148:5,13
149:21 150:5
**formalized**  22:16
**format**  121:6
**former**  58:5 65:19
66:6
**forms**  45:11
136:18
**formula**  139:9
**forth**  15:9 92:14
**forward**  80:7
**found**  15:6,7
100:18 131:13
**foundation**  148:14
**four**  76:6 88:16
**fourth**  18:9 73:18
**friday**  1:17 2:4 5:1

**frog**  72:4
**front**  39:5 59:1
63:20
**full**  45:12 59:22
144:4
**fully**  124:8
**fun**  14:9
**function**  144:6
**funny**  61:18
**further**  70:2 90:9
130:5 131:17
145:1 150:20
152:11
**future**  44:6,10
46:13,18,19 54:21
62:21 83:5

**g**

**gain**  78:7
**general**  42:11
69:22 95:2 99:3
124:1
**generally**  69:24
76:14 117:9
119:17 132:22
**generated**  88:6,9
**geographic**  65:10
65:16 101:7,12
112:12 113:13,20
113:23 114:9,16
116:6 132:15
135:14
**geographically**
109:25
**geographies**  66:2
101:11 121:18
**georgia**  112:7
**getting**  32:17
56:15,15,16 68:8
70:13
**give**  8:15 24:13
28:21 63:4 80:20

87:9 108:20
**given**  10:1 36:14
123:14 155:9
**giving**  36:16 77:20
79:11
**go**  6:16,19 14:10
15:5 16:7,9 17:2
18:1,8 20:4,5
24:22 32:16 38:11
39:2 43:2 44:15
44:17 56:17 59:9
70:2 71:15 75:15
91:7 92:19 130:5
132:15 133:3,8
140:1 143:3
145:20 148:23
150:23 151:2
**goal**  120:24
**going**  6:22 7:7
10:7 13:18,22
14:12,15 15:13,19
19:15,16,19 24:7
32:18 38:7,25
39:14 42:7,8,11,17
56:17 59:23 63:10
63:13 64:23,24
65:8 67:5 75:15
76:2,3 80:12,24
90:21 102:14
103:4,7,13 110:19
111:17,20 118:6
118:12 120:13
128:14 132:20
134:18 135:6,7
137:2 143:11,14
143:18
**good**  5:4 6:10,11
61:21 102:24
103:2 105:2,11
**google**  22:11

**gotten** 127:24
**grab** 7:15 101:21
 111:8
**granola** 8:6
**gray** 137:23
**grayed** 137:23
**great** 8:9 39:21
 63:23 67:8 143:10
**greater** 55:8 82:4
**greenberg** 3:11
 5:23 8:11
**ground** 6:16
**group** 23:9 100:13
**gtlaw.com** 3:14
 153:2
**guess** 20:11 24:2
 29:18 31:20 32:4
 34:4 38:6 41:8
 45:8,15 47:22,22
 50:22 56:9,12
 59:21 61:18 62:7
 62:20 66:1 67:18
 70:10 75:5 79:24
 83:10 90:5 91:23
 93:23 97:23 98:10
 99:8 107:11,14,25
 113:16,24 114:10
 115:19 116:14
 117:25 122:8
 123:13,23 125:1
 125:12,18 129:14
 131:11 132:2
 133:7,9 135:8,21
 136:7 145:1,22
 146:11 149:4
**guessing** 11:11
**guys** 102:10 103:3

**h**

**h** 4:7 154:3
**habit** 39:12

**half** 102:21
**halfway** 76:9
**hampered** 117:2
**hand** 152:13
**happen** 102:14
 139:7
**happened** 9:23
 46:11 80:4 106:14
 138:19
**happening** 138:20
**happy** 92:20
**hard** 6:23 15:1,7
 31:19 65:3
**hardy** 3:4 5:19
**harm** 24:11 30:24
 45:1,18,20,21,23
 45:25 46:1,2,3,6,7
 46:9,12,15,20,22
 46:23 47:21 48:1
 48:2,4,5 49:8,11
 49:14,16 50:1,12
 52:9,11 53:16
 54:4,6,8,18,22
 55:8,12,16,20,23
 56:4,6,9,11,14,21
 60:25 61:6,10,16
 61:25,25 62:4,4,10
 64:8 66:21 69:16
 70:20 79:16,20
 80:3,4 82:10,14,20
 84:24 85:2,3,19
 86:4,6 87:6 89:19
 104:8 120:25
 122:6 124:15
 148:3
**harmed** 48:1,11
 49:6,17,24 50:5,10
 51:8,13 52:18
 59:20 61:19 70:24
 78:5 82:4,12 86:8
 104:13

**harms** 85:21,22
**head** 11:3 12:2
**heading** 42:16,20
 43:11 63:18 80:25
 119:7 139:22
**headings** 42:15
**health** 25:24 26:5
 26:19
**healthcare** 18:19
 25:22,24 26:3
**hear** 35:18
**heard** 35:17 150:8
**hearing** 78:10
 124:17
**heat** 33:8
**helicopter** 78:9
**hello** 5:22
**help** 20:3 88:11
 126:1
**helpful** 110:4
**helps** 8:2 20:1
**hereto** 155:7
**hereunto** 152:13
**hey** 52:22 120:25
**high** 130:9,18
 140:22,24
**higher** 93:2 98:16
 98:24 141:17
**highest** 129:16
 130:1
**hindered** 86:19
**hint** 149:24 150:3
 150:12
**hire** 118:21 122:20
**hired** 21:18
**history** 10:20
**hobbs** 3:5 5:21
**hold** 16:6,6 18:5
 22:9 75:14 92:20
 102:5,8 105:15
 127:22 132:7

 136:8 143:1
 145:19
**home** 1:7,8,8 5:12
 25:24 26:5,19
 41:25 87:12,13
 88:4,13 90:15
 113:23 125:15
 142:9,13,21 153:4
 154:1 155:1
**honest** 35:17
 120:5
**hope** 8:5 70:21
 78:14 139:20
**hopefully** 21:4
 42:19 87:10
 103:12 143:19
 147:16 150:22
**hospice** 25:24
**hour** 63:8 101:23
 102:6,21 143:8
**hundreds** 100:19
 101:3 131:6
**hung** 146:2
**hypothetical**
 30:14 84:21,25
 94:15 97:22
 107:24 121:15
 134:21 136:12
**hypothetically**
 56:8 83:9,14
 84:22 85:7 86:11
 115:4 131:11
 135:20

**i**

**ideally** 88:25
**identification** 14:5
**identified** 37:15
 58:5 73:1 112:3
 122:18 130:10
 133:25

**identifies** 65:19
**identify** 5:16 17:23 29:24 31:14 36:20 108:12 118:20 143:22
**identifying** 58:6 58:20 65:21 86:7
**imagine** 135:20
**impact** 27:15 46:10 72:23 83:17 88:18 89:5,16 97:20 98:1 99:24 101:5,6 117:22 135:11 137:10 138:25 139:14 140:15 141:23 142:23
**impacted** 86:17 89:10,12 96:4 109:23 121:18 130:14 131:24 132:2 133:25 134:18 135:4,17
**implied** 53:22 149:8
**implies** 94:1
**imply** 96:2 116:13
**important** 75:11 118:1
**impossible** 109:5,9
**improper** 30:13 57:11 60:18 84:3 84:20 97:21 107:23 134:20
**inappropriate** 75:3 96:21 119:7 121:15,19 124:3
**include** 27:17 68:7 68:17 90:3 93:15 93:18 105:23 111:1 118:15 126:20
**included** 13:20 15:15 34:13 150:3
**includes** 41:1
**including** 140:3
**income** 84:16 85:1
**incomplete** 30:17
**incorporates** 119:2
**incorrect** 39:23
**increase** 83:24 85:1,3,4 98:7,8,18 131:8
**increases** 84:16,17
**increasing** 94:2
**incremental** 91:25 92:5
**incurred** 87:25 126:7
**independent** 125:10 149:2
**index** 58:6 65:20
**indicate** 56:22 130:7
**indicated** 106:10 118:3 149:7,7
**indicates** 33:20 49:24 108:19
**indicating** 105:18 105:21 122:13
**indication** 64:3 81:21 122:6
**indications** 74:9 148:2
**industries** 95:15 97:12
**industry** 42:1 99:14 128:4,7
**infer** 94:22
**inflatable** 33:7
**inflicted** 148:3
**informally** 90:12
**information** 29:3 29:8,11,14,19 30:1 30:8,18 44:3,7,11 52:2 58:12 59:17 59:22 60:11 64:16 65:16 66:11 68:7 68:21 69:16,17,20 69:23 81:17 86:22 87:4 88:11,17 89:1 90:3,8,11 91:3,13,14 105:15 105:20 106:2,5,9 106:16,22 107:12 108:21,25 109:3 109:12,16,19 110:4,15 112:3 115:16 117:5,6,7 117:12 118:1 132:3 136:13 142:20 145:17 146:8 150:19
**informative** 101:11 117:7
**informed** 95:13
**informs** 45:15
**infringement** 11:9 21:11 23:12 37:3
**infringing** 33:11
**initial** 90:8
**input** 99:19 119:19 137:17 138:1,5 140:25 141:24,25 142:2 142:25
**inputs** 38:13 119:2 137:10,14 139:8 140:15 141:4
**inquire** 60:16 90:17
**inquired** 60:14
**intellectual** 37:2
**intend** 35:7 43:16 43:24 44:12
**intended** 45:20,24 47:25
**intent** 142:23
**interactions** 42:5 150:8
**interested** 7:12 87:11,19 152:11
**interject** 35:3
**internal** 109:12
**internet** 22:11 37:2,24
**investigate** 60:6 109:9
**investigating** 37:3
**investment** 23:9
**involve** 11:15,20 17:25 28:23 91:12
**involved** 11:9 12:1 13:17 16:15 19:13 22:10 23:13 24:8 33:6 41:24
**involving** 26:4
**ip** 37:3
**issue** 13:17 15:21 20:19 37:20 75:23 98:5 136:17
**issued** 43:6
**issues** 28:23

