UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case Number: 20-23391-CIV- GOODMAN
[Consent Case]

ADT LLC; and The ADT Security
Corporation,

      Plaintiffs/Counterclaim Defendants,

          v.

Vivint Smart Home, Inc. f/k/a Mosaic
Acquisition Corp.; and Legacy Vivint Smart
Home, Inc. f/k/a Vivint Smart Home, Inc.,

      Defendants/Counterclaimants.

_____ /

**ADT'S OPPOSITION TO VIVINT'S**
**MOTION TO EXCLUDE DR. ERIC MATOLO**

Vivint's sales representatives have misled numerous ADT customers into believing, among many other things: (1) that the agent is there to simply "update" or "upgrade" the ADT customer's equipment, when in reality he or she is switching out the ADT system for Vivint's; (2) that ADT has been bought out or is going out of business and/or that Vivint is taking over ADT accounts; and/or (3) that Vivint is a subcontractor, installer or is otherwise affiliated with or acting at the direction of ADT. Such misrepresentations allow Vivint to freeride on the goodwill of ADT, they harm ADT's brand and reputation, and they lead ADT's customers to do business with Vivint under false pretenses. In effect, Vivint took without permission a license to use the ADT brand in the market for its own profit in violation of both the Lanham Act and the common law of unfair competition.

The Lanham Act broadly permits a plaintiff to recover for all forms of damage caused by the defendant's unlawful conduct, including the defendant's profits, "any damages sustained by the plaintiff," and costs of the action. 15. U.S.C. § 1117(a).  Consistent with this broad statutory language and in recognition of the Act's express intent to protect parties "engaged in . . . commerce against unfair competition" and to "prevent fraud and deception in such commerce," 15 U.S.C. § 1127, courts in the Eleventh Circuit and elsewhere have recognized a wide breadth of available remedies, including royalty awards.  *See, e.g.*, *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1519-20 (11th Cir. 1990) (recognizing forced royalties as an appropriate measure of damages for Lanham Act violations).  Here, ADT seeks to present the expert testimony of Dr. Eric Matolo regarding a royalty rate that should be paid by Vivint to account for its misconduct.  Dr. Matolo's proposed royalty rate is not hypothetical – it is based on market measures directly tied to how ADT shares revenue with its existing authorized dealers. Dr. Matolo's opinion and methodology are also neither unique nor novel. Over the past decade Dr. Matolo and his colleague Dr. Russell Mangum

have presented virtually identical expert opinions employing the same methodology in numerous courts on behalf of ADT (including to this very Court in three separate cases), each of which have allowed those opinions and methodology to be presented to the jury.  In fact, in 2017 Judge Middlebrooks allowed Dr. Mangum to present a virtually identical opinion using the exact same methodology in a prior identical case against Vivint.

Vivint cannot (and has not even attempted to) argue that Dr. Matolo lacks the requisite knowledge, skill, experience and training to testify. Dr. Matolo's opinions are plainly appropriate here as they will assist the jury in determining the proper amount of a royalty award to compensate ADT for its lost profits and to similarly disgorge Vivint's wrongful gains. As this and other courts have previously found, his opinions are methodologically sound, and rooted in reliable facts and data supplied by real-world licensing arrangements already negotiated by ADT with hundreds of *authorized* dealers in the marketplace. Vivint offers no valid ground for exclusion of his opinions. Vivint's motion should be denied.

## STANDARDS

In performing its "gate-keeping" role, the Court is instructed to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can be applied to the facts at issue." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 592–93, 113 S.Ct. at 2796 (1993).  Many factors may bear on this inquiry, but whether *Daubert's* suggested indicia of reliability apply to any given testimony depends on the nature of the issue at hand, the witness's particular expertise, and the subject of the testimony.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 1174-76 (1999).  Further, "[t]he presumption is that expert testimony is admissible, so that once a proponent has made the requisite threshold showing, further disputes go to weight, not admissibility."

*Simmons v. Ford Motor Co.*, 576 F. Supp. 3d 1136, 1140 (S.D. Fla. 2021).  In exercising its "gatekeeping" role, therefore, the trial court "must remain chary not to improperly use the admissibility criteria to supplant a plaintiff's right to a jury trial: 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'"  *Moore*, 995 F.3d at 850 (quoting *Daubert*). The Eleventh Circuit has cautioned, "the rejection of expert testimony is the exception rather than the rule."  *Moore v. Intuitive Surgical, Inc*. 995 F.3d 839, 851 (11th Cir. 2021) (reversing exclusion of expert and citing Fed. R. Evid. official notes).

