UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 20-cv-23391-GOODMAN

[CONSENT]

ADT LLC, *et al.*,

     Plaintiffs,

v.

VIVINT SMART HOME, INC. f/k/a Mosaic
Acquisition Corp., et al.,

     Defendants.

_____/

### OMNIBUS ORDER ON MOTIONS *IN LIMINE* AND *DAUBERT*[1]

Defendants Vivint Smart Home, Inc. f/k/a Mosaic Acquisition Corp. and Legacy Vivint Smart Home, Inc. f/k/a Vivint Smart Home, Inc. (collectively, "Vivint" or "Defendants") have filed a motion *in limine* and two *Daubert* motions. [ECF Nos. 114-16]. Plaintiffs ADT, LLC and The ADT Security Corporation (collectively, "ADT" or "Plaintiffs") have filed opposition responses. [ECF Nos. 124-25; 127] and Defendants have filed replies [ECF Nos. 131-33]. The parties have also filed some redacted exhibits [ECF

---

[1]     *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Nos. 119; 130] and some exhibits under seal [ECF Nos. 118; 120; 128-29].[2]

For the reasons discussed below, the Court **grants in part and denies in part** Defendants' *in limine* motion, **denies** Defendants' *Daubert* motion as to Dr. Winer, and **grants** the *Daubert* motion directed to Dr. Matolo.

The rulings in this pre-trial Order are subject to change based on the *actual* trial testimony. For instance, if this Order permits certain expert opinion testimony but the expert's testimony is other than what was represented in the submissions or the cross-examination exposes additional and substantial flaws or more-serious gaps than presented before trial, then the Court has authority to strike some or all of the expert opinion testimony or to issue limiting instructions or to issue a post-trial ruling, if necessary. *See Harper v. Lawrence Cnty., Ala.*, 592 F.3d 1227, 1231 (11th Cir. 2010) ("It is permissible for a district court to rescind its own interlocutory order."). The Court has similar discretion concerning the non-expert evidence which is the subject of the rulings on the *in limine* motion. *See Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000) (noting that *in limine* rulings are "not binding on the trial judge, and the judge may always change his mind during the course of the trial").

---

[2]     This Order is publicly filed because it does not disclose the substance of any under-seal filings.

## I.      Background

In the operative First Amended Complaint, Plaintiffs assert the following causes of action: (1) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (2) common law unfair competition; (3) trade slander/commercial disparagement; and (4) tortious interference with advantageous business relationships. [ECF No. 22].

ADT describes the gist of its claims against Vivint as follows:

This case is about Vivint's false and misleading sales practices on the doorsteps and in the homes of hundreds—if not thousands—of ADT customers across the country. Through well-rehearsed sales tactics, Vivint's sales representatives have misled scores of ADT customers into believing, among other things: (1) that the Vivint agent is there to simply "update" or "upgrade" the ADT customer's equipment, when in reality he or she is switching out the ADT system for Vivint; (2) that ADT has been bought out or is going out of business and that Vivint is taking over ADT accounts; and (3) that Vivint is a subcontractor, installer or is otherwise affiliated with or acting on behalf of ADT. These affiliation misrepresentations allow Vivint to freeride on the goodwill of ADT, damage ADT's name, and lead ADT's customers to do business with Vivint under false pretenses, typically resulting in the ADT customer becoming bound into a multi-year contract with Vivint valued in the thousands of dollars that is impossible for the customer to extricate him or herself from once the customer has finally become aware of Vivint's deception. These practices violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the related common law of unfair competition. ADT seeks damages to remedy its loss of numerous customers (some known, some unknown) and the disruption of thousands of others since December 20, 2017; ADT's injuries to its goodwill and reputation; ADT's lost royalties from Vivint's unauthorized use of the ADT brand; Vivint's profits from its ill-gotten gains, ADT's attorneys' fees; and punitive damages to punish and deter Vivint from continuing to engage in its intentional conduct.

*Id.* at ¶ 1.

In response to ADT's claims, Vivint filed an answer and asserted the following counterclaims: (1) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (2) vicarious unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (3) contributory unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (4) induced unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (5) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); (6) common law unfair competition; (7) federal trademark infringement under the Lanham Act; (8) contributory infringement of federally registered trademark; (9) vicarious infringement of federally registered trademark; (10) defamation *per se* under Florida law; and (11) tortious interference with advantageous business relationships under Florida law. [ECF No. 76].

## II.     Applicable Legal Standards

### A.     *In Limine* Motions

Motions *in limine* in essence seek a prophylactic against the introduction of damaging evidence that could "'irretrievably affect the fairness of the trial.'" *Benson v. Facemyer*, No. 1:13-cv-595, 2017 WL 1400558, at * 1 (N.D. Ga. Apr. 19, 2017) (quoting *Soto v. Geico Indem. Co.*, No. 6:13-CV-181, 2014 WL 3644247 at * 1 (M.D. Fla. July 21, 2014)). Courts thus grant them "only if the evidence in question is clearly inadmissible." *Hamilton v. Lanier*, 464 F. Supp. 3d 1379, 1381 (S.D. Ga. 2020) (quoting *Stewart v. Hooters of*

*Am., Inc.*, No. 8:04-cv-40, 2007 WL 1752873, at *1 (M.D. Fla. June 18, 2007)); *see also Ctr. Hill Courts Condo. Ass'n, Inc. v. Rockhill Ins. Co.*, No. 19-cv-80111, 2020 WL 496065, at *1 (S.D. Fla. Jan. 30, 2020) (citing *United States v. Gonzalez*, 718 F. Supp. 2d 1341, 1345 (S.D. Fla. 2010)).

*In limine* rulings are "not binding on the trial judge, and the judge may always change his mind during the course of the trial." *Ohler*, 529 U.S. at 758 n.3.

"When seeking to exclude evidence *in limine*, '[t]he movant has the burden of demonstrating that the evidence is inadmissible on any relevant ground.'" *Guantanamera Cigars Co. v. SMCI Holding, Inc.,* No. 21-cv-21714, 2022 WL 2046884, at *1 (S.D. Fla. June 27, 2022) (citing *Gonzalez*, 718 F. Supp. 2d at 1345).

### B.    *Daubert*

A Court has "broad discretion in determining whether to admit or exclude expert testimony, and its decision will be disturbed on appeal only if it is **manifestly erroneous**." *Evans v. Mathis Funeral Home*, 996 F.2d 266, 268 (11th Cir. 1993) (emphasis added). This "manifestly erroneous" standard is used because "by virtue of the trial court's role in presiding over trial proceedings, it is in the best position to decide such matters." *See United States v. Brown*, 415 F.3d 1257, 1264-65 (11th Cir. 2005).

The decision to admit or exclude expert testimony is within the trial court's discretion and the court enjoys **"considerable leeway"** when determining the

admissibility of this testimony. *See Cook v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1103

(11th Cir. 2005) (emphasis supplied).

Federal Rule of Evidence 702 governs the admission of expert testimony, as

explained and refined by the United States Supreme Court in *Daubert v. Merrell Dow*

*Pharms., Inc.*, 509 U.S. 579, 582 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137

(1999). Under this framework, district courts are charged with a gatekeeping function "to

ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey*

*v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

> Rule 702 provides that:
>
> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge
>> will help the trier of fact to understand the evidence or to determine
>> a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;
>>
>> (c) the testimony is the product of reliable principles and methods;
>> and
>>
>> (d) the expert has reliably applied the principles and methods to the
>> facts of the case.

Fed. R. Evid. 702.

To fulfill its obligation under *Daubert*, a trial court engages in a three-part inquiry:

(1) whether the expert is qualified to testify competently; (2) whether the methodology

used to reach the conclusions is sufficiently reliable; and (3) whether the testimony assists the trier of fact to understand the evidence or to determine a fact at issue. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).

As an overarching principle, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey*, 298 F.3d at 1256. "In order to be admissible, an expert's testimony must be based on 'more than subjective belief or unsupported speculation.'" *Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1167 (S.D. Fla. 1996) (quoting *Daubert*, 509 U.S. at 590). There should be "[s]cientific method; good grounds and appropriate validation." *United States v. Masferrer*, 367 F. Supp. 2d 1365, 1371 (S.D. Fla. 2005).

Reliability of the methodology requires "an exacting analysis of the proffered expert's methodology." *McCorvey*, 298 F.3d at 1257. That analysis takes into consideration a number of factors, including: (1) whether the expert's methodology can be, and has been, tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method employed has a known rate of error; and (4) whether the technique is generally accepted in the scientific community. *Rink*, 400 F.3d at 1292; *see also Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

These reliability factors, however, are non-exhaustive. *Kumho Tire*, 526 U.S. at 150; *Rink*, 400 F.3d at 1292. Thus, "[i]n evaluating the reliability of an expert's method . . . a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink*, 400 F.3d at 1293 n.7. The burden of establishing the reliability of an expert's opinions rests on the proponent of that expert's testimony. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*). The party proffering the expert also has the burden of "laying the proper foundation for the admission of the expert testimony . . . and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

"It is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341. Thus, a court cannot exclude an expert because it believes the expert lacks personal credibility. *Rink*, 400 F.3d at 1293 n.7. Instead, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id*. (quoting *Daubert*, 509 U.S. at 596).

A less-than-perfect expert opinion may still be admitted, even if it contains gaps. *See In re Trasylol Prods. Liab. Litig.*, No. 08–MD–01928, 2010 WL 1489793, at *6 (S.D. Fla.

8

Feb. 24, 2010) ("Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.").