**j**

**j** 3:5
**janet** 27:2
**job** 82:9 89:15
**jobs** 128:6,7
**josh** 8:4 16:10 31:11 39:20 63:6 102:8,12,14 111:7

**joshua** 3:12 5:22
  153:1
**jump** 7:13 74:5
**jumped** 17:7
  82:25
**jurisdictions**
  10:24
**jury** 50:4,9,21,22
  51:1,5,7,13 52:17
  53:9 61:15,17,19
  61:23 62:9 80:12
  81:14 96:12
  100:18 131:12
  134:18,24 135:10
**justification** 120:5
**justified** 119:20
**justify** 64:9 68:3
  95:22 99:7
**justin** 127:17,17
  127:23

**k**

**k** 1:7,8
**katherine** 1:24 2:5
  152:4,18
**keep** 33:8 107:19
  110:10 135:12,13
**keeps** 107:16
  109:13 115:12
  116:17
**key** 20:18
**kidding** 102:12
**kind** 28:19 39:12
  41:6 43:2 49:21
  53:23 71:18 75:24
  77:21 80:6 85:17
  86:1,15 91:15,23
  93:23,25 95:13,21
  95:25 96:2,13
  97:3 110:23 113:8
  116:12,14 118:12
  120:3,4 127:11

128:14 129:2
  135:23 137:13
  138:19,20 139:16
  140:17 144:10
  146:2 147:3,6
**kinds** 129:17
**know** 6:15,20 7:6
  7:12,15,20 8:3,4
  8:17 9:19 10:2,20
  11:8,10 12:22,24
  13:3 16:3,23 17:5
  17:6,22 20:22
  22:2,5 24:9,18
  25:4,7,10 26:8,15
  28:8 30:15,20,20
  30:22,23 34:7
  35:16,19 36:4
  37:7,11,22,25 39:1
  39:23 40:10,23,24
  41:5,9 44:2,4,7
  45:22 46:8 47:22
  48:6 52:24 53:1,3
  53:4,5 54:19,23
  56:13 59:2 60:11
  60:14,19 61:9
  62:11 64:13,19
  70:11 72:14,21,23
  74:12,14,14 75:7
  75:11 78:20,22
  79:6,8 80:1,4
  81:13,14 82:3,8,8
  82:10 84:3,12,24
  85:18 86:2,19
  87:13,16,24 88:3,5
  88:7,12,25 89:3,6
  89:8,11,14,15 90:5
  90:6,13,16,17,18
  93:25 94:12 95:14
  95:20 96:3 97:10
  97:15,18,23 98:1
  99:10,12,17

100:15 102:13,19
  104:8,9,10,12,24
  105:7 106:4,7,8,8
  106:12,12,14
  107:16,18 108:2,3
  108:9,18 109:9,11
  109:14,19,21,24
  110:3,9,12 112:17
  113:7,24 114:2,10
  115:12,15,21
  116:17 117:5
  118:2 120:2,12,14
  120:16,22,24
  121:2 122:11,20
  128:6 129:6,10
  130:3 131:12,12
  132:5,22 133:14
  134:3,22 135:6,6,9
  136:20 137:20
  139:13 140:5
  141:20 142:5
  144:15 145:23
  146:11 149:12,14
  150:10
**knowledge** 152:10
**known** 95:18

**l**

**l.l.p.** 3:4
**lack** 30:1 31:15
  86:19 104:10
  133:4 148:13
**lacked** 27:21,23
  117:20
**lake** 3:18
**lanham** 11:12
  32:14 33:2 76:11
  76:15,18 77:11,21
  90:23
**largely** 86:19
**larger** 94:16,16
  96:15 131:14

139:14
**late** 8:5
**law** 12:24 13:8
  79:8
**lawsuit** 26:7 91:17
**lawyer** 62:11
**lead** 67:20
**leads** 11:4 90:9
**learn** 114:16
  145:15 146:7
**learned** 57:14
  146:19
**leave** 99:3 114:5
**leaving** 44:10
  78:13
**led** 26:6 97:4
**left** 26:6 37:19
  108:8,10,12,17,21
  149:11
**legacy** 1:7
**legal** 5:8 13:8
  25:19 79:2,7
  120:3 153:23
**length** 72:10
**lettering** 147:15
**letters** 144:6,12,22
  145:12 146:4,23
**level** 82:5,6,23
  119:4
**leveraged** 109:13
**liability** 50:20
  52:3,25
**liable** 50:23 51:2
  53:10
**life** 18:10 19:24
  20:6 21:7,21,24
  22:4,8
**likelihood** 90:2
**limited** 30:18
  52:22 62:15
  140:13 142:4

**line**   5:20,24 60:21
  79:14 154:4,7,10
  154:13,16,19
**list**   10:20 13:20
  15:16 32:17 39:4
  59:10 90:3 105:15
  105:24,24 106:5
  107:1,6,8 120:13
**listed**   19:12 43:15
**listen**   147:23
**listing**   15:15,24
  17:19 36:17 66:6
  77:12
**listings**   36:20
**literature**   13:4,5,9
**litigation**   9:16,18
  12:16,21 78:21
**little**   18:4 20:23
  31:19 39:3 47:23
  50:3 56:16,16
  57:4 73:24 78:2
  80:19 84:12 88:21
  98:11 111:24
  118:12 128:15
  137:5 141:16
**live**   19:22 20:23
**llp**   3:11
**located**   5:8
**long**   38:10 62:25
  143:18
**longer**   7:25 101:20
  138:24
**look**   6:14 9:19
  15:23 17:20 36:19
  37:12 71:20,21
  76:6 82:2,7
  110:20 137:21
  141:20 144:3
**looked**   59:11
  60:11 104:18
  120:8 137:6

146:15 148:1
  149:5,6,9,13,23
**looking**   17:6,18
  39:20 43:3 46:9
  46:10,25 80:7
  121:9 137:4,22
  138:4
**looks**   14:24 40:12
  57:3 93:1
**los**   5:8
**lost**   30:6 34:5 49:9
  49:9,10,11 53:21
  56:1,22 74:13
  75:2,2,4 103:19
  104:2,7,22,23
  106:23 107:21
  108:5,7 109:4
  112:15,18,22
  113:9,17,22 114:2
  114:4,12,20 115:2
  115:5 129:8 132:5
**lot**   39:1 41:1 91:12
**low**   98:15 129:15
**lower**   83:6 96:9
  142:3
**lowest**   129:15

**m**

**m**   4:1
**main**   3:17
**maintain**   88:3
**making**   39:19 53:9
  61:4 106:17
  117:18 123:5
**management**
  40:25 41:8 127:14
**mangum**   44:25
  49:22 52:2,8
  74:16 104:12
**marked**   14:4,21
  43:5

**market**   84:15,16
**marketing**   8:21
  30:10 34:9,25
  35:4,13,18 40:9,11
  40:19,22,25 41:1
  41:12,18 72:16
  80:5 88:1 95:22
  97:4 103:20,21
  118:16,23 119:17
  119:18,19 120:14
  120:16,18,23
  121:3,5,16,23
  122:19,22 123:7,8
  123:9,10,13,18,20
  123:22 124:1,7,11
  124:11,14,23
  126:11,19,21,24
  127:4 128:2,23
  132:11 133:23
  137:25 140:6
  141:7,8,14,15,17
  141:21 142:6,6,11
  142:12,16,21
  144:5
**marketplace**   89:3
  142:14
**marriage**   18:10
  20:7 21:8
**mas**   3:19
**master's**   40:16
**match**   56:9,10
**materials**   12:15
  37:8,13 78:22
**math**   30:25 31:4,5
**matt**   5:24
**matter**   100:3
**matthew**   3:16
**maximum**   96:3
  120:4 130:10
  131:8

**mba**   40:13,20
**mckenna**   40:4,8
**mean**   12:3 16:5
  29:21 31:20 32:5
  34:11 36:13,24
  37:4 43:19 45:8,9
  46:24 47:16 49:20
  50:22 53:4,13
  55:6,15 56:12
  59:9 61:12 62:7
  64:11,20 67:18
  70:1,18 71:14
  72:21 75:5 77:11
  79:25 83:2 85:16
  86:1 87:9 89:6,21
  90:8,12 92:18
  94:22 95:20 97:25
  99:8,19 100:2
  101:9 102:13,19
  104:4 105:9,10
  106:20,21 107:11
  108:24 109:8,14
  112:20,21 113:7
  113:16,17 114:19
  114:22 116:9
  117:25 120:3
  124:4 128:21
  133:9 134:2,5
  135:8 140:25
  145:23 148:15,16
  149:4,5
**meant**   35:20 80:18
  145:25
**measure**   9:14 28:5
  29:12 31:22 32:6
  32:7,13 34:1,3,9
  34:12 35:1 45:18
  45:21 46:3,14,22
  47:21 48:5 49:6,9
  49:11,14,16 51:3
  54:18 55:9 56:2