## ARGUMENT

I.   **Dr. Matolo's royalty damages methodology is a recognized and accepted measure of Lanham Act damages in this Court, and numerous others.**

ADT alleges that Vivint in effect took without permission a license to use the ADT brand in the market for its own profit, in violation of both the Lanham Act and state law on unfair competition. A reasonable royalty based on market measures or a hypothetical negotiation can be a measure of actual damage in a trademark infringement case.  *See Sands, Taylor & Wood v. Quaker Oats Co*., 34 F.3d 1340, 1350 (7th Cir. 1994) ("[O]ne measure of actual damages that, if ascertained with reasonable certainty, could be said to reflect the actual loss of [the trademark owner]--the cost of a reasonable royalty[.]"); *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1519-20 (11th Cir. 1990) ("The use of lost royalties to determine the actual damages incurred by a victim of trademark misuse is well established in this court."); *Source Perrier, S.A. v. Waters of Saratoga Springs, Inc.*, No. 81 CIV. 0178, 1982 WL 51044, at *5 (S.D.N.Y. Dec. 9, 1982) (awarding hypothetical royalty of 50% of the infringer's net profits); *Ramada Inns, Inc. v. Gadsden Motel Co*., 804 F.2d 1562, 1565 (5th Cir. 1986) (noting that loss of royalty payments during the period of infringement is a proper measure of damages for the misuse of the mark); *Go Medical*

*Industries PTY, Ltd. v. Inmed Corp. d/b/a Rusch International*, Civil Action No. 1:01-CV-313, 2005 U.S. Dist. LEXIS 19588, *16 (N.D. Ga. Jan. 25, 2005); *Boston Prof'l Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 597 F.2d 71, 78 (5th Cir. 1979) (upholding royalty award based on the rate offered by the plaintiff to the defendant prior to the defendant's infringing conduct).

The *Khimani* case states the controlling law of this Circuit with respect to the applicability of forced royalty damages in Lanham Act cases. There, plaintiff Howard Johnson sought damages for contempt of an injunction. Noting that "[t]he use of lost royalties to determine the actual damages incurred by a victim of trademark misuse is well established in [the Eleventh Circuit]," *id*. at 1519-20, the *Khimani* Court discussed at length the policies behind the use of an implied royalty theory of recovery to compensate the mark holder – among other reasons, the defendant's misuse of the mark "takes advantage of perhaps the most significant benefit" of the mark holder's brand name and "exploits the goodwill" of the mark holder in the market. *Id*. at 1520. "Likewise, any unfavorable reaction of the imitator's patrons are likely to be attributed to the franchise as a whole and diminish its reputation." *Id*. Accordingly, the Eleventh Circuit concluded, it is "not an abuse of discretion for the district court to use lost royalty payments to replicate the actual damages suffered by" the plaintiff. *Id*.

This is exactly the measure of damages Dr. Matolo seeks to apply in this case. Further, unlike the many Lanham Act cases where the value of an avoided licensing agreement requires a fact finder to make assumptions as to the value of the "hypothetical" licensing arrangement that might have been reached with the wrongdoer, the value of a license to affiliate with ADT is actually known and well-established in this case. As Dr. Matolo explains, over 200 authorized ADT dealers have already negotiated a right to use the ADT name and trademarks in return for sharing a portion of the revenues generated by new accounts with ADT (and on the condition of abiding by ADT's

rules). *See* Expert Report of Eric Matolo, PH.D. ("Matolo Rep."), **DE 119-116**, ¶¶ 27, 32. Authorized dealers pay this to ADT not in the form of an express "royalty," but instead by selling alarm accounts they generate on behalf of ADT to ADT at steep discounts to the actual value of the accounts. Also, in reaching agreements with its authorized dealers on revenue sharing, and based on actual data derived from those agreements, ADT developed and actually uses and relies upon an analytical model, called the "ADT Revenue Sharing Model," to determine the portion of customer contract revenue retained by the dealer vs. the portion owed to ADT. *Id*. at ¶ 33. Thus, as Dr. Matolo opines, there is an established market rate that *authorized* dealers—i.e., those who validly license a right to affiliate with ADT—pay to ADT for use of its brand, name and trademarks. *Id*. at ¶¶ 27-36. That same rate is what <u>Vivint</u> should be required to pay for its *unauthorized* use of ADT's name in violation of the Lanham Act. *Id*.

Vivint's Motion ignores *Khimani*. It also disregards this Court's application of *Khimani* to Lanham Act cases involving claims of deceptive sales practices between alarm industry competitors – in other words, *the exact set of facts present here*. For example, in *ADT LLC v. Alarm Protection LLC*, Case No. 9:15-cv-80073 (S.D. Fla. May 9, 2017), Judge Rosenberg agreed that ADT's request for a royalties measure of damages was proper in light of *Khimani*. *Alarm Protection*, 2017 WL 2212541 at 5*. Judge Rosenberg also agreed that while ADT's dealers do not pay a royalty *per se* to ADT, the dealers pay ADT an implied royalty under the respective ADT dealer agreement (*i.e.*, the ADT Revenue Sharing Model), and that this implied royalty (here, about 22 percent) was a fair measure of the value of the forced royalty that an unauthorized user of the ADT mark should pay as a consequence of the expropriation. *See id.*, 2017 WL 2212541 at

*3-4.[1]  The methodology used by Dr. Matolo's colleague in that case, Dr. Russell Mangum, was the exact same methodology that Dr. Matolo utilizes here.  *See id.*

The same methodology was also approved by this Court in ADT's prior litigation against Vivint.  In *ADT LLC and ADT US Holdings, Inc. v. Vivint, Inc.*, Case No. 9:17-cv-80432-DMM/DLB, DE 170 (S.D. Fla. Nov. 15, 2017), Judge Middlebrooks permitted Dr. Mangum to testify regarding the same implied royalty rate sought here, including testimony as to Dr. Mangum's reliance on the ADT Revenue Sharing Model to determine the appropriate implied royalty rate.  *See* Judge Middlebrooks Order dated November 15, 2017, attached as **Exhibit B**. As acknowledged in Vivint's Motion, Judge Middlebrooks' *only* limitation on such testimony concerned the application of the royalty to the proportion of households in the market with the plaintiff's alarm systems consistent with Mangum's testimony, *see* **Ex. B**, which is exactly how Dr. Matolo's royalty is applied in this case.