Furthermore, courts "must be careful not to conflate questions of admissibility of expert testimony with the weight appropriately to be accorded to such testimony by the fact finder." *Id.* at *7 (*quoting Quiet Tech DC–8, Inc.*, 326 F.3d at 1341); *cf. Peng v. Citizens Property Ins. Co.*, 337 So. 3d 488, 493 (Fla. 3d DCA 2022) ("[A]ny discrepancies between [an expert]'s affidavit and his deposition may provide fertile ground for cross-examination but should not serve as the basis for being stricken under *Daubert*.").

On the other hand, courts do not hesitate to exclude purported expert testimony which does not pass muster. *See Allison*, 184 F.3d at 1322 (affirming summary judgment in favor of silicone breast implant manufacturers and upholding district court's exclusion of proffered expert's causation testimony under *Daubert*); *Rink*, 400 F.3d at 1286 (affirming exclusion of expert testimony in products liability and toxic trespass action against pesticide manufacturer and therefore affirming summary judgment for defendant); *Frazier*, 387 F.3d at 1263 (finding trial court in criminal case did not abuse its discretion in excluding proffered expert testimony from forensic investigator); *Hendrix v. Evenflo Co., Inc.*, 609 F.3d 1183, 1201–03 (11th Cir. 2010) (affirming defense summary judgment for infant car seat manufacturer in products liability lawsuit involving child who sustained

traumatic brain injuries and upholding trial court ruling which excluded expert testimony because the experts were not sufficiently reliable).

But regardless of whether a court admits or excludes expert opinion testimony under *Daubert*, "it is difficult to persuade a court of appeals to reverse a district court's judgment on *Daubert* grounds." *Brown*, 415 F.3d at 1264-66 (explaining that the "considerable deference" given to trial judges on evidentiary rulings "applies with equal or even greater force to *Daubert* issues in particular" because it is "an area where the abuse of discretion standard thrives").

## III.   Analysis

### A.   *In Limine* Motion [ECF No. 114]

Vivint's *in limine* motion [ECF No. 114] seeks to exclude evidence of (or any reference to, or argument about) four categories of testimony, exhibits and computations: (1) customer complaints other than testimony from customers subject to cross-examination ("Customer Complaints"); (2) external proceedings, settlements, and complaints against Vivint by nonparties, and a 2017 proceeding brought by ADT against Vivint ("External Matters Against Vivint"); (3) lawsuits Vivint has brought against non-ADT competitors ("Competitor Lawsuits"); and (4) damage computations based on the foregoing and other inadmissible evidence ("Inadmissible Damages").

The Court's analysis will unfold on a category-by-category basis:

## Customer Complaints

Vivint wants to exclude evidence of ADT customer complaints other than testimony from customers subject to cross-examination. The so-called "complaints" are recordings of phone calls between customers and ADT, Vivint or both, as well as notes, reports or a spreadsheet summary purporting to document the customer's recollection of their interactions with Vivint on these recorded calls. In the "complaints," an ADT customer supposedly tells an ADT (or Vivint) customer service representative about something a Vivint salesperson allegedly said.

At bottom, Vivint contends that these Customer Complaints are inadmissible hearsay. In fact, it argues that the complaints consist of *multiple* layers of hearsay. It also argues that they are untrustworthy and that their admission would destroy its right of cross-examination. Vivint says that ADT plans to improperly ask the jury to treat the allegations in the complaints as proof of Vivint's purported misconduct.

Noting that ADT seeks to admit the complaints for the truth of the ADT customer's statement that a Vivint salesperson made deceptive statements, Vivint contends that the business records exception of Federal Rule of Evidence 803(6) does not apply because: (1) the customers did not make the complaints in the regular course of *their* business; (2) the complaints are not trustworthy because ADT coaches its customers to believe that a deceptive sales practice was committed by Vivint; (3) ADT customers express faulty

11

memories or fail to attribute statements to Vivint; and (4) ADT customers have motives to misrepresent interactions with Vivint sales staffers.

Vivint's motion also contends that the residual hearsay exception of Federal Rule of Evidence 807 is inapplicable because: (1) the complaints do not have sufficient guarantees of trustworthiness; and (2) the complaints are not more probative than any other evidence ADT could obtain through reasonable efforts.

Finally, Vivint's motion concerning the complaints contend that summaries are also inadmissible because ADT cannot establish that the underlying documents used to create the summaries are admissible.

In response, ADT describes the *in limine* motion as Vivint's tactic to preclude nearly all evidence concerning its "years of egregious deceptive sales practices." ADT says that Vivint's motion, if granted, would eliminate all circumstantial evidence -- and would require ADT to "prove intent and every individual instance of Vivint's wrongful conduct through customer testimony alone." This, ADT argues, would require hundreds, perhaps thousands, of deceived customers to testify at trial, a scenario which it says would create a trial lasting many, many months.

ADT contends that there are several non-hearsay uses of the complaints (i.e., they would be offered for some purpose other than to prove the truth of the allegations made to ADT during the recorded calls). Specifically, ADT says it has four non-hearsay

purposes for introducing the complaints at trial: (1) showing that Vivint had knowledge and notice of the deceptive sales practices of its sales representatives; (2) showing that Vivint acted with intent by failing to rectify known deceptive sales practices or adequately discipline the offending sales representatives; (3) proving actual customer confusion under the Lanham Act; and (4) demonstrating how many customers were harmed by Vivint's deceptive sales practices for ADT's damages calculations.

In addition, ADT argues that Vivint's own documentation of the customer complaints it received, the actions it took to investigate the complaints and Vivint's own conclusions about the complaints are party admissions, which are not hearsay and therefore are admissible.

ADT also contends that Vivint's motion is an attempt to exclude all customer complaints for all purposes (not merely for the truth of the matter asserted) and is an unfair tactic to limit ADT to only live customer witness testimony. This, ADT says, is inequitable because Vivint wants to limit ADT to proving its damages with only customer testimony but also challenged the number of customer depositions which ADT could take in this case before finally consenting to a total of 15 depositions.

Moreover, ADT says that the Customer ID, date of report, competitor company name, contract, customer name, street address, city, state, zip code, date of activity and call (memorialized on spreadsheets ADT prepared about customer complaints) date do

not implicate hearsay concerns *even if* the customer comments were redacted as hearsay. Thus, ADT argues, at the very least, a redacted version of the spreadsheet is admissible.

Moreover, ADT argues that complaints and its own spreadsheet can be used to prove the number of ADT customers who reported complaints about Vivint, which it says is a permissible, non-hearsay use of the spreadsheet.

According to ADT, any Vivint arguments about how ADT supposedly coaches customers relate to the weight assigned to the customer complaints, not the fundamental admissibility.

On a related point, ADT says that it has documented more than 385 complaints it has received about Vivint's sales practices -- but Vivint identified only less than 10 which it disputes as reporting deceptive sales conduct by Vivint's salesforce. And ADT also contends that Vivint's challenge to the trustworthiness of the customer complaints is unconvincing because it is based on only a few "cherry-picked" statements and because it excluded the entirety of the customer complaints without including the remainder to provide necessary context. ADT provided specific examples of the few "cherry-picked" complaints and argues that Vivint "grossly mischaracterized" those few complaints. ADT describes Vivint's tactics as a challenge based on "selective quotation and omission" which does not support wholesale exclusion of the evidence.

14

Vivint takes issue with the arguments ADT has put together in opposition to the *in limine* motion.

Vivint's reply [ECF No. 131] says the so-called non-hearsay purposes of the challenged evidence are not *actually* promoting a non-hearsay theory. Instead, Vivint contends, each suggested non-hearsay use inherently requires the jury to rely on the **truth** of the complaints -- i.e., that the customer complaints **are**, in fact, evidence of deceptive sales practices committed by Vivint.

For example, Vivint explains that ADT's effort to admit the complaints is *not* to show Vivint's mere *notice* and knowledge of its *receipt* of those complaints. Instead, Vivint points to language from ADT's own memorandum to demonstrate ADT's *true* purpose: to show "evidence of Vivint's notice and knowledge of **deceptive sales practices**." [ECF 124, p. 4 (emphasis added)].

Therefore, Vivint continues, in order to equate "complaints" with evidence of actual "deceptive sales practices," the jury must presume the truth and validity of each inadmissible hearsay complaint as a "deceptive sales practice."

The Court is *inclined* to agree.

ADT has, in effect, conceded that its purpose of providing evidence of notice is actually to establish notice of the **very deceptive sales practices which would require the jury to conclude that the complaints are, in fact, evidence of misconduct**. Merely

*saying* that the non-hearsay purpose is to establish notice does not necessarily mean that this is in fact ADT's actual purpose, and it does not mean that truth will not play a role in assessing the evidence for the purported non-hearsay purpose. *See, e.g., Moon v. Advanced Med. Optics, Inc.*, No. 4:08-CV-0021, 2010 WL 11500832, at *9 (N.D. Ga. Dec. 29, 2010) (database reports based on "subjective communications from lay persons" were inadmissible hearsay, and the plaintiffs "[could not] avoid the hearsay rules by arguing that they [sought] to introduce the [database] entries and reports to show notice" because "[the] [p]laintiffs **necessarily [were] seeking to introduce the [database] entries and reports to show the truth of the matters contained in those documents**" (emphasis added)).

Boiled down to its basics, Vivint's theory about mere notice or knowledge of the receipt of customer calls could very well result in the introduction of evidence without any probative value -- unless ADT *also* advises the jury that these calls alleged *deceptive* conduct and that those reports were *valid.*

Significantly, ADT claims that Vivint's records show the receipt of "more than 75,000 complaints about the conduct of its sales representatives" and will argue that Vivint has failed in sufficient "deter[rence]" or "punishment" of deceptive sales practices, based on its "extensive knowledge of the magnitude of this problem[.]" [ECF No. 124, p. 4].