56:10,14 70:6
73:12 74:2,8 78:4
80:3 85:19,20
86:6 89:9 91:20
104:6,8,9 117:11
117:19
**measured** 80:9
**measurement**
44:25 45:2 46:2
52:8 54:3,23,25
73:22 79:15,20
86:3 115:23
**measurements**
67:12 68:2,17
69:1 70:15 86:23
87:5
**measures** 18:11
30:12,19,21,24
31:2 34:6 36:4
69:14 70:22 73:19
74:4,7 75:12
**measuring** 41:9
46:9,10
**mechanism** 24:11
37:6 124:9 144:19
**media** 37:24
**meetings** 146:25
**memory** 17:7 24:7
71:16
**mention** 70:3
**mentioned** 9:6
19:17,18,23 23:5
25:21 26:25 28:11
32:19 37:5 41:23
64:15 88:16 89:17
98:4 103:17
**merely** 144:17
**messages** 29:21,23
**methodologies**
31:24 70:3 117:19
117:20 132:21

**methodology** 32:3
36:3 98:22 117:23
119:2,8,10
**methods** 50:11
119:3 143:24
**metric** 96:14
**metrics** 41:9 67:11
69:11,14
**million** 118:21,23
119:16 122:20,22
130:4 141:21
142:1,12,17,17,17
**mind** 13:12 17:6
44:19 46:8 62:20
72:1 82:25 87:10
88:14 89:7
**minimum** 138:22
**ministries** 18:11
20:7 21:9
**minute** 78:12
**minutes** 63:1,2,2,8
101:21 111:7,11
111:12 143:3
**mischaracterizes**
16:8 17:1 52:5
103:23 136:9
**missed** 58:1
**missing** 29:15
38:21 138:17
**mission** 18:19
25:21,23 26:3
**misstates** 10:8
31:9 62:18
**mistake** 35:12
138:16,18
**mixing** 49:21
**moment** 10:19
11:13 13:12 44:20
60:19 65:6,7
107:13 127:18

**monastery** 20:6
21:8
**money** 48:21
**months** 59:11
**morning** 5:4 6:10
6:11
**mosaic** 1:7
**mountain** 7:21
102:25
**moving** 81:6 111:4
**multifactor** 89:22
**multipart** 89:13
89:22
**multiple** 57:3,3
99:11 109:7
**multiplying**
138:11
**multistep** 91:8
**multitude** 83:16

**n**

**n** 3:1 4:1,1,1,7
**name** 5:6 6:12
9:18,20 124:5
127:16,18,20
146:3
**named** 74:16
152:7
**names** 10:15,21
15:22 21:13 33:7
33:12 58:7 65:21
**nature** 38:1 45:19
**near** 46:19 54:21
62:21
**necessarily** 46:2
48:5,8 70:18
95:16 97:13 115:7
**necessary** 38:13
81:13 155:6
**necessitated** 29:25
**need** 7:11,14,14
50:24 56:22 59:21

62:25 65:7 67:24
68:2 72:6 75:21
81:24,25 86:22
87:4 88:10 89:9
90:4 100:7 103:12
104:24 105:7
107:8 111:8,10
114:7 117:6 121:2
131:18 145:2
**needed** 8:6 30:9
36:23 46:21 81:15
117:21 130:7
131:14,17 140:1
**needs** 81:10,12
109:9 120:21
**negative** 89:11
**neighborhoods**
109:25 115:9,13
**neither** 44:24
49:22 80:25,25
**never** 25:16 36:24
120:5
**new** 87:13 88:4
90:15 94:23 99:22
111:4 125:14,21
126:2
**news** 89:11
**noon** 7:24
**normal** 87:21
**north** 1:1 112:7
**notary** 155:13,19
**note** 125:20 129:6
129:7 153:10
**noted** 155:7
**notes** 27:8 143:4
**noticing** 5:17
**notion** 95:2 103:18
**notwithstanding**
55:2
**number** 5:14
26:15 42:14 55:7

58:24 63:17 65:18
82:13 85:14 92:11
93:13 94:16,18
95:17,24,25 96:3,9
96:15 98:15,17,24
99:21 103:21
104:17,24 105:7
106:18 108:11,16
108:18 124:2
125:15,19,19
126:2,5,16,16
129:19 130:2,23
131:14 133:24
134:18,23,24
135:16 136:21
137:24 138:1,24
139:11,12,13,14
139:14,17,18,23
140:21 142:18,23
**numbered**  93:2
**numbers**  95:21
  127:3 128:9,11,16
  129:12 130:3
  133:21 137:23
  142:3,22
**numerical**  48:2

**o**

**o**  4:1
**oath**  6:3
**object**  10:7,17
  11:7,17,22 12:6
  16:8,25,25 20:21
  28:17 30:3,13
  31:9,18 38:18
  39:11 43:18 44:1
  44:14,17 45:7
  47:15 50:6,13
  51:10,17 52:5,20
  53:2,11 54:12
  57:24 58:15,23
  60:4 62:6,18

64:18 66:15 67:1
67:17 69:10,25
73:6 76:3 77:16
77:23 79:4,23
80:18 84:8,20
85:6 86:9,25 87:8
88:20 93:22 94:10
95:4 96:22 97:7
97:21 98:9,21
100:1,24 101:8
103:23 106:11
107:10,23 108:23
109:6 110:2
115:18 116:8
117:3,14,24
119:11 120:11
121:25 128:24
129:20 130:15,20
131:1,10 132:23
134:1,12,20
135:19 136:6,8
141:11 144:25
145:8,19,19
146:10 147:1,9
148:5,13 149:21
150:5
**objection**  95:4
  133:6
**obligated**  74:22
**observation**  45:6
  45:10,10 49:21
  67:15,19 140:14
  141:2
**observations**
  67:20 96:1 97:11
  98:1 124:18
  140:23
**observed**  140:22
**obtain**  125:14,21
  126:2

**obvious**  26:9
**obviously**  26:8
  44:6 55:6 102:19
**occurred**  46:15
  116:11,23,25
  142:8,9
**october**  1:17 2:4
  5:1,6 152:13
  153:3
**offer**  28:9 43:16
  43:25 44:5,12
  91:20 96:19
  140:11
**offered**  26:21 34:8
**offering**  49:4 62:2
  125:2 140:8,13
  144:18
**offhand**  9:20
**office**  78:10
**oh**  20:13 27:1
  80:15 93:4 103:13
  111:10 127:6
  146:1
**okay**  5:4 6:1,18
  7:11,17 9:6,16
  10:3,23 11:15
  14:3,18 17:10,14
  17:18 18:2,13,18
  18:24 19:5,11,21
  20:5,13,17 21:21
  22:18,22 23:8
  24:4,23 25:11,21
  26:1 27:6 28:3,21
  29:1 32:8,16
  33:23 34:13 36:17
  37:18 38:7,11
  39:21 40:3 42:7
  42:24 43:2,15
  44:22 45:14 47:4
  47:9,19 48:15
  51:13,23 54:1

55:18,22 56:6,17
57:2,16 58:3,19
60:23 61:3,14
62:24 63:16,23
64:25 65:12 66:9
67:5,5,8 69:6 70:6
71:13 72:8,12,19
72:25 73:18 74:12
74:15,20 75:23
76:9,17 78:2,17
79:14 81:6,18
83:8 84:2 85:9
86:21 91:7,14
92:13,23 93:4,7
94:21 97:19
101:17,18,20,24
102:24 103:2,10
103:17 104:15,22
105:13 106:8,16
107:19 108:20
109:2 110:20
111:3 117:9 118:8
118:19 119:7,14
119:24 122:16
124:17 125:13,25
126:15 127:2,22
128:1,14,21 130:9
131:4,21,23 133:2
133:12 136:20
137:2,3,15 138:4
138:10,14 139:1
139:11,16,19,22
140:16,24 141:3,6
143:5,6,17 145:12
146:1 147:6,18,22
148:1,19 150:2,20
150:21
**old**  39:1
**once**  16:3 71:21
  101:9 128:21

**ones** 38:9 88:14
108:12
**online** 21:14 37:3
144:6,12,22
145:13 146:5,23
**oops** 18:2
**open** 39:3
**operate** 113:6
114:11 115:10
116:7
**operated** 89:4
**operates** 112:6,19
112:23 113:4,14
113:14,21 115:1
120:18
**operating** 87:15
105:18 112:11
**operations** 88:2
89:10,12 112:12
126:10 142:13
**opine** 52:25 75:3
**opined** 15:22
34:12
**opinion** 10:1 22:13
22:17,23 23:24
24:2,4,8,13,16,25
25:8 26:22 28:3,6
28:9,13 29:10,24
30:11,23,25 31:20
33:23 34:4,8,25
35:25 45:5,11
49:4 50:19 51:14
52:1,15,21 53:8,13
53:13,19 54:17
62:2,8,14 64:1,6,7
66:9,11,12,16,24
67:14,21,23 70:8
71:2,10 73:20
74:1,2,18 75:7
77:20 79:11 81:8
81:23 82:14 87:6

91:21 94:24 96:19
97:20 99:5 100:15
104:2,4 110:24,25
112:17 118:14,21
118:25 120:8
121:21 123:12,15
124:24 125:2,5
128:22 129:18
131:23 133:10
140:8,11,12 141:3
144:1,21
**opinions** 8:11,16
9:12 22:3 26:19
42:17,20 43:11,16
43:24 44:5,7,8,12
45:16 57:3 63:18
77:8 98:1 130:1
132:24
**opportunity**
100:17
**opposed** 42:9
45:20 46:14 54:21
114:5 120:25
131:7
**opposing** 13:23
**orange** 3:12
**order** 50:18 53:19
53:20 67:23 68:3
79:2 81:8,9,23
85:10 86:22 89:1
91:1,8 100:6
104:23 112:15
114:17 146:21
150:22,23,25
**original** 48:8
**orlando** 3:13
**outcome** 152:11
**outlined** 27:20
72:18 140:7
**outside** 13:1 36:10
53:23 78:9 112:22