Most recently, Judge Cannon fell in line with Judges Rosenberg and Middlebrooks when she denied a motion to exclude Dr. Matolo from providing expert testimony in support of damages sought by ADT against Safe Home (another competitor engaged in the same deceptive door-to-door sales practices at issue in this case).  Judge Cannon held that Safe Home's challenges to Dr. Matolo's "forced royalty" theory of damages, at most, "go to the weight of Dr. Matolo's opinions and can be probed more properly via the conventional means of cross-examination and contrary evidence." *See ADT LLC v. Safe Home Sec. Inc*., Case No. 20-23918-CIV, 2022 WL 3702839, at *2 (S.D. Fla. June 21, 2022), attached as **Exhibit C**.

---

[1] After issuing the initial order denying the defendants' motion to exclude Mangum, the Honorable Robin Rosenberg also considered and rejected the defendants' remaining legal arguments in ruling on defendants' motion for summary judgment on the issue of a reasonable royalty award. ADT attaches this order as **Ex. A**, as it is by far the most comprehensive analysis of the propriety of royalty damages like those offered by Drs. Matolo and Mangum.

Other courts have also considered and rejected motions to exclude expert testimony virtually identical to the opinions and methodologies reflected in Dr. Matolo's report, *i.e.,* the appropriate amount of royalty percentage when an alarm company falsely affiliates with ADT by engaging in deceptive door-to-door sales that falsely suggest affiliation. *See e.g., ADT LLC v. Capital Connect, Inc*., No. 3:15-cv-02252, DE 409 (N.D. Tex. June 2, 2017) (paperless order denying motion to exclude Dr. Mangum); *ADT LLC and ADT US Holdings, Inc. v. Alder Holdings LLC, et al.*, Case No. 9:17-cv-81237, DE 408 (S.D. Fla. June 30, 2019) (trial testimony of Dr. Mangum regarding reasonable royalty based on the same methodology used by colleague Dr. Matolo in this case).

Bottom line: the complaints now levied by Vivint have been considered and repeatedly rejected by very intelligent, highly-respected judges on this Court.  This case is no different.

## II.    ADT's existing revenue sharing model is an established market measure upon which an expert can rely, not a "theory" or "opinion" that itself must be tested, peer-reviewed or generally accepted.

Dr. Matolo will opine, as he and Dr. Mangum have previously opined in the numerous cases cited above, that ADT's revenue sharing agreements and model are an appropriate "market measure" for determining a royalty rate applicable to Vivint. Dr. Matolo's analysis focuses on the relationships between ADT and its existing network of *authorized* dealers, as those relationships demonstrate what ADT is willing to accept, and what dealers are willing to actually pay, for the use of ADT's brand. This analysis employs a three-step process: (1) determining the effective royalty in ADT's existing dealer revenue sharing model; (2) identifying necessary adjustments to that model to account for the unique aspects applicable to the present situation (*i.e.*, Vivint's *unauthorized* use of ADT's name and brand); and (3) applying those adjustments to compute a royalty rate to be applied to Vivint's sales revenues.

Dr. Matolo explains the full methodology used to calculate the royalty in his report, but his calculations can be distilled down to an intuitive process. As between ADT and its existing authorized dealers, each entity benefits from the relationship; the dealer retains some of the profits of accounts it generates, and so does ADT. In a typical arrangement, the dealer takes a cut of the up-front payments, as well as a cut of the recurring monthly revenue. (Generally, the more the dealer takes up front, the less percentage interest it will take in the recurring revenue). The up-front payment is based on a multiple of the monthly recurring revenue. Converting both up-front and residual revenues to a present value for a typical contract, ADT's portion of new accounts yields a sharing of customer revenue between the dealer and ADT whereby ADT gets 37.6% and the dealer is paid the remainder, 62.4%. *See* Matolo Rep., **DE 119-116**, ¶ 36. These economics of the ADT/Dealer relationship are the basis of the ADT Revenue Sharing Model. It is not some contrived "expert" opinion that Dr. Matolo relies upon in rendering his opinions; it is an established economic model that ADT actually uses in the real world to run its authorized dealer business.

To calculate what the appropriate "implied royalty" would be for a competitor that infringes ADT's mark and falsely affiliates, Dr. Matolo then reduces the amount ADT typically retains in its relationship with authorized dealers by the costs ADT is not required to incur in an "unauthorized" use scenario – such as monitoring costs and additional costs to serve.[2] After applying those reductions, Dr. Matolo calculated the amount of revenue ADT should retain for use of the ADT brand to be 22% of Vivint's revenues generated from alarm monitoring, security and automation products/services, limited to door-to-door sales, during the relevant period. Again, Dr. Matolo's 22% royalty rate is not based on hypotheticals or conjecture; it is rather an <u>established</u>

---

[2] ADT would normally incur these costs under its Authorized Dealer agreements because ADT is the one monitoring and servicing the customer's account. But here, because ADT and Vivint are competitors and Vivint has effectively stolen that customer from ADT, ADT does not incur costs to monitor and service that stolen account.