The Court concludes that the customer complaints are inadmissible hearsay which cannot be introduced for the truth of the matter asserted. The complaints are unadjudicated allegations and consist of multiple levels of hearsay. They are inadmissible for the purpose of truth. *ADT LLC v. Alarm Prot. LLC,* 2017 WL 1881957, *1–2 n.2 (S.D. Fla. May 9, 2017) (excluding phone calls of customer complaints to prove truth of asserted deceptive sales practices against defendant) (citing *ADT, LLC v. Sec. Networks, LLC*, No. 12-CIV-81120 (S.D. Fla. Dec. 9, 2016) (same)).

The ruling that the customer complaints cannot be introduced for the truth applies to **summaries** of those complaints, as well. A summary under Fed. R. Evid. 1006 requires ADT to "establish that the underlying documents would have been admissible if the proponent had sought their admission." *In re Int'l Mgmt. Assocs., LLC,* 781 F.3d 1262, 1266 (11th Cir. 2015). This Court rejected a prior attempt by ADT to circumvent the hearsay rule. *See ADT, LLC v. Vivint, Inc.*, No. 17-cv-80432, 2017 WL 11632866, at *4 (S.D. Fla. Dec. 8, 2017) (excluding "any documents that purport to summarize any customer phone calls [as] inadmissible hearsay . . . . This includes the spreadsheet and corresponding summary . . . [which] purports to summarize the recordings described above").

Although I view Vivint's arguments and concerns about **notice** favorably at this pre-trial point, I am not going to now rule that the complaints are in fact totally inadmissible for that non-hearsay purpose. Instead, I will await trial to make a ruling, but

I am putting ADT on notice now that it will face an uphill legal climb if it seeks to establish that notice is a permissible purpose, given the non-frivolous concerns voiced by Vivint (and discussed above) about what conclusions are likely to be implicit in any review of the complaints. *Cf. ADT LLC v. Vivint, Inc.*, 2017 WL 11632866, *1-4 (holding that hearsay-filled recordings of customer complaints may not be admitted as evidence for the truth of the statements and noting that any objections to purported relevance for a non-hearsay purpose, such as notice and the number of customer complaints (which might have relevance to damages) would be "dealt with at trial").

Awaiting trial to see how the legal and factual issues unfold and how they impact the notice theory is the more-prudent approach and is a view frequently adopted by federal trial courts. *Ctr. Hill Cts. Condo. Ass'n, Inc.*, 2020 WL 496065, at *1 (unless the evidence is inadmissible on any relevant ground, evidentiary rulings should be deferred until trial) (citing *United States v. Gonzalez*, 718 F. Supp. 2d 1341, 1345 (S.D. Fla. 2010) (internal quotations omitted)). Motions *in limine* are often disfavored, and Courts frequently prefer to address the admissibility of evidence as such issues arise at trial. *Begualg Inv. Mgmt., Inc. v. Four Seasons Hotel Ltd.*, No. 10-22153-CIV, 2013 WL 750309, at *1 (S.D. Fla. Feb. 27, 2013).

The Undersigned therefore **grants, in part**, Vivint's motion. Specifically, the Court partially grants the motion *in limine* and excludes the Customer Complaints for purposes

of the truth of the complaints. ADT's announced plan to introduce the complaints to prove notice (and Vivint's alleged failure to do anything in response) will, if objected to at trial, be the subject of an in-trial ruling.

For purposes of demonstrating the number of complaints received by Vivint, the Court will also reserve ruling for trial, assuming an objection is lodged. It may well be that the chart itself (or a portion of it) might be admissible without violating the hearsay rule. For example, a **redacted** version of the spreadsheet (with the customer comments section redacted) might be a workable solution.[3]

---

[3]     In *ADT LLC v. Alder Holdings, LLC*, the Court permitted ADT to use its complaint spreadsheet with the "customer comments" section redacted, allowing for admission of other non-hearsay fields such as Customer ID, Date of Report, Competitor Company Name, Contract, Customer Name, Street Address, City, State, Zip Code, Date of Activity, and Call Date. *See*, [ECF No. 124-6 (Exhibit F (*Alder* Trial Exhibit P9))]. The *Alder* defendants made a motion *in limine* "to exclude all references to the existence and substance of customer complaints for the truth of the matter, regardless of the source of the evidence[.]" *See ADT LLC v. Alder Holdings, LLC*, No. 17-CV-81237-ROSENBERG, ECF No. 218 (S.D. Fla. Feb. 22, 2019) (attached to Vivint's Response, [ECF No. 124-7 (Exhibit G)]).

According to Vivint, [ECF No. 124, pp. 9-10], the Honorable Robin Rosenberg denied this motion without prejudice and, following a hearing with Magistrate Judge Bruce Reinhart, the spreadsheet was admitted with the customer comments field redacted but all the information in the aforementioned categories remained unredacted. Vivint's memorandum did not provide an ECF number for this development, but ADT's Reply did not in any way challenge its accuracy, and the Undersigned therefore accepts the representation.

But, from an overarching perspective, the Undersigned deems it prudent to await trial for a substantive ruling on the numerosity purpose. In order to avoid any undue delay at trial, ADT should by trial time have already prepared a redacted version of the spreadsheet.

The Court rejects the notion that Vivint's documentation of customer complaints are admissible as non-hearsay party admissions of Vivint. I also reject the theories that the complaints are admissible as business records (because, among other reasons, the customers did not make their complaints in the regular course of *their* own business), are admissible under the residual exception of Federal Rule of Evidence 807[4], and/or that the records of the complaints are admissible as evidence of actual confusion under the Lanham Act.

---

[4]     *See generally In re Terazosin Hydrochloride Antitrust Litig.*, No. 99-MDL-1317, 2005 WL 5955699, at *5 (S.D. Fla. Feb. 2, 2005) ("This exception . . . is to be utilized only rarely, and is not to be taken as a 'broad license for trial judges to admit hearsay statements that do not fit within one of the other exceptions[.]" (internal citation and quotation omitted)). Rule 807 permits hearsay only if the statement is (1) "supported by sufficient guarantees of trustworthiness--after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement"; and (2) "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Civ. P. 8(a).

**<u>External Proceedings, Settlements, and Complaints Against Vivint</u>**

Vivint seeks to exclude (1) evidence regarding "consumer" complaints about Vivint to the Better Business Bureau ("BBB") and to state attorneys general or other regulatory agencies ("Agency Complaints"); and (2) evidence, including documents and depositions, related to external proceedings brought against Vivint by third parties, and a 2017 proceeding brought by ADT[5] (collectively, "Other Proceedings"). ADT intends to introduce these unadjudicated matters to argue Vivint's liability beyond any testifying customers or other proof in this case.

Vivint argues that the Agency Complaints are hearsay for the same reasons that the Customer Complaints are hearsay -- but are even *more* untrustworthy because they consist of third parties communicating with other third parties, which, according to Vivint, "constrains [its] ability to address accuracy and reliability concerns." Vivint says it is particularly concerned about the Agency Complaints because it argues that ADT encourages customers to "file dubious Agency Complaints against Vivint." Furthermore, Vivint says that ADT advises customers that they can "get out" of Vivint agreements by making Agency Complaints.

---

[5]     *ADT LLC and ADT US Holdings, Inc. v. Vivint, Inc.*, Case No. 9:17-cv-80432-DMM/DLB (S.D. Fla. Apr. 4, 2017) ("2017 Lawsuit").

Vivint also argues that the Agency Complaints are unduly prejudicial under Federal Rule of Evidence 403. To combat the prejudice arising from Agency Complaints, Vivint says, it would be forced to conduct a mini-trial on the validity of each Agency Complaint, which it says would be impossible where there will be no testimony to cross-examine and where the trial period would not be long enough to accommodate this collateral-type litigation.

Vivint argues that evidence of the other proceedings are : (1) irrelevant under Rule 402 (because separate lawsuits and settlement, involving different parties, legal standards and circumstances are not indicative to Vivint's liability here; (2) inadmissible hearsay; (3) inadmissible as prior bad acts, in violation of Rule 404(b); and (4) unfairly prejudicial because it would be portrayed as a "bad" company based on unsubstantiated complaints and/or its participation in litigation. The net result, Vivint contends, would be to confuse and mislead the jury about ADT's innuendo and speculation (as opposed to actual, substantive evidence of admissible customer complaints).

Vivint emphasizes that ADT has disclosed 27 depositions from the 2017 Lawsuit and contends that it would need to defend all of the claims discussed there to the same extent as the claims in the instant lawsuit, which would, in its view, "subsum[e] this trial entirely."

In response, ADT says it intends to use the complaints to agencies to prove Vivint's notice and knowledge of customer complaints unrelated to ADT from across the country, which is for a purpose other than to prove the truth of the complaints.

ADT also argues that the Agency Materials and Lawsuits contain evidence of Vivint's statements about complaints or investigations and that it is permitted to cross-examine Vivint's company witnesses about them because they are admissions and therefore not hearsay.

Federal Rule of Evidence 404(b)(2) permits ADT to use "other bad act" evidence for certain limited purposes, and ADT says it may use this type of evidence to show that Vivint's misconduct is not an accident or the result of only a few "bad apple" employees, but, instead, is a "longstanding pattern of misconduct that spans many years, sales representatives, and geographic areas." [ECF No. 124, p. 18].

ADT argues that Rule 403's exclusion provision is an "exceptional remedy" which is invoked only "sparingly." ADT agrees that evidence of Vivint's chronic misconduct may make Vivint look bad -- but it says this is a **fair** result, not an unfairly prejudicial scenario.