113:25 116:14
120:20 142:13
**overlap** 112:12
**overstepped** 35:20
**owned** 27:10

**p**

**p** 3:1,1
**p.m.** 2:4 5:2 103:5
103:8 111:18,21
143:12,15 151:5
**pacific** 5:6
**page** 4:4,8 14:22
14:24 16:3,4,16
17:25 18:1,2,8,22
18:24 19:5,7,11,12
20:1 23:6 25:23
27:2,9 36:17,18,25
38:8 39:6,17,18,20
39:25 42:18,25
43:23 57:5 63:17
63:20 65:8 73:9
75:15 78:3 92:19
105:13,16 110:19
110:20 112:2
118:7,19 128:9,11
128:16 129:7,16
129:17 130:10
141:16,19,23
143:20 144:4
154:4,7,10,13,16
154:19
**pages** 1:25 42:9,18
43:8,11 76:6
**paid** 72:10 89:24
**paragraph** 65:13
76:9 78:3,16
105:17 112:5,8
118:24 121:9
125:13 144:4
**paragraphs** 121:8

**parse** 85:11 86:16
88:18 91:9 115:2
**parsing** 89:2
**part** 40:16 86:13
90:10 92:4,13
106:1 114:7 132:9
132:13 138:25
148:6 149:17
**particular** 30:20
58:24,25 59:1
**particularly** 6:17
15:6
**parties** 10:16
21:13 69:12
152:12
**partners** 23:10
**parts** 134:5
**party** 21:15 26:9
45:18 48:1,9,11,16
48:22,25 49:17
55:4,17 56:5,7
74:22 79:3 82:3
82:12 84:3,14,18
128:2 140:2
146:19,19
**party's** 55:10
**pattern** 66:20,20
94:19
**paula** 150:24
**pause** 17:3 73:24
80:19
**paying** 56:15,16
**payment** 48:24
**pdt** 2:3,4 5:2,2
**people** 7:13 26:13
29:2,21,22 92:15
95:3 99:6 102:8
132:1,20
**percent** 72:16
93:24 94:1,9,15
95:12,16,23 96:2

96:20,20 97:9,11
97:16,16 99:4,4
119:18,23 120:4,6
120:17,21 121:1
121:14 123:6,18
124:2,7,9,13
138:12,12,22
142:19
**percentage** 92:15
95:2 119:25 120:9
120:14,15 124:22
124:25 125:1
**percentages** 97:5
**perception** 149:14
**perfect** 8:7 63:5,23
143:9
**perform** 29:17
31:6 86:22 87:5
91:15 108:5
117:21
**performance**
54:24 70:23 81:1
81:11,19,22 82:1,5
82:6,24 83:3,3,24
87:5,22 89:8
90:14 91:4,16
104:10,10
**performed** 87:7
**performing** 109:4
**period** 46:25 85:2
91:4,16 108:15
**permissible** 77:21
**person** 146:22
152:11
**personally** 13:2,10
**personnel** 72:11
**phd** 4:11
**phone** 144:7,12,22
145:13 146:5,24
**phrase** 32:4

**picked** 139:21
**piece** 58:8 108:20
110:4 115:25
122:20,21
**pitch** 133:8
**pitches** 132:21
133:4
**place** 10:24 55:4
82:2,7 108:8
125:15 152:7
**placed** 29:3
**placeholder**
139:13,17,18
**placeholders**
142:22
**plaintiff** 1:5 2:2
3:3 6:5,13 11:2
21:11,17,18 23:1
23:12,21 24:9,18
25:15 26:6,8,14
27:4,10 30:11,22
32:24 33:10 47:5
48:7,8 52:10
53:21 76:18,24
77:14 78:4,7
79:15 115:22
**plaintiff's** 30:6
34:5 80:1,8
122:13 136:16
141:18
**plaintiffs** 5:14
**planning** 8:2
87:20 90:19
101:22
**plastic** 33:7
**please** 5:16 6:2 7:6
7:12 150:23
**plugging** 137:14
**point** 7:11,16 15:5
22:16,17 26:21
32:19 39:16 44:2

44:23 51:24 53:8
53:24 56:18 59:23
60:23 62:14 63:17
63:24,25 65:4
66:10,18 67:3,10
68:15,15 71:1,23
73:8,9,18 94:18
96:8 98:24 105:2
107:1 112:10
118:23 123:5
131:22 145:6,10
**pointed** 96:10
**points** 43:12,15,23
90:2 95:24 105:12
105:15,24 112:2,5
**pool** 33:8,9
**pools** 32:23
**population** 56:21
60:1,9 95:19
115:2 126:14
139:15
**portion** 36:22 91:9
94:16 112:11
144:1
**portions** 117:21
**position** 48:1,8,11
48:17,23 49:1,18
51:25 55:4,11,19
55:22,24 68:16,25
80:1
**possible** 91:24
122:14 129:8,9
132:6 135:15
142:24 148:3
149:13
**possibly** 82:25
148:10 149:19
**posting** 27:12
**potential** 27:18
56:24 74:23 77:15
90:22 107:17

117:22 118:15
130:2 132:22
133:4 135:16
140:3,9
**potentially** 96:4
101:6
**practice** 10:20
70:22 74:6 79:8
82:11 90:16 91:12
101:4 146:14
**practices** 11:16
21:22 23:16 33:15
58:14,21 59:18
93:19 96:7,12,13
100:21 101:5
114:24 150:18
**precedent** 12:25
13:9
**preclude** 70:16
**precludes** 69:3
**precluding** 69:7
**precursor** 68:10
**prefatory** 35:11
**prefer** 59:14
**prepared** 27:14
87:20 95:6
**present** 3:21 26:18
50:19 57:15 61:10
62:3 128:17
132:21 135:7
**presentation**
36:16,23 37:9,14
**presentations** 36:9
36:11,14,19,21,25
37:1,4,7,14,20
**presented** 9:5 25:5
51:20 55:7,25
56:2 61:16,25
62:4 64:9 81:16
91:21 98:4,15
104:11 114:23

122:12,24 125:3 128:11 130:5 132:3 135:3,7 139:9 140:20
**presenting** 25:16
**presents** 61:17 133:3
**presumably** 126:22
**presume** 49:8 113:21 142:10
**pretty** 38:10 73:24 85:13 89:23 143:2 147:15
**prevented** 29:16
**previously** 54:16 79:25
**previse** 71:19
**primarily** 27:9
**primary** 36:24
**prior** 38:12 41:23 42:3 83:1 103:24
**probably** 7:24 15:4,10 19:18 20:16 25:19 35:19 37:16 60:10 92:21 92:25 94:12 101:23 104:7 107:7 133:16,18
**problem** 65:14 101:7
**proceed** 136:10
**proceeding** 82:13
**proceedings** 5:9 152:9
**process** 65:15 89:3 89:13 91:11 132:14,18
**processes** 113:8 147:4
**produced** 95:9
**producing** 57:14
**product** 139:3
**profess** 89:14
**professional** 8:17 12:23
**professor** 4:10
**professors** 41:5
**profit** 114:20 129:8
**profits** 30:6 34:5 49:10,12 53:21 56:1 74:13 75:2,4 76:19 77:13 85:1 90:23 91:1,9,25 92:5 103:19 104:3 104:7,22,24 105:19,21 106:23 107:21 108:5,7 109:4 112:11,16 112:18 113:9,10 113:17,18 114:2
**progress** 26:21
**progressed** 22:16
**promotion** 41:2
**proof** 49:11 130:13
**proper** 47:20 62:11
**property** 27:10,11 37:2
**proposed** 18:11,16 18:19 27:19 29:7 70:7 72:17 89:18 121:6 130:4
**proposes** 49:25 126:11
**proposing** 126:8
**prove** 53:21
**proves** 61:25
**provide** 8:11 9:12 23:24 29:19 31:22 44:8 49:6 57:10 61:20 62:8 67:11 67:12 68:18,20 69:1,2,15,17,20,23 70:14,16,22 71:4 78:4 79:15
**provided** 13:21 17:15 24:20 30:5 33:20 34:2,25 49:23 60:12 61:13 62:9 72:7 74:18 81:20 86:20 87:16 90:20 106:4 108:19 125:7 126:18 127:9,12 128:12 136:14
**providers** 26:5
**provides** 44:25 124:6
**providing** 11:1 48:21
**provision** 76:15
**provisions** 150:11
**public** 29:4 155:19
**publication** 36:22
**publications** 36:18 36:21 37:20
**published** 41:6
**pull** 13:22 64:23 92:20
**pulled** 14:19 143:20
**purely** 139:18
**purpose** 48:13 50:16 55:3 129:24
**purposes** 55:15 101:22
**pursuant** 98:18 138:12
**put** 28:14 33:8 49:17 55:11 59:1 118:2 142:3
**puts** 8:4
**putting** 42:19