<u>market measure</u>, based on the amount ADT *actually* receives from authorized dealers for use of ADT's brand.[3] Judges Rosenberg, Middlebrooks and Cannon have all concluded that this is a reliable analysis a jury should hear. This Court should do the same.

In its Motion, Vivint now complains that Dr. Matolo's reliance on the ADT Revenue Sharing Model is somehow inappropriate because the model itself is an "opinion" or "theory" that must satisfy the reliability requirements for an independent expert opinion. First, as expressly acknowledged in the decisions of Judge Rosenberg and Judge Middlebrooks, the ADT Revenue Sharing Model reflects the actual economics of the agreements ADT has with its authorized dealers. The model is not a "theory." Nor is it an "opinion." The model is an existing business tool that allows ADT to calculate the Net Present Value ("NPV") to ADT for any particular dealer relationship regardless of the amounts the dealer takes up-front versus through recurring revenue. The notion that the actual economic model used by ADT to calculate the compensation paid by dealers to affiliate with ADT must itself be a "reliable" expert opinion borders on the absurd. ADT uses this model to run its dealer business and has for many years.

Second, not one of the cases cited by Vivint in support of its contention that the ADT Revenue Sharing Model is unreliable concern a royalty rate calculation, let alone an expert's utilization of or reliance upon the actual economics of a party's existing contractual relationships to extract a royalty rate. Rather, each case cited by Vivint concerns an expert's theory or opinion

---

[3] As one prominent treatise states, "In order to determine a reasonable royalty, a court ***should first look to any established royalty for the mark preexisting the infringement***. In the absence of an established royalty, a court must base the reasonable royalty on a 'hypothetical negotiation' between a willing trademark owner and a willing licensee . . . . In conducting this hypothetical negotiation, a court may well want to consider the '*Georgia-Pacific* factors' used in deriving a reasonable royalty in patent infringement litigation." Terence P. Ross, *Intellectual Property Law Damages & Remedies*, § 4.03[2], 4-24 (emph. added). Here, as Dr. Matolo opines, it is not necessary to venture into any hypothetical negotiation between ADT and Vivint because there is already an established royalty in the marketplace between ADT and its 200+ authorized dealers.

that the Court concluded did not meet one of the traditional indicia of reliability. *See e.g., Dishman v. Wise*, Civil Action No. 7:08-cv-45 (HL), 2009 WL 1938968, at *3-5 (M.D. Ga. July 7, 2009) (in personal injury case, excluding opinion testimony by treating physician that a delay in diagnosis caused injuries due to lack of any medical literature, studies, or any other information supporting the opinion's reliability); *Affiliati Network, Inc. v. Wanamaker*, No. 1:16-cv-24097-UU, 2017 WL 7361048, * 7 (S.D. Fla. Aug. 14, 2017) (excluding expert testimony when damages calculation was solely based on purported "common practice" of dividing the number of chargebacks by the revenue on sales for one website and comparing figures to chargebacks and revenue figures of other affiliate websites); *Benkwith v. Matrixx Initiatives*, *Inc*., 467 F. Supp. 2d 1316, 1330 (M.D. Ala. 2006) (in toxic tort case, excluding opinion testimony by doctor regarding whether Zicam can reach olfactory epithelium when used as directed, and cause damage).

Further, Vivint's criticisms (*see* Motion at 6) that the economics reflected in the ADT Revenue Sharing Model (i) only apply to ADT, and (ii) have not been applied by other experts in other litigations, and (iii) are not available outside of ADT, reflect a fundamental misunderstanding of the data at issue and the purpose for which it is being used. It is axiomatic that ADT's contractual relationships with its own dealers, and an expert's reliance on the economics of those relationships as the basis for determining a reasonable royalty rate for wrongful affiliation, is limited to cases involving ADT. That is not to say that other courts and other experts have not relied upon an applicable party's own licensing agreements (or comparable agreements) to determine royalty rates. To the contrary, such information is a recognized basis for determining royalty damages in all manner of industries. *See, e.g.*, *Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers Inc*., 446 F.2d 295, 300 (2d Cir. 1971) ("We realize that no one can be sure what the parties would have done had they actually negotiated. But determination of an assumed royalty is in essence a device

for retroactively reaching a just result . . . ."); Ross, *Intellectual Property Law: Damages and Remedies*, § 4.03[2] at 4-24.

More importantly, as explained by Judge Rosenberg in the *Alarm Protection* case, the economic relationship between ADT and its Authorized Dealers is "the economic functional equivalent of a royalty."  *See* **Ex A.**   As in the *Alarm Protection* case, ADT is not now seeking compensation from a hypothetical system – ADT is seeking instead to recover damages from Vivint according to the same economic system by which revenue is and has been obtained from its own authorized dealers. ADT's existing authorized dealer system licenses its dealers to use ADT's name and marks in exchange for "the functional equivalent of a royalty."  *Id.*   Judge Middlebrooks, citing to Judge Rosenberg's reasoning in *Alarm Protection*, reached a similar conclusion in the prior 2017 *Vivint* case, holding that "whether or not the ADT dealer model is a proper reference point is a question for the jury and does not affect the evidence's admissibility." *See* **Ex. B** at 4.  Both decisions concern the same ADT Revenue Sharing Model about which Vivint now complains.