ADT points out that Vivint is seeking to exclude entire *categories* of evidence, without a showing about how any *particular* document might cause it undue prejudice. Therefore, it says, Vivint's motion is overbroad. As a result, ADT says, it is impossible to

determine in the abstract whether *any* document from any investigation, complaint, or lawsuit against Vivint is so clearly inadmissible on all grounds as to warrant an *in limine* Order excluding them *all*, regardless of content.

Vivint says the 2017 Lawsuit resulted in a full release by ADT and that the release "operates to exclude any evidence of the 2017 Lawsuit independent of the applicable evidentiary rules." [ECF No. 131, p. 8].

Similar to its position concerning the Customer Complaints, Vivint contends that ADT cannot successfully invoke the non-hearsay purposes of notice, knowledge, or admissions because the evidence would still necessarily be offered for the **truth** of the allegations. And, as it argued in response to the Customer Complaint evidence theory, Vivint notes that ADT conceded its *true* and actual purpose when it wrote "the **fact** that [Vivint] sales representatives **were engaging** in deceptive sales practices" is a permissible, non-hearsay reason to permit the evidence. [ECF No. 131, pp. 8-9 (quoting ECF No. 124, p. 17 (alteration and emphasis in Reply))].

Vivint argues that Federal Rule of Evidence 404(b) does not permit the evidence because the external matters are "nothing more than contested, unadjudicated allegations." Vivint also contends that ADT has not even bothered to show substantial similarity between the "other bad act" evidence and the specifics of the experiences any given ADT customers had with a given Vivint sales representative on a given date or in

a given place. According to Vivint, the conduct at issue varies in each instance because that is "simply the nature of door-to-door conduct" involved in the industry. [ECF No. 131, p. 9].

Concerning Rule 403, Vivint says it has neither the trial time nor resources to respond to all the untold number of mini-trials which would be necessary to confront each allegation in each matter. And it contends that "allowing ADT to frame the trial around Vivint as a "bad" company because it has been involved in other proceedings has no probative value as to whether a particular ADT customer was misled, whether ADT was harmed as a result, and/or whether Vivint's alleged conduct in this case justifies punitive damages." *Id.* at 10.

The Court concludes that the external proceedings such as other lawsuits and investigations are inadmissible hearsay for purposes of ADT urging the truth of the allegations in them, and I therefore exclude evidence of them for that purpose. *See Salinero v. Johnson & Johnson*, No. 1:18-cv-23643, 2019 WL 7753445, at *3 (S.D. Fla. Sept. 25, 2019) ("[I]f [the] [p]laintiffs were to use the existence of other claims or complaints as proof that other women suffered complications . . . such evidence would be inadmissible hearsay."); *see also Steed v. EverHome Mortg. Co.*, 308 F. App'x 364, 369 n.2 (11th Cir. 2009) (in Fair Housing Act lawsuit, allegations of targeting in another complaint would be inadmissible hearsay because allegations would be offered for their truth); *Bowe v. Public Storage*, No.

1:14-cv-21559, 2015 WL 10857339, at *2 (S.D. Fla. June 2, 2015) (granting motion *in limine* to exclude other lawsuits and any unrelated claims or disputes against the defendant, except for any relevant admissions previously made by defendant or its agents).

In addition, although ADT *says* it also wants to introduce the evidence for the non-hearsay purpose of notice, the Undersigned shares the same concern I articulated earlier in this Order about evidence of Customer Complaints: it will be extremely difficult to deem the evidence relevant for the purpose of notice without advising the jury that the allegations are **true** (or permitting the jury to reach that unavailable conclusion on its own).

However, if ADT has evidence of *specific* Vivint officers, executives, or managers **speaking about** (or writing about) allegations of deceptive misconduct by their sales representatives, then ADT may cross-examine them with *those* statements, as they are *admissions* and not excludable as hearsay.

The Undersigned rejects ADT's argument that the external matters are admissible under Rule 404(b) because it has not established substantial similarity between them and the specific allegations in this case. *See United States v. Liuzzo*, 608 F. Supp. 1234, 1236 (S.D. Fla. 1985) ("While it is true that the 'similar acts' evidence need not be identical to the act charged . . . there must be sufficient similarity to insure its probative value will outweigh the prejudice that will inevitably be suffered by the [d]efendant by its introduction.");

26

*Moon v. Advanced Med. Optics, Inc.*, No. 4:08-CV-0021, 2010 WL 11500832, at *5 (N.D. Ga. Dec. 29, 2010) (excluding other lawsuits, claims or incidents against a defendant attributed to the same product where there was only "cursory evidence" that failed to establish substantial similarity of prior incidents).

Conceivably, ADT might be able to demonstrate this substantial similarity at trial. But, even if successful on that point, ADT would then directly confront the rule that the external lawsuits and investigations (in general, other than the admissions) would be excludable as unduly prejudicial under a Rule 403 analysis. ADT is seeking to introduce evidence of myriad *unproven* allegations. There is a considerable risk that the jury would be confused about the significance (if any) of unproven allegations and whether they constituted innuendo and speculation.

Moreover, there is a risk that the primary focus of the trial would deviate from the instant case to a series of mini-trials addressing the validity of the unsubstantiated allegations in other lawsuits and investigations. *See A.T.O. Golden Constr. Corp. v. Allied World Ins. Co.,* No. 17-24223, 2018 WL 5886663, at *8-9 (S.D. Fla. Nov. 9, 2018) (excluding prior lawsuits because "even if [the] [p]laintiff could demonstrate some probative value from allegations in other lawsuits, presenting evidence of these other cases would lead to a series of mini-trials that would likely confuse and mislead the jury from the task at hand of evaluating plaintiff's claims in this case and result in a waste of time and judicial

27

resources"); *Bui v. Minority Mobile Sys., Inc.*, No. 15-21317, 2016 WL 6518804, at *1 (S.D. Fla. Jan. 28, 2016) ("[T]he probative value of [prior litigation] evidence is substantially outweighed by the danger of unfair jury bias against the chronic litigant under Rule 403."); *see also Boneta v. Am. Med. Sys., Inc.*, No. 20-CIV-60409, 2021 WL 6776245, at *3 (S.D. Fla. Oct. 6, 2021) ("[E]vidence of other lawsuits and the factual allegations therein is inadmissible under Rule 403." (alteration in original, citation and internal quotation marks omitted)).

Therefore, the Undersigned grants Vivint's motion *in limine* concerning other lawsuits and investigations (other than the admissions, if any). This rule of exclusion also addresses ADT's notice theory because the evidence of other unproven lawsuits and investigations would still be excludable under Rule 403 as unduly prejudicial and likely to confuse the jury. Specific admissions by Vivint executives, officers, and/or managers, however, result in a different conclusion under a Rule 403 balancing analysis. As noted, ADT can use that evidence at trial to cross-examine Vivint witnesses.

### Vivint-Filed Lawsuits Against Non-ADT Parties

Vivint contends that the same reasons justifying the exclusion of evidence concerning the external matters also support exclusion of evidence of external lawsuits where Vivint sued non-ADT competitors. These other lawsuits, Vivint notes, did not

involve any ADT customer, and they concern allegedly unlawful conduct by non-Vivint salespersons.

At bottom, Vivint explains, ADT intends to use this evidence to: (1) portray Vivint as litigious; (2) seek to show that Vivint is adopting inconsistent legal positions; and (3) urge the jury to therefore conclude that Vivint's current legal defenses are invalid. In addition, Vivint contends that the evidence, if permitted, would require the jury to assess the allegations and non-binding legal arguments from two cases which were not resolved at trial or summary judgment and which are more than a decade old.

ADT, on the other hand, argues that Vivint made "numerous party admissions that are damning to its case" in testimony its executives and officers gave in lawsuits it filed against competitors "for the same deceptive door-to-door practices at issue in this case." [ECF No. 124, p. 20]. ADT contends that "the shoe [is] now [ ]on the other foot," and that it has many relevant purposes for using Vivint's party admissions from the other lawsuits. *Id.*

In response to Vivint's argument that the evidence is unfairly prejudicial under Rule 403, ADT notes that the evidence may well be harmful to Vivint's defense, but there is nothing unfair about using Vivint's prior statements against it.

In addition to the points outlined above, Vivint's reply contends that one of ADT's actual motivations to use this evidence is to plug up the evidentiary hole in its expert's

proffered testimony in a 2017 Lawsuit. As explained by Vivint, ADT's prior expert could not support an extrapolation theory with adequate methodology to survive muster -- and ADT should not be able to now advance past the admissibility hurdle (which it previously stumbled over and failed to clear) "by reference to a footnote in a decade-old motion pleading." [ECF No. 131, p. 11].

It is, of course, correct that testimony and arguments from other lawsuits are frequently excluded. *See e.g., Energy Smart Indus., LLC v. Morning View Hotels-Beverly Hills, LLC,* No. 14-cv-23284, 2015 WL 11233085, at *1 (S.D. Fla. June 3, 2015) (excluding the plaintiff's other lawsuits because the fact that the plaintiff brought breach of contract claims against other parties "does nothing to show that [the] [p]laintiff breached its contract with [the] [d]efendant"); *Hydentra HLP Int. Ltd. v. Luchian,* No. 1:15-cv-22134, 2016 WL 5942525, at *2 (S.D. Fla. May 31, 2016) (excluding testimony and argument from prior copyright infringement lawsuits because "[t]he charge of litigiousness is a serious one, likely to result in undue prejudice against the party charged, unless the previous claims made by the party are shown to have been fraudulent").