**q**

**qualifications** 6:15
**quantified** 50:2
**quantify** 131:15
**quantitative** 31:22
**question** 6:24,25 7:5,7 11:4 12:19 13:5 21:4 31:12 31:20 35:8,11,22 39:15 42:24 45:4 51:2 55:15 59:4,8 59:16 61:22 64:7 68:10 70:13,14 74:21 76:3,21 78:18 83:1 84:10 84:13 85:11 87:3 90:22 94:21,23 99:2 111:25 112:21,25 114:1 114:15 120:2 122:17 125:24 129:14 132:7 133:13,15,21 136:10 138:16 141:11 144:10 146:1
**questioned** 138:19
**questioning** 118:10,11
**questions** 15:19 19:16 42:11 54:4 90:7,9 96:18 143:17 147:14
**quick** 14:11 103:11 111:9

**quickly** 7:14
**quite** 79:25
**quote** 76:10

**r**

**r** 3:1,12 154:3,3
**range** 128:19
 140:22,23 142:24
**ratio** 93:24 94:15
 96:20 97:16,19
 98:6,18 99:4
 138:12
**rationale** 73:16
**reach** 29:20,21
 30:2 38:14,20
 134:7 150:23
**reaches** 73:21
**reaching** 66:9
**read** 29:22 45:5
 56:18,25 78:11,15
 78:23 105:16
 119:5,17 147:16
 147:17 150:21
 153:9 155:5
**reading** 68:9
 73:23 81:7
**real** 14:10 23:13
 89:17
**realize** 150:7
**really** 19:3 96:2,6
 120:5 130:6 133:9
**realm** 11:11
**reason** 25:11,14
 26:7 95:8 111:6
 113:24 114:5
 153:11 154:6,9,12
 154:15,18,21
**reasonable** 24:6
 34:3,9,12 35:1
 36:1 45:22 51:21
 53:20 56:9 70:20
 71:4 74:10 75:10

78:4 79:17 81:10
82:9,18,21 89:18
96:8 99:9 102:19
102:21,23 103:21
104:6 108:25
120:23 126:4
128:18 131:15
133:23 142:10
**reasonableness**
 9:13,14 22:23
 23:25 66:13
**reasonably** 130:3
**reasons** 60:15 94:9
**recall** 10:20 11:18
 11:23,25 13:20
 15:17,22 18:25
 21:10,23 23:4,17
 24:8 26:4 27:8,19
 28:6,25 29:18
 30:4,15 32:18
 33:16 34:2,4,11,23
 34:24 36:16 37:22
 38:16,24 40:11
 41:5 42:2,14 47:7
 53:5 57:25 58:10
 58:11,16 60:10,20
 60:20 64:20 72:15
 90:12 91:18 92:11
 92:17,21 96:23
 103:22 104:19
 108:18 110:8,13
 110:17 118:17
 138:18 144:1
**receipt** 153:18
**receive** 14:1 58:19
 90:6 100:7 135:14
 142:20
**received** 58:12
 59:5 64:15 91:14
 96:7,11 99:17
 100:14,19 101:3

128:10 145:16
 146:8
**receiving** 40:16
**recognize** 14:22
 14:23
**recollection** 11:8
 13:14 16:1 22:9
 34:16 36:4 38:1,4
 38:5 70:2
**reconcile** 30:19
**reconciled** 129:12
**reconciling** 31:1
**record** 5:5 14:10
 14:12,14,15 61:22
 63:10,12,13 103:4
 103:6,7 111:7,17
 111:19,20 143:11
 143:13,14 151:2
 152:9
**record's** 35:22
**recording** 5:9
**recordings** 60:15
 60:17 147:23
**records** 127:4
**recover** 76:18
**recoveries** 77:15
**refer** 59:15
**reference** 42:15
 76:10 86:13 95:12
 112:8 126:17
 131:9 141:7
**referenced** 10:12
 57:6 59:3 60:7
 65:25 92:9 93:12
 94:7,25 97:5
 127:16,19 134:10
 138:7 153:6
**references** 40:3
 130:25
**referencing** 71:23
 100:11

**referring** 17:23
 27:24 31:4 32:8
 64:20 71:9 94:11
 136:11 141:14
**reflect** 81:25 110:6
**reflected** 59:6
 82:15,17,20 83:4,6
 84:6 128:8 149:20
**reflecting** 37:13
 149:18
**reflective** 128:12
**reflects** 39:6 40:3
 108:14
**refresh** 13:13
**refreshes** 15:25
**regarding** 16:2
 27:15,25 30:1
 34:17 58:13 100:8
 112:3
**region** 113:14
**regions** 116:6
 135:15
**relate** 73:1
**related** 12:9,16
 13:9 17:16 21:10
 21:25 22:3 23:18
 25:5,8 30:8 33:17
 36:6,9,11 37:9
 38:14,20 41:11,14
 74:18 91:3 100:19
 101:4 104:13
 142:6 152:12
**relates** 33:24
**relationship** 99:12
**relatively** 95:14
**relevant** 6:17
 13:11 59:17,19
 68:21 69:8,15,17
 81:15,18 91:16
 97:24 99:23 100:3
 100:14 101:10

106:17 112:4,17 113:2,4,14 114:16 114:22 115:16 116:2,4 121:23 123:8 124:15 140:6 145:15,22 146:7,22
**reliability** 94:24
**reliance** 63:25 144:18
**relied** 56:19 59:10 59:24 147:24
**relying** 15:8 93:11 127:2,3
**remedied** 55:13
**remedies** 13:1 18:16,20 33:25 77:21
**remedy** 13:7 22:7 27:20 28:10,13,14 29:7,11 31:7 45:20,23,24 46:3 47:21,25 48:6 51:6,9,15,21 56:10 56:13 65:15 72:3 82:10 89:18 95:23 120:15 121:6
**remember** 9:20,25 10:5,11,15,23 11:1 11:5,13 13:18 17:3 32:22 33:4 33:23,25 34:19 40:23 72:14,19 96:24 122:23 127:18
**reminder** 80:22
**remotely** 2:6
**render** 68:7 106:23 107:20
**rep** 149:8
**repair** 45:20,24 46:1,3,7 47:20,25 50:1 55:16,20,20 55:23 56:7,8
**rephrase** 7:7 98:13 146:1
**report** 4:9,10 13:19,20,24,25 14:20,25 15:2,5,24 16:11,12,13,13,17 16:18 17:10,11,19 22:19,21 23:2 24:21 25:1 27:14 27:17,19,21 33:21 34:14 36:18 39:3 39:6 42:8,9,12,25 43:3,4,6 44:24,25 45:16 47:14 49:22 49:22,25 51:19,20 52:8,8,11 53:6,15 56:19 57:7,12,14 57:17,17,20 58:1,4 59:4,25 60:8,11 64:2,12,24 65:1,8 65:25 66:4 67:6 67:10,16 68:17,20 69:12 70:12 71:2 71:12,17,20,21 72:18,22 73:19 75:14,16 81:1,16 83:13 86:14,24 91:19,22 92:9,15 93:12 94:7,14 95:1,6,7 96:18 97:5,10 99:10 100:12 103:13,15 104:12 106:20 108:14,16 109:15 110:20 111:1 116:4 118:7,15,17 119:22 121:8 122:25 123:6 124:6,8,12,19 125:3,4,7 126:8,11 126:17 127:13,16 127:20 128:9,12 129:25 130:1,5,7 130:25 131:9 132:3 134:11,14 138:8,21 139:10 140:7,21,22 141:19,22 143:21 144:4,17 145:3 147:19,21
**report's** 66:19 121:13
**reported** 1:24 98:8 121:4 123:19 141:21 152:7
**reporter** 6:2 77:24 80:17 151:1 152:4
**reporter's** 152:1
**reporting** 2:5
**reports** 45:6,10 52:2,22 75:22 83:7,15 87:12 94:25
**represent** 5:17,19 6:13 75:20
**representations** 102:9
**representative** 56:20 59:25 60:8
**represented** 27:3 30:21 57:19
**representing** 5:21 5:23,25 32:24 42:4
**represents** 139:7
**request** 22:24 109:16
**requested** 22:14 23:25 60:20 106:9
**require** 85:13 135:18
**required** 20:19 31:5 46:17 73:2 88:2 91:2,7 155:13
**requirement** 79:2 81:13
**research** 12:9,16 12:19,23 13:10,14 97:4 122:12 128:5 140:4,14,20,23
**reserve** 68:12
**reshare** 103:13
**reside** 113:22
**residential** 142:13
**residents** 27:11
**resolve** 136:17
**resolved** 26:23
**resort** 18:21 27:1 27:2,7,10,11,13 28:4 29:15 32:9
**resources** 144:9
**respect** 24:4,16 73:8,10 92:7 104:16 110:24 134:17 149:18
**respective** 152:12
**response** 110:9
**responses** 110:12 110:14 141:18
**restate** 43:20
**restroom** 7:14 63:4
**result** 44:3 48:3 78:6,6 104:25 105:6,19 124:13 138:25