Vivint also argues that Dr. Matolo's reliance on the ADT Revenue Sharing Model to calculate a reasonable royalty rate was inappropriate because the members of ADT's finance team that developed the model for ADT's business are not themselves "experts."  *See* Motion at 9. Vivint once again fundamentally misconstrues the purpose and substance of the model.  The model reflects the actual economics of ADT's past and present agreements with its dealers, *i.e.*, it constitutes the established royalty rate to affiliate with ADT. As Terrence Ross explains, "In order to determine a reasonable royalty, a court should ***first*** look to any established royalty for the mark preexisting the infringement." Ross, *Intellectual Property Law: Damages and Remedies*, § 4.03[2] at 4-24. (emphasis added).  If such an established royalty exists, it is not necessary to then engage

- 11 -

in the speculative process of a "hypothetical" royalty negotiation under the *Georgia-Pacific* factors.  *See id.*  Here, the ADT Revenue Sharing Model is the measure and method actually used by ADT in its business to enter into agreements with dealers so that those dealers can use ADT's brand and affiliate with ADT to sell alarm accounts. It is not a "theory" or the "opinion" of another expert. As a recognized market measure, Dr. Matolo's use of the model to establish a reasonable royalty percentage for a violation of the Lanham Act is entirely consistent with royalty calculation jurisprudence, including the prevailing law in this Circuit.  Dr. Matolo is not "parroting" ADT's opinion, he is properly relying on ADT's actual and current contractual relationships to reach his own expert conclusion applicable to Vivint in this case.

**III.    Dr. Matolo is not required to "verify" ADT's business data.**

Without identifying a single piece of data or any aspect of the ADT Revenue Sharing Model that Vivint contends is inaccurate, Vivint argues that the entirety of Dr. Matolo's expert opinions in this case should be excluded on the basis that Matolo "undertook no substantive analysis of ADT's data on his own, nor does he understand the cases and inputs ADT used in creating the model."[4] However, contrary to the implications of Vivint's argument, "courts often conclude that experts are permitted to rely on information provided by clients without confirming the accuracy." *Companhia Energetica Potiguar v. Caterpillar Inc.*, No. 14-cv-24277, 2016 WL 11547499, at *12–13 (S.D. Fla. June 13, 2016), R&R adopted, No. 14-24277-CIV, 2016 WL 7497339 (S.D. Fla. Sept. 20, 2016).  Rule 703 itself expressly recognizes, "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703.  Thus in *Caterpillar*, when the defendant moved to exclude the plaintiff's expert

---

[4] Omitted from Vivint's motion is the fact that Vivint noticed a 30(b)(6) deposition of ADT and included express topics on the factual bases underlying Dr. Matolo's opinions. Vivint had more than a fair opportunity to examine the facts supplied by ADT to Dr. Matolo in that deposition.

for his failure to "independently verify" data provided by the client, Judge Goodman held that the

issue went to the weight, not the admissibility, of the testimony. Judge Goodman explained:

> A party confronted with an expert accountant's damages opinion is, of course, free
> to challenge the accuracy, completeness and relevance of the material provided to
> the expert during cross-examination (and in post-case motions and/or closing
> argument). If the information given to the expert accountant is incorrect, unreliable
> or speculative, then the jury will take that into consideration when deciding what
> weight, if any, to give the expert's conclusions. And if the information is incorrect
> enough (or speculative enough) to justify a case-dispositive ruling from the trial
> court, then the party challenging the expert's conclusions will obtain the requisite
> relief.

2016 WL 11547499, at *12–13 (citing numerous other authorities holding the same).

Vivint cites three cases supposedly supporting its contention that Dr. Matolo's failure to

properly analyze ADT's data renders his opinion inadmissible.  But the cases cited say no such

thing.  In fact, as with the cases Vivint cited in support of its contention that the ADT Revenue

Sharing Model is an "opinion," the three cases Vivint claims require an expert to analyze client

data do not actually deal with client data at all.  Instead, each of the cited cases merely stand for

the unremarkable proposition that an expert is not permitted to blindly rely on the opinions of other

experts—a proposition that is frankly irrelevant to the issues here. *See e.g.*, *Mamani v. Berzain*,

No. 07-22459-CIV-COHN/SELTZER, 2018 WL 1090546, *4 (S.D. Fla. Feb. 28, 2018)

(precluding an expert from blindly relying on the opinion of another expert); *Sofillas v. Carnival*

*Corp.*, Civil Action No 14-23920-Civ-Scola, 2016 WL 5407889, *4 (S.D. Fla. July 7, 2016)

(same); *MasForce Europe v. Mastyr Marine & Indus. Design, Inc.*, No. 8:11-CV-1814-T-24AEP,

2013 WL 8148666, *4-5 (M.D. Fla. Aug. 27, 2013) (same).

Ultimately, if Vivint takes issue with the accuracy of Dr. Matolo's opinions, or the data

that underlies his opinions, or even Dr. Matolo's alleged lack of understanding of the data that

underlies his opinions, Vivint may cross-examine Dr. Matolo at trial. (Indeed, Vivint has already

spent several hours questioning ADT's corporate representatives on those facts at deposition.) As

this very Court has explained, the jury can decide what weight, if any, to give Dr. Matolo's calculations based on those issues, but this complaint is not a basis for exclusion.