Some reasons that evidence of prior lawsuits is generally not allowed "is because evidence of other cases can at times lead to a series of mini-trials, and pose a danger of confusing and misleading the jury from the task at hand of evaluating plaintiff's claims, including a waste of time and judicial resources." *Gutierrez v. Galiano Enters. of Miami*

*Corp.*, No. 17-24081, 2019 WL 3302325, at *3 (S.D. Fla. July 23, 2019) (internal citation and quotation marks omitted) (summarizing cases where evidence was excluded).

On the other hand, party admissions are not hearsay. That point, though, concerns a hearsay objection, not a relevance objection under Rule 402 or an objection of unfairly prejudicial evidence under Rule 403. But ADT submitted a three-page order by United States District Judge Donald M. Middlebrooks (in the 2017 Lawsuit between ADT and Vivint) in which he postponed until trial a ruling on ADT's argument that evidence was admissible under a party admissions theory. [ECF No. 124-4 (Exhibit "D")]. The Undersigned does not find that decision applicable because the one-sentence ruling concerned a hearsay objection (and whether Vivint's responses to customer complaints to the BBB constituted admissions, which is not hearsay), not objections to relevance and the purported unfair level of prejudice.

It is difficult to obtain a sufficient grasp of the factual background for purposes of grappling with the parties' competing positions with enough focus to permit a sound pre-trial ruling. ADT has provided only a few instances of Vivint's so-called admissions in other lawsuits against other defendants. It is therefore risky for the Undersigned to now enter a pre-trial ruling excluding (or permitting) an entire category of evidence without knowing the precise evidence and understanding how it might relate to the issues, in context.

For purposes of this Order, therefore, the Undersigned rejects *for now* Vivint's motion concerning Vivint's lawsuits against non-ADT defendants but gives ADT notice that its admissions theory will at trial be confronted with hurdles created by both Rule 402 and Rule 403. *See generally Ctr. Hill Cts. Condo. Ass'n, Inc.*, 2020 WL 496065, at *1 (unless a movant meets the high burden of demonstrating that evidence is inadmissible on any relevant ground, "evidentiary rulings should be deferred until trial so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context").

### **Damages Calculations Based on Purportedly Inadmissible Evidence**

Vivint seeks to exclude any reference to any category or computation of damages based on, or extrapolated from, the evidence it challenged in its motion. Specifically, it targets two of ADT's experts, Dr. Russell Winer and Dr. Eric Matolo. It has filed separate *Daubert* motions against these experts [ECF Nos. 115-16] and the Undersigned will address those motions in this Omnibus Order. Those separate *Daubert* motions are primarily based on objections and challenges different from those Vivint raised in the instant *in limine* motion. Nevertheless, Vivint contends that both experts will attempt to rely on Customer Complaints, External Matters Against Vivint, and Competitor Lawsuits.

32

At bottom, Vivint says that expert opinion testimony based on inadmissible underlying evidence is also inadmissible, and it notes that "extrapolation is inappropriate because the underlying evidence is inadmissible for the reasons discussed above" (i.e., in its motion *in limine*).

Vivint also claims the attempted extrapolations fail for an additional reason: "the [c]ustomer [c]omplaints are not a reliable representation of Vivint's sales practices." [ECF No. 114, p. 23]. According to Vivint, what ADT terms a "deceptive sales practice" complaint can mean different things -- and determining whether one occurred and harmed ADT "requires customer testimony and cross-examination."

Pursuing a related objection, Vivint contends that ADT's efforts to extrapolate damages are further flawed because they fail to distinguish actionable misconduct from legal sales activity.

Finally, Vivint's motion argues that ADT's attempts to extrapolate damages should not be permitted because ADT did not timely disclose its formula for these damages. Specifically, Vivint's motion alleges that ADT's counsel emailed a "demonstrative exhibit" to Vivint's counsel on November 18, 2022, in the midst of the ADT Rule 30(b)(6) deposition, including a previously undisclosed "formula" for "Lost Account Damages," containing previously undisclosed factors titled "Multiple" and "Underreporting Factor." According to Vivint, ADT "offered no justification for this late

33

disclosure, which prejudiced Vivint's ability to prepare for and conduct discovery including the ongoing depositions of ADT." [ECF No. 114, p. 24].

ADT's response to this portion of the *in limine* motion is to rely on its responses to Vivint's separate *Daubert* motions. So those points will be analyzed below. ADT says it timely disclosed its damages computations "numerous times throughout discovery" [ECF No. 124, p. 23] and that Vivint's counsel had a "full opportunity" to depose ADT's Rule 30(b)(6) witness on ADT's damages calculation, including the valuation of its damages.

In its reply, Vivint argues that ADT's explanation does not directly address the actual issue because none of the previous damages disclosures mentioned or otherwise disclosed the "formula" finally provided during the deposition.

Both parties have provided only skeletal, succinct, truncated grounds on the issue of the supposedly belated disclosure. Based on the skimpy record presented by both sides on this disclosure-timing issue, the Undersigned is unable to grant the motion on that ground and exclude ADT's damages computations. But Vivint will be permitted to comprehensively and vigorously cross-examine ADT's witnesses, including any experts, about the timing of the disclosure of "the formula."

From a substantive perspective, ADT will not be permitted to introduce through its experts evidence the Court has deemed inadmissible, either here in this Order or later,

during an in-trial ruling. For instance, Dr. Winer will not be permitted to read tweets from dissatisfied ADT customers. *See Grajeda v. Vail Resorts Inc.*, No. 2:20-CV-00165, 2023 WL 2613543, at *4 (D. Vt. Mar. 23, 2023) ("An expert may not merely serve as a conduit for the hearsay testimony of another witness.").

In addition, the Undersigned **rejects** Vivint's argument that ADT's experts will not be permitted to provide expert opinion testimony without adequately distinguishing between actionable misconduct and permissible sales techniques and then making appropriate adjustments in the damages model. That argument goes to the weight of the expert testimony (assuming it is permitted over the objections raised in the *Daubert* motions), not its admissibility. But the Undersigned will give Vivint wide latitude to mount a major attack on ADT's expert(s) during cross-examination. *See Daubert*, 509 U.S. at 596, 113 S. Ct. at 2798 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *In re Takata Airbag Prod. Liab. Litig.*, No. 15-MD-02599, 2022 WL 3584510, at *2 (S.D. Fla. Aug. 16, 2022) ("[The] [d]efendants argue that Dr. Dubé's model does not calculate relevant damages and it is unreliable. However, these arguments go to weight, rather than admissibility, meaning they are better challenged during cross-examination before the jury instead of under *Daubert*.").

The Undersigned will now address the two *Daubert* motions:

B.    *Daubert* **Motions [ECF Nos. 115-16]**

Defendants also seek to exclude Plaintiffs' expert witnesses Dr. Russell S. Winer and Dr. Eric Matolo. Both experts offer opinions on damages. None of the parties requested an evidentiary hearing for the *Daubert* motions (in either the two motions, two responses, or two replies). The Court finds that this is not a complicated case, thereby avoiding the need for such a hearing. *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1113-14 (11th Cir. 2005) (explaining that trial courts are not obligated to hold a hearing on *Daubert* motions and holding that "[b]ecause this is not a 'complicated case[ ] involving multiple expert witnesses'—Dr. Maris was the only proffered expert—we cannot conclude that the district court abused its discretion by not holding a *Daubert* hearing"). The *Cook* Court also held that an appellate court reviews a trial court's decision on whether to hold a *Daubert* hearing for an abuse of discretion. *Id.* at 1113.

For the reasons discussed in more detail below, Vivint's complaints about Dr. Winer's opinions are best addressed through cross-examination rather than exclusion. There are many substantive attacks which Defendants will be able to level, including the fact that Dr Winer's proposed remedial advertising campaign would reach customers who were not exposed to Vivint's alleged misconduct. Vivint will be able to probe these potential weak links during rigorous cross-examination. If these Vivint-led challenges are

successful, then the jury will either place less reliance on these opinions or may even discount them completely. In either case, these challenges are for the jury to resolve.

On the other hand, Dr. Matolo's opinions do not satisfy the reliability prong of *Daubert* and will be excluded.

### Dr. Russell S. Winer

Plaintiffs retained Dr. Winer to (among other things): (1) opine on whether and to what extent the manner in which Vivint marketed itself to ADT customers caused harm to ADT's brand and (2) "identify and outline potential remedies to reverse any harm done to the ADT brand arising from Vivint's use of deceptive sales tactics, including misrepresentation[.]" [ECF No. 119-15, ¶ 8].

Defendants take issue with Dr. Winer's proposed remedy: an approximately $27.2 million "restoration campaign." *Id.* at ¶ 17; [ECF No. 115, p. 4 ("Allowing [Dr.] Winer to testify will . . . infect the jury with a highly suspect $27 million proposed remedial information campaign that is contrary to law and outside the bounds of any generally accepted methodology[.]")].

### 1.      Background

Dr. Winer is the William Joyce Professor of Marketing and Deputy Chair of the Marketing Department at the Stern School of Business, New York University. [ECF No.

119-15, ¶ 1]. He received a Ph.D. in Industrial Administration in 1977 from Carnegie Mellon University.[6]

Defendants seek to exclude Dr. Winer's opinions in their entirety on (lack of) reliability and (lack of) relevancy grounds. [ECF No. 115, p. 1]. They argue that "[a]llowing [Dr.] Winer to testify will (1) infect the jury with a highly suspect $27 million proposed remedial information campaign that is contrary to law and outside the bounds of any generally accepted methodology; and (2) usurp the jury's role as a factfinder on issues of liability." [ECF No. 115, p. 4].

Plaintiffs assert that Dr. Winer's "opinions [will] assist the jury in assessing whether and in what amount ADT has been damaged by Vivint's widespread deceptive sales practices directed at ADT's customers in largely undocumented, in-person interactions throughout the United States." [ECF No. 125, p. 1].