**results** 83:5 85:24 86:17,20 87:16,17 88:19 123:19 129:7,8 138:14,14 142:5,24
**resume** 103:14
**retained** 8:10 78:24
**return** 48:1,7,11 48:16,22,25 153:13,17
**revenue** 49:10 84:17 85:1 88:6 88:12 112:16,18 113:3,5 115:25 116:2,5,5,13,18,19 117:1 129:9 135:14
**revenues** 88:9 105:18,21 112:11
**review** 9:11 10:19 16:15 17:22 44:3 44:6 58:19 59:10 59:21 65:24 67:15 81:11 91:2 95:6 95:11,13 97:9 100:7,17 104:16 129:25 132:2 147:20,22 148:25 150:7 153:7
**reviewed** 9:2,4 12:24 13:3 47:9 57:16 58:4,9 60:12 65:15 66:1 66:3 81:17 135:9 148:8,16 150:15
**reviewing** 9:8 12:15,22 13:8 15:25 26:22 75:6 83:15 89:3
**reviews** 81:1
**rfps** 141:18
**right** 6:19 8:9 13:15 14:23 15:12 18:3 19:19 20:8 27:4 33:2,21 35:9 35:21 38:7 40:13 46:18 49:19 50:5 51:4 52:15,19 53:24 61:16 62:16 68:12,14,14 72:20 73:14 75:1 76:19 77:10,20,22 79:1 80:14 85:21 92:2 93:14,16,24 94:5 97:2 98:19 100:9 103:14 105:12 108:14 113:16,23 115:20 118:6 121:4 124:4 126:9 127:22 129:14 130:23,25 132:1 132:13,19 133:17 134:23 137:18,22 141:23 148:8 150:15
**rings** 18:25 32:20 32:23 33:5
**risk** 21:5
**rock** 18:21 26:25 27:2,3,7 28:3 29:15 32:9
**rohner** 3:5 4:5 5:18,18 6:9,12 8:4 8:7,8 10:13,22 11:14,19,24 12:8 14:6,10,17 16:19 17:9 20:2 21:2 28:20 30:7 31:3 31:13 32:1 35:7 35:10 38:19 39:19 39:22,24 43:20,22 44:9,21 45:13 47:18 50:8,17 51:12,22 52:14,23 53:7,18 54:14 58:2,18 59:2 60:5 62:13,22 63:3,6,9 63:15 64:22 66:22 67:4,22 69:19 70:5 73:7 76:4,5 77:19 78:1 79:10 80:11,23 84:11,23 85:8 86:12 87:2 88:15 89:20 94:4 94:20 96:16 97:1 97:14 98:2,12 99:1 100:5 101:1 101:13,17 102:1,7 102:17,24 103:2,9 104:1 106:15 107:15 108:1 109:1,18 110:5 111:6,10,14,16,22 115:24 116:16 117:8,17 118:5 119:13 121:7 122:15 129:1,22 130:17,22 131:3 131:20 133:1,11 134:8,15 135:1 136:1,19 141:13 143:6,9,16 145:5 145:11,24 146:16 147:5,12 148:7,18 149:1 150:1,14 151:4
**role** 62:9 86:2 132:1
**royalty** 74:18
**rpr** 1:24 2:5 152:4 152:18
**rules** 6:17 50:15
**rulings** 120:3
**run** 14:11
**russell** 4:11

**s**

**s** 3:1 4:11 154:3
**salaries** 140:3,9
**salary** 72:10 137:25 139:22 140:10
**sales** 11:16,21 12:1 21:22,25 23:15,19 33:14,18 58:14,22 59:7,18 60:18 96:7,11,13 107:8 107:17,20 109:10 109:24 110:7 114:17,24 115:14 116:22 123:14 124:1 125:15 126:10 128:7 131:6 132:10,18 132:20 143:25 146:14
**salespeople** 101:5 110:1 132:14 148:11
**salesperson** 133:3
**salespersons** 146:18,21
**salt** 3:18
**sandwich** 101:21
**saw** 32:20 47:8 99:9
**saying** 35:9 39:12 44:16 70:2 81:13 120:25 135:23 140:11
**says** 24:20 27:14 39:13,25 42:20 43:11 52:12 63:25

65:13 67:10 68:24
69:5 71:1 79:14
121:13 141:17
144:5
**schedule** 72:22
92:22,23,24 93:1,2
93:5 137:4 140:1
140:2 141:20
147:15,18 148:2
148:17,24
**schedules** 92:18
137:3
**scheduling** 7:19
**scope** 13:2 65:10
65:14 101:7,12
**screen** 42:20 43:4
63:21 64:25
105:14 112:1
143:20
**scroll** 15:8,13 16:4
17:20 18:4,24
19:15 36:23 37:18
37:19 38:7 42:8
65:8
**scrolled** 128:14
**scrolling** 19:11
78:2 93:3 137:7
147:13
**search** 22:11,11,12
**secard** 32:23
**second** 19:18
37:23 63:24 64:25
66:17 75:14 76:9
92:4 98:3 118:22
119:16 122:21
123:4 143:1
**section** 65:9 75:16
75:25 77:11 80:24
110:22 111:4
137:9

**sections** 42:13
**securing** 132:9
**security** 1:4 5:12
5:20 6:13 42:1
88:8 128:4 153:4
154:1 155:1
**see** 25:22,23 26:1
26:14 32:21 35:18
36:20 37:19 39:9
39:10,25 40:6
42:19,20 43:13
52:7,22 54:19
60:13 61:1 63:22
64:4,25 65:11,22
67:6 71:6 75:18
76:12 78:8 79:18
81:2,21 83:12
92:18 103:20
107:4 112:8,13
119:22 120:12
121:11 125:17
130:3 137:11
138:5 148:9 149:9
149:14
**seeing** 57:25 58:11
58:16 64:20 66:2
87:11,19 103:14
110:13 143:19
**seek** 26:20 67:23
**seeking** 21:15
23:21 31:17,21
**seen** 12:20 29:22
43:8 44:4 49:5
61:13 80:2,8
95:10 105:17,20
106:2 110:6 120:3
120:5 135:21
136:16,23 150:8
**segment** 87:12
88:3,4,7,13 109:11
142:10,22

**segments** 87:14,14
88:4,4 90:15
120:19 142:7
**selling** 121:17,22
122:2,7,10,14
123:2,9,11
**sense** 7:3 15:10
105:9 116:15
118:1
**sent** 29:22 153:14
**sentence** 63:24
78:11,15
**separate** 100:13
**service** 26:3,5 88:8
**services** 25:24
88:8 113:25
**sessions** 3:16
**set** 90:8 92:14
94:22 99:15
108:10 116:4
152:13
**share** 13:18 43:4
84:16
**sharing** 112:1
143:20
**shb.com** 3:8,8
**she'll** 150:24
**sheet** 153:11
**shook** 3:4 5:19
**shorter** 102:20
**shorthand** 152:4,8
**show** 13:22 15:9
37:9 53:16 72:23
75:20 82:4 100:4
105:13 120:22
131:5 139:13
142:23 146:17
**showed** 101:2
**showing** 14:23
92:23

**shows** 54:24,25
136:23
**side** 23:1 56:12
101:19 138:14
**sign** 153:12
**signature** 2:7
42:22,25 152:18
**signed** 153:20
**significant** 117:20
**significantly** 131:8
**similar** 9:10 16:13
59:12 129:8 133:4
133:8
**similarly** 91:2,7
**simply** 74:3
**sitting** 10:15 34:7
34:24 35:23 38:3
44:11 71:19
144:20
**situation** 82:19
83:5 84:13
**situations** 9:10
**size** 134:6,9,9,16
**skills** 152:10
**skin** 109:7 115:20
**skipping** 75:24
**slightly** 7:25 21:3
90:21 91:11
101:20 114:14
139:14
**slipped** 17:6
**small** 92:15 94:18
95:2 147:16
**smart** 1:7,8,8 5:12
153:4 154:1 155:1
**snag** 14:11
**snow** 3:16 5:25
**social** 37:24
**solar** 18:25 32:20
32:23 33:5

**sole** 36:15
**solicit** 132:16
**solutions** 5:8 153:23
**somebody** 56:14 135:22
**somewhat** 9:10 30:17
**sorry** 10:18 14:7 17:4 18:14 31:11 43:20 44:15 72:5 76:20,22 78:9 81:4 96:23 110:19 114:21 127:8 141:10 145:21 147:13
**sound** 78:13
**sounded** 25:20
**sounds** 7:18 20:14 47:7 51:5 61:18 61:19 89:22 102:18,21,24 103:2 124:17
**source** 107:12 108:25 117:5
**sources** 65:17 128:2,6 140:2
**south** 3:12,17 112:7
**speak** 30:25 146:21
**speaking** 117:10
**specialist** 41:6
**specialty** 40:16
**specific** 9:20 12:13 12:15 38:1,3 41:3 41:17,20 58:17 59:15 62:14 67:2 67:12 68:3,17 69:1 70:15,23 85:19 86:4 88:6 92:5 99:14 108:9 113:20 116:12,22 116:24 117:12 124:10 140:11 142:23 149:11
**specifically** 13:5 15:20 58:10 64:19 114:20 143:21
**specified** 142:21
**speculative** 64:2 71:3,8 73:21 74:3 85:20 118:4
**spend** 119:20
**spent** 120:25
**spots** 15:9
**spread** 65:16
**spreadsheet** 58:5 58:11,20 65:18,25 66:5,12,24
**staff** 58:22
**standard** 90:16
**standing** 150:22
**standpoint** 7:20 83:18
**start** 10:6 44:22 108:8,10,11 110:21 119:15
**started** 8:9 26:6,11 26:22 92:12 118:9 118:11
**starting** 5:17 11:11 19:16 36:18 96:8,15 98:24 105:2,11
**starts** 121:10
**state** 44:24 86:23 115:8 116:19,20 152:3,4
**stated** 45:11 50:15 58:3 67:21 106:20 136:14
**statement** 39:17 53:5 83:18 123:16
**statements** 27:12 27:16 81:25 82:15 82:17,20 83:4 84:6 86:14,15 91:3 104:17 149:6 149:7,18
**states** 1:1 112:18 113:3 115:1 116:22,25
**stay** 102:10
**stealing** 146:20,20
**step** 10:14 28:21 42:10 49:15 68:8 89:21 91:24 94:1 111:24
**steward** 3:16 5:24
**stick** 102:13
**stock** 118:3
**stockdale** 18:15,15 18:16 23:5,9,9
**stopping** 7:16 67:14
**storehouse** 20:7 21:8
**street** 3:6,17
**strength** 70:23
**stretch** 114:11
**stretching** 22:9
**strike** 132:19
**structured** 42:12
**struggled** 133:15
**struggling** 18:6 55:14
**studies** 94:6,8 95:7 95:10,11,13 96:1 97:10 99:9,11
**study** 12:23 94:11 99:14 134:3
**stuff** 59:11
**subheadings** 42:15
**subject** 20:25 93:19 120:16 150:11
**submit** 22:20 23:1
**submitted** 16:11 16:12,17,17 17:11 17:11 22:18 27:21
**subscribed** 155:14
**subscriber** 125:14 125:22
**substantial** 123:21
**substantially** 130:4
**success** 83:17
**suffered** 45:1,18 48:4,5 49:10 55:8 55:16 56:4,6 80:9 80:14
**sufficient** 56:21 60:24 61:5 62:4 145:14
**suggested** 30:16 98:15
**suggesting** 96:19 100:12
**suggests** 135:3
**suite** 3:6,13,17
**summaries** 42:15
**summarize** 148:2
**summary** 67:20 123:19 142:5
**sun** 18:25 32:20,20 32:23 33:5
**support** 43:17,25 45:25 50:19 52:3 72:16 88:2 94:15 123:9 142:12
**supported** 119:23 120:21