IV.    **Dr. Matolo's opinion does not depend on the Representative Industry Model; it uses it only as a "check" on the ADT-specific model used to calculate the royalty applicable to Vivint.**

As discussed above, Dr. Matolo's opinion that the appropriate royalty rate is 22% is based on the real-world licensing arrangements already negotiated by ADT in the marketplace that are represented by the ADT Revenue Sharing Model.  In addition, and as a means of testing the validity of his conclusions, Dr. Matolo also performed a similar royalty analysis using a different model that was not tied exclusively to ADT's dealer agreements. Deposition of Dr. Matolo ("Matolo Dep."), **DE 119-117**, 182:14-22, 185:8-22.  This model, called the Representative Industry Model, was developed by Dr. Matolo and his colleague Dr. Mangum. The model relies on multiple different market measures from various dealer programs in the alarm industry – as opposed to a singular revenue sharing model for a specific alarm service provider like ADT.  Based on specific and reliable industry data drawn from revenue sharing arrangements for multiple dealer programs in the alarm services industry (revenue sharing data that Vivint does not appear to dispute), Dr. Matolo was able to determine an alternative royalty rate using the same methodology applied to the ADT Revenue Sharing Model. As noted in Dr. Matolo's report, the data utilized for the Representative Industry Model resulted in an implied royalty rate that was in line with, but slightly higher than, the royalty rate using ADT data exclusively. Matolo Rep., **DE 119-116**, ¶ 47.

Notwithstanding the fact that Dr. Matolo's 22% Royalty Rate opinion does not actually reference or rely upon the higher royalty rate supported by the Representative Industry Model, Vivint seeks to exclude the entirety of Dr. Matolo's opinion in this case for the mere fact that the Representative Industry Model is even mentioned.  In support, Vivint points to the one case where the royalty rate opinion of Dr. Mangum has been excluded.  In that case, *CPI Security Systems,*

*Inc. v. Vivint Smart Home, Inc.*, 3:20-CV-0504-FDW-DSC (W.D. N.C. Jan 14, 2022), Dr. Mangum sought to apply a royalty rate derived **solely from** the Representative Industry Model for an alarm company that, unlike ADT, did not have its own dealer program and therefore did not have its own market measure from which to derive an appropriate royalty rate. Vivint complained in the *CPI* case that the Representative Industry Model was not properly tied to the actual economics of the specific alarm company at issue, CPI. The Court in *CPI* ultimately precluded Dr. Mangum's testimony because, in the Court's view, Dr. Mangum did not establish that the industry-wide data used to develop the Representative Industry Model was an appropriate market measure for a specific company (CPI) that did not itself have a dealer program. *See* Jan. 10, 2022 Hrg. Tr., *CPI v. Vivint*, No. 3:20-CV-00504 (W.D. N.C.), 20:19-27:8, 45:25-46:15, attached hereto as **Exhibit D**.

Contrary to Vivint's argument, the exclusion of Dr. Mangum in the *CPI* case has no bearing on the admissibility of Dr. Matolo's opinions in this case. First, as discussed above, Dr. Matolo's opinion supporting a 22% implied royalty rate is based on ADT's specific agreements and relationships with its dealers and the ADT Revenue Sharing Model, not the Representative Industry Model at issue in CPI. Second, Dr. Mangum's opinion in CPI was precluded *specifically because* unlike ADT, CPI did not have an existing dealer program from which direct licensing market measures could be derived. *See id.*; *see also* Matolo Dep., **DE 119-117**, at 232:5-9. There is no evidence that the CPI court took issue with the concept of deriving a royalty rate from evidence of a party's <u>own</u> licensing agreements; in fact, the Court based its exclusion of Dr. Mangum on the fact that there was not an established rate specific to CPI and Dr. Mangum's rate was based solely on an industry-wide model.

In contrast, here the opinion expressed by Dr. Matolo, and the methodology applied by Dr.

Matolo to reach his opinions, is based on ADT's own revenue sharing model. Dr. Matolo cites the Industry model only as verification that the ADT-specific model "checks out" when you compare it to other similar economic relationships between other providers and dealers in the industry. Matolo Dep., **DE 119-117**, 115:2-116:1-7, 182:14-22, 185:8-22. As Judges Rosenberg, Middlebrooks and Cannon each found, Dr. Matolo's ADT-specific methodology is sufficiently supported and reliable to present to a jury.

**V.      Dr. Matolo reliably applies his methodology to the facts of this case.**

Vivint's final argument is that Dr. Matolo has not reliably applied his principles and methods to the facts of this case. More specifically, Vivint complains that because Dr. Matolo's calculations supposedly fail to differentiate or quantify the Vivint subscribers that originated from ADT, a fact that is virtually undisputed because Vivint says it does not track its customers' former providers, the calculations are "entirely divorced from the misconduct ADT alleges in this case." Motion at 14. Vivint's argument reflects both a fundamental misunderstanding as to the purpose of a royalty rate damages analysis, which does not tie application of the royalty to a sale-by-sale basis, and a refusal to acknowledge that any perceived difficulties with tying the royalty rate to specific instances of misconduct is the result of Vivint's own obfuscation and self-serving refusal to disclose the true scope of its deceptive sales practices. The Court should reject Vivint's recycled attempt to have the Court rule differently than Judge Middlebrooks already did in the first case.