For the reasons discussed below, the Court finds that Defendants' challenges (and there are several) go to the weight, rather than the admissibility, of Dr. Winer's opinions.

## 2.    Analysis

Defendants argue that some of Dr. Winer's opinions are "novel" and contrary to law:

---

[6]    Defendants do not challenge Dr. Winer's qualifications. [ECF No. 115, p. 5 n.2 ("Vivint is not challenging [Dr.] Winer's qualifications in this Motion.")].

> [Dr.] Winer proposes an entirely novel "inoculation theory" as part of his remedial information campaign. Under this "theory," ADT customers that have never been visited by a Vivint representative must still be educated by ADT during its door-to-door campaign to "watch out for" Vivint's future deceptive sales practices that might never take place. His "inoculation theory" is, thus, an impermissible attempt to obtain highly speculative damages to prevent potential harm from unknown future interactions with Vivint that might never occur and might not be deceptive or misleading. The law of damages, however, is not intended to "inoculate"—it is meant to compensate.

[ECF No. 115, p. 2]; *see also* [ECF No. 132, p. 4 ("Vivint seeks to exclude Winer's testimony because his remedy is meant to 'inoculate' against the potential that a customer might be deceived by some assumed future visit from Vivint—a very different rubric that is contrary to the well-settled principle that prospective corrective advertising is a 'method of repair' for harm that has already been sustained.")].

But, as one court found, Dr. Winer's opinions *are* corrective advertising (but just under a different label):

> Based on the parties' testimony, the Court finds Dr. Winer's, quote, "remedial information campaign," closed quote, is, quote, "corrective advertising," closed quote, by a different name.

> Accordingly, [the] defendant's motion *in limine* to exclude testimony of Russell Winer pursuant to Rule 702, Document Number 94, is denied.

[ECF No. 127-4, p. 45 (Hrg. Tr, *CPI Sec. Sys, Inc. v. Vivint Smart Home, Inc.*, 3:20-CV-0504-FDW-DSC (W.D.N.C. Jan. 14, 2022)]. Vivint attempts to distinguish *CPI Sec. Sys, Inc.* by arguing that "[t]hat case involve[d] different facts, a different expert report, different

conclusions, and different parties, in a different jurisdiction." [ECF No. 132, p. 5]. But that is almost always the reality when analogizing to another lawsuit.

Moreover, as ADT points out, the Eleventh Circuit has sanctioned corrective advertising as a permissible measure of damages. [ECF No. 125, p. 5 (quoting *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1241 (11th Cir. 2008) ("[D]amages sustained by the plaintiff include all elements of injury to the business of the trademark owner proximately resulting from the infringer's wrongful acts' **such as the costs of corrective advertising** or injury to business reputation or goodwill." (emphasis added, citation and internal quotation marks omitted))].

Thus, the Court does not find Dr. Winer's opinions in the instant case to be "novel" or contrary to law. What Dr. Winer proposes is -- in effect -- a corrective advertising campaign. Defendants may well believe the costs of Dr. Winer's proposed campaign is excessive, and they may cross-examine Dr. Winer extensively on his cost estimates, but that is not a basis for *excluding* Dr. Winer's testimony.

In the same vein, Defendants argue that Dr. Winer's remedial information campaign is too widespread:

> [Dr.] Winer's proposed sweeping remedial information campaign is further suspect because it is not tailored to rectify the ADT customer confusion caused by Vivint's alleged false or misleading statements. Instead, Winer casts such a wide net to remedy harm that it does not matter to him if ADT's customers believed Vivint's purported statements or were confused or deceived by Vivint's alleged conduct. Instead, [Dr.] Winer contends that if

40

> a Vivint representative visits an ADT customer and that ADT customer has
> any "negative feelings" about ADT or Vivint after the interaction, that ADT
> customer is subject to his $27 million remedial information campaign. The
> law, however, was never intended to remedy negative feelings—it is meant
> to correct customer confusion about perceived affiliation as between the
> parties' goods and services. Accordingly, [Dr.] Winer's sweeping remedial
> information campaign travels far outside the boundaries of the law and is
> neither relevant nor helpful in addressing the facts and evidence in this
> case.

[ECF No. 115, pp. 2-3]. But again, to the extent Defendants believe that the proposed

remedial information campaign reaches too large an audience, is for too long a time,

should be limited to a smaller geographical area, etc., these are all topics that Defendants

will be able to explore on cross-examination.

In *PODS Enters., LLC v. U-Haul Int'l, Inc.*, the defendant ("U-Haul") filed a post-

trial motion attacking an award of damages for corrective advertising supported by Dr.

Winer's trial testimony. 126 F. Supp. 3d 1263 (M.D. Fla. 2015). One of the arguments

raised by U-Haul was that Dr. Winer's opinion was overinclusive: "U-Haul argues that

the 113.6 million misimpressions were overstated, as they included all searches for 'pods'

on search engines, even those that did not result in clicks on U-Haul websites." *Id.* at 1283.

The court found that U-Haul's argument concerned "the weight of the evidence, a matter

within the province of the jury." *Id.*

Similarly here, if Defendants believe Dr. Winer "casts such a wide net" and his

numbers should be more "tailored" [ECF No. 115, p. 2], then it is their burden to persuade

the jury on those points. As ADT points out, "if the jury doesn't agree with some or any of Dr. Winer's testimony, it does not have to award the full amount of damages Dr. Winer endorses." [ECF No. 125, p. 13].

Defendants also take issue with the fact that Dr. Winer relied on six or seven recorded calls provided to him by GBX (the litigation consulting firm he worked with), instead of reviewing all 1,300 audio files himself. [ECF No. 115, p. 15]. If Vivint believes Dr. Winer should have personally listened to more recorded calls, then they may delve into that line of questioning at trial, but it is not a ground for excluding Dr. Winer's expert testimony.

Lastly, Vivint accuses Dr. Winer of usurping the jury's role:

> ADT seeks to admit Winer's opinion that Vivint is liable under the Lanham Act because, among other things, (1) Vivint allegedly engaged in deceptive sales tactics by suggesting that ADT is an "inadequate, non-functioning, or fading corporate entity"; and (2) as a result, created customer confusion resulting in harm to ADT's brand. (Winer Report at ¶¶ 12-17, 92-95). Such statements are pure legal conclusions wholly outside of the purview of permissible expert testimony.

[ECF No. 115, pp. 17-18].

ADT responds that, at trial, "Dr. Winer will explain, from his expert marketing perspective, how and why Vivint's conduct is damaging to ADT's brand equity requiring corrective messaging, and what specific course of conduct would be required to attempt to restore it." [ECF No. 125, pp. 22-23].

The Court is confident that ADT (who is being represented by many seasoned and top-tier litigators) will ensure that Dr. Winer (having testified as a branding and marketing expert in numerous cases like this one) will "stay in his lane" and not opine on matters that are reserved for the jury, such as liability and causation. Nonetheless, should a concern arise at trial, either party may timely raise the issue with the Court.

In sum, the Court finds that Defendants' arguments affect the weight to be afforded to Dr. Winer's damages opinions, rather than their admissibility, and his report and testimony will therefore not be excluded under *Daubert*.

### **Dr. Eric Matolo**

### 1.  **Background**

Dr. Matolo has "a Ph.D. and an M.A. in economics from the University of California at Santa Barbara, and a B.A. in economics/mathematics from the University of California at Santa Barbara" and "actively employed in the area of economic analysis and/or economic instruction for over 14 years." [ECF No. 119-16, ¶ 5].[7]

Plaintiffs retained Dr. Matolo to quantify and opine on royalty damages incurred after December 20, 2017, in connection with Plaintiff's Lanham Act and common law unfair competition claims. *Id.* at ¶¶ 2-3.

---

[7]      Vivint does not challenge Dr. Matolo's qualifications.

2.      **Analysis**

Defendants seek to exclude Dr. Matolo's opinions in their entirety based on (lack of) reliability and (un)helpfulness grounds. [ECF No. 116]. They argue that: "(A) [Dr.] Matolo's wholesale adoption of the ADT Model is unreliable; (B) [Dr.] Matolo's wholesale adoption of [Dr.] Mangum's Representative Industry Model is unreliable; and (C) [Dr.] Matolo has not "reliably applied" either model "to the facts of [this] case." *Id.* at 4.

Dr. Matolo calculated two royalty percentage rates using an ADT Dealer Revenue Sharing Model ("ADT Model"), which yielded a 22 percent royalty rate, and a Representative Dealer Revenue Sharing Model ("Industry Model"), which yielded a 24.4 percent royalty rate. [ECF No. 119-16].

Defendants seek to exclude both revenue sharing models as unreliable. They also argue that Dr. Matolo's royalty base opinion -- i.e., the application of the 22 percent royalty rate to a portion of Vivint's sales for the years 2018, 2019, and 2020 -- is flawed because it is not tied to revenue attributable to Vivint's alleged misconduct.

At the outset, the Undersigned notes that Vivint does not dispute that forced royalty rates can be a measure of damages in certain Lanham Act cases. [ECF No. 133, p. 2 ("Vivint agrees with ADT that a reasonable royalty based on market measures can be an appropriate measure of actual damages in a trademark infringement case."); *id.* ("Vivint does not argue that the royalty damages theory itself is improper or

speculative[.]"); *id.* at 3 ("[I]t is generally accepted methodology to review comparable license agreements to develop a 'market measure,' a measure discerned from reviewing actual past transactions from the market.")]. Nonetheless, Vivint argues that the manner in which Dr. Matolo formulated his damages opinions does not pass muster under *Daubert*. For the reasons discussed below, the Court agrees.