**supporting**  23:2
**suppose**  106:25
  134:22
**sure**  6:20 7:22
  12:18 19:3 39:20
  39:22 42:12 44:23
  46:4 47:3 51:24
  52:21 55:18 57:2
  57:4 59:13 63:9
  65:3 71:18,24
  72:24 74:25 76:4
  76:20 80:2 83:11
  84:9 109:12
  110:24 111:2,6,14
  111:16 112:20
  113:7,11 114:7
  115:11 122:9
  123:23 125:24
  136:2 137:13
  141:11 143:4
  145:2 146:4
**surprise**  133:2,7
**suspect**  11:10
**sustained**  76:24
  77:13
**switched**  104:25
  105:5,8,25 106:5
  106:18 108:4
**switches**  108:6
**switching**  111:23
**sworn**  6:7 152:6
  155:14
**systems**  1:4 5:12
  5:20 6:14 153:4
  154:1 155:1

**t**

**t**  4:1,7 154:3,3
**table**  139:6,20
  141:22
**tactic**  132:11
  147:4

**take**  7:15,25 9:19
  10:14 28:21 40:8
  40:19,22 41:3
  42:10 49:15 62:20
  62:23 68:8 71:15
  89:21 101:20
  102:20 103:11
  111:5 143:3,18
**taken**  2:1 5:13
  152:7
**talk**  16:20 39:3
  67:9 75:13 76:7
  125:13 127:15
**talked**  79:24
  104:15,15 112:2
  129:9
**talking**  13:16
  38:12 51:23 53:23
  58:24 59:24 63:17
  63:23 65:9 66:10
  71:18 73:14 83:9
  87:1 90:22 92:8
  95:14 113:8 116:1
  119:14 122:17
  123:1,3 128:15
**task**  31:23 85:17
**taught**  41:11,14
**team**  66:3 90:17
  146:18
**teams**  132:14
**technician**  5:7
**technology**  5:10
  18:6
**tell**  8:14 15:25
  19:1,3 20:17
  23:10 26:2 27:6
  86:21 106:13
  117:18 135:23
  136:3,4,4 147:19
  150:24,24

**ten**  63:2,3 111:7
  111:10,12 143:8,9
**tennessee**  112:7
**term**  9:2 35:4,17
  35:18 70:8,10,11
  72:2 81:12 133:4
**terminology**  45:9
  47:23
**terms**  20:19 35:15
  47:24 49:21 54:5
  87:4 99:2 115:25
  116:1
**territories**  122:11
**territory**  112:22
  113:21,23,25
  114:11 115:5
  116:12,14
**test**  71:16
**tested**  140:14
**testified**  6:7,15
  15:20 16:1 23:10
  28:12 34:17 98:14
**testify**  24:23 25:11
  34:21 57:21 152:6
**testimony**  10:8
  11:2 13:21 16:9
  16:21 17:1,16
  20:14 22:2 24:20
  25:2,8 31:10
  33:21 34:20 36:10
  39:18 50:18 52:6
  62:19 103:18,22
  103:24 104:19
  136:9 139:2 152:9
  152:10 153:9,18
  155:8
**text**  45:12 148:25
  149:3 150:7,12
**thank**  6:2 16:10
  80:21 111:23
  151:1

**thanks**  38:25
  80:21 103:2,10
**theirs**  145:16
**theoretical**  91:25
**theoretically**
  100:2
**theories**  26:16,16
**theory**  50:15
**thing**  42:17 45:9
  47:23
**things**  46:25 54:8
  69:7 71:19 88:23
  89:24 95:5 98:23
  103:17 124:18
  148:9,16
**think**  9:2 10:4
  13:15 15:4,10
  20:9,25 22:10
  28:6,12,18 30:25
  34:12,15 36:8
  43:18 45:21 46:24
  49:20 50:15 51:18
  51:19 53:12,22
  55:21,24 59:9,14
  61:18 65:7 70:10
  70:21 71:16 74:5
  74:6 78:11 80:7
  81:12,15,18 84:9
  87:15 88:21 90:8
  94:23 96:7 97:8
  98:3,13 101:22
  103:11 104:6,15
  106:21 107:13
  108:9,15,16 109:8
  109:11,14 115:1
  115:21 117:15
  120:13,21 121:2
  123:5 124:4,22
  125:7,23 130:6
  131:17,25 137:5,6
  139:1 143:19

145:18 147:2

**thinking**  7:24

**third**  73:8 84:14
84:18 128:2 140:2
146:19,19

**thought**  15:11
104:5 111:25
146:2

**three**  10:2,3,4,16
16:21 19:12 38:8
65:17 77:14
103:11 121:8
138:6

**throat**  72:4

**throw**  121:1

**tied**  108:5 112:18
115:7 128:9
130:23 133:23

**time**  5:5,6 7:21,22
7:23,24,24,25
10:18 14:13,16
16:17 17:6 18:7
27:21 38:10 46:25
48:6 57:12 63:4
63:11,14 72:10
84:15 85:2 91:4
91:16 97:9 102:9
102:23 103:5,8
108:15 111:18,21
133:8,16 143:12
143:15 149:23
152:7 153:19

**timeframe**  153:8

**times**  6:21 9:23
55:19 130:18

**titled**  75:16

**titles**  40:23

**today**  5:6 10:15
34:7,24 35:23
38:3 44:11 46:19
71:19 101:19

133:16 144:20

**told**  82:22

**tools**  37:2,25

**top**  11:3 12:2 18:9
19:11 33:8 37:23
72:1 78:3 105:14
105:16 118:7,19
128:15 137:16,24
138:1 144:3

**topic**  36:13,15,24
37:23 38:1 60:22
94:13 146:14

**topics**  60:21

**total**  56:20 60:1,8
60:12 98:6,17
120:17 121:16
123:7,8,10,18
124:7 135:16
138:25 139:15

**totally**  84:18

**tough**  120:2

**towns**  115:13

**track**  107:16,19
110:10 115:12
116:17 135:12,14

**trade**  21:13 33:7
33:11 100:20
101:4

**trademark**  11:9
21:11 23:12 33:6
36:14 114:24

**trademarks**  21:13
33:11

**train**  118:22
122:21

**trained**  133:3

**training**  12:4

**transcribed**  152:8

**transcript**  149:10
149:11,14,15,20
150:10,22 152:9

153:6,20 155:5,8

**transcription**
150:10 152:8

**transcripts**  56:19
57:5,6,10 58:17
59:24 60:7,24
61:4,11 62:16
64:1 66:18,20
92:9 138:9 147:20
147:22,25 148:1,8
148:9,16,17,25
149:3,6 150:8,16

**transmission**
152:10

**traurig**  3:11 5:23
8:11

**trial**  13:21 24:21
24:22,23 25:4,12
34:21,22 57:22
64:9 135:3,7

**trick**  112:25

**trier**  62:9 77:9
81:14 131:13,25

**tripped**  68:11

**trouble**  78:10

**true**  43:6 47:20
48:15 50:10 79:21
84:7 85:15 152:9
155:8

**truly**  135:15

**truth**  152:6,6,6

**try**  102:13

**trying**  14:7 48:20
54:2 99:20 109:22
117:10 123:23,24
133:13,19

**turn**  105:13
110:18,19

**two**  23:13 26:4
30:16,19,20,23
31:1 35:15 37:1,1

37:14 42:18 43:11
45:6,10 52:9,22
54:7 74:9 75:22
77:13 88:11 92:25
93:5 101:23 113:8
113:9 118:20
119:14 122:18,23
122:24 125:4
128:16 134:5
138:25

**type**  10:1 29:12
31:21 87:18 89:2
109:16 123:13
126:7 145:10

**types**  60:13 88:1,6
88:12 89:8 91:13

**typical**  128:2

**typically**  6:22
35:18 54:19 88:7

**u**

**ultimately**  52:17
61:15 62:3 90:4
100:18 134:16

**unable**  24:19
28:14 29:19 78:4
97:9

**unclear**  52:10
93:25

**uncomfortable**
7:13 75:5

**underlined**  26:9

**underlying**  46:22

**understand**  7:6
8:10 32:2,5,12
35:14 42:13 44:23
46:4 48:20 50:4
51:24 55:18 61:14
65:14 66:8 74:1
74:15,22 76:17
77:5,11,12,17 78:3
78:19 79:6,25