Throughout its Motion, Vivint points out that Dr. Matolo's opinion and supporting exhibits are virtually identical to opinions and exhibits he and Dr. Mangum have offered in other ADT cases against other defendants. Based on these similarities, Vivint argues that Dr. Matolo's royalty rate calculations are necessarily "divorced" from the facts of this particular case, meaning that somehow the royalty rate itself is dependent on the scope of Vivint's misconduct, *i.e.*, that the rate and methodology should somehow change depending upon the number of ADT customers

deceived by Vivint.  *See* Motion at 14. However, as discussed in detail above, the royalty rate

calculated by Dr. Matolo is derived from the existing market measure evidenced by ADT's

business arrangement with its own dealers.  The rate has nothing to do with the number of times

Vivint actually misuses ADT's brand; rather, it is based on what the established rate is to have a

right of affiliation with ADT—regardless of the number of times a given authorized dealer actually

invokes ADT's name. In other words: you either have a license to claim an affiliation with ADT,

or you don't. If you do, you (i.e., an *authorized* dealer) must pay the market rate to ADT for all

accounts generated, regardless of the weight ADT's name played in consummating any given sale.

(Notably, all authorized dealers have exclusivity with ADT, requiring them to tender all contracts

generated to ADT.)  Here, having used ADT's brand and name without permission, Vivint does

not get to choose on the backend, after its unlawful conduct, in which specific transactions it

actually used ADT's name and which ones it didn't—that would give Vivint the wrongdoer a

*better* deal than ADT's *authorized* dealers receive. As explained by Judge Rosenberg, the dealers

pay ADT an implied royalty under the ADT dealer agreement (*i.e.*, the ADT Revenue Sharing

Model) which is a fair measure of the value of the forced royalty that an unauthorized user of the

ADT mark should pay as a consequence of the expropriation. *See* **Ex. B**, 2017 WL 2212541 at *3-

4.

Vivint also argues that Dr. Matolo should be precluded from testifying about his calculation

of the royalty base.  In doing so Vivint again wrongly suggests that Dr. Matolo's analysis would

result in payment of damages that were not actually attributable to Vivint's misconduct.  This is

simply not true, for the same reasons noted above. And, Dr. Matolo's analysis limits the applicable

royalty base to the proportion of U.S. households *with ADT alarm systems*.  In his report, Dr.

Matolo opines: "With the targeting of *ADT customers*, market share data can be applied to isolate

the share of new sales potentially related to prior ADT customers." Matolo Rep., **DE 119-116**, ¶ 28 (emphasis added). In other words, Dr. Matolo would *not* apply the 22% royalty to all revenues generated by Vivint during the relevant time-period. Instead, just as Judge Middlebrooks previously recognized with respect to application of Dr. Mangum's royalty rate in the prior action between these parties, Dr. Matolo adjusts the royalty base to account for the proportion of households in the market with ADT's system.[5]

Finally, Vivint complains that Dr. Matolo's analysis is deficient because he admits that he does not know the total number of new subscribers that were actually subjected to Vivint's misconduct.  *See* Motion at 15.  Apart from ignoring that that information is irrelevant to the application of Dr. Matolo's forced royalty, apparently lost on Vivint is the fact that such information is simply not available or it is exclusively in the possession of Vivint, and it has refused to produce it.[6]  As with its motion to exclude the testimony of ADT's marketing expert Dr. Winer,

---

[5] Again, Dr. Matolo's analysis is in-line with the general concept of any licensing arrangement.  A party subject to such an agreement is not permitted to reduce its royalty obligation based on its post-hoc contention that in a given particular sale it did not actually use the relevant license.  And, for ADT, the agreements with its authorized dealers require exclusivity in tendering *all accounts generated* by the dealer to ADT.  By applying the royalty rate to revenue gained only where ADT has market share and only in the amount of that market share, Dr. Matolo ensures that ADT is fairly receiving royalty in an amount tied to Vivint's actual misconduct.  *See* Matolo Dep., **DE 119-117**, 252:11-21 (explaining that Matolo's base calculation is limited "to the share of the market where the affiliation with ADT could be potentially relevant.").

[6] At the time Dr. Matolo rendered his report, Vivint had not provided *any* information about the volume of reports Vivint has received about deceptive sales conduct by its sales force, even though the academic literature is clear that Vivint would be the entity most likely to receive complaints about its salesforce's conduct. Since that time, following this Court's order compelling production, Vivint has produced a spreadsheet with over 75,000 complaint entries (what Vivint calls "feedback cases"). Vivint claims it investigates each such complaint and comes to a conclusion about the nature and validity of the complaint. Yet, Vivint has redacted the column in the spreadsheet it produced showing its conclusion classifying the respective complaints, despite this Court's order overruling Vivint's claims of privilege relating to such information. [*See* DE 62.] Other documents make clear that the information withheld would show how many complaints Vivint classified as "affiliation misrepresentations" or "slams," terms it uses to refer to the same sales misconduct at issue in this case. At Vivint's 30(b)(6) deposition, Vivint continued to claim it 'just doesn't know' how many complaints about deceptive sales practices it has received from ADT customers and