### a.     ADT Model

Dr. Matolo used the ADT Model to calculate a 22 percent forced royalty rate. Vivint argues that Dr. Matolo's opinions concerning the ADT Model must be excluded because he purportedly "wholesale adopt[s] . . . the opinions and conclusions of [unknown person(s) at ADT who developed the ADT Model], without any independent analysis of his own[.]" [ECF No. 119, p. 9].

Plaintiffs maintain that:

> Dr. Matolo's proposed royalty rate is not hypothetical—it is based on market measures directly tied to how ADT shares revenue with its existing authorized dealers. Dr. Matolo's opinion and methodology are also neither unique nor novel. Over the past decade Dr. Matolo and his colleague Dr. Russell Mangum have presented virtually identical expert opinions employing the same methodology in numerous courts on behalf of ADT (including to this very Court in three separate cases), each of which have allowed those opinions and methodology to be presented to the jury.

[ECF No. 127, pp. 1-2]. They note that "[t]he same methodology was also approved by this Court in ADT's prior litigation against Vivint," 2017 Lawsuit. *Id.* at 7 (citing *ADT LLC*

*and ADT US Holdings, Inc. v. Vivint, Inc.*, Case No. 9:17-cv-80432- DMM/DLB, DE 170 (S.D. Fla. Nov. 15, 2017).

Plaintiffs point out that "over 200 authorized ADT dealers have already negotiated a right to use the ADT name and trademarks in return for sharing a portion of the revenues generated by new accounts with ADT[.]" *Id.* at 4-5. "[T]he dealers pay ADT an implied royalty under the respective ADT dealer agreement (i.e., the ADT Revenue Sharing Model)." *Id.* at 5 (citing *ADT & ADT US Holdings, Inc. v. Alarm Prot. LLC*, No. 9:15-CV-80073, 2017 WL 2212541, at *3-4 (S.D. Fla. May 17, 2017)).

Plaintiffs provided the ADT Model to Dr. Matolo. But Dr. Matolo did not review the underlying data. He did not verify the numbers or components that make up the ADT Model to determine whether it made sense to include them, whether there were any missing components which should have been included, or whether there was a sound basis, from an economic perspective, for the model.

While Dr. Matolo made some tweaks to the ADT Model (for instance, adjusting the percentage figure to account for "ADT [ ] not providing the monitoring service") [ECF No. 119-16, ¶ 37], there is no dispute that the ADT Model was used to calculate the net present value for the dealer agreements, *id.* at ¶ 33 ("ADT has created an analytical model to identify the value (the Net Present Value, or 'NPV') to ADT of the dealer relationship") (footnote omitted)).

46

Vivint alleges (and ADT does not materially dispute) that "[Dr.] Matolo undertook no substantive analysis of ADT's data on his own[.]" [ECF No. 116, p. 7].

ADT argues the ADT Revenue Sharing Model is not a "theory" or "opinion" but rather "an existing business tool that allows ADT to calculate the Net Present Value . . . to ADT for any particular dealer relationship regardless of the amounts the dealer takes up-front versus through recurring revenue." [ECF No. 127, at 10]. They note that "ADT uses this model to run its dealer business and has for many years." *Id.* Plaintiffs state that "[t]he model reflects the **actual** economics of ADT's past and present agreements with its dealers, i.e., it constitutes the established royalty rate to affiliate with ADT." *Id.* at 11.

It may well be that Plaintiffs will introduce at trial the **fact** that ADT uses a revenue sharing model as part of its business. Vivint even suggests that "this one page document . . . may meet the standard for a business record under Fed. R. Evid. 803(6)." [ECF No. 133, p. 7]. But that does not mean that ADT gets to paint the ADT Model with the veneer of expertise simply because they handed it to their expert.

ADT also argues that it was not necessary for Dr. Matolo to verify the ADT Model in formulating his opinion on a reasonable royalty rate in the instant case because "'courts often conclude that experts are permitted to rely on information provided by clients without confirming the accuracy.'" [ECF No. 127, p. 12 (quoting *Companhia Energetica Potiguar v. Caterpillar Inc.*, No. 14-CV-24277, 2016 WL 11547499, at *12 (S.D. Fla. June 13,

2016), report and recommendation adopted, No. 14-24277-CIV, 2016 WL 7497339 (S.D.

Fla. Sept. 20, 2016))].

> To be sure, as this Court has noted,

> an expert witness is not a private investigator hired to investigate the accuracy of each report or document he uses in creating his report. Instead, the documents or data an expert witness utilizes **must only be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."**

*Platypus Wear, Inc. v. Clarke Modet & Co.*, No. 06-20976-CIV, 2008 WL 4533914, at *5 (S.D.

Fla. Oct. 7, 2008) (citing Fed. R. Evid. 703) (emphasis added). On the other hand, "[a]n

expert cannot parrot the opinions and conclusions of other experts whose testimony is

not subject to cross-examination." *Robison v. Cont'l Cas. Co.*, No. 1:17-CV-508, 2022 WL

336900, at *9 (E.D. Tex. Jan. 6, 2022) (citation omitted).

In *Companhia Energetica Potiguar*, the Undersigned rejected the argument that "a

damages expert witness, such as an accountant, must himself personally and

independently verify the accuracy of information provided by the party who retained

that expert" and noted that "**expert accountants routinely rely on financial information**

**provided by their clients when reaching opinions about financial loss (or other**

**accounting-related issues)**." 2016 WL 11547499 at *2 (emphasis added).

But this "routine reliance" component is missing from Dr. Matolo's report. In

*United States v. Athens Orthopedic Clinic, P.A.*, for example, the court found that the

opinion of an economist, Dr. Bruce Seaman, met the reliability prong of *Daubert* because

he ensured it was of the type used by other economists for the same purpose:

> Dr. Seaman's job here was to determine how to use the available data to
> project the claims for the years where only Medicare Part B data was
> available and data for the rest of Government-payor claims was missing.
> **He considered claims data that had been captured by [another expert,] Dr.
> Matthew Mercurio. Based on the correspondence Dr. Seaman reviewed,
> he was comfortable that Dr. Mercurio's data was processed in a way such
> that it was the type of data economists typically rely on in performing the
> type of analysis Dr. Seaman did here.** Dr. Seaman derived a simple
> average of the ratios across all years, then determined the variance,
> standard deviation, and coefficient of variation. Based on the results, Dr.
> Seaman determined that the use of mean data was justified to project the
> missing claims data, and he applied an adjustment factor to the relevant
> data to project the claims amounts for the missing data years.

No. 3:15-CV-122 (CDL), 2022 WL 4554424, at *3 (M.D. Ga. Sept. 29, 2022) (emphasis

added). Thus, while Dr. Seaman obtained data gathered by another expert, he also took

the important step of ensuring that "he was comfortable that Dr. Mercurio's data was

processed in a way such that it was the type of data economists typically rely on in

performing the [same] type of analysis[.]" *Id.*

    This critical step was not taken here. Dr. Matolo did not review the ADT formula

or any of the dealer agreements to ensure that, from an economics perspective, it was the

type of data routinely relied on by other experts in performing this type of formulation.

He simply took the piece of paper provided to him by an ADT employee and plopped it

into his report.

This blind and unquestioning adoption of ADT's revenue sharing model is incompatible with the requirements of *Daubert*. *See Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268, 275 (E.D. La. 2014) ("The crucial issue is whether Dr. Sanford independently evaluated or verified the opinions upon which he relies. Dr. Sanford conceded in his deposition that he did not read most of the material cited in the opinions nor verify the data referenced therein. Thus, it is clear that Dr. Sanford did not undertake the kind of independent evaluation that *Daubert* and Rule 702 require. He merely parroted the opinions and conclusions of other experts whose testimony is shielded from cross examination. The Court cannot allow Dr. Sanford's testimony into evidence without abdicating its role as gatekeeper.").

Noticeably absent from Plaintiffs' defense of the ADT Model is any application of the traditional gauges of reliability: "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant [ ] community." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001).

The Undersigned notes that the ADT Model is **unique to ADT**. It was developed by and for ADT. **No other company (in the alarm industry or otherwise) uses it.** Plaintiffs have not introduced any evidence that other companies use similar models. In fact, ADT closely guards the ADT dealer revenue sharing model. It was redacted from

Dr. Matolo's publicly available report and is akin to (or is) proprietary information. Therefore, it *cannot* be widely used or generally accepted (or evaluated by other, similar experts).

Thus, instead of the traditional measures of reliability, ADT relies heavily on the fact that a few other courts have allowed Dr. Matolo (and Dr. Mangum) to provide expert testimony on the ADT Model.

The Undersigned acknowledges that other courts have ruled in favor of admissibility:

In the 2017 Lawsuit, for instance, Judge Middlebrooks addressed Vivint's *Daubert* challenge to ADT's then expert, Dr. Mangum. Like Dr. Matolo, Dr. Mangum "conclude[d] that ADT's damages can be modeled in the form of a royalty [payment] and that the appropriate royalty amount [was] 22 percent of revenues earned from home monitoring, security and automation products/services for accounts generated during the timeframe contemplated in the Complaint (i.e., 2013-2016)." [ECF No. 170 in Case No. 9:17-cv-80432-DMM/DLB, p. 3 (citation and internal quotation marks omitted)].

Judge Middlebrooks ruled that "[w]hether or not the ADT dealer model is a proper reference point is a question for the jury and does not affect the evidence's admissibility." *Id.* at 4. He also ruled that "[w]hether [Dr.] Mangum should have considered [a 1.65%] royalty rate" set forth in the Trademark Licensing Agreement between ADT US

51

Holdings, Inc., and ADT, LLC "[was] an issue more appropriately explored on cross examination and [did] not affect the admissibility of his testimony and report." *Id.* at 4.