80:12 84:10 88:11
89:9 95:8,20
102:14 110:24
111:2 112:20
121:20 123:24
126:1 132:8,11,13
136:2 137:8,13
139:1 142:4
**understanding**
8:14 19:22 21:6
46:5 48:13 54:3
61:23 62:12 77:7
78:19 79:1 94:6,8
94:14 121:3 122:1
123:17,21 132:17
147:3
**understood** 7:8
12:18 39:19 57:19
57:20 66:4,5 95:8
**undertake** 72:11
122:2
**unexpected** 83:24
83:25
**unforeseen** 78:7
**unfortunately**
17:5 122:3
**uniform** 19:24
**united** 1:1
**units** 87:15 88:1
**universal** 18:10
20:6 21:7,21,24
22:4,8
**unjust** 99:20 129:9
**unjustly** 92:1
99:21 116:10,13
**unnecessary** 24:12
52:13,16 53:17
**unreasonable**
22:14 55:9,23
56:3 64:2 71:3,9
71:22 73:10,21

74:3 116:13 130:8
**unrelated** 84:18
85:19 121:5
123:11 126:23,24
**unreliable** 96:20
**unspecific** 69:12
**untrue** 27:12
**unwilling** 29:19
**upper** 96:3
**use** 7:14 33:6
47:24 63:4 66:19
68:10 70:10
117:22 119:22
121:13,16 124:25
132:21 133:8
142:19
**uses** 70:11 72:3
95:21 124:2
139:23 141:22
**utah** 3:18
**utilize** 74:23
**utilized** 133:21
**utilizing** 128:16
143:23

**v**

**v** 1:6 153:4 154:1
155:1
**vague** 86:25 94:10
100:1 132:23
**valuation** 37:25
67:13,24 68:18
69:2 70:16 75:9
**value** 28:14 50:11
54:25 70:3,4,23
130:9 131:8
**valued** 69:24
**various** 67:10
128:6 141:4
**verify** 39:14,16
127:11 128:1
153:9

**veritext** 5:7
153:14,23
**veritext.com**
153:15
**versus** 5:12 16:14
16:22 17:8,15
18:10,15 20:7
21:8 23:9 25:24
27:2 32:23 46:6
48:24 54:6 69:8
85:24 116:19
124:1
**victim** 96:13
**video** 5:7,11
**videoconference**
1:16 2:3,6 3:3,10
3:21 5:1,10
152:10
**videographer** 3:22
5:4 6:1 14:12,15
63:10,13 103:4,7
111:17,20 143:11
143:14 151:2
**videotaped** 1:15
2:1
**view** 20:18 48:21
52:3 54:10 123:24
142:18
**virtually** 109:4,8
**vivint** 1:7,7,8 5:12
16:14,22 17:8,15
19:19 41:25 42:4
42:5 43:19 47:6
47:13 51:8,14
52:19,25 53:10
57:11 58:4,11,12
58:13,14,20,21,21
59:4,5,6,7,17,18
60:16,18 64:16
65:14,18,19,24,24
66:7,7,23 86:14

88:18 91:15 93:15
97:15,19 99:17,20
99:22 100:8,9,14
100:16,18,21
101:2,5 104:25
105:5,8,25 106:4,9
106:10,19 107:8
107:16,19 108:4
108:13,22,22
109:3,25 110:1,7
110:10,16 112:16
113:3 114:8,10,16
114:23 115:9,12
116:2,6,10,17,21
116:24 117:2
122:8 123:14,20
125:19,21 126:7,9
126:12,18 127:10
127:12,14 128:10
128:13 131:6
132:8,12 135:12
135:23 136:3,4,13
136:14 140:3
145:15,23,23,25
146:7,12,13,17
148:3,11 149:8,12
150:16,17 153:4
154:1 155:1
**vivint's** 43:25
59:20 65:10,17
66:12 105:18
107:2 109:23
110:12,13 112:11
121:17,21 123:1
125:14 126:2
127:2,3 146:13

**w**

**wait** 6:23 7:1
78:12 136:8
**waived** 2:7

**walk** 72:22 110:23
**want** 8:2 11:12 20:23 26:14 37:18 39:3,15,16 44:22 46:4 51:24 55:18 57:2,4 62:25 67:9 70:25 71:17,18 74:1 75:23 87:24 88:5,25 99:17 104:21 105:13 109:24 110:23 111:2 113:11 121:20 127:17,17 136:2 137:8,13 143:21 149:5
**wanted** 38:11 39:2
**warranted** 149:16
**warrants** 94:13
**washington** 20:8
**way** 22:5 23:17 25:19 32:5 37:5 42:22 54:19 60:22 61:9 62:11 67:19 83:25,25 86:1 89:17 93:3 94:22 97:18 98:10 107:18 110:17 115:15,20 116:18 131:15 134:23 136:15 138:20 152:11
**ways** 109:7,12 113:16 115:23
**we've** 14:21 36:2 43:3 47:23 111:7 125:12 137:6
**website** 60:13 90:16
**went** 40:12 96:1 118:10 149:12
**west** 1:24 2:5 7:20 152:4,18
**western** 1:1
**whereof** 152:13
**whittle** 108:11 109:22
**widespread** 99:24
**willing** 97:23
**windfall** 30:21 56:15 78:6
**winer** 4:11 44:24 49:22,25 51:20 52:2,7,24 56:19 57:19 58:3,9 59:25 60:7 64:2 64:11 65:9 66:19 67:10 68:16,20 69:12 70:7 71:2 72:2,14,18 73:3,18 74:12 75:1 81:16 83:13 86:24 87:7 91:22 92:9,15 93:12 94:14 95:7 95:21,24 100:12 104:3,4,12,18 109:14 110:25 119:9,22 120:17 121:13 122:25 123:6,18 124:2,5,6 124:7,12 125:3,7 126:8,10 130:1,5,7 130:25 132:3 134:11,14 137:17 138:1,20 139:3,8,9 139:23 140:7,10 140:13,21 141:19 141:21 144:17 145:3 147:21
**winer's** 13:25 57:6 57:17 59:4 64:24 65:1,8,25 66:4 73:11 94:7 95:1 97:5 118:13,20 122:18 123:3 138:8 144:18
**witness** 2:7 4:3 6:5 10:8,10,18 11:8,18 11:23 12:1,7,14 16:7,9,10 17:3 20:22 28:18 30:4 30:15 31:11,19 44:2,15,19 45:8 47:16 50:7,14 51:11,18 52:7,21 53:3,12 54:13 57:25 58:16 62:7 62:20 63:5 64:19 66:16 67:2,18 69:11 70:1 77:17 77:25 79:5,24 80:21 84:9,22 85:7 86:11 87:9 88:21 93:23 94:12 95:1,5 96:23 97:8 97:23 98:10,22 100:2,25 101:9 102:5 103:24 106:12 107:11,25 108:24 109:7 110:3 115:19 116:9 117:4,15,25 119:12 120:12 122:1 128:25 129:21 130:16,21 131:2,11 132:24 133:7 134:2,13,22 135:20 136:7,11 145:1,9,21 146:11 147:2,10 148:6,15 148:24 149:22 150:6 152:5,13 153:8,10,12,19
**witness's** 17:1 52:6 62:19 136:9
**witnesses** 15:6 25:17
**word** 121:10
**words** 88:1 139:6 149:22
**work** 6:23 12:14 63:6 85:17 102:2 132:14 135:15 139:20
**worked** 13:2,17
**working** 14:8 78:21 136:12
**works** 102:3,4 103:1
**written** 36:6 41:17 41:20 51:18 52:11
**wrong** 102:15 127:25 146:3
**wrongdoer** 90:24 91:2
**wrongdoers** 91:4
**wrongdoing** 47:13 88:18 115:5
**wrongful** 48:17,23 49:1,18 51:8 55:5 85:5,13,25 86:16 91:5,10 105:1,6,19 105:22 106:1 107:3 108:6 113:19 114:4,25 115:6 116:11 135:4,17 136:22 142:8
**wrote** 57:12 97:10

**x**

**x** 4:1,1,7,7

**y**

**yeah** 11:13,18 17:5,24 18:5 19:8 19:12,23 20:11,11 23:7,8 25:22 26:14 28:18 30:4 31:19 32:4 34:16 34:19 38:9 47:7 47:22 48:13,19 50:14,22 51:5 52:7,21 54:16,19 55:6,15 56:8 59:9 61:12 63:7,21 64:11 66:16 69:23 70:10 71:24 72:21 73:24 77:17 79:5 80:16,21 81:5 83:1 84:22 85:7 85:16 86:1 90:7 90:11 91:18 92:11 92:18,25 93:2,6 94:1 96:23 97:25 98:10,20 100:2 101:9,10 105:2,9 105:10,12 106:20 106:25 107:11 111:10 112:24 114:10,22 115:19 116:9 117:25 122:24 123:5 125:18 131:11,25 132:24 133:9 134:13 135:8 136:15 139:6 140:4 141:16 142:20 144:3 147:8 148:6,15,24 149:4 150:12,19

**year** 84:17

**years** 9:24 19:2 32:21 40:10 78:23 126:7

**yep** 102:16

**z**

**zambrano** 3:22 5:7

**zoom** 1:16 2:3 5:1 6:17,20 14:9

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.