Vivint now seeks to benefit from its refusal to monitor and record the misconduct of its sales representatives.  Essentially, Vivint seeks to exclude Dr. Matolo's testimony because Vivint has made it impossible to know who has been deceived.  However, it is a fundamental tenet of damages law both generally and under the Lanham Act that where the tortfeasor's conduct makes it difficult to pinpoint or prove the scope of damage, that difficulty is construed against the wrongdoer—not the victim—and does not preclude recovery.  *E.g.*, *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931).  As stated in *Ramada Inns*, "Lanham Act damages may be awarded even when they are not susceptible to precise calculations."  804 F.2d at 1565 (emphasis added). The court explained:

> Where the wrong is of such a nature as to preclude exact ascertainment of the amount of damages, plaintiff may recover upon a showing of the extent of damages as a matter of just and reasonable inference, although the result may be only an approximation. The wrongdoer may not complain of inexactness where his actions preclude precise computation of the extent of the injury.

*Id.* (internal citations to Supreme Court precedent omitted); *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1520 (11th Cir. 1990) (same).  By applying the royalty rate only to the portion of Vivint's revenue based on its overlap with ADT's actual market share, Dr. Matolo reasonably approximates the royalty base attributable to Vivint's actions, subject to any rebuttal proof that Vivint may try to offer showing what specific accounts may not have been generated using ADT's name and brand.  The fact that Vivint purposely sticks its head in the sand, refuses to disclose which ADT customers reported deceptive sales practices to Vivint, and refuses to disclose the incidents Vivint itself determined to be valid based on its investigation of such reports does not serve as a basis for excluding such testimony.

---

classified as slams or affiliation misrepresentations. Vivint's refusal to provide such information in direct contravention of this Court's orders does not supply a basis to exclude Dr. Matolo.

Significantly, Vivint's argument is also contrary to the burden-shifting framework established by the Lanham Act related to disgorgement of Vivint's profits. As Dr. Matolo opines, the amount Vivint avoided paying to rightfully license a right of affiliation with ADT represents both lost profits to ADT, and wrongfully obtained profits by Vivint. *E.g.*, Matolo Rep., **DE 119-116**, ¶ 52 ("[T]here is a connection between the avoided royalty discussed above and royalty revenue received by ADT. Whatever royalty was avoided by Defendants was at the same time lost to ADT. Thus, any calculation of avoided royalty is also a calculation of lost royalties . . . ."). Under the Lanham Act's burden-shifting framework for disgorgement of a defendant's profits, ADT is required to prove Vivint's gross sales only, and it is <u>Vivint's burden</u> to show which sales or other deductions should be applied to reduce that number. 15 U.S.C. § 1117(a) ("In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."); *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 261 (1916) (holding where a plaintiff is unable to apportion profits specifically attributable to the infringement either "because of the action of the wrongdoer" or the "inherent impossibility of making an approximate apportionment," that the issue should be resolved against the infringer); *Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1487-88 (11th Cir. 1987) ("A plaintiff need not demonstrate actual damage to obtain an accounting of the infringer's profits under section 35 of the Lanham Act. It is enough that the Plaintiff proves the infringer's sales. The burden then shifts to the Defendant, which must prove its expenses and other deductions from gross sales." (citations omitted)); *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206-07 (1942) ("The burden is the infringer's to prove that his infringement had no cash value in sales made by him. If he does not do so, the profits made on sales of goods bearing the infringing mark properly belong to the owner of the mark. There may be a windfall to the trade-

mark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer."); *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."). Thus, if Vivint takes issue with Dr. Matolo's royalty base, the law charges Vivint with the burden of showing what deductions should be applied. Vivint's refusal to identify the scope of confirmed reports of its only deceptive sales practices is construed against Vivint, not ADT, and does not support exclusion of Dr. Matolo's opinion.

## **<u>CONCLUSION</u>**

Vivint's Motion to Exclude the Testimony of Dr. Eric Matolo should be denied.

Dated:  January 24, 2023

Respectfully submitted,

**SHOOK, HARDY & BACON L.L.P.**

*s/ Jennifer A. McLoone*
Jennifer A. McLoone
Florida Bar No. 029234
jmcloone@shb.com
201 S. Biscayne Blvd., #3200
Miami, Florida 33131
Tel:  (305) 358-5171
Fax: (305) 358-7470

-and-

*s/ Charles C. Eblen*
Charles C. Eblen (*admitted pro hac vice*)
ceblen@shb.com
2555 Grand Blvd.
Kansas City, Missouri 64108
Tel:  (816) 474-6550
Fax: (816) 421-5547

-and-

_s/ Daniel E. Rohner_____
Daniel E. Rohner (*admitted pro hac vice*)
drohner@shb.com
Eric J. Hobbs (*admitted pro hac vice*)
ehobbs@shb.com
1660 17th Street, Suite 450
Denver, Colorado 80202
Tel:  (303) 285-5300
Fax: (303) 285-5301

*Counsel for Plaintiffs/Counterclaim
Defendants ADT LLC and The ADT Security
Corporation*