Nonetheless, Judge Middlebrooks also agreed with Vivint that a portion of Dr. Mangum's opinion -- the percentage of Vivint's revenue to which the 22 percent royalty rate would be applied -- should be excluded because he sought to apply this rate "to ***all*** of Vivint's revenues earned from home monitoring, security and automation products/services for accounts generated during the [relevant] timeframe" and "ADT ha[d] failed to identify evidence suggesting that this sweeping damages calculation reflect[ed] damages actually attributable to Vivint's alleged misconduct." *Id.* at 6 (emphasis added; internal quotation marks omitted).

In sum, Judge Middlebrooks ruled that ADT's expert "[could] testify as to an appropriate royalty rate applicable to ADT's claim for a forced royalty but [could] **not** testify that the royalty rate should be applied to Vivint's revenues that [were] not actually attributable to Vivint's alleged misconduct." *Id.* (emphasis added).

More recently, in a case brought by ADT against a competitor for allegedly deceptive door-to-door sales practices, Judge Aileen M. Cannon addressed the defendants' *Daubert* challenge to ADT's expert, Dr. Matolo. *ADT LLC v. Safe Home Sec. Inc.*, No. 20-23918-CIV, 2022 WL 3702839 (S.D. Fla. June 21, 2022). One of the grounds raised by the defendants in that case was that "Dr. Matolo's 'forced royalty' theory of

damages" was unreliable because "[his] methodology was not generally accepted[,] and that his analysis . . . ignored over a dozen factors that needed to be considered in order to render a sound opinion[.]" *Id.* at *2 (citation and internal quotation marks omitted).

Judge Cannon found no "basis to exclude Dr. Matolo's expert opinion under *Daubert* or Rule 702" and noted that "as to the substance of Dr. Matolo's 'forced royalty' theory of damages[,] [the] [d]efendants' challenges to such theory go to the weight of Dr. Matolo's opinions and can be probed more properly via the conventional means of cross-examination and contrary evidence." *Id.*

But Plaintiffs must first convince *this* Court, in its gatekeeper role, that Dr. Matolo's opinions concerning the ADT Model are reliable. They have not done so. The Undersigned finds that Plaintiffs have not carried their burden of showing that Dr. Matolo's opinion based on the ADT Model is reliable under Federal Rule of Evidence 702 and *Daubert*. For all practical purposes, Dr. Matolo merely adopted the ADT Model even though it has *none* of the traditional indicia of reliability, including being tested, being capable of testing, having an error rate, being peer reviewed, being published, or being generally accepted in the relevant expert community.

Dr. Matolo's blind, wholesale adoption and use of the ADT Model is akin to ADT handing him a piece of paper and saying "here is the royalty rate you will reach if you

review all of our contracts with our dealers." This is patently insufficient for expert opinion under Rule 702.

As noted above, ADT alleges the ADT Model is an "established market measure," rather than an opinion or theory. In doing so, ADT conflates the admissibility of the purported "fact" of the ADT Model with the admissibility of expert opinion. ADT states: "[the ADT Model] is not some contrived 'expert' opinion that Dr. Matolo relies upon in rendering his opinions; it is an established economic model that ADT actually uses in the real world to run its authorized dealer business." [ECF No. 127, p. 9]. But Vivint does not argue that the ADT Model is based on "hypotheticals" or "conjecture," nor does it deny that ADT actually uses the model to "run its dealer business." *Id.* at 9-10.

Instead, Vivint simply emphasizes that use in ADT's business is not the proper standard for admissibility of expert opinion. Indeed, as mentioned above, this one-page document reviewed by Dr. Matolo may well meet the standard for a business record under Fed. R. Evid. 803(6). Nevertheless, *that* is not the standard for the admissibility of **expert** testimony under Fed. R. Evid 702. There is a vast difference between ADT *using* the ADT Model in its business and Dr. Matolo relying on it as the primary basis for his expert conclusions. ADT may use the model in its own business decisions, of course, but expert opinion requires more, especially when the model clears none of the admissibility hurdles erected by courts to gauge reliability.

54

b.      **Industry Model**

Defendants also seek to exclude Dr. Matolo's opinions concerning the representative dealer revenue sharing model on the ground that it is a "novel methodology [that] has not been applied by other experts aside from [Dr.] Matolo and his colleague, [Dr.] Mangum" and "has not been tested, not subject to peer review, and not generally accepted in the scientific community." [ECF No. 119, p. 10].

ADT does not meet Defendants' challenges to the Industry Model head on. Rather than defend the Industry Model, ADT argues that "Dr. Matolo cites the Industry [M]odel only as verification that the ADT-specific model 'checks out' when you compare it to other similar economic relationships between other providers and dealers in the industry." [ECF No. 127, p. at 17].

ADT's failure to address this argument in its response concedes the point. *See Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) ("'[A] party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed.'" (quoting *Kramer v. Gwinnett Cnty., Ga.*, 306 F. Supp. 2d 1219, 1221 (N.D. Ga.2 004) (alteration in original)); *Ryder Truck Rental, Inc. v. Logistics Res. Sols., Inc.*, No. 21-21573-CIV, 2022 WL 1238665, at *9, n.4 (S.D. Fla. Apr. 14, 2022) ("[B]y failing to respond to [the movant]'s arguments on [an] issue, [the non-movant] ha[d] essentially

conceded that it ha[d] failed to carry its burden of establishing that [its expert]'s opinion ha[d] any relevance to . . . [a specific] claim.").

Here, Defendants raised specific arguments, supported by case law for why the Industry Model should be excluded under *Daubert's* reliability prong. Plaintiffs side-stepped these arguments in a section titled: "Dr. Matolo's opinion does not depend on the [ ] Industry Model; it uses it only as a 'check' on the ADT-specific model used to calculate the royalty applicable to Vivint." [ECF No. 127, p. 14].

The burden of establishing the reliability of an expert's opinions rests on the proponent of that expert's testimony. *Frazier*, 387 F.3d at 1260; *see also Allison*, 184 F.3d at 1306 (The party proffering the expert also has the burden of "laying the proper foundation for the admission of the expert testimony . . . and admissibility must be shown by a preponderance of the evidence."). Because ADT fails to defend the Industry Model on substantive *Daubert* grounds, the Undersigned will exclude Dr. Matolo's opinion to the extent it relies on or in any way uses the Industry Model.

### c.      Royalty Base

To calculate the royalty base ($25.4 million), Dr. Matolo applied the 22 percent royalty rate from the ADT Model to a certain percentage of Vivint's revenues for the years 2018, 2019, and 2020. [ECF No. 119-16, ¶¶ 52-54]. Vivint argues that Dr. Matolo's methodology is not related to the scope of the alleged infringement here because "[his]

calculations do not differentiate or quantify the Vivint subscribers that originated from ADT, switched to ADT, or were subject to alleged misconduct." [ECF No. 116, p. 14].

While the parties agree that the precise number of ADT customers who were affected by Vivint's alleged misconduct is unknown, they squabble over who is at fault for this missing piece of the puzzle and whether ADT's market share is an appropriate substitute. *See* [ECF Nos. 127, p. 19 ("[A]pparently lost on Vivint is the fact that [the total number of new subscribers subjected to Vivint's alleged misconduct] is simply not available or it is exclusively in the possession of Vivint, and it has refused to produce it."); *id.* at 20 ("Vivint now seeks to benefit from its refusal to monitor and record the misconduct of its sales."); 133, p. 11 ("ADT attempts to reframe [Dr.] Matolo's lack of knowledge regarding the number of new subscribers that were actually subject to misconduct as Vivint's own doing based on previously resolved discovery disputes. . . . Alleged 'discovery concerns' simply do not excuse an expert from applying a reliable methodology that comports with the law.")].

In any event, because Dr. Matolo will not be opining on a royalty rate (either under the ADT Model or the Industry Model), it is not necessary for the Court to determine whether Dr. Matolo's $25.4 million royalty base opinion is sufficiently tied to Vivint's alleged misconduct in this case.

**IV.     Conclusion**

For the reasons discussed above, the Court will exclude customer complaints (and summaries of complaints) as inadmissible hearsay. This ruling does not foreclose the possibility that customer complaints may be admissible for the non-hearsay purpose of showing notice. The Court is also reserving ruling on the *number* of complaints received by Vivint because there may be a possibility that a redacted spreadsheet (redacting the customer comments section) could be admissible.

External proceedings (including lawsuits and investigations) are inadmissible hearsay and will be excluded from trial for truth purposes. Nonetheless, to the extent that any evidence exists of specific Vivint officers, executives, or managers speaking about (or writing about) allegations of deceptive misconduct by their sales representatives, ADT may cross-examine those witnesses on that evidence, if appropriate. The Court will defer ruling until trial on the issue of whether Vivint's statements in other Vivint-filed lawsuits are party admissions. Either party may revisit at trial the deferred rulings outlined above.

The Court will not exclude Dr. Winer based on Defendants' *Daubert* challenges. Defendant's challenges to Dr. Winer's opinions can be probed through rigorous cross-examination and through the presentation of contrary evidence. Nonetheless, the Court warns ADT that to the extent Dr. Winer relies on hearsay evidence (e.g., customer complaints and external proceedings), ADT may not use him to "parrot" already

excluded or inadmissible evidence. *See United States v. Scrima*, 819 F.2d 996, 1002 (11th Cir. 1987) ("Rule 703 . . . is not an open door to all inadmissible evidence disguised as expert opinion.").

The Court will exclude Dr. Matolo as an expert at trial. ADT has failed to meet its burden of showing that Dr. Matolo's opinions meet *Daubert's* reliability prong.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on May 19, 2023.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
All counsel